Stephen Karotkin
Martin A. Sosland (*pro hac vice admission pending*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                            :
In re                                       :        Chapter 11
                                            :
BLOCKBUSTER INC., et al.,¹                  :        Case No. 10-_____ (__)
                                            :
                                            :        (Joint Administration Requested)
                        Debtors.            :
-------------------------------------------------------------x
```

**DEBTORS' MOTION PURSUANT TO**
**11 U.S.C. §§ 105(a), 363(b), AND 503(b) REQUESTING AUTHORITY**
**TO HONOR CERTAIN UNDISPUTED PREPETITION OBLIGATIONS**
**OF CERTAIN ESSENTIAL VENDORS, SUPPLIERS, AND SERVICE PROVIDERS**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Blockbuster Digital Technologies Inc., its parent Blockbuster Inc., and their

debtor affiliates, as debtors and debtors in possession (collectively, "***Blockbuster***" or the

"***Debtors***"), submit this motion (the "***Motion***") and respectfully represent as follows:

---

[1]     The Debtors, together with the last four digits of each Debtor's federal tax identification number, are:
Blockbuster Inc. (5102); Blockbuster Canada Inc. (1269); Blockbuster Digital Technologies  Inc.
(9222); Blockbuster Distribution, Inc. (0610); Blockbuster Gift Card, Inc. (1855); Blockbuster Global
Services Inc. (3019); Blockbuster International Spain Inc. (7615); Blockbuster Investments LLC
(6313); Blockbuster Procurement LP (2546); Blockbuster Video Italy, Inc (5068); Movielink, LLC
(5575); Trading Zone Inc. (8588); and B² LLC (5219).

# I.

## BACKGROUND

1.     On September 23, 2010 (the "***Commencement Date***"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").  The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").

# II.

## BLOCKBUSTER'S BUSINESS

2.     More than twenty five years ago, Blockbuster became the first national retail chain provider of in-home entertainment, with its blue and gold torn-ticket logo symbolizing the decision by consumers to forego the movie theatre experience and "Make it a Blockbuster Night"[®] by staying home to watch the latest in new movie title releases from the convenience of their living rooms.  Since its incorporation in 1982, Blockbuster has expanded its retail business operations domestically and abroad via a mix of corporate and franchisee-owned stores, with, as of August 29, 2010, over 5,600 stores in the United States and its territories and 16 other countries.  To manage its business and properties, Blockbuster employs approximately 25,500 employees who perform a variety of critical functions, including customer service, inventory control, management, leasing, accounting, marketing, purchasing and sales, shipping, tax, technical services, and legal services.

A. **Domestic Operations**

3.     Blockbuster operates its domestic media entertainment business through three principal channels of distribution: (i) retail; (ii) by-mail; and (iii) digital.  As a result of this multi-channel distribution scheme, Blockbuster offers customers a value-priced entertainment experience, combining the broad array of products offered by a specialty or online retailer with the convenience of a local neighborhood retailer.

1.     *Retail Channel*

4.     The convenience offered to customers by having Blockbuster stores located in their cities, towns, and neighborhoods has been instrumental in establishing the BLOCKBUSTER® brand.  As of August 29, 2010, there were 3,306 stores operating under the BLOCKBUSTER® brand in the United States and its territories.  Of these stores, 2,924 are owned and operated by Blockbuster Inc. and 382 stores are owned and operated by franchisees. Blockbuster stores offer movies and games (collectively, "***Product***") for rent and purchase (both new and previously-viewed) as well as other-entertainment related consumer electronics and accessories, game consoles, confection, and movie-related merchandise for purchase. Additionally, approximately 240 of these locations include store-in-store game locations operating under the GAME RUSH® brand.

5.     In step with its continued commitment to be the premier retailer of new release movies, Blockbuster has recently focused on promoting its rapidly emerging availability advantage over certain of its key competitors, who do not have access to key new Product for the initial 28 days of release (the "***28-day Window***").  In 2009, the 28-day Window was imposed by certain movie studios on the rental of newly released titles after the initial distribution date of a title so as to diminish the effect of rental on the retail sale of such titles.  Given that a substantial

portion of Blockbuster's rental revenues are derived from the rental of such new release Product, Blockbuster's advantage with respect to the 28-day Window is expected to maintain and improve its customer preference and loyalty in comparison to its competitors.

6.　　To expand its retail reach, in early 2009, Blockbuster entered into an agreement with NCR Corporation ("***NCR***") to launch BLOCKBUSTER Express® branded vending kiosks.　Through this partnership, NCR builds and maintains the kiosks and pays royalties to Blockbuster on the revenues generated.　This agreement allows Blockbuster to compete in the popular vending kiosk channel without incurring capital expenditures and start-up costs on its own account, while making Product more convenient and less expensive for its customers.　As of September 19, 2010, there were approximately 6,630 kiosks operating under the BLOCKBUSTER Express® brand throughout the United States and its territories.

### 2.　　By-Mail Channel

7.　　Blockbuster offers a by-mail subscription program through its retail chain and through its website, www.blockbuster.com, whereby customers rent Product that is delivered directly to them by-mail.　The by-mail subscription program provides customers access to substantially more Product than is available in its stores, and allows Blockbuster to compete directly with certain of its key competitors.　In contrast to its competitors, Blockbuster offers:　(i) a wide selection of games and (ii) Blu-ray Product at no additional charge.　Through its BLOCKBUSTER Total Access™ program ("***Total Access***"), Blockbuster also offers its by-mail subscribers the ability to exchange up to five online movie rentals for in-store movies at its retail locations for only a few dollars more per month.　The by-mail subscription program allows Blockbuster to reach customers located in geographic areas where it does not operate store locations.

