Stephen Karotkin
Martin A. Sosland (*pro hac vice admission pending*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
**In re**                                                   :        **Chapter 11**
                                                            :
**BLOCKBUSTER INC., *et al.*,**[1]                          :        **Case No. 10-_____ (__)**
                                                            :
                                                            :        **(Jointly Administered)**
                                                            :
          **Debtors.**                                      :
------------------------------------------------------------x

**DEBTORS' APPLICATION**
**PURSUANT TO 11 U.S.C. §§ 327(a), 328(a),**
**AND 330, FED. R. BANKR. P. 2014(a) AND 2016,**
**AND LOCAL BANKRUPTCY RULES 2014-1 AND 2016-1 TO**
**RETAIN ROTHSCHILD INC. AS FINANCIAL ADVISOR AND INVESTMENT**
**BANKER TO THE DEBTORS *NUNC PRO TUNC* TO THE COMMENCEMENT DATE**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

             Blockbuster Digital Technologies Inc., its parent Blockbuster Inc., and their

debtor affiliates, as debtors and debtors in possession (collectively, "***Blockbuster***" or the

"***Debtors***"), submit this motion (the "***Motion***") and respectfully represent as follows:

---

[1]     The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Blockbuster Inc. (5102); Blockbuster Canada Inc. (1269); Blockbuster Digital Technologies Inc. (9222); Blockbuster Distribution, Inc. (0610); Blockbuster Gift Card, Inc. (1855); Blockbuster Global Services Inc. (3019); Blockbuster International Spain Inc. (7615); Blockbuster Investments LLC (6313); Blockbuster Procurement LP (2546); Blockbuster Video Italy, Inc (5068); Movielink, LLC (5575); Trading Zone Inc. (8588); and $B^2$ LLC (5219).

# I.

## BACKGROUND

1.     On September 23, 2010 (the "***Commencement Date***"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").  The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").

# II.

## BLOCKBUSTER'S BUSINESS

2.     More than twenty five years ago, Blockbuster became the first national retail chain provider of in-home entertainment, with its blue and gold torn-ticket logo symbolizing the decision by consumers to forego the movie theatre experience and "Make it a Blockbuster Night"[®] by staying home to watch the latest in new movie title releases from the convenience of their living rooms.  Since its incorporation in 1982, Blockbuster has expanded its retail business operations domestically and abroad via a mix of corporate and franchisee-owned stores, with, as of August 29, 2010, over 5,600 stores in the United States and its territories and 16 other countries.  To manage its business and properties, Blockbuster employs approximately 25,500 employees who perform a variety of critical functions, including customer service, inventory control, management, leasing, accounting, marketing, purchasing and sales, shipping, tax, technical services, and legal services.

## A.    <u>Domestic Operations</u>

      3.     Blockbuster operates its domestic media entertainment business through three principal channels of distribution: (i) retail; (ii) by-mail; and (iii) digital. As a result of this multi-channel distribution scheme, Blockbuster offers customers a value-priced entertainment experience, combining the broad array of products offered by a specialty or online retailer with the convenience of a local neighborhood retailer.

### *1.*    *Retail Channel*

      4.     The convenience offered to customers by having Blockbuster stores located in their cities, towns, and neighborhoods has been instrumental in establishing the BLOCKBUSTER® brand. As of August 29, 2010, there were 3,306 stores operating under the BLOCKBUSTER® brand in the United States and its territories. Of these stores, 2,924 are owned and operated by Blockbuster Inc. and 382 stores are owned and operated by franchisees. Blockbuster stores offer movies and games (collectively, "***Product***") for rent and purchase (both new and previously-viewed) as well as other entertainment-related consumer electronics and accessories, game consoles, confection, and movie-related merchandise for purchase. Additionally, approximately 240 of these locations include store-in-store game locations operating under the GAME RUSH® brand.

      5.     In step with its continued commitment to be the premier retailer of new release movies, Blockbuster has recently focused on promoting its rapidly emerging availability advantage over certain of its key competitors, who do not have access to key new Product for the initial 28 days of release (the "***28-day Window***"). In 2009. the 28-day Window was imposed by certain movie studios on the rental of newly released titles after the initial distribution date of a title so as to diminish the effect of rental on the retail sale of such titles. Given that a substantial portion of Blockbuster's rental revenues are derived from the rental of such new release Product,

Blockbuster's advantage with respect to the 28-day Window is expected to maintain and improve its customer preference and loyalty in comparison to its competitors.

6.     To expand its retail reach, in early 2009, Blockbuster entered into an agreement with NCR Corporation ("*NCR*") to launch BLOCKBUSTER Express® branded vending kiosks. Through this partnership, NCR builds and maintains the kiosks and pays royalties to Blockbuster on the revenues generated. This agreement allows Blockbuster to compete in the popular vending kiosk channel without incurring capital expenditures and start-up costs on its own account, while making Product more convenient and less expensive for its customers. As of September 19, 2010, there were approximately 6,630 kiosks operating under the BLOCKBUSTER Express® brand throughout the United States and its territories.

### 2.     *By-Mail Channel*

7.     Blockbuster offers a by-mail subscription program through its retail chain and through its website, www.blockbuster.com, whereby customers rent Product that is delivered directly to them by-mail. The by-mail subscription program provides customers access to substantially more Product than is available in its stores, and allows Blockbuster to compete directly with certain of its key competitors. In contrast to its competitors, Blockbuster offers:  (i) a wide selection of games and (ii) Blu-ray Product at no additional charge. Through its BLOCKBUSTER Total Access™ program ("*Total Access*"), Blockbuster also offers its by-mail subscribers the ability to exchange up to five online movie rentals for in-store movies at its retail locations for only a few dollars more per month. The by-mail subscription program allows Blockbuster to reach customers located in geographic areas where it does not operate store locations.

8.     In order to promote the synergies between its retail and by-mail channels of distribution and to profitably grow its by-mail customer base, Blockbuster recently launched a

marketing partnership with Comcast Cable Corporation ("*Comcast*").  This partnership includes the launch of *DVDs by Mail*, a co-branded by-mail offer available at www.DVDsbymail.com. As part of the marketing partnership, Comcast customers are now being offered Blockbuster's by-mail services (both by-mail and Total Access-like products) through the new co-branded web site as an additional service within their Comcast package.  On the site, customers can browse Blockbuster's vast library of more than 95,000 movie and television titles, create a queue of titles they want to rent and then get the DVDs through the mail or at a Blockbuster retail store, where they can also exchange their rentals.  In turn, Blockbuster is installing Comcast-dedicated kiosks in select stores that allow customers to quickly and easily learn about, and sign up for, Comcast services.

### 3. *Digital Channel*

9.     As new distribution channels have emerged and as consumer interest in accessing Product in new ways has grown, Blockbuster has begun to expand its footprint into the digital realm.  To that end, Blockbuster's digital business currently offers its customers on-demand access to one of the largest libraries of digital movies for both rental and sale through multiple formats.  Blockbuster began its digital initiatives with the purchase of Movielink from a consortium of movie studios in 2007.

10.     Through Blockbuster's website, www.blockbuster.com, Blockbuster customers can download and view movies on their personal computers after downloading Blockbuster's personal computer application.  In addition, with the convergence of media entertainment and electronic devices, Blockbuster recently entered into strategic partnerships with certain global third party consumer electronics device developers – including Samsung, Philips, TiVo, and Toshiba – to digitally deliver media entertainment to its customers through consumer electronics such as Internet-connected TVs and Blu-ray players through Blockbuster

applications embedded in these devices. In the mobile space, Blockbuster has partnered with device makers such as Motorola and HTC, embedding Blockbuster's digital applications in its popular new models for Verizon and T-Mobile. Blockbuster is also pursuing partnerships with Cable TV providers to offer Blockbuster-branded video-on-demand services inside an operator's set-top-box infrastructure.

### B. International Operations

11.     Blockbuster's international operations, which serve as ambassadors of the BLOCKBUSTER® brand, are comprised of all store operations outside the United States and its territories, including: (i) owned retail operations in Canada, the United Kingdom, Denmark, Italy, Mexico, Argentina, and Uruguay; and (ii) franchised retail operations in Australia, Brazil, Chile, Columbia, Guatemala, Israel, Italy, Mexico, New Zealand, Panama, Portugal, and Taiwan. As of August 29, 2010, Blockbuster had 2,333 stores in 16 markets outside of the United States operating under the BLOCKBUSTER® brand, the GAME RUSH® brand, and other brand names owned by Blockbuster. During 2008 and 2009, 29% and 30% of Blockbuster's revenues were generated outside of the United States, respectively. Blockbuster's international operations have historically been more dependent than the domestic operations on retail sales and, in particular, sales of games, as opposed to revenue generated from rentals.

### C. Financials

12.     As of July 4, 2010, the Debtors, on a consolidated basis, reported approximately $1.2 billion in total assets and approximately $1.6 billion in total liabilities. For 2009, Blockbuster reported consolidated revenues of approximately $4.1 billion and net cash from operating activities of $29.3 million.

13.     Additional information regarding Blockbuster's business, capital structure, and the circumstances leading to these chapter 11 cases is contained in the *Affidavit of Jeffery J.*

*Stegenga Pursuant to Local Bankruptcy Rule 1007-2 in Support of First Day Motions* (the "***First Day Affidavit***") filed contemporaneously herewith.

## III.

## JURISDICTION

14.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## IV.

## RELIEF REQUESTED

15.     Blockbuster requests entry of an order, substantially in the form of ***Exhibit "A"*** annexed hereto, pursuant to sections 327(a), 328(a), and 330 of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016, Rules 2014-1 and 2016-1 of the Local Bankruptcy Rules for the Southern District of New York (the "***Local Rules***"), and the Court's General Order on Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Court, M-389, dated November 25, 2009 (the "***Amended Guidelines***"), (a) authorizing the employment and retention of Rothschild Inc. ("***Rothschild***") as financial advisor and investment banker, effective *nunc pro tunc* to the Commencement Date, under the terms and conditions set forth in that certain engagement letter (the "***Engagement Letter***"),[2] dated as of February 8, 2010 (the "***Engagement Date***"), a copy of which is attached as Exhibit 1 to the Augustine Declaration (as defined below) and incorporated by reference herein; (b) approving the terms of Rothschild's employment, including the proposed fee structure and the

---

[2]     Any references to, or summaries of, the Engagement Letter in this Application are qualified by the express terms of the Engagement Letter, which shall govern if there is any conflict between the Engagement Letter and the summaries provided herein.  Each capitalized term used but not otherwise defined in this Application shall have the meaning ascribed to it in the Engagement Letter.

indemnification provisions set forth in the Engagement Letter, subject to the standards set forth in section 328 of the Bankruptcy Code, effective *nunc pro tunc* to the Commencement Date, provided that solely the Office of the United States Trustee for the Southern District of New York (the "***U.S. Trustee***") shall be entitled to review applications for payment of compensation and reimbursement of expenses of Rothschild under section 330 of the Bankruptcy Code; and (c) granting such other and further relief as the Court deems appropriate.  In support of this Application, Blockbuster submits the Affidavit of Neil Augustine, a Managing Director of Rothschild (the "***Augustine Affidavit***") attached hereto as ***Exhibit "B"***.

16.     The terms of this Application as well as the terms of the order requested by this Application and any order entered pursuant thereto, shall apply to any and all affiliates of Blockbuster that have not yet filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code as of the Commencement Date, but which subsequently file such a petition during the pendency of these Chapter 11 Cases.

## V.

## ROTHSCHILD'S QUALIFICATIONS

17.     Blockbuster seeks to retain Rothschild as its financial advisor and investment banker because, among other things, Rothschild has extensive experience and an excellent reputation in providing high quality investment banking services to debtors in bankruptcy reorganizations and other restructurings.  Rothschild is particularly well qualified to serve as Blockbuster's financial advisor and investment banker in these chapter 11 cases.

18.     Rothschild is a member of one of the world's leading independent investment banking groups, with more than 40 offices in more than 30 countries, including an office located at 1251 Avenue of the Americas, 51st Floor, New York, New York 10020. Rothschild has expertise in domestic and cross-border restructurings, mergers and acquisitions,

new capital raises and other investment banking and financial advisory services, with particular experience in providing high-quality financial advisory services to financially troubled companies. Rothschild is an experienced bankruptcy and restructuring advisor to debtors, bondholders, creditors' committees, single creditor classes, and secured creditors in a variety of industries. Rothschild is highly qualified to advise on strategic alternatives and its professionals have extensive experience in deals involving complex financial and operating restructurings. Rothschild is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.

19.     Rothschild and its professionals have extensive experience working with financially troubled companies from a variety of industries in complex financial restructurings, both out-of-court and in chapter 11 cases. Rothschild's business reorganization professionals have served as financial and strategic advisors in numerous cases, including, among others: *In re Xerium Techs., Inc.*, Ch. 11 Case No. 10-11031 (KJC) (Bankr. D. Del., Apr. 27, 2010) [Docket No. 150]; *In re Affiliated Media, Inc.*, Ch. 11 Case No. 10-10202 (KJC) (Bankr. D. Del. Mar. 3, 2010) [Docket No. 136]; *In re Trident Res. Corp.*, Ch. 11 Case No. 09-13150 (MFW) (Bankr. D. Del. Jan. 28, 2010) [Docket No. 187]; *In re FairPoint Commc'ns, Inc.*, Ch. 11 Case No. 09-16335 (BRL) (Bankr. S.D.N.Y. Jan. 11, 2010) [Docket No. 328]; *In re MIG, Inc.*, Ch. 11 Case No. 09-12118 (KG) (Bankr. D. Del. Sept. 4, 2009) [Docket No. 176]; *In re Sea Launch Co., LLC*, Ch. 11 Case No. 09-12153 (BLS) (Bankr. D. Del. Aug. 20, 2009) [Docket No. 211]; *In re Visteon Corp.*, Ch. 11 Case No. 09-11786 (CSS) (Bankr. D. Del. July 1, 2009) [Docket No. 474]; *In re Sun-Times Media Group, Inc.*, Ch. 11 Case No. 09-11092 (CSS) (Bankr. D. Del. May 12, 2009) [Docket No. 173]; *In re Tronox Inc.*, Ch. 11 Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Apr. 7, 2009) [Docket No. 339]; *In re Milacron Inc.*, Ch. 11 Case No. 09-11235 (JVA) (Bankr. S.D. Ohio Apr. 6, 2009) [Docket No. 236]; *In re PPI Holdings, Inc.*, Ch. 11 Case No. 08-13289

(KG) (Bankr. D. Del. Feb. 4, 2009) [Docket No. 254]; *In re Recycled Paper Greetings Inc.*, Ch. 11 Case No. 09-10002 (KG) (Bankr. D. Del. Jan. 23, 2009) [Docket No. 147]; *In re Circuit City Stores, Inc.*, Ch. 11 Case No. 08-35653 (KRH) (Bankr. E.D. Va. Jan. 9, 2009) [Docket No. 1435]; *In re VeraSun Energy Corp.*, Ch. 11 Case No. 08-12606 (BLS) (Bankr. D. Del. Jan. 6, 2009) [Docket No. 460]; *In re Motor Coach Indus. Intl., Inc.*, Ch. 11 Case No. 08-12136 (BLS) (Bankr. D. Del. Oct. 17, 2008) [Docket No. 213]; *In re BHM Techs.*, Ch. 11 Case No. 08-04413 (SWD) (Bankr. W.D. Mich. July 25, 2008) [Docket No. 452]; *In re Hilex Poly Co. LLC*, Ch. 11 Case No. 08-10890 (KJC) (Bankr. D. Del. May 30, 2008) [Docket No. 135]; *In re Delphi Corp.*, Ch. 11 Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Nov. 30, 2005) [Docket No. 1363]; *In re Solutia Inc.*, Ch. 11 Case No. 03-17949 (PCB) (Bankr. S.D.N.Y. Apr. 13, 2005) [Docket No. 752]; *In re Int'l Wire*, Ch. 11 Case No. 04-11991 (BRL) (Bankr. S.D.N.Y. Mar. 25, 2004) [Docket No. 31]; *In re WestPoint Stevens, Inc.*, Ch. 11 Case No. 03-13532 (RDD) (Bankr. S.D.N.Y. June 6, 2003) [Docket No. 32]; *In re Viasystems Group, Inc.*, Ch. 11 Case No. 02-14867 (ALG) (Bankr. S.D.N.Y. Nov. 21, 2002) [Docket No. 69]; *In re Guilford Mills, Inc.*, Ch. 11 Case No. 02-40667 (BRL) (Bankr. S.D.N.Y. June 26, 2002) [Docket No. 255].[3]

20.     Rothschild's experience, resources, and capabilities are crucial to the success of these chapter 11 cases. A financial advisor and investment banker such as Rothschild fulfills a critical service that complements the services provided by Blockbuster's other professionals. As discussed in detail below, Rothschild will concentrate its efforts on serving as Blockbuster's financial advisor and investment banker in these chapter 11 cases and, more specifically, in formulating strategic alternatives and assisting Blockbuster in its efforts with regard to a restructuring, financing, and/or sale (or any combination thereof). For the

---

[3]     Because of the voluminous nature of the unreported orders cited herein, such orders are not annexed to the Motion. Copies of these orders are available upon request of Debtors' counsel.

aforementioned reasons, Blockbuster requires the services of a capable and experienced financial advisor and investment banker such as Rothschild.

