Stephen Karotkin
Martin A. Sosland (*admitted pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007

Attorneys for Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------------x
                                                               :
In re                                                          :    Chapter 11
                                                               :
BLOCKBUSTER INC., et al.,[1]                                   :    Case No. 10-14997 (BRL)
                                                               :
                                                               :    (Jointly Administered)
                                    Debtors.                   :
---------------------------------------------------------------x
```

**DEBTORS' OBJECTION TO MOTION OF SUMMIT DISTRIBUTION, LLC
FOR ENTRY OF AN ORDER (I) COMPELLING IMMEDIATE
PAYMENT OF ITS ADMINISTRATIVE EXPENSE CLAIM PURSUANT
TO 11 U.S.C. §§ 105(a), 363(b) AND 503(b) OR, IN THE ALTERNATIVE,
(II) GRANTING IT RELIEF FROM THE AUTOMATIC STAY
PURSUANT TO 11 U.S.C. § 362(d) TO PERMIT RECLAMATION OF ITS GOODS
AND CONVERTING THE ABOVE-CAPTIONED CHAPTER 11 CASES TO
CASES UNDER CHAPTER 7 FOR CAUSE PURSUANT TO 11 U.S.C. § 1112(b)**

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

Blockbuster Inc. and its debtor affiliates, as debtors and debtors in possession

(collectively, "**Blockbuster**" or the "**Debtors**"), submit this objection (the "***Objection***") to the

---

[1] The Debtors, together with the last four digits of each Debtors' federal tax identification number, are: Blockbuster Inc. (5102); Blockbuster Canada Inc. (1269); Blockbuster Digital Technologies Inc. (9222); Blockbuster Distribution, Inc. (0610); Blockbuster Gift Card, Inc. (1855); Blockbuster Global Services Inc. (3019); Blockbuster International Spain Inc. (7615); Blockbuster Investments LLC (6313); Blockbuster Procurement LP (2546); Blockbuster Video Italy, Inc (5068); Movielink, LLC (5575); Trading Zone Inc. (8588); and B$^2$ LLC (5219).

Motion of Summit Distribution, LLC ("**Summit**"), for an Entry of an Order (I) Compelling Immediate Payment of its Administrative Expense Claim Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 503(b) or, in the Alternative, (II) Granting It Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d) to Permit Reclamation of its Goods and Converting the above-captioned Chapter 11 Cases to Cases Under Chapter 7 for Cause Pursuant to 11 U.S.C. § 1112(b), including Memorandum of Law in Support (the "**Motion**") [Docket No. 907].

I.

## PRELIMINARY STATEMENT

1.  The Motion is an inappropriate and untimely attempt by Summit to unfairly advantage its position vis-à-vis other administrative creditors in these chapter 11 cases. As discussed below, Summit is unable to meet any of the factors necessary to grant immediate payment of its administrative expense claim (the "***Summit Administrative Expense Claim***"). In the alternative, Summit seeks the unprecedented relief of reclamation by claming it was misled into believing a debtor already in bankruptcy was solvent, or that the Debtors used the very documents that explained the limitations on their ability to use cash collateral to trick Summit into believing no risk existed to its repayment. Finally, absent an ability to reclaim its goods or receive immediate payment, Summit seeks to derail the Debtors' entire chapter 11 proceedings, without regard for other creditors, by requesting conversion of these chapter 11 cases into chapter 7 cases. All three requested remedies are inappropriate.

II.

## BACKGROUND AND PROCEDURAL HISTORY

2.  As further detailed in the First Day Affidavit, the commencement of these chapter 11 cases was the result of months-long negotiations between the Debtors and certain of the holders (the "***Steering Committee***") of approximately 80% in principal amount of the 11.75%

Senior Secured Notes due 2014 issued by Blockbuster Inc. (the "***Senior Secured Notes***"). Specifically, immediately prior to the Commencement Date, Blockbuster entered into a Plan Support Agreement ("***PSA***") with the Steering Committee pursuant to which they agreed to the terms of a chapter 11 plan (the "***Plan***"). The Plan contemplated the substantial deleveraging of Blockbuster by, among other things, converting all of the Senior Secured Notes into equity of the reorganized Blockbuster, thus providing the reorganized Blockbuster with a capital structure designed to have the financial flexibility necessary to enable pursuit of its business plan in an optimal manner.