8.     In order to promote the synergies between its retail and by-mail channels of distribution and to profitably grow its by-mail customer base, Blockbuster recently launched a marketing partnership with Comcast Cable Corporation ("***Comcast***").  This partnership includes the launch of *DVDs by Mail,* a co-branded by-mail offer available at www.DVDsbymail.com. As part of the marketing partnership, Comcast customers are now being offered Blockbuster's by-mail services (both by-mail and Total Access-like products) through the new co-branded web site as an additional service within their Comcast package.  On the site, customers can browse Blockbuster's vast library of more than 95,000 movie and television titles, create a queue of titles they want to rent and then get the DVDs through the mail or at a Blockbuster retail store, where they can also exchange their rentals.  In turn, Blockbuster is installing Comcast-dedicated kiosks in select stores that allow customers to quickly and easily learn about, and sign up for, Comcast services.

### 3.     *Digital Channel*

9.     As new distribution channels have emerged and as consumer interest in accessing Product in new ways has grown, Blockbuster has begun to expand its footprint into the digital realm.  To that end, Blockbuster's digital business currently offers its customers on-demand access to one of the largest libraries of digital movies for both rental and sale through multiple formats.  Blockbuster began its digital initiatives with the purchase of Movielink from a consortium of movie studios in 2007.

10.     Through Blockbuster's website, www.blockbuster.com, Blockbuster customers can download and view movies on their personal computers after downloading Blockbuster's personal computer application.  In addition, with the convergence of media entertainment and electronic devices, Blockbuster recently entered into strategic partnerships

with certain global third party consumer electronics device developers – including Samsung, Philips, TiVo, and Toshiba – to digitally deliver media entertainment to its customers through consumer electronics such as Internet-connected TVs and Blu-ray players through Blockbuster applications embedded in these devices. In the mobile space, Blockbuster has partnered with device makers such as Motorola and HTC, embedding Blockbuster's digital applications in its popular new models for Verizon and T-Mobile. Blockbuster is also pursuing partnerships with Cable TV providers to offer Blockbuster-branded video-on-demand services inside an operator's set-top-box infrastructure.

**B.     International Operations**

11.     Blockbuster's international operations, which serve as ambassadors of the BLOCKBUSTER® brand, are comprised of all store operations outside the United States and its territories, including: (i) owned retail operations in Canada, the United Kingdom, Denmark, Italy, Mexico, Argentina, and Uruguay; and (ii) franchised retail operations in Australia, Brazil, Chile, Columbia, Guatemala, Israel, Italy, Mexico, New Zealand, Panama, Portugal, and Taiwan. As of August 29, 2010, Blockbuster had 2,333 stores in 16 markets outside of the United States operating under the BLOCKBUSTER® brand, the GAME RUSH® brand, and other brand names owned by Blockbuster. During 2008 and 2009, 29% and 30% of Blockbuster's revenues were generated outside of the United States, respectively. Blockbuster's international operations have historically been more dependent than the domestic operations on retail sales and, in particular, sales of games, as opposed to revenue generated from rentals.

**C.     Financials**

12.     As of July 4, 2010, the Debtors, on a consolidated basis, reported approximately $1.2 billion in total assets and approximately $1.6 billion in total liabilities. For

2009, Blockbuster reported consolidated revenues of approximately $4.1 billion and net cash from operating activities of $29.3 million.

13. Additional information regarding Blockbuster's business, capital structure, and the circumstances leading to these chapter 11 cases is contained in the *Affidavit of Jeffery J. Stegenga Pursuant to Local Bankruptcy Rule 1007-2 in Support of First Day Motions* (the "***First Day Affidavit***") filed contemporaneously herewith.

## III.

## JURISDICTION

14. This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## IV.

## RELIEF REQUESTED[2]

15. By this Motion, pursuant to sections 105(a), 363(b), and 503(b) of the Bankruptcy Code, the Debtors seek discretionary authority to pay, in the exercise of their sound business judgment, certain undisputed prepetition obligations ("***Essential Vendors' Claims***") owed to certain of their key vendors, suppliers, service providers and similar counterparties that the Debtors deem essential to maintaining Blockbuster's ongoing business operations (the "***Essential Business Vendors***"). The proposed form of order approving the relief requested herein on an interim basis is annexed hereto as ***Exhibit "A"*** (the "***Interim Order***") and, on a final basis, as ***Exhibit "B"*** (the "***Final Order***" and, with the Interim Order, the "***Orders***").

---

[2] Capitalized terms used but not defined in this prayer for relief shall have the meaning ascribed to them in the balance of this Motion.

16.     In recognition of the extraordinary nature of the relief requested herein, and so as to ensure the benefit estimated to these estates are preserved, the Debtors propose to condition payment of any Essential Vendors' Claim on that Essential Business Vendor's binding agreement to continue supplying its goods or services to the Debtors on Customary Trade Terms (as defined below) during the pendency of these cases.  In the event that such Essential Business Vendor, after receipt of payment, fails to provide the Debtors with any goods and/or services requested upon customary trade terms and/or contractual terms (together, "***Customary Trade Terms***") during the pendency of these chapter 11 cases, the Debtors further propose that such postpetition payment be deemed an unauthorized postpetition transfer and, therefore, recoverable by the Debtors pursuant to section 549 of the Bankruptcy Code.

17.     Lastly, the Debtors also request that the Court authorize and direct all banks and other financial institutions (each, a "***Bank***" and collectively, "***Banks***") on which checks are drawn or electronic funds are transferred with respect to the Essential Vendors' Claims to receive, process, honor, and pay, to the extent of funds on deposit, any and all such checks or electronic transfers, whether such checks or transfers were issued before or after the Commencement Date, upon the receipt by each Bank of notice of authorization without further order of the Court.

## V.
## THE ESSENTIAL BUSINESS VENDORS

### A.      Blockbuster's Relationship with the Essential Business Vendors

18.     As discussed above, Blockbuster maintains three distinct channels for the distribution of its Product for rental and/or sale to its customers: (i) retail; (ii) by-mail; and (iii) digital.

19.     Blockbuster is dependent upon the Essential Business Vendors for a variety of goods and/or services.  With respect to the retail and by-mail channels, certain of the Essential Business Vendors supply the materials, equipment, software, and technical support necessary to the manufacturing process by which Blockbuster converts unpackaged, generic Product into Blockbuster branded Product.  With respect to the digital channel, certain of the Essential Business Vendors provide Blockbuster with the platforms from which users can download digital Product, as well as supply Blockbuster with the necessary software, hardware, licenses and technical support to maintain such platforms.  These services are highly technical and specialized, and have been tailored to meet Blockbuster's specific requirements.