21.     During the prepetition period, since its retention in February 2010, as well as its prior retention during the Company's successful refinancing processes in 2009, Rothschild expended substantial time and effort in its role as financial advisor and investment banker, assisting in evaluating Blockbuster's liquidity situation, capital structure alternatives, recapitalization opportunities on a standalone basis and with potential strategic and financial partners, and potential divestitures. Rothschild has played a central role in continuous and ongoing negotiations with Blockbuster's stakeholders, including the ad hoc groups of senior and senior subordinated noteholders, and in the ongoing process of soliciting, facilitating, and evaluating potential transactions with strategic and financial third parties. Rothschild also played a central role in soliciting, evaluating, and structuring DIP financing for Blockbuster in preparation for Blockbuster's filing for chapter 11 protection. Rothschild is also involved in determining an appropriate capital structure for Blockbuster.

22.     Furthermore, as a result of the prepetition work performed on behalf of Blockbuster since Rothschild's retention and during its prior retention during the 2009 refinancing processes, Rothschild has acquired significant knowledge of Blockbuster and its business and is now intimately familiar with Blockbuster's financial affairs, debt structure, business operations, capital structure, key stakeholders, financing documents and other related material information. Likewise, in providing prepetition services to Blockbuster, Rothschild's professionals have worked closely with Blockbuster's management, board of directors, and its other advisors. Accordingly, Rothschild has developed relevant experience and expertise regarding Blockbuster that will assist it in providing effective and efficient services in these chapter 11 cases.

# VI.

## SERVICES TO BE PROVIDED

23.     Subject to further order of this Court, and consistent with the Engagement

Letter, Blockbuster requests the employment and retention of Rothschild to render to

Blockbuster the following financial advisory and investment banking services as necessary,

appropriate and feasible and as requested by Blockbuster:

(a)     Reviewing and analyzing the business plans and financial projections prepared by Blockbuster including, but not limited to, testing assumptions and comparing those assumptions to historical trends of Blockbuster and its industry;

(b)     Evaluating Blockbuster's debt capacity in light of its projected cash flows and assisting in the determination of an appropriate debt structure for Blockbuster;

(c)     Identifying and/or initiating potential Transactions;

(d)     Advising Blockbuster on the risks and benefits of considering a Transaction with respect to Blockbuster's intermediate and long-term business prospects and strategic alternatives to maximize the business enterprise value of Blockbuster;

(e)     Assisting in the negotiations with Blockbuster's (i) senior secured noteholders, (ii) senior subordinated noteholders, (iii) preferred shareholders, (iv) common shareholders, (v) studio creditors, and (vi) such other creditors or constituents as may be reasonably requested by Blockbuster and, in each case, as needed to effectuate any Transaction approved by the management or, if required, the boards of directors;

(f)     Reviewing and analyzing any proposals Blockbuster receives from third parties in connection with a Transaction or other transaction, including, without limitation, any proposals for debtor-in-possession ("***DIP***") financing, as appropriate;

(g)     Assisting in soliciting and structuring DIP and/or exit financing;

(h)     Soliciting interest from investors and/or buyers for an M&A Transaction;

(i)     Assisting or participating in negotiations with parties in interest, including, without limitation, any current or prospective creditors of, holders of equity in, or claimants against Blockbuster and/or its respective representatives in connection with a Transaction;

(j)     Advising Blockbuster with respect to, and attending meetings of, (i) Blockbuster's boards of directors (including any Transaction Committees), (ii) creditor groups, (iii) studios, (iv) official constituencies and (v) other interested parties, as necessary;

(k)     Participating, if requested by Blockbuster, in hearings before this Court and providing relevant testimony with respect to the matters described herein and issues arising in connection with any proposed Plan; and

(l)     Rendering other such financial advisory and investment banking services as may be agreed upon by Rothschild and Blockbuster.

24.     The services that Rothschild will provide to Blockbuster are necessary to enable Blockbuster to maximize the value of its estates. Blockbuster believes that the services will not duplicate the services that other professionals will be providing to Blockbuster in these chapter 11 cases. Specifically, Rothschild will carry out unique functions and will use reasonable efforts to coordinate with Blockbuster's other retained professionals to avoid unnecessary duplication of services.

## VII.

## PROFESSIONAL COMPENSATION AND FEE APPLICATIONS

25.     Rothschild intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with the chapter 11 cases, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, guidelines established by the U.S. Trustee, the Amended Guidelines, and any other applicable procedures and orders of the Court and consistent with the proposed compensation set forth in the Engagement Letter.

26.     In consideration of the services to be provided by Rothschild, and as more fully described in the Engagement Letter, subject to this Court's approval, Blockbuster has agreed to pay Rothschild in cash under the following fee structure (the "*Fee Structure*").

27. <u>Monthly Fee.</u>  An advisory fee (the "***Monthly Fee***") of $125,000 payable on October 1, 2010 and monthly thereafter.

28. <u>New Capital Fee.</u>  A new capital fee (the "***New Capital Fee***") equal to the following percentages of the gross cash proceeds of any new capital or refinancing capital raised: (i) 1.0% for all secured debt, including any DIP financing, but not including debt raised by Callidus secured exclusively by Canadian collateral; (ii) 2.0% for all unsecured debt and (iii) 4.0% for any equity capital or hybrid capital raised.  Notwithstanding the above, a New Capital Fee will not be earned with respect to any capital provided by Blockbuster's existing creditors or shareholders, including any reinstatement of existing debt on a consensual or non-consensual basis pursuant to a Plan or otherwise.  The New Capital Fee is payable upon the closing of the transaction by which the new capital is committed.  For the avoidance of doubt, the term "raised" includes the amount committed or otherwise made available to Blockbuster whether or not such amount, or any portion thereof, is drawn down at closing or is ever drawn down and whether or not such amount, or any portion thereof, is used to refinance existing obligations of Blockbuster.

29. <u>Recapitalization Fee.</u>  A recapitalization fee (the "***Recapitalization Fee***") payable upon the consummation of a Recapitalization Transaction equal to $3,100,000.  Rothschild is entitled to only a single Recapitalization Fee if more than one Recapitalization Transaction is consummated.

30. <u>M&A Fee</u>.  A mergers and acquisitions fee (the "***M&A Fee***"), payable at the closing of any M&A Transaction, as set forth in Exhibit B of the Engagement Letter and based on a variable percentage of Aggregate Consideration that ranges from 1.75% of Aggregate Consideration of $100,000,000 to 0.70% of Aggregate Consideration of $1,000,000,000, with fees above and below such amounts agreed in good faith consistent with the schedule of fees in Exhibit B of the Engagement Letter.  In the event that Blockbuster consummates multiple

Transactions that constitute M&A Transactions, the M&A Fee shall be determined on the aggregate consideration of such M&A Transactions. No M&A Fee shall be earned with respect to any transaction with or capital provided primarily or solely by Blockbuster's creditors or shareholders (or their respective affiliates) existing as of the Engagement Date.

31. In the event that Blockbuster enters into a single Transaction that constitutes both a Recapitalization Transaction and an M&A Transaction, Rothschild shall be entitled only to the greater of the Recapitalization Fee and the M&A Fee. Upon becoming entitled to receive any Recapitalization Fee or M&A Fee, Rothschild shall not thereafter be entitled to earn or be paid any other fee under the Engagement Letter except New Capital Fees and Monthly Fees, if any, earned prior to the related M&A Transaction or Recapitalization Transaction. Also, upon becoming entitled to receive any Recapitalization Fee or M&A Fee, Blockbuster shall have the option to terminate the Engagement Letter with no further obligation (including, but not limited to, any Tail Obligation).[4] However, if Blockbuster thereafter elects not to terminate the Engagement Letter, the Monthly Fee will still apply.

32. To the extent Blockbuster requests Rothschild to perform additional services not contemplated by the Engagement Letter, additional fees shall be mutually agreed upon by Rothschild and Blockbuster, in writing, in advance.

---

[4] Under the Tail Obligation contemplated in the Engagement Letter, a New Capital Fee, Recapitalization Fee and/or M&A Fee, as the case may be, shall be payable in the event that (i) the engagement is terminated by Blockbuster and a New Capital Raise, Recapitalization Transaction or M&A Transaction, as applicable, is consummated at any time prior to the expiration of one year *after* the effective date of such termination or (ii) a definitive agreement with respect thereto is executed at any time prior to the expiration of one year *after* such termination (which definitive agreement within no later than 18 months after the date of such termination results in the consummation of a New Capital Raise, Recapitalization Transaction, or M&A Transaction, as applicable).

33.     To the extent not otherwise credited, Rothschild will credit: (a) 50% of all Monthly Fees paid in excess of $525,000 in the aggregate[5] (the "**Monthly Fee Credit**") against the Recapitalization Fee or the M&A Fee and (b) 50% of any New Capital Fees against the Recapitalization Fee or the M&A Fee (the "**New Capital Fee Credit**").  However, the sum of the Monthly Fee Credit and the New Capital Fee Credit shall not exceed the fee against which it is to be credited.

34.     In addition to the fees described above, Blockbuster agrees to reimburse Rothschild for all of its professionals' reasonable expenses incurred in connection with the performance of its engagement under the Engagement Letter, including, without limitation, reasonable and documented fees, disbursements, and other charges by Rothschild's counsel. Reasonable expenses shall also include, but not be limited to, expenses incurred in connection with travel and lodging, data processing and communication charges, research, and courier services.

35.     The hours worked, the results achieved, and the ultimate benefit to Blockbuster of the work performed by Rothschild in connection with its engagement may vary and Blockbuster and Rothschild have taken this into account in setting the above fees.  The Fee Structure described above was established to reflect the difficulty of the extensive assignments Rothschild expects to undertake and the challenging nature of this engagement.  Further, the Fee Structure is consistent with Rothschild's normal and customary billing practices for cases of this size and complexity which require the level of services to be provided.  Accordingly, Rothschild and Blockbuster believe the Fee Structure is both reasonable and market-based.

---

[5]     To date, Rothschild has earned and received payment for Monthly Fees in the amount of $1,050,000.

36.     Rothschild will file interim and final fee applications for the allowance of compensation for services rendered and reimbursement of expenses incurred in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the guidelines established by the U.S. Trustee and, any applicable Orders of this Court.

37.     It is not the general practice of investment banking firms, including Rothschild, to keep detailed time records similar to those customarily kept by attorneys.  Because Rothschild does not ordinarily maintain contemporaneous time records in one-tenth hour (.10) increments or provide or conform to a schedule of hourly rates for its professionals, Rothschild should only be required to maintain time records in half-hour (0.50) increments setting forth, in a summary format, a description of the services rendered by each professional and the amount of time spent on each date by each such individual in rendering services on behalf of the Debtors.

38.     Rothschild will maintain detailed records of any actual and necessary costs and expenses incurred in connection with the aforementioned services.  Rothschild's applications for compensation and expenses will be paid by Blockbuster pursuant to the terms of the Engagement Letter, in accordance with any procedures established by this Court.

39.     Blockbuster acknowledges and agrees that Rothschild's strategic and financial expertise as well as its capital markets knowledge, financing skills, restructuring capabilities, and mergers and acquisitions expertise, some or all of which may be required by Blockbuster during the term of Rothschild's engagement hereunder, were important factors in determining the Fee Structure, and the ultimate benefit to Blockbuster of Rothschild's services hereunder could not be measured by reference to the number of hours to be expended by Rothschild's professionals in the performance of such services.

40.     Blockbuster also acknowledges that the Fee Structure has been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort

will be required of Rothschild and its professionals and in light of the fact that (i) such commitment may foreclose other opportunities for Rothschild and (ii) the actual time and commitment required of Rothschild and its professionals to perform its services may vary substantially from week to week and month to month, creating "peak load" issues for Rothschild.

## VIII.

### INDEMNIFICATION PROVISIONS

41.     As part of the overall compensation payable to Rothschild under the terms of the Engagement Letter, Blockbuster has agreed to certain indemnification and contribution obligations as described in the Engagement Letter and Exhibit A thereto (the "***Indemnification Obligations***").  More specifically, the Indemnification Obligations provide that Blockbuster will indemnify and hold Rothschild harmless against liabilities arising out of or in connection with its retention by Blockbuster, except for any liability for losses, claims, damages, or liabilities incurred by Blockbuster that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from the gross negligence, willful misconduct, bad faith, or fraud of Rothschild.