3. In connection with the PSA, the Steering Committee also agreed, subject to the participation rights of all holders of the Senior Secured Notes (collectively, the "***DIP Lenders***"), to provide debtor in possession financing (the "***DIP Facility***")[2] to the Debtors, which financing was approved by the Court after extensive negotiations with, and concessions to, the Creditors' Committee.

4. On November 3, 2010, this Court entered an Amended Final Order Pursuant to 11 U.S.C. §§ 105, 363(b)(1), and 503(b) and Fed. R. Bankr. P. 6003 and 6004 Requesting (i) Authority to Pay Certain Prepetition Claims of Movie Studies and Game Providers and (II) Administrative Expense Priority Status for All Undisputed Obligations Arising Prepetition (the "***Studio Accommodation Order***") [Docket No. 470] granting the Debtors the right to enter into Accommodation Agreements (as that term is used in the Studio Accommodation Order) with certain studios, pursuant to which (i) the studios' prepetition claims

---

[2] The DIP Facility was approved pursuant to that certain *Final Order (I) Authorizing Postpetition Superpriority Secured Financing Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (II) Authorizing Postpetition Use of Cash Collateral Pursuant to 11 U.S.C. § 363, and (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364* [Docket No. 432], dated October 27, 2010 (the "***DIP Order***").

would be paid; (ii) the studios' postpetition claims would be granted administrative expense priority and paid in full; and (iii) the studios and the Debtors would continue to do business under their prepetition agreements. On November 17, 2010, Summit entered into an Accommodation Agreement with the Debtors pursuant to which Summit was repaid in full on account of any outstanding prepetition invoices.

5. At the time of the filing of the Motion, the Debtors' records indicate the Summit Administrative Expense Claim to be $9,360,599.[3]

### III.

### **OBJECTION**

A. **Summit Is Not Entitled to Immediate Payment of its Administrative Expense Claim**

6. The Bankruptcy Code is silent as to the timing for payment of administrative expenses, and generally timing of payments is a matter to be determined within the discretion of the bankruptcy court. *In re Photo Promotion Associates, Inc.*, 881 F.2d 6, 9 (2d Cir. 1989); *In re Midway Airlines Corp.*, 406 F.3d 229, 242 (4th Cir. 2005). Courts in the Second Circuit have disfavored distributions to administrative claimants if there is a possibility that the bankruptcy estate may not be able to pay all of the administrative expenses in full. *In re Shihai*, 392 B.R. 62, 68 (Bankr. S.D.N.Y. 2008); *In re Wingspread Corp.*, 116 B.R. 915, 932 (Bankr. S.D.N.Y. 1990) ("Given that there is a good deal of doubt concerning the ability of this estate ultimately to pay all expenses of administration during the chapter 11 period in full, to honor the request for immediate payment would be, in effect, to grant [the claimant] a

---

[3] The Motion estimates the Summit Administrative Expense Claim is $9,510,114. The variance between the values are related to a $233,912.00 credit owed to the Debtors by Summit and a revenue sharing credit of $85,306.56 owed to Summit by the Debtors. The Debtors reserve all rights with respect to such estimates.

superpriority claim."); *see also In re HQ Global Holdings, Inc.*, 282 B.R. 169 (Bankr. D. Del. 2002).

7. In determining whether to award immediate payment of an administrative claim, courts in other circuits have considered three factors, (1) prejudice to the debtor; (2) hardship to the claimant; and (3) potential detriment to other creditors. *See In re Garden Ridge Corp.*, 323 B.R. 136, 143 (Bankr. D. Del. 2005). Though this test has not been specifically adopted by the Second Circuit, it illustrates why Summit is not entitled to immediate payment of the Summit Administrative Expense Claim.