20.     The Essential Business Vendors are critical to Blockbuster's day-to-day operations because either they are the only source for a particular part, supply or service, or because obtaining a replacement source would entail substantial delay or significantly increased costs.  Moreover, in some instances, the Debtors have essentially outsourced certain of their operations to these Essential Business Vendors.  As a result, the Debtors and such Essential Business Vendors have a symbiotic relationship whereby the success, and failure, of one depends on the other.  Thus, in the event of a failure by any of the Essential Business Vendors, the Debtors believe they would have no alternative supplier or service provider.  Thus, to ensure a seamless transition into chapter 11 and prevent undue harm to these estates, the Debtors seek the relief requested herein.

21.     The Debtors estimate that, as of the Commencement Date, the total amount of undisputed, outstanding prepetition obligations due to the Essential Business Vendors for which the Debtors seek authority to pay is approximately $1.3 million and, of such amounts,

approximately $300,000 are on account of section 503(b)(9) claims. Of this total, approximately $300,000 is estimated to become due during the first 21 days of these cases.

**B.**     **Proposed Terms of Payment**

22.     As set forth above, the Debtors propose to condition payment of any Essential Vendors' Claim on that Essential Business Vendor's binding agreement to continue on a postpetition basis to supply its goods or services to the Debtors on Customary Trade Terms. To facilitate this process, the Debtors propose that each selected Essential Business Vendor execute a simple letter agreement (the "***Essential Vendor Agreement***") attached hereto as "***Exhibit C***".

23.     A summary of the key terms of the Essential Vendor Agreement is as follows:

1. The Essential Business Vendor agrees to be bound by the executed Essential Vendor Agreement throughout the pendency of the chapter 11 cases.

2. The Customary Trade Terms shall be those trade terms between the Debtors and the Essential Business Vendor that were in effect the day prior to the Commencement Date, or such other terms as agreed between the Debtors and the Essential Business Vendor, pursuant to the executed Essential Vendor Agreement. These Customary Trade Terms shall include, but not be limited to, credit terms, historical pricing conventions, historical product volumes, cash discounts, payment terms, allowances, rebates, normal product availability, and other applicable terms.

3. By executing the Essential Vendor Agreement, the Essential Business Vendor acknowledges that it has reviewed the terms and provisions of the Motion and Orders and that it consents to be bound thereby.

4. If an Essential Business Vendor refuses to supply goods and/or services to the Debtors on Customary Trade Terms following receipt of payment on its Essential Vendor Claim, or fails to comply with any Essential Vendor Agreement entered into between such Essential Business Vendor and the Debtors, the Debtors may in their discretion, and without further order of the Court, (i) declare that payments made to the Essential Business Vendor on account of its Essential Vendors' Claims be deemed payment of any outstanding postpetition claims of such vendors, and (ii) require that the Essential Business Vendor immediately repay to

the Debtors any payment made to it in excess of the postpetition claim, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or otherwise.

5.  Any dispute with respect to the Essential Vendor Agreement or the Orders shall be determined by the Bankruptcy Court.

24.  The Debtors submit that there may be instances in which payment to an Essential Business Vendor, prior to or in lieu of an Essential Vendor Agreement being entered into, is necessary to avoid causing irreparable harm to Blockbuster's business operations. In those cases, the Debtors seek authority to make payments on account of such Essential Vendors' Claims, notwithstanding the fact that following diligent efforts to enter into an Essential Vendor Agreement with an Essential Business Vendor, no Essential Vendor Agreement has been reached.

## VI.

## BASIS FOR RELIEF REQUESTED

25.  The Debtors submit that the relief requested is reasonable and necessary under the circumstances and is justified by applicable law. To successfully reorganize, Blockbuster must be authorized to pay, in its sound business judgment, those undisputed claims of the Essential Business Vendors that, absent payment, would render immediate and irreparable harm to Blockbuster's business.

A.  **Payment of the Prepetition Claims Comports With the Debtors' Business Judgment and is Authorized Under Sections 363(b) and 105(a) of the Bankruptcy Code**

26.  Section 363(b)(1) of the Bankruptcy Code provides that, after notice and a hearing, the trustee "may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code further empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to

carry out the provisions of this title." *Id*. § 105(a). A Bankruptcy Court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). "Under Section 105, the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor." *In re NVR L.P.,* 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *Ionosphere Clubs*, 98 B.R. at 177).

27.     Federal courts have consistently permitted postpetition payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See*, *e.g.*, *Miltenberger v. Logansport Ry.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of [crucial] business relations"); *Dudley v. Mealey*, 147 F.2d 268 (2d Cir. 1945), *cert. denied*, 325 U.S. 873 (1945) (Second Circuit extends doctrine for payment of prepetition claims beyond railroad reorganization cases); *Mich. Bureau of Workers' Disability Compensation v. Chateaugay Corp. (In re Chateaugay Corp.*), 80 B.R. 279, 285-86 (S.D.N.Y. 1987), *appeal dismissed*, 838 F.2d 59 (2d Cir. 1988) (approving lower Court order authorizing payment of prepetition wages, salaries, expenses, and benefits); *In re Boston & Me. Corp.,* 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to debtors' continued operation).

28.     The doctrine of necessity functions in a chapter 11 case as a mechanism by which the Bankruptcy Court can exercise its equitable power to facilitate a successful reorganization by allowing payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code. *See In re Just for Feet, Inc.*, 242 B.R. 821, 824 (D. Del. 1999) (recognizing

that "[c]ertain pre-petition claims by employees and trade creditors . . . may need to be paid postpetition to facilitate a successful reorganization").