42.     Blockbuster and Rothschild believe the Indemnification Obligations are customary and reasonable for financial advisory and investment banking engagements, both out of court and in Chapter 11 Cases.  *See, e.g.*, *In re Xerium Techs., Inc.*, Ch. 11 Case No. 10-11031 (KJC) (Bankr. D. Del. Apr. 27, 2010) [Docket No. 150]; *In re Affiliated Media, Inc.*, Ch. 11 Case No. 10-10202 (KJC) (Bankr. D. Del. Mar. 3, 2010) [Docket No. 136]; *In re Trident Res. Corp.*, Ch. 11 Case No. 09-13150 (MFW) (Bankr. D. Del. Jan. 28, 2010) [Docket No. 187]; *In re FairPoint Commc'ns, Inc.*, Ch. 11 Case No. 09-16335 (BRL) (Bankr. S.D.N.Y. Jan 11, 2010) [Docket No. 328]; *In re Charter Commc'ns, Inc.*, Ch. 11 Case No. 09-11435 (JMP) (Bankr. S.D.N.Y. Apr. 15, 2009) [Docket No. 183]; *In re Recycled Paper Greetings Inc.*, Ch. 11 Case

No. 09-10002 (KG) (Bankr. D. Del. Jan. 23, 2009) [Docket No. 147]; *In re VeraSun Energy Corp.*, Ch. 11 Case No. 08-12606 (BLS) (Bankr. D. Del. Jan. 2, 2009) [Docket No. 441]; *In re Movie Gallery, Inc.*, Ch. 11 Case No. 07-33849 (DOT) (Bankr. E.D. Va. Oct. 18, 2007) [Docket No. 114]; *In re Motor Coach Indus. Intl., Inc.*, Ch. 11 Case No. 08-12136 (BLS) (Bankr. D. Del. Oct. 16, 2008) [Docket No. 213]; *In re Calpine Corp.*, Ch. 11 Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. May 1, 2006) [Docket No. 1422]; *In re FLYi, Inc.*, Ch. 11 Case No. 05-20011 (MFW) (Bankr. D. Del. Dec. 2, 2005) [Docket No. 280]; *In re Delphi Corp.*, Ch. 11 Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Nov. 4, 2005) [Docket No. 1372]; *In re Foamex Int'l, Inc.*, Ch. 11 Case No. 05-12685 (PJW) (Bankr. D. Del. Oct. 17, 2005) [Docket No. 203]; *In re Collins & Aikman Corp.*, Ch. 11 Case No. 05-55927 (SWR) (Bankr. E.D. Mich. July 18, 2005) [Docket No. 731].

43.     The terms and conditions of the Engagement Letter, including the Indemnification Obligations contained therein, were negotiated by Blockbuster and Rothschild at arms' length and in good faith.  Blockbuster respectfully submits that the Indemnification Obligations contained in the Engagement Letter, viewed in conjunction with the other terms of Rothschild's proposed retention, are reasonable and in the best interests of the Debtors, their estates, and all parties in interest.  Accordingly, as part of this application, the Debtors request that this Court approve the Indemnification Obligations.

## IX.

## ROTHSCHILD'S DISINTERESTEDNESS

44.     In reliance on the Augustine Affidavit, the Debtors believe that, except as set forth in the Augustine Affidavit:  (i) Rothschild has no connection with Blockbuster, Blockbuster's creditors, the U.S. Trustee, any person employed in the office of the U.S. Trustee or any other party with an actual or potential interest in these Chapter 11 Cases or their respective attorneys or accountants; (ii) Rothschild is not a creditor, equity security holder, or

insider of Blockbuster; (iii) neither Rothschild (nor any of its principals) is or was, within two years of the Commencement Date, a director, officer, or employee of Blockbuster; and (iv) Rothschild does not have an interest materially adverse to the Debtors, their respective estates or any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interest in Blockbuster, or for any other reason. Accordingly, Blockbuster believes that Rothschild is a "disinterested person," as defined in section 101(14) of the Bankruptcy Code and as required by section 327(a) of the Bankruptcy Code.

45.    In the 90 days prior to the Commencement Date, Blockbuster paid Rothschild $700,000 in fees and $162,291.90 for reimbursement of expenses, including $50,000 for estimated expenses already incurred but not yet processed in Rothschild's accounting system, which will be credited against future invoices.

46.    To the extent that any new relevant facts or relationships bearing on the matters described herein during the period of Rothschild's retention are discovered or arise, Rothschild will use reasonable efforts to file promptly a supplemental declaration, as required by Bankruptcy Rule 2014(a).

## X.

## BASIS FOR RELIEF REQUESTED

47.    Blockbuster seeks approval of the Fee Structure and Engagement Letter pursuant to section 328(a) of the Bankruptcy Code, which provides, in relevant part, that Blockbuster "with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a).  Accordingly, section 328 of the Bankruptcy Code permits the compensation of professionals, including investment bankers, on more flexible terms

that reflect the nature of their services and market conditions, which is a significant departure

from prior bankruptcy practice relating to the compensation of professionals. As the United

States Court of Appeals for the Fifth Circuit recognized in *In re Nat'l Gypsum Co.*, 123 F.3d 861

(5th Cir. 1997):

> Prior to 1978 the most able professionals were often unwilling
> to work for bankruptcy estates where their compensation would
> be subject to the uncertainties of what a judge thought the work
> was worth after it had been done. That uncertainty continues
> under the present section 330 of the Bankruptcy Code, which
> provides that the court award to professional consultants
> "reasonable compensation" based on relevant factors of time
> and comparable costs, etc. Under present section 328 the
> professional may avoid that uncertainty by obtaining court
> approval of compensation agreed to with the trustee (or debtor
> or committee).

*Id.* at 862 (citations omitted); *see also Riker, Danzig, Scherer, Hyland & Perretti LLP v. Official*

*Comm. of Unsecured Creditors (In re Smart World Techs. LLC)*, 83 B.R. 869, 874

(S.D.N.Y. 2008). Owing to this inherent uncertainty, courts have approved similar arrangements

that contain reasonable terms and conditions under section 328 of the Bankruptcy Code. *See,*

*e.g., In re Citadel Broad. Corp.*, Ch. 11 Case No. 09-17442 (BRL) (Bankr. S.D.N.Y. Apr. 12,

2010) [Docket No. 271]; *In re Neff Corp.*, Ch. 11 Case No. 10-12610 (SCC) (Bankr. S.D.N.Y.

July 21, 2010) [Docket No. 0293]; *In re Almatis B.V.*, Ch. 11 Case No. 10-12308 (MG) (Bankr.

S.D.N.Y. June 9, 2010) [Docket No. 188]; *In re Uno Rest. Holdings Corp.*, Ch. 11 Case No. 10-

10209 (MG) (Bankr. S.D.N.Y. Mar. 5, 2010) [Docket No. 345]; *In re Trident Res. Corp.*, Ch. 11

Case No. 09-13150 (MFW) (Bankr. D. Del. Jan. 28, 2010) [Docket No. 187]; *In re FairPoint*

*Commc'ns, Inc.*, Ch. 11 Case No. 09-16335 (BRL) (Bankr. S.D.N.Y. Jan. 11, 2010) [Docket No.

328]; *In re Motors Liquidation Company*, Ch. 11 Case No. 09-50026 (REG) (Bankr. S.D.N.Y.

Oct. 28, 2009) [Docket No. 4304].

48.     Section 328(a) of the Bankruptcy Code specifically allows payment on "a fixed or percentage fee basis, or on a contingent fee basis." Thus, the Court should approve Blockbuster's application to employ Rothschild on a fixed percentage fee basis or on a contingent fee basis such as the Fee Structure set forth in the Engagement Letter.

49.     Blockbuster believes the Fee Structure and Indemnification Obligations set forth in the Engagement Letter are reasonable terms and conditions of employment and should be approved under section 328(a) of the Bankruptcy Code. The Fee Structure and Indemnification Obligations adequately reflect: (i) the nature of the services to be provided by Rothschild; and (ii) fee structures and indemnification provisions typically utilized by Rothschild and other leading financial advisory and investment banking firms, which do not bill their time on an hourly basis and generally are compensated on a transactional basis. In particular, Blockbuster believes the proposed Fee Structure creates a proper balance between fixed, monthly fees, and contingency fees based on the successful consummation of certain sales of the Debtors' assets, raises of new capital, and the overall success of these Chapter 11 Cases. Moreover, Rothschild's substantial experience with respect to financial advisory and investment banking services, coupled with the nature and scope of work already performed by Rothschild before the Commencement Date, further suggest the reasonableness of the Fee Structure and Indemnification Obligations.

50.     Finally, similar fixed and contingency fee arrangements have been approved and implemented by courts in other large chapter 11 cases. *See, e.g., In re Citadel Broad. Corp.*, Ch. 11 Case No. 09-17442 (BRL) (Bankr. S.D.N.Y. Apr. 12, 2010) [Docket No. 271]; *In re Uno Rest. Holdings Corp.*, Ch. 11 Case No. 10-10209 (MG) (Bankr. S.D.N.Y. Mar. 5, 2010) [Docket No. 345]; *In re Trident Res. Corp.*, Ch. 11 Case No. 09-13150 (MFW) (Bankr. D. Del. Jan. 28, 2010) [Docket No. 187]; *In re FairPoint Commc'n's, Inc.*, Ch. 11 Case No. 09-

16335 (BRL) (Bankr. S.D.N.Y. Jan. 11, 2010) [Docket No. 328]; *In re Lear Corp.*, Ch. 11 Case.

No. 09-14326 (ALG) Bankr. S.D.N.Y. Aug. 25, 2009) [Docket No. 501]; *In re Gen. Growth*

*Props., Inc.*, Ch. 11 Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. May 26, 2009) [Docket No.

602]; *In re Charter Commc'ns, Inc.*, Ch. 11 Case No. 09-11435 (JMP) (Bankr. S.D.N.Y. Apr. 15,

2009) [Docket No. 183]; *In re Tronox Inc.*, Ch. 11 Case No. 09-10156 (Bankr. S.D.N.Y. Apr. 7,

2009) [Docket No. 339]; *In re Recycled Paper Greetings Inc.*, Ch. 11 Case No. 09-10002 (KG)

(Bankr. D. Del. Jan. 23, 2009) [Docket No. 147]; *In re VeraSun Energy Corp.*, Ch. 11 Case No.

08-12606 (Bankr. D. Del. Jan. 6, 2009) [Docket No. 441]; *In re Motor Coach Indus. Int'l, Inc.*,

Ch. 11 Case No. 08-12136 (Bankr. D. Del. Oct. 17, 2008) [Docket No. 213]; *In re Delphi Corp.*,

Ch. 11 Case No. 05-44481 (Bankr. S.D.N.Y. Nov. 30, 2005) [Docket No. 1363].

## XI.

## NOTICE

51.     No trustee or examiner has been appointed in these chapter 11 cases. The

Debtors have served notice of this Motion on: (i) the Office of the United States Trustee for the

Southern District of New York (Attn: Brian Masumoto, Esq.); (ii) those creditors holding the

fifty largest unsecured claims against the Debtors' estates; (iii) Sheppard, Mullin, Richter &

Hampton LLP, the attorneys for U.S. Bank National Association, as trustee under that certain

indenture agreement, dated as of October 1, 2009, with respect to the 11.75% Senior Secured

Notes due 2014 issued by Blockbuster Inc. (Attn:  Kyle J. Mathews, Esq.); (iv) The Bank of New

York Trust Company, N.A., as trustee under that certain indenture agreement, dated as of August

20, 2004, with respect to the 9% Senior Subordinated Notes due 2012 issued by Blockbuster Inc.

(Attn: Corporate Trust); (v) Sidley Austin LLP, attorneys for the lenders under the proposed

Debtor in Possession Revolving Credit Agreement (the "*DIP Facility*") (Attn:  James Seery,

Esq.); (vi) Wilmington Trust FSB as Agent (the "*Agent*") under the DIP Facility (Attn: Joshua

G. James); and (vii) Skadden, Arps, Slate, Meagher & Flom LLP, the attorneys for the Agent (Attn: Peter J. Neckles, Esq.) (collectively, the "***Notice Parties***"). The Debtors submit that no other or further notice need be provided.

52. No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, for the reasons set forth herein and in the Augustine Affidavit, Blockbuster respectfully requests that the Court enter an order, substantially in the form attached as ***Exhibit "A"***, (a) authorizing Blockbuster to employ and retain Rothschild as its financial advisor and investment banker effective *nunc pro tunc* as of the Commencement Date, (b) approving the terms of the Engagement Letter and the Indemnification Agreement, and (c) granting such other and further relief as it deems just and proper.

Dated: September 23, 2010
     New York, New York

Name: Roderick J. McDonald, Esq.
Title:   Vice President, General
       Counsel, and Secretary to the
       Debtors and Debtors in
       Possession

**Exhibit A**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

| | : | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **BLOCKBUSTER INC., et al.,**[1] | : | **Case No. 10-_____ (__)** |
| | : | |
| | : | **(Jointly Administered)** |
| **Debtors.** | : | |

-------------------------------------------------------------------x

### ORDER PURSUANT TO 11 U.S.C. §§ 327, 328(a), AND 330, FED. R. BANKR. P. 2014(a) AND 2016, AND LOCAL BANKRUPTCY RULES 2014-1 AND 2016-1 AUTHORIZING THE RETENTION AND EMPLOYMENT OF ROTHSCHILD INC. AS FINANCIAL ADVISOR AND INVESTMENT BANKER TO THE DEBTORS *NUNC PRO TUNC* TO THE COMMENCEMENT DATE

Upon the application, dated September 23, 2010 (the "***Application***") of

Blockbuster Digital Technologies Inc., its parent, Blockbuster Inc., and its debtor affiliates, as

debtors and debtors in possession (collectively, "***Blockbuster***" or the "***Debtors***"), pursuant to

sections 327, 328(a), and 330 of title 11 of the United States Code (the "***Bankruptcy Code***"),

Rules 2014(a) and 2016 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy

Rules***"), and Rules 2014-1 and 2016-1 of the Local Bankruptcy Rules for the Southern District

of New York (the "***Local Rules***"), for entry of an order authorizing Blockbuster to retain and

employ Rothschild Inc. ("***Rothschild***") as its financial advisor and investment banker *nunc pro

tunc* to the Commencement Date, under the terms and conditions set forth in that certain

---

[1]    The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Blockbuster Inc. (5102); Blockbuster Canada Inc. (1269); Blockbuster Digital Technologies Inc. (9222); Blockbuster Distribution, Inc. (0610); Blockbuster Gift Card, Inc. (1855); Blockbuster Global Services Inc. (3019); Blockbuster International Spain Inc. (7615); Blockbuster Investments LLC (6313); Blockbuster Procurement LP (2546); Blockbuster Video Italy, Inc (5068); Movielink, LLC (5575); Trading Zone Inc. (8588); and B$^2$ LLC (5219).

engagement letter (the "***Engagement Letter***"),[2] dated as of February 8, 2010, all as more fully set forth in the Application; and upon the Affidavit of Neil Augustine in support of the Application; and this Court having jurisdiction to consider the Application and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Application and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and Blockbuster having provided notice of the Application to the Notice Parties (as defined in the Application); and the Court having held a hearing to consider the requested relief (the "***Hearing***"); and upon the record of the Hearing, and all of the proceedings before this Court, this Court finds and determines that (a) Rothschild does not hold or represent any interest adverse to the Debtors' estates; (b) Rothschild is a "disinterested person" as defined in section 101(14) of the Bankruptcy Code and as required by section 327(a) of the Bankruptcy Code; (c) the terms and conditions of Rothschild's employment, including the compensation structure set forth in the Engagement Letter, are reasonable as required by section 328(a) of the Bankruptcy Code; and (d) the requested relief is in the best interests of the Debtors, the Debtors' estates, creditors, and all parties in interest; and Blockbuster having provided due and proper notice of the Application and the opportunity for a hearing on the Application and no further notice is necessary; the legal and factual bases set forth in the Application and at the Hearing establish just and sufficient cause to grant the relief requested therein; **IT IS HEREBY ORDERED**:

   1.  The Application is granted in its entirety *nunc pro tunc* to the Commencement Date.

---

[2] All capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Engagement Letter.

2.     The Debtors are authorized to employ and retain Rothschild as their financial advisor and investment banker in accordance with the terms and conditions set forth in the Engagement Letter attached hereto as *Exhibit "1* to the Augustine Affidavit and incorporated by reference herein, and to pay fees to Rothschild on the terms and times specified in the Engagement Letter.