8. Based on the current circumstances of these chapter 11 cases, Summit cannot meet the first *Garden Ridge* factor—lack of prejudice to the debtor. At this time, payment of the Summit Administrative Expense Claims would place the Debtors in violation of the current approved budget under the DIP Facility. Courts have held that debtors in similar situations are prejudiced by the requirement to prematurely pay administrative expense claims. *See generally In re Global Home Prods., LLC,* 2006 Bankr. LEXIS 3608 at *13 (Bankr. D. Del. Dec. 21, 2006) (holding that repayment of administrative claims outside of the budget provided under a DIP financing agreement were prejudicial to the debtors).

9. As for the second of the *Garden Ridge* factors—hardship to the claimant—Summit has not shown that the failure to make an immediate payment of $9.3 million will have a significant impact on Summit's operations. Summit's own marketing materials proclaim "Summit Entertainment has access to over $1 billion for development, production, acquisition, markets and distribution of filmed entertainment across all media." Company Info, http://www.summit-ent.com/ (Feb. 9, 2011). Moreover, although the Declaration of Stephen Nickerson (the "***Declaration***") recites the *Garden Ridge* factor that "if [the administrative claim]

should go unpaid, Summit would suffer a significant hardship," it is devoid of any mention of the need for "immediate" payment, nor does the Motion or the Declaration provide any figures that would tend to show that the $9.3 million constitutes a substantial amount for Summit. Motion, Ex. A ¶ 6.

10. Summit falls short of the third of the *Garden Ridge* factors as well. By requiring immediate payment of the Summit Administrative Expense Claim, Summit is attempting to place itself ahead of similarly-situated creditors. "One of the chief factors courts consider is bankruptcy's goal of an orderly and equal distribution among creditors and the need to prevent a race to a debtor's assets." *In re Baptist Med. Ctr. of N.Y., Inc.*, 52 B.R. 417, 421 (E.D.N.Y. 1985). Allowing payment of Summit's administrative expense claim at this juncture could result in a proverbial "run on the bank" as other claimants try to bring administrative expense claims—a chaotic result that could jeopardize the orderly administration of theses cases.

11. Further, Summit itself implicitly recognizes that, in taking this action, Summit is putting itself in a position that will place it ahead of other similarly situated creditors, stating "all administrative creditors are harmed by the course of action that the Debtors apparently intend to take," while noting that Summit believes not all administrative creditors may be paid. Motion at ¶ 12.

12. Where the possibility exists, as Summit suggests, that all administrative expense claims may not be paid in full, courts have held that in the presence of such a possibility, it is appropriate to refuse to allow payment of administrative expense claims, "until after a bar date for claiming administrative expenses is established to ensure that Debtors have sufficient funds to pay all administrative expenses in full." *In re Modern Metal Prods. Co.*, 2009 Bankr. LEXIS 1258 at *5 (Bankr. N.D. Ill. May 13, 2009).

13.      For these reasons, as Summit has failed to show sufficient reason under any of the *Garden Ridge* factors that it should be immediately paid for its administrative expense claim, the Court should deny this request.

14.      Finally, while the Court has broad discretion under 11 U.S.C. § 105 to use its authority to enforce or implement court orders, the relief requested by Summit pursuant to section 105 of the Bankruptcy Code is outside the scope of the Studio Accommodation Order. Summit asserts that the Debtors' failure to pay Summit within sixty days of the delivery date is in "direct violation of" the Studio Accommodation Order, but fails to cite to any provision of the Studio Accommodation Order that has such a requirement. Motion at ¶ 10. To the contrary, the Studio Accommodation Order authorizes the Debtor to enter into Accommodation Agreements without further order of the Court, and authorizes, *but does not direct*, the Debtors to provide certain accommodations to studios like Summit, but at no point does the Studio Accommodation Order require payment in full of any expenses incurred post-petition by the Debtors. Studio Accommodation Order at ¶¶ 4, 5 (emphasis added).