29.     The doctrine is frequently invoked early in a chapter 11 case.  The Court in *In re Structurelite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988), indicated its accord with "the principle that a Bankruptcy Court may exercise its equity powers under section 105(a) to authorize payment of prepetition claims where such payment is necessary to permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately."  The Court stated that "a *per se* rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." *Id.* at 932.  The rationale for the doctrine of necessity rule is consistent with the paramount goal of chapter 11 of "facilitating the continued operation and rehabilitation of the debtor." *Ionosphere Clubs*, 98 B.R. at 176.

30.     The continued relationship with the Essential Business Vendors is critical to Blockbuster's ability to deliver Products to its stores and customers.  The Essential Business Vendors associated with each channel of sale and/or rental have been specifically chosen to service Blockbuster's needs as effectively as possible and in the most cost efficient manner.  Furthermore, Blockbuster believes that the cost of establishing new relationships with alternative vendors will be substantially more expensive and disruptive to Blockbuster's operations.  Prior to the Commencement Date, Blockbuster began experiencing difficulty establishing relationships with alternative vendors, especially those who would offer trade terms similar or better than the ones in place with the Essential Business Vendors.  Therefore, there is a real possibility that should certain Essential Business Vendors cease doing business with the Debtors, the Debtors will not be able to find replacement vendors to deliver the supplies and services necessary to

continue operations in the ordinary course of business during these chapter 11 cases. Given this possibility, the Debtors submit that the amount of the Essential Vendors' Claims is *de minimus* in comparison to the value that will accrue to these estates' stakeholders from an uninterrupted production and supply of Product, whether in stores or online.

31.     Moreover, services that the vendors for the digital channel provide are highly specialized and cannot be easily acquired from alternative vendors without severe disruption to the Debtors' nascent digital business. In recognizing that the digital market for movies is a relatively new and developing area, the Debtors submit that continuing relationships with these vendors on a postpetition basis is essential in allowing Blockbuster to continue its expansion in this burgeoning area of the entertainment market.

32.     The relief sought herein is entirely consistent with the intent of section 105(a) of the Bankruptcy Code and the rehabilitative purpose of chapter 11, and similar relief has been granted in other chapter 11 cases of similar size in this district.[3] *See*, *e.g.*, *In re U.S. Shipping Partners L.P.*, *et al.*, Ch. 11 Case No. 09-12711 (RDD) (Bankr. S.D.N.Y. June 17, 2009) [Docket No. 197]; *In re Lenox Sales, Inc.*, *et al.*, Ch. 11 Case No. 08-14679 (MG) (Bankr. S.D.N.Y. Jan. 22, 2009) [Docket No. 240]; *In re Bally Total Fitness of Greater New York, Inc.*, *et. al.*, Ch. 11 Case No. 08-14818 (BRL) (Bankr. S.D.N.Y. Jan. 7, 2009) [Docket No. 388]; *In re Dana Corp.*, Ch. 11 Case No. 06-10354 (BRL) (Bankr. S.D.N.Y. Mar. 29, 2006) [Docket No. 722]; *In re Neff Corp.*, *et al.*, Ch. 11 Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. May 16, 2010) [Docket No. 128]; *In re Uno Restaurant Holdings Corporation*, Ch. 11 Case No. 10-10209 (MG)

---

[3]     Because of the voluminous nature of the unreported orders cited herein, such orders are not annexed to the Motion. Copies of these orders are available upon request of Debtors' counsel.

(Bankr. S.D.N.Y. Jan 20, 2010) [Docket No. 148]; *In re General Motors Corp.*, *et al.*, Ch. 11

Case No. 09-50026 (REG) (Bankr. S.D.N.Y. June 1, 2009) [Docket No. 2533].

**B.  Certain Essential Vendor Claims
May Be Entitled to Administrative Expense Priority
Status Pursuant to Section 503(b)(9) of the Bankruptcy Code**

33.  Section 503(b)(9) of the Bankruptcy Code provides that administrative

expense priority status shall be granted to creditors holding claims for "the value of any goods

received by the debtor within 20 days before the date of commencement of a case under this title

in which the goods have been sold to the debtor in the ordinary course of such debtor's

business." 11 U.S.C. § 503(b)(9). Blockbuster estimates that approximately 300,000 of the

amount—or 20%—that it seeks to pay to the Essential Business Vendors is derived from Product

received by Blockbuster within twenty (20) days prior to the Commencement Date. As such,

these Essential Vendors' Claims are entitled to administrative expense priority status.

Accordingly, other unsecured creditors will not be prejudiced by Blockbuster's payment of these

prepetition claims.

**C.  Applicable Banks Should Be Directed to Honor and Process
Checks and Transfers Related to the Essential Vendors' Claims**

34.  In furtherance of the relief requested herein, the Debtors request that the

Court authorize and direct their Banks to receive, honor, process, and pay, to the extent of funds

on deposit, any and all checks or electronic transfers requested or to be requested by the Debtors

relating to the Essential Vendors' Claims, including those checks or electronic transfers that have

not cleared the Banks as of the Commencement Date, without the need for further Court

approval.

35. The Debtors also seek authority to replace any prepetition checks or electronic transfers relating to the Essential Vendors' Claims that may be dishonored or rejected. Each of the checks or electronic transfers can be readily identified as relating directly to the authorized payment of the Essential Vendors' Claims. The Debtors believe that prepetition checks and electronic transfers, other than those for Essential Vendors' Claims, or those authorized by another order of the Court, may not be honored inadvertently. The Debtors also request that the Banks be authorized and directed to rely on the representations of the Debtors as to which checks and electronic transfers are in payment of the Essential Vendors' Claims.

**D.** **Deemed Compliance and/or Waiver with Applicable Bankruptcy Rules**

*1.* ***The Requested Relief Satisfies Bankruptcy Rule 6003***

36. Bankruptcy Rule 6003 provides that, except to the extent the relief requested is necessary to avoid immediate and irreparable harm to the debtor's estate, the court shall not, within 21 days after the filing of the petition, grant relief regarding a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition. As detailed above and as set forth in the First Day Affidavit, the Debtors submit that such relief is necessary to avoid immediate and irreparable harm to the Debtors and their estates and, accordingly, submit that Bankruptcy Rule 6003 is satisfied.