3.     Rothschild is entitled to reimbursement by the Debtors for reasonable expenses incurred in connection with the performance of its engagement under the Engagement Letter, including, without limitation, the fees, disbursements and other charges by Rothschild's counsel (which counsel shall not be required to be retained pursuant to section 327 of the Bankruptcy Code or otherwise).

4.     The indemnification provisions included in the Engagement Letter and incorporated by reference herein are approved.

5.     Rothschild shall file fee applications for interim and final allowance of compensation and reimbursement of expenses pursuant to the procedures set forth in sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the guidelines for the U.S. Trustee and any applicable orders of this Court; *provided*, *however*, that the fee applications filed by Rothschild shall be subject to review pursuant to the standard of review set forth in section 328 of the Bankruptcy Code and solely the U.S. Trustee shall be entitled to review applications for payment of compensation and reimbursement of expenses of Rothschild under section 330 of the Bankruptcy Code.

6.     Rothschild shall include in its fee applications, among other things, time records setting forth, in a summary format, a description of the services rendered by each

professional, and the amount of time spent on each date by each such individual in rendering services on behalf of Blockbuster in one-half hour (0.5) increments.

7.     Blockbuster is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

8.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry, notwithstanding the possible applicability of Bankruptcy Rules 6004(g), 7062, or 9014.

9.     The relief granted herein shall be binding upon any chapter 11 trustee appointed in these Chapter 11 Cases, or upon any chapter 7 trustee appointed in the event of a subsequent conversion of these Chapter 11 Cases to cases under chapter 7.

10.    To the extent that this Order is inconsistent with any prior order or pleading with in these cases, the terms of this Order shall govern.

11.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2010
       New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit B

### Augustine Affidavit

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                              :

**In re**                                :      **Chapter 11**
                              :

**BLOCKBUSTER INC.,** *et al.,*[1]        :      **Case No. 10-_____ (__)**
                              :
                              :      **(Joint Administration Requested)**

        **Debtors.**               :
-------------------------------------------------------------------x

## AFFIDAVIT OF NEIL AUGUSTINE IN SUPPORT OF APPLICATION PURSUANT TO 11 U.S.C. §§ 327(a), 328(a), AND 330, FED. R. BANKR. P. 2014(a) AND 2016, AND LOCAL BANKRUPTCY RULES 2014-1 AND 2016-1 TO EMPLOY AND RETAIN ROTHSCHILD INC. AS FINANCIAL ADVISOR AND INVESTMENT BANKER TO THE DEBTORS *NUNC PRO TUNC* TO THE COMMENCEMENT DATE

Pursuant to Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), Neil Augustine, under penalty of perjury, declares as follows:

1.      I am over the age of 18 and competent to testify. I am a Managing Director of the investment banking firm Rothschild Inc. ("***Rothschild***"), which has an office located at 1251 Avenue of the Americas, New York, New York 10020. I am duly authorized to make this statement (the "***Affidavit***") on behalf of Rothschild and in support of the application (the "***Application***")[2] of Blockbuster Digital Technologies Inc., its parent, Blockbuster Inc., and its debtor affiliates, as debtors and debtors in possession (collectively "***Blockbuster***" or the

---

[1]    The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Blockbuster Inc. (5102); Blockbuster Canada Inc. (1269); Blockbuster Digital Technologies Inc. (9222); Blockbuster Distribution, Inc. (0610); Blockbuster Gift Card, Inc. (1855); Blockbuster Global Services Inc. (3019); Blockbuster International Spain Inc. (7615); Blockbuster Investments LLC (6313); Blockbuster Procurement LP (2546); Blockbuster Video Italy, Inc (5068); Movielink, LLC (5575); Trading Zone Inc. (8588); and B[2] LLC (5219).

[2]    Capitalized terms used, but not defined, herein shall have the same meanings as in the Application.

"**_Debtors_**") in the above-captioned Chapter 11 Cases, for entry of an order authorizing Blockbuster to employ and retain Rothschild as financial advisors and investment bankers for Blockbuster in connection with its Chapter 11 Cases. Unless otherwise stated in this Affidavit, I have personal knowledge of the matters set forth herein.

2.      I submit this affidavit in compliance with sections 105, 327, 328, 330, and 1107(a) of the Bankruptcy Code and to provide the disclosure required under Rule 2014(a), 2016, and 5002 of the Bankruptcy Rules.

3.      Rothschild believes that its services will not duplicate the services that other professionals will be providing to Blockbuster in these Chapter 11 Cases. Specifically, Rothschild will carry out unique functions and will use reasonable efforts to coordinate with Blockbuster's other retained professionals to avoid the unnecessary duplication of services.

## XII.

## <u>ROTHSCHILD'S QUALIFICATIONS</u>

4.      Rothschild is a member of one of the world's leading independent investment banking groups, with expertise in domestic and cross border mergers and acquisitions, restructurings, privatization advice, and other investment banking and financial advisory services. A private firm with approximately 220 employees in the United States and offices in New York and Washington, D.C., Rothschild is experienced in providing high quality investment banking and financial advisory services to financially troubled companies. Rothschild is highly qualified to advise on strategic alternatives and its professionals have extensive experience in deals involving complex financial and operational restructurings. Rothschild is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.

5.     Rothschild and its professionals also have extensive experience working with financially troubled companies from a variety of industries in complex financial restructurings, both out of court and in chapter 11 cases.  Rothschild's business reorganization professionals have extensive experience in advising debtors, creditors, and other constituents in chapter 11 cases and have served as financial and strategic advisors in numerous cases, including, among others: *In re Xerium Techs., Inc.*, Ch. 11 Case No. 10-11031 (KJC) (Bankr. D. Del. Apr. 27, 2010) [Docket No. 150]; *In re Affiliated Media, Inc.*, Ch. 11 Case No. 10-10202 (KJC) (Bankr. D. Del. Mar. 3, 2010) [Docket No. 136]; *In re Trident Res. Corp.*, Ch. 11 Case No. 09-13150 (MFW) (Bankr. D. Del. Jan. 28, 2010) [Docket No. 187]; *In re FairPoint Commc'ns, Inc.*, Ch. 11 Case No. 09-16335 (BRL) (Bankr. S.D.N.Y. Jan. 11, 2010) [Docket No. 328]; *In re MIG, Inc.*, Ch. 11 Case No. 09-12118 (KG) (Bankr. D. Del. Sept. 4, 2009) [Docket No. 176]; *In re Sea Launch Co., LLC*, Ch. 11 Case No. 09-12153 (BLS) (Bankr. D. Del. Aug. 20, 2009) [Docket No. 211]; *In re Visteon Corp.*, Ch. 11 Case No. 09-11786 (CSS) (Bankr. D. Del. July 1, 2009) [Docket No. 474]; *In re Sun-Times Media Group, Inc.*, Ch. 11 Case No. 09-11092 (CSS) (Bankr. D. Del. May 12, 2009) [Docket No. 173]; *In re Tronox Inc.*, Ch. 11 Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Apr. 7, 2009) [Docket No. 339]; *In re Milacron Inc.*, Ch. 11 Case No. 09-11235 (JVA) (Bankr. S.D. Ohio Apr. 6, 2009) [Docket No. 236]; *In re PPI Holdings, Inc.*, Ch. 11 Case No. 08-13289 (KG) (Bankr. D. Del. Feb. 4, 2009) [Docket No. 254]; *In re Recycled Paper Greetings Inc.*, Ch. 11 Case No. 09-10002 (KG) (Bankr. D. Del. Jan. 23, 2009) [Docket No. 147]; *In re Circuit City Stores, Inc.*, Ch. 11 Case No. 08-35653 (KRH) (Bankr. E.D. Va. Jan. 9, 2009) [Docket No. 1435]; *In re VeraSun Energy Corp.*, Ch. 11 Case No. 08-12606 (BLS) (Bankr. D. Del. Jan. 6, 2009) [Docket No. 460]; *In re Motor Coach Indus. Intl., Inc.*, Ch. 11 Case No. 08-12136 (BLS) (Bankr. D. Del. Oct. 17, 2008) [Docket No. 213]; *In*

*re BHM Techs.*, Ch. 11 Case No. 08-04413 (SWD) (Bankr. W.D. Mich. July 25, 2008) [Docket No. 452]; *In re Hilex Poly Co. LLC*, Ch. 11 Case No. 08-10890 (KJC) (Bankr. D. Del. May 30, 2008) [Docket No. 135]; *In re Delphi Corp.*, Ch. 11 Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Nov. 30, 2005) [Docket No. 1363]; *In re Solutia Inc.*, Ch. 11 Case No. 03-17949 (PCB) (Bankr. S.D.N.Y. Apr. 13, 2005) [Docket No. 752]; *In re Int'l Wire*, Ch. 11 Case No. 04-11991 (BRL) (Bankr. S.D.N.Y. Mar. 25, 2004) [Docket No. 31]; *In re WestPoint Stevens, Inc.*, Ch. 11 Case No. 03-13532 (RDD) (Bankr. S.D.N.Y. June 6, 2003) [Docket No. 32]; *In re Viasystems Group, Inc.*, Ch. 11 Case No. 02-14867 (ALG) (Bankr. S.D.N.Y. Nov. 21, 2002) [Docket No. 69]; *In re Guilford Mills, Inc.*, Ch. 11 Case No. 02-40667 (BRL) (Bankr. S.D.N.Y. June 26, 2002) [Docket No. 255].

6.     Further, as a result of Rothschild's prepetition engagement by Blockbuster, Rothschild has developed a reserve of institutional knowledge related to, and an intimate understanding of, Blockbuster's business operations, capital structure, key stakeholders, financing documents and other material information, and therefore will be able to facilitate Blockbuster's effort to maximize value in these Chapter 11 Cases.  I believe that Rothschild and the professionals it employs are uniquely qualified to advise Blockbuster in the matters for which Rothschild is proposed to be employed.

7.     The Fee Structure described in the Application and Engagement Letter is consistent with Rothschild's normal and customary billing practices for comparably-sized and complex cases and transactions, both in and out of court, involving the services to be provided in connection with these Chapter 11 Cases.  Further, the Fee Structure was established to reflect the difficulty of the extensive assignments Rothschild expects to undertake.  Accordingly,

Rothschild believes that the foregoing compensation arrangements are both reasonable and market-based.

8.　　Rothschild will file interim and final fee applications for the allowance of compensation for services rendered and reimbursement of expenses incurred in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the guidelines for the U.S. Trustee for the Southern District of New York (the "*U.S. Trustee*"), and any applicable orders of this Court.

9.　　Rothschild will maintain detailed records of any actual and necessary costs and expenses incurred in connection with the aforementioned services. Rothschild's applications for compensation and expenses will be paid by Blockbuster, pursuant to the terms of the Engagement Letter, in accordance with the procedures established by the Court.

10.　　According to Rothschild's books and records, within the 90-day period prior to the Petition Date, Blockbuster paid Rothschild $700,000 in fees and $162,291.90 for reimbursement of expenses, including $50,000 for estimated expenses already incurred but not yet processed in Rothschild's accounting system, which will be credited against future invoices.

**XIII.**

**ROTHSCHILD'S DISINTERESTEDNESS**

11.　　In connection with Rothschild's proposed employment and retention by the Debtors, Rothschild undertook a conflicts analysis to determine whether it had any conflicts or other relationships that might cause it to represent or hold any interest adverse to the Debtors' estates. In connection with this inquiry, Rothschild obtained from Blockbuster and/or its representatives a list of names of individuals and entities that may be parties-in-interest in these Chapter 11 Cases (the "*Potential Parties in Interest*"), which included the following:

a.  Debtors (including trade names and aliases up to 8 years);

b.  Affiliates and Subsidiaries;

c.  Franchisee Parent Companies;

d.  Sublessees;

e.  Officers and Directors (Current and Former);

f.  Officer and Director Affiliations;

g.  Financial Advisors;

h.  Consolidated List of Top 50 Largest Unsecured Creditors;

i.  Litigation Parties;

j.  Professionals to be Retained in these Chapter 11 Cases;

k.  Movie Studios;

l.  Taxing Authorities;

m.  Ordinary Course Professionals;

n.  Vendors (exceeding a threshold of $100,000);

o.  IT/Digital Vendors;

p.  Utilities;

q.  Insurance Providers;

r.  Banks;

s.  Office of the United States Trustee for the Southern District of New York;

t.  Landlords;

u.  Equipment Lessors;

v.  Indenture Trustees for: (i) Indenture agreement dated as of October 1, 2009 and (ii) Indenture agreement, dated as of August 20, 2004; and

w.  Significant Equity Holders (greater than 5%)

12. To the best of my knowledge and belief, Rothschild has not represented any Potential Parties in Interest in connection with matters relating to the Debtors, their estates, assets, or businesses and will not represent other entities which are creditors of, or have other relationships to, the Debtors in matters relating to these Chapter 11 Cases except as set forth herein and in *Exhibit "2"* attached hereto.

13. Rothschild provides financial advice and investment banking services to an array of clients in the areas of restructuring and distressed debt. As a result, Rothschild has represented, and may in the future represent, certain Potential Parties in Interest in matters unrelated to these Chapter 11 Cases, either individually or as part of representation of a committee of creditors or interest holders. To the best of my knowledge, information and belief, insofar as I have been able to ascertain after reasonable inquiry, none of these representations are adverse to Blockbuster's interests.

14. To the best of my knowledge and belief, neither Rothschild nor I, nor any other employee of Rothschild that will work on Blockbuster's engagement has any connection with or holds any interest adverse to the Debtors, their estates or the Potential Parties in Interest in matters related to Rothschild retention in these Chapter 11 Cases, except (i) as set forth in Exhibit 2 and (ii) as otherwise set forth below:

15. Before the commencement of these cases, Rothschild rendered prepetition services to Blockbuster. As noted above, although Rothschild's records indicate that it is not owed any amounts in respect of prepetition services provided to Blockbuster, it is possible that certain expenses that were incurred by Rothschild, and that are reimbursable under the terms of the Engagement Letter, were not yet reflected on Rothschild's books and records as of the Commencement Date. Upon entry of the Order approving the Application, Rothschild will

waive any claim for such unreimbursed expenses in excess of amounts paid to Rothschild pre-petition.

16. Rothschild is a large investment banking firm and has likely provided services unrelated to Blockbuster for companies and individuals that have conducted business in the past and/or currently conduct business with Blockbuster, and who may be creditors of Blockbuster. To the best of my knowledge, information and belief, Rothschild's services to these parties were and are wholly unrelated to the Debtors, their estates, or these Chapter 11 Cases.

17. As part of its practice, Rothschild appears in numerous cases, proceedings, and transactions involving many different professionals, some of which may represent claimants and parties in interest in Blockbuster's Chapter 11 Cases. Furthermore, Rothschild has in the past and will likely in the future be working with or against other professionals involved in these cases in matters unrelated to these cases. Based on my current knowledge of the professionals involved, and to the best of my knowledge and information, none of these business relationships represents an interest materially adverse to Blockbuster herein in matters upon which Rothschild is to be engaged.

18. Rothschild, through the equity owners of its parent company, Rothschild North America Inc., has indirect affiliate relationships with numerous investment banking institutions located worldwide (the "*Affiliated Entities*"). However, none of the Affiliated Entities is being retained in connection with this engagement and none of the professionals or employees of the Affiliated Entities will provide services to Blockbuster in connection with this engagement. None of the professionals or employees of Rothschild has discussed or will discuss the Debtors' cases with any professional or employee of the Affiliated Entities. Thus, there has

not been and will not be any flow of information between Rothschild and any Affiliated Entity with respect to any matter pertaining to the Debtors or their Chapter 11 Cases. Rothschild can make no representation as to the disinterestedness of the professionals or employees of the Affiliated Entities in respect of the Debtors' Chapter 11 Cases.