### B.  Summit Has No Legal Right to Reclamation Because the Debtors Never Represented They Were Solvent to Summit

15.      Pursuant to the contract between the Debtors and Summit, the rights related to the goods provided by Summit are controlled by New York Law, specifically the Uniform Commercial Code, as adopted in New York.[4] Summit's ability to reclaim its goods pursuant to the UCC falls short of meeting the requirements of N.Y. U.C.C. § 2-702(2) on two

---

[4] The Uniform Commercial Code (the "*UCC*"), as adopted in New York, permits a seller to reclaim its goods if certain criteria is met. See N.Y. U.C.C. § 2-702(2) ("Where a seller discovers that the buyer has received goods on credit while insolvent, he may reclaim the goods upon demand made within ten days after the receipt, but if misrepresentation of solvency has been made to the particular seller in writing within three months before delivery the ten day limitation does not apply.")

grounds—there was no misrepresentation of solvency by the Debtors and no writing misrepresenting solvency was addressed to Summit particularly.[5]

16. Under the UCC, as adopted in New York, "[a] person is 'insolvent' who . . . is insolvent within the meaning of federal bankruptcy law." N.Y. U.C.C. § 1-201(23). The Bankruptcy Code defines "insolvent" as a "financial condition such that the sum of [an] entity's debts is greater than all of such entity's property . . . ." 11 U.S.C. § 101(32)(A). At all times relevant to this Motion and during the pendency of the Debtors' chapter 11 cases, the Debtors have been insolvent *by definition* under both the Bankruptcy Code and the UCC.

17. Summit has no evidence that the Debtors represented specifically to Summit, in writing, that the Debtors were solvent during any time period relevant to this Motion or the chapter 11 cases.[6] Additionally, Summit cannot show that the Debtors innocently or fraudulently misrepresented their intent to pay Summit in writing, as required by N.Y. U.C.C. § 2-702. As soon as the Debtors were aware that their ability to use their DIP Facility to make administrative expense claims was being severely restricted by their DIP Lenders, they made Summit and other administrative expense claimants aware of the situation to limit the harm to these claimants. As such, Summit has failed to carry its burden of proof under N.Y. U.C.C. § 2-

---

[5] Summit does not contend in its Motion that it made any attempt to reclaim its goods within the ten-day period, only that the Debtors misrepresented solvency within the three months before delivery.

[6] In fact, at no point during the course of the Debtors' chapter 11 proceedings have the Debtors represented that the sum of their debts was less than the sum of their property. Indeed, beginning with the Debtors' voluntary petitions, the Debtors listed their total assets as $1.02 billion and their total debts as $1.46 billion. *See* Voluntary Petition of Blockbuster, Inc., Ex. A [Docket No. 1]. Further, at no point in any pleading, including the DIP Financing Motion (as defined in the Motion), did the Debtors represent that they were solvent entities. To the contrary, the Debtors specifically represented from the very outset of the case that their debts exceed the sum of their property and they are thus, by definition under the Bankruptcy Code, "insolvent." Indeed, at a hearing on January 20, 2011, this Court stated, "it's pretty hard to say that this debtor is anything but insolvent." Hearing Tr. 24:18-19 (Jan. 20, 2011).

702(2) that the Debtors misrepresented themselves as solvent or misrepresented their intent to pay Summit. *See Nanjing Textiles Imp/Exp Corp. v. NCC Sportswear Corp.*, 2006 U.S. Dist. LEXIS 56111 at *9 (S.D.N.Y. Aug. 11, 2006) ("At the very least, NY UCC § 2-702(2) requires [the plaintiff] to establish . . . that [the defendant] misrepresented its solvency in writing within three months prior to delivery.")

18. The DIP Order governs the Debtors' ability to use cash collateral. Within the DIP Facility and DIP Order are various milestones and deadlines the Debtors are required to meet to use cash collateral, as well as explicit covenants for continued access to postpetition financing. Summit elected to provide goods to the Debtors throughout the pendency of these chapter 11 cases with full knowledge that the ability of the Debtors to make the required payments was contingent on the Debtors' continuing access to cash collateral and post-petition financing.