*2.* ***Waiver of Bankruptcy Rules 6004(a) and (h)***

37. Unless the Court orders otherwise, Bankruptcy Rule 6004(a) requires the Debtors to provide 21 days notice to all creditors and certain other parties in interest of the use of property outside the ordinary course of business. Moreover, unless the Court orders otherwise, Bankruptcy Rule 6004(h) automatically stays for 14 days any order granting such relief. As

described above and in the First Day Affidavit, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors that would otherwise be caused by a delay in the relief requested herein.

38. Accordingly, the Debtors request the Court waive (i) the notice requirements under Bankruptcy Rule 6004(a) and (ii) the stay of the order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## VII.

## NOTICE

39. No trustee or examiner has been appointed in these chapter 11 cases. The Debtors have served notice of this Motion on: (i) the Office of the United States Trustee for the Southern District of New York (Attn: Brian Masumoto, Esq.); (ii) those creditors holding the fifty largest unsecured claims against the Debtors' estates; (iii) Sheppard, Mullin, Richter & Hampton LLP, the attorneys for U.S. Bank National Association, as trustee under that certain indenture agreement, dated as of October 1, 2009, with respect to the 11.75% Senior Secured Notes due 2014 issued by Blockbuster Inc. (Attn: Kyle J. Mathews, Esq.); (iv) The Bank of New York Trust Company, N.A., as trustee under that certain indenture agreement, dated as of August 20, 2004, with respect to the 9% Senior Subordinated Notes due 2012 issued by Blockbuster Inc. (Attn: Corporate Trust); (v) Sidley Austin LLP, attorneys for the lenders under the proposed Debtor in Possession Revolving Credit Agreement (the "*DIP Facility*") (Attn: James Seery, Esq.); (vi) Wilmington Trust FSB as Agent (the "*Agent*") under the DIP Facility (Attn: Joshua G. James); and (vii) Skadden, Arps, Slate, Meagher & Flom LLP, the attorneys for the Agent (Attn: Peter J. Neckles, Esq.) (collectively, the "*Notice Parties*"). The Debtors submit that no other or further notice need be provided.

40.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated:  September 23, 2010
        New York, New York

/s/ Stephen Karotkin
Stephen Karotkin
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

and

Martin A. Sosland (*pro hac vice admission pending*)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas  75201
Telephone:  (214) 746-7700
Facsimile:  (214) 746-7700

## Exhibit A

## Proposed Interim Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------x
                          :

In re                         :           **Chapter 11**
                          :

**BLOCKBUSTER INC.,** *et al.*,[1]     :           **Case No. 10-_____ (_____)**
                          :

                          :           **(Jointly Administered)**
           **Debtors.**           :
----------------------------------------------------------x

## INTERIM ORDER PURSUANT
## TO 11 U.S.C. §§ 105(a), 363(b), AND 503(b) AUTHORIZING
## THE DEBTORS TO PAY CERTAIN UNDISPUTED PREPETITION OBLIGATIONS
## OF CERTAIN ESSENTIAL VENDORS, SUPPLIERS, AND SERVICE PROVIDERS

Upon the Motion,[2] dated ___, 2010, of Blockbuster Digital Technologies Inc.,

its parent Blockbuster Inc., and their debtor affiliates, as debtors and debtors in possession

(collectively, "***Blockbuster***" or the "***Debtors***"), pursuant to sections 105(a), 363(b), and 503(b)

of the Bankruptcy Code, requesting discretionary authority to pay certain undisputed

prepetition obligations ("***Essential Vendors' Claims***") owed to certain of their key vendors,

suppliers, service providers and similar counterparties that the Debtors deem essential to

maintaining Blockbuster's ongoing business operations (the "***Essential Business Vendors***"),

all as more fully described in the Motion; and the Court having jurisdiction to consider the

Motion and grant the requested relief in accordance with 28 U.S.C. §§ 157 and 1334 and the

Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Blockbuster Inc. (5102); Blockbuster Canada Inc. (1269); Blockbuster Digital Technologies Inc. (9222); Blockbuster Distribution, Inc. (0610); Blockbuster Gift Card, Inc. (1855); Blockbuster Global Services Inc. (3019); Blockbuster International Spain Inc. (7615); Blockbuster Investments LLC (6313); Blockbuster Procurement LP (2546); Blockbuster Video Italy, Inc (5068); Movielink, LLC (5575); Trading Zone Inc. (8588); and B[2] LLC (5219).

[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and

consideration of the Motion being a core proceeding pursuant to 28 U.S.C. § 157(b); and

venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the Debtors

having provided notice of the Motion and Interim Hearing (as defined below) to the Notice

Parties; and the Court having held a hearing to consider the requested relief (the "***Interim***

***Hearing***"); and upon the record of the Interim Hearing, and all of the proceedings before the

Court, the Court finds and determines that the requested relief is in the best interests of the

Debtors, their estates, creditors, and all other parties in interest; the Debtors have provided due

and proper notice of the Motion and Interim Hearing and no further notice is necessary; the

legal and factual bases set forth in the Motion establish just and sufficient cause to grant the

requested relief herein; **IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted on an interim basis as provided herein.

2.      The Debtors are authorized, but not directed, to make payments in

respect of those Essential Vendors' Claims, whether relating to the period prior to or after the

Commencement Date, as the Debtors determine, in the exercise of their business judgment, to

be necessary or appropriate to ensure the delivery of supplies and continuation of services

from the Essential Business Vendors.

3.      The Debtors are authorized, but are not directed, in their sole discretion,

to seek to cause each Essential Business Vendor to enter into an Essential Vendor Agreement,

with the Debtors, attached as **"*Exhibit C*"** to the Motion, as a condition to payment of its

Essential Vendors' Claim.