19.　To the best of my knowledge, no individual assignment referenced on Exhibit 2 currently accounts for more than 2% of Rothschild's gross annual revenues.

20.　To the best of my knowledge, information, and belief, except as described herein, Rothschild has not been retained to assist any entity or person other than Blockbuster on matters relating to these Chapter 11 Cases. Rothschild will, however, continue to provide professional services to entities or persons that may be creditors or equity security holders of Blockbuster or Interested Parties in these Chapter 11 Cases; *provided* that such services do not relate to, or have any direct connection with, these Chapter 11 Cases or Blockbuster.

21.　If any new relevant facts or relationships are discovered or arise during the pendency of these Chapter 11 Cases, Rothschild will use reasonable efforts to identify such further developments and will promptly file a supplemental affidavit as required by Bankruptcy Rule 2014.

22.　I am not related or connected to and, to the best of my knowledge, no other professional of Rothschild who will work on this engagement is related or connected to, any United States Bankruptcy Judge for the Southern District of New York, any of the District Judges for the Southern District of New York who handle bankruptcy cases, or any employee in the Office of the U.S. Trustee.

23.     To the best of my knowledge, Rothschild has no agreement with any other

entity to share with such entity any compensation received by Rothschild in connection with

Blockbuster's bankruptcy cases.

24.     Accordingly, except as otherwise set forth herein, insofar as I have been

able to determine, none of Rothschild, I, nor any employee of Rothschild who will work on the

engagement holds or represents any interest adverse to the Debtors or their estates, and

Rothschild is a "disinterested person" as that term is defined in section 101(14) of the

Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, in that Rothschild,

and its professionals and employees who will work on the engagement:

(a)     are not creditors, equity security holders, or insiders of Blockbuster;

(b)     were not, within two years before the date of filing of the Debtors' chapter
11 petitions, a director, officer, or employee of Blockbuster; and

(c)     do not have an interest materially adverse to the interest of the Debtors'
estates or any class of creditors or equity security holders, by reason of
any direct or indirect relationship to, connection with, or interest in the
Debtors, or for any other reason.

25.     If Rothschild discovers additional information that requires disclosure,

Rothschild promptly will file a supplemental disclosure with the Court as required by

Bankruptcy Rule 2014.

26.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

foregoing is true and correct.

Dated:     September 22, 2010
           New York, New York

By:     Neil Augustine
Title:  Managing Director,
        Rothschild Inc.

DONNA GRASSO SHANDLEY
Notary Public, State Of New York
No.01GR6058322
Qualified In Westchester County
Commission Expires May 7, 20 11

10

## Exhibit 1

### Engagement Letter

As of February 8, 2010

James W. Keyes
Chairman of the Board and Chief Executive Officer
Blockbuster Inc.
1201 Elm Street
Dallas, Texas 75270



Dear Mr. Keyes:

This letter (the "Agreement") will confirm the terms and conditions of the agreement by and among Blockbuster Inc., together with its respective direct and indirect subsidiaries (the "Company") and Rothschild Inc., collectively with its affiliates, successors and assignees, as appropriate and as permitted pursuant to Section 9(b) below ("Rothschild"), regarding the retention of Rothschild as financial advisor and investment banker to the Company in connection with any New Capital Raise, Recapitalization Transaction and/or M&A Transaction (each as defined below and collectively, a "Transaction").

Section 1    Services to be Rendered.  In connection with the formulation, analysis and implementation of various options for a recapitalization, restructuring, reorganization or other strategic alternative relating to the Company, whether pursuant to a Transaction or any series or combination of Transactions, Rothschild will perform the following services to the extent Rothschild deems necessary, appropriate and feasible (and in any event, as are appropriate to be provided by a top-tier investment bank conducting projects of the nature described in this Agreement) and as requested or approved by the Company:

(a)    review and analyze the business plans and financial projections prepared by the Company including, but not limited to, testing assumptions and comparing those assumptions to historical Company and industry trends;

(b)    evaluate the Company's debt capacity in light of its projected cash flows and assist in the determination of an appropriate capital structure for the Company;

(c)    identify and/or initiate potential Transactions;

(d)    advise the Company on the risks and benefits of considering a Transaction with respect to the Company's intermediate and long-term business prospects and strategic alternatives to maximize the business enterprise value of the Company;

(e)    assist in the negotiations with the Company's (i) senior secured noteholders; (ii) senior subordinated noteholders; (iii) preferred shareholders; (iv) common shareholders; (v) studios; and (vi) such other creditors or constituents reasonably requested by the Company, in each case, as needed to effectuate any Transaction as approved by management, the Company or, if required, by the Company's Board of Directors;

(f)    review and analyze any proposals the Company receives from third parties in connection with a Transaction or other transaction, including, without limitation, any proposals for debtor-in-possession ("DIP") financing, as appropriate;

Rothschild Inc.
1251 Avenue of the Americas
New York, NY 10020
www.rothschild.com

(g)    assist in soliciting and structuring DIP and/or exit financing should the Company and/or any of its direct or indirect subsidiaries seek protection under the Bankruptcy Code (as defined below);

(h)    solicit interest from investors and/or buyers for a M&A Transaction (as defined below);

(i)    assist or participate in negotiations with parties in interest, including, without limitation, any current or prospective creditors of, holders of equity in, or claimants against the Company and/or their respective representatives in connection with a Transaction;

(j)    advise the Company with respect to, and attend meetings of, (i) the Company's Board of Directors (including its Transaction Committee); (ii) creditor groups; (iii) studios; (iv) official constituencies and (v) other interested parties, as necessary;

(k)    in the event the Company determines to commence any Chapter 11 case then, at such time, if requested by the Company, participate in hearings before the court in which such case is commenced and prosecuted (the "Bankruptcy Court") and provide relevant testimony with respect to the matters described herein and issues arising in connection with any proposed Plan (as defined below); and

(l)    render such other financial advisory and investment banking services as may be agreed upon by Rothschild and the Company.

As used herein, the term "Recapitalization Transaction" shall mean any of the transactions referred to in clauses (a) through (d) below, whether implemented through or pursuant to a plan of reorganization (a "Plan") confirmed in connection with any case or cases commenced by or against the Company or any of its subsidiaries or any combination thereof, whether individually or on a consolidated basis (a "Bankruptcy Case"), under Title 11 of the United States Code §§ 101 et seq. (the "Bankruptcy Code") or otherwise; (a) any transaction or series of transactions that effects material amendments to or other material changes in any of the Company's outstanding indebtedness, and other liabilities including, without limitation, any exchange, tender or repurchase of the Company's indebtedness; (b) any material recapitalization, restructuring, reorganization, exchange offer, tender offer, refinancing or similar transaction involving the Company or any securities issued by the Company, whether or not pursuant to a Plan; (c) pursuant to § 363 of the Bankruptcy Code (i) any merger, consolidation, business combination or other transaction pursuant to which the Company's U.S. operations, substantially as an entirety, (or control thereof) is acquired by, or combined with, any person, group of persons, partnership, corporation or other entity (an "Acquirer") or (ii) any acquisition, directly or indirectly, by an Acquirer (or by one or more persons acting together with an Acquirer pursuant to a written agreement or otherwise), whether in a single transaction, multiple transactions or a series of transactions, of (A) other than in the ordinary course of business, the U.S.-based assets, business or operations of the Company, substantially as an entirety (or control thereof) or (B) any outstanding or newly-issued shares of the

Company's capital stock or any securities convertible into, or options, warrants or other rights to acquire such capital stock or other equity securities of the Company, for the purpose of effecting, participating in or pursuing a recapitalization or change of control of the U.S.-based operations of the Company substantially as an entirety (or control thereof); provided that the term "Recapitalization Transaction" in each such case under this clause (c) will apply only to transactions involving a credit bid where the sole consideration includes pre- and post-petition loans, trade claims, leases, other similar outstanding pre- and post-petition indebtedness or other non-cash consideration (a "Credit Bid Transaction"); or (d) any transaction similar to any of the foregoing. A transaction will not be deemed to be a "Recapitalization Transaction" unless: (x) such transaction is implemented through or pursuant to a Plan or (y) such transaction is approved by the Board of Directors of the Company or the Bankruptcy Court.

As used herein, the term "M&A Transaction" shall mean (a) other than pursuant to a Credit Bid Transaction (i) any merger, consolidation, business combination or other transaction pursuant to which the Company (or control thereof) is acquired by, or combined with, any person, group of persons, partnership, corporation or other entity (an "Acquirer") (in the case of any or all of the foregoing, only in a transaction in which the Company or any of its subsidiaries or any shareholder thereof is a contracting party) or (ii) any acquisition, directly or indirectly, by an Acquirer (or by one or more persons acting together with an Acquirer pursuant to a written agreement or otherwise), whether in a single transaction, multiple transactions or a series of transactions (in the case of any or all of the foregoing, only in a transaction in which the Company or any of its subsidiaries or any shareholder thereof is a contracting party), of (A) other than in the ordinary course of business, any material portion of the assets, business or operations of the Company or (B) any outstanding or newly-issued shares of the Company's capital stock or any securities convertible into, or options, warrants or other rights to acquire such capital stock or other equity securities of the Company, for the purpose of effecting, participating in or pursuing a recapitalization or change of control of the Company or (b) any transaction similar to any of the foregoing. Notwithstanding any other provision of this Agreement, a M&A Transaction must be a going-concern transaction involving the U.S.-based operations or assets of the Company substantially as an entirety (or control thereof). If the Company requests Rothschild's assistance with a transaction involving operations or assets other than the U.S.-based operations or assets of the Company substantially as an entirety, including but not limited to a sale of the Company's United Kingdom, Canada, Mexico or Italy operations, the fees for any such other transaction shall be mutually agreed upon by Rothschild and the Company, in writing, in advance. A transaction will not be deemed to be a "M&A Transaction" unless such transaction is approved by the Board of Directors of the Company or the Bankruptcy Court. In addition, for the avoidance of doubt, an Online Assets Transaction (as defined in the letter agreement between the Company and Rothschild dated as of August 7, 2009) shall not, for so long as such agreement is in effect, constitute a M&A Transaction hereunder.

In performing its services pursuant to this Agreement, and notwithstanding anything to the contrary herein, Rothschild is not assuming any responsibility for the Company's decision to pursue (or not to pursue) any business strategy or to effect (or not to effect) any Transaction or

other transaction. Rothschild shall not have any obligation or responsibility to provide accounting, audit, "crisis management" or business consultant services to the Company, and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements.

<u>Section 2</u>    <u>Information Provided by the Company.</u>

(a)    The Company understands and agrees that the services to be rendered by Rothschild pursuant to Section 1 of this Agreement and the advice, whether formal or informal, relating thereto are solely for the benefit and use of the Company. The Company agrees that any reports, recommendations or opinions, which are provided to the Company in the context of this engagement, shall not be summarized, excerpted from, disclosed publicly, made available to third parties (other than the Company's board of directors and any of the Company's attorneys, advisors, employees, officers and affiliates) or otherwise referred to, in whole or in part, without the prior written consent of Rothschild or as the Company determines is required to comply with any applicable law or judicial, regulatory or legal process.   Any reference to Rothschild in a press release or other document shall be submitted to Rothschild for its approval prior to distribution or dissemination thereof.

(b)    The Company will cooperate with Rothschild and furnish to, or cause to be furnished to, Rothschild any and all information that Rothschild reasonably requests and as Rothschild reasonably deems appropriate to enable Rothschild to render services hereunder (all such information being the "Information").   The Company recognizes and confirms that Rothschild (i) will use and rely solely on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having assumed any obligation to verify independently the same; (ii) does not assume responsibility for the accuracy or completeness of the Information and such other information and (iii) will not act in the official capacity of an appraiser of specific assets of the Company or any other party.   The Company confirms that the information relating to the Company (other than Company estimates, forecasts and other forward-looking information) to be furnished by the Company, when delivered, to the best of its knowledge, will be prepared in good faith and will be true and correct in all material respects.. The Company will promptly notify Rothschild if it learns of any material inaccuracy or misstatement in, or material omission from, any Information theretofore delivered to Rothschild.

(c)    The Company acknowledges that in the course of this engagement it may be necessary for Rothschild and the Company to communicate electronically. The Company further acknowledges that although Rothschild will use commercially reasonable procedures to check for the most commonly known viruses, the electronic transmission of information cannot be guaranteed to be secure or error-free.   Furthermore, such information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete or otherwise be adversely affected or unsafe to use.  Accordingly, the Company agrees that, to the extent Rothschild utilizes such commercially reasonable procedures, Rothschild shall have no liability to the Company with respect to any

electronic or transmission error or omission arising from or in connection with the electronic communication of information to the Company or the Company's resulting reliance on such information.

(d)     As used herein, the term "Confidential Information" shall mean all Information provided to Rothschild by the Company other than information which (i) has become part of the public domain other than by acts or omissions of Rothschild or its employees; (ii) becomes available to Rothschild on a non-confidential basis from a source other than the Company, provided that source is not bound by a confidentiality agreement with the Company or otherwise prohibited from transmitting the information to Rothschild by a contractual, legal or fiduciary obligation or (iii) was in Rothschild's possession prior to disclosure by the Company and was not acquired by Rothschild, its employees or representatives directly or, to Rothschild's knowledge, indirectly from the Company.  Except as required by applicable law or judicial, regulatory or legal process, Rothschild shall keep confidential (with the same level of care Rothschild uses with its own confidential business information) all Confidential Information, and shall not disclose such Confidential Information to any third party except to those persons who need to know such information in connection with Rothschild's performance of its responsibilities hereunder, including, but not limited to, its employees or advisors, and who are advised of the confidential nature of the Confidential Information and who agree to keep such information confidential. Rothschild agrees that the Confidential Information shall not be used for any purpose other than Rothschild's engagement under this Agreement.  If Confidential Information is requested from Rothschild as a result of legal or administrative process, Rothschild shall use commercially reasonable efforts to give the Company prompt written notice of such circumstance. Rothschild shall not make any public announcements regarding the Company without the prior written consent of the Company.

(e)     All Confidential Information, including such information stored electronically on Rothschild's computer systems, shall be the sole and exclusive property of the Company.  Upon termination of this Agreement, after notice to the Company, Rothschild shall destroy all copies of the Confidential Information, including Confidential Information stored electronically on Rothschild's computer systems; provided, however, that Rothschild shall be entitled to retain (i) copies of all Confidential Information to be retained in Rothschild's records management or legal department for record and archive purposes only and (ii) Confidential Information Rothschild is required to retain in order to satisfy the requirements of any law, regulation or securities exchange rule applicable to Rothschild, in each case, subject to the confidentiality provisions of this Agreement.