### C. Conversion of the Debtors' Cases is Not in the Best Interests of All Creditors

19. Conversion is not in the best interests of the Debtors' creditors and their estates. Section 1112(b)(1) of the Bankruptcy Code provides, in pertinent part, that:

> [O]n request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion . . . is not in the best interests of creditors and the estate, the court shall convert a case under [chapter 11] to a case under chapter 7, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C.§ 1112(b)(1).

20. The Court has discretion under section 1112(b)(1) to deny the Conversion Motion because unique or "special" circumstances exist upon which to find that conversion is not in the best interests of creditors and the estate. *In re 15375 Memorial Corp.*, 386 B.R. 548, (Bankr. D. Del. 2008) ("***Memorial Corp. II***"). Where creditors best interests are served by

sustaining the chapter 11, conversion is not appropriate. Importantly, the interests of a single creditor or group of creditors is not dispositive in the Court's determination of what constitutes the best interests of creditors and the estate. *See In re Mazzocone*, 183 B.R. 402, (Bankr. E.D. Pa. 1995). Indeed, in evaluating the best interests of creditors, courts "must consider the interests of all creditors." *Rollex Corp. v. Assoc. Materials, Inc., (In re Superior Siding & Window, Inc.)*, 14 F.3d 240, 243 (4th Cir. 1994) (emphasis in original).

21. In *Memorial Corp. II*, movants sought reconsideration of the court's decision to deny a motion to dismiss a chapter 11 case pursuant to section 1112(b). Although the court recognized that a finding of "cause" would appear to mandate dismissal or conversion of a case given the Bankruptcy Abuse and Consumer Protection Amendments of 2005 to section 1112(b)(1), the court pointedly held that its inquiry did "not end with the 'for cause' test." *Id*. at 552. Rather, the court recognized its discretion under section 1112(b)(1) to find and identify the existence of special circumstances to avoid dismissal or conversion when appropriate. *Id*. *Accord. In re The 1031 Tax Group, LLC*, 374 B.R. at 93 ("[E]ven if there is a finding of cause, a court is not obligated to convert the case – the decision remains within the court's discretion" as the statute "explicitly provides for this discretion where a court is able to identify 'unusual circumstances'" that establish conversion is not in the best interests of creditors and the estate) (citations omitted).

22. After a review of the record, the *Memorial Corp. II* court found that the debtors (i) had accomplished tasks that inured to the benefit of all its creditors, such as, for example, the dismissal of litigations or claims that would have diminished the movant's interest in the debtors' insurance policies, and (ii) "continue[d] to marshal and preserve assets and

benefit creditors." *Id.* at 553. In light of, *inter alia,* the debtors' continued efforts to maximize the value of estate assets in the chapter 11 forum, the court held that dismissal was inappropriate.

23. The rationale of *Memorial Corp. II* applies with equal force here. Blockbuster currently anticipates to demonstrate at the hearing on this Motion its intention to pursue a course of action that will serve to maximize the value of its assets in an orderly fashion as opposed to the immediate conversion to chapter 7 which Summit seeks with the loss of value that will necessarily be attendant thereto.

### IV.

### CONCLUSION

24. Based upon the foregoing, the relief requested in the Motion should be denied.

Dated: February 17, 2011
      New York, New York

                        /s/ Stephen Karotkin
                        Stephen Karotkin
                        WEIL, GOTSHAL & MANGES LLP
                        767 Fifth Avenue
                        New York, New York 10153
                        Telephone: (212) 310-8000
                        Facsimile: (212) 310-8007

                                and

                        Martin A. Sosland (*admitted pro hac vice*)
                        WEIL, GOTSHAL & MANGES LLP
                        200 Crescent Court, Suite 300
                        Dallas, Texas 75201
                        Telephone: (214) 746-7700
                        Facsimile: (214) 746-7700