4.      If any Essential Business Vendor refuses to supply goods and/or

services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the

parties) following receipt of payment of its Essential Vendors' Claim (regardless of whether such Essential Business Vendor has entered into an Essential Vendor Agreement), or fails to comply with any Essential Vendor Agreement entered into between such Essential Business Vendor and the Debtors, the Debtors are authorized to, in their discretion and without further order of the Court, declare that (a) any Essential Vendor Agreement between the Debtors and such Essential Business Vendor is terminated (if applicable), and (b) the payments made to such Essential Business Vendor on account of its Essential Vendors' Claims, whether pursuant to an Essential Vendor Agreement or otherwise, shall be deemed to have been made in payment of then-outstanding postpetition claims of such Essential Business Vendor without further order of the Court or action by any person or entity. In such event, pursuant to section 549 of the Bankruptcy Code, the Essential Business Vendor shall immediately repay to the Debtors any payments made to it on account of its Essential Vendors' Claim to the extent that any such payments exceed the postpetition claims of such Essential Business Vendor then outstanding without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or otherwise.

5. In the event that an Essential Vendor Agreement is terminated or an Essential Business Vendor refuses to supply goods and/or services to the Debtors on Customary Trade Terms following receipt of payment on its Essential Vendors' Claim (regardless of whether such Essential Business Vendor has entered into an Essential Vendor Agreement), the Debtors and such Essential Business Vendor are to be returned to their *status quo ante*, i.e., their respective positions immediately prior to entry of this Order.

6. Notwithstanding the foregoing, the Debtors, in their business judgment, may reinstate an Essential Vendor Agreement if the underlying default under the Essential

Vendor Agreement is fully cured by the Essential Business Vendor not later than five (5) business days following the Debtors' notification to the Essential Business Vendor that such default occurred, or the Debtors, in their business judgment, reach a favorable alternative agreement with the Essential Business Vendor.

7.      The Debtors' inability to enter into an Essential Vendor Agreement with a particular Essential Business Vendor shall not preclude them from paying an Essential Vendors' Claim when, in the exercise of their reasonable business judgment, such payment is necessary to the Debtors' operations.

8.      Nothing contained in the Motion or in this Order shall be deemed to constitute an assumption, adoption, or rejection of any executory contract or agreement between the Debtors and any of the Essential Business Vendors, or any other third party, or to require the Debtors to make any of the payments authorized herein.

9.      Nothing in this Order of the Motion shall be construed as prejudicing any rights the Debtors may have to dispute or contest the amount of, or basis for, any claims against the Debtors arising in connection with the Essential Vendors' Claims.

10.     The authorization granted hereby to pay Essential Business Vendor Claims shall not create any obligation on the part of the Debtors or their officers, directors, attorneys, or agents to pay the Essential Vendors' Claims, and none of the foregoing persons shall have any liability on account of any decision by the Debtors not to pay an Essential Vendors' Claim, and nothing contained in this Order shall be deemed to increase, reclassify, elevate to an administrative expense status (unless otherwise entitled to administrative expense status), or otherwise affect the Essential Vendors' Claims to the extent they are not paid.

11.     The amount of such Essential Vendors' Claim set forth in an Essential

Vendor Agreement shall be used only for purposes of determining such Essential Business

Vendor's claim (as such term is defined in the Bankruptcy Code) under this Order and shall

not be deemed a claim allowed by the Court, and the rights of all interested persons to object

to such claim shall be fully preserved until further order of the Court.

12.     No Essential Business Vendor who receives payment on account of its

claim pursuant to the terms of this Order, is permitted to file or perfect a lien, reclamation

claim, or a claim under section 503(b)(9) of the Bankruptcy Code on account of such claim,

and any such Essential Business Vendor shall take, at its own expense, all necessary actions to

remove any existing lien or withdraw such reclamation claim or 503(b)(9) claim relating to

such claim, even if the lien, reclamation claim, or 503(b)(9) claim is against property of a non-

debtor.

13.     Each of the Banks is authorized and directed to receive, process, honor,

and pay, to the extent of funds on deposit, all checks and electronic transfers issued in respect

of the Essential Vendors' Claims whether presented prior to or after the Commencement Date

without further Order of the Court, and such Banks are authorized to rely on the

representations of the Debtors as to which checks and electronic transfers are issued or

authorized to be paid pursuant to this Order.

14.     The requirements of Bankruptcy Rule 6003(b) are satisfied.

15.     The requirements of Bankruptcy Rule 6004(a) are waived.

16.     A final hearing to consider entry of an order granting the relief

requested in the Motion on a final basis shall be held on _____, 2010 at __:__ _.m.

(Prevailing Eastern Time); and any objections to entry of such order shall be in writing, filed

with the Court in accordance with General Order M-242, and served upon the attorneys for the

Debtors, the Notice Parties, and counsel for any official committee of unsecured creditors

appointed in these chapter 11 cases, in each case so as to be received no later than 4:00 p.m.

on _____, 2010 (Prevailing Eastern Time)

        17.     This Court shall retain jurisdiction to hear and determine all matters

arising from or related to the implementation, interpretation and/or enforcement of this Order.

Dated: _____, 2010
      New York, New York

                                 _____
                                 UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                          :

**In re**                                      :            **Chapter 11**
                                            :
**BLOCKBUSTER INC.,** *et al.*,[1]       :            **Case No. 10-_____ (_____)**
                                            :
                                            :            **(Jointly Administered)**
             **Debtors.**                        :
-------------------------------------------------------------x

## FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 503(b) AUTHORIZING THE DEBTORS TO PAY CERTAIN UNDISPUTED PREPETITION OBLIGATIONS <u>OF CERTAIN ESSENTIAL VENDORS, SUPPLIERS, AND SERVICE PROVIDERS</u>

Upon the Motion,[2] dated ___, 2010, of Blockbuster Digital Technologies Inc.,

its parent Blockbuster Inc., and their debtor affiliates, as debtors and debtors in possession

(collectively, "***Blockbuster***" or the "***Debtors***"), pursuant to sections 105(a), 363(b), and 503(b)

of the Bankruptcy Code, requesting discretionary authority to pay certain undisputed

prepetition obligations ("***Essential Vendors' Claims***") owed to certain of their key vendors,

suppliers, service providers and similar counterparties that the Debtors deem essential to

maintaining Blockbuster's ongoing business operations (the "***Essential Business Vendors***"),

all as more fully described in the Motion; and the Court having granted the Interim Order; and

the Court having jurisdiction to consider the Motion and grant the requested relief on a final

basis in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring

---

[1]     The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Blockbuster Inc. (5102); Blockbuster Canada Inc. (1269); Blockbuster Digital Technologies Inc. (9222); Blockbuster Distribution, Inc. (0610); Blockbuster Gift Card, Inc. (1855); Blockbuster Global Services Inc. (3019); Blockbuster International Spain Inc. (7615); Blockbuster Investments LLC (6313); Blockbuster Procurement LP (2546); Blockbuster Video Italy, Inc (5068); Movielink, LLC (5575); Trading Zone Inc. (8588); and B[2] LLC (5219).