Section 3     Application for Retention of Rothschild.  In the event a Bankruptcy Case is commenced, the Company shall apply promptly to the Bankruptcy Court pursuant to §§ 327(a) and 328(a) of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure, applicable local rules and procedural orders of the Bankruptcy Court and procedural guidelines established by the Office of the United States Trustee, for approval of (a) this Agreement and (b) Rothschild's retention by the Company under the terms of this Agreement, (including, without

limitation, the reimbursement of the fees, disbursements and other charges of Rothschild's counsel pursuant to Section 6 hereof without the requirement that the retention of such counsel be approved by the Bankruptcy Court), *nunc pro tunc* to the date the Chapter 11 case was commenced, and shall use reasonable best efforts to obtain Bankruptcy Court authorization thereof. The Company shall use reasonable best efforts to obtain such Bankruptcy Court approval and authorization subject only to the subsequent review by the Bankruptcy Court under the standard of review provided in §328(a) of the Bankruptcy Code and not subject to the standard of review set forth in § 330 of the Bankruptcy Code. The Company shall supply Rothschild and its counsel with a draft of such application and any proposed order authorizing Rothschild's retention sufficiently in advance of the filing of such application and proposed order to enable Rothschild and its counsel to review and comment thereon. Rothschild shall have no obligation to provide any services under this Agreement unless Rothschild's retention under the terms of this Agreement is approved in the manner set forth above by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which order is reasonably acceptable to Rothschild in all respects. In the event Rothschild's retention is denied by the Bankruptcy Court then Rothschild will have no right or claim to any fees or expenses under this Agreement, other than any claim for fees and expenses that were due and payable prior to the date the Bankruptcy Case was commenced.

Rothschild acknowledges that in the event that the Bankruptcy Court approves its retention by the Company pursuant to the application process described in this Section 3, payment of Rothschild's fees and expenses shall be subject to (i) the jurisdiction and approval of the Bankruptcy Court under § 328(a) of the Bankruptcy Code and any order approving Rothschild's retention; (ii) any applicable fee and expense guidelines and/or orders and (iii) any requirements governing interim and final fee applications. In the event that Rothschild's engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of Rothschild hereunder as promptly as practicable in accordance with the terms hereof and the orders governing interim and final fee applications, and after obtaining all necessary further approvals from the Bankruptcy Court, if any, provided, however, that the Company shall use reasonable efforts by filing any necessary motions sufficiently in advance of the closing of any Transaction or similar transaction, or confirmation and effectiveness of a Plan, to seek authorization to pay any fees set forth in Section 4 hereof to Rothschild simultaneously with the closing of such transaction or Transaction or Plan effectiveness, as applicable.

In agreeing to seek Rothschild's retention under § 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that Rothschild's general restructuring experience and expertise, its knowledge of the capital markets and its merger and acquisition capabilities will inure to the benefit of the Company, that the value to the Company of Rothschild's services hereunder derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the Monthly Fee, the New Capital Fee, the Recapitalization Fee and the M&A Fee (each as defined below), are reasonable regardless of the number of hours to be expended by Rothschild's professionals in performance of the services provided hereunder.

Section 4    Fees of Rothschild.  As compensation for the services rendered hereunder, the Company, and its successors, if any, agree to pay Rothschild (via wire transfer or other mutually acceptable means) the following fees in cash:

(a)    Commencing on April 1, 2010 and whether or not a Transaction is proposed or consummated, an advisory fee (the "Monthly Fee") of $175,000 per month for the first six (6) months of this Agreement and $125,000 per month thereafter.  The initial Monthly Fee shall be payable by the Company on April 1, 2010.  Thereafter, the Monthly Fee shall be payable by the Company in advance on the first day of each month.

(b)    A new capital fee (the "New Capital Fee") equal to the following percentages of the gross cash proceeds of any new capital or refinancing capital raised: (i) 1.0% for all secured debt, including any DIP financing, but not including debt raised from Callidus secured exclusively by Canadian collateral; (ii) 2.0% for all unsecured debt; and (iii) 4.0% for any equity capital or hybrid capital raised (each, a "New Capital Raise").  Notwithstanding the above, a New Capital Fee shall not be earned with respect to any capital provided by the Company's existing creditors or shareholders, including any reinstatement of existing debt on a consensual or non-consensual basis pursuant to a Plan or otherwise.  The New Capital Fee shall be payable upon the closing of the transaction by which the new capital is committed.  For the avoidance of doubt, the term "raised" shall include the amount committed or otherwise made available to the Company whether or not such amount (or any portion thereof) is drawn down at closing or is ever drawn down and whether or not such amount (or any portion thereof) is used to refinance existing obligations of the Company.

(c)    A recapitalization fee (the "Recapitalization Fee") payable upon the consummation of a Recapitalization Transaction equal to $3,100,000; provided, that the Recapitalization Fee shall equal (i) $4,500,000 in the event that such Recapitalization Transaction is consummated "out-of-court" or (ii) $4,000,000, in the event that such Recapitalization Transaction is part of a "prepackaged" Plan in which the necessary votes were solicited and obtained in order to confirm a Plan prior to the commencement of a Bankruptcy Case.  Rothschild shall be entitled to only a single Recapitalization Fee if more than one Recapitalization Transaction is consummated.

(d)    A fee (the "M&A Fee") as specified in Exhibit B hereto shall be payable at the closing of any M&A Transaction.  In the event that the Company consummates multiple Transactions that constitute M&A Transactions, the M&A Fee shall be determined on the aggregate consideration of such M&A Transactions.

(e)    To the extent the Company requests Rothschild to perform additional services not contemplated by this Agreement, such additional fees shall be mutually agreed upon by Rothschild and the Company, in writing, in advance.

Notwithstanding any other provision of this Agreement, in the event the Company enters into a single Transaction that constitutes both a Recapitalization Transaction and a M&A

Transaction, Rothschild shall be paid only the greater of the Recapitalization Fee and the M&A Fee. Upon becoming entitled to receive any Recapitalization Fee or M&A Fee, Rothschild thereafter shall not be entitled to earn or be paid any other fee hereunder (other than any New Capital Fees and any Monthly Fees, if any, earned prior to any such M&A Transaction or Recapitalization Transaction), including, without limitation, the Recapitalization Fee or M&A Fee (except that if the Company then elects not to terminate this Agreement, the Monthly Fee will continue to apply) and the Company shall have the option to terminate this Agreement with no further obligation (including but not limited to any Tail Obligation). No M&A Fee shall be earned with respect to any transaction with or capital provided primarily or solely by the Company's existing creditors or shareholders or their respective affiliates. No New Capital Fee shall be earned with respect to any transaction with or capital provided by the Company's existing creditors or shareholders or their respective affiliates, including any reinstatement of existing debt on a consensual or non-consensual basis pursuant to any Plan.

The Company and Rothschild agree that unless and until a definitive agreement providing for a Transaction has been executed by all parties thereto, and to the extent it is necessary approved by the appropriate authority, (for the avoidance of doubt, an agreement is not executed if signature pages are held in escrow or are not exchanged), neither the Company nor its affiliates are or will be under any legal obligation of any kind whatsoever to pay the Recapitalization Fee, the M&A Fee or the New Capital Fee pursuant to this Agreement. Rothschild acknowledges and agrees that this Agreement and its engagement hereunder do not impose or otherwise create any obligation on the Company and its affiliates to negotiate or consummate any Transaction and the Company and its affiliates reserve the right, in their sole discretion, to reject any and all proposals made by any person or entity with regard to any Transaction, to terminate discussions and negotiations with any such persons or entities with respect to any Transaction for any reason or no reason and to make any decisions whether or not to consummate any Transaction.

The Company and Rothschild acknowledge and further agree that (i) the hours worked, (ii) the results achieved, and (iii) the ultimate benefit to the Company of the work performed, in each case, in connection with this engagement, may be variable, and that the Company and Rothschild have taken such factors into account in setting the fees hereunder.

Section 5    Credit.  To the extent not otherwise credited hereunder, Rothschild shall credit (a) 50% of all Monthly Fees paid under Section 4(a) in excess of $525,000 in the aggregate (the "Monthly Fee Credit") against the Recapitalization Fee or the  M&A Fee and (b) 50% of any New Capital Fees paid under Section 4(b) against the Recapitalization Fee or the M&A Fee (the "New Capital Fee Credit").   The sum of the Monthly Fee Credit and the New Capital Fee Credit; however, shall not exceed the relevant Transaction fee against which it is to be credited.

Section 6    Expenses.  Without in any way reducing or affecting the provisions of Exhibit A hereto, the Company shall reimburse Rothschild for its reasonable and documented out-of-pocket expenses incurred in connection with the performance of its engagement hereunder (but limited, in the case of legal counsel, to the reasonable and documented fees, disbursements and

other charges of one firm of outside counsel). Reasonable and documented out-of-pocket expenses shall also include, but not be limited to, expenses incurred in connection with travel and lodging, data processing and communication charges, research and courier services. Rothschild shall use commercially reasonable efforts to minimize expenses in the performance of its services hereunder. In the event the Company becomes a debtor and/or a debtor-in-possession in a Chapter 11 case, consistent with and subject to any applicable order of the Bankruptcy Court, the Company shall promptly reimburse Rothschild for such expenses under this Section 6 upon presentation of an invoice or other similar documentation with reasonable detail.

Section 7    Indemnity. The Company agrees to the provisions of Exhibit A hereto which provide for indemnification by the Company of Rothschild and certain related persons. Such indemnification is an integral part of this Agreement and the terms thereof are incorporated by reference as if fully stated herein. Such indemnification shall survive any termination, expiration or completion of this Agreement or Rothschild's engagement hereunder. Notwithstanding anything to the contrary, but without limiting or in any way compromising any of the Company's obligations set forth in Exhibit A, other than with respect to the payment of fees and expenses to Rothschild in accordance with this Agreement, neither the Company nor any of its affiliates, employees, officers or directors shall have any liability to Rothschild relating to, or resulting from, any breach by the Company of any of its other obligations under this Agreement.

Section 8    Term. The term of Rothschild's engagement shall extend until the earlier of the confirmation and effectiveness of a Plan or the closing of a Transaction; provided, however, this Agreement may be terminated by either the Company or Rothschild after ninety days (90) at any time without liability or continuing obligation to Rothschild or the Company except as set forth in this Section 8. If terminated, Rothschild shall be entitled to payment of any fees for any monthly period which are due and owing to Rothschild upon the effective date of termination; however, such amounts will be pro-rated for any incomplete monthly period of service, and Rothschild will be entitled to reimbursement of any and all reasonable and documented out-of-pocket expenses as described in Section 6. Termination of Rothschild's engagement hereunder shall not affect or impair the Company's continuing obligation to indemnify Rothschild and certain related persons as provided in Exhibit A. Without limiting any of the foregoing, a New Capital Fee, Recapitalization Fee and/or M&A Fee, as the case may be, shall be payable in the event that (i) the engagement is terminated by the Company and a New Capital Raise, Recapitalization Transaction or M&A Transaction, as applicable, is consummated at anytime prior to the expiration of one year after the effective date of such termination or (ii) a definitive agreement with respect thereto is executed at any time prior to one year after such termination (which definitive agreement within no later than 18 months after the date of such termination results in the consummation of a New Capital Raise, Recapitalization Transaction or M&A Transaction, as applicable) (items (i) and (ii), collectively, the "Tail Obligation"), in each case (A) as to which Rothschild advised the Company hereunder prior to the termination of this Agreement, subject to the limitations set forth in the immediately following sentence and (B) which involves a party identified to the Company by Rothschild or with whom the Company had discussions regarding a Transaction, in each case during the term of Rothschild's engagement hereunder. For the avoidance of doubt, Rothschild shall in no event be

entitled to payment of any fees contemplated by this Agreement (including, fees in connection with the Tail Obligation) and the Tail Obligation shall immediately terminate and be of no force and effect if, prior to the closing of a Transaction, (i) Rothschild resigns or (ii) Rothschild is terminated by the Company for bad faith, willful misconduct or gross negligence or a material breach of the express terms of this Agreement that is not cured within 5 days after receipt of written notice thereof by the Company.

Section 9    Miscellaneous.

(a)    Administrative Expense Priority.    In the event the Company determines to commence Chapter 11 cases in order to pursue a Transaction, the Company agrees that the application to retain Rothschild shall seek Bankruptcy Court approval that Rothschild's post-petition compensation as set forth herein and payments made pursuant to reimbursement and indemnification provisions of this Agreement shall be entitled to priority as expenses of administration under § 503(b)(1)(A) and 507(a)(1) of the Bankruptcy Code and shall be entitled to the benefits of any "carve-outs" for professional fees and expenses in effect in such Chapter 11 cases pursuant to one or more financing orders entered by the Bankruptcy Court.

(b)    Survival, Successors & Assigns.    Sections 6 through 9 hereof, inclusive, including the provisions set forth in Exhibit A hereto, shall survive the termination or expiration of this Agreement.    Subject to the last sentence of this paragraph, the benefits of this Agreement and the indemnification and other obligations of the Company to Rothschild and certain related persons contained in Exhibit A hereto shall inure to the respective successors and assigns of the parties hereto and thereto and of the indemnified parties, and the obligations and liabilities assumed in this Agreement and Exhibit A by the parties hereto and thereto shall be binding upon their respective successors and assigns.    Rothschild shall not assign or otherwise delegate this agreement or any of its rights or obligations hereunder without the express written consent of the Company (which can be withheld in the Company's sole and absolute discretion.    Any assignment or delegation of this Agreement or the rights/obligations hereunder in violation hereof shall not be effective for any purposes.

(c)    Benefit of Agreement; No Reliance by Third Parties.    The advice (oral or written) rendered by Rothschild pursuant to this Agreement is intended solely for the benefit and use of the Company and its officers, directors, employees and professionals in considering the matters to which this Agreement relates.

(d)    Nature of Relationship.    The relationship of Rothschild to the Company hereunder shall be that of an independent contractor and Rothschild shall have no authority to bind, represent or otherwise act as agent, executor, administrator, trustee, lawyer or guardian for the Company, nor shall Rothschild have the authority to manage money or property of the Company.    The parties hereto acknowledge and agree that by providing the services contemplated hereunder, Rothschild will not act, nor will it be deemed to have acted, in any managerial or fiduciary capacity

whatsoever with respect to the Company or any third party including security holders, creditors or employees of the Company.

(e) <u>Rothschild Affiliates</u>. Rothschild, through the equity owners of its parent company, Rothschild North America Inc., has indirect affiliate relationships with numerous investment banking institutions located worldwide (the "Affiliated Entities"). None of the Affiliated Entities is being retained hereunder nor will any professionals or employees of the Affiliated Entities provide services to the Company in connection with the matters contemplated hereby. The Affiliated Entities are involved in a wide range of investment banking and other activities. Rothschild can make no representation as to the "disinterestedness" (as defined in the Bankruptcy Code) of the professionals or employees of the Affiliated Entities. Information that is held by the Affiliated Entities will not for any purpose be taken into account in determining Rothschild's responsibilities to the Company hereunder. None of the Affiliated Entities will have any duty to disclose to the Company or any other party, or utilize for the Company's benefit, any non-public information acquired in the course of providing services to any other person engaging in any transaction or otherwise carrying on its business.

(f) <u>Required Information</u>. For your information, Rothschild may screen the Company against various databases to verify its identity.

(g) <u>Public Announcements</u>. The Company acknowledges that Rothschild may at its option and expense, after announcement of the Transaction, place announcements and advertisements or otherwise publicize the Transaction in such financial and other newspapers and journals as it may choose, stating that Rothschild acted as financial advisor to the Company in connection with such Transaction. The Company further consents to Rothschild's public use or display of Company's logo, symbol or trademark as part of Rothschild's general marketing or promotional activities.