[2]     Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion.

to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having held a hearing to consider the requested relief (the "*Final Hearing*"); and due and proper notice of the Motion having been provided to the Notice Parties, and it appearing that no further notice need be provided; and the Court having held a hearing to consider the requested relief; and a hearing to consider approval of the Motion on an interim basis having been held (the "*Interim Hearing*"); and the Court having entered an interim order (the "*Interim Order*") granting the relief requested in the Motion, pending the Final Hearing; and it appearing that due and proper notice of the Final Hearing having been given and that no other or further notice need be provided; and upon the record of the Interim Hearing and the Final Hearing and all of the proceedings had before the Court; and upon the First Day Affidavit; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and all other parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor; **IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as provided herein on a final basis.

2.      The Debtors are authorized, but not directed, to make payments in respect of those Essential Vendors' Claims, whether relating to the period prior to or after the Commencement Date, as the Debtors determine, in the exercise of their business judgment, to be necessary or appropriate to ensure the delivery of supplies and continuation of services from the Essential Business Vendors.

3.	The Debtors are authorized, but are not directed, in their sole discretion, to seek to cause each Essential Business Vendor to enter into an Essential Vendor Agreement, with the Debtors, attached as **_"Exhibit C"_** to the Motion, as a condition to payment of its Essential Vendors' Claim.

4.	If any Essential Business Vendor refuses to supply goods and/or services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of payment of its Essential Vendors' Claim (regardless of whether such Essential Business Vendor has entered into an Essential Vendor Agreement), or fails to comply with any Essential Vendor Agreement entered into between such Essential Business Vendor and the Debtors, the Debtors are authorized to, in their discretion and without further order of the Court, declare that (a) any Essential Vendor Agreement between the Debtors and such Essential Business Vendor is terminated (if applicable), and (b) the payments made to such Essential Business Vendor on account of its Essential Vendors' Claims, whether pursuant to an Essential Vendor Agreement or otherwise, shall be deemed to have been made in payment of then-outstanding postpetition claims of such Essential Business Vendor without further order of the Court or action by any person or entity.  In such event, pursuant to section 549 of the Bankruptcy Code, the Essential Business Vendor shall immediately repay to the Debtors any payments made to it on account of its Essential Vendors' Claim to the extent that any such payments exceed the postpetition claims of such Essential Business Vendor then outstanding without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or otherwise.

5.	In the event that an Essential Vendor Agreement is terminated or an Essential Business Vendor refuses to supply goods and/or services to the Debtors on

Customary Trade Terms following receipt of payment on its Essential Vendors' Claim (regardless of whether such Essential Business Vendor has entered into an Essential Vendor Agreement), the Debtors and such Essential Business Vendor are to be returned to their *status quo ante*, i.e., their respective positions immediately prior to entry of this Order.

6.     Notwithstanding the foregoing, the Debtors, in their business judgment, may reinstate an Essential Vendor Agreement if the underlying default under the Essential Vendor Agreement is fully cured by the Essential Business Vendor not later than five (5) business days following the Debtors' notification to the Essential Business Vendor that such default occurred, or the Debtors, in their business judgment, reach a favorable alternative agreement with the Essential Business Vendor.

7.     The Debtors' inability to enter into an Essential Vendor Agreement with a particular Essential Business Vendor shall not preclude them from paying an Essential Vendors' Claim when, in the exercise of their reasonable business judgment, such payment is necessary to the Debtors' operations.

8.     Nothing contained in the Motion or in this Order shall be deemed to constitute an assumption, adoption, or rejection of any executory contract or agreement between the Debtors and any of the Essential Business Vendors, or any other third party, or to require the Debtors to make any of the payments authorized herein.

9.     Nothing in this Order of the Motion shall be construed as prejudicing any rights the Debtors may have to dispute or contest the amount of, or basis for, any claims against the Debtors arising in connection with the Essential Vendors' Claims.

10.     The authorization granted hereby to pay Essential Business Vendor Claims shall not create any obligation on the part of the Debtors or their officers, directors,

attorneys, or agents to pay the Essential Vendors' Claims, and none of the foregoing persons shall have any liability on account of any decision by the Debtors not to pay an Essential Vendors' Claim, and nothing contained in this Order shall be deemed to increase, reclassify, elevate to an administrative expense status (unless otherwise entitled to administrative expense status), or otherwise affect the Essential Vendors' Claims to the extent they are not paid.

11.  The amount of such Essential Vendors' Claim set forth in an Essential Vendor Agreement shall be used only for purposes of determining such Essential Business Vendor's claim (as such term is defined in the Bankruptcy Code) under this Order and shall not be deemed a claim allowed by the Court, and the rights of all interested persons to object to such claim shall be fully preserved until further order of the Court.

12.  No Essential Business Vendor who receives payment on account of its claim pursuant to the terms of this Order, is permitted to file or perfect a lien, reclamation claim, or a claim under section 503(b)(9) of the Bankruptcy Code on account of such claim, and any such Essential Business Vendor shall take, at its own expense, all necessary actions to remove any existing lien or withdraw such reclamation claim or 503(b)(9) claim relating to such claim, even if the lien, reclamation claim, or 503(b)(9) claim is against property of a non-debtor.