(h) <u>CHOICE OF LAW: JURISDICTION</u>. THIS AGREEMENT HAS BEEN NEGOTIATED, EXECUTED AND DELIVERED AT AND SHALL BE DEEMED TO HAVE BEEN MADE IN NEW YORK, NEW YORK. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAWS. REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF THE PARTIES HERETO, EACH SUCH PARTY HEREBY IRREVOCABLY CONSENTS AND AGREES THAT ANY AND ALL CLAIMS OR DISPUTES BETWEEN THE PARTIES HERETO PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE BROUGHT IN ANY OF (A) ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE OF NEW YORK OR (B) THE BANKRUPTCY COURT OR ANY COURT HAVING APPELLATE JURISDICTION OVER THE BANKRUPTCY COURT. BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT

COMMENCED IN ANY SUCH COURT. EACH PARTY HERETO HEREBY WAIVES ANY OBJECTION WHICH IT MAY HAVE BASED ON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT. EACH PARTY CONSENTS TO THE SERVICE OF PROCESS IN ACCORDANCE WITH NEW YORK LAW.

(i)      Waiver of Jury Trial.  Each of the parties hereto hereby knowingly, voluntarily and irrevocably waives any right it may have to a trial by jury in respect of any claim upon, arising out of or in connection with this Agreement.  Each of the parties hereto hereby certifies that no representative or agent of any other party hereto has represented expressly or otherwise that such party would not seek to enforce the provisions of this waiver.  Each of the parties hereto hereby acknowledges that it has been induced to enter into this Agreement by and in reliance upon, among other things, the provisions of this paragraph.

(j)      Entire Agreement.   This Agreement embodies the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understandings relating to the matters provided for herein.  No alteration, waiver, amendment, change or supplement hereto shall be binding or effective unless the same is set forth in writing signed by a duly authorized representative of each of the parties hereto.

(k)      Authority.  Each party hereto represents and warrants that it has all requisite power and authority to enter into this Agreement and Exhibit A and the transactions contemplated hereby. Each party hereto further represents that this Agreement has been duly and validly authorized by all necessary corporate action and has been duly executed and delivered by each of the parties hereto and constitutes the legal, valid and binding agreement thereof, enforceable in accordance with its terms except as may be limited by law or in equity.  Rothschild will assume that any instructions, notices or requests have been properly authorized by the Company if they are given or purported to be given by, or is reasonably believed by Rothschild to be a director, officer, employee or authorized agent.

(l)      Counterparts.  This Agreement may be executed in as many counterparts as may be deemed necessary and convenient, and by the different parties hereto on separate counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by telecopier or electronic mail shall be effective as delivery of a manually executed counterpart to this Agreement.

(m)      Notices.  Any notice given pursuant to, or relating to, this Agreement shall be in writing and shall be mailed or delivered by courier (a) if to the Company, at the address set forth above, Attn: James W. Keyes and (b) if to Rothschild, to Rothschild Inc., 1251 Avenue of the Americas, 51st Floor, New York, New York 10020, Attention: Neil Augustine and Steven



Tishman, and a copy to Rothschild Inc., 1251 Avenue of the Americas, 51st Floor, New York, New York 10020, Attention: General Counsel.

     If the foregoing correctly sets forth the understanding and agreement between Rothschild and the Company, please so indicate by signing the enclosed copy of this letter, whereupon it shall become a binding agreement between the parties hereto as of the date first above written.

Very truly yours,

ROTHSCHILD INC.

By: _____
    Neil Augustine
    Managing Director

Date: 4/29/10

By: _____
    Steven Tishman
    Managing Director

Date: 4/29/10

Accepted and Agreed to as of
the date first written above:

BLOCKBUSTER INC.

By: _____
Name: James W. Keyes
Title: Chairman and CEO

Date: 5/4/10

396923v6

## Exhibit A

The Company shall indemnify and hold harmless Rothschild and its affiliates, and the respective directors, officers, controlling persons, agents and employees of each of the foregoing (Rothschild and each of such other persons, an "Indemnified Party" and, collectively, the "Indemnified Parties"), from and against any losses, claims or proceedings, including, without limitation, stockholder actions, damages, judgments, assessments, investigation costs, settlement costs, fines, penalties, arbitration awards and any other liabilities, costs, fees and expenses (collectively, "Losses") directly or indirectly related to, in connection with, arising out of, based upon, or in any way related to the engagement of Rothschild under this Agreement or any transaction or conduct in connection therewith, provided that the Company shall not be required to indemnify any Indemnified Party for such Losses if it is finally judicially determined by a court of competent jurisdiction that such Losses arose primarily because of the gross negligence, willful misconduct, bad faith or fraud of such Indemnified Party.

The Company shall further reimburse any Indemnified Party promptly after obtaining the necessary approval of the Bankruptcy Court, if any, for any legal or other fees, disbursements or expenses as they are incurred (a) in investigating, preparing, pursuing or settling any action or other proceeding (whether formal or informal) or threat thereof, whether or not in connection with pending or threatened litigation or arbitration and whether or not any Indemnified Party is a party, in each case, for which indemnification under this Agreement is available (each, an "Action") and (b) in connection with enforcing such Indemnified Party's rights under this Agreement; provided, however, that in the event and only to the extent that it is finally judicially determined by a court of competent jurisdiction that the Losses of such Indemnified Party arose primarily because of the gross negligence, willful misconduct, bad faith or fraud of such Indemnified Party, such Indemnified Party will promptly remit to the Company any amounts reimbursed under this paragraph.

Upon receipt by an Indemnified Party of notice of any Action, such Indemnified Party shall notify the Company in writing of such Action, but the failure to so notify shall not relieve the Company from any liability hereunder (a) if the Company had actual notice of such Action or (b) unless and only to the extent that the Company suffers actual material prejudice as a result of such failure. The Company may assume the defense of any such Action including the employment of counsel reasonably satisfactory to Rothschild and will not, without the prior written consent of Rothschild (which consent will not be unreasonably withheld or delayed), settle, compromise, consent or otherwise resolve or seek to terminate any pending or threatened Action (whether or not any Indemnified Party is a party thereto) unless such settlement, compromise, consent or termination (i) contains an express, unconditional release of each Indemnified Party from all liability relating to such Action; and (ii) does not include a statement as to, or an admission of fault, culpability or a failure to act by or on behalf of any Indemnified Party. Any Indemnified Party shall be entitled to retain separate counsel of its choice and participate in the defense of any Action in connection with any of the matters to which this Agreement relates, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (x) the Company has failed promptly

to assume the defense and employ counsel or (y) the named parties to any such Action (including any impleaded parties) include such Indemnified Party and the Company, and such Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or in addition to those available to the Company; provided that the Company shall not in such event be responsible under this Agreement for the fees and expenses of more than one firm of separate counsel (in addition to local counsel) in connection with any such Action in the same jurisdiction.

The Company agrees that if any right of any Indemnified Party set forth in the preceding paragraphs is finally judicially determined to be unavailable (except by reason of the gross negligence, willful misconduct, bad faith or fraud of such Indemnified Party), or is insufficient to hold such Indemnified Party harmless against such Losses as contemplated herein, then the Company shall contribute to such Losses (a) in such proportion as is appropriate to reflect the relative benefits received by the Company, on the one hand, and such Indemnified Party, on the other hand, in connection with the transactions contemplated hereby, and (b) if (and only if) the allocation provided in clause (a) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (a) but also the relative fault, if any, of the Company and such Indemnified Party; provided, that, in no event shall the aggregate contribution of all such Indemnified Parties exceed the amount of fees received by Rothschild under this Agreement. Benefits received by Rothschild shall be deemed to be equal to the compensation paid by the Company to Rothschild in connection with this Agreement. Relative fault shall be determined by reference to, among other things, whether any alleged untrue statement or omission or any other alleged conduct relates to information provided by the Company or other conduct by the Company (or the Company's employees or other agents) on the one hand or by Rothschild on the other hand.

The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with advice or services rendered or to be rendered by any Indemnified Party pursuant to this Agreement, the transactions contemplated hereby or any Indemnified Party's actions or inactions in connection with any such advice, services or transactions except for and only to the extent that such Losses of the Company are finally judicially determined by a court of competent jurisdiction to have arisen primarily because of the gross negligence, willful misconduct, bad faith or fraud of such Indemnified Party in connection with any such advice, actions, inactions or services.

The rights of the Indemnified Parties hereunder shall be in addition to any other rights that any Indemnified Party may have at common law, by statute or otherwise. Except as otherwise expressly provided for in this Agreement, if any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other

authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall all remain in full force and effect and shall in no way be affected, impaired or invalidated. The reimbursement, indemnity and contribution obligations of the Company set forth herein shall apply to any modification of this Agreement and shall remain in full force and effect regardless of any termination of, or the completion of any Indemnified Party's services under or in connection with, this Agreement.

## Exhibit B

## ROTHSCHILD INC.

### M&A Fee Schedule

(Dollars In Millions)

| Aggregate<br>Consideration[a] | M&A Fee<br>Percentage [b] |
|---|---|
| $100.0 | 1.75% |
| 200.0 | 1.50 |
| 300.0 | 1.25 |
| 400.0 | 1.10 |
| 500.0 | 1.00 |
| 600.0 | 0.90 |
| 700.0 | 0.85 |
| 800.0 | 0.80 |
| 900.0 | 0.75 |
| 1,000.0 | 0.70 |

(a)   For purposes hereof, the term "Aggregate Consideration" shall mean the total amount of all cash plus the total value (as determined pursuant hereto) of all securities, and other consideration, including, without limitation, any contingent or earned consideration, paid or payable in connection with a M&A Transaction (including, without limitation, amounts paid to holders of any warrants, stock purchase rights or convertible securities of the Company and to holders of any options or stock appreciation rights issued by the Company, whether or not vested); provided, however, that the Company shall have no obligation to pay a fee on account of Aggregate Consideration until such Aggregate Consideration is actually received and realized by the Company.  Aggregate Consideration shall also include the amount of any indebtedness for borrowed money (less Company cash retained by the purchaser) and capitalized leases repaid, defeased or retired in connection with or in anticipation of a M&A Transaction or (y) existing on the Company's balance sheet at the time of a M&A Transaction (if such M&A Transaction takes the form of a merger, consolidation or a sale of stock or partnership interests) or assumed in connection with a M&A Transaction (if such M&A Transaction takes the form of a sale of assets).  In the event such M&A Transaction takes the form of a recapitalization, restructuring, spin-off, split-off or similar transaction, Aggregate Consideration shall include the fair market value of any securities received by the Company's security holders in exchange for or in respect of securities of the Company following such M&A Transaction (all securities received by such security holders being deemed to have been paid to such security holders in such M&A Transaction).  The value of securities that are freely tradable in an established public market will be determined on the basis of the last market closing price prior to the consummation of an

M&A Transaction. The value of securities that are not freely tradable or have no established public market, or if the consideration consists of property other than securities, the value of such property shall be the fair market value thereof as determined in good faith by the Company and Rothschild, provided, however, that all debt securities shall be valued at their stated principal amount without applying a discount thereto. If the consideration to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such consideration is payable. Aggregate Consideration shall also include the face amount of any liabilities tendered as purchase price in connection with any credit bid.

(b) Percentages rounded to two decimal places. The applicable M&A Fee Percentage for Aggregate Consideration value amounts which fall between the amounts listed above shall be calculated based on a straight line interpolation of the percentages in the M&A Fee Schedule. For Aggregate Consideration value amounts which fall below or above the amounts listed above, the applicable M&A Fee Percentage shall be agreed upon by Rothschild and the Company in good faith consistent with the above fee schedule.

## **Exhibit 2**

## **Relationships With Potential Parties in Interest**

# Relationships With Potential Parties In Interest

## Blockbuster Inc.

| Party in Interest | Entity With Which Rothschild Inc. Has a Connection | Nature of Connection |
|---|---|---|
| ADT Security Services Inc | ADT Worldwide | RINC was involved in a transaction unrelated to Blockbuster where ADT Worldwide was a participant. |
| AIG Cat Excess Liability | AIG | Current RINC client on matters unrelated to Blockbuster. |
| AT&T; AT&T CFM; AT&T Mobility II LLC; AT&T – Data Center; AT&T – Web Hosting; SBC Global Services, INC DBA AT&T Global Services; AT&T Long Distance | AT&T | Current RINC client on matters unrelated to Blockbuster. |
| Ameren CIPS/66875, 66878; Ameren UE/66301, 66529; Amerenip; Amerencilco – 66826 | Ameren Corporation | Former RINC client on matters unrelated to Blockbuster. |
| America Online Incorporated | AOL Time Warner | Client pitches by RINC on matters unrelated to Blockbuster. |
| American Express Company; American Express Co; American Express Load 092509 | American Express | RINC Vendor. |
| Automatic Data Processing Inc. | Automatic Data Processing Inc. | RINC Vendor. |
| Bank of America; Bank of America, National Association successor in interest to Continental Illinois Bank and Trust Company of Chicago; Bank of America, National Association, successor in interest by corporate merger, consolidation, amendment or conversion to Fleet National Bank; Bank of America, N.A. | Bank of America Capital Investors | Current RINC client on matters unrelated to Blockbuster. |
| Barclay Group; Barclay Group Development Holdings LLP; Barclay Group | Barclays Capital | RINC was involved in a transaction unrelated to Blockbuster where Barclays |

RINC has limited its search to the Parties in Interest provided by Blockbuster Incorporated. Affiliates, subsidiaries or parent companies of Parties In Interest have not been searched unless specifically noted.

| Party in Interest | Entity with which RINC has a Connection | Nature of Connection |
|---|---|---|
| No. 10, Limited Partnership | | Capital was an interested party. |
| Bear Stearns Commercial Mortgages, Inc. | Bear Stearns | RINC was involved in a transaction unrelated to Blockbuster where Bear Stearns was an interested party. |
| BellSouth Inc. | Bell Canada; Bell Alliant; Bell South Latin America | RINC was involved in separate transactions unrelated to Blockbuster where Bell Canada and Bell Alliant were participants. Both transactions were subsequently abandoned.<br><br>Client pitches by RINC to Bell South Latin America on matters unrelated to Blockbuster. |
| Best Buy Co., Inc. | Best Buy Co., Inc. | Client pitches by RINC on matters unrelated to Blockbuster. |
| Black Hills Energy | Black Hills Corp. | RINC was involved in a transaction unrelated to Blockbuster where Black Hills Corp. was a participant. |
| Blackberry (Research in Motion) | Blackberry | RINC Vendor. |
| BP International, Inc. | BP PLC | Former RINC client on matters unrelated to Blockbuster. |
| Carl Icahn | Carl Icahn | In matters unrelated to these cases, RINC has in the past and may in the future be working with or against companies of which Mr. Icahn was/is a Director. |
| CDW Corp; CDW Corporation | CDW | RINC Vendor. |
| Centerpoint Energy Arkla/ 4583; Centerpoint Energy Minnegasco/4671; Centerpoint Energy/1325/4981/2628 | CenterPoint Energy Inc. | Client pitches by RINC on matters unrelated to Blockbuster. |
| Circuit City Stores, Inc. | Circuit City Stores, Inc. | Former RINC client on matters unrelated |

RINC has limited its search to the Parties in Interest provided by Blockbuster Incorporated. Affiliates, subsidiaries or parent companies of Parties In Interest have not been searched unless specifically noted.