13.  Each of the Banks is authorized and directed to receive, process, honor, and pay, to the extent of funds on deposit, all checks and electronic transfers issued in respect of the Essential Vendors' Claims whether presented prior to or after the Commencement Date without further Order of the Court, and such Banks are authorized to rely on the representations of the Debtors as to which checks and electronic transfers are issued or authorized to be paid pursuant to this Order.

14.     The requirements of Bankruptcy Rule 6003(b) are satisfied.

15.     The requirements of Bankruptcy Rule 6004(a) are waived.

16.     This Court shall retain jurisdiction to hear and determine all matters

arising from or related to the implementation, interpretation and/or enforcement of this Order.

Dated: _____, 2010
        New York, New York


                                        _____
                                        UNITED STATES BANKRUPTCY JUDGE

**Exhibit C**

**Essential Vendor Agreement**

_____, 2010

TO:     [Essential Business Vendor]
[Name]
[Address]

Dear [Essential Business Vendor]:

        As you are probably aware, Blockbuster Digital Technologies Inc., its parent Blockbuster Inc., and their debtor affiliates (collectively, the "***Debtors***" or the "***Company***") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Cases***" and the "***Bankruptcy Court***," respectively) on September 23, 2010 (the "***Commencement Date***").  The Company requested authorization to pay certain key vendors, suppliers, and service providers (the "***Essential Business Vendors***") in recognition, in part, of the importance of its relationship with such Essential Business Vendors, and its desire that the Bankruptcy Cases have as little effect on these Essential Business Vendors as possible.

        On _____, 2010, the Bankruptcy Court entered an order (the "***Order***") authorizing the Company, under certain conditions, to pay the prepetition claims of certain Essential Business Vendors that agree to the terms set forth below, and to be bound by the terms of the Order.  A copy of the Order is enclosed.

        In order for the Company to pay, in its sole discretion, all or a portion of an Essential Vendor's prepetition claim (the "***Essential Vendors' Claims***"), each selected Essential Business Vendor must agree to continue to supply goods to the Company on Customary Trade Terms as detailed below.

        In order to facilitate this, as authorized by the Bankruptcy Court, the Company and you agree to execute an agreement (the "***Essential Vendor Agreement***") as follows:

   i.  The estimated balance of the prepetition Essential Vendors' Claim that the Company will provisionally pay you is $_____ .

   ii. You will provide open credit terms as follows (if more space is required, attach continuation pages)

        _____
        _____
        _____
        _____

iii. The open trade balance or credit line that you will extend to the Company for shipment of postpetition goods is $_____ (which shall not be less than the greater of the open trade balance outstanding on _____).

iv. You agree that you shall not require a lump sum payment upon confirmation of a plan in these chapter 11 cases on account of any administrative expense priority claim that you may assert, but instead agree that such claims will be paid in the ordinary course of business after confirmation of a plan under the Customary Trade Terms, if the plan provides for the ongoing operations of the Company.

v. You will hereafter extend to the Company the same trade terms between you and the Debtors that were in effect the day prior to the Commencement Date, or such other terms as agreed upon between you and the Company, (the "***Customary Trade Terms***"). These Customary Trade Terms shall include, but not be limited to, credit terms, historical pricing conventions, historical product volumes, cash discounts, payment terms, allowances, rebates, normal product availability, and other applicable terms.

Payment of your Essential Vendor Claim in the manner set forth in the Order may only occur upon execution of this letter by a duly authorized representative of your company and the return of this letter to the Company. Your execution of this letter agreement and its return to the Company constitutes an agreement by you and the Company:

1. To the Customary Trade Terms and, subject to the reservations contained in the Order, to the amount of the Essential Vendor Claim set forth above;

2. That during the pendency of the Bankruptcy Case, you will continue to supply the Company with goods pursuant to the Customary Trade Terms and that the Company will pay for such goods in accordance with Customary Trade Terms; that you have reviewed the terms and provisions of the Order and that you consent to be bound by such terms;

3. That you will not separately seek payment for reclamation and similar claims; in consideration for the payment described herein, you agree not to file or otherwise assert against any and all of the Debtors, their estates or any other person or entity or any of their respective assets or property (real or personal) any lien (regardless of the statute or other legal authority upon which such lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to you by the Debtors arising from agreements entered into prior to the Commencement Date. Furthermore, if you have taken steps to file or assert such a lien prior to entering into this letter agreement, you agree to take all necessary steps to remove such lien as soon as possible; and

4. That if you refuse to continue to supply goods to the Debtors on the Customary Trade Terms during the pendency of the Debtors' chapter 11 cases, any payments received by you on account of your Essential Vendor Claim will be deemed to have been in payment of then outstanding postpetition obligations owed to you and that you will immediately repay to the Company any payments made to you on account of your Essential Vendor Claim to the extent that the aggregate amount of such payments exceed the postpetition obligations then

outstanding without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise.

The Company and you also hereby agree that any dispute with respect to this letter agreement or the Order shall be determined by the Bankruptcy Court.

If you have any questions about this Essential Vendor Agreement or our financial restructuring, do not hesitate to call _____ at _____.

Sincerely,

Blockbuster Inc.

By: _____

Agreed and Accepted by:
[Name of Essential Business Vendor]

By: _____
Dated: _____, 2010

## Acknowledgement By Essential Business Vendor

[Name of Essential Business Vendor] is in receipt of the Debtors' purchase order #_____ requesting shipment of [describe requested goods by type, quantity and price] (the "***Goods***") or delivery of services (the "***Services***"), which was/were received by us on _____, _____ (the "***Purchase Order***") and which requests delivery of the Goods or Services on _____, _____, at those places set forth in the Purchase Order. (If the Purchase Order requires multiple delivery dates and/or locations, we have attached a schedule of such information to this Acknowledgment.) We hereby acknowledge and agree that shipment of the Goods or Services will be in accordance with the Customary Trade Terms and the Order authorizing the payment of Essential Business Vendors.

[Name of Essential Business Vendor]


By: _____
    Printed Name:
    Title:

Date: _____, 2010