**Source: Interested Party List 9/17/2010**

| Party in Interest | Entity with which RINC has a Connection | Nature of Connection |
|---|---|---|
| | | to Blockbuster. |
| Citigroup / Smith Barney; Citigroup Incorporated | Citigroup Mezzanine III LP; Citigroup Infrastructure Fund. | RINC was involved in transaction unrelated to Blockbuster where Citigroup Mezzanine III LP and was an interested party.<br><br>Client pitch by RINC to Citigroup Infrastructure Fund on matters unrelated to Blockbuster. |
| Citrix | Citrix | RINC Vendor. |
| Conagra | ConAgra Foods, Inc. | Client pitch by RINC on matters unrelated to Blockbuster. |
| Crystal Reports | Crystal Reports | RINC Vendor. |
| Deloitte & Touche LLP; Deloitte Tax LLP | Deloitte Consulting | Former RINC client on matters unrelated to Blockbuster. |
| Dell Inc.; Dell Computers (BO); Dell Computers | Dell | RINC Vendor. |
| DeMoulas Super Markets; DeMoulas Super Markets, Inc.; DeMoulas Super Markets, Inc. (DSM) | The George DeMoulas Family | Current RINC client on matters unrelated to Blockbuster. |
| Deutsche Bank Securities, Inc. | Deutsche Bank | RINC and Deutsche Bank were co-advisors in a potential buy-side transaction involving Blockbuster Inc. The transaction was subsequently abandoned. |
| DIRECTV; DirecTV Holdings LLC; DIRECTV, Inc. | DirecTV | Client pitches by RINC on matters unrelated to Blockbuster. |
| Domtar; Domtar LLC | Domtar | Former RINC client on matters unrelated to Blockbuster. |
| DTE Energy/2859/67-069A | DTE Energy Company | Client pitches by RINC on matters unrelated to Blockbuster. |

RINC has limited its search to the Parties in Interest provided by Blockbuster Incorporated. Affiliates, subsidiaries or parent companies of Parties In Interest have not been searched unless specifically noted.

| Party in Interest | Entity with which RINC has a Connection | Nature of Connection |
|---|---|---|
| Duke Energy/70516, 9001076 | Duke Energy | Former RINC client on matters unrelated to Blockbuster. |
| Duquesne Light Company | Duquesne Light Holdings | Client pitches by RINC on matters unrelated to Blockbuster. |
| E*Trade Financial Corp. | E*Trade | Client pitches by RINC on matters unrelated to Blockbuster. |
| Eastman Kodak Co.; Kodak | Eastman Kodak Company | Client pitch by RINC on matters unrelated to Blockbuster. |
| EchoStar Corp. | EchoStar Communications Corp. | Client pitches by RINC on matters unrelated to Blockbuster. |
| Electronic Data Systems Corporation | Electronic Data Systems | Client pitches by RINC on matters unrelated to Blockbuster. |
| Facebook, Inc., a Delaware corporation | Facebook | Client pitches by RINC on matters unrelated to Blockbuster. |
| Fairpoint Communications | Fairpoint Communications | Former RINC client on matters unrelated Blockbuster. |
| Federal Express Corporation | Federal Express Corporation | RINC Vendor. |
| Ford Motor Co. | Ford Motor Company | RINC was involved in a transaction unrelated to Blockbuster where Ford was an interested party. |
| Frank Crystal & Company | Frank Crystal & Company | Current RINC client on matters unrelated to Blockbuster. |
| GE Acquisition Corp.; GE Capital Franchise Finance Corporation; GE Commercial Finance Business Property Corporation, successor in interest to General Electric Capital Business Asset Funding Corporation | GE Capital; GE Commercial Finance Entity; GE SeaCo Services Ltd. | RINC was involved in separate transactions unrelated to Blockbuster where GE Capital and GE Commercial Finance Entity were participants.<br><br>Client pitches by RINC to GE SeaCo Services Ltd. on matters unrelated to |

RINC has limited its search to the Parties in Interest provided by Blockbuster Incorporated. Affiliates, subsidiaries or parent companies of Parties In Interest have not been searched unless specifically noted.

Source: Interested Party List 9/17/2010

| Party in Interest | Entity with which RINC has a Connection | Nature of Connection |
|---|---|---|
| | | Blockbuster. |
| Georgia Power | Georgia Power | RINC was involved in a transaction unrelated to Blockbuster where Georgia Power was a participant. The transaction was subsequently abandoned. |
| Goldman Sachs Group, Inc. | Goldman Sachs PIA | Client pitches by RINC on matters unrelated to Blockbuster. |
| Google Inc. | Google Inc. | Client pitches by RINC on matters unrelated to Blockbuster. |
| Green Mountain Power (GMP) | Green Mountain Power Corp. | RINC was involved in a transaction unrelated to Blockbuster where Green Mountain Power Corp. was a participant. The transaction was subsequently abandoned. |
| Hilco Merchant Resources LLC | Hilco Trading Company | Client pitches by RINC on mattes unrelated to Blockbuster. |
| Hughes Electronics Corp. | Hughes Communications, Inc. | Client pitches by RINC on matters unrelated to Blockbuster. |
| Intel Corporation | Intel Corporation | Current RINC client on matters unrelated to Blockbuster. |
| International Paper | International Paper Company | Former RINC client on a matter unrelated to Blockbuster. |
| International Power & Light (IPL) | International Power | Client pitches by RINC on matters unrelated to Blockbuster. |
| Iron Mountain | Iron Mountain | RINC Vendor. |
| James Crystal | James Crystal | James Crystal is the Chairman and Chief Executive Officer of Frank Crystal & |

RINC has limited its search to the Parties in Interest provided by Blockbuster Incorporated. Affiliates, subsidiaries or parent companies of Parties In Interest have not been searched unless specifically noted.

**Source: Interested Party List 9/17/2010**

| Party in Interest | Entity with which RINC has a Connection | Nature of Connection |
|---|---|---|
| | | Company, a current RINC client. |
| James W. Keyes | James W. Keyes | RINC has in the past and may in the future be working with or against companies of which Mr. Keyes was/is a director. |
| JPMorgan Chase & Co.; JPM Chase; JPMorgan Chase Bank, N.A.; JP Morgan Securities Inc. | JP Morgan; JP Morgan Asset Management; JPMorgan Asset Management - Infrastructure | RINC was involved two separate transactions where JP Morgan and JP Morgan Asset Management were participants. Both transactions were unrelated to Blockbuster.<br><br>Client pitches by RINC to JP Morgan Asset Management – Infrastructure on matters unrelated to Blockbuster. |
| Kekst & Company | Kekst & Company | RINC Vendor. |
| Latham & Watkins LLP | Latham & Watkins LLP | RINC Vendor. |
| Lenovo | Lenovo | RINC Vendor. |
| Level 3 Communications LLC | Level 3 Communications | Client pitches by RINC on matters unrelated to Blockbuster. |
| Macquarie Countrywide-Regency II, LLC; Macquarie Equipment Finance, LLC | Macquarie Infrastructure Co. LLC | RINC was involved in a transaction unrelated to Blockbuster where Macquarie Infrastructure Co. LLC was a participant. The transaction was subsequently abandoned. |
| Mercer Trust Company | Mercer Trust Company | RINC Vendor. |
| Metro Goldwyn Mayer Inc.; MGM Inc | MGM (US) | Former RINC client on matters unrelated to Blockbuster. |

RINC has limited its search to the Parties in Interest provided by Blockbuster Incorporated. Affiliates, subsidiaries or parent companies of Parties In Interest have not been searched unless specifically noted.

Source: Interested Party List 9/17/2010

| Party in Interest | Entity with which RINC has a Connection | Nature of Connection |
| --- | --- | --- |
| Microsoft | Microsoft | RINC Vendor. |
| MidAmerican Energy Company | MidAmerican Energy Holdings | RINC was involved in a transaction unrelated to Blockbuster where MidAmerican Energy Holdings was a participant. The transaction was subsequently abandoned. |
| National Grid -1048; National Grid – Brooklyn/020690/29212; National Grid – Hicksville/9037/9040; National Grid – Massachusetts/1005; National Grid – New York /1303; National Grid – Rhode Island/1049; National Grid – Woburn/4300 | National Grid Group | Former RINC client on matters unrelated to Blockbuster. |
| National Union Fire Ins. Co. | National Union Fire Ins. Co. | RINC Vendor. |
| NCR Corporation | NCR Corp. | Client pitches by RINC on matters unrelated to Blockbuster. |
| New York Life Insurance | New York Life Insurance | RINC Vendor. |
| Nomura Corp Research | Nomura Securities Co., Ltd. | RINC was involved in a transaction unrelated to Blockbuster where Nomura Securities Co., Ltd. was a participant. The transaction was subsequently abandoned. |
| Pacific Gas & Electric | Pacific Gas & Electric Company | Former RINC client on matters unrelated to Blockbuster. RINC employee currently serving as a Board Member of Pacific Gas & Electric Company. |
| PNC | PNC Equity Management | RINC was involved in a transaction unrelated to Blockbuster where PNC Equity Management was a participant. |
| Pitney Bowes; Pitney Bowes Global | Pitney Bowes Inc | Client pitch by RINC on matters unrelated |

RINC has limited its search to the Parties in Interest provided by Blockbuster Incorporated. Affiliates, subsidiaries or parent companies of Parties In Interest have not been searched unless specifically noted.

**Source: Interested Party List 9/17/2010**

| Party in Interest | Entity with which RINC has a Connection | Nature of Connection |
|---|---|---|
| Financial Service, LLC | | to Blockbuster. |
| Prentice Capital Management LP | Prentice Capital | RINC was involved in a potential transaction involving both Prentice Capital and Blockbuster Inc. The transaction was subsequently abandoned. |
| Qwest Corporation, successor in interest to Northwestern Bell Telephone Company and US West Communications, Inc.; Qwest | Qwest Communications International | Client pitches by RINC on matters unrelated to Blockbuster. Former RINC client on matters unrelated to Blockbuster. |
| Rabobank | Rabobank; Rabobank Group | Rabobank is a former RINC affiliate client on matters unrelated to Blockbuster. Rabobank Group and Rothschild Group have established a global co-operation agreement in the food and agricultural sectors and are involved in several transactions unrelated to Blockbuster. |
| Rent-A-Center, Inc. | Rent-A-Center | Client pitch by RINC on a matter unrelated to Blockbuster. |
| Richards Layton & Finger PA | Richards Layton & Finger PA | RINC Vendor. |
| Rite Aid Corporation; Rite Aid of Florida, Inc.; Rite Aid of Michigan | Rite Aid Corporation | Current RINC client on matters unrelated to Blockbuster. |
| Screen Media Ventures, LLC | Screen Media Ventures LLC | Client pitch by RINC on a matter unrelated to Blockbuster. |
| Sprint Wireline | Sprint Corp. | Former RINC client on matters unrelated to Blockbuster. |
| Sony Pictures Home Entertainment, Inc.; Sony BMG Music Entertainment; Sony Computer Entertainment America Inc.; Sony Electronics Inc / 1029410 | Bertelsmann Music AG; BMG Music Publishing | RINC was involved in a transaction unrelated to Blockbuster where BMG Music Publishing and Bertelsmann Music AG were participants. The transaction |

RINC has limited its search to the Parties in Interest provided by Blockbuster Incorporated. Affiliates, subsidiaries or parent companies of Parties In Interest have not been searched unless specifically noted.

| Party in Interest | Entity with which RINC has a Connection | Nature of Connection |
|---|---|---|
| | | was subsequently abandoned. |
| St. Paul Fire & Marine Insurance Company | St. Paul Fire & Marine Insurance Company | RINC Vendor. |
| Starbucks Corporation; Starbucks Coffee Company | Starbucks Corporation | RINC was involved in a transaction unrelated to Blockbuster where Starbucks Corporation was an interested party. |
| State of New York, Department of Transportation | New York State Department of Transportation | Former RINC client on a matter unrelated to Blockbuster. The transaction was subsequently abandoned. |
| SunGard Availability Services | SunGard Availability Services | RINC Vendor. |
| SunTrust | SunTrust Bank | RINC was involved in a transaction unrelated to Blockbuster where SunTrust Bank was an interested party. |
| Symantec | Symantec | RINC Vendor. |
| T Mobile | T-Mobile USA, Inc. | RINC was involved in a transaction unrelated to Blockbuster where T-Mobile USA, Inc. was a participant. The transaction was subsequently abandoned. |
| Time Warner Cable of NYC | Time Warner Inc. | RINC was involved in a transaction unrelated to Blockbuster where Time Warner Inc. was a participant. The transaction was subsequently abandoned. |
| United Parcel Service; The UPS Store; The UPS Store #1696; UPS Dallas | UPS | RINC Vendor. |
| VeriSign, Inc | VeriSign, Inc | RINC Vendor. |
| Verizon (MCI); Verizon Select Summary; Verizon Communications Corp. | Verizon | Client pitches by RINC on matters unrelated to Blockbuster. |
| Viacom International Inc. | Viacom | RINC was involved in several separate |

RINC has limited its search to the Parties in Interest provided by Blockbuster Incorporated. Affiliates, subsidiaries or parent companies of Parties In Interest have not been searched unless specifically noted.

| Party in Interest | Entity with which RINC has a Connection | Nature of Connection |
|---|---|---|
| | | transactions unrelated to Blockbuster where Viacom was a participant. |
| Vivendi Entertainment | Vivendi Universal Entertainment; Vivendi Universal S.A.; Vivendi Universal Games; Vivendi Universal Interactive Pub. N. America | RINC was involved in a transaction where Vivendi Universal Entertainment and Vivendi Universal S.A. were participants. The transaction was subsequently abandoned.<br><br>Client pitches by RINC to Vivendi Universal Games and Vivendi Universal Interactive Pub. N. America on matters unrelated to Blockbuster. |
| Wal Mart Stores Inc. and Walmart.com; Walmart Stores 6489; Wal-Mart Corp. | WalMart Stores Inc. | Client pitches by RINC on matters unrelated to Blockbuster. |
| Wells Fargo Bank, N.A.; Wells Fargo; Wells Fargo Bank, National Association, as Trustee for the registered holders of Credit Suisse First Boston Mortgage Securities Corp. commercial mortgage pass-through certificates, Series 2004-C1; Wells Fargo Bank, National Association, successor in interest by corporate merger, consolidation, amendment or conversion to First State | Wells Fargo Leasing | Client pitches by RINC to Wells Fargo Leasing on matters unrelated to Blockbuster. |

RINC has limited its search to the Parties in Interest provided by Blockbuster Incorporated. Affiliates, subsidiaries or parent companies of Parties In Interest have not been searched unless specifically noted.

Source: Interested Party List 9/17/2010

| Party in Interest | Entity with which RINC has a Connection | Nature of Connection |
|---|---|---|
| Bank of Spring Lake Park; Wells Fargo Bank N.A. (Colorado); Wells Fargo Bank, N.A. – San Francisco, CA; Wells Fargo Bank N.A., Successor by merger with Wells Fargo Bank, National Association; Wells Fargo Bank, Trustee CUSIP #99RE77720; Wells Fargo Corporate Properties Group | | |
| XL Specialty Insurance Company | XL Capital Assurance Inc. | Former RINC client on matters unrelated to Blockbuster. |
| Yahoo! Inc. | Yahoo | Client pitches by RINC on matters unrelated to Blockbuster. |

RINC has limited its search to the Parties in Interest provided by Blockbuster Incorporated. Affiliates, subsidiaries or parent companies of Parties In Interest have not been searched unless specifically noted.