<u>HEARING TO CONSIDER ENTRY OF BID PROCEDURES ORDER</u>
HEARING DATE AND TIME:  TBD
OBJECTION DEADLINE:  TBD

<u>HEARING TO CONSIDER ENTRY OF SALE ORDER</u>
HEARING DATE AND TIME:  TBD
OBJECTION DEADLINE:  TBD

Stephen Karotkin
Martin A. Sosland (*admitted  pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Attorneys for Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                                             :
**In re**                                                    :    **Chapter 11**
                                                             :
**Blockbuster Inc., *et al.*,**[1]                           :    **Case No. 10-14997 (BRL)**
                                                             :
                                                             :    **(Jointly Administered)**
            **Debtors.**                                     :
-------------------------------------------------------------x

**DEBTORS' MOTION, PURSUANT TO 11 U.S.C. §§ 105, 363, 364,**
**AND FED. R. BANKR. P. 2002, 4001, 6004, 6006, 9008, AND 9014, FOR**
**ENTRY OF: (I) AN ORDER APPROVING (A) BID PROCEDURES,**
**(B) STALKING HORSE EXPENSE REIMBURSEMENT, (C) NOTICE**
**OF SALE, AUCTION, AND SALE HEARING, (D) ASSUMPTION**
**PROCEDURES AND RELATED NOTICES, (E)  INCURRENCE**
**OF SALE-RELATED ADMINISTRATIVE PRIORITY CLAIMS, AND**
**(F) IMPOSITION OF AN ADMINISTRATIVE STAY; AND (II) AN ORDER**
<u>**APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS**</u>

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

---

[1]    The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Blockbuster Inc. (5102); Blockbuster Canada Inc. (1269); Blockbuster Digital Technologies Inc. (9222); Blockbuster Distribution, Inc. (0610); Blockbuster Gift Card, Inc. (1855); Blockbuster Global Services Inc. (3019); Blockbuster International Spain Inc. (7615); Blockbuster Investments LLC (6313); Blockbuster Procurement LP (2546); Blockbuster Video Italy, Inc (5068); Movielink, LLC (5575); Trading Zone Inc. (8588); and B[2] LLC (5219).

Blockbuster Inc. and its debtor affiliates, as debtors and debtors in possession

(collectively, "**Blockbuster**" or the "**Debtors**")[2] submit this motion (the "**Motion**") and

respectfully represent as follows:

## I.

## PRELIMINARY STATEMENT

1.      More than twenty five years ago, Blockbuster became the first national

retail chain provider of in-home entertainment.  Since its incorporation in 1982, Blockbuster

has expanded its retail business operations domestically and abroad via a mix of corporate and

franchisee-owned stores, and, more recently, expanded into the by-mail, digital, and vending

distribution channels.  Despite these efforts at retaining its brand relevancy and market

presence, Blockbuster has faced a number of challenges in recent years, which, taken together,

have had a negative impact on its overall financial performance.

2.      Among the many reasons for declining revenues, the largest challenge

that Blockbuster has faced in the past several years is the rapid rise of new competitors that

use alternative distribution methods to meet customer demands.  These competitors have

garnered substantial market share and have eroded the size of Blockbuster's traditional "brick

and mortar" retail store based customer market, resulting in a decline in revenues.  In addition

to competitors that rent, sell, or trade movies and games in new ways, Blockbuster has also

---

[2]     Information regarding Blockbuster's business, capital structure, and the circumstances leading to
these chapter 11 cases is contained in the *Affidavit of Jeffery J. Stegenga Pursuant to Local
Bankruptcy Rule 1007-2 in Support of First Day Motions* [Docket No. 3], filed on September 23,
2010 (the "**Commencement Date**"), the date on which each of the Debtors commenced a voluntary
case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors
are authorized to continue to operate their business and manage their properties as debtors and debtors
in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' cases are
being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure
(the "**Bankruptcy Rules**").  Further, on October 1, 2010, the United States Trustee for Region 2 (the
"**U.S. Trustee**") appointed a statutory committee of unsecured creditors (the "**Creditors'
Committee**").

faced an overall decline in the market for the rental and sale of physical discs, as competition

has increased with providers of direct delivery media entertainment—such as direct broadcast

satellite, on-demand and pay-per-view offerings, growing penetration of broadband Internet

access, TiVo/DVR, and the growth of on-demand digital streaming rentals and sales over the

Internet by services such as Apple's iTunes service and Amazon.com.  Accordingly, at various

points over the past several years, the Debtors experienced liquidity problems and had

difficulty accessing capital.

        3.      As further detailed in the First Day Affidavit, the commencement of

these chapter 11 cases was the result of months-long negotiations between the Debtors and

certain of the holders (the "*Steering Committee*") of approximately 80% in principal amount

of the 11.75% Senior Secured Notes due 2014 issued by Blockbuster Inc. (the "*Senior*

*Secured Notes*").  Specifically, immediately prior to the Commencement Date, Blockbuster

entered into a Plan Support Agreement (the "*PSA*") with the Steering Committee pursuant to

which they agreed to the terms of a chapter 11 plan (the "*Plan*").  The Plan contemplated the

substantial deleveraging of Blockbuster by, among other things, converting all of the Senior

Secured Notes into equity of the reorganized Blockbuster, thus providing the reorganized

Blockbuster with a capital structure designed to have the financial flexibility necessary to

enable pursuit of its business plan in an optimal manner.

        4.      In connection with the PSA, the Steering Committee also agreed,

subject to the participation rights of all holders of the Senior Secured Notes (collectively, the

"*DIP Lenders*"), to provide debtor in possession financing (the "*DIP Facility*")[3] to the

---

[3]    The DIP Facility was approved pursuant to that certain *Final Order (I) Authorizing Postpetition Superpriority Secured Financing Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (II) Authorizing Postpetition Use of Cash Collateral Pursuant to 11 U.S.C. § 363, and (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363 and*

Debtors so as to ensure that Blockbuster's business had sufficient liquidity for ordinary course operations during the restructuring, which financing was approved by the Court after extensive negotiations with, and concessions to, the Creditors' Committee. Thus, the Debtors commenced these chapter 11 cases with the reasonable expectation of consummating the Plan within the time frame set forth in the PSA given the liquidity runway of the DIP Facility and the support of its key constituencies.

5.      Due to, among other things, poor holiday sales, deteriorating business operations, the inability to reach a consensus with the DIP Lenders with respect to a long-term business plan and the failure to meet certain other milestones required by the PSA[4], the Debtors, in conjunction and in consultation with the Steering Committee, determined that the Plan was no longer feasible. The Debtors and the Steering Committee thus agreed, in an effort to maximize the value of the Debtors' estates, to pursue a sale of substantially all of the Debtors' assets on an expedited basis under section 363 of the Bankruptcy Code.

6.      In furtherance of this process, and recognizing the limited period of time the DIP Lenders were willing to provide financing and the consensual use of cash collateral given the Debtors' liquidity concerns, the Debtors determined to select on an expedited basis one of two proposals from among certain members of the Steering Committee who had expressed an interest in serving as a stalking horse bidder. The Debtors required that

---

*364* [Docket No. 432], dated October 27, 2010 (the "***DIP Order***"). As of the date hereof, no amounts are outstanding under the DIP Facility for new money borrowings. However, the Roll-UP Notes provided for in the DIP Facility (as defined therein) are in the amount of $125 million.

[4]   Such failure has resulted in the occurrence of a Termination Event under the terms of the PSA and an Event of Default under the DIP Facility. Accordingly, a "Termination Event" and a "Roll-Up Event," as each are defined in the DIP Order, have occurred. As discussed more fully in Section VII.B below, the Requisite Lenders (as defined in the DIP Order) have determined to allow for the consensual use of Cash Collateral during the sale process, terminate the DIP Facility, and have also advised the Debtors that they intend to deliver a Carve-Out Trigger Notice (as such term is defined in the DIP Order) to the Debtors, the United States Trustee, and the Creditors' Committee.

these two proposals be furnished by January 28, 2011 so that the sale process could advance

promptly and so that a proposal could be selected as a stalking horse to serve as a basis to

create additional interest (particularly in view of the limited stalking horse protections

described below), all with the view of maximizing value.

7.      On February 21, 2011, the Debtors entered into that certain Asset

Purchase and Sale Agreement (the "***Purchase Agreement***") providing for the sale of

substantially all of their assets or the proceeds of those assets, as described below (the

"***Assets***") to a newly formed entity named Cobalt Video Holdco LLC (the "***Purchaser***" or

"***Stalking Horse Bidder***" and, with the Purchase Agreement, being sometimes referred to as

the "***Stalking Horse Bid***").  For purposes of entering into the Purchase Agreement, the

Purchaser was established by Monarch Alternative Capital LP, Owl Creek Asset Management

LP, Stonehill Capital Management, LLC, and Värde Partners, Inc. who collectively hold more

than 50% of the Senior Secured Notes and each of which is a member of the Steering

Committee.  Despite the limited time available to identify the Stalking Horse Bidder and

negotiate the Purchase Agreement, the Debtors believe they have achieved an agreement that

will maximize value in a 363 sale context and one with bid protections favorable to the estates.

8.      A copy of the Purchase Agreement, which was the product of hard

fought, arms' length negotiations among the parties, is annexed hereto as ***Exhibit "1"***.

9.      It should be noted that the Purchase Agreement provides that, under

certain circumstances and at the Purchaser's option, the Purchaser shall have the right to

compel a conversion of the Debtors' cases to cases under chapter 7 of the Bankruptcy Code

upon or, at Purchaser's option, following the closing of the Purchase Agreement.  Similarly,

Purchaser has the option to direct the estates' liquidation of their inventory under an agency agreement.

10.    In that regard, the Purchase Agreement provides that as a condition of the Purchaser's obligation to close under the Purchase Agreement, the Order of the Bankruptcy Court approving the sale to the Purchaser must include provisions ordering that: (i) in certain circumstances, the Debtors' chapter 11 cases must be converted to cases under chapter 7 of the Bankruptcy Code upon the Purchaser's election of the "*Agency Alternative*" (as defined in the Purchase Agreement and as summarized below) and as otherwise provided in Paragraph 8.8(b) of the Purchase Agreement; (ii) the Agency and License Agreement (as defined in the Purchase Agreement) shall be binding on the chapter 7 trustee in any such chapter 7 cases; and (iii) such Order shall be binding on the chapter 7 trustee in any such chapter 7 cases.  In addition, under the Purchase Agreement, the Purchaser has made no commitment to continue the operations of any portion of the Debtors' business after consummation of the Sale Transaction and there is no requirement that the Purchaser do so.

## II.

### JURISDICTION

11.    This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.

### RELIEF REQUESTED

12.    Pursuant to sections 105, 363, 364, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001(c), 6003, 6004, 6006, and 9006, it is requested that the Court grant the following relief in connection with the sale of the Assets (the "*Sale Transaction*") to

the Stalking Horse Bidder or bidder (which may include the Stalking Horse Bidder) who has a

higher or otherwise better offer at the conclusion of the Auction (as defined below), which

may be selected by the Debtors as the winning bidder (the "*Successful Bidder*").

13.    *First*, a "*Bid Procedures Order*", substantially in the form attached

hereto as *Exhibit "2"*, which will authorize and approve, among other things: (i) the

procedures for the conduct of the auction (the "*Auction*") of the Assets (the "*Bid*

*Procedures*"), substantially in the form attached as *Exhibit "A"* to the Bid Procedures Order,

(ii) the reimbursement of the Stalking Horse Bidder for the reasonable, documented costs and

expenses incurred in connection with its bid up to the maximum amount of $5 million (the

"*Expense Reimbursement*"), (iii)  the procedures for the assumption and assignment of

contracts and leases (the "*Assumption Procedures*") to any Successful Bidder for the Assets

and the resolution of any objections thereto and related notices, (iv) the scheduling of a

hearing to approve any such Sale Transaction with respect to any bid accepted by the Debtors

(the "*Sale Hearing*"), (v) the form and manner of notice with respect to the proposed sale of

the Assets, the Auction, and the Sale Hearing (the "*Sale Notice*"), and (vi) the following

additional relief (collectively, the "*Administrative Relief*") so as to assure that the sale process

can proceed to a conclusion on a reasonable basis:

a.    the non-payment during the Sale Process Period (as defined below)
of all costs and expenses of administration of the Debtors' estates
(other than the Critical Expenses,[5] as hereinafter defined and
limited to the amounts provided in the Sale Budget (as hereinafter

---

[5]    As described below, the Critical Expenses include certain professional fees and expenses, employee-
related expenses, customer-related liabilities, taxes, and certain critical vendor and supplier payments
related to the Pre-Sale Period as set forth and subject to the Sale Budget.

defined))[6] incurred during the period from the Commencement Date through February 24, 2011 (the "**Pre-Sale Period**");

b.     the payment in full of (i) all costs and expenses of administration relating to the period beginning on February 25, 2011 and ending on the Closing Date (as hereinafter defined) (the "**Sale Process Period**") as provided in and up to the amounts provided in the Sale Budget (the "**Administrative Priority Expenses**"), and (ii) the Critical Expenses; *provided, however*, that in connection with any studio agreements between the Debtors and movie studios, only the following shall be included as Administrative Priority Expenses[7]: (x) revenue share fees from the rental of movie titles that accrue during the Sale Process Period ("**Rental Share Fees**") only up to the amounts provided in the Sale Budget, and (y) previously rented product fees that accrue during the Sale Process Period from the sale of movie titles only up to the amounts provided in the Sale Budget (A) in stores that continue to operate in the ordinary course (the "**Operating Stores PRP Fees**") and (B) in connection with any previously rented product fees that accrue during the Sale Process Period from the sale of movie titles in stores that are liquidating (the "**Closing Stores PRP Fees**"), *provided*, that such Closing Stores PRP Fees shall be limited to an amount no greater than $9 million (the "**Closing Stores PRP Fee Cap**") as provided for in the Sale Budget, and only Operating Stores PRP Fees and Closing Stores PRP Fees only up to the Closing Store PRP Fee Cap shall receive superpriority claim status[8];

c.     pursuant to section 364 of the Bankruptcy Code, the granting of superpriority claim status (the "**Administrative Priority Claim**")[9]

---

[6]   As set forth below, the Sale Budget is subject to the approval of the DIP Lenders prior to the conclusion of the hearing to approve the Bid Procedures.

[7]   For the avoidance of doubt, Administrative Priority Expenses shall not include (i) any amounts or claims under any studio agreements other than the subsequently defined Rental Share Fees, Operating Stores PRP Fees, and Closing Stores PRP Fees accrued during the Sale Process Period up to the Closing Stores PRP Fee Cap; (ii) any revenue share fees or previously rented product fees or any other fee or claim that may accrue after the Sale Process Period or as a result of the sale of the Assets; (iii) any amounts not detailed in the Sale Budget; and (iv) any Rental Share Fees, Operating Stores PRP Fees, and Closing Stores PRP Fees owed to a movie studio that stops shipping units or delivering digital content to the Debtors on cash in advance or other terms agreeable to the Debtors.

[8]   Any amount of Closing Stores PRP Fees greater than the Closing Stores PRP Fee Cap shall not receive superpriority claim status notwithstanding such fees may have been incurred during the Sale Process Period.

[9]   For the avoidance of doubt, (i) any amounts or claims that may be claimed to arise under studio agreements whether they accrue during or after the Sale Process Period (other than the

to the Administrative Priority Expenses, senior and prior to all other costs and expenses of administration in these cases, other than the Carve-Out Expenses and the DIP Obligations (exclusive of the Roll-Up Note Obligations) (as each of such terms is defined in the DIP Order); and

d. pursuant to sections 105(a) and 362 of the Bankruptcy Code and 28 U.S.C. § 959, an injunction enjoining through June 21, 2011 any collection efforts with respect to the payment of administrative expense claims incurred during or related to the Pre-Sale Period (the "*Administrative Stay*").

14. *Second*, a "*Sale Order*," substantially in the form to be filed with the Court on or prior to the hearing to consider approval of, among other things, the Bid Procedures (the "*Bid Procedures Hearing*"), that will, *inter alia*, approve (i) the sale[10] of the Assets pursuant to sections 105, 363(b), (f), and (m), and 365 of the Bankruptcy Code and Bankruptcy Rules 6004, 6006, 9008, and 9014 in accordance with the terms of either the Stalking Horse Bid or a modified version thereof with the Successful Bidder, free and clear of all liens, claims, encumbrances, and other interests (other than certain expressly specified permitted encumbrances and assumed liabilities, all as more specifically set forth in the applicable purchase agreement), and (ii) the assumption and assignment of certain executory

---

aforementioned Rental Share Fees, Operating Stores PRP Fees, and Closing Stores PRP Fees accrued during the Sale Process Period and, as to Closing Stores PRP Fees, up to the Closing Stores PRP Fee Cap); (ii) any revenue share fees or previously rented product fees or any other fee or claim that may accrue after the Sale Process Period or as a result of the sale of the Assets; (iii) any amounts not detailed in the Sale Budget; and (iv) any Rental Share Fees, Operating Stores PRP Fees, and Closing Stores PRP Fees owed to a movie studio that stops shipping units or delivering digital content to the Debtors on cash in advance or other terms agreeable to the Debtors shall not receive status as Administrative Priority Claims.

[10] In certain circumstances, the Purchaser may not take title to all of the Assets but, instead, act as agent for the disposition of those Assets, receiving the proceeds of doing so in consideration for the Purchase Price. For ease of reference, this disposition and delivery of the Purchased Assets pursuant to the Purchase Agreement is included in the use of the word "sale" and the defined term "Sale Transaction".

contracts and unexpired leases related to the Assets and the Sale Transaction, pursuant to sections 363 and 365 of the Bankruptcy Code.

15.    Bifurcation of costs and expenses of administration as requested herein is the only way to assure an orderly sale process and avoid immediate and irreparable harm to these estates.  In the absence of such relief, the Debtors will be unable to obtain the goods and services necessary to sustain their operations and consummate a sale.  Indeed, without these limitations in place, the Debtors have been advised that the DIP Lenders will not continue to fund or consent to the use of their cash collateral, and the Debtors' management would be unwilling to continue to incur obligations, without the assurance that there will be sufficient resources for payment.  Accordingly, entry of the proposed Bid Procedures Order and the proposed Sale Order with the provisions requested herein is critical to the maximization of the value of the Assets.

## IV.

## THE PURCHASE AGREEMENT

16.    As stated, the Debtors set a deadline of January 28, 2011 for initial proposal from members of the Steering Committee who had expressed an interest in becoming a stalking horse bidder.  On January 21, 2011, Blockbuster received a term sheet with a proposal to acquire the Debtors' Assets from one of the members of the Steering Committee. Being the sole proposal submitted from any of the lenders at that time, the Debtors and their professionals immediately began negotiations with such potential purchaser, attempting to negotiate the highest or otherwise best terms for these estates that would be utilized as a stalking horse bid in a 363 sale process.  On or about January 28, 2011, Blockbuster received a competing term sheet from the Purchaser and the Debtors began to negotiate the terms of purchase with both the initial interested bidder and the Purchaser.

17.    After thoroughly evaluating both proposals and, with the input of their professional advisors, the Debtors selected the Purchaser to serve as the stalking horse bidder and entered into the Purchase Agreement to serve as the stalking horse bid.

A.    **The Purchase Agreement**[11]

18.    The salient terms of the Purchase Agreement are summarized as follows:

       a.    Deposit:  Upon execution of the Purchase Agreement, Purchaser paid cash in the amount of twenty million dollars ($20,000,000) into the Escrow Account.  The Deposit will be applied at Closing toward payment of the Purchase Price, or released to Purchaser or Sellers in accordance with the Purchase Agreement;

       b.    Purchase Price:  Cash in an amount equal to two hundred sixty-five million dollars ($265,000,000) or, if the Studio Condition[12] is not satisfied fully and the Assumed Studio Liabilities are not assumed, two hundred ninety million dollars ($290,000,000), subject to the following adjustments (as adjusted, the "***Purchase Price***"):[13]

---

[11]    The following summary is qualified entirely by the terms of the Purchase Agreement.  To the extent there are any inconsistencies between the description of the Purchase Agreement contained herein and the terms and conditions of the Purchase Agreement, the terms of the Purchase Agreement shall control.  Capitalized terms used but not defined in this Section IV.A shall have the meaning(s) ascribed to them in the Purchase Agreement.

[12]    Pursuant to the Purchase Agreement, the "***Studio Condition***" means that at all times from the date of the Purchase Agreement until the Closing, (A) at least five (5) of Twentieth Century Fox Home Entertainment LLC, Sony Pictures Home Entertainment Inc., Warner Home Video, Paramount Home Entertainment Inc., Universal Studios Home Entertainment LLC and The Walt Disney Company (collectively, with their Affiliates, the "***Required Studios***") shall have continued to (i) support Sellers' digital business on terms materially consistent with or better than those in effect on February 14, 2011, (ii) provide Sellers' Stores and its international operations with physical copies of movies in amounts requested by Sellers, on a "cash in advance" or better payment basis and at prices materially consistent with or better than those in effect on February 14, 2011, and (B) the studios whose payments are secured, in whole or in part, shall not have taken any court or formal administrative action or exercised self-help or other similar remedies to foreclose on the assets securing such payments under the Collateral Trust Agreement prior to the Closing.

[13]    The amount of the Purchase Price payment at Closing will be based on estimated amounts for the Cash Adjustment and Inventory Adjustment, with a post-Closing true-up based on the actual calculations of

- Cash Adjustment: The Purchase Price shall be increased (decreased) by an amount equal to the difference between (a) the aggregate amount of all of the cash, cash equivalents and freely marketable securities held by the Sellers immediately prior to the Closing Date *minus* (b) $68,400,000 *less* any unpaid Contract Maintenance Costs[14] *plus* the Sales Tax Amount;[15]

- Inventory Adjustment: The Purchase Price shall be increased (decreased) by an amount equal to the difference between (a) the sum of the value of the inventory held by Sellers immediately prior to the Closing Date, calculated using the methodology set forth on Schedule 1.1(b), plus the Inventory Liquidation Expenses *minus* (b) $635,848,496.66, the reference value of Sellers' December 31, 2010 inventory count using such methodology;

- Reimbursable Expenses: The Purchase Price shall be decreased by no more than five million dollars ($5,000,000), representing HSR Act filing fees of the Purchaser and reasonable and documented out-of-pocket fees and expenses (including professional fees) incurred by Purchaser and each of Monarch Alternative Capital LP, Owl Creek Asset Management LP, Stonehill Capital Management, LLC and Värde Partners, Inc.; and

- Revenue Share Adjustment Amount: In the event that any of the inventory and merchandise located at the Stores and Distribution Centers at Closing are subject to liabilities and obligations under Revenue Sharing Agreements that Purchaser will be required to satisfy post-Closing, and Purchaser and Sellers agree that Purchaser will acquire

---

such amounts. Purchaser's right to receive any such true-up payment will be secured by a $20,000,000 escrow to be funded out of the Purchase Price at Closing.

[14] If Sellers propose to reject any executory Contract or unexpired real property lease that has not been designated as a Purchaser Assumed Contract, and Purchaser elects to cause Sellers to defer such election and does not assume such Excluded Contracts, Purchaser will be responsible for the out-of-pocket costs and expenses (including any rental amounts due during such period) incurred by Sellers with respect to (and solely as a result of the deferral of) such Excluded Contracts ("**Contract Maintenance Costs**") during the period from the Proposed Rejection Date to the earlier of the Closing Date and the Rejection Deferral Date.

[15] On the day immediately prior to the Closing Date, Sellers shall pay all accrued unpaid sales and use taxes that were generated in the ordinary course of business and remain unpaid, and the Purchase Price will be increased by an amount (the "**Sales Tax Amount**") equal to the lesser of such amount and $8,000,0000.

such assets as Purchased Assets, an amount equal to the aggregate estimated amount of all such liabilities and obligations (alternatively the parties may agree that such assets shall be liquidated in connection with Purchaser's Agency Alternative election or retained by Sellers and treated as Excluded Assets (with any such Excluded Assets being disregarded and not taken into account for purposes of determining any purchase price adjustments related to the Closing Inventory Amount).

    c.    <u>Payment and Allocation of Proceeds</u>:  At Closing, the Purchaser will pay the Purchase Price (including the Deposit) as follows:

- <u>First</u>, an amount in cash necessary to pay in cash and/or create a sufficient cash reserve necessary to satisfy in cash all Carve-Out Expenses (as defined in the DIP Order) shall be paid to an account designated by Sellers;

- <u>Second</u>, an amount equal to the amounts due to the DIP Agent and/or Senior Indenture Trustee (as defined in the DIP Order), as applicable, to satisfy and/or create a sufficient reserve necessary for amounts due to them for fees and expenses authorized to be paid under the DIP Order, including, without limitation, under paragraphs 7(d)(iii), 17 and 22(c) thereof and under Section 10.4 of the DIP Credit Agreement;

- <u>Third</u>, an amount equal to the Estimated Wind Down Expenses[16] and, if the Agency Alternative election is made, the Approved Sale Expenses[17] shall be paid to the Sellers;

---

[16]  Pursuant to the Purchase Agreement, "***Estimated Wind Down Expenses***" means Sellers' reasonable good faith estimate of the out-of-pocket costs and expenses that Sellers expect to incur in connection with winding down their bankruptcy estates, which estimate shall include a reasonably detailed breakdown of such costs and expenses by category and shall be provided in writing by Sellers to Purchaser not later than the earlier to occur of (i) the Auction and (ii) five (5) Business Days prior to the Sale Hearing, and which estimate shall be reasonably acceptable to the Purchaser.  The budget (the "***Wind-Down Budget***") in which such Estimated Wind Down Expenses will be reflected shall be subject to the approval of the Requisite DIP Lenders (as such term is defined in the DIP Order) prior to the conclusion of the hearing to approve the Bid Procedures.

[17]  Pursuant to the Purchase Agreement, "***Approved Sale Expenses***" means Sellers' reasonable good faith estimate of the costs and expenses of Sellers in connection with the sale and liquidation of any of the Purchased Assets, which shall be provided in writing by Sellers to Purchaser not later than the earlier to occur of (i) the Auction and (ii) five (5) Business Days prior to the Sale Hearing, and shall be reasonably acceptable to the Purchaser.

- <u>Fourth</u>, an amount equal to twenty million dollars ($20,000,000) shall be deposited into the Purchase Price Adjustment Escrow;

- <u>Fifth</u>, an amount equal to the amounts due under the DIP Credit Agreement (other than the Roll-Up Notes) shall be paid to the DIP Agent for immediate distribution to the DIP Lenders in accordance with the DIP Facility;

- <u>Sixth</u>, an amount equal to the aggregate outstanding amount of Administrative Priority Expenses shall be paid to the Sellers for payment thereof;

- <u>Seventh</u>, an amount equal to the amounts due under the DIP Credit Agreement with respect to the Roll-Up Notes shall be paid to the DIP Agent for immediate distribution to the Roll-Up Noteholders in accordance with the DIP Facility; and

- <u>Eighth</u>, the remaining balance, if any, shall be paid to the Sellers.

d.   <u>Purchased Assets</u>:  Purchaser will acquire all assets (other than Excluded Assets) of the Sellers, or the proceeds of the disposition thereof if Purchaser elects the Agency Alternative, including, without limitation, the following:

- all of the outstanding ownership interests in each of the Non-Debtor Subsidiaries;

- all rights, title and interest of the Sellers in the 2009 Trust;

- all cash, cash equivalents, bank deposits or similar cash items of the Sellers;

- all accounts and notes receivable and other rights to payment (including credit card receivables), other than any accounts and notes receivable or other rights to payment arising out of or relating to any Excluded Asset and which receivable or right to payment is created or arises subsequent to the Closing, arising from the conduct of the Sellers' business, together with any unpaid financing charges accrued thereon;

- all deposits (including security deposits for rent, electricity, telephone or otherwise) and prepaid or deferred charges and expenses of Sellers, including all prepaid rentals and unbilled charges, fees or deposits, other than deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Asset, which are made, created or arise subsequent to Closing;

- all tangible personal property owned by Sellers related to, useful in or held for use in the conduct of the Sellers' business;

- all rights, title and interest of the Sellers in each Owned Property and under each Real Property Lease which is a Purchaser Assumed Contract, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

- all rights, title and interest of the Sellers in and to any property subject to a personal property lease that is related to, useful in or held for use in the conduct of the Sellers' business to the extent any such personal property lease is a Purchaser Assumed Contract;

- the Purchased Intellectual Property;

- to the extent transferable after giving effect to the Sale Order, all of the rights and benefits accruing under any of the Purchaser Assumed Contracts, including each Real Property Lease, personal property lease or Intellectual Property License that is a Purchaser Assumed Contract;

- the Franchise Arrangements;

- all goodwill and other intangible assets associated with the Sellers' business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property;

- all assets attributable to Non-Debtor Benefit Plans;

- all of the Sellers' assets related to, located at, or used or useful in connection with the operation of the Distribution Centers;

- all rights, claims and causes of action of Sellers (except to the extent arising under the Transaction Documents), including, without limitation, under the Bankruptcy Code (including, without limitation, chapter 5 thereof); and

- all other assets, properties, rights and claims of the Sellers of any kind or nature which relate to the Business, which are used or useful in or held for use in the Sellers' business, or which relate to the Purchased Assets (in each case, other than the Excluded Assets).

e.   <u>Excluded Assets</u>:  Purchaser will acquire all assets of the Sellers other than the Excluded Assets identified in the Purchase Agreement, including, without limitation, the following:

- the Excluded Contracts;

- all equity interests (other than the outstanding ownership interests in each of the Non-Debtor Subsidiaries and any subsidiaries thereof) in the Sellers;

- any (i) confidential personnel and medical records pertaining to any employee not permitted to be transferred to Purchaser by law; (ii) books and records that the Sellers are required by law to retain, that relate exclusively to the Excluded Assets or the Excluded Liabilities, including Tax Returns (as defined in the Purchase Agreement), financial statements, and corporate or other entity filings; and (iii) corporate charters, qualifications to do business, taxpayer and other identification numbers, corporate seals, minute books, stock ledgers, stock certificates and any other documentation related to governance, organization, maintenance or existence of the Sellers;

- any claim, right or interest of any Seller in or to any refund, rebate, abatement or other recovery for Taxes (as defined in the Purchase Agreement), together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date;

- all rights and claims of the Sellers under the Transaction Documents;

- all Debtor Benefit Plans (and any trusts, 501(c)(9) organizations, insurance, administrative or other service contracts relating thereto); and

- all restricted cash relating to cash collateralized letters of credit and/or Excluded Liabilities.

f.    <u>Assumed Liabilities</u>:  Purchaser will not assume any liabilities or obligations of the Sellers, other than the Assumed Liabilities identified in the Purchase Agreement, including, without limitation, the following :

- all Liabilities of Sellers under the Purchaser Assumed Contracts solely to the extent of the Assumed Cure Costs and Liabilities arising from events arising and occurring following the Closing Date;

- all Liabilities with respect to accrued and unpaid wages, accrued and unused vacation, and the employer's share of any payroll Taxes, in each case with respect to Transferred Employees who accept the Purchaser's offer of employment and commence employment with the Purchaser on the

Closing Date, in an amount not to exceed one half of the aggregate amount of such wages, vacation and payroll taxes accrued during such Transferred Employee's normal pay period cycle;

- certain Liabilities with regards to employee benefits and tax expenses as set forth in the Purchase Agreement;

- all sales or use or other Taxes of any Seller (but not including any Taxes assumed by Purchaser pursuant to Section 2.3(b) of the Purchase Agreement or paid by Sellers pursuant to the Closing Sales Tax Payment), up to an aggregate amount not to exceed $1,600,000, that (i) result from sales and use Tax audits or examinations of Sellers for periods prior to the Closing Date or (ii) for which any director, officer or employee of a Seller may be personally liable under Applicable Law; *provided*, that Purchaser shall be entitled to all Tax refunds of Sellers for Tax periods prior to the Closing Date to the extent they relate to Taxes that would constitute Assumed Liabilities pursuant to Section 2.3(d) of the Purchase Agreement; *provided, further,* however, that Purchaser shall not be entitled to any such refund to the extent that it would cause the aggregate amount of refunds received by Purchaser pursuant to Section 2.3(d) of the Purchase Agreement to exceed the aggregate amount of Taxes that become Assumed Liabilities pursuant to Section 2.3(d) of the Purchase Agreement;

- the Assumed Studio Liabilities (as defined in the Purchase Agreement), provided, that the Studio Condition is fully satisfied;  and

- all Liabilities with respect to the Assumed Cure Costs (as defined in the Purchase Agreement).

g.    Excluded Liabilities:  Excluded Liabilities include all liabilities or obligations of the Sellers that are not Assumed Liabilities, and include, without limitation, the following:

- all liabilities for accrued expenses and accounts payable incurred prior to the Closing Date, except to the extent that the same constitute Assumed Liabilities;

- all liabilities arising out of any of the Excluded Assets, including Excluded Contracts;

- all Environmental Liabilities and Obligations, and all other Liabilities relating to any Laws in connection with any environmental, health or safety matters based on facts

arising or existing during Sellers' operation of the Business prior to the Closing Date;

- all Liabilities relating to any claims for infringement, dilution, misappropriation or any other violation of or by the Business Intellectual Property arising from Sellers' operation of the Business prior to the Closing Date;

- all Liabilities for (i) any Taxes of any Seller (other than those assumed pursuant to Sections 2.3(b) and 2.3(d)) and (ii) Transfer Taxes;

- all Liabilities arising out of, relating to or with respect to (i) the employment or performance of services by any Employee of Sellers or any of their Affiliates prior to the Closing, (ii) termination of employment or services of any Employee by any Seller or any of its Affiliates, including any severance payments, (iii) each of the Employee Benefit Plans subject to Title IV of ERISA and all Debtor Benefit Plans and (iv) the WARN Act;

- all Liabilities arising as a result of any Action initiated at any time, to the extent related to the business or the Purchased Assets on or prior to the Closing Date, including any shareholder actions, actions for breach of contract or any tort action;

- all Liabilities arising under any Indebtedness of Sellers, including any Liabilities with respect to the DIP Credit Agreement and any obligations or Liabilities to equity holders;

- all Liabilities with respect to any customer programs or rights, including merchandise returns;

- all Liabilities with respect to any gift cards outstanding on the Closing Date;

- all liabilities with respect to any customer programs or rights, including merchandise liability;

- all liabilities with respect to gift cards outstanding on the Closing Date;

- all Liabilities with respect to any Studio Contracts, including without limitation, the Revenue Sharing Agreements;

- all Liabilities relating to the failure to comply with any bulk sales Laws; and

- if the Studio Condition is not fully satisfied, the Assumed Studio Liabilities.

h.    Sellers' Obligations with Respect to Stores:

- Prior to, on or promptly following the date of the Purchase Agreement, Sellers shall seek by written request from the counterparty to each of the Leased Properties – other than the Initial Liquidating Stores (i) an extension of not less than ninety (90) days of the April 21, 2011 deadline for Sellers' assumption or rejection of such Leased Properties under section 365 of the Bankruptcy Code (the "*Lease Rejection Deadline*") and (ii) that such counterparty respond to such request no later than February 27, 2011. By March 3, 2011, Sellers shall provide Purchaser with a list of each Leased Property for which extension of the Lease Rejection Deadline of at least sixty (60) days (a "*Lease Extension*") has not been received.  In the event that any counterparty to a Leased Property has not affirmatively agreed in writing, by February 28, 2011, to a Lease Extension, Sellers shall, unless otherwise directed by Purchaser, promptly, and no later than March 7, 2011, commence and diligently pursue liquidation of each Store that is the subject of such Leased Property; *provided, however*, that the Protected Stores shall not be subject to such Liquidation Condition.

- The Sellers must commence the liquidation of each of the 609 Stores listed on Schedule 1.1(c) to the Purchase Agreement (the "*Initial Liquidating Stores*") by February 28, 2011 and such liquidations must be completed by the Closing Date.  It shall be a Purchaser Closing Condition that the Sellers shall have completed the liquidation and closure of all of the Initial Liquidating Stores.

- In connection with the liquidation through the conduct of "store closing" or similar going out of business sales or liquidations of any Stores (the "*Store Closing Liquidations*") occurring prior to the Closing Date, Sellers shall consult with Purchaser as to how such liquidations shall be conducted, including the selection and terms of engagement of the liquidators, if any, to be used and the aggregate estimated expenses to be incurred in connection with such liquidations.

- With respect to any Leased Property (including any Protected Store or Distribution Center) for which Purchaser has not previously designated the real property lease as a

Purchaser Assumed Contract (the "**Closing Date Leased Properties**"), Purchaser shall either (i) timely designate as a Purchaser Assumed Contract the unexpired real property lease pursuant to which such Closing Date Leased Property is leased, or (ii) in lieu of assuming the unexpired real property lease pursuant to which such Closing Date Leased Property is leased and purchasing the Designated Liquidation Merchandise and Designated FF&E[18] at such Closing Date Leased Property, elect to have Sellers retain, and Sellers shall retain, as an Excluded Asset, such unexpired real property lease and such Designated Liquidation Merchandise and Designated FF&E and engage Purchaser as its exclusive agent for the purpose of conducting Store Closing Liquidations during the Liquidation Period[19] of the Designated Liquidation Merchandise and Designated FF&E at such Closing Date Leased Property (the "**Agency Alternative**"), together with any additional inventory in transit to such Closing Date Leased Property as of the Closing Date (the "**Agency Liquidations**").

- If Purchaser elects the Agency Alternative with respect to any Closing Date Leased Property, then (A) in the event that Sellers have obtained Lease Extensions for all of the Closing Date Leased Properties, Sellers shall carry out Agency Liquidations at the Closing Date Leased Properties pursuant to the terms of the Agency and License Agreement during the Liquidation Period, and (B) in the event that Sellers shall have obtained Lease Extensions for less than all of the Closing Date Leased Properties, then in order to carry out Agency Liquidations at the Closing Date Leased Properties pursuant to the terms of the Agency and License Agreement during the Liquidation Period, Sellers shall (unless instructed by Purchaser to carry out such Agency Liquidations in the Bankruptcy Cases pursuant to

---

[18] As used in the Purchase Agreement, "**Designated FF&E**" means all furniture, fixtures and equipment owned by Sellers and located at the Closing Date Leased Properties and "**Designated Liquidation Merchandise**" means all movie, television program, game and cell phone inventory, merchandise, memorabilia, supplies, food and beverage items and other finished goods inventory owned by Sellers on the Closing Date and located at, or in transit to, the Closing Date Leased Properties.

[19] As used in the Purchase Agreement, "**Liquidation Period**" means (i) with respect to any Leased Property for which a Lease Extension has been received, the period from the Closing Date until the expiration of such Lease Extension (which period shall not be less than sixty (60) days) and (ii) with respect to any Leased Property for which a Lease Extension has not been received, a period of not less than sixty (60) days following the Closing Date.

clause (A) even though Sellers shall have obtained Lease Extensions for less than all of the Closing Date Leased Properties), either (i) have sought and obtained prior to the Closing Date appropriate relief under Applicable Law to extend the date by which Sellers must reject such Closing Date Leased Property for a period sufficient to permit the orderly completion of the Agency Liquidation at all Closing Date Leased Properties after the Closing pursuant to the Agency and License Agreement (but in any event for a period not less than the Liquidation Period), or (ii) if such relief has not been obtained prior to the Closing Date, then, at Purchaser's option, convert the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code at the Closing to permit completion of the Agency Liquidations at all Closing Date Leased Properties after the Closing pursuant to the Agency and License Agreement to be carried out under the provisions of chapter 7 of the Bankruptcy Code in accordance with the Agency and License Agreement for a period of not less than the Liquidation Period.  The terms, conditions and procedures applicable to the conduct of the Store Closing Liquidations in such Closing Date Leased Properties as to which Purchaser elects the Agency Alternative are set forth in the Agency and License Agreement.  Under the Agency and License Agreement, Purchaser shall be entitled to receive the Proceeds (as defined in the Agency and License Agreement) from the Agency Liquidations (as defined in the Agency and License Agreement) and shall be responsible for the payment of the Expenses (as defined in the Agency and License Agreement).

- In the event that the aggregate number of Leased Properties for which a Lease Extension has been received plus the actual number of Protected Stores is not greater than 1,500, Sellers shall at all times thereafter, in connection with the Store Closing Liquidations described above, use their commercially reasonable efforts to make appropriate arrangements for the liquidation through such Store Closing Liquidations of inventory at the Distribution Centers in an amount not less than an average of 10,000 units per Store Closing Liquidation.

i.    <u>Transition Services Agreement</u>.  If requested by Purchaser, Sellers shall negotiate in good faith to execute an agreement at Closing pursuant to which Sellers will continue to provide to Purchaser, on terms to be mutually agreed upon, certain general

and administrative services then being provided by Sellers with respect to the business.

j. Use of Name: Upon and following the Closing, Sellers shall not use the name "Blockbuster" or any of the items listed in the schedule of Trademarks and Trademark Applications in the Purchase Agreement or similar names or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs, or insignia related thereto or containing or comprising the foregoing, including any name or mark confusingly similar thereto (collectively, the "*Purchased Business Name Trademarks*"), other than in the case of disclosures by Sellers of their former ownership of the business. As promptly as practicable but in no event later than 120 days following the Closing Date, each Seller shall remove any Purchased Business Name Trademarks from its legal name by appropriate legal proceedings in the jurisdiction of such Seller's organization.

k. Assumption of Contracts and Leases: All of the Purchaser Assumed Contracts shall be assumed by the Sellers at the Closing and assigned to the Purchaser. All Cure Amounts shall, with respect to the Purchaser Assumed Contracts, be paid in full by the Purchaser on or before the Closing Date.

- Employees: Prior to the Closing Date, the Purchaser will offer employment, commencing as of the Closing Date and contingent upon the Closing, on an at-will basis to substantially all of the Sellers' employees who are providing services with respect to the Purchased Assets immediately prior to the Closing (the "*Transferred Employees*").

l. Conduct of Business Between Signing and Closing: The Purchase Agreement requires the Sellers to conduct their business in the ordinary course of business, maintain their insurance on the Purchased Assets, preserve their business and assets and business relationships, continue to operate their billing and collection procedures, and maintain their business records. The Purchase Agreement also requires the Sellers to do the following:

- Gift Cards: For a period of 45 days (or such longer period required by applicable state law or local regulations) after the date on which the Purchase Agreement is executed, the Sellers may honor or redeem in accordance with past practice any gift cards issued by Sellers that are presented and/or surrendered by customers during such time.

Upon expiration of such 45 day period (or such longer period required by applicable state law or local regulations), the Sellers will not honor or redeem any gift cards that are outstanding on, or issued subsequent to, the date of the Purchase Agreement, except to the extent honored and/or redeemed pursuant to a program for which Purchaser provides, in its sole discretion, its prior written consent.

- Cash Flow Budget: The Sellers shall operate in accordance with the Cash Flow Budget approved by the Purchaser and the Sale Budget approved by the Requisite DIP Lenders prior to the conclusion of the hearing to approve the Bid Procedures.

m.    Representations & Warranties; Covenants: The Purchase Agreement includes customary representations, warranties, and covenants.

n.    Outside Date: Purchaser or the Sellers may terminate the Purchase Agreement if the Closing shall not have occurred by April 20, 2011 (the "*Outside Date*").

o.    Purchaser Termination Events: The Purchaser shall have the right to terminate the Purchase Agreement upon occurrence of the following events:

- the Bid Procedures Order shall not have been entered by the Court on or before March 4, 2011;

- the Sale Order shall not have been entered by April 11, 2011;

- the Bid Procedures Order and/or the Sale Order shall have been modified in any manner adverse to Purchaser without Purchaser's prior written consent (which consent may be withheld in its sole discretion);

- Sellers enter into a definitive agreement with respect to a Competing Bid, the Court enters an order approving a Competing Bid or the Court enters an order that otherwise precludes the consummation of the transactions contemplated by the Purchase Agreement on the terms and conditions set forth in the Purchase Agreement;

- a Governmental Authority enters an order permanently restraining, prohibiting or enjoining the Sellers or the Purchaser from consummating the transactions

contemplated by the Purchase Agreement and such order shall have become final and non-appealable or shall have been vacated prior to the Outside Date;

- any of the Sellers' Chapter 11 cases have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

- a breach of any covenant or agreement of the Sellers set forth in the Purchase Agreement or any representation or warranty of the Sellers becomes untrue, and in either case, such that Purchaser's closing conditions would not be satisfied and such breach or untruth cannot be cured before the Outside Date;

- any secured creditor of the Sellers obtains relief from the stay to foreclose on any of the Purchased Assets, the effect of which would cause or would reasonably be expected to cause, a Seller Material Adverse Effect (as defined in the Purchase Agreement);

- the Sales Motion has not been filed on or before the second business day following the date of the Purchase Agreement;

- by joint written consent with the Sellers; or

- the Sellers have not obtained prior to the conclusion of the hearing on the Bid Procedures Order, written consent from the Requisite DIP Lenders (as defined in the DIP Order) of the Wind-Down Budget and the Sale Budget.

## B.    Certain "Extraordinary" Provisions in the Purchase Agreement that Require Separate Disclosure

19.    The Stalking Horse Bid contains the following provisions, which the Guidelines for the Conduct of Asset Sales, adopted by this Court's General Order M-331, require be separately disclosed:

a.    <u>Deadlines that Effectively Limit Notice</u>.  Concurrently with the filing of this Motion, the Debtors have filed a motion requesting that the Court enter an order shortening time with respect to the hearing to consider the Bid Procedures and the Administrative Relief, and approve the form and manner of notice to parties to whom notice of the Bid Procedures Hearing will be given.  The Debtors do not intend to, however, request shortening of the notice period as to the Sale Hearing and will provide notice of same as described below.

b.   Use of Proceeds:  As set forth above, the Purchase Agreement
contemplates a definitive allocation of sale proceeds.  This
distribution is consistent with the priorities and rights under the
DIP Order and the goal of assuring an orderly wind-down of the
estates after consummation of the Sale Transaction.

c.   Potential Consummation of the Sale Transaction in Chapter 7:  As
set forth above (Paragraphs 9, 10 and 18h), the Purchase
Agreement (see Section 8.8 of the Purchase Agreement) provides
that, under certain circumstances as described therein and at the
Purchaser's option, the Purchaser shall have the right to compel a
conversion of the Debtors' cases to cases under chapter 7 of the
Bankruptcy Code upon or, at Purchaser's option, following the
closing of the Purchase Agreement.

In that regard, the Purchase Agreement provides that as a condition
of the Purchaser's obligation to close under the Purchase
Agreement, the Order of the Bankruptcy Court approving the sale
to the Purchaser must include provisions ordering that: (i) in
certain circumstances, the Debtors' chapter 11 cases must be
converted to cases under chapter 7 of the Bankruptcy Code upon
the Purchaser's election of the "*Agency Alternative*" (as defined in
the Purchase Agreement) and as otherwise provided in Paragraph
8.8(b) of the Purchase Agreement; (ii) the Agency and License
Agreement (as defined in the Purchase Agreement) shall be
binding on the chapter 7 trustee in any such chapter 7 cases; and
(iii) such Order shall be binding on the chapter 7 trustee in any
such chapter 7 cases.

d.   Stalking Horse Bid Protections:  The Stalking Horse Bid
incorporates the following provisions:

i.   The Stalking Horse Bidder will not be entitled to any
break-up, termination fee, or other compensation.

ii.   The Stalking Horse Bidder will be entitled to the Expense
Reimbursement, which will include reimbursement for
expenses incurred in connection with the Sale Transaction,
such as attorneys' and financial advisor's fees.  The
Expense Reimbursement shall be paid in full in cash from
the sale proceeds.

e.   Record Retention:  It is contemplated that the Stalking Horse
Bidder will acquire a substantial portion of the books and records
pertaining to the operation of the business and the Purchased
Assets.  The Sellers and the Stalking Horse Bidder are required to
preserve the business records held by each of them relating to the

business for a period of three (3) years from the Closing Date and shall make such business records available to the other as may be reasonably required by such other party; *provided, however* that the Sellers shall not be required to preserve such records after the bankruptcy cases are closed.

f.    <u>Sale of Avoidance Actions</u>:  The Purchaser has insisted, in view of the consideration being provided, that the Purchase Agreement include the sale of all of the estates' claims under chapter 5 of the Bankruptcy Code.

g.    <u>Requested Findings as to Successor Liability</u>:  The Purchase Agreement requires that the Sale Order contain findings of fact and conclusions of law limiting the Purchaser's successor liability. Actual notice of the Sale Hearing to all known creditors of the Debtors will be provided, in addition to notice by publication. Accordingly, the Debtors submit that such notice is sufficient for the requested finding.

h.    <u>Requested Findings as to Fraudulent Conveyances or Transfers</u>: The Purchaser has insisted on, in view of the consideration being provided, that the Sale Order contain findings of fact and conclusions of law with respect to the consideration paid and presence or absence of the elements of fraudulent transfer or conveyance.

i.    <u>Sale Free and Clear</u>:  As described in this Motion and as provided in the Sale Order, the sale of the Assets will be free and clear of all liens, claims, encumbrances, and other interests except for those permitted encumbrances and Assumed Liabilities, as specified in the Purchase Agreement.

j.    <u>Relief from Bankruptcy Rule 6004(h)</u>:  As described below, the Sellers seek relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h).

20.    In order to ensure that the Debtors receive the maximum value for the Assets, the Debtors and the Stalking Horse Bidder have agreed that the Stalking Horse Bid is subject to higher or otherwise better offers and that the Auction will take place subject to the Bid Procedures.  The Stalking Horse Bid will serve as the "stalking horse" bid for the sale of the Assets.  As set forth in the Stalking Horse Bid and in the Bid Procedures Order, the Debtors and the Stalking Horse Bidder have requested that any competing bids be submitted

by no later than 12:00 p.m. (New York Time) on the third day prior to the Auction (the "***Bid***

***Deadline***") and, that if qualified competing bids as provided in the Bid Procedures are

received, the Auction be conducted no less than three (3) business days prior to the Sale

Hearing.  Notably, the only protection for the Stalking Horse Bidder is the Expense

Reimbursement.  No break-up fee is being requested, thereby facilitating the making of

competing qualified bids.

**V.**

**SALE NOTICE AND RELATED DEADLINES,
THE BID PROCEDURES, AND THE AUCTION**

A.     **Notice of Sale, Auction, Sale Hearing, and Related Deadlines**

21.     The Debtors propose the following notice and other procedures to be

implemented in connection with the sale process:

> a.     <u>Notice of Sale, Auction, and Sale Hearing</u>:  Within three (3) business days after entry of the Bid Procedures Order, the Debtors (or their agents) shall:
>
> > i.     provide the Sale Notice, in substantially the form attached as ***Exhibit "B"*** to the proposed Bid Procedures Order, of the Bid Procedures Order, this Motion, the Stalking Horse Bid, the Auction, the Sale Hearing, and the proposed Sale Order by email, mail, facsimile, or overnight delivery service, upon: (1) the U.S. Trustee; (2) the attorneys for the Creditors' Committee; (3) the attorneys for U.S. Bank National Association, as trustee under the Indenture, dated as of October 1, 2009, with respect to the Senior Secured Notes; (4) the attorneys for The Bank of New York Trust Company, N.A., as trustee under the Indenture, dated as of August 20, 2004, with respect to the 9% Senior Subordinated Notes due 2012 issued by Blockbuster Inc.; (5) the attorneys for the DIP Lenders; (6) the attorneys for Wilmington Trust FSB, as agent under the DIP Facility; (7) each counterparty to an executory contract or unexpired lease; (8) for each State in which the Debtors' stores are located, (x) the Attorney General's Office, and (y) the applicable taxing authorities; (9) the United States Attorney for the Southern District of New York; (10) the attorneys

for the Purchaser; (11) those parties who have requested notice pursuant to Bankruptcy Rule 2002; (12) all known creditors of the Debtors and all entities known to have asserted any claims against the Assets or the Debtors' interest in the Assets and other entities known to have asserted a lien, interest or encumbrance in or upon any of the Assets; and (13) all known bona fide entities that have previously expressed an interest in purchasing the Assets in the last twelve months preceding the date of the Motion (collectively, the "*Sale Notice Parties*");

ii.    publish the Sale Notice on one occasion each in *The Wall Street Journal* and *The New York Times*, national editions; and

iii.    cause the Sale Notice to be published on www.kccllc.net/blockbuster (the "*Website*").

b.    <u>Date, Time, and Place of Auction</u>:  The Debtors propose that the Auction be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 on a date approved by the Court commencing **approximately thirty (30) days after entry of the Bid Procedures Order at 10:00 a.m. (New York time)**.

c.    <u>Date, Time, and Place of Sale Hearing</u>:  The Debtors propose that the Sale Hearing be held on the first business day that is three (3) days following the Auction**,** or as soon thereafter as the Court may permit.  The Sale Hearing may be adjourned, from time to time, without further notice to the Sale Notice Parties, creditors or other parties in interest other than by announcement of the adjournment in open Court or on the Court's docket.

d.    <u>Notice of Successful Bidder</u>:  As soon as immediately practicable after the Auction, but no later than one (1) business day after conclusion of the Auction, the Debtors will provide electronic notice of the results of the Auction on the Court's docket.

e.    <u>Objection Deadline to Sale Order</u>:  In accordance with this Court's order (the "*Case Management Order*"), dated October 21, 2010 [Docket No. 365], establishing case management procedures, objections to the relief sought in the Sale Order shall be in writing, filed, and served so as to be actually received by the parties on the Master Service List (as set forth in the Case Management Order) by five (5) business days prior to the Sale Hearing, at 4:00 p.m. (New York time).  To the extent the Successful Bidder is an entity other than the Stalking Horse Bidder, any further objections to the

Sale Order based solely on the ability of the Successful Bidder to perform under any Designated Contract (as defined below) shall be filed by no later than 5:00 p.m. (New York time) on the day that is one (1) business day prior to the Sale Hearing.

    f.    <u>Data Room</u>: The data room containing information furnished to the Purchaser shall be made available to all prospective bidders who enter into appropriate confidentiality agreements with the Debtors.

**B.**    **The Bid Procedures**

22.    The Debtors believe that the Bid Procedures[20], substantially in the form annexed as ***Exhibit "A"*** to the Bid Procedures Order, are appropriate and will maximize the recovery for the Debtors and their estates in connection with the sale of the Assets. The Bid Procedures provide an appropriate framework for selling the Assets in an orderly fashion and will enable the Debtors to review, analyze, and compare all bids received to determine which bid(s) are in the best interests of the Debtors and their economic stakeholders.

23.    A summary of certain of the relevant provisions of the Bid Procedures are as follows:

    a.    <u>Assets to be Sold</u>: The Auction shall consist of all of the Assets used in Blockbuster's business operations, including but not limited to, its inventory, cash, intellectual property, digital rights, executory contracts, unexpired leases of nonresidential real property (including its distribution centers), owned real property, and the Debtors' equity interests in their non-Debtor foreign subsidiaries.

    b.    <u>Confidentiality Agreements</u>: Upon execution of a valid confidentiality agreement, in form and substance satisfactory to the Debtors, any party that the Debtors deem in their discretion capable of submitting a Qualified Bid (as defined below) that wishes to conduct due diligence on any of the Assets may be granted access to all material information that has been or will be provided to the Purchaser and other such bidders.

---

[20]    Capitalized terms not defined herein but pertaining to the Bid Procedures shall have the meaning ascribed to them in the Bid Procedures.

c.    Qualified Bid:  In order to participate in the bidding process and be deemed a "***Qualified Bidder***", each potential bidder (other than the Stalking Horse Bidder) must submit a "***Qualified Bid***" by the Bid Deadline.  To constitute a Qualified Bid, a bid must, among other things:

- be in writing;

- state that such bidder offers to purchase the Assets, or some substantial portion thereof;

- state that such bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of such Assets on terms and conditions no less favorable in the aggregate to the Debtors than the terms and conditions contained in the Purchase Agreement, including (i) taking into account payment of the Expense Reimbursement plus at least $1 million in additional value, and (ii) provision for a cash component sufficient to pay in full in cash the Expense Reimbursement and all amounts set forth in items First through Third and Fifth through Seventh in paragraph 18c above entitled, "Payment and Allocation of Proceeds";

- include a clean and duly executed Asset Purchase Agreement (the "***Modified APA***") and a marked Modified APA reflecting the variations from the Purchase Agreement;

- provide that such bidder's offer is terminable only in accordance with its terms as agreed to by the Debtors and otherwise irrevocable until (i) the closing of the purchase of the Assets if such bidder is the Successful Bidder (as defined below) and (ii) for two (2) business days after the earlier of the closing of the Sale Transaction with the Successful Bidder or the termination of the Successful Bid, if such bidder is designated the Back-Up Bidder (as defined in the Bid Procedures) at the conclusion of the Auction;

- state that such bidder is financially capable of consummating the transactions contemplated by the Modified APA and detail the source(s) of funds that will be used to consummate the transaction;

- include such financial and other information that will allow the Debtors to make a reasonable determination as to the

bidder's financial and other capabilities to consummate the transaction contemplated by the Modified APA;

• for any bid that requires the assumption and assignment of executory contracts or unexpired leases, identification of which executory contracts and/or unexpired leases are to be assumed and assigned and provide evidence establishing its ability to provide adequate assurance of performance of such executory contracts or unexpired leases;

• fully disclose the identity of each entity that will be bidding for the applicable Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

• not contain any due diligence or financing contingencies of any kind;

• include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery, and closing of the Modified APA; and

• include a cash deposit (a "***Good Faith Deposit***") in an amount equal to ten (10%) percent of the value of the consideration offered to purchase the Assets.

The Debtors, in their discretion, may accept a single Qualified Bid, or multiple bids for non-overlapping material portions of the Assets such that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid.

d. <u>Bids for Less Than Substantially All the Assets</u>. Notwithstanding the requirement in paragraph 23.c immediately above that a Qualified Bid must include an offer to purchase all or a substantial portion of the Assets, the Debtors will consider bids for less than a substantial (but nevertheless a material) portion of the Assets. In this regard, with the goal and primary purpose of selling substantially all of the Assets, the Debtors, in their discretion, may accept as a single Qualified Bid, multiple bids for non-overlapping material portions of the Assets such that, when taken together in the aggregate, such bids would otherwise meet the standards for a single Qualified Bid. The Debtors may permit otherwise Qualified Bidders who submitted bids by the Bid Deadline for less than a substantial (but nevertheless a material) portion of the Assets but who were not identified as a component of such a single Qualified Bid consisting of such multiple bids to participate in the Auction

and to submit higher or otherwise better bids that in subsequent rounds of bidding may be considered, together with other bids for non-overlapping material portions of the Assets, as part of such a single Qualifying Bid for overbid purposes.

e.    Credit Bids:  In accordance with section 363(k) of the Bankruptcy Code, a credit bid may be submitted on behalf of all of the holders of the Senior Secured Notes to the extent any such credit bid is authorized by the terms of paragraph 29 of the DIP Order, the Indenture, and any other documents governing such notes; *provided, however,* in order to be considered, any such credit bid must include a cash component adequate to fund the payment in full, in cash of the Carve-Out Expenses, the Critical Expenses, the Administrative Priority Expenses, the Expense Reimbursement, the Estimated Wind Down Expenses, and the Approved Sale Expenses.  A credit bid may also be submitted on behalf of all holders of the Roll-Up Notes or all of the DIP Lenders only to the extent any such credit bid is authorized by the terms of paragraph 29 of the DIP Order, and subject to the foregoing requirements as to the cash component.  A credit bid consistent with this paragraph shall be deemed to be a Qualified Bid.

f.    Reservation of Rights:  The Debtors reserve the right, in their reasonable discretion and subject to the exercise of their business judgment, to make non-material alterations to the Bid Procedures and/or to terminate discussions with any and all prospective acquirers and investors at any time (including the Stalking Horse Bidder) and without specifying the reasons therefor, but only to the extent not materially inconsistent with the Bid Procedures.

## C.    **The Auction**

24.    As further described in the Bid Procedures, only the Stalking Horse Bidder and other Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.  Bidding at the Auction will commence with the highest Qualified Bid submitted by the Qualified Bidders prior to the Auction.  Qualified Bidders may then submit successive bids higher than the previous bid in increments of no less than $1 million.  The Debtors reserve the right, in their reasonable discretion and subject to the exercise of their business judgment, to announce reductions or increases in minimum incremental bids at any time during the Auction.  All Qualified Bidders shall have the right to submit additional bids and

make additional modifications to the Stalking Horse Purchase Agreement or their respective Modified APAs, as applicable, at the Auction to improve such bids. The Debtors may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make subsequent bids) for conducting the Auction, *provided* that such rules are (i) not inconsistent with the Bid Procedures Order, the Bankruptcy Code, or any order of the Bankruptcy Court entered in connection herewith, and (ii) disclosed to each Qualified Bidder. As noted above, to facilitate the Auction process and assist interested parties in preparing bids for the Assets, Qualified Bidders will be required to provide to the Debtors a Modified APA.

25.      The Debtors reserve the right to (i) determine, in their reasonable discretion and in consultation with the Creditors' Committee and the Steering Committee (in the latter case, provided that neither the Stalking Horse Bidder nor any other holder of the Senior Secured Notes who has submitted, or participated in the submission of, a bid may participate in the Steering Committee's consultation rights unless and until such time as the Stalking Horse Bidder or such other bidder informs the Debtors and the Steering Committee that it has irrevocably withdrawn from participating in the Auction), which bid is the highest or otherwise best (recognizing that, in determining same, a critical consideration shall be which bid provides the greatest net proceeds available for distribution to creditors by the estates after payment of, *inter alia*, the Carve-Out Expenses, Critical Expenses, Administrative Priority Expenses, and the Expense Reimbursement, if any), and (ii) reject at any time, without liability, any offer, other than the Stalking Horse Bid, that the Debtors, in their reasonable discretion and in consultation with the Creditors' Committee and the Steering Committee, deem to be (x) inadequate or insufficient, (y) not in conformity with the requirements of the

Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or procedures set forth therein or in the Bid Procedures Order, or (z) contrary to the best interests of the Debtors and their estates.

        26.    The Auction shall continue until the Debtors determine, in consultation with the Creditors' Committee and the Steering Committee, and subject to Bankruptcy Court approval, that the Debtors have received the highest or otherwise best offer or offers for the Assets from among the Qualified Bidders (including the Stalking Horse Bidder) submitted at the Auction (the "*Successful Bid(s)*") (recognizing that, in determining same, a critical consideration shall be which bid provides the greatest net proceeds available for distribution to creditors by the estates after payment of, *inter alia*, the Carve-Out Expenses, Critical Expenses, Administrative Priority Expenses, and the Expense Reimbursement, if any).  In making this decision, the Debtors may, in consultation with the Creditors' Committee and the Steering Committee, consider, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the Qualified Bidders' ability to close a given transaction, the proposed timing thereof, and rights of such Qualified Bidder and the Debtors with respect to the termination thereof, the number, type and nature of any changes reflected in the Modified APA requested by each Qualified Bidder, and the net benefit to the Debtors' estates.  The Qualified Bidder(s) submitting such Successful Bid(s) for the Assets shall become the "Successful Bidder(s)," and shall have such rights and responsibilities of a purchaser, as set forth in the Modified APA or Purchase Agreement, as applicable.  For the avoidance of doubt, absent participation in the Auction and the making of an overbid, the Stalking Horse Bidder cannot be designated the Back-Up Bidder, unless it consents to such designation.

27.     If no timely, conforming Qualified Bids, other than the Stalking Horse Bid reflected in the Purchase Agreement, are submitted by the Bid Deadline with respect to any of the Assets, the Debtors shall not hold the Auction and, instead, shall request at the Sale Hearing that the Bankruptcy Court approve the Purchase Agreement with the Stalking Horse Bidder.  However, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Qualified Bid for the Assets at the Auction (the "***Back-Up Bid***") shall be required to serve as the back-up bidder (the "***Back-Up Bidder***") for such Assets and keep such Back-Up Bid open and irrevocable for either (i) two (2) business days after the closing of the Sale Transaction with the Successful Bidder, or (ii) five (5) business days after the termination of the Successful Bid, whichever applies.  Following the Sale Hearing, if the Successful Bidder fails to consummate an approved Sale Transaction because of a breach or failure to perform on the part of such Successful Bidder or otherwise, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Bankruptcy Court.

28.     Except as otherwise provided in the Bid Procedures, Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder by no later than the fifth (5th) business day following the conclusion of the Auction.  The Good Faith Deposit of the Back-Up Bidder shall be held by the Debtors until one (1) business day after the closing of the sale transaction with the Successful Bidder.

29.     The Debtors will sell the Assets for the highest or otherwise best Qualified Bid upon the approval of such Qualified Bid by the Court after the Sale Hearing. The Stalking Horse Bidder and all holders of Senior Secured Notes shall have standing and

shall retain all rights with respect to any objections each of them may have to the Court's

approval of any Qualified Bid that the Debtors select as the highest or otherwise best bid at the

conclusion of the Auction.

### D.    <u>Assumption Procedures</u>

30.    Within three (3) business days after receiving the schedule from the

Stalking Horse Bidder of those executory contracts and unexpired leases it wishes to assume

pursuant to the Purchase Agreement (the "***Designated Contracts***") and no later than fifteen

(15) days prior to the Sale Hearing (subject to adjustment as provided below), the Debtors

shall file with the Court and serve on each counterparty to an executory contract or unexpired

lease set forth on such schedule, a notice of assumption, assignment, and cure (the

"***Assumption, Assignment, and Cure Notice***"), substantially in the form attached as ***Exhibit***

***"C"*** to the proposed Bid Procedures Order.  The Assumption, Assignment, and Cure Notice

shall include the Debtors' calculation of the cure amount (the "***Cure Amount***") for each such

Designated Contract.  A list of the Designated Contracts and Cure Amounts shall be posted on

the Website and updated as modified.

31.    Any counterparty to a Designated Contract shall file and serve any

objections to (i) the proposed assumption and assignment to the Successful Bidder and (ii) if

applicable, the proposed Cure Amount, no later than five (5) business days before the Sale

Hearing; *provided*, *however,* that to the extent the Successful Bidder is an entity other than the

Stalking Horse Bidder, any further objections to the Sale Order by a counterparty to a

Designated Contract based solely on the ability of the Successful Bidder to perform under any

such Designated Contract shall be filed by no later than 5:00 p.m. (New York time) on the

date that is one (1) day prior to the Sale Hearing.  If any executory contract or unexpired lease

is added to the schedule of Designated Contracts, a copy of the applicable Assumption,

Assignment, and Cure Notice shall be served on the counterparty by overnight courier service

within (1) one business day of such addition and any counterparty may file an objection as

aforesaid at any time that is one (1) business day prior to the Sale Hearing.

32.    If no objection is timely received, (i) the counterparty to a Designated

Contract shall be deemed to have consented to the assumption and assignment of the

Designated Contract to the Successful Bidder and shall be forever barred from asserting any

objection with regard to such assumption and assignment, and (ii) the Cure Amount set forth

in the Assumption, Assignment, and Cure Notice shall be controlling, notwithstanding

anything to the contrary in any Designated Contract, or any other document, and the

counterparty to a Designated Contract shall be deemed to have consented to the Cure Amount

and shall be forever barred from asserting any other claims related to such Designated

Contract against the Debtors or the Successful Bidder, or the property of any of them.

## VI.

## THE SALE IS WARRANTED AND IN THE BEST INTERESTS
## OF THE DEBTORS AND THEIR ECONOMIC STAKEHOLDERS

### A.    Sale of the Assets

33.    Ample authority exists for approval of the proposed sale.  Section 363

of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a

hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b)(1).  Courts in the Second Circuit and others, in applying this

section, have required that the sale of a debtor's assets be based upon the sound business

judgment of the debtor. *See Official Comm. of Unsecured Creditors v. LTV Corp. (In re*

*Chateaugay Corp.*), 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a

section 363(b) application must find from the evidence presented a good business reason to

grant such application); *Comm. of Equity Sec. Holders v. The Lionel Corp.* (*In re The Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983) (same).  Once a Court is satisfied that there is a sound business justification for the proposed sale, the Court must then determine whether (i) the debtor has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith.  *In re Betty Owens Sch., Inc.*, No. 96 Civ. 3576 (PKL), 1997 U.S. Dist. Lexis 5877, at *11-12 (S.D.N.Y. Apr. 16, 1997); *accord In re Del. and Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Decora Indus., Inc.*, Case No. 00-4459 JJF, 2002 WL 32332749, at *3 (D. Del. May 20, 2002).

34.    As described above, an expeditious sale of the Assets is critical to preserving and maximizing the value of Blockbuster.  Despite efforts by management in the digital and vending distribution channels to enhance brand relevance and consumer preference, as well as substantial efforts at reducing costs at the retail store operations through the lease renegotiation process, Blockbuster's business has deteriorated.  Moreover, given the current circumstances and the Debtors liquidity constraints, the consummation of the Plan as contemplated in the PSA is no longer a viable option.  Furthermore, absent the DIP Lenders' continued commitment to finance, the Debtors simply do not have the wherewithal to continue to operate in chapter 11 without pursuing a sale transaction.  Indeed, this is the only course of action the DIP Lenders are willing to support.  Accordingly, the Sale Transaction as proposed herein appears to be the only viable option to maximize the recoveries for the parties in interest in these chapter 11 cases.

35.    The Sale Notice that the Debtors propose to provide and the proposed Bid Procedures are more than adequate and reasonable.  As stated, the Sale Notice will be

served promptly on the Sale Notice Parties and will be timely published in newspapers of

general circulation. In addition, the Debtors' financial advisors will contact various parties

who have expressed an interest in acquiring assets of the Debtors or entering into a strategic

relationship with the Debtors over the past 12 months to determine whether they are interested

in submitting a competing bid. The Debtors believe that this is more than sufficient notice and

a reasonable period in which to attract competing bids, particularly in view of the extensive

activities engaged in by the Debtors and their financial advisors prior to the Commencement

Date with respect to strategic alternatives.

          36.     The Debtors believe that the Purchase Price under the Stalking Horse

Bid is fair and reasonable, but the Court will be assured at the Sale Hearing and after the

Auction is concluded, that the Debtors have selected the party or parties with the highest or

otherwise best offer for the Assets, recognizing that, in determining same, a critical

consideration shall be which bid provides the greatest net proceeds available for distribution to

creditors by the estates after the payment of, *inter alia*, the Carve-Out Expenses, Critical

Expenses, Administrative Priority Claims, and the Expense Reimbursement. Although the

Debtors recognize that the proposed time period between the approval of the Bid Procedures

and the Auction is relatively short, they believe that it is more than adequate to maximize

value in view of marketing efforts that have occurred to date and the Debtors' existing

liquidity constraints. Moreover, the Debtors have contemplated the possibility that liquidity

constraints or other factors may compel the Successful Bidder or Back-Up Bidder to close in a

superseding chapter 7 case or cases, and as such, in order to ensure that the estates reap the

benefits of the expedited chapter 11 sale and Auction process the Debtors have requested that

the Purchase Agreement and all Qualified Bids and Modified APAs provide that the closing

will go forward in a chapter 7 without adjustment to the Sale Transaction if conversion is

necessary.

**B.**    **Sale Free and Clear of Liens, Claims, Encumbrances, and Interests**

      37.    In the interest of attracting the best offers, the sale of the Assets should

be free and clear of any and all liens, claims, encumbrances and other interests in accordance

with section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances and

other interests attaching to the sale proceeds (subject and subordinate in all respects to the

Carve-Out Expenses, the Critical Expenses, the Administrative Priority Claims, and the

Expense Reimbursement, if applicable). Pursuant to section 363(f) of the Bankruptcy Code, a

debtor in possession may sell property of the estate "free and clear of any interest in such

property of an entity other than the estate" if applicable nonbankruptcy law permits sale of

such property free and clear of such interest, if such entity consents, if such interest is a lien

and the price at which such property is to be sold is greater than the aggregate value of all

liens on such property, if such interest is in bona fide dispute, or if such entity could be

compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)–(5). The Debtors believe that the DIP Lenders will consent to the Sale

Transaction as contemplated by this Motion. With respect to any other party asserting a lien,

claim, encumbrance, or other interest against the assets, the Debtors anticipate that they will

be able to satisfy one or more of the conditions set forth in section 363(f).

**C.**    **Protections As a Good Faith Purchaser**

      38.    Section 363(m) of the Bankruptcy Code protects a good-faith

purchaser's interest in property purchased from a debtor notwithstanding that the sale

conducted under section 363(b) is later reversed or modified on appeal. Specifically, section

363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) fosters the "'policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely.'" *Reloeb Co. v. LTV Corp* (*In re Chateaugay Corp.*, No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 3d Cir. 1986). *See also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

39.    The selection of the Successful Bidder will be the product of arm's-length, good-faith negotiations in as competitive a purchasing process as is possible under the circumstances. Based upon the record to be made at the Sale Hearing, the Debtors will request a finding that the Successful Bidder is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**D.    Bid Procedures**

40.    The Debtors believe the Bid Procedures are fair and reasonable and will ensure that the bidding process with respect to the Auction will yield the maximum value for the Debtors' estates and creditors. Accordingly, approval of the Bid Procedures, including the dates established thereby for the Auction and the Sale Hearing, is warranted.

E.    **The Expense Reimbursement**

41.    Approval of the Expense Reimbursement as a superpriority claim as a

form of bidder protection in connection with a sale of assets pursuant to section 363 of the

Bankruptcy Code has become a recognized practice in chapter 11 cases because it enables a

debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair,

while providing the debtor with the potential of obtaining an enhanced recovery through an

auction process.[21]

42.    More specifically, pursuant to the Purchase Agreement, the Expense

Reimbursement is payable in the event that the Purchaser terminates the Purchase Agreement

pursuant to Section 4.4 (exclusive of Sections 4.4(e), (i), (l) and (m)), which is summarized as

follows:

        a.    Termination prior to the closing by the joint written consent of
            Sellers and Purchaser;

        b.    Termination by either Sellers or Purchaser if the closing has not
            occurred by April 20, 2011 (as such date may be extended by the
            parties), provided that the party seeking to terminate is not in
            material breach of its obligations under the Purchase Agreement

---

[21]    *See, e.g., In re Finlay Enters., Inc., et al.*, Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Aug. 20, 2009)(approving break-up fee); *In re Lehman Bros. Holdings Inc., et al.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Oct. 22, 2008) (approving break-up fee and expense reimbursement); *In re Steve & Barry's Manhattan LLC, et al.*, Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) (approving break-up fee and expense reimbursement); *In re Fortunoff Fine Jewelry and Silverware, LLC*, Case No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 22, 2008) (approving break-up fee); *In re Bally Total Fitness of Greater New York, Inc.*, Case No. 07-12395(BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (approving break-up fee and expense reimbursement); *In re G+G Retail, Inc.*, Case No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006); *In re Footstar, Inc.* Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Apr. 6, 2004) (authorizing the debtors to enter into purchase agreements with break-up fees); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc., (In re Integrated Res., Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (approving break-up fee and expense reimbursement); *In re Twinlab Corp., et al.*, Case No. 03-15564 (CB) (Bankr. S.D.N.Y. 2003) (approving break-up fee and expense reimbursement); *In re Adelphia Business Solutions, Inc., et al.*, Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002) (approving break-up fee and expense reimbursement).

and such breach is the sole reason that the closing has not occurred;

c.    Termination by Purchaser, or prior to entry of the Sale Order, by Sellers, if (i) Sellers enter into a definitive agreement with respect to a competing bid; (ii) the Court enters an order approving a competing bid or (iii) the Court enters an Order that otherwise precludes consummation of the transaction contemplated by the Purchase Agreement;

d.    Termination by Purchaser or Sellers if an order is entered by a governmental unit restraining, prohibiting or enjoining either party from consummating the transaction and such order shall not have been timely vacated;

e.    Termination by Purchaser or Sellers if the Sale Order has not been entered by the Court on or before April 11, 2011;

f.    Termination by Purchaser, if any of the bankruptcy cases are dismissed or converted to a case under chapter 7 of the Bankruptcy Code for any reason;

g.    Termination by Purchaser (so long as Purchaser is not in material breach) upon a breach of any covenant or agreement of Sellers in the Purchase Agreement, of if any representation or warranty of Sellers shall have been or becomes untrue such that the conditions to closing in the Purchase Agreement cannot be satisfied;

h.    Termination by Purchaser if the Bidding Procedures Order or the Sale Order is modified in any manner adverse to Purchaser without Purchaser's consent; and

i.    Termination by Purchaser if any secured creditor obtains relief from the automatic stay to foreclose on any of the Purchased Assets, the effect of which would cause, or would reasonably be expected to cause, a Seller Material Adverse Effect (as such term is defined in the Purchase Agreement).

43.    As described above, authorization is requested to pay the Expense Reimbursement to the Stalking Horse Bidder, which is the only bid protection. The Expense Reimbursement (which will be a superpriority administrative expense) was a material inducement for, and condition of, the Stalking Horse Bidder's entry into the Purchase Agreement. No other form of stalking horse bidder protection is being sought. The Stalking

Horse Bidder is unwilling to commit to hold open the offer to purchase the Assets under the terms of the Stalking Horse Bid unless the Stalking Horse Bidder is assured of payment of the Expense Reimbursement. The Expense Reimbursement will promote more competitive bidding by inducing the Stalking Horse Bidder to hold its offer open as a minimum or floor bid on which other bidders—and the Debtors—can rely. Value has been received as a result of the Stalking Horse Bid and the Stalking Horse Bidder is entitled to be compensated as a result.

44.    Notably, unlike many other similar situations, no break-up fee is being provided. The Debtors believe that the requested Expense Reimbursement will not deter or chill bidding, is reasonable, and will enable the Debtors to maximize the value of their estates.

**F.    Assumption and Assignment of Designated Contracts**

45.    To facilitate and effect the sale of the Assets, the Debtors seek authorization to assume and assign the Designated Contracts to the Successful Bidder. Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, Courts will approve the assumption under section 365(a) of the Bankruptcy Code. *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993). In connection with the proposed sale, the Debtors will only assume and assign the Designated Contracts, *i.e.*, those executory contracts and unexpired leases that the Successful Bidder has designated it wants to assume. The Debtors' assumption of the Designated Contracts will be contingent upon payment of Cure Amounts and effective only upon the Closing. Further, section 365(k)

of the Bankruptcy Code provides that assignment by the debtor to an entity of a contract or

lease "relieves the trustee and the estate from any liability for any breach of such contract or

lease occurring after such assignment." 11 U.S.C. § 365(k). Pursuant to section 365(k), the

Debtors and the estates will therefore be relieved from any liability for any breach of any

Designated Contract after such assignment to the Successful Bidder. As such, the assumption

of the Designated Contracts will be an exercise of the Debtors' sound business judgment.

46.    Section 365(b)(1) of the Bankruptcy Code requires that any outstanding

defaults under the Designated Contracts that will be assumed must be cured or that adequate

assurance be provided that such defaults will be promptly cured. As set forth above, the

Debtors propose to file with the Court, publish on the Website, and serve on each counterparty

to a Designated Contract a notice which shall include the Debtors' calculation of the Cure

Amount for each such Designated Contract. Contract counterparties shall have the

opportunity to lodge any objections to the proposed assumption and assignment to the

Successful Bidder and, if applicable, the proposed Cure Amount. The Purchaser shall be

obligated to pay or cause to be paid any and all Cure Amounts with respect to the Designated

Contracts to be assumed. In the event of any dispute relating to any Cure Amount, the

Purchaser may elect not to assume the Designated Contract if it is unsatisfied with the

resolution of such dispute.

47.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may

assign an executory contract or unexpired lease of nonresidential real property if "adequate

assurance of future performance by the assignee of such contract or lease is provided." 11

U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on

the facts and circumstances of each case, but should be given "practical, pragmatic

construction." *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524,

538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436,

440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean

absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop,*

*Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every

case, the required assurance will fall considerably short of an absolute guarantee of

performance."). Among other things, adequate assurance may be given by demonstrating the

assignee's financial health and experience in managing the type of enterprise or property

assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate

assurance of future performance is present when prospective assignee of lease has financial

resources and expressed willingness to devote sufficient funding to business to give it strong

likelihood of succeeding; in the leasing context, chief determinant of adequate assurance is

whether rent will be paid). At the Sale Hearing, to the extent necessary, the Debtors will be

prepared to proffer testimony or present evidence to demonstrate the ability of the Successful

Bidder to perform under the Designated Contracts. The Sale Hearing, therefore, will provide

the Court and other interested parties with the opportunity to evaluate the ability of the

Successful Bidder to provide adequate assurance of future performance under the Designated

Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code. Accordingly, it is

requested that at the conclusion of the Sale Hearing, the proposed assumption and assignment

of the Designated Contracts be approved.

48.    To facilitate the assumption and assignment of the Designated

Contracts, the Debtors further request the Court find all anti-assignment provisions of the

Designated Contracts to be unenforceable under section 365(f) of the Bankruptcy Code.[22]

### G.    Request for Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d)

49.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use,

sale, or lease of property…is stayed until the expiration of 14 days after entry of the order,

unless the court orders otherwise." FED. R. BANKR. P. 6004(h).  Bankruptcy Rule 6006(d)

further provides that an "order authorizing the trustee to assign an executory contract or

unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the

order, unless the court orders otherwise." FED. R. BANKR. P. 6006(d).

50.    In light of the current circumstances and the financial condition of the

Debtors, the Debtors believe that in order to preserve and maximize value, the sale of the

Assets should be consummated as soon as practicable.  Accordingly, the Debtors request that

the Sale Order approving the sale of the Assets and the assumption and assignment of the

Designated Contracts be effective immediately upon entry of such order and that the fourteen-

day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

### H.    Appointment of a Consumer Privacy Ombudsman

51.    Pursuant to section 363(b)(1) of the Bankruptcy Code, a debtor may sell

or lease personally identifiable information, such as its consumer customer list, so long as it

---

[22]    Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or
unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the
assignment of such contract or lease, the trustee may assign such contract or lease…"
11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "Notwithstanding a provision in an
executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies,
or permits a party other than the debtor to terminate or modify, such contract or lease or a right or
obligation under such contract or lease on account of an assignment of such contract or lease, such
contract, lease, right, or obligation may not be terminated or modified under such provision because
of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

complies with the debtor's privacy policy.  11 U.S.C. § 363(b)(1)(A).  If a sale is inconsistent

with the debtor's privacy policy, Bankruptcy Code section 332 governs the appointment of a

consumer privacy ombudsman.  11 U.S.C. § 332(b)(1).

52.    Should the Debtors sell personally identifiable information, the Debtors

will ensure that the sale is consistent with the Debtors' current privacy policy.  Therefore, the

appointment of a consumer privacy ombudsman is unnecessary at this time.  Should the

Debtors propose to sell such information other than in compliance with their privacy policy,

they will promptly notify the Court and seek the appointment of a consumer privacy

ombudsman in accordance with section 332 of the Bankruptcy Code.

## I.    Waiver of Compliance with the Requirements of Local Rule 6004-1, to the Extent Applicable

53.    The Debtors propose to conduct the sale of the Assets without

employing an appraiser or an auctioneer.  The Debtors submit that given the extensive

description of the procedures pursuant to which this sale will be conducted, the requirements

of Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of New York have

been satisfied.  Alternatively, to the extent that the Court finds that the Debtors have not met

any applicable provision of Local Bankruptcy Rule 6004-1, the Debtors respectfully request

that the Court waive such requirements with respect to this Motion.

## J.    Authority to Continue Store Closing Sales

54.    By Order dated January 20, 2011, the Court (i) authorized the Debtors

to continue to conduct store closing sales and bulk inventory sales, (ii) approved certain store

closing procedures, and (iii) granted ancillary and related relief overriding or invalidating any

contractual provisions or state or local laws that may restrict such sales.[23]   The Debtors

request that the relief granted by such Order be made applicable with equal force to any

similar store closings or bulk sales conducted in connection with this Motion, the Sale

Transaction, or otherwise, whether such sales are conducted by the Debtors, a Successful

Bidder, or another third party agent of either, or in any subsequent chapter 7 case of any

Debtor; *provided, however*, that any of the foregoing shall be subject to the provisions of such

Order, including the "***Store Closing Sales Procedures***" approved (and defined) therein.

## VII.

## THE ADMINISTRATIVE RELIEF IS ESSENTIAL TO A SUCCESSFUL SALE

### A.    Necessity of the Granting of the Administrative Priority Claims and the Issuance of the Administrative Stay

55.    Generally, a debtor in possession may incur unsecured debt in the

ordinary course of its business during a chapter 11 case without the necessity of Court

approval, and any claims on account of such extension of credit are entitled to administrative

claim status. *See* 11 U.S.C. § 364(a).  However, when a debtor in possession is unable to

procure such unsecured credit, section 364(c)(1) of the Bankruptcy Code empowers the Court,

"after notice and a hearing, [to] authorize the obtaining of credit or the incurring of debt . . .

***with priority over any or all administrative expenses of the kind specified in section 503(b)***

***or 507(b) of this title***."  11 U.S.C. § 365(c)(1) (emphasis added).  Further, section 105(a) of

the Bankruptcy Code provides:

> The court may issue any order, process, or judgment that is necessary or
> appropriate to carry out the provisions of this title.  No provision of this
> title providing for the raising of an issue by a party in interest shall be

---

[23]    Order Pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed R. Bankr. P. 6004 Authorizing the Debtors to Continue to Conduct Store Closing Sales and Bulk Inventory Sales, Approving Procedures with Respect to Ordinary Course Store Closing Sales, and Granting Ancillary and Related Relief [Dkt. No. 864]

construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

56.    Courts have previously granted such superpriority status to certain administrative expenses so as to ensure that creditors working for, or doing business with, a chapter 11 debtor are not unduly prejudiced by extending credit during the debtor's sale and subsequent wind-down period. *See, e.g., In re PLVTZ, Inc.*, Chapter 11 Case No. 07-13532 (Jan. 8, 2008) (Gerber, J.); *In re Caldor's, Inc.*, Chapter 11 Case No. 95 B 44080 (Jan. 22, 1999) (affirmed 266 B.R. 575 (S.D.N.Y. 2001)) (Garrity, J.); *In re Klein Sleep Prods., Inc.*, Chapter 11 Case No. 91 B 12577 (Jan. 4, 1993) (Conrad, J.); *In re The Lionel Corporation, et al.*, Chapter 11 Case Nos. 91 B 12704 and 91 B 12705 (Lifland, C.J.) (June 28, 1993).[24] Courts have also granted injunctive relief to prevent administrative claimants from attempting to trump this priority status by demanding payment of their existing claims, which, if permitted, would result in substantial detriment to the debtors' estates. *See In re Caldor's, Inc.*, Chapter 11 Case No. 95 B 44080 (Garrity, J.) (Jan. 22, 1999) (affirmed 266 B.R. 575 (S.D.N.Y. 2001)); *In re The Lionel Corporation, et al.*, Chapter 11 Case Nos. 91 B 12704 and 91 B 12705 (June 28, 1993) (Lifland, C.J.).

57.    As stated, in view of the current circumstances of the Debtors and the limited amount of financial resources available to them, the Sale Transaction described herein is the only realistic alternative to maximize the value of these estates. Moreover, under these circumstances, the Debtors must provide assurance to those parties who supply goods and services to the Debtors during the period necessary to achieve a sale that they are paid.

---

[24]    A copy of each of these orders is available upon request to the attorneys for the Debtors.

Accordingly, as stated above, the Debtors seek authority to implement the following

procedures and relief in order to assure that a Sale Transaction can proceed and be

consummated in an orderly fashion:

a.    the non-payment during the Sale Process Period of all costs and
expenses of administration of the Debtors' estates (other than the
Critical Expenses and limited to the amounts provided in the Sale
Budget) incurred during the Pre-Sale Period;

b.    the payment in full of (i) all Administrative Priority Expenses, as
provided in and up to the amounts provided in the Sale Budget,
and (ii) the Critical Expenses; *provided, however*, that in
connection with any studio agreements between the Debtors and
movie studios, only the following shall be included as
Administrative Priority Expenses[25]: (x) Rental Share Fees that
accrue during the Sale Process Period only up to the amounts
provided in the Sale Budget, and (y) Operating Stores PRP Fees
only up to the amounts provided in the Sale Budget and Closing
PRP Fees that accrue during the Sale Process Period from the sale
of movie titles in stores that are liquidating, *provided*, that such
Closing Stores PRP Fees shall be limited to the Closing Stores
PRP Fee Cap, as provided for in the Sale Budget, and only
Operating Stores PRP Fees and Closing Stores PRP Fees only up
to the Closing Store PRP Fee Cap shall receive superpriority claim
status[26];

c.    pursuant to section 364 of the Bankruptcy Code, the granting of
superpriority claim status[27] to the Administrative Priority

---

[25]   For the avoidance of doubt, Administrative Priority Expenses shall not include (i) any amounts or
claims under any studio agreements other than Rental Share Fees, Operating Stores PRP Fees, and
Closing Stores PRP Fees accrued during the Sale Process Period and, as to Closing Stores PRP Fees,
up to the Closing Stores PRP Fee Cap; (ii) any revenue share fees or previously rented product fees or
any other fee or claim that may accrue after the Sale Process Period or as a result of the sale of the
Assets; and (iii) any amounts not detailed in the Sale Budget.

[26]   Any amount of Closing Stores PRP Fees greater than the Closing Stores PRP Fee Cap shall not
receive superpriority claim status notwithstanding that such fees may have been incurred during the
Sale Process Period.

[27]   For the avoidance of doubt, (i) any amounts or claims that may be claimed to arise under studio
agreements whether they accrue during or after the Sale Process Period (other than the
aforementioned Rental Share Fees, Operating Stores PRP Fees, and Closing Stores PRP Fees accrued
during the Sale Process Period and, as to Closing Stores PRP Fees, up to the Closing Stores PRP Fee
Cap) or (ii) any revenue share fee or previously rented product fees or any other fee or claim that may

---

Expenses, senior and prior to all other costs and expenses of administration in these cases, other than the Carve-Out Expenses and the DIP Obligations (exclusive of the Roll-Up Note Obligations) (as each of such terms is defined in the DIP Order); and

d.    the imposition of the Administrative Stay.

58.    Further, in order to avoid any disruption to the sale process, it will be necessary to pay (but only pursuant to and as permitted by the Sale Budget) certain administrative claims (the "*Critical Expenses*") that relate to the Pre-Sale Period. These encompass claims related to employee-related matters and other critical items and include the following:

a.    employee salary and wages, withholding taxes, and any other amounts withheld from employees;

b.    professional fees and expenses;

c.    medical and workers' compensation coverage premiums, benefits, claims and expenses;

d.    unreimbursed employee business expenses;

e.    certain customer obligations (as disclosed in advance by the Debtors and included in the Sale Budget); and

f.    other essential costs and expenses which must be paid during the period necessary to consummate the sale, including, without limitation, utility obligations, maintenance charges, taxes, insurance coverage premiums, and professionals fees and expenses.

59.    Because the payment of these items will be made from the use of cash collateral, the Debtors propose that payment of all of the foregoing items (including the Administrative Priority Expenses and the Critical Expenses) will be subject to an agreed upon budget subject to the approval of the Requisite DIP Lenders (as defined in the DIP Order) (the

---

accrue after the Sale Process Period or as a result of the sale of the Assets, shall not receive status as Administrative Priority Claims.

"*Sale Budget*"). A copy of the Sale Budget will be available at the hearing to consider this

Motion and, of course, will be subject to adjustment with the consent of the Requisite DIP

Lenders on an ongoing basis in order to address the fact that it is not possible to predict with

certainty future events. As part of the continued consensual use of Cash Collateral under the

DIP Order, the DIP Lenders have consented to the Administrative Priority Expenses and the

superiority thereof as described above.

        60.    Granting the requested extraordinary relief is essential to ensure that

creditors – such as movie studios, game providers, maintenance and janitorial service

providers, landlords, utilities, and employees – are not further prejudiced on account of their

extension of unsecured credit during the Sale Process Period. Since January 17, 2011, the

Debtors, with the consent of the DIP Lenders, have made payments to administrative expense

creditors for goods and services provided post January 17, 2011. Those payments are to be

applied to administrative expense claims related to that period. The Debtors propose to

continue to pay these administrative expense creditors for post January 17, 2011 exposure

accruals consistent with the applicable budget so as to assure that all administrative expense

creditors are treated essentially equally with respect to such period. These creditors will be

providing value to the estates as their continued provision of goods and services will enable

the Debtors to sell the Assets in an orderly process. Indeed, in the absence of this protection,

the sale process would not be able to proceed.

        61.    Finally, in order to avoid any undue disruption to the sale process and

avoid a rush to the courthouse by creditors holding Pre-Sale Period claims, the Debtors submit

that it is necessary and appropriate for the Court to impose a stay against any collection efforts

with respect to such claims. Again, this will assure that the sale process can be consummated and that no creditor obtains an advantage over those similarly situated.

## B.    Carve-Out Trigger Notice

62.    As of the date of the filing of this Motion, there are no outstanding draws on the DIP Facility. Given the Debtors' failure to meet certain milestones required under the PSA and DIP Facility, the Debtors have been advised that the PSA and DIP Facility are going to be terminated. Consequently, there will be no further draws available under the DIP Facility. However, in furtherance of this sale process, the DIP Lenders are willing to continue to allow the consensual use of cash collateral through the Sale Process Period limited to the amounts provided under the Sale Budget and limited to the amounts to be consented to by the Requisite DIP Lenders in the Wind Down Budget; *provided*, *however*, that the DIP Lenders' consent to the use of cash collateral shall be subject to the continuation of the sale process, as detailed herein, to complete the Sale Transaction to the Stalking Horse Bidder or another bidder who has a higher or otherwise better offer at the conclusion of the Auction. Given the termination of the DIP Facility, the Debtors have been advised that the Requisite DIP Lenders intend to deliver a Carve-Out Trigger Notice (as such term is defined in the DIP Order) to the Debtors, the United States Trustee, and the Creditors' Committee, in accordance with the provisions of the DIP Order. Accordingly, pursuant to the terms of the DIP Order, upon delivery of the Carve-Out Trigger Notice, the Roll-Up Notes shall become effective.

## VIII.

## NOTICE

63.    No trustee or examiner has been appointed in these chapter 11 cases. The Debtors have filed a motion requesting the Court set a hearing and notice procedures with respect to the Bidding Procedures Hearing. The Debtors will serve notice of this Motion in

accordance with any order entered by the Court with respect to such motion, and propose to furnish additional notice as described herein.   The Debtors submit that no further notice need be provided.

64.    No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just.

Dated: New York, New York
        February 21, 2011

*[signature]*

Stephen Karotkin
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

and

Martin A. Sosland (*admitted pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone:  (214) 746-7700
Facsimile:  (214) 746-7777

Attorneys for Debtors and Debtors in Possession

# EXHIBIT 1

**Purchase Agreement**

**EXECUTION COPY**

---

**ASSET PURCHASE AND SALE AGREEMENT**

**BY AND AMONG**

**BLOCKBUSTER INC.,**

**THE DEBTOR SUBSIDIARIES PARTY HERETO,**

**AND**

**COBALT VIDEO HOLDCO LLC**

**Dated as of February 21, 2011**

---

# TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS ............................................................................................. 1

    Section 1.1        Definitions .................................................................. 1

    Section 1.2        Terms Defined Elsewhere in this Agreement ..................................... 13

    Section 1.3        Other Definitional and Interpretative Provisions .............................. 15

ARTICLE II        PURCHASE AND SALE ................................................................. 16

    Section 2.1        Purchase and Sale of Assets ................................................ 16

    Section 2.2        Excluded Assets ................................................................ 18

    Section 2.3        Assumption of Liabilities .................................................. 19

    Section 2.4        Excluded Liabilities ......................................................... 20

    Section 2.5        Assumed Contracts ........................................................... 21

    Section 2.6        Further Conveyances and Assumptions ............................ 23

    Section 2.7        Bulk Sales Laws ............................................................... 24

    Section 2.8        Receivables ...................................................................... 24

ARTICLE III        PURCHASE PRICE ....................................................................... 24

    Section 3.1        Purchase Price .................................................................. 24

    Section 3.2        Deposit .............................................................................. 24

    Section 3.3        Payment of Purchase Price ............................................... 25

    Section 3.4        Purchase Price Adjustment ............................................... 26

    Section 3.5        Allocation of Purchase Price ............................................ 28

ARTICLE IV        CLOSING AND TERMINATION ................................................. 29

    Section 4.1        Closing Date ...................................................................... 29

    Section 4.2        Deliveries by Sellers ........................................................ 29

    Section 4.3        Deliveries by Purchaser .................................................... 30

    Section 4.4        Termination of Agreement ................................................ 30

    Section 4.5        Effect of Termination ....................................................... 31

ARTICLE V        REPRESENTATIONS AND WARRANTIES OF SELLERS ..................... 32

    Section 5.1        Organization and Good Standing ...................................... 32

    Section 5.2        Ownership of Non-Debtor Subsidiaries ............................ 32

    Section 5.3        Authorization of Agreement ............................................. 33

    Section 5.4        No Violation; Consents ..................................................... 33

    Section 5.5        Financial Information ........................................................ 34

    Section 5.6        No Undisclosed Liabilities ............................................... 35

    Section 5.7        Title to Purchased Assets .................................................. 35

i

# TABLE OF CONTENTS
## (continued)

| | | Page |
|---|---|---|
| Section 5.8 | Taxes | 35 |
| Section 5.9 | Real Property | 36 |
| Section 5.10 | Tangible Personal Property; Capital Leases | 37 |
| Section 5.11 | Intellectual Property | 38 |
| Section 5.12 | Material Contracts | 39 |
| Section 5.13 | Employee Benefits | 40 |
| Section 5.14 | Labor | 41 |
| Section 5.15 | Litigation | 41 |
| Section 5.16 | Compliance with Laws; Permits | 41 |
| Section 5.17 | Environmental Matters | 42 |
| Section 5.18 | Accounts and Notes Receivable and Payable | 42 |
| Section 5.19 | Insurance | 43 |
| Section 5.20 | Financial Advisors | 43 |
| Section 5.21 | No Other Representations or Warranties; Schedules | 43 |
| ARTICLE VI | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 43 |
| Section 6.1 | Organization and Good Standing | 43 |
| Section 6.2 | Authorization of Agreement | 43 |
| Section 6.3 | No Violation; Consents | 44 |
| Section 6.4 | Litigation | 44 |
| Section 6.5 | Investment Intention | 44 |
| Section 6.6 | Financial Capability | 45 |
| Section 6.7 | Bankruptcy | 45 |
| Section 6.8 | Financial Advisors | 45 |
| Section 6.9 | Condition of the Business | 45 |
| ARTICLE VII | BANKRUPTCY COURT MATTERS | 45 |
| Section 7.1 | Competing Transaction | 45 |
| Section 7.2 | Bankruptcy Court Filings | 46 |
| ARTICLE VIII | COVENANTS | 47 |
| Section 8.1 | Access to Information | 47 |
| Section 8.2 | Conduct of the Business Pending the Closing | 47 |
| Section 8.3 | Consents | 51 |
| Section 8.4 | Appropriate Action; Filings | 51 |

# TABLE OF CONTENTS
## (continued)

|  |  | Page |
|---|---|---|
| Section 8.5 | Confidentiality | 52 |
| Section 8.6 | Preservation of Records; Cooperation | 53 |
| Section 8.7 | Publicity | 53 |
| Section 8.8 | Lease Extensions; Store Liquidations | 54 |
| Section 8.9 | Transition Services Agreement | 55 |
| Section 8.10 | Banks | 55 |
| Section 8.11 | Supplements to Schedules | 55 |
| Section 8.12 | Further Assurances | 56 |
| Section 8.13 | Payment of Sales Tax Amounts | 56 |
| Section 8.14 | Use of Name | 56 |
| ARTICLE IX | EMPLOYEE AND EMPLOYEE BENEFITS MATTERS; TAX MATTERS | 56 |
| Section 9.1 | Employment | 56 |
| Section 9.2 | Employee Benefits | 57 |
| Section 9.3 | Tax Matters | 57 |
| ARTICLE X | CONDITIONS TO CLOSING | 59 |
| Section 10.1 | Conditions Precedent to Obligations of Purchaser | 59 |
| Section 10.2 | Conditions Precedent to Obligations of Sellers | 60 |
| Section 10.3 | Conditions Precedent to Obligations of Purchaser and Sellers | 61 |
| Section 10.4 | Frustration of Closing Conditions | 61 |
| ARTICLE XI | LIMITATIONS | 62 |
| Section 11.1 | Purchaser's Review | 62 |
| Section 11.2 | No Consequential or Punitive Damages | 62 |
| ARTICLE XII | MISCELLANEOUS | 62 |
| Section 12.1 | Survival of Representations, Warranties, Covenants and Agreements | 62 |
| Section 12.2 | Remedies | 63 |
| Section 12.3 | Expenses | 63 |
| Section 12.4 | Non-Recourse | 63 |
| Section 12.5 | Submission to Jurisdiction | 64 |
| Section 12.6 | Waiver of Jury Trial | 64 |
| Section 12.7 | Authorization of Parent as Representative of Sellers | 64 |
| Section 12.8 | Time of Essence | 65 |

## TABLE OF CONTENTS
### (continued)

|  |  | **Page** |
|---|---|---|
| Section 12.9 | Entire Agreement; Amendments and Waivers | 65 |
| Section 12.10 | Governing Law | 65 |
| Section 12.11 | Notices | 66 |
| Section 12.12 | Severability | 67 |
| Section 12.13 | No Right of Set-Off | 67 |
| Section 12.14 | Expense Reimbursement | 67 |
| Section 12.15 | Binding Effect; Assignment | 67 |
| Section 12.16 | Counterparts | 67 |

Exhibits

Exhibit A – Form of Agency and License Agreement
Exhibit B – Form of Bidding Procedures Order
Exhibit C – Form of Bill of Sale
Exhibit D – Form of Assignment Agreement

Schedules

| | |
|---|---|
| Schedule 1.1(a) | Assumed Studio Liabilities |
| Schedule 1.1(b) | Inventory Amount Methodology |
| Schedule 1.1(c) | Initial Liquidating Stores |
| Schedule 1.1(d) | Non-Debtor Subsidiaries |
| Schedule 1.1(e) | Purchaser Assumed Contracts |
| Schedule 5.2(a) | Ownership of Non-Debtor Subsidiaries |
| Schedule 5.2(d) | Other Ownership Interests |
| Schedule 5.4(a) | No Violation |
| Schedule 5.4(b) | Consents |
| Schedule 5.7 | Title to Purchased Assets |
| Schedule 5.8 | Taxes |
| Schedule 5.9(a) | Owned Property |
| Schedule 5.9(b) | Real Property Leases |
| Schedule 5.9(c) | Rights to Occupancy |
| Schedule 5.10 | Personal Property Leases |
| Schedule 5.11(a) | Intellectual Property Registrations |
| Schedule 5.11(b) | Intellectual Property Licenses |
| Schedule 5.11(c) | Intellectual Property |
| Schedule 5.12(a) | Material Contracts |
| Schedule 5.13(a) | Employee Benefit Plans |
| Schedule 5.13(c) | Qualified Plans |
| Schedule 5.13(d) | Non-Debtor Benefit Plan Compliance |
| Schedule 5.13(e) | Non-Debtor Benefit Plan Proceedings |
| Schedule 5.14(a) | Labor Agreements |
| Schedule 5.14(b) | Work Stoppages |
| Schedule 5.15 | Litigation |
| Schedule 5.16 | Compliance with Laws |
| Schedule 5.17(a) | Environmental Matters |
| Schedule 5.19 | Insurance |
| Schedule 5.20 | Sellers' Financial Advisors |
| Schedule 6.8 | Purchaser's Financial Advisors |
| Schedule 8.2(a) | Conduct of Business Pending Closing |
| Schedule 8.2(b) | Conduct of Business Pending Closing |
| Schedule 10.1(d) | Store Liquidations |

## ASSET PURCHASE AND SALE AGREEMENT

THIS ASSET PURCHASE AND SALE AGREEMENT, dated as of February 21, 2011 (this "Agreement"), is made and entered into by and among Blockbuster Inc., a Delaware corporation ("Parent"), each of the Debtor Subsidiaries (as defined below, and together with Parent, "Sellers", and individually a "Seller") and Cobalt Video Holdco LLC, a Delaware limited liability company ("Purchaser"). Sellers and Purchaser are sometimes herein referred to collectively as the "Parties" and individually as a "Party."

W I T N E S S E T H :

WHEREAS, Sellers and their Subsidiaries are global providers of rental and retail media entertainment, including movie and game entertainment products delivered through one or more distribution channels (such business and all other business conducted by any Seller or any of its Subsidiaries, the "Business");

WHEREAS, on September 23, 2010, Sellers filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq*. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and

WHEREAS, on the terms and subject to the conditions hereinafter set forth and pursuant to a Sale Order (as defined herein), the Parties desire to enter into this Agreement pursuant to which, among other things, Sellers shall sell to Purchaser, and Purchaser shall purchase from Sellers, all of Sellers' right, title and interest in and to the Purchased Assets (as defined herein) and Purchaser shall assume from Sellers and thereafter pay, discharge and perform the Assumed Liabilities (as defined herein).

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, representations, warranties and agreements herein contained, and intending to be legally bound hereby, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.  For the purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"Action" means any action, suit, arbitration, claim, inquiry, proceeding or investigation by or before any Governmental Authority of any nature, civil, criminal, regulatory or otherwise, in law or in equity.

"Affiliate" (and, with a correlative meaning "affiliated") means, with respect to any Person, any direct or indirect subsidiary of such Person, and any other Person that directly, or through one or more intermediaries, controls or is controlled by or is under common control with such first Person.  As used in this definition, "control" (including with correlative meanings, "controlled by" and "under common control with") means possession, directly or indirectly, of

power to direct or cause the direction of the management or policies (whether through ownership of securities or partnership or other ownership interests, by Contract or otherwise).

"<u>Agency and License Agreement</u>" means the Agency and License Agreement to be entered into between Purchaser and Sellers substantially in the form attached as <u>Exhibit A</u> hereto.

"<u>Applicable Law</u>" means, with respect to any Person, any Law applicable to such Person or its business, properties or assets.

"<u>Approved Sale Expenses</u>" means Seller's reasonable good faith estimate of the costs and expenses of Sellers in connection with the sale and liquidation of any of the Purchased Assets, which shall be provided in writing by Sellers to Purchaser not later than the earlier to occur of (i) the Auction (as defined in the Bidding Procedures Order) and (ii) five (5) Business Days prior to the Sale Hearing (as defined in the Bidding Procedures Order) and shall be reasonably acceptable to Purchaser.

"<u>Assumed Studio Liabilities</u>" means administrative expense liabilities of Sellers related to the period prior to the date of this Agreement, in an aggregate amount equal to $25,000,000, with respect to any of Sellers' contracts, agreements, arrangements or understandings with any one or more of the Required Studios, which liabilities shall be identified by Purchaser, in its sole discretion, at any time prior to the Closing, pursuant to a supplement to <u>Schedule 1.1(a)</u>, which schedule may be amended and/or supplemented by Purchaser, in its sole discretion, at any time and from time to time prior to the Closing.

"<u>Bankruptcy Cases</u>" means the chapter 11 cases commenced by Sellers on September 23, 2010, jointly administered under Case No. 10-14997 (BRL).

"<u>Beginning Inventory Amount</u>" means an amount equal to $635,848,496.66, the reference value of the December 31, 2010 inventory count provided by Sellers to Purchaser, based on the methodology set forth in <u>Schedule 1.1(b)</u>.

"<u>Bidding Procedures Order</u>" means an Order of the Bankruptcy Court, substantially in the form attached hereto as <u>Exhibit B</u>.

"<u>Business Day</u>" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Law to close. Any event the scheduled occurrence of which would fall on a day that is not a Business Day shall be deferred until the next succeeding Business Day.

"<u>Business Intellectual Property</u>" means all (i) Purchased Intellectual Property and (ii) other Intellectual Property used by any Seller or any of its Subsidiaries.

"<u>Cash Flow Budget</u>" means the approved DIP Credit Agreement budget, as amended, and any budget subsequently adopted by Sellers and approved by Purchaser in connection with the DIP Credit Agreement, any refinancing thereof, or any other debtor-in-possession financing entered into by Sellers.

"Closing Cash Amount" means the amount of all cash, cash equivalents and freely marketable securities held by Sellers as of 11:59 p.m. (prevailing eastern time) on the day immediately preceding the Closing Date, less the amounts of any unpaid checks, drafts and wire transfers issued by Sellers on or prior the Closing Date, calculated in accordance with GAAP applied on a basis consistent with the preparation of the Balance Sheet, plus the Sales Tax Amount.

"Closing Inventory Amount" means the value of the inventory held by Sellers as of 11:59 p.m. (prevailing eastern time) on the day immediately preceding the Closing Date, calculated in accordance with the methodologies set forth on Schedule 1.1(b).

"COBRA" means the Consolidated Omnibus Reconciliation Act of 1985, as amended

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral Trust Agreement" means that certain Collateral Trust Agreement, dated as of March 31, 2010, by and among Blockbuster Canada Co., Warner Home Video, Twentieth Century Fox Home Entertainment LLC, Sony Pictures Home Entertainment Inc., and Home Trust Company, as Collateral Trustee.

"Competition Laws" means the HSR Act and all other Laws that are designed or intended to prohibit, restrict or regulate (i) actions having the purpose or effect of monopolization or restraint of trade or lessening of competition or (ii) foreign investment.

"Contract" means any written contract, indenture, note, bond, loan, instrument, lease, license, commitment or other agreement.

"Cure Costs" means amounts that must be paid and obligations that otherwise must be satisfied, including pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of any Purchaser Assumed Contract as determined pursuant to the Sale Order.

"Debtor Benefit Plans" means the Employee Benefit Plans other than the Non-Debtor Benefit Plans.

"Debtor Subsidiaries" means Blockbuster Global Services Inc., Blockbuster Investments LLC, Blockbuster Video Italy, Inc., Blockbuster Distribution, Inc., Blockbuster Procurement LP, Blockbuster Canada Inc., Blockbuster International Spain Inc., Blockbuster Digital Technologies Inc., Movielink, LLC, Blockbuster Gift Card Inc., Trading Zone Inc., and B2 LLC.

"Designated FF&E" means all furniture, fixtures and equipment owned by Sellers and located at the Closing Date Leased Properties.

"Designated Liquidation Merchandise" means all movie, television program, game and cell phone inventory, merchandise, memorabilia, supplies, food and beverage items and other finished goods inventory owned by Sellers on the Closing Date and located at, or in transit to, the Closing Date Leased Properties on the Closing Date.

3

"DIP Agent" has the meaning given to such term in the DIP Credit Agreement.

"DIP Credit Agreement" means that certain Senior Secured, Super-Priority Debtor-In-Possession Revolving Credit Agreement, dated as of September 23, 2010, among Sellers, the lenders signatory thereto and Wilmington Trust FSB, as agent.

"DIP Lenders" has the meaning given to such term in the DIP Credit Agreement.

"DIP Order" means the Final Order (I) Authorizing Postpetition Superpriority Secured Financing Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (II) Authorizing Postpetition Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364, entered by the Bankruptcy Court in the Bankruptcy Cases (docket #423), as entered in the Bankruptcy Cases.

"Distribution Centers" means (i) all of Sellers' distribution centers located throughout the United States to support Sellers' by-mail subscription business and (ii) Sellers' 850,000 square foot distribution center located in McKinney, Texas.

"Documents" means all files, documents, instruments, papers, books, reports, manuals, records, tapes, microfilms, hard drives, databases, compilations of information, photographs, letters, budgets, accounts, forecasts, ledgers, journals, title policies, customer and supplier lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (including sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to the Business and the Purchased Assets in each case whether or not in electronic form.

"Employee" means any employee of any Seller who performs work primarily related to the operation of the Business.

"Employee Benefit Plans" means all employee benefit plans (as defined in Section 3(3) of ERISA), all employment or individual compensation agreements, and all other plans, policies, agreements, payroll practices or arrangements providing any bonus, incentive, retention, equity or equity-based compensation, deferred compensation, stock purchase, severance pay, sick leave, vacation pay, salary continuation, disability, welfare benefit, pension benefit, life insurance, medical insurance, fringe benefits, educational assistance, tax gross up, change in control or other material employee benefit, in each case as to which any Seller or their Subsidiaries has any Liability with respect to any current or former officers, employees or directors of any Seller or their Subsidiaries.

"Environmental Law" means all Applicable Laws in effect on the date hereof relating to the environment, natural resources, health and safety or the protection thereof, including but not limited to any applicable provisions of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*, the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, the Clean Air Act, 42

4

U.S.C. § 7401 *et seq.*, the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*, the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 *et seq.*, the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.*, and the Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq.*, and the regulations promulgated pursuant thereto, and all analogous state or local statutes.

"Environmental Liabilities and Obligations" means all Liabilities arising from any impairment or damage to the environment or failure to comply with Environmental Laws in connection with the prior or ongoing ownership or operation of the Business, including Liabilities related to:  (i) the transportation, storage, use, arrangement for disposal or disposal of Hazardous Materials or waste; (ii) the Release of Hazardous Materials or waste; (iii) any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments; (iv) any other obligations imposed under Environmental Laws with respect to the Business; and (v) all obligations with respect to personal injury, property damage, wrongful death and other damages and losses arising under Applicable Law as a result of any of the matters identified in clauses (i) – (iv) of this definition.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Estimated Cash Adjustment Amount" means (i) if the Target Cash Amount exceeds the Estimated Cash Amount, the amount of such excess, which shall reduce the Closing Date Payment by such amount, or (ii) if the Estimated Cash Amount exceeds the Target Cash Amount, the amount of such excess, which shall increase the Closing Date Payment by such amount.

"Estimated Inventory Adjustment Amount" means (i) if the Beginning Inventory Amount exceeds the sum of the Estimated Inventory Amount *plus* the Inventory Liquidation Expenses, the amount of such excess, which shall reduce the Closing Date Payment by such amount, or (ii) if the sum of the Estimated Inventory Amount *plus* the Inventory Liquidation Expenses exceeds the Beginning Inventory Amount, the amount of such excess, which shall increase the Closing Date Payment by such amount.

"Estimated Wind Down Expenses" means Sellers' reasonable good faith estimate of the out-of-pocket costs and expenses that Sellers expect to incur in connection with winding down their bankruptcy estates, which estimate shall include a reasonably detailed breakdown of such costs and expenses by category and shall be provided in writing by Sellers to Purchaser not later than the earlier to occur of (i) the Auction (as defined in the Bidding Procedures Order) and (ii) five (5) Business Days prior to the Sale Hearing (as defined in the Bidding Procedures Order), and which estimate shall be reasonably acceptable to Purchaser.

"GAAP" means United States generally accepted accounting principles as in effect during the time period of the relevant financial statement.

"Governmental Authority" means any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to United States or foreign federal, state or local government, any governmental authority, agency, department, board, commission or instrumentality or any political subdivision thereof, and any tribunal or court or arbitrator(s) of competent jurisdiction, and shall include the Bankruptcy Court.

5

"Hazardous Materials" means all substances defined as "hazardous substances," "hazardous wastes," "hazardous materials," "pollutants," "toxic wastes," "toxic substances" or "contaminants" or otherwise regulated under Environmental Laws or with respect to which liability or standards of conduct are imposed under Environmental Laws.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Indebtedness" of any Person means, without duplication, (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations, "keep well" agreements, agreements to maintain or contribute cash or capital to any Person or other similar agreements or arrangements; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Initial Liquidating Stores" means the list of not less than 600 Stores identified by Sellers in Schedule 1.1(c) that will be subject to liquidation, and with respect to which Sellers have commenced or shall have commenced in-store liquidation or going out of business sales after the date hereof but in no event later than February 28, 2011.

"Intellectual Property" means all worldwide intellectual property and rights arising from or in respect of the following:  all (i) inventions, discoveries, industrial designs, business methods, patents and patent applications (including provisional and Patent Cooperation Treaty applications), including continuations, divisionals, continuations-in-part, reexaminations and reissues, extensions, renewals and any patents that may be issued with respect to the foregoing; (ii) trademarks, service marks, certification marks, collective marks, trade names, business names, assumed names, d/b/a's, fictitious names, brand names, trade dress, logos, symbols, Internet domain names and corporate names, and general intangibles of a like nature and other indicia of origin or quality, whether registered, unregistered or arising by Law, and all applications, registrations, and renewals for any of the foregoing, together with the goodwill associated with and symbolized by each of the foregoing; (iii) published and unpublished works of authorship in any medium, whether copyrightable or not (including databases and other compilations of information, computer software, source code, object code, algorithms, and other similar materials and Internet website content), copyrights and moral rights therein and thereto, and registrations and applications therefor, and all issuances, renewals, extensions, restorations and reversions thereof; and (iv) confidential and proprietary information, trade secrets, and know-how, including methods, processes, business plans, schematics, concepts, software and

databases (including source code, object code and algorithms), formulae, drawings, prototypes, models, designs, devices, technology, research and development and customer information and lists (collectively, "Trade Secrets").

"Intellectual Property Licenses" means (i) any Contract that contains any grant by any Seller or any of its Subsidiaries to any third Person of any right to use, publish, perform or exploit any of the Business Intellectual Property, and (ii) any Contract that contains any grant by any third Person to any Seller or any of its Subsidiaries of any right to use, publish, perform or exploit any Intellectual Property of such third Person concerning or relating to the Business Intellectual Property.

"Inventory Liquidation Expenses" means the sum of (a) an amount equal to $900,000 for lease return conditions actually paid by Sellers with respect to Stores for which liquidations commenced after January 1, 2011 and which expenses were incurred and paid during the period beginning January 1, 2011 through the date of this Agreement, *plus* (b) the product of (i) the aggregate number of Stores that commence and complete liquidation or going out of business sales during the period from January 1, 2011 until the Closing Date, *multiplied by* (ii) $36,500.

"IRS" means the United States Internal Revenue Service.

"Law" means any foreign, federal, state or local law (including common law), statute, code, ordinance, rule, regulation or other requirement enacted, promulgated, issued or entered by a Governmental Authority.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Authority.

"Liabilities" means any and all debts, losses, liabilities, claims (including claims as defined in the Bankruptcy Code), damages, expenses, fines, costs, royalties, proceedings, deficiencies or obligations (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, or otherwise and whether due or to become due, and whether in contract, tort, strict liability or otherwise, and whether or not resulting from third party claims, and any reasonable out-of-pocket costs and expenses in connection therewith (including reasonable legal counsels', accountants', or other fees and expenses incurred in defending any action or in investigating any of the same or in asserting any rights thereunder or hereunder).

"Lien" means any lien, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, right of first offer, easement, servitude, transfer restriction under any shareholder or similar agreement or encumbrance or any other restriction or limitation whatsoever.

"Liquidation Period" means (i) with respect to any Leased Property for which a Lease Extension has been received, the period from the Closing Date until the expiration of such Lease Extension (which period shall not be less than sixty (60) days) and (ii) with respect to any

7

Leased Property for which a Lease Extension has not been received, a period of not less than sixty (60) days following the Closing Date.

"Non-Debtor Benefit Plans" means the Employee Benefit Plans (excluding any governmental plan or arrangement) as to which any Non-Debtor Subsidiary (or any of their Subsidiaries) has any Liability arising from or relating to any current or former employee or director of any Non-Debtor Subsidiary (or any of their Subsidiaries) and (i) has been established under the laws of a jurisdiction other than the United States or any state or other jurisdiction thereof, and (ii) exclusively covers current and former employees or directors of the Non-Debtor Subsidiaries (or any of their Subsidiaries).

"Non-Debtor Subsidiaries" means the foreign subsidiaries of Sellers that are listed on Schedule 1.1(d), provided that Purchaser, in its sole discretion, at any time and from time to time prior to the Closing, shall be entitled to modify such schedule to (i) remove any one or more of the subsidiaries of Sellers listed thereon and/or (ii) add any one or more of the subsidiaries of Sellers that are not Debtors.  For the avoidance of doubt, the representations and warranties set forth in Article V with respect to the Non-Debtor Subsidiaries are being made by Sellers solely with respect to the Non-Debtor Subsidiaries that are listed on Schedule 1.1(d) as of the date hereof.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award.

"Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business through the date hereof consistent with past practice during the one month period prior to the date of this Agreement, and without regard to store closures and liquidations.

"Permits" means any approvals, authorizations, consents, licenses, franchises, permits or certificates.

"Permitted Liens" means:

(a)    with respect to any real property and to the extent that they do not materially interfere with the ownership, occupancy, use or operation of the affected Owned Properties or Real Property Leases in the manner and for the purposes heretofore used by Sellers and their Subsidiaries in connection with the Business, easements, restrictive covenants, and rights-of-way on, over or in respect of any Owned Property or Real Property Lease, servitudes, permits, surface leases and other rights with respect to surface operations;

(b)    all rights reserved to or vested in any Governmental Authority to control or regulate the Purchased Assets and all obligations and duties under all Applicable Laws or under any permit issued by any Governmental Authority;

(c)    statutory Liens for current Taxes not yet delinquent or the amount or validity of which is being contested in good faith;

8

(d)    any Lien that pursuant to section 363(f) of the Bankruptcy Code will be released from the Purchased Assets upon entry of the Sale Order; and

(e)    other Liens that will be released on or prior to Closing at no cost or expense to Purchaser.

"Person" means and includes natural persons, corporations, limited partnerships, limited liability companies, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and all Governmental Authorities.

"Pre-Closing Tax Period" means any Tax period (or the portion thereof) ending on or before the Closing Date.

"Protected Stores" means the retail store locations identified by Sellers in a list provided to Purchaser upon the execution of this Agreement.

"Purchased Intellectual Property" means all Intellectual Property owned by any Seller or any Debtor Subsidiary.

"Purchaser Assumed Contracts" means, to the extent assignable pursuant to section 365 of the Bankruptcy Code, all Contracts set forth on Schedule 1.1(e) (as may be modified prior to the Closing pursuant to Section 2.5), which Schedule Purchaser shall deliver in writing to Sellers in accordance with the Bidding Procedures Order and which shall not be amended or supplemented after April 1, 2011 for the purpose of including any additional Contracts thereon. For the avoidance of doubt, Purchaser shall have the right to remove Contracts from Schedule 1.1(e) at any time and from time to time in accordance with Section 2.5(d).

"Purchaser Material Adverse Effect" means any change, circumstance, fact, condition or event that individually or in the aggregate with any other change, circumstance, fact, condition or event, would or would reasonably be expected to materially delay or impair the ability of Purchaser to perform its obligations under this Agreement.

"Reimbursable Expenses" means the reasonable and documented out-of-pocket fees and expenses (including the fees and expenses of Milbank, Tweed, Hadley & McCloy LLP and Kramer Levin Naftalis & Frankel LLP as counsel, and Houlihan Lokey Howard & Zukin Capital, Inc. as financial advisor) incurred by Purchaser and each of Monarch Alternative Capital LP, Owl Creek Asset Management LP, Stonehill Capital Management, LLC and Värde Partners, Inc. (or on its or their behalf) in connection with this Agreement, the Transactions, or related to or contemplated hereby or thereby, in an aggregate amount not to exceed $5,000,000.

"Release" means any release, spill, emission, discharge, migration, leaking, pumping, injection, deposit or disposal of Hazardous Materials into or through the environment.

"Remedial Action" means any investigation, response, corrective action, monitoring or remedial action required under any Environmental Law or by a Governmental Authority to address a Release or threatened Release of Hazardous Materials.

"Representatives" of a Person means its officers, directors, managers, employees, attorneys, investment bankers, accountants and other agents and representatives.

"Required Studios" means Twentieth Century Fox Home Entertainment LLC, Sony Pictures Home Entertainment Inc., Warner Home Video, Paramount Home Entertainment Inc., Universal Studios Home Entertainment LLC and The Walt Disney Company, together with their respective Affiliates.

"Revenue Share Adjustment Amount" means, in the event that any of the Purchased Assets that are acquired by Purchaser are subject to liabilities or obligations under the Revenue Sharing Agreements, an amount equal to the aggregate estimated amount of all liabilities and obligations under the Revenue Sharing Agreements to which the Purchased Assets will be subject and which Purchaser will be required to satisfy following the Closing, with such amount to be determined by the good faith estimate of Sellers to be delivered in writing to Purchaser not less than two (2) Business Days prior to the Closing Date.  In the event that Sellers' counterparties under the Revenue Sharing Agreements have asserted ownership rights to, or other restrictions on, sales of any portion of the inventory and merchandise located at the Stores and Distributions Centers subject to such Revenue Sharing Agreements at Closing (the "Rev Share Units"), Sellers shall give prompt written notice to Purchaser with respect to any such assertions of ownership or other restrictions with respect to any Rev Share Units.  Not later than five (5) Business Days prior to the Closing, Sellers and Purchaser shall mutually agree as to whether all or any portion of the Rev Share Units shall be (i) liquidated in connection with Purchaser's Agency Alternative election, (ii) retained by Sellers and treated as Excluded Assets or (iii) transferred to Purchaser as Purchased Assets; provided, however, in the event that Sellers and Purchaser cannot reach agreement on the treatment of the Rev Share Units, the Rev Share Units shall be retained by Sellers and treated as Excluded Assets.  For the avoidance of doubt, if any Rev Share Units are retained by Sellers and treated as Excluded Assets, then, with respect to such Rev Share Units, (i) no adjustment to the Cash Purchase Price shall be made pursuant to Section 3.3(b)(vi), and (ii) in lieu of such adjustment to the Cash Purchase Price, such Rev Share Units shall be disregarded and shall not be taken into account in computing the Estimated Inventory Amount, the Closing Inventory Amount or the Final Inventory Amount for purposes of Sections 3.3 and 3.4.

"Revenue Sharing Agreements" means, collectively, the "revenue sharing" agreements between Sellers and certain studios, including, but not limited to each of the Required Studios and Summit Distribution, LLC and Lions Gate Films Inc., pursuant to which such studios supply Sellers with movie titles for a price that includes a certain percentage of the revenue Sellers generate from the rental and/or sale of such titles.

"Roll-Up Notes" has the meaning given to such term in the DIP Credit Agreement.

"Sale Motion" shall mean the motion to be filed by Sellers with the Bankruptcy Court seeking entry of the Sale Order and the Bidding Procedures Order, in the form attached to the Form of Bidding Procedures Order attached hereto as Exhibit B, which shall not be amended, supplemented or modified except with Purchaser's prior written consent to the extent such amendments, supplements or modifications are adverse to Purchaser.

"Sale Order" means an order or orders of the Bankruptcy Court issued pursuant to sections 105, 363 and 365 of the Bankruptcy Code, in form and substance acceptable to Purchaser, approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Sellers to consummate the Transactions and enter into the Transaction Documents.  Without limiting the generality of the foregoing, such order shall specifically include, among other things, provisions ordering that (i) the Bankruptcy Cases be converted to cases under chapter 7 of the Bankruptcy Code upon the Purchaser's election of the Agency Alternative, in the event that the Agency Liquidations are to be carried out in chapter 7 pursuant to Section 8.8(b), (ii) the Agency and License Agreement shall be binding on the chapter 7 trustee in any such chapter 7 cases and (iii) in the event that any of the Bankruptcy Cases are converted to cases under chapter 7 of the Bankruptcy Code, the Sale Order shall be binding on the chapter 7 trustee in such chapter 7 cases.

"Sales Tax Amount" means the lesser of (x) the amount of the Closing Sales Tax Payment paid as of the close of business on the day immediately preceding the Closing Date pursuant to Section 8.13 and (y) $8,000,000.

"Seller Material Adverse Effect" means any change, circumstance, fact, condition or event that, individually or in the aggregate with any other change, circumstance, fact, condition or event, (a) is or would reasonably be expected to have a materially adverse effect on (i) the Business, financial condition, results of operations, properties or assets of Sellers and their Subsidiaries (taken as a whole) as the same shall have existed as of the date hereof, or (ii) the ability of Sellers to perform their respective obligations under this Agreement, or (b) prevents or materially delays the consummation of the Transactions, in each case other than an Excluded Matter which shall not be taken into account in determining whether there has been or would reasonably be expected to be a Seller Material Adverse Effect.  "Excluded Matter" means any adverse change, circumstance, fact, condition or event resulting from one or more of the following:  (i) the condition of the economy or the securities markets in general, or any outbreak of hostilities, terrorist activities or war; (ii) the announcements, pendency or consummation of the sale of the Purchased Assets or any other action by Purchaser or its Affiliates contemplated or required hereunder, including the Store Closing Liquidations and the inability of Sellers to pay any administrative expense claims in the Bankruptcy Cases and any Action taken by any Person as a result thereof, if, in each case in this clause (ii), the result thereof would not reasonably be expected to prevent the Business from operating substantially in the Ordinary Course of Business; (iii) any changes in general economic, political or regulatory conditions; (iv) the impact on the Business or assets of any Seller or any of their Subsidiaries as a result of the termination of the DIP Credit Agreement and any ability of Sellers to use cash collateral; (v) any Action (including a bankruptcy filing or equivalent proceeding under Applicable Law) taken by any Person other than Sellers or their Affiliates or Representatives with respect to Blockbuster Canada Co.; (vi) any changes in Applicable Laws or accounting rules; or (vii) any material breach by Purchaser of any covenant or agreement herein or any representation or warranty of Purchaser having been or having become untrue in any material respect.

"Sellers' Knowledge" means the knowledge of Jim Keyes, Tom Kurrikoff, Bruce Lewis, Dennis McGill, Jeff Stegenga, Roger Dunlap, Kevin Lewis, Joyce Woodward and Josh D. Owuso.

"Stores" means Sellers' domestic non-franchised retail store locations.

"Straddle Period" means any Tax period beginning before, and ending after, the Closing Date.

"Studio Condition" means that at all times from the date of this Agreement until the Closing, (A) at least five (5) of the Required Studios shall have continued to (i) support Sellers' digital business on terms materially consistent with or better than those in effect on February 14, 2011, (ii) provide Sellers' Stores and its international operations with physical copies of movies in amounts requested by Sellers, on a "cash in advance" or better payment basis and at prices materially consistent with or better than those in effect on February 14, 2011, and (B) the studios whose payments are secured, in whole or in part, shall not have taken any court or formal administrative action or exercised self-help or other similar remedies to foreclose on the assets securing such payments under the Collateral Trust Agreement prior to the Closing.

"Studio Contracts" mean all liabilities and obligations of Sellers with respect to any contracts, agreements, arrangements or understandings with the Required Studios or any of Sellers' movie and/or video game suppliers.

"Subsidiary" or "subsidiary" means, with respect to any Person, any corporation, limited liability company, joint venture or partnership of which such Person (a) beneficially owns, either directly or indirectly, more than fifty percent (50%) of (i) the total combined voting power of all classes of voting securities of such entity entitled, under ordinary circumstances, to vote in the election of directors or other governing body of such Person, (ii) the total combined equity interests, or (iii) the capital or profit interests, in the case of a partnership; or (b) otherwise has the power to vote or to direct the voting of sufficient securities to elect a majority of the board of directors or similar governing body of such Person.

"Subsidiary Shares" means the outstanding ownership interests in each of the Non-Debtor Subsidiaries.

"Target Cash Amount" means an amount equal to $68,400,000, *less* any Contract Maintenance Costs described in Section 2.5(b) not previously reimbursed by Purchaser.

"Tax" means all federal, state, provincial, territorial, municipal, local or foreign income, profits, franchise, gross receipts, environmental (including taxes under Code Section 59A), customs, duties, net worth, sales, use, goods and services, withholding, value added, ad valorem, employment, social security, disability, occupation, pension, real property, personal property (tangible and intangible), stamp, transfer, conveyance, severance, production, excise and other taxes, withholdings, duties, levies, imposts and other similar charges and assessments (including any and all fines, penalties and additions attributable to or otherwise imposed on or with respect to any such taxes, charges, fees, levies or other assessments, and interest thereon) imposed by or on behalf of any Governmental Authority.

"Tax Returns" means any report, return, declaration, claim for refund, information report or return or statement required to be supplied to a Taxing Authority in connection with Taxes, including any schedule or attachment thereto or amendment thereof.

"<u>Taxing Authority</u>" means any Governmental Authority exercising any authority to impose, regulate, levy, assess or administer the imposition of any Tax.

"<u>Transaction Documents</u>" means this Agreement, the Escrow Agreement, the escrow agreement to be entered into with respect to the Purchase Price Adjustment Escrow, the Assignment Agreement, the Agency and License Agreement and, if applicable, the Transition Services Agreement entered into pursuant to <u>Section 8.9</u> hereof, and all other Contracts and agreements necessary to effectuate the Transactions.

"<u>Transition Services Agreement</u>" means the agreement, if applicable, to be entered into by Parent and Purchaser pursuant to <u>Section 8.9</u> hereof.

"<u>Transactions</u>" means the transactions contemplated by this Agreement and the other Transaction Documents.

"<u>WARN Act</u>" means the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* (1988) and any similar state or local "mass layoff" or "plant closing" laws.

Section 1.2    <u>Terms Defined Elsewhere in this Agreement</u>.  For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| <u>Term</u> | <u>Section</u> |
|---|---|
| Accounting Referee | Section 3.4(c) |
| Agency Alternative | Section 8.8(b) |
| Agency Liquidations | Section 8.8(b) |
| Agreement | Preamble |
| Asset Acquisition Statement | Section 3.5 |
| Assignment Agreement | Section 4.2(d) |
| Assumed Cure Costs | Section 2.5(a) |
| Assumed Liabilities | Section 2.3 |
| Balance Sheet | Section 5.5(a) |
| Balance Sheet Date | Section 5.5(a) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Business | Recitals |
| Capital Leases | Section 5.10(b) |
| Cash Purchase Price | Section 3.1 |
| Closing | Section 4.1 |
| Closing Accounts | Section 3.4(a) |
| Closing Date | Section 4.1 |
| Closing Date Leased Properties | Section 8.8(b) |
| Closing Date Payment | Section 3.3(b) |
| Closing Sales Tax Payment | Section 8.13 |
| Closing Statement | Section 3.4(a) |
| Competing Bid | Section 7.1(a) |
| Confidentiality Agreement | Section 8.5 |

13

| Term | Section |
|---|---|
| Contract Maintenance Costs | Section 2.5(b) |
| Deposit | Section 3.2(a) |
| Escrow Agent | Section 3.2(a) |
| Escrow Agreement | Section 3.2(a) |
| Estimated Cash Amount | Section 3.3(a) |
| Estimated Inventory Amount | Section 3.3(a) |
| Excluded Assets | Section 2.2 |
| Excluded Contract | Section 2.5(b) |
| Excluded Liabilities | Section 2.4 |
| Excluded Matter | Section 1.1 (in Seller Material Adverse Effect definition) |
| Final Cash Amount | Section 3.4(f) |
| Final Inventory Amount | Section 3.4(e) |
| Financial Statements | Section 5.5(a) |
| Franchise Arrangements | Section 2.1(q) |
| Lease Extensions | Section 8.8(a) |
| Leased Properties | Section 8.8(a) |
| Liquidation Condition | Section 8.8(a) |
| Material Contracts | Section 5.12(a) |
| Nonassignable Assets | Section 2.6(d) |
| Notice Period | Section 2.5(b) |
| Outside Date | Section 4.4(b) |
| Owned Properties | Section 5.9(a) |
| Parent | Preamble |
| Parties | Preamble |
| Personal Property Leases | Section 5.10(a) |
| Proposed Allocation | Section 3.5 |
| Proposed Rejection Date | Section 2.5(b) |
| Purchase Price | Section 3.1 |
| Purchase Price Adjustment Escrow | Section 3.3(c)(iv) |
| Purchased Assets | Section 2.1 |
| Purchased Business Name Trademarks | Section 8.14 |
| Purchaser | Preamble |
| Purchaser Documents | Section 6.2 |
| Real Property Lease | Section 5.9(b) |
| Rejection Deferral Date | Section 2.5(b) |
| Rejection Deferral Notice | Section 2.5(b) |
| Removed Contract | Section 2.5(d) |
| Rev Share Units | Section 1.1 (in Revenue Share Adjustment Amount definition) |
| Revised Statements | Section 3.5 |
| Securities Act | Section 6.5 |
| Seller or Sellers | Preamble |

14

| Term | Section |
|---|---|
| Seller Documents | Section 5.3 |
| Store Closing Liquidations | Section 8.8(a) |
| Tax Claim | Section 9.3(c) |
| Taxable Consideration | Section 3.5 |
| Trade Secrets | Section 1.1 (in Intellectual Property definition) |
| Transfer Taxes | Section 9.3(a) |
| Transferred Employees | Section 9.1(a) |
| Undisclosed Assumed Contract | Section 2.5(c) |

Section 1.3     Other Definitional and Interpretative Provisions.

(a)     The words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(b)     The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term.

(c)     Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

(d)     Any reference in this Agreement to "$" shall mean United States dollars.

(e)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(f)     Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.  References to a Person are also to its permitted successors and assigns.

(g)     All Article and Section references herein are to Articles and Sections of this Agreement, unless otherwise specified.

(h)     All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(i)     This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if all Parties had prepared it and, in the

event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Assets.   On the terms and subject to the conditions set forth in this Agreement, at the Closing, Sellers shall sell, transfer, assign, convey and deliver to Purchaser (or its designee), and Purchaser (or its designee) shall purchase, acquire and accept from Sellers, free and clear of any and all Liens (other than Liens created by Purchaser and Permitted Liens), all of Sellers' right, title and interest in, to and under any and all of the assets, properties, rights and claims of any kind or nature, whether tangible or intangible, real, personal or mixed, wherever located and whether or not carried or reflected on the books and records of any Seller, which are used or useful in or held for use in connection with the operation of the Business, excluding only the Excluded Assets expressly identified in Section 2.2 (such assets, properties, rights and claims to be acquired hereunder, collectively, the "Purchased Assets"). The Purchased Assets shall include the following:

(a)    all of the outstanding ownership interests in each of the Non-Debtor Subsidiaries;

(b)    all rights, title and interest of Sellers in the BB 2009 Trust;

(c)    all cash, cash equivalents, bank deposits or similar cash items of Sellers (including all items taken into account in determining the $68,400,000 amount for purposes of the definition of Target Cash Amount);

(d)    all accounts and notes receivable and other rights to payment (including credit card receivables), together with any unpaid financing charges accrued thereon, other than any accounts and notes receivable or other rights to payment arising out of or relating to any Excluded Asset and which receivable or right to payment is created or arises subsequent to the Closing, arising from the conduct of the Business;

(e)    all deposits (including security deposits for rent, electricity, telephone or otherwise) and prepaid or deferred charges and expenses of Sellers, including all prepaid rentals and unbilled charges, fees or deposits, other than deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Asset which are made, created or arise subsequent to the Closing;

(f)    all tangible personal property owned by Sellers related to, useful in or held for use in the conduct of the Business, including movie, television program, game, and cell phone inventory, merchandise, memorabilia, supplies, food and beverage items, samples, equipment, televisions, monitors, video players, computers, hardware, electronics, file servers, scanners, printers, networks, copiers, cash registers, furniture, furnishings, fixtures, telephone lines, telecopy machines, telecommunication equipment, storeroom contents, spare parts, shipping materials, packaging materials, raw materials and other consumables relating to or

16

available for sale or use in connection with the Business; provided, however, that, in the event that Purchaser elects the Agency Alternative, Purchased Assets shall not include any of the Designated Liquidation Merchandise or Designated FF&E at the Closing Date Leased Properties, and Purchaser shall have the exclusive right, as set forth in Section 8.8(b) and the Agency and License Agreement, (i) to direct the sale or other disposition by Sellers of all such Designated Liquidation Merchandise and Designated FF&E and (ii) the exclusive right to receive and retain, for its own account, the proceeds, as set forth herein and in the Agency and License Agreement, of all such sales and dispositions;

(g)     all rights, title and interest of Sellers in each Owned Property and under each Real Property Lease which is a Purchaser Assumed Contract, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

(h)     all rights, title and interest of Sellers in and to any property subject to a personal property lease that is related to, useful in or held for use in the conduct of the Business, to the extent any such personal property lease is a Purchaser Assumed Contract;

(i)     the Purchased Intellectual Property;

(j)     to the extent transferrable after giving effect to the Sale Order, all of the rights and benefits accruing under any of the Purchaser Assumed Contracts, including each Real Property Lease, personal property lease or Intellectual Property License that is a Purchaser Assumed Contract;

(k)     all Documents that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business, including Documents relating to marketing, advertising, promotional materials, Purchased Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (g) above, but excluding (i) personnel files for Employees who are not Transferred Employees, (ii) such files as may not be transferred under Applicable Law regarding privacy, (iii) Documents which any Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party and (iv) Documents relating to an Excluded Asset or Excluded Liability; provided, however, to the extent such Documents relate in any way to the conduct of the Business, Purchaser shall receive copies thereof;

(l)     all of the rights and benefits accruing under any Permits held, used or made by any Seller in the Business to the extent assignable, except any such Permit that is an Excluded Contract;

(m)     all warranties and guarantees related to the Purchased Assets, including warranties and guarantees made by suppliers, manufacturers and contractors under the Purchased Assets, and claims against suppliers and other third parties in connection with the Purchaser Assumed Contracts;

(n)     any rights, demands, claims, causes of action, rights of recovery, credits, allowances, rebates, or rights of setoff or subrogation arising out of or relating to any of the Purchased Assets;

17

(o)    all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(p)    all third party property and casualty insurance proceeds, and all rights to third party property and casualty insurance proceeds, in each case to the extent received or receivable in respect of the Business or the Purchased Assets (or to any portion thereof);

(q)    all rights of Sellers under or pursuant to any franchise agreements or other arrangements with franchisees, other than any such agreement or arrangement which the Purchaser has specifically designated as a Removed Contract pursuant to Section 2.5(d) (the "Franchise Arrangements");

(r)    all goodwill and other intangible assets associated with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property;

(s)    all assets attributable to Non-Debtor Benefit Plans (including any trusts, insurance or other funding arrangements);

(t)    all of Sellers' assets related to, located at, or used or useful in connection with the operation of Sellers' Distribution Centers; provided, however, that, in the event that Purchaser elects the Agency Alternative, Purchased Assets shall not include any of the Designated Liquidation Merchandise or Designated FF&E at the Distribution Centers that are Closing Date Leased Properties, and Purchaser shall have the exclusive right, as set forth in Section 8.8(b) and the Agency and License Agreement, (i) to direct the sale or other disposition by Sellers of all such Designated Liquidation Merchandise and Designated FF&E  and (ii) the exclusive right to receive and retain, for its own account, the proceeds, as set forth herein and in the Agency and License Agreement, of all such sales and dispositions;

(u)    all rights, claims and causes of action of Sellers (except to the extent arising under the Transaction Documents), including under the Bankruptcy Code (including chapter 5 thereof);

(v)    sales and use Tax refunds to the extent provided in Section 2.3(d); and

(w)    all other assets, properties, rights and claims of Sellers of any kind or nature which relate to the Business, which are used or useful in or held for use in the Business, or which relate to the Purchased Assets (in each case, other than the Excluded Assets) not otherwise described in this Section 2.1, including, but not limited to, all of Sellers' assets related to, located at, or used or useful in connection with (i) the operation of all of Sellers' Stores, (ii) the operation of Sellers' digital, kiosk and by-mail businesses and (iii) Sellers' franchise businesses.

Section 2.2    Excluded Assets.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets.  "Excluded Assets" shall mean only the following assets:

18

(a)      the Excluded Contracts, including any accounts receivable arising out of or in connection with any Excluded Contract;

(b)      all equity interests (other than those set forth in <u>Section 2.1(a)</u> and any Subsidiaries thereof) in Sellers;

(c)      any (i) confidential personnel and medical records pertaining to any Employee of Sellers not permitted to be transferred to Purchaser under Applicable Law; (ii) books and records that Sellers are required by Law to retain, that relate exclusively to the Excluded Assets or the Excluded Liabilities, including Tax Returns, financial statements, and corporate or other entity filings; <u>provided</u>, <u>however</u>, that Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets or Assumed Liabilities; and (iii) corporate charters, qualifications to do business, taxpayer and other identification numbers, corporate seals, minute books, stock ledgers, stock certificates and any other documentation related to governance, organization, maintenance or existence of Sellers; <u>provided</u>, that Purchaser shall have the right to make copies of any portions of such documents and records;

(d)      any claim, right or interest of any Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date;

(e)      all rights and claims of Sellers under the Transaction Documents;

(f)      all Debtor Benefit Plans (and any trusts, 501(c)(9) organizations, insurance (including fiduciary insurance), administrative or other service contracts relating thereto); and

(g)      all restricted cash of Sellers relating to cash collateralized letters of credit and/or Excluded Liabilities.

Section 2.3    <u>Assumption of Liabilities</u>.  Purchaser shall assume no Liability of Sellers except the Liabilities and to the extent expressly set forth in this <u>Section 2.3</u> (collectively, the "<u>Assumed Liabilities</u>").  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume the Assumed Liabilities and shall agree to pay, discharge, perform and otherwise satisfy such Assumed Liabilities in accordance with their respective terms, subject to any defenses or claimed offsets asserted in good faith against the obligee to whom such Liabilities of Sellers and their Subsidiaries are owed.  The Assumed Liabilities shall consist of only the following Liabilities:

(a)      all Liabilities of Sellers under the Purchaser Assumed Contracts solely to the extent of the Assumed Cure Costs and Liabilities arising from events arising and occurring following the Closing Date;

(b)      all Liabilities of Sellers with respect to accrued and unpaid wages, accrued and unused vacation, and the employer's share of any payroll Taxes, in each case with respect to Transferred Employees who accept Purchaser's offer of employment and commence employment with Purchaser; <u>provided</u>, that with respect to each Transferred Employee, the

19

maximum aggregate amount of such wages, vacation and payroll Taxes included in the Assumed Liabilities shall not exceed an amount equal to one half of the aggregate amount of such wages, vacation and payroll Taxes accrued during such Transferred Employee's normal pay period cycle;

        (c)     all Liabilities of Sellers to the extent specifically provided in <u>Article IX</u>;

        (d)     all sales or use or other Taxes of any Seller (but not including any Taxes assumed by Purchaser pursuant to <u>Section 2.3(b)</u> or paid by Sellers pursuant to the Closing Sales Tax Payment), up to an aggregate amount not to exceed $1,600,000, that (i) result from sales and use Tax audits or examinations of Sellers for periods prior to the Closing Date or (ii) for which any director, officer or employee of a Seller may be personally liable under Applicable Law; <u>provided</u>, that Purchaser shall be entitled to all Tax refunds of Sellers for Tax periods prior to the Closing Date to the extent they relate to Taxes that would constitute Assumed Liabilities pursuant to this <u>Section 2.3(d)</u>; <u>provided</u>, <u>further</u>, <u>however</u>, that Purchaser shall not be entitled to any such refund to the extent that it would cause the aggregate amount of refunds received by Purchaser pursuant to this <u>Section 2.3(d)</u> to exceed the aggregate amount of Taxes that have become Assumed Liabilities pursuant to this <u>Section 2.3(d)</u>;

        (e)     the Assumed Studio Liabilities, provided, that the Studio Condition is fully satisfied; and

        (f)     all Liabilities with respect to the Assumed Cure Costs.

For the avoidance of doubt, while Purchaser is not assuming the Liabilities of any of the Non-Debtor Subsidiaries, Purchaser acknowledges that the Liabilities of each Non-Debtor Subsidiary will remain intact as obligations of such Non-Debtor Subsidiary as such exists on the Closing Date.

        Section 2.4     <u>Excluded Liabilities</u>.  Notwithstanding anything to the contrary in this Agreement, the Parties expressly acknowledge and agree that Purchaser shall not assume or in any manner whatsoever be liable or responsible for any Liabilities of any Seller or of any predecessor of any Seller, existing on the Closing Date or arising thereafter, other than the Assumed Liabilities.  All of the Liabilities of any Seller or of any predecessor of any Seller not specifically and expressly assumed by Purchaser pursuant to <u>Section 2.3</u> shall be referred to herein collectively as the "<u>Excluded Liabilities</u>."  Without limiting the foregoing, Purchaser shall not be obligated to assume, and does not assume, and hereby disclaims all of the Excluded Liabilities, including all of the following Liabilities, of each Seller or of any predecessor of any Seller:

        (a)     all Liabilities for accrued expenses and accounts payable incurred prior to the Closing Date, except to the extent that the same constitute Assumed Liabilities pursuant to <u>Section 2.3</u>;

        (b)     all Liabilities arising out of any of the Excluded Assets, including Excluded Contracts;

(c)        all Environmental Liabilities and Obligations, and all other Liabilities relating to any Laws in connection with any environmental, health or safety matters based on facts arising or existing during Sellers' operation of the Business prior to the Closing Date;

(d)        all Liabilities relating to any claims for infringement, dilution, misappropriation or any other violation of or by the Business Intellectual Property arising from Sellers' operation of the Business prior to the Closing Date;

(e)        all Liabilities for (i) any Taxes of any Seller (other than those assumed pursuant to Sections 2.3(b) and 2.3(d)) and (ii) Transfer Taxes;

(f)        all Liabilities arising out of, relating to or with respect to (i) the employment or performance of services by any Employee of Sellers or any of their Affiliates prior to the Closing, (ii) termination of employment or services of any Employee by any Seller or any of its Affiliates, including any severance payments, (iii) each of the Employee Benefit Plans subject to Title IV of ERISA and all Debtor Benefit Plans and (iv) the WARN Act;

(g)        all Liabilities arising as a result of any Action initiated at any time, to the extent related to the Business or the Purchased Assets on or prior to the Closing Date, including any shareholder Actions, Actions for breach of contract, or any tort Actions;

(h)        all Liabilities arising under any Indebtedness of Sellers, including any Liabilities with respect to the DIP Credit Agreement and any obligations or Liabilities to equity holders;

(i)        all Liabilities with respect to any costs and expenses (including all legal, accounting, financial advisory, valuation, investment banking and other third party advisory or consulting fees and expenses) incurred by or on behalf of any Seller or its Affiliates in connection with the Bankruptcy Cases or the Transactions;

(j)        all Liabilities incurred in the Ordinary Course of Business existing prior to the filing of the Bankruptcy Cases that are subject to compromise under the Bankruptcy Cases, other than the Assumed Cure Costs;

(k)        all Liabilities with respect to any customer programs or rights, including merchandise returns;

(l)        all Liabilities with respect to any gift cards outstanding on the Closing Date;

(m)        all Liabilities with respect to any Studio Contracts, including the Revenue Sharing Agreements;

(n)        all Liabilities relating to the failure to comply with any bulk sales Laws; and

(o)        if the Studio Condition is not fully satisfied, the Assumed Studio Liabilities.

21

Section 2.5    Assumed Contracts.

(a)    Purchaser Assumed Contracts.  At the Closing and pursuant to section 365 of the Bankruptcy Code and the Sale Order, Sellers shall assume and assign to Purchaser, and Purchaser shall consent to such assignment from Sellers, the Purchaser Assumed Contracts.  All Cure Costs with respect to the Purchaser Assumed Contracts shall be paid in full by Purchaser on or before the Closing Date (the "Assumed Cure Costs"), and Sellers shall have no Liability therefor.

(b)    Excluded Contracts.  Prior to the Closing, with respect to any executory Contract or unexpired real property lease that has not been designated as a Purchaser Assumed Contract (each, an "Excluded Contract"), Sellers shall, prior to the rejection of any such Excluded Contract, provide Purchaser with not less than five (5) Business Days notice, which shall include the proposed date of such rejection (the "Proposed Rejection Date"), of their intent to reject such Excluded Contract (the "Notice Period").  If Purchaser desires to include such Excluded Contract as a Purchaser Assumed Contract, it shall provide Sellers with written notice of such election prior to the expiration of the Notice Period and such Contract shall thereafter be deemed to be a Purchaser Assumed Contract for purposes of this Agreement and the Sale Order and shall be added to Schedule 1.1(e).  If Purchaser elects not to include such Excluded Contract as a Purchaser Assumed Contract, it shall have the option upon written notice to Sellers prior to the expiration of the Notice Period (a "Rejection Deferral Notice") to require Sellers, up until the date specified in the Rejection Deferral Notice (the "Rejection Deferral Date"), which date shall be on or before (and may be extended until, in Purchaser's sole discretion) the date of the applicable rejection deadline under the Bankruptcy Code, to defer the rejection of such Excluded Contract and Purchaser (whether or not the Closing occurs) shall thereafter pay, or promptly reimburse Sellers for, all out-of-pocket costs and expenses (including any rental amounts due during such period) incurred by Sellers with respect to (and solely as a result of the deferral of) such Excluded Contract during the period from the Proposed Rejection Date to the earlier of the Closing Date and the Rejection Deferral Date (the "Contract Maintenance Costs"); provided, that Purchaser shall not have any obligation with respect to Contract Maintenance Costs if this Agreement is terminated pursuant to Section 4.4(e) or Section 4.4(h).  Notwithstanding the foregoing, at any time and from time to time prior to Closing, Purchaser may elect, by written notice to Sellers, to cause any one or more of the Excluded Contracts (to the extent not previously rejected by Sellers after giving notice as required above) to be included as a Purchaser Assumed Contract, and such Contract shall be added to Schedule 1.1(e) and shall thereafter be deemed to be a Purchaser Assumed Contract for purposes of this Agreement and the Sale Order and, to the extent such Contract is actually assumed and assigned to Purchaser at Closing, Purchaser shall not have any obligation to pay or reimburse Sellers for any Contract Maintenance Costs with respect to such Purchaser Assumed Contract.  In the event that Purchaser does not desire that Sellers defer such rejection or fails to provide Sellers with notice of any election prior to the expiration of the Notice Period, Sellers shall thereafter be permitted to file such motions and other documentation with the Bankruptcy Court and take such other action as they deem necessary to reject any such Excluded Contract(s) and to liquidate any assets related thereto.

(c)    Undisclosed Assumed Contracts.  If prior to, at, or following the Closing (but prior to the conclusion of the Bankruptcy Cases), any Party becomes aware of any executory Contract or unexpired lease that has not been disclosed in writing or that was not made available,

22

in each case, to Purchaser prior to the date hereof, the discovering party shall promptly (but in any event no later than two (2) Business Days) notify the other party in writing of such executory Contract or unexpired lease.  Purchaser may elect, no later than the later of (i) five (5) Business Days after such notice and (ii) the Closing Date, to receive an assignment of such Seller's rights in such executory Contract or unexpired lease (upon such election by Purchaser, an "Undisclosed Assumed Contract"); provided that the Bankruptcy Court enters an order (in a form and substance reasonably acceptable to Purchaser and Sellers) authorizing the assumption by Sellers (for Contracts entered prior to the commencement of the Bankruptcy Cases, whether or not amended after the commencement of the Bankruptcy Cases) and the assignment to Purchaser of such Undisclosed Assumed Contract(s).  All Cure Costs under any and all Undisclosed Assumed Contracts shall be paid in full by Purchaser.

(d)    Removed Contracts.  Purchaser may elect to remove any Contract(s) and/or unexpired real property lease(s) (each, a "Removed Contract") from the list of Purchaser Assumed Contracts by giving written notice thereof to Sellers no later than the conclusion of the Auction (as defined in the Bidding Procedures Order).  Upon designation in accordance with the foregoing, each such Removed Contract shall cease to be a Purchaser Assumed Contract for the purposes of this Agreement and the Sale Order and may thereafter be rejected at Sellers' discretion without any additional notice to or consent from Purchaser or any liability of Purchaser (other than with respect to any Contract Maintenance Costs, if applicable).

Section 2.6    Further Conveyances and Assumptions.

(a)    From time to time following the Closing and except as prohibited by Law, Sellers shall, or shall cause their Affiliates to, make available to Purchaser such non-confidential data in personnel records of Transferred Employees as is reasonably necessary for Purchaser to transition such employees into Purchaser's records.

(b)    From time to time following the Closing, Sellers and Purchaser shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquittances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents and to assure fully to Sellers and their Affiliates and their successors and assigns, the assumption of the Assumed Liabilities assumed by Purchaser under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby; provided, that nothing in this Section 2.6 shall require the Purchaser to assume any Liabilities other than the Assumed Liabilities.

(c)    To the extent not obtained at or prior to Closing, Sellers shall use reasonable best efforts to obtain termination statements, lien releases, discharges, financing change statements or other documents, notices or other instruments as Purchaser may reasonably deem necessary to release Liens (other than Permitted Liens) on the Purchased Assets, each in form and substance reasonably satisfactory to Purchaser.

(d)     Nothing in this Agreement nor the consummation of the Transactions shall be construed as an attempt or agreement to transfer or assign any Purchased Asset, including any Contract, Permit, certificate, approval, authorization or other right, which (i) is not capable of being assigned pursuant to section 365 of the Bankruptcy Code or transferred pursuant to section 363 of the Bankruptcy Code to Purchaser at the Closing, or (ii) the transfer or assignment of which would result in a violation of any Applicable Law, if the consent of a third party is not obtained prior to such transfer or assignment ("Nonassignable Assets") unless and until such consent shall have been obtained.  Sellers shall use their reasonable best efforts, and Purchaser shall use commercially reasonable efforts to cooperate with Sellers, in endeavoring to obtain such consents; provided that no Party shall be obligated to incur any costs or expenses or provide any financial accommodation or other consideration of any nature to any Person to facilitate obtaining such consent to transfer any Nonassignable Asset.  To the extent permitted by Applicable Law, in the event consents to the assignment thereof cannot be obtained, such Nonassignable Assets shall be held, as of and from the Closing Date, by Sellers in trust for Purchaser and the covenants and obligations thereunder shall be performed by Purchaser in the applicable Seller's name to the extent it would have been responsible therefor if such consent or approval had been obtained, and all benefits and obligations existing thereunder shall be for Purchaser's account.  Sellers shall promptly pay over to Purchaser all money or other consideration received by it in respect of all Nonassignable Assets.  Notwithstanding the foregoing, Sellers shall not have any obligation to renew any Nonassignable Asset upon the expiration or termination thereof.  In addition, to the extent that any Nonassignable Asset contains an "evergreen" provision that automatically renews such Nonassignable Asset unless terminated or cancelled by either party thereto, Sellers shall not be prohibited from terminating or canceling such Nonassignable Asset as permitted pursuant to the terms thereof.

Section 2.7     Bulk Sales Laws.  Purchaser hereby waives compliance by Sellers with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

Section 2.8     Receivables.  If, following the Closing, any Seller shall receive payment in respect of accounts receivable that are included in the Purchased Assets, then such Seller shall hold such amounts in trust for Purchaser and shall promptly forward such payment to Purchaser.

# ARTICLE III

# PURCHASE PRICE

Section 3.1     Purchase Price.  The aggregate consideration for the Purchased Assets (the "Purchase Price") shall be (a) an amount in cash equal to the Closing Date Payment, subject to adjustment as provided in Section 3.4 (the "Cash Purchase Price"), *plus* (b) the assumption of Assumed Liabilities.

Section 3.2     Deposit.

(a)     Upon the execution of this Agreement, Purchaser shall deposit with Wilmington Trust Company, as escrow agent (the "Escrow Agent"), pursuant to that certain

Escrow Agreement, dated as of the date hereof, among Parent, Purchaser and the Escrow Agent (the "Escrow Agreement"), by certified check or wire transfer of immediately available funds, an amount equal to $20,000,000 (the "Deposit").

(b)    The Parties agree that the Deposit shall (i) be applied as a deposit towards the Closing Date Payment and delivered to Parent at Closing as provided in Section 3.3(d), (ii) be returned to Purchaser (with any accrued interest actually earned thereon and less the Escrow Agent's fees and expenses) in the event that this Agreement is terminated pursuant to any provision of Section 4.4 other than by Sellers pursuant to (A) Section 4.4(i) or (B) pursuant to Section 4.4(b) in the event that Closing does not occur on or before the Outside Date solely as a result of Purchaser's material breach of its obligations under this Agreement (including non-payment of the Closing Date Payment pursuant to Section 3.3), or (iii) be paid to Sellers (with any accrued interest actually earned thereon and less the Escrow Agent's fees and expenses) in the event that this Agreement is properly terminated by Sellers (A) pursuant to Section 4.4(i) or (B) pursuant to Section 4.4(b) in the event that Closing does not occur on or before the Outside Date solely as a result of Purchaser's material breach of its obligations under this Agreement (including payment of the Closing Date Payment pursuant to Section 3.3).

Section 3.3    Payment of Purchase Price.

(a)    Not later than three (3) Business Days prior to the Closing Date, Sellers shall prepare and provide to Purchaser a statement setting forth (i) the Inventory Liquidation Expenses and (ii) Sellers' good faith reasonable estimate of (x) the projected Closing Inventory Amount (the "Estimated Inventory Amount") and (y) the projected Closing Cash Amount (the "Estimated Cash Amount").

(b)    At the Closing, Purchaser shall deliver, or cause to be delivered, the Closing Date Payment (as defined below) by wire transfer of immediately available funds, as set forth in clause (c) below.  "Closing Date Payment" means an amount calculated as follows:

(i)    an amount equal to $265,000,000 or, if the Studio Condition is not satisfied fully and the Assumed Studio Liabilities are not assumed pursuant to Section 2.3(e), $290,000,000;

(ii)    *plus or minus* (as applicable) an amount equal to the Estimated Cash Adjustment Amount;

(iii)    *plus or minus* (as applicable) an amount equal to the Estimated Inventory Adjustment Amount;

(iv)    *minus* an amount equal to the Deposit (with any accrued interest actually earned thereon and less the Escrow Agent's fees and expenses);

(v)    *minus* an amount equal to the Reimbursable Expenses; and

(vi)    *minus*, if applicable, an amount equal to the Revenue Share Adjustment Amount.

(c)    At the Closing, Purchaser will pay the Closing Date Payment as follows:

(i)    an amount in cash necessary to pay and/or create a cash reserve sufficient to satisfy in cash all Carve-Out Expenses (as defined in the DIP Order) shall be paid to an account designated in writing by Sellers to Purchaser at least two (2) Business Days prior to the Closing;

(ii)    an amount equal to the amounts due to the DIP Agent and/or Senior Indenture Trustee (as defined in the DIP Order), as applicable, to satisfy and/or create a sufficient reserve necessary for amounts due to them for fees and expenses authorized to be paid under and subject to the provisions of the DIP Order, including under paragraphs 7(d)(iii), 17 and 22(c) thereof and under Section 10.4 of the DIP Credit Agreement;

(iii)    an amount equal to the sum of the Estimated Wind Down Expenses plus, if the Agency Alternative election is made, the Approved Sale Expenses shall be paid to an account designated in writing by Sellers to Purchaser at least two (2) Business Days prior to the Closing;

(iv)    an amount equal to $20,000,000 shall be deposited with the Escrow Agent pursuant to an escrow agreement to be agreed among Purchaser, Sellers and the Escrow Agent (or such other escrow agent as is agreed by Purchaser and Parent) for the purposes of satisfying any adjustments to the Purchase Price payable to Purchaser by Seller pursuant to Section 3.4 (the "Purchase Price Adjustment Escrow");

(v)    an amount equal to the amounts due under the DIP Credit Agreement, other than with respect to the Roll-Up Notes, shall be paid to an account designated in writing by the DIP Agent to Purchaser at least two (2) Business Days prior to the Closing, for immediate distribution to the DIP Lenders in accordance with the DIP Credit Agreement;

(vi)    an amount equal to the aggregate outstanding amount of Administrative Priority Expenses (as defined in the Bidding Procedures Order) shall be paid to an account designated in writing by Sellers to Purchaser at least two (2) Business Days prior to the Closing for payment thereof;

(vii)    an amount equal to the aggregate amount due under the DIP Credit Agreement with respect to the Roll-Up Notes shall be paid to an account designated in writing by the DIP Agent to Purchaser at least two (2) Business Days prior to the Closing for immediate distribution to the holders of the Roll-Up Notes in accordance with the DIP Credit Agreement;

(viii)    the remaining balance, if any, shall be paid to an account designated in writing by Sellers to Purchaser at least two (2) Business Days prior to the Closing.

(d)    At the Closing, Parent and Purchaser shall jointly instruct the Escrow Agent to transfer to Parent the Deposit (plus the amount of any accrued interest actually earned thereon and less the Escrow Agent's fees and expenses) by wire transfer of immediately available funds into an account designated in writing by Parent.

26

(e)      On or prior to the Closing Date, Purchaser shall deliver to each of the counterparties to the Purchaser Assumed Contracts the full amount of the applicable Cure Costs for the assumption and assignment of such Contracts by Sellers.

Section 3.4      Purchase Price Adjustment.

(a)      As promptly as practicable, but no later than forty-five (45) days after the Closing Date, Purchaser shall cause to be prepared and delivered to Parent a closing statement (the "Closing Statement") setting forth Purchaser's calculation of (i) the Closing Inventory Amount *plus* the Inventory Liquidation Expenses and (ii) the Closing Cash Amount (together, the "Closing Accounts").

(b)      If Parent disagrees with Purchaser's calculation of the Closing Accounts delivered pursuant to Section 3.4(a), Parent may, within fifteen (15) days after delivery of the Closing Statement, deliver a notice to Purchaser disagreeing with such calculation and setting forth Purchaser's calculation of such amount.  Any such notice of disagreement shall specify those items or amounts as to which Parent disagrees, and Parent shall be deemed to have agreed with all other items and amounts contained in the Closing Statement and the calculation of the Closing Accounts delivered pursuant to Section 3.4(a).  In the event that Parent fails to timely deliver a notice of disagreement within such fifteen (15) day period, the Closing Statement and Purchaser's determination of the Closing Accounts shall be deemed final and binding on the Parties.

(c)      If a notice of disagreement shall be duly delivered pursuant to Section 3.4(b), Purchaser and Parent shall, during the fifteen (15) days following such delivery, use their commercially reasonable efforts to reach agreement on the disputed items or amounts in order to determine, as may be required, the amount of the Closing Accounts, which amount shall not be less than the amount thereof shown in Purchaser's calculation delivered pursuant to Section 3.4(a) nor more than the amount thereof shown in Parent's calculation delivered pursuant to Section 3.4(b).  If during such period, Purchaser and Parent are unable to reach such agreement, they shall promptly thereafter cause an independent accountant to be mutually agreed upon by Parent and Purchaser (the "Accounting Referee") to review this Agreement and the disputed items or amounts for the purpose of calculating the Closing Accounts (it being understood that in making such calculation, the Accounting Referee shall be functioning as an expert and not as an arbitrator).  In making such calculation, the Accounting Referee shall consider only those items or amounts in the Closing Statement and Purchaser's calculation of the Closing Accounts as to which Parent has disagreed.  The Accounting Referee shall deliver to Purchaser and Parent, as promptly as practicable (but in any case no later than thirty (30) days from the date of engagement of the Accounting Referee), a report setting forth such calculation.  Such report shall be final and binding upon Purchaser and Sellers.  Sellers shall pay a portion of the fees and expenses of the Accounting Referee equal to 100% multiplied by a fraction, the numerator of which is the absolute value of the difference between the Accounting Referee's calculation of the Closing Accounts and Parent's calculation of the Closing Accounts, and the denominator of which is the sum of (x) the absolute value of the difference between the Accounting Referee's calculation of the Closing Accounts and Parent's calculation of the Closing Accounts *plus* (y) the absolute value of the difference between the Accounting Referee's calculation of the Closing Accounts and Purchaser's calculation of the Closing Accounts, with

27

each Seller jointly and severally liable for the entire portion allocable to Sellers.  Purchaser shall pay only such portion of the fees and expenses of the Accounting Referee that Sellers are not required to pay hereunder.

(d)     Purchaser and Parent shall, and shall cause their respective representatives to, cooperate and assist in the preparation of the Closing Statement and the calculation of the Closing Accounts and in the conduct of the review referred to in this Section 3.4, including, the making available to the extent necessary of books, records, work papers and personnel.

(e)     If the Final Inventory Amount exceeds the Estimated Inventory Amount plus the Inventory Liquidation Expenses, Purchaser shall pay to Sellers, in the manner provided in Section 3.4(g), the amount of such excess and, if the Estimated Inventory Amount plus the Inventory Liquidation Expenses exceeds the Final Inventory Amount, Sellers shall pay to Purchaser, as an adjustment to the Cash Purchase Price, in the manner provided in Section 3.4(g) the amount of such excess.  The "Final Inventory Amount" means the Closing Inventory Amount plus Inventory Liquidation Expenses (i) as shown in Purchaser's calculation delivered pursuant to Section 3.4(a) if no notice of disagreement with respect thereto is duly delivered pursuant to Section 3.4(b) or (ii) if such a notice of disagreement is delivered, (A) as agreed by Purchaser and Parent pursuant to Section 3.4(c) or (B) in the absence of such agreement, as shown in the Accounting Referee's calculation delivered pursuant to Section 3.4(c); provided, however, that in no event shall the Final Inventory Amount be less than Purchaser's calculation of the Closing Inventory Amount plus Inventory Liquidation Expenses delivered pursuant to Section 3.4(a) or more than Parent's calculation of the Closing Inventory Amount plus Inventory Liquidation Expenses delivered pursuant to Section 3.4(b).

(f)     If the Final Cash Amount exceeds the Estimated Cash Amount, Purchaser shall pay to Sellers, in the manner provided in Section 3.4(g), the amount of such excess and, if the Estimated Cash Amount exceeds the Final Cash Amount, Sellers shall pay to Purchaser, as an adjustment to the Cash Purchase Price, in the manner provided in Section 3.4(g) the amount of such excess.  The "Final Cash Amount" means the Closing Cash Amount (i) as shown in Purchaser's calculation delivered pursuant to Section 3.4(a) if no notice of disagreement with respect thereto is duly delivered pursuant to Section 3.4(b) or (ii) if such a notice of disagreement is delivered, (A) as agreed by Purchaser and Parent pursuant to Section 3.4(c) or (B) in the absence of such agreement, as shown in the Accounting Referee's calculation delivered pursuant to Section 3.4(c); provided, however, that in no event shall the Final Cash Amount be less than Purchaser's calculation of the Closing Cash Amount as set forth in the Closing Statement delivered pursuant to Section 3.4(a) or more than Parent's calculation of the Closing Cash Amount as set forth in its calculations delivered pursuant to Section 3.4(b).

(g)     Any payments pursuant to Sections 3.4(e) or 3.4(f) shall be made within five (5) Business Days after the Final Inventory Amount or the Final Cash Amount, as applicable, has been determined pursuant to this Section 3.4, by wire transfer by Purchaser or Sellers, as the case may be, of immediately available funds to the account of such other Party as may be designated in writing by such other Party.  In the event that any payments are due to Purchaser pursuant to Section 3.4(e) or 3.4(f), such amounts shall be paid (i) to Purchaser by the Escrow Agent out of the Purchase Price Adjustment Escrow and (ii) if any amounts remain due to Purchaser after payment to Purchaser of the full amount of such Purchase Price Adjustment

Escrow and any earnings thereon, by Sellers out of funds available to them.  The obligations of Sellers to pay any purchase price adjustments pursuant to Sections 3.4(e) and 3.4(f) and this Section 3.4(g) shall be joint and several obligations.

Section 3.5    Allocation of Purchase Price.  Within thirty (30) days after the Closing Date, Purchaser shall prepare and deliver to Sellers an allocation of the Cash Purchase Price, the Assumed Liabilities and any other items that are treated as additional purchase price for Tax purposes (the "Taxable Consideration") among the Purchased Assets in accordance with Section 1060 of the Code (the "Proposed Allocation").  Sellers shall have thirty (30) days after receipt of the Proposed Allocation to notify Purchaser in writing of any items of the Proposed Allocation that are not reasonable in Sellers' view.  If Sellers do not object in writing during such thirty (30) day period, then the Proposed Allocation shall be final and binding on all Parties.  If Sellers object in writing during such thirty (30) day period, then the Parties shall cooperate in good faith to reach a mutually agreeable allocation of the Taxable Consideration, which allocation shall be binding on all Parties.  If the Parties are unable to reach an agreement within sixty (60) days of Sellers' receipt of the Proposed Allocation, then any disputed items shall be referred to the Accounting Referee for resolution, and the determination of the Accounting Referee shall be final and binding on the Parties.  The fees and expenses of the Accounting Referee shall be paid fifty percent (50%) by Purchaser and fifty percent (50%) by Sellers, with each Seller severally liable for the entire portion allocable to Sellers.  In accordance with such allocation, Purchaser shall prepare and deliver to Sellers copies of Form 8594 and any required exhibits thereto (the "Asset Acquisition Statement").  Purchaser shall prepare and deliver to Sellers (or their designated successors) from time to time revised copies of the Asset Acquisition Statement (the "Revised Statements") so as to report any matters on the Asset Acquisition Statement that need updating (including pursuant to purchase price adjustments, if any), consistent with the agreed upon allocation.  The Parties shall, and shall cause their respective Affiliates to, use the allocations set forth in the Asset Acquisition Statement or, if applicable, the last Revised Statement for all Tax purposes, file all Tax Returns in a manner consistent with such allocation statement and take no position contrary thereto, in each case, unless required to do so by a change in applicable Tax Laws or good faith resolution of a Tax contest.

## ARTICLE IV

## CLOSING AND TERMINATION

Section 4.1    Closing Date.  Subject to the satisfaction of the conditions set forth in Section 10.1, Section 10.2 and Section 10.3 (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York (or at such other place as the Parties may designate in writing) at 10:00 a.m. local time on the date that is three (3) Business Days following the satisfaction or waiver of the conditions set forth in Article X (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the Parties.  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."  Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title and interest of Sellers to be acquired by Purchaser

hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (prevailing eastern time) on the Closing Date.

Section 4.2    <u>Deliveries by Sellers</u>.  At the Closing, Sellers shall deliver to Purchaser:

(a)    for each Owned Property listed on <u>Schedule 5.9(a)</u>, a warranty deed duly executed by the applicable Seller;

(b)    a duly executed copy of the Agency and License Agreement;

(c)    a duly executed bill of sale in the form attached as <u>Exhibit C</u> hereto;

(d)    a duly executed assignment and assumption agreement in the form attached as <u>Exhibit D</u> hereto (the "<u>Assignment Agreement</u>") and duly executed assignments transferring all of Sellers' and any Debtor Subsidiary's rights, titles and interests in and to the Intellectual Property included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. Patent and Trademark Office and U.S. Copyright Office;

(e)    copies of all consents, waivers and approvals referred to in <u>Section 10.1(f)</u>;

(f)    stock certificates, if applicable, representing the Subsidiary Shares, duly endorsed in blank or accompanied by appropriate transfer documentation duly endorsed in blank and with all appropriate stock transfer tax stamps affixed;

(g)    for each Seller, a certificate of non-foreign status pursuant to Section 1445 of the Code and Treasury Regulation Section 1.1445-2(b);

(h)    a certified copy of the Sale Order;

(i)    the written resignations of each of the directors, managing members or equivalent authorized persons of each Non-Debtor Subsidiary effective as of the Closing; and

(j)    a certificate signed by an authorized officer of each Seller (in form and substance reasonably satisfactory to Purchaser) pursuant to <u>Sections 10.1(a)</u> and <u>(b)</u>).

Section 4.3    <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser shall deliver to Sellers:

(a)    the Closing Date Payment;

(b)    a duly executed copy of the Assignment Agreement;

(c)    a duly executed copy of the Agency and License Agreement; and

(d)    a certificate signed by an authorized officer of Purchaser (in form and substance reasonably satisfactory to Sellers) pursuant to <u>Sections 10.2(a)</u> and <u>(b)</u>.

Section 4.4    Termination of Agreement.  This Agreement may be terminated prior to the Closing Date as follows:

(a)    At any time prior to the Closing Date by the joint written consent of Sellers and Purchaser;

(b)    By either Sellers or Purchaser if the Closing has not occurred on or before April 20, 2011 (as may be extended by written agreement of the Parties, the "Outside Date"); provided, however, that a Party may not terminate this Agreement pursuant to this Section 4.4(b) if such Party is in breach of its obligations hereunder in any material respect and such breach is the sole reason that the Closing has not occurred by such date;

(c)    By the Purchaser or, prior to entry of the Sale Order, by Sellers, if (i) Sellers enter into a definitive agreement with respect to a Competing Bid or (ii) the Bankruptcy Court enters an Order approving a Competing Bid or (iii) the Bankruptcy Court enters an Order that otherwise precludes the consummation of the Transactions on the terms and conditions set forth in this Agreement;

(d)    By either Sellers or Purchaser, if an Order is entered by a Governmental Authority of competent jurisdiction having valid enforcement authority permanently restraining, prohibiting or enjoining either Party from consummating the Transactions and such Order shall have become final and non-appealable or shall not have been vacated prior to the Outside Date;

(e)    By Purchaser or Sellers, if the Bidding Procedures Order has not been entered by the Bankruptcy Court on or before March 4, 2011;

(f)    By Purchaser or Sellers, if the Sale Order has not been entered by the Bankruptcy Court on or before April 11, 2011;

(g)    By Purchaser, if any of the Bankruptcy Cases are dismissed or converted to a case under chapter 7 of the Bankruptcy Code for any reason;

(h)    By Purchaser, so long as Purchaser is not in breach of its obligations under this Agreement in any material respect, upon a breach of any covenant or agreement of Sellers set forth in this Agreement, or if any representation or warranty of Sellers shall have been or becomes untrue, in each case such that the conditions set forth in Section 10.1(a) or Section 10.1(b), as the case may be, would not be satisfied and such breach or untruth cannot be cured by the Outside Date;

(i)    By Sellers, so long as Sellers are not in breach of their obligations under this Agreement in any material respect, upon a breach of any covenant or agreement of Purchaser set forth in this Agreement, or if any representation or warranty of Purchaser shall have been or becomes untrue, in each case such that the conditions set forth in Section 10.2(a) or Section 10.2(b), as the case may be, would not be satisfied and such breach or untruth cannot be cured by the Outside Date;

31

(j)      By Purchaser, if the Bidding Procedures Order or the Sale Order is modified in any manner adverse to Purchaser without the prior written consent of Purchaser (which consent may be withheld in Purchaser's sole discretion);

(k)      By Purchaser, if any secured creditor of Sellers obtains relief from the stay to foreclose on any of the Purchased Assets, the effect of which would cause, or would reasonably be expected to cause, a Seller Material Adverse Effect;

(l)      By Purchaser, if the Sale Motion has not been filed by Sellers on or before the second Business Day following the date of execution of this Agreement; and

(m)      By Purchaser, if Sellers shall not have obtained, prior to the conclusion of the hearing on the Bidding Procedures Order, written consent from the Requisite Lenders (as defined in the DIP Credit Agreement) of a budget that will cover, in full, the Estimated Wind Down Expenses and the Sale Budget (as defined in the Sale Motion).

Section 4.5      Effect of Termination.

(a)      No termination of this Agreement pursuant to Section 4.4 shall be effective until notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which such termination is made.  In the event that this Agreement is validly terminated as provided herein, this Agreement shall become wholly void and of no further force and effect without liability to Purchaser or Sellers, or any of their respective Representatives, and each shall be fully released and discharged from any Liability or obligation after the date of such termination and such termination shall be without liability to Purchaser or Sellers; provided, however, that the obligations of the Parties under the Escrow Agreement and Sections 4.5, 8.5, and 8.7 and Article XII of this Agreement shall survive any such termination and shall be enforceable hereunder.

(b)      In the event this Agreement is properly terminated pursuant to Section 4.4 (other than Sections 4.4(e), 4.4(i), 4.4(l) or 4.4(m)), Sellers shall promptly (but in no event later than three (3) Business Days) pay to Purchaser by wire transfer of immediately available funds the Reimbursable Expenses.  In the event this Agreement is properly terminated by Sellers pursuant to (i) Section 4.4(b) in the event that Closing does not occur on or before the Outside Date solely as a result of Purchaser's material breach of its obligations under this Agreement or (ii) Section 4.4(i) as a result of a material breach by Purchaser, the sole remedy of Sellers shall be retention of the Deposit as provided in Section 12.2(a)(ii).  Under no circumstance shall Purchaser have any liability to Sellers for termination of this Agreement for any other reason.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby represent and warrant to Purchaser as follows:

Section 5.1      Organization and Good Standing.  Each Seller and each Non-Debtor Subsidiary is duly organized, validly existing, in good standing and duly qualified to transact business under the laws of the jurisdiction of its formation, and is duly qualified or licensed to do

32

business in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect, and, subject to the limitations imposed on Sellers as a result of having filed petitions for relief under the Bankruptcy Code, or pursuant to any Order entered by the Bankruptcy Court, each Seller and each Non-Debtor Subsidiary has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted. Other than with respect to Blockbuster NZ Ltd., each Seller and each Non-Debtor Subsidiary has delivered or made available to Purchaser true, complete and correct copies of its organizational documents as in effect on the date hereof.

Section 5.2    <u>Ownership of Non-Debtor Subsidiaries</u>.

(a)    Except as otherwise indicated on <u>Schedule 5.2(a)</u>, all of the outstanding capital stock or other equity interests of each Non-Debtor Subsidiary are owned, directly or indirectly, by the owner reflected on <u>Schedule 5.2(a)</u>, free and clear of any and all Liens, other than (i) restrictions on transfer that may be imposed by federal or state securities Laws, (ii) Liens that arise out of any actions taken by or on behalf of Purchaser or its Affiliates, or (iii) Permitted Liens.  All equity interests of each Non-Debtor Subsidiary have been validly issued and are fully paid, nonassessable and were not issued in violation of any purchase or call option, right of first refusal, subscription right, preemptive right or any similar rights.

(b)    There are no outstanding or authorized options, convertible or exchangeable securities or instruments, warrants, rights, contracts, calls, puts, rights to subscribe, conversion rights or other agreements or commitments to which Sellers are a party or which are binding on any of them providing for the issuance, disposition or acquisition of any equity interest of any of the Non-Debtor Subsidiaries.

(c)    There are no voting trusts, proxies or other agreements or understandings with respect to the voting of any equity interest of the Non-Debtor Subsidiaries.

(d)    Except (i) for the equity interests in the Non-Debtor Subsidiaries and other Sellers and (ii) as set forth on <u>Schedule 5.2(d)</u>, Sellers do not own or hold of record or beneficially any equity interests in any Person.

Section 5.3    <u>Authorization of Agreement</u>.  Subject to the entry of the Sale Order, Sellers have all requisite power, authority and legal capacity to execute and deliver this Agreement and each other Transaction Document, agreement, document, or instrument or certificate contemplated by this Agreement or to be executed by any such Seller in connection with the consummation of the transactions contemplated by this Agreement (the "Seller Documents"), to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Seller Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate or limited liability company action, as applicable, on the part of each Seller.  This Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by each Seller which is a party hereto and thereto and (assuming the due authorization,

execution and delivery by the other parties hereto and thereto, the entry of the Sale Order and, with respect to Sellers' obligations under <u>Section 12.14</u>, the entry of the Bidding Procedures Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of such Seller enforceable against such Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

      Section 5.4    <u>No Violation; Consents</u>.

      (a)    Except as set forth on <u>Schedule 5.4(a)</u>, none of the execution and delivery by Sellers of this Agreement or any of the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Sellers with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or give rise to any obligation of any Seller or their Subsidiaries to make any payment under or to the increased, additional, accelerated or guaranteed rights or entitlements of any Person under, or result in the creation of any Liens (other than Permitted Liens) upon any of the Purchased Assets or the assets of the Non-Debtor Subsidiaries or cancellation under any provision of (i) the certificate of incorporation and bylaws or comparable organizational documents of any Seller or any Non-Debtor Subsidiary; (ii) subject to entry of the Sale Order, any Contract or Permit to which any Seller or any Non-Debtor Subsidiary is a party or by which any of the properties or assets of any Seller or any Non-Debtor Subsidiary are bound; (iii) subject to entry of the Sale Order, any Order of any Governmental Authority applicable to any Seller or any Non-Debtor Subsidiary or any of the properties or assets of any Seller or any Non-Debtor Subsidiary as of the date hereof and as of the Closing Date; or (iv) subject to entry of the Sale Order, any Applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

      (b)    Except as set forth on <u>Schedule 5.4(b)</u>, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of any Seller or any Non-Debtor Subsidiary in connection with the execution and delivery of this Agreement or the Seller Documents, the compliance by any Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the assignment and assumption of the Purchaser Assumed Contracts, or the taking by any Seller of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the entry of the Sale Order, (iii) the entry of the Bidding Procedures Order with respect to Sellers' obligations under <u>Section 12.14</u> and (iv) other immaterial consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications.

      Section 5.5    <u>Financial Information</u>.

(a)    Sellers have delivered to Purchaser copies of (i) the audited consolidated balance sheet of Sellers and their Subsidiaries as at January 3, 2010 and the related audited consolidated statement of income and of cash flows of Sellers and their Subsidiaries for the year then ended and (ii) the unaudited consolidated balance sheet of Sellers and their Subsidiaries as at January 2, 2011 and the related consolidated statement of income and cash flows of Sellers and their Subsidiaries for the twelve (12) month period then ended (such audited and unaudited statements, including the related notes and schedules thereto, are referred to herein as the "Financial Statements").  Each of the Financial Statements is complete and correct in all material respects, has been prepared in accordance with GAAP consistently applied throughout the periods indicated without modification of the accounting principles used in the preparation thereof throughout the periods presented and presents fairly in all material respects the consolidated financial position, results of operations and cash flows of Sellers and their Subsidiaries as at the dates and for the periods indicated therein, subject to normal year-end adjustments and the absence of complete notes in the case of the unaudited statements.  For the purposes hereof, the unaudited consolidated balance sheet of Sellers and their Subsidiaries as at January 2, 2011 is referred to as the "Balance Sheet" and January 2, 2011 is referred to as the "Balance Sheet Date."

(b)    Sellers make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of their respective assets. Sellers maintain systems of internal accounting controls sufficient to provide reasonable assurances that:  (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP and to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the actual levels at reasonable intervals and appropriate action is taken with respect to any differences.

Section 5.6    No Undisclosed Liabilities.  No Seller nor any of its Subsidiaries has any Liabilities that would have been required to be reflected in, reserved against or otherwise described in the Balance Sheet or the notes thereto in accordance with GAAP, other than Liabilities incurred in the Ordinary Course of Business since the Balance Sheet Date, Liabilities under this Agreement, Liabilities of Sellers that will not be Assumed Liabilities and Liabilities that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

Section 5.7    Title to Purchased Assets.  Except as set forth in Schedule 5.7, and other than the real property subject to the Real Property Leases, Intellectual Property owned by third parties and licensed to Sellers subject to any Intellectual Property Licenses and personal property subject to personal property leases (including the Personal Property Leases), Sellers own each of the Purchased Assets, and at the Closing Purchaser will be vested with good and valid title to such Purchased Assets, free and clear of all Liens, other than Permitted Liens, to the fullest extent permissible under section 363(f) of the Bankruptcy Code.

Section 5.8    Taxes.  Except as set forth on Schedule 5.8 and except as precluded by the Bankruptcy Code:

(a)    (i) Sellers and each of their Subsidiaries have timely filed (or have caused to be timely filed) with the appropriate Taxing Authorities all material Tax Returns required to be filed with respect to the Purchased Assets (taking into account any extension of time to file granted or obtained with respect to such entity); (ii) all such Tax Returns are complete and accurate; and (iii) all income and other material Taxes due, regardless of whether shown on a filed Tax Return, have been timely paid.

(b)    No Tax audits, investigations or administrative or judicial proceedings are pending or in progress or, to Sellers' Knowledge, have been threatened in writing with respect to the Purchased Assets or the Non-Debtor Subsidiaries.

(c)    Each of Sellers and the Non-Debtor Subsidiaries has complied in all material respects with all Applicable Laws relating to the payment and withholding of Taxes and has duly and timely withheld and paid over to the appropriate Taxing Authorities all amounts required to be so withheld and paid over under all Applicable Laws.

(d)    No Seller or any Subsidiary of a Seller has been party to any "listed transaction" as defined in Treasury Regulation Section 1.6011-4 or subject to any similar provision of state, local or foreign Law.

(e)    Each Non-Debtor Subsidiary is treated as an association taxable as a corporation for U.S. federal income Tax purposes.

(f)    No Seller is a foreign person within the meaning of Section 1445 of the Code.

(g)    No agreement, waiver or other document or arrangement extending or having the effect of extending the period for assessment or collection of Taxes (including, but not limited to, any applicable statute of limitations) or the period for filing any Tax Return, has been executed or filed with any Taxing Authority by or on behalf of any of the Non-Debtor Subsidiaries.

(h)    No power of attorney with respect to any Tax matter is currently in force with respect to the Purchased Assets, the Business or any of the Non-Debtor Subsidiaries that would, in any manner, bind, obligate, or restrict Purchaser.

(i)    No Tax elections have been made with respect to the Purchased Assets or the Business or by any Non-Debtor Subsidiary that would, in any manner, bind, obligate or restrict Purchaser.

(j)    Other than with respect to customary provisions related to a Tax pass-through, employee gross-up or other similar arrangements entered into in the Ordinary Course of Business, no Tax allocation, Tax sharing or Tax indemnity or similar agreement or arrangement is currently in effect with respect to the Purchased Assets or the Business or by any Non-Debtor Subsidiary that would, in any manner, bind, obligate or restrict Purchaser.

Section 5.9    Real Property.

36

(a)    Schedule 5.9(a) sets forth a complete list of all material real property and interests in real property owned by Sellers and the Non-Debtor Subsidiaries that is necessary for, used or held for use in connection with the operation and conduct of the Business (individually, an "Owned Property" and collectively, the "Owned Properties").  Each of Sellers and the Non-Debtor Subsidiaries has good and marketable (or, to the extent located in Texas, indefeasible) fee title to all Owned Properties, free and clear of all Liens of any nature whatsoever except (i) as set forth on Schedule 5.9(a), (ii) matters that are disclosed in the relevant title policy and survey for such Owned Real Property, (iii) Permitted Liens and (iv) zoning, planning and other limitations and restrictions of record, none of which would reasonably be expected to have, individually or in the aggregate, a material impact on the use or operation of any such Owned Property or prevent or materially limit the continued use and operation of the Owned Properties as currently owned and operated.  Except as set forth on Schedule 5.9(a), the Owned Properties are not subject to any leases or tenancies or other rights of occupancy.  Neither Seller nor any Non-Debtor Subsidiary has received notice that any of the improvements comprising the Owned Properties or the business conducted by Sellers or any Non-Debtor Subsidiaries thereon is in violation of any building line, use or occupancy restriction, limitation, easement, condition or covenant of record.  To Sellers' Knowledge, there are no physical defects in the buildings or other facilities or machinery or equipment located at any of the Owned Properties which would interfere with the use and operation of the Owned Properties as currently used and operated, other than with respect to such defects as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

(b)    Schedule 5.9(b) sets forth a complete list of all material real property and interests in real property leased by Sellers or any Non-Debtor Subsidiaries (individually, a "Real Property Lease" and collectively, the "Real Property Leases") as lessee or lessor.  Sellers have provided Purchaser with, or access to, true, correct, accurate and complete copies of all leases and other instruments and agreements together with all amendments, modifications, supplements, and restatements thereto, if any, pertaining to the Real Property Leases.  To Sellers' Knowledge, there are no physical defects in the buildings or other facilities or machinery or equipment located at any of the properties subject to any of the Real Property Leases which would interfere with the continued use and operation of the properties subject to the Real Property Leases as currently used and operated, other than with respect to such defects as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

(c)    Except as disclosed in Schedule 5.9(c), neither Seller nor any Non-Debtor Subsidiary has granted to any other Person any rights, adverse or otherwise, under such Real Property Lease, or sublet, assigned or otherwise conveyed all or any portion of the premises demised under the Real Property Lease or Real Property Lease to any other Person.

Section 5.10    Tangible Personal Property; Capital Leases.

(a)    Schedule 5.10 sets forth all leases of personal property ("Personal Property Leases") involving annual payments in excess of $50,000 relating to personal property used by Sellers or any of the Non-Debtor Subsidiaries in connection with the Business or to which any Seller or any Non-Debtor Subsidiary is a party or by which the properties or assets of any Seller or any Non-Debtor Subsidiary are bound.

37

(b)    Schedule 5.10 sets forth all capital leases ("Capital Leases") involving annual payments in excess of $50,000 relating to property used by Sellers or any of the Non-Debtor Subsidiaries in connection with the Business or to which any Seller or any Non-Debtor Subsidiary is a party or by which the properties or assets of any Seller or any Non-Debtor Subsidiary are bound.

(c)    Sellers and the Non-Debtor Subsidiaries have a valid and enforceable leasehold interest under each of the Personal Property Leases and Capital Leases under which each is a lessee, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).  Each of the Personal Property Leases and Capital Leases is in full force and effect.

(d)    All personal property of Sellers and the Non-Debtor Subsidiaries (including personal property subject to Personal Property Leases) and all property of Sellers or any of the Non-Debtor Subsidiaries subject to Capital Leases, other than any Excluded Asset, is (i) in good operating condition and repair (ordinary and reasonable wear and tear excepted), and (ii) suitable for the purposes for which it is currently used.

(e)    None of Sellers nor any of the Non-Debtor Subsidiaries has leased or subleased to any other Person any property that is subject to a Personal Property Lease or a Capital Lease.  None of Sellers nor any of the Non-Debtor Subsidiaries has assigned to any other Person its interest under any lease or sublease with respect to any property subject to a Personal Property Lease or Capital Lease.  The rental set forth in each lease or sublease of any item or distinct group of personal property of each Seller or each Non-Debtor Subsidiary is and immediately after the Closing will be the actual rental being paid by such Seller or such Non-Debtor Subsidiary and there are and immediately after the Closing will be no separate agreements or understandings in respect thereof.

Section 5.11    Intellectual Property.

(a)    Schedule 5.11(a) sets forth a true and complete list of all material issuances and registrations and material applications for issuance or registration included in the Purchased Intellectual Property.

(b)    Schedule 5.11(b) sets forth a true and complete list of (i) all material written Intellectual Property Licenses that are Purchaser Assumed Contracts and (ii) to Sellers' Knowledge, all material oral Intellectual Property Licenses that are Purchaser Assumed Contracts, regardless of whether such Intellectual Property Licenses involve annual payments by or to a Seller or an Affiliate of any Seller.

(c)    Except as set forth on Schedule 5.11(c):

(i)    A Seller or one of its Subsidiaries owns all Intellectual Property listed on Schedule 5.11(a) and has valid rights in and to, including rights to use, publish, and perform, as applicable, all other Business Intellectual Property included in the Purchased Assets

38

as such Business Intellectual Property is used in the Ordinary Course of Business, in each case, free and clear of all Liens other than Permitted Liens and Intellectual Property Licenses.

(ii)    The Purchased Intellectual Property is not the subject of any ownership, validity, use, or enforceability challenge or claim received by Sellers in writing or, to Sellers' Knowledge, any outstanding Order restricting the use by Sellers or any of their Subsidiaries thereof or adversely affecting any of the rights of Sellers or any of their Subsidiaries thereto, except as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

(iii)    No Seller has received any written notice of any default or any event that with notice or lapse of time, or both, would constitute a default under any Intellectual Property License that is a Purchaser Assumed Contract and to which any Seller is a party or by which it is bound, except for defaults that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.  To Sellers' Knowledge, no Person is violating any Purchased Intellectual Property or Business Intellectual Property exclusively licensed to any Seller or any of its Subsidiaries under an Intellectual Property License that is a Purchaser Assumed Contract, except for violations that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

(iv)    To Sellers' Knowledge, (A) no Seller nor any of its Subsidiaries is violating, and since September 23, 2010, has violated, any Intellectual Property rights of any other Person and (B) there are no Actions or Legal Proceedings, pending or threatened, concerning any claim that Sellers or any of their Subsidiaries have infringed, diluted, misappropriated, or otherwise violated any Intellectual Property rights of any other Person, in each case, except as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

(v)    Sellers and their Subsidiaries have used commercially reasonable efforts to protect the confidentiality of any material Trade Secrets and other material confidential and proprietary information included in the Purchased Assets.

Section 5.12    Material Contracts.

(a)    Schedule 5.12(a) sets forth all of the following Contracts to which any Seller or any Non-Debtor Subsidiary is a party or by which any Seller or any Non-Debtor Subsidiary is bound in connection with the Business or by which the Purchased Assets may be bound or affected and that are Purchaser Assumed Contracts (collectively, the "Material Contracts"):

(i)    Contracts with any Affiliate or current or former officer or director of any Seller or any of its Subsidiaries or any Non-Debtor Subsidiaries;

(ii)    Contracts pursuant to which a Seller or any of its Subsidiaries or any Non-Debtor Subsidiary grants to any Person any franchise rights or rights to represent a Seller or any Non-Debtor Subsidiary with respect to any product, or act as agent for any Seller or any Non-Debtor Subsidiary in connection with the marketing, distribution or sale of any Business product;

       (iii)    Contracts with any labor union or association representing any employees of any Seller or any Non-Debtor Subsidiary;

       (iv)    Contracts for the sale of any of the assets of the Business, other than in the Ordinary Course of Business;

       (v)    Contracts relating to the acquisition by any Seller or any of its Subsidiaries, or any Non-Debtor Subsidiary of any operating business or the capital stock of any other Person;

       (vi)    Contracts containing a covenant that restricts a Seller or any Affiliate of a Seller or any Non-Debtor Subsidiary from engaging in any line of business, conducting the Business in any geographic area, competing with any Person or hiring any Person;

       (vii)    Contracts relating to incurrence of Indebtedness or the making of any loans, in each case involving amounts in excess of $100,000;

       (viii)    Contracts relating to a joint venture of the Business, any Seller or any of its Subsidiaries or any Non-Debtor Subsidiaries;

       (ix)    Contracts which involve the expenditure of more than $100,000 in the aggregate or require performance by any party more than one year from the date hereof that, in either case, are not terminable by a Seller or any Non-Debtor Subsidiary without penalty on less than one hundred eighty (180) days' notice;

       (x)    the Studio Contracts;

       (xi)    the Alliance Agreement, dated as of January 23, 2009, by and between NCR Corporation and Blockbuster Inc.;

       (xii)    Contracts providing for severance, retention, change in control or similar payments; and

       (xiii)    Contracts for the employment of any individual on a full-time, part-time or consulting or other basis providing annual compensation in excess of $100,000.

       (b)    Each of the Material Contracts is in full force and effect and is the legal, valid and binding obligation of Sellers or a Non-Debtor Subsidiary, enforceable against them in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).  Sellers have good and valid title to the Material Contracts, free and clear of all Liens (other than Permitted Liens).  Sellers have delivered or otherwise made available to Purchaser true, correct and complete copies of all of the Material Contracts, together with all amendments, modifications or supplements thereto.

       Section 5.13    <u>Employee Benefits</u>.

(a)     Schedule 5.13(a) separately lists:  (i) all material Debtor Benefit Plans and (ii) all material Non-Debtor Benefit Plans.

(b)     True, correct and complete copies of each of the material Employee Benefit Plans and with respect to each Non-Debtor Benefit Plan the following documents (as applicable) have been made available to Purchaser (i) the most recent annual report or similar document filed with any Governmental Authority, (ii) the most recent financial statement and actuarial valuation, (iii) the most recent IRS determination letter or other governmental registration, and (iv) the most recent summary plan descriptions (including letters or other documents updating such descriptions).

(c)     Except as disclosed on Schedule 5.13(c), each of the Employee Benefit Plans (including the Non-Debtor Benefit Plans) intended to qualify for tax-advantaged status under Applicable Laws so qualifies.

(d)     Except as disclosed on Schedule 5.13(d), each of the Non-Debtor Benefit Plans has been administered in all material respects in compliance with its terms and all Applicable Laws and, with respect to each such Non-Debtor Benefit Plan, (i) all employer and employee contributions required by Law or by the terms of the plan have been made, or, if applicable, accrued, in accordance with normal accounting practices; (ii) if they are intended to be funded and/or book-reserved, the fair market value of the assets of each funded plan, or the book reserve established for each plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations with respect to all current and former participants in such plan according to the actuarial assumptions and valuations most recently used to account for such obligations in accordance with applicable generally accepted accounting principles; and (iii) it has been registered as required and has been maintained in good standing with applicable regulatory authorities.

(e)     Except as disclosed on Schedule 5.13(e), there are no judicial or governmental proceedings pending or, to Sellers' Knowledge, threatened with respect to any Non-Debtor Benefit Plan other than claims for benefits thereunder in the ordinary course.

(f)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) result in any payment becoming due to any Employee of any Seller; (ii) increase any benefits otherwise payable under any Employee Benefit Plan; or (iii) result in the acceleration of the time of payment or vesting of any such benefits, in each case, that would be required to be satisfied by Purchaser following the Closing.

Section 5.14    Labor.

(a)     Except as set forth on Schedule 5.14(a), none of Sellers, the Non-Debtor Subsidiaries or any of the Debtor Subsidiaries is a party to any labor or collective bargaining agreement.

(b)     Except as set forth on Schedule 5.14(b), there are no (i) strikes, work stoppages, work slowdowns or lockouts pending or, to Sellers' Knowledge, threatened against or involving Seller, any of the Non-Debtor Subsidiaries or any of the Debtor Subsidiaries, or

(ii) unfair labor practice charges, grievances or complaints pending or, to Sellers' Knowledge, threatened by or on behalf of any employee or group of employees of Seller, any of the Non-Debtor Subsidiaries or any of the Debtor Subsidiaries, except in each case as would not have a Seller Material Adverse Effect.

Section 5.15    Litigation.  Except (a) as set forth on Schedule 5.15, (b) for matters before the Bankruptcy Court involving Sellers or any of their Affiliates, and (c) any matters that will otherwise be resolved by the Sale Order without any Liability or restriction applicable to Purchaser or the Purchased Assets, there are no Legal Proceedings pending or, to Sellers' Knowledge, threatened against any Seller or any of its Subsidiaries, or relating to the Business or any of the Purchased Assets or Assumed Liabilities, before any Governmental Authority, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

Section 5.16    Compliance with Laws; Permits.

(a)    Except as set forth on Schedule 5.16, since September 23, 2010, Sellers and the Non-Debtor Subsidiaries have (i) conducted and continue to conduct the Business in accordance with all Applicable Laws and Orders applicable to their respective operations or assets or the Business, (ii) complied with and continue to comply with all Laws and Orders applicable to the Purchased Assets and the Assumed Liabilities, and (iii) are not in violation of any such Law or Order, except where the failure to be in compliance would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect and except with respect to Environmental Laws which are addressed in Section 5.17.  Neither any Seller nor any of its Subsidiaries has received any written notice of or been charged with the violation of any Laws and, to Sellers' Knowledge, there are no facts or circumstances that would reasonably be expected to give rise to any such violation, except where such violation would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

(b)    Sellers and the Non-Debtor Subsidiaries currently have all Permits which are required for the operation of the Business as presently conducted, except where the absence of which would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.  Neither any Seller nor any of its Subsidiaries is in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which it is a party, and, to Sellers' Knowledge, there are no facts or circumstances that would reasonably be expected to give rise to any such violation, except where such default or violation would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

Section 5.17    Environmental Matters.

(a)    Except as set forth on Schedule 5.17(a), the operations of Sellers and their Subsidiaries are in material compliance with all applicable Environmental Laws and all Permits issued pursuant to Environmental Laws or otherwise and no Seller nor any of its Subsidiaries has any material Environmental Liabilities or Obligations and no facts exist or events have occurred that could reasonably be expected to give rise to any such material Environmental Liabilities or Obligations.

42

(b)     Sellers and their Subsidiaries have obtained all Permits required under all applicable Environmental Laws necessary to operate the Business.

(c)     None of Sellers or their Subsidiaries is the subject of any outstanding Order or Contract with any Governmental Authority respecting (i) Environmental Laws, (ii) Remedial Action or (iii) any Release or threatened Release of a Hazardous Material.

(d)     None of Sellers or their Subsidiaries has received any written communication alleging that any Seller or any of its Subsidiaries may be in violation of any Environmental Law or any Permit issued pursuant to Environmental Law, or may have any Environmental Liabilities or Obligations.

(e)     To Sellers' Knowledge, there are no investigations of the Business, or currently or previously owned, operated or leased property of any Seller or any of its Subsidiaries pending or, to Sellers' Knowledge, threatened which would reasonably be expected to result in the imposition of any material liability pursuant to any Environmental Law.

Section 5.18    Accounts and Notes Receivable and Payable.

(a)     All accounts and notes receivable of Sellers and the Non-Debtor Subsidiaries have arisen from bona fide transactions in the Ordinary Course of Business consistent with past practice and are payable on ordinary trade terms, are properly reflected on Sellers' and the Non-Debtor Subsidiaries' books and records and properly reserved for with respect to doubtful accounts, all in accordance with GAAP.

(b)     All accounts payable of Sellers and Non-Debtor Subsidiaries reflected in the Balance Sheet or arising after the date thereof are the result of bona fide transactions in the Ordinary Course of Business.

Section 5.19    Insurance.  Set forth on Schedule 5.19 is a list of all material policies of insurance by which the Purchased Assets and the Non-Debtor Subsidiaries are covered as of the date hereof.  Except as set forth on Schedule 5.19, all such policies are in full force and effect and there are no material claims pending as of the date hereof under any of such policies where underwriters have reserved their rights or disclaimed coverage under such policy with such exceptions that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

Section 5.20    Financial Advisors.  Except as set forth on Schedule 5.20, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for any Seller or any of its Subsidiaries in connection with the transactions contemplated by this Agreement.  No Person is entitled to any fee or commission or like payment from Purchaser in respect thereof.

Section 5.21    No Other Representations or Warranties; Schedules.  Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), no Seller nor any other Person makes any express or implied representation or warranty with respect to Sellers, their Subsidiaries, the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and Sellers disclaim any other representations or warranties, whether made by Sellers, any Affiliate of Sellers or any of their

43

respective officers, directors, employees, agents or representatives.  Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), Sellers expressly disclaim and negate any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or express warranty of merchantability or fitness for a particular purpose). Sellers make no representations or warranties to Purchaser regarding the probable success or profitability of the Business.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers as follows:

Section 6.1    Organization and Good Standing.  Purchaser is a limited liability company duly organized, validly existing, in good standing and duly qualified to transact business under the laws of the State of Delaware and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 6.2    Authorization of Agreement.  Purchaser has all requisite power, authority and legal capacity to execute and deliver this Agreement, the other Transaction Documents and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "Purchaser Documents"), to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary limited liability company action on behalf of Purchaser.  This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 6.3    No Violation; Consents.

(a)    None of the execution and delivery by Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of formation and operating agreement or comparable organizational documents of Purchaser, (ii) any Contract or Permit to which Purchaser is a party or by which Purchaser or its properties

44

or assets are bound, (iii) any Order of any Governmental Authority applicable to Purchaser or by which any of the properties or assets of Purchaser are bound or (iv) any Applicable Law, except in the case of clauses (ii), and (iii) and (iv) as would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of Purchaser in connection with the execution and delivery of this Agreement or the Purchaser Documents, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for compliance with the applicable requirements of the HSR Act, or that would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

Section 6.4    Litigation.  There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to have a Purchaser Material Adverse Effect.

Section 6.5    Investment Intention.  Purchaser is acquiring the Subsidiary Shares for its own account, for investment purposes only and not with a view to the distribution thereof in violation of the Securities Act of 1933, as amended (the "Securities Act").  Purchaser understands that the Subsidiary Shares have not been registered under the Securities Act and cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is available.

Section 6.6    Financial Capability.  Purchaser (a) will have at the Closing sufficient funds available to pay the Purchase Price and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement, and (b) will have at the Closing the resources and capabilities (financial or otherwise) to perform its obligations hereunder.

Section 6.7    Bankruptcy.  There are no bankruptcy, reorganization or arrangement proceedings pending against, being contemplated by, or to the knowledge of Purchaser, threatened against, Purchaser.

Section 6.8    Financial Advisors.  Except as set forth on Schedule 6.8, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated hereunder and no Person is entitled to any fee or commission or like payment in respect thereof which would be payable by Sellers (other than pursuant to the requirement to pay the Reimbursable Expenses).

Section 6.9    Condition of the Business.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that no Seller is making any representations or warranties whatsoever, express or implied, beyond those expressly given by Sellers in Article V hereof (as modified by the Schedules hereto as supplemented or amended in accordance with Section 8.11), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a

45

"where is" and, as to condition, "as is" basis.  Purchaser further represents that no Seller or any of its Affiliates or any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Sellers or any of their Subsidiaries, the Business or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and no Seller, any of their Affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives or Purchaser's use of, any such information, including any confidential memoranda distributed on behalf of Sellers relating to the Business or other publications or data room information provided to Purchaser or its representatives, in connection with the sale of the Business and the Transactions.  Purchaser acknowledges that it has conducted to its satisfaction its own independent investigation of the Business and, in making the determination to proceed with the Transactions, Purchaser has relied on the results of its own independent investigation.

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

Section 7.1    Competing Transaction.

(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids, including, in consideration of any sale, transfer, liquidation or disposition of the Business or assets of Sellers or their Subsidiaries, or a plan of reorganization or liquidation with respect to the Business or assets of Sellers and their Subsidiaries (each a "Competing Bid").  From the date hereof (and any prior time) and until the earlier of:  (i) the consummation of the Transactions and (ii) the conclusion of any bid process described in the Bidding Procedures Order, Sellers are permitted to cause their representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) in compliance with the Bidding Procedures Order in connection with any sale or other disposition of the Purchased Assets and the Business.  In addition, Sellers shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets or the Business and perform any and all other acts related thereto which are required under the Bankruptcy Code or other Applicable Law, including supplying information relating to the Business and the assets of Sellers and its Subsidiaries to prospective purchasers.

(b)    Sellers shall not and shall not permit any of their Subsidiaries to furnish information concerning Sellers, the Non-Debtor Subsidiaries, the Business, or the properties or assets of Sellers or their Subsidiaries to any third party, except (i) in the Ordinary Course of Business, (ii) to any Governmental Authority, or (iii) pursuant to a confidentiality agreement entered into between any Seller and such third party.  Sellers shall use commercially reasonable efforts to promptly provide, or identify and make available to Purchaser any non-public information concerning Sellers, the Non-Debtor Subsidiaries, the Purchased Assets or the Business provided to any other Person after the date hereof which was not previously provided to Purchaser.

46

(c)    Following the date of the entry of the Sale Order approving this Agreement and until such time as this Agreement has been terminated in accordance with its express terms, Sellers shall not, nor shall any of their Subsidiaries authorize or permit any Representative of any Seller to, (i) directly or indirectly solicit, initiate or encourage the submission of any offer or proposal concerning any Competing Bid, or (ii) directly or indirectly participate in any discussions or negotiations regarding, or furnish to any Person any information with respect to, or take any other action to facilitate the making of, any proposal or expression of interest that constitutes or is reasonably likely to lead to a Competing Bid.

Section 7.2    Bankruptcy Court Filings.  As promptly as practicable following the date of this Agreement (but not later than the second Business Day thereafter), Sellers shall file with the Bankruptcy Court the Sale Motion seeking entry of the Sale Order and the Bidding Procedures Order.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and the Bidding Procedures Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  In the event the entry of the Sale Order or the Bidding Procedures Order shall be appealed, Sellers and Purchaser shall use their respective reasonable best efforts to defend such appeal.  Sellers shall not amend, supplement, or modify, or cause to be amended, supplemented or modified, the Sale Order and/or the Bidding Procedures Order, in any manner adverse to Purchaser without Purchaser's prior written consent (which consent may be withheld in Purchaser's sole discretion).

## ARTICLE VIII

## COVENANTS

Section 8.1    Access to Information.  Sellers agree that, prior to the Closing Date, Purchaser shall be entitled, through its officers, employees and Representatives, to (a) make such investigation of the properties, businesses and operations of the Business and (b) make such examination of the books and records of the Business, the Non-Debtor Subsidiaries, the Purchased Assets and the Assumed Liabilities as Purchaser reasonably requests and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and Sellers and their Subsidiaries shall cooperate fully therein.  Purchaser and its Representatives shall cooperate with Sellers and their Representatives and shall use their reasonable efforts to minimize any disruption to the Business in connection with such investigation and examination.  Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Sellers or any of their Subsidiaries to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which such Seller or any of its Subsidiaries is bound.  With respect to any material vendor or other strategic partner of Sellers and their Subsidiaries that Purchaser desires to contact prior to Closing, Purchaser shall consult with Sellers and, so long as in Sellers' reasonable judgment such contact would not be materially detrimental to the Business, Sellers and their Subsidiaries shall promptly seek and use commercially reasonable efforts to

47

arrange appropriate meetings and telephone conferences with such parties.  No investigation by Purchaser prior to or after the date of this Agreement shall diminish or obviate any of the representations, warranties, covenants or agreements of Sellers and the Non-Debtor Subsidiaries contained in this Agreement or the Seller Documents.  In order that Purchaser may have full opportunity to make such physical, business, accounting and legal review, examination or investigation as it may reasonably request of the affairs of Sellers and their Subsidiaries, Sellers shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of Sellers and their Subsidiaries to cooperate fully with such representatives in connection with such review and examination.  Sellers shall promptly deliver to Purchaser all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed in any other judicial or administrative proceeding as Purchaser may reasonably request.

Section 8.2    Conduct of the Business Pending the Closing.

(a)    Prior to the Closing, except (1) as set forth on Schedule 8.2(a), (2) as required by Applicable Law or by Order of the Bankruptcy Court, (3) as otherwise expressly contemplated by this Agreement, or (4) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), Sellers shall, and shall cause their Subsidiaries to:

(i)    conduct the Business only in the Ordinary Course of Business (other than Store Closing Liquidations in accordance with this Agreement) and comply with the Cash Flow Budget in all material respects;

(ii)    use their commercially reasonable efforts to (A) preserve the present business operations, organization and goodwill of the Business, and (B) preserve the present relationships with Persons having business dealings with Sellers and their Subsidiaries (including customers and suppliers of the Business);

(iii)    (A) maintain the books, accounts and records of Sellers and their Subsidiaries in the Ordinary Course of Business, (B) continue to operate billing procedures and collect accounts receivable utilizing normal procedures and without discounting or accelerating payment of such accounts, (C) subject to compliance with the Cash Flow Budget, pay accounts payable and comply with all contractual and other obligations applicable to the operation of the Business, and (D) not permit any material change in any pricing, investment, accounting, financial reporting, inventory, credit, allowance or Tax practice or policy of Sellers or the Non-Debtor Subsidiaries that would adversely affect any of the Non-Debtor Subsidiaries;

(iv)    promptly following the date of this Agreement, provide general notice to the public in connection with the Store Closing Liquidations that gift cards and/or gift certificates issued in connection with the operation of the Business will only be honored or redeemed as set forth in Section 8.2(b)(xxi);

(v)    subject to any confidentiality restrictions which apply to Sellers or their Subsidiaries, use commercially reasonable efforts to consult in good faith from time to time with the Representatives of Purchaser to report cash flow results of the Business, material

48

operational developments as they arise, the general status of ongoing operations of the Business and with respect to the Store Closing Liquidations;

(vi)    other than in the Ordinary Course of Business or in connection with any liquidations or going out of business sales, maintain the Purchased Assets and assets of the Non-Debtor Subsidiaries in their current condition, ordinary wear and tear excepted;

(vii)    defend and protect the properties and assets of Sellers and their Subsidiaries from infringement or usurpation;

(viii)    maintain in full force and effect until the Closing insurance upon all of the Purchased Assets and the assets of the Non-Debtor Subsidiaries in such amounts and of such kinds comparable to that in effect on the date of this Agreement; and

(ix)    comply with Applicable Laws, including Environmental Laws, other than with respect to the failure of such compliance as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

(b)    Except (1) as set forth on Schedule 8.2(b), (2) as required by Applicable Law or Order of the Bankruptcy Court, (3) as otherwise contemplated by this Agreement, (4) as permitted or contemplated by the Cash Flow Budget, or (5) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Sellers shall not, and shall not permit their Subsidiaries to:

(i)    other than with respect to payments made in the Ordinary Course of Business on a "payment neutral" basis (i.e., payments to vendors with respect to new extensions of credit from revenue sharing arrangements or otherwise) or as otherwise permitted by the Cash Flow Budget, make any payments to any studio vendors or with respect to any Studio Contract;

(ii)    (A) increase the compensation of any of their respective employees, (B) grant any bonus, benefit or other direct or indirect compensation to any director or employee, (C) increase the coverage or benefits available under (or create any new or otherwise amend) any Employee Benefit Plan or (D) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which any Seller or any of its Subsidiaries is a party or involving a director or executive officer of any Seller or any of its Subsidiaries, except, in each case, as required by Applicable Law from time to time in effect;

(iii)    (A) make, change or rescind any material election relating to Taxes, (B) settle or compromise any material claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes, or (C) except as may be required by Applicable Law or GAAP, make any material change to any of its methods of accounting for Tax purposes from those employed in the preparation of its most recent Tax Returns;

(iv)    subject any of the Purchased Assets or the assets of a Non-Debtor Subsidiary to any Lien, except for Permitted Liens and except for non-exclusive licenses under

49

any Purchased Intellectual Property or any Intellectual Property owned by any Non-Debtor Subsidiary granted in the Ordinary Course of Business;

(v)      acquire any material properties or assets that would be Purchased Assets or assets of a Non-Debtor Subsidiary or, except for the purpose of disposing of obsolete or worthless assets, sell, assign, license, transfer, convey, lease or otherwise dispose of any of the Purchased Assets or assets of a Non-Debtor Subsidiary;

(vi)     cancel or compromise any material debt or claim or waive or release any material right of Seller or any of its Subsidiaries that constitutes a Purchased Asset or an asset of a Non-Debtor Subsidiary;

(vii)    acquire any entity or all or substantially all of the assets of any entity or enter into any commitment for capital expenditures in excess of $25,000 for any individual commitment and $100,000 for all commitments in the aggregate;

(viii)   enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization;

(ix)     enter into any Contract for the sale of any Owned Property or the sublease with respect to any property subject to a Real Property Lease;

(x)      enter into any transaction or enter into, modify or renew any Contract which by reason of its size or otherwise is not in the Ordinary Course of Business;

(xi)     enter into any Contract, understanding or commitment that restrains, restricts, limits or impedes the ability of the Business, or the ability of Purchaser, to compete with or conduct any business or line of business in any geographic area;

(xii)    terminate, amend, restate, supplement or waive any rights under (A) prior to the expiration of Purchaser's right to designate Purchaser Assumed Contracts pursuant to Section 2.5 and subject to Sellers' rights under <u>Section 2.5(b)</u>, any material contracts of Sellers, (B) following the expiration of Purchaser's right to designate Purchaser Assumed Contracts, any Purchaser Assumed Contract, (C) any material contract of any Non-Debtor Subsidiary or (D) any Permit;

(xiii)   amend its certificate or articles of incorporation, bylaws, or other organizational documents or take any other action if any such amendment or action would have an adverse effect on the ability of Seller to consummate the Transactions or otherwise adversely affect the Business or the value, utility or transferability of the Purchased Assets or Subsidiary Shares;

(xiv)    issue, and Sellers shall use their reasonable efforts to prohibit any of their franchisees and franchisees of Non-Debtor Subsidiaries from issuing, to any customers or Employees any gift cards, gift certificates, vouchers, discounts or any other offers that may be redeemable for cash or any inventory offered by the Business following the Closing Date;

(xv)    other than with respect to customary advances for expenses to Employees in the Ordinary Course of Business, make any loan or advance to any Person;

(xvi)    engage in any transaction with respect to the Business with any officer, director or Affiliate of Sellers or their Subsidiaries;

(xvii)    incur or assume any Indebtedness;

(xviii)    enter into or agree to enter into any merger or consolidation with any corporation or other entity, and not engage in any new business or invest in, make a loan, advance or capital contribution to, or otherwise acquire the securities of, any other Person;

(xix)    declare, set aside, make or pay any dividend or other distribution in respect of the capital stock of Sellers or their Subsidiaries or repurchase, redeem or otherwise acquire any outstanding shares of the capital stock or other securities of, or interests in, Sellers or their Subsidiaries;

(xx)    introduce any material change with respect to the operation of the Business, including any material change in the types, nature, composition or quality of products or services, or make any change in product specifications or prices or terms of distributions of such products;

(xxi)    honor or redeem (or in any way use assets of Sellers' bankruptcy estate in connection with the honoring or redemption of) any gift cards that are outstanding on, or issued subsequent to, the date hereof, except to the extent honored and/or redeemed pursuant to a program for which Purchaser provides, in its sole discretion, its prior written consent upon and following the date that is forty-five (45) days (or such longer period as required by applicable state or local regulations) after the date hereof; provided, that for the avoidance of doubt, this Section 8.2(b)(xxi) shall not restrict Sellers' right to honor or redeem gift cards prior to the expiration of such 45-day period (or, to the extent applicable, such longer period as required by applicable state or local regulations);

(xxii)    issue any equity in any of the Non-Debtor Subsidiaries, or securities or rights that by their terms may be exercised or exchanged or converted into equity of any of the Non-Debtor Subsidiaries; or

(xxiii)    agree to do anything prohibited by this Section 8.2.

Section 8.3    Consents.  Sellers shall use (and shall cause each of their Subsidiaries to use) commercially reasonable efforts, and Purchaser shall cooperate with Sellers, to obtain at the earliest practicable date all consents and approvals required to consummate the Transactions, including the consents and approvals referred to in Section 5.4(b); provided, however, that neither Sellers nor Purchaser shall be obligated to (a) pay any consideration therefor to any third party from whom consent or approval is requested, or (b) agree to any restrictions on its ability to operate the Business or the Purchased Assets or Non-Debtor Subsidiaries or hold or exercise ownership over the Purchased Assets, or initiate any litigation or Legal Proceedings to obtain any such consent or approval.

51

Section 8.4     Appropriate Action; Filings.

(a)     Through the Closing Date, Sellers and Purchaser shall cooperate with each other and use (and shall cause their respective Affiliates to use) commercially reasonable efforts: (i) to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable on its part under this Agreement, Applicable Law or otherwise to consummate and make effective the Transactions, (ii) to obtain promptly from any Governmental Authority any Orders or Permits required to be obtained by Sellers or Purchaser or any of their respective Affiliates in connection with the authorization, execution, delivery and performance of this Agreement and the consummation of the Transactions, (iii) to promptly make all necessary filings and thereafter make any other required submissions with respect to this Agreement and prompt consummation of the Transactions required under (A) the HSR Act, (B) any notifications or filings required for the Transactions under other applicable Competition Laws, and (C) any Applicable Law, (iv) to defend any and all lawsuits and other proceedings by or before any Governmental Authority challenging this Agreement or the consummation of the Transactions, (v) to cause to be lifted or rescinded any injunction, decree, ruling, order or other action of any Governmental Authority adversely affecting the ability of any of the Parties to consummate the Transactions, and (vi) to provide prompt notification to the other Party of any actions pursuant to clauses (i) – (v) of this Section 8.4(a); provided, however, that nothing in this Section 8.4 shall be construed as altering the rights or obligations of Sellers under Section 7.1; provided further, subject to Section 8.4(b), that neither Purchaser nor any Seller shall be obligated to pay any consideration or incur any costs to obtain any approvals or consents from third parties, whether or not they may be necessary, proper or advisable to consummate the Transactions.

(b)     As promptly as practicable, but in no event later than five (5) Business Days after the date of entry of the Bidding Procedures Order, the Parties shall (i) each file with the Federal Trade Commission and the Department of Justice any notifications and report forms, together with all required supplemental information, required to be filed under the HSR Act and the regulations promulgated thereunder with respect to the Transactions, and request early termination of the waiting period with respect to the Transactions and (ii) file any notifications or filings required under the Transactions under other applicable Competition Laws.  Sellers and Purchaser shall consult with each other as to the appropriate time of filing such notifications and shall use their reasonable best efforts to make such filings at the agreed upon time, to respond promptly to any requests for additional information made by the Federal Trade Commission, the Department of Justice or any other Governmental Authority, to cooperate with each other in connection with resolving any investigation or other inquiry concerning the Transactions commenced by the Federal Trade Commission, the Department of Justice or any other Governmental Authority and to cause the waiting periods under the HSR Act to terminate or expire at the earliest possible date after the date of filing.  Sellers and Purchaser shall use their reasonable best efforts to (i) eliminate every impediment under any Competition Law, including taking all actions necessary to obtain any necessary approval under applicable Competition Laws and resisting in good faith any assertion that the Transactions contemplated hereby constitute a violation of the Competition Laws, and (ii) otherwise resolve all such objections, if any, as may be asserted by any Governmental Authority so as to enable the Closing to occur as soon as reasonably possible, all to the end of expediting the consummation of the Transactions contemplated hereby.  In connection with seeking the foregoing approvals, none of Purchaser or

52

Sellers or their respective Affiliates shall be required to, and Sellers (other than Parent) may not, without the prior written consent of Parent, become subject to, consent to, or offer or agree to, or otherwise take any action with respect to, any requirement, condition, limitation, understanding, agreement or order to (i) sell, license, assign, transfer, divest, hold separate or otherwise dispose of any assets, business or portion of business of Purchaser, Sellers, Non-Debtor Subsidiaries, or any of their respective Affiliates in any manner, (ii) conduct, restrict, operate, invest or otherwise change the assets, business or portion of business of Purchaser, Sellers, Non-Debtor Subsidiaries, or any of their respective Affiliates in any manner, or (iii) impose any restriction, requirement or limitation on the operation of the business or portion of the business of Purchaser, Sellers, Non-Debtor Subsidiaries or any of their respective Affiliates in any manner.

(c)    Through the Closing Date, Sellers shall use (and shall cause their Subsidiaries to use) commercially reasonable efforts (subject to receipt of the Sale Order) to promptly obtain all necessary consents and approvals for the assignment and assumption of all of the Purchaser Assumed Contracts.

Section 8.5    Confidentiality.  Purchaser acknowledges that Confidential Information (as defined in the Confidentiality Agreement) has been, and in the future will be, provided to it in connection with this Agreement, including under Section 8.1, and is subject to the terms of the confidentiality agreement between Parent and Purchaser, dated as of the date hereof (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference. Purchaser acknowledges and understands that this Agreement may be made available by Sellers to prospective bidders and that such disclosure shall not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.  Effective upon, and only upon, the Closing, the Confidentiality Agreement shall terminate.  Sellers acknowledge that from and after the Closing, all non-public information relating to the Business, including, but not limited to the Purchased Assets and the Assumed Liabilities, will be valuable and proprietary to Purchaser and its Affiliates.  Sellers agree that, from and after the Closing, no Seller will and Sellers will cause their Subsidiaries not to disclose to any Person any non-public information relating to Purchaser and its Affiliates, or the Business, including but not limited to the Purchased Assets, the Non-Debtor Subsidiaries and the Assumed Liabilities, except as required by Law or as otherwise becomes available in the public domain other than through any action by any Seller in violation of its obligations under this Section 8.5.  The provisions of this Section 8.5 shall survive the Closing.

Section 8.6    Preservation of Records; Cooperation.  Sellers and Purchaser shall (and shall cause their Affiliates to) preserve and keep in their possession all records held by them on and after the date hereof relating to the Purchased Assets for a period of three (3) years or such longer period as may be required by Applicable Law; (provided, however, that in no event shall Sellers be required to preserve such records after the Bankruptcy Cases are closed) and shall make such records and personnel available to the other Party as may reasonably be required by such Party, including in connection with any insurance claims or Legal Proceedings involving the Purchased Assets, or any governmental investigations of Sellers or Purchaser or any of their respective Affiliates related to the Purchased Assets or in order to enable Sellers or Purchaser or any of their respective Affiliates to comply with their respective obligations hereunder and each other agreement, document or instrument contemplated hereby or thereby or otherwise; provided, however, that in no event shall either Party be obligated to provide any information the

disclosure of which would jeopardize any privilege available to such Party or any of its Affiliates relating to such information or which would cause such Party or any of its Affiliates to breach a confidentiality obligation to which it is bound.  Purchaser further acknowledges that Sellers shall be entitled to copy any such records, at Sellers' sole cost and expense, and to retain copies of such records.  After the expiration of any applicable retention period, before Purchaser shall dispose of any of such records, at least ninety (90) days' prior written notice to such effect shall be given by Purchaser to Sellers or their successors (or a Person designated by Sellers) and Sellers or their successors (or a Person designated by Sellers) shall have the opportunity (but not the obligation), at their sole cost and expense, to remove and retain all or any part of such records as they may in their sole discretion select.  In the event Sellers wish to destroy any records after the Bankruptcy Cases are closed, before Sellers shall dispose of any of such records, at least ninety (90) days' prior written notice to such effect shall be given by Sellers to Purchaser or its successors (or a Person designated by Purchaser) and Purchaser or its successors (or a Person designated by Purchaser) shall have the opportunity (but not the obligation), at its sole cost and expense, to remove and retain all or any part of such records as it may in its sole discretion select.

Section 8.7    Publicity.  Prior to the Closing and without limiting or restricting any Party from making any filing with the Bankruptcy Court with respect to this Agreement or the Transactions, no Party shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld or delayed, unless, in the reasonable judgment of Purchaser or Sellers, disclosure is otherwise required by Applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of the Securities Exchange Commission or any stock exchange on which Purchaser or such Seller lists securities, provided that the Party intending to make such release shall use its best efforts consistent with such Applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.  After the Closing, the Parties may issue public announcements regarding the Transactions so long as such announcements, in the case of announcements made by Sellers, do not disclose the specific terms or conditions of this Agreement or any Transaction Document except where such terms and conditions have already been disclosed as required by Law, applicable stock exchange regulation or in filings that any Seller is required to make in the Bankruptcy Court or office of the United States Trustee; provided, however, that the issuing party shall use its best efforts to consult with the other party with respect to the text thereof.

Section 8.8    Lease Extensions; Store Liquidations.

(a)    Prior to, on or promptly following the date hereof, Sellers shall seek by written request from the counterparty to each unexpired real property lease to which any Seller is a party (other than the Initial Liquidating Stores) (the "Leased Properties") (i) an extension of not less than ninety (90) days of the April 21, 2011 deadline for Sellers' assumption or rejection of such unexpired real property leases under section 365 of the Bankruptcy Code and (ii) that such counterparty respond to such request no later than February 27, 2011.  On or prior to March 3, 2011, Sellers shall provide Purchaser with a list of each Leased Property for which extension of such deadline of at least sixty (60) days (a "Lease Extension") has not been received.  In the event that any counterparty to a Leased Property has not affirmatively agreed in writing, by

54

February 28, 2011, to a Lease Extension, Sellers shall, unless otherwise directed by Purchaser, promptly, and in no event later than March 7, 2011, commence and diligently pursue liquidation of such Leased Property (the "Liquidation Condition"); provided, however, that the Protected Stores shall not be subject to the Liquidation Condition.  In connection with the liquidation through the conduct of "store closing" or similar going out of business sales or liquidations of any Stores (the "Store Closing Liquidations") occurring prior to the Closing Date, Sellers shall consult with Purchaser as to how such liquidations shall be conducted, including the selection and terms of engagement of the liquidators, if any, to be used and the aggregate estimated expenses to be incurred in connection with such liquidations.

(b)      With respect to any Leased Property (including any Protected Store or Distribution Center) for which Purchaser has not previously designated the real property lease as a Purchaser Assumed Contract (the "Closing Date Leased Properties"), Purchaser shall either (i) designate as a Purchaser Assumed Contract, on or before April 1, 2011, the unexpired real property lease pursuant to which such Closing Date Leased Property is leased, or (ii) in lieu of assuming the unexpired real property lease pursuant to which such Closing Date Leased Property is leased and purchasing the Designated Liquidation Merchandise and Designated FF&E at such Closing Date Leased Property, elect (as so elected, the "Agency Alternative") to have Seller retain, and Seller shall retain, as an Excluded Asset, such unexpired real property lease and such Designated Liquidation Merchandise and Designated FF&E and engage Purchaser as its exclusive agent for the purpose of conducting Store Closing Liquidations during the Liquidation Period of the Designated Liquidation Merchandise and Designated FF&E at such Closing Date Leased Property, together with any additional inventory in transit to such Closing Date Leased Property as of the Closing Date (the "Agency Liquidations").  If Purchaser elects the Agency Alternative with respect to any Closing Date Leased Property, then (A) in the event that Sellers have obtained Lease Extensions for all of the Closing Date Leased Properties, Sellers shall carry out Agency Liquidations at the Closing Date Leased Properties through the end of the Liquidation Period and pursuant to the terms of the Agency and License Agreement and (B) in the event that Sellers shall have obtained Lease Extensions for less than all of the Closing Date Leased Properties, then in order to carry out Agency Liquidations at the Closing Date Leased Properties pursuant to the terms of the Agency and License Agreement during the Liquidation Period, Sellers shall (unless instructed by Purchaser in writing to carry out such Agency Liquidations in the Bankruptcy Cases pursuant to clause (A), even though Sellers shall have obtained Lease Extensions for less than all of the Closing Date Leased Properties) either (x) have sought and obtained prior to the Closing Date appropriate relief under Applicable Law to extend the date by which Sellers must reject such Closing Date Leased Property for a period sufficient to permit the orderly completion of the Agency Liquidation at all Closing Date Leased Properties after the Closing pursuant to the Agency and License Agreement (but in any event for a period not less than the Liquidation Period) or (y) if such relief has not been obtained prior to the Closing Date, then, at Purchaser's option, pursuant hereto and to the Sale Order, convert the Bankruptcy Cases to cases under Chapter 7 of the Bankruptcy Code at the Closing to permit the orderly completion of the Agency Liquidations at all Closing Date Leased Properties after the Closing pursuant to the Agency and License Agreement to be carried out under the provisions of Chapter 7 and in accordance with the Agency and License Agreement (but in any event for a period not less than the Liquidation Period).  The terms, conditions and procedures applicable to the conduct of the Store Closing Liquidations in such Closing Date Leased Properties as to which Purchaser elects the Agency Alternative are set forth in the Agency and License

55

Agreement.  Under the Agency and License Agreement, Purchaser shall be entitled to receive the Proceeds (as defined in the Agency and License Agreement) from the Agency Liquidations and shall be responsible for the payment of the Expenses (as defined in the Agency and License Agreement).

(c)    In the event that the aggregate number of Leased Properties for which a Lease Extension has been received plus the actual number of Protected Stores is not greater than 1,500, Sellers shall at all times thereafter, in connection with the Store Closing Liquidations described in <u>Section 8.8(a)</u>, use their commercially reasonable efforts to make appropriate arrangements for the liquidation through such Store Closing Liquidations of inventory at the Distribution Centers in an amount not less than an average of 10,000 units per Store Closing Liquidation.

Section 8.9    <u>Transition Services Agreement</u>.  If requested by Purchaser, Sellers shall negotiate in good faith to execute an agreement at Closing pursuant to which Sellers will continue to provide to Purchaser, on terms to be mutually agreed upon, certain general and administrative services then being provided by Sellers with respect to the Business.

Section 8.10    <u>Banks</u>.  Not less than two (2) Business Days prior to the Closing, Sellers shall provide to Purchaser a complete and correct list of the names and locations of all banks in which any Non-Debtor Subsidiaries have accounts or safe deposit boxes and the names of all persons authorized to draw thereon or to have access thereto.

Section 8.11    <u>Supplements to Schedules</u>.  Sellers may (i) by written notice to Purchaser from time to time prior to the date that is ten (10) days following entry of the Bidding Procedures Order, supplement or amend the Schedules provided pursuant to <u>Sections 5.4</u>, <u>5.8</u>, <u>5.9</u>, <u>5.10</u> and <u>5.19</u> in connection with any disclosure related to the Non-Debtor Subsidiaries, and (ii) in response to any changes or updates to <u>Schedule 1.1(e)</u> by Purchaser, supplement or amend the Schedules provided pursuant to <u>Sections 5.4(b)</u>, <u>5.11(b)</u> and <u>5.12(a)</u>.  Such supplements or amendments shall be effective to cure and correct, for all purposes, any breach of any representation or warranty which would have existed if Sellers had not made such supplements or amendments.  All references to Schedules that are supplemented or amended pursuant to this <u>Section 8.11</u> shall be deemed to be a reference to such Schedule as supplemented or amended.

Section 8.12    <u>Further Assurances</u>.  Each Seller and Purchaser shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the Transactions and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Transactions.

Section 8.13    <u>Payment of Sales Tax Amounts</u>.  During the period between the date of this Agreement and the Closing Date, Sellers will continue to pay when due and in accordance with past practices all sales and use taxes generated in the Ordinary Course of Business.  On the day immediately prior to the Closing Date, Sellers shall pay to the appropriate Taxing Authorities all accrued unpaid sales and use taxes which were generated in the Ordinary Course of Business and remain unpaid at such date (the "<u>Closing Sales Tax Payment</u>").

Section 8.14    <u>Use of Name</u>.

56

Sellers hereby agree that upon and following the Closing, Sellers shall not use the name "Blockbuster" or any of the items listed in the schedule of Trademarks and Trademark Applications set forth in Schedule 5.11(a) or similar names or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing or comprising the foregoing, including any name or mark confusingly similar thereto (collectively, the "Purchased Business Name Trademarks"), other than in the case of disclosures by Sellers of their former ownership of the Business.   In furtherance thereof, as promptly as practicable but in no event later than one hundred twenty (120) days following the Closing Date, each Seller shall remove any Purchased Business Name Trademarks from its legal name by appropriate legal proceedings in the jurisdiction of such Seller's organization.

## ARTICLE IX

## EMPLOYEE AND EMPLOYEE BENEFITS MATTERS; TAX MATTERS

Section 9.1    Employment.

(a)    Transferred Employees.  At least five (5) days prior to the Closing, Purchaser shall deliver, in writing individually or generally, an offer of employment commencing on the Closing Date and contingent upon the Closing, on an at-will basis (except to the extent otherwise expressly agreed in a writing signed by Purchaser and such Employee) and on such other terms and conditions as Purchaser may determine, to substantially all of the Employees who remain employed by Sellers and are providing services with respect to the Purchased Assets immediately prior to the Closing.  Such individuals who accept such offer are hereinafter referred to as the "Transferred Employees."  For the avoidance of doubt, Purchaser shall not be required to offer employment to any employees providing services with respect to Closing Date Leased Properties as to which Purchaser elects the Agency Alternative and such employees shall not be Transferred Employees.

(b)    Standard Procedure.  Pursuant to the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 20, (i) Purchaser and Seller shall report on a predecessor/successor basis as set forth therein, (ii) Seller will not be relieved from filing a Form W-2 with respect to any Transferred Employees, and (iii) Purchaser will undertake to file (or cause to be filed) a Form W-2 for each such Transferred Employee with respect to the portion of the year during which such Employees are employed by Purchaser that includes the Closing Date, excluding the portion of such year that such Employee was employed by Seller or its Subsidiaries.

Section 9.2    Employee Benefits.

(a)    Accrued Vacation.  Purchaser shall be responsible for all Liabilities with respect to Transferred Employees attributable to their accrued and unused vacation, sick days and personal days through the Closing Date.

(b)    Accrued Wages and Bonus.  Purchaser shall assume and pay all accrued and unpaid wages of Transferred Employees through the Closing Date.

(c)    Severance.  Sellers shall be and remain solely responsible for all severance Liabilities and obligations arising under any plan, program, policy or agreement of or with Sellers or their Affiliates (other than any Non-Debtor Subsidiaries).

(d)    COBRA.  Purchaser shall provide continuation coverage under its group medical plan pursuant to ERISA or Section 4980B of the Code to all Employees as of the Closing Date and their respective qualified beneficiaries as of the Closing Date, all former Employees and their qualified beneficiaries who are entitled to such coverage as of the Closing Date under the Employee Benefit Plans, and all other "affected employees" as defined for purposes of ERISA and Section 4980B of the Code and their qualified beneficiaries.

(e)    WARN Act.  Within five (5) Business Days after the date hereof, Sellers shall provide notice to such Employees of Sellers that they determine, in their sole discretion, could be entitled to such notice in accordance with the WARN Act or similar state Laws.

(f)    Nothing contained in this Section 9.2 or elsewhere in this Agreement shall be construed to prevent the termination of employment of any Transferred Employee or any change in the employee benefits available to any Transferred Employee.

Section 9.3    Tax Matters.

(a)    Transfer Taxes.  All sales, transfer, filing, recordation, registration, documentary, stamp, value-added, goods and services and similar Taxes and fees arising from or associated with the Transactions (collectively, "Transfer Taxes"), whether levied on Purchaser or Sellers, shall be paid by Sellers.  Sellers shall prepare at Sellers' expense, with Purchaser's cooperation, any necessary Tax Returns and other documentation with respect to any Transfer Taxes, and the party required by law to file such Tax Return shall timely do so.

(b)    From the date of this Agreement until the Closing, and taking into account Section 8.2(b), each Seller, on behalf of itself and its Subsidiaries, shall prepare and file (or cause to be prepared and filed) in accordance with past practice and in a timely manner all Tax Returns relating to such Seller, each of its Subsidiaries, and the Purchased Assets, that are required to be filed on or before the Closing Date (after giving effect to any applicable extensions), and shall pay all Taxes required to be paid by or on behalf of such Seller, its Subsidiaries, and the Purchased Assets on or before the Closing Date; provided, however, that Sellers shall deliver to Purchaser (i) a copy of any material Tax Return for a Straddle Period or a Pre-Closing Tax Period and shall consider in good faith any comments submitted by Purchaser at least ten (10) days prior to the due date for filing such Tax Return (after giving effect to any applicable extensions), and (ii) written notice of any material Tax payment obligation for which Sellers are liable hereunder at least ten (10) Business Days prior to the date on which such payment is required to be made.  After the Closing, Purchaser shall prepare and file (or cause to be prepared and filed) all Tax Returns required to be filed with respect to the Purchased Assets.  In connection with the foregoing, Sellers shall pay Purchaser, prior to the payment due date, any amounts attributable to any Tax obligation which is Sellers' responsibility under Section 2.4(e); provided, however, that Purchaser shall deliver to Sellers (i) a copy of any material Tax Return and shall consider in good faith any comments submitted by Sellers at least ten (10) days prior to the due date for filing such Tax Return (after giving effect to any applicable extensions), and

(ii) written notice of any material Tax payment obligation at least ten (10) Business Days prior to the date on which such payment is required to be made.  Whenever it is necessary to determine liability for Taxes in respect of any Seller, any of its Subsidiaries or the Purchased Assets for a Straddle Period, the portion of such Tax which relates to the portion of the Straddle Period ending on the Closing Date shall (i) in the case of any Taxes, other than Taxes based upon or related to income or receipts, be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days in the portion of the Straddle Period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period; and (ii) in the case of any Tax based upon or related to income or receipts, be deemed equal to the amount which would be payable on the basis of an interim closing of the books as of the end of the Closing Date.  The dispute resolution provisions of Section 3.5 should apply in the case of any disagreement with respect to any Tax Returns governed under this Section 9.3(b).

(c)    Sellers, at their expense, shall have the right, but not the obligation, to control the conduct of the defense of any audit, claim, proceeding, investigation, or other controversy relating solely to Taxes ("Tax Claim") for which Sellers are liable pursuant to Section 2.4(e); provided, however, that Sellers will not have the right to settle any such Tax Claim if the resolution or determination of such Tax Claim is reasonably likely to adversely affect Purchaser without first obtaining Purchaser's written consent, such consent to not be unreasonably withheld, conditioned or delayed.  Purchaser shall control the conduct of all other Tax Claims; provided, however, that if such Tax Claim, if successful, could reasonably be expected to result in any Tax for which Sellers may be responsible for under this Agreement, Purchaser shall (i) promptly notify Sellers in writing of such claim, (ii) notify Sellers of any significant developments regarding such claim, (iii) consider in good faith recommendations of Sellers in connection with such claim, and (iv) not settle any such claim without first obtaining Sellers' written consent, such consent to not be unreasonably withheld, conditioned or delayed.

(d)    Sellers shall cause any Tax allocation, Tax sharing, or Tax indemnity agreement or arrangement (other than this Agreement) between any Non-Debtor Subsidiary and any Debtor Subsidiary, or between two Non-Debtor Subsidiaries, to be terminated as of the Closing Date (but only as between such subsidiaries, and not any third party) and, after the Closing Date, such Non-Debtor Subsidiary shall no longer be bound thereby or have rights or liabilities thereunder.

(e)    Sellers acknowledge and agree that no restructuring activities shall be undertaken by any Seller or any of its Affiliates in connection with the Bankruptcy Cases (or otherwise) that may produce any material adverse Tax consequences for Purchaser and its Affiliates.  Upon Purchaser's request, the Parties shall use their reasonable best efforts to restructure the transactions contemplated by this Agreement in a Tax-efficient manner. Purchaser may, in its sole discretion and expense, make (or cause to be made) an election under Section 338(g) of the Code (and any corresponding or similar provision of state or local Law) with respect to the acquisition of any Non-Debtor Subsidiary that is treated as an association taxable as a corporation for U.S. federal income Tax purposes, provided, however, that such election shall not materially adversely effect any of Sellers.

59

(f)      Sellers, on the one hand, and Purchaser will provide each other with such cooperation and information as either of them reasonably may request of the other in filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes, or participating in or conducting any audit or other proceeding in respect of Taxes.  Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings and other determinations by Taxing Authorities.  Any information obtained under this <u>Section 9.3</u> shall be kept confidential except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting any audit or other proceeding.

(g)      Any reimbursement payment to be made pursuant to this Agreement shall be treated by the Parties as an adjustment to the Cash Purchase Price for all Tax purposes.

## ARTICLE X

## CONDITIONS TO CLOSING

Section 10.1    <u>Conditions Precedent to Obligations of Purchaser</u>.  The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser, in its sole discretion, in whole or in part to the extent permitted by Applicable Law):

(a)      the representations and warranties of Sellers set forth in this Agreement shall be true and correct at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date); <u>provided</u>, <u>however</u>, that in the event of a breach of a representation or warranty other than a representation or warranty qualified by materiality or Seller Material Adverse Effect, the condition set forth in this <u>Section 10.1(a)</u> shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together results in a Seller Material Adverse Effect, and Purchaser shall have received a certificate signed by an authorized officer of each Seller (in form and substance reasonably satisfactory to Purchaser), dated the Closing Date, to such effect;

(b)      Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect;

(c)      Sellers shall have executed, delivered and/or filed or authorized Purchaser to file such termination statements, lien releases, discharges, financing change statements or other documents, notices or other instruments as Purchaser may reasonably deem necessary to release Liens (other than Permitted Liens) on the Purchased Assets, to the extent Sellers are authorized to do so absent the consent of the holder of the Lien;

(d)     Sellers shall have completed the Store liquidations and closures of the Initial Liquidating Stores and the Stores set forth in Schedule 10.1(d), as such schedule shall be updated from time to time to reflect the Stores to be liquidated pursuant to Section 8.8(a);

(e)     Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2; and

(f)     all material consents (or in lieu thereof waivers) to the performance by Sellers of their obligations under this Agreement or to the consummation of the Transactions contemplated hereby as are required under any Contract to which any Seller or Non-Debtor Subsidiary is a party or by which any of their respective assets and properties are bound (i) shall have been obtained, (ii) shall be in form and substance reasonably satisfactory to Purchaser, (iii) shall not be subject to the satisfaction of any condition that has not been satisfied or waived and (iv) shall be in full force and effect, except where the failure to obtain any such consent (or in lieu thereof waiver) could not reasonably be expected, individually or in the aggregate with other such failures, to result in a Seller Material Adverse Effect.

Section 10.2    Conditions Precedent to Obligations of Sellers.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers, in their sole discretion, in whole or in part to the extent permitted by Applicable Law):

(a)     the representations and warranties of Purchaser set forth in this Agreement shall be true and correct at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date); provided, however, that in the event of a breach of a representation or warranty other than a representation or warranty qualified by materiality or Purchaser Material Adverse Effect, the condition set forth in this Section 10.2(a) shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together results in a Purchaser Material Adverse Effect, and Sellers shall have received a certificate signed by an authorized officer of Purchaser (in form and substance reasonably satisfactory to Sellers), dated the Closing Date, to such effect;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(c)     Sellers shall have obtained authorization to use cash collateral to fund (i) all of the wind-down costs of the estates in the Bankruptcy Cases in accordance with the Estimated Wind Down Expenses and (ii) the costs and sale expenses related to Store Closing Liquidations occurring following the Closing in accordance with the Approved Sale Expenses;

(d)     Purchaser shall have paid in full or otherwise satisfied all Cure Costs with respect to the Purchaser Assumed Contracts set forth on Schedule 1.1(e) prior to or on the Closing Date; and

      (e)     Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in <u>Section 4.3</u>.

      Section 10.3   <u>Conditions Precedent to Obligations of Purchaser and Sellers</u>.  The respective obligations of Purchaser and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Sellers in whole or in part to the extent permitted by Applicable Law):

      (a)     there shall not be in effect any Law or Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

      (b)     the Bankruptcy Court shall have entered the Bidding Procedures Order and such Order shall be in full force and effect and shall not have been reversed, modified, amended or stayed;

      (c)     the Bankruptcy Court shall have entered the Sale Order and such Order shall be in full force and effect and shall not have been reversed, modified, amended or stayed; and

      (d)     the waiting period applicable to the transactions contemplated by this Agreement under the HSR Act shall have expired or early termination shall have been granted and the Parties shall have obtained any other consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Authority required to be obtained or made in connection with the execution and delivery of this Agreement or the performance of the Transactions.

      Section 10.4   <u>Frustration of Closing Conditions</u>.  Neither Sellers nor Purchaser may rely on the failure of any condition set forth in <u>Section 10.1</u>, <u>Section 10.2</u> or <u>Section 10.3</u>, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

**ARTICLE XI**

**LIMITATIONS**

      Section 11.1   <u>Purchaser's Review</u>.

      (a)     <u>No Reliance</u>.  Purchaser has had the opportunity to ask questions, and has received sufficient answers, in connection with its decision to enter into this Agreement, and to consummate the Transactions.  In connection with the execution and delivery of this Agreement and the consummation of the Transactions, Purchaser has not relied upon, and Purchaser expressly waives and releases Sellers from any Liability for any claims relating to or arising from, any representation, warranty, statement, advice, document, projection, or other information of any type provided by Sellers or their Affiliates or any of their respective Representatives, except for those representations and warranties expressly set forth in <u>Article V</u>.  In deciding to enter into this Agreement, and to consummate the Transactions, Purchaser has relied solely upon

its own knowledge, investigation, judgment and analysis (and that of its Representatives) and not on any disclosure or representation made by, or any duty to disclose on the part of, Sellers or their Affiliates or any of their respective Representatives, other than the express representations and warranties of Seller set forth in Article V.

(b)    Limited Duties.  Any and all duties and obligations which any Party may have to any other Party with respect to or in connection with the Purchased Assets, this Agreement or the Transactions are limited to those specifically set forth in this Agreement. Neither the duties nor obligations of any Party, nor the rights of any Party, shall be expanded beyond the terms of this Agreement on the basis of any legal or equitable principle or on any other basis whatsoever.

Section 11.2    No Consequential or Punitive Damages.  NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

# ARTICLE XII

## MISCELLANEOUS

Section 12.1    Survival of Representations, Warranties, Covenants and Agreements.  The representations and warranties of any Party made herein, in any Transaction Document or in any other instrument delivered pursuant to this Agreement shall terminate at the Closing, or upon termination of this Agreement pursuant to Section 4.4, and, following the Closing or the termination of this Agreement, as the case may be, there shall be no Liability in respect thereof on the part of any Party or any of its Representatives.  Except with respect to covenants or agreements which are to be performed on or prior to the Closing, all covenants and agreements contained in this Agreement shall survive the Closing in accordance with their respective terms; provided, that any covenant or agreement contained herein whose survival is not limited by its terms shall survive until fully performed in accordance with its terms.

Section 12.2    Remedies.

(a)    The Parties acknowledge and agree that the following remedies shall be available upon the following occurrences:

(i)    the sole remedy available to Purchaser in the event of Sellers' breach of this Agreement shall be to terminate this Agreement pursuant to and to the extent permitted by Section 4.4 and, to the extent provided in Section 4.5(b), to receive the Reimbursable Expenses and, to the extent provided in Section 3.2(b), the Deposit; and

63

(ii)    the sole remedy available to Sellers in the event of Purchaser's breach of this Agreement shall be to terminate this Agreement pursuant to and to the extent permitted by (A) Section 4.4(b) in the event that Closing does not occur on or before the Outside Date solely as a result of Purchaser's material breach of its obligations under this Agreement (including payment of the Closing Date Payment pursuant to Section 3.3) or (B) Section 4.4(i), and in connection therewith to receive the Deposit, to the extent provided in Section 3.2(b), as liquidated damages.

(b)    The Parties acknowledge and agree that no Party shall have the right to seek injunctive or other similar relief to prevent or remedy any breach or purported breach hereof, except to enforce the payment of the Reimbursable Expenses as provided in Section 12.14 and the retention or delivery of the Deposit as provided in Section 3.2(b) and in the Escrow Agreement.

Section 12.3    Expenses.  Except as otherwise set forth in this Agreement, including with respect to Reimbursable Expenses, each Party shall bear its own expenses (including attorneys' fees) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated hereby and the consummation of the Transactions contemplated hereby and thereby; provided, however, Purchaser shall bear sole responsibility for any governmental charges relating to HSR Act filing fees by Purchaser and its Affiliates and any UCC-3 filing fees, FAA, ICC, DOT, real estate, title recording or filing fees and other amounts payable in respect of transfer filings in connection with the transactions contemplated by this Agreement, which fees, expenses and other amounts shall constitute Reimbursable Expenses and shall be reimbursed to Purchaser as provided in Section 3.3(b)(v) upon Closing or otherwise pursuant to Section 4.5(b).

Section 12.4    Non-Recourse.  The Parties acknowledge and agree that no past, present or future director, officer, employee, incorporator, member, partner, stockholder, agent, attorney, Representative or Affiliate of the Parties to this Agreement, in such capacity, shall have any liability for any obligations or liabilities of Purchaser or Sellers, as applicable, under this Agreement or for any claim based on, in respect of, or by reason of, the Transactions.

Section 12.5    Submission to Jurisdiction.

(a)    Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes among the Parties which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all Actions related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and shall receive notices at such locations as indicated in Section 12.11; provided, however, that if the Bankruptcy Cases have been fully and finally dismissed and the Bankruptcy Court declines jurisdiction, the Parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County.

(b)    The Parties hereby unconditionally and irrevocably waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any dispute arising out of or relating to this Agreement or any of the Transactions brought in any court specified in subsection (a) above, or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)    Each of the Parties hereby consents to process being served by any Party in any suit, Action or proceeding by the mailing of a copy thereof in accordance with the provisions of Section 12.11; provided, however, that such service shall not be effective until the actual receipt thereof by the Party being served.

Section 12.6    Waiver of Jury Trial.  THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.6.

Section 12.7    Authorization of Parent as Representative of Sellers.

(a)    By entering into and executing this Agreement, Sellers irrevocably make, constitute and appoint Parent as their agent, effective as of the date hereof, and authorize and empower Parent to fulfill the role of Sellers' representative hereunder, and each Seller appoints Parent as such Person's true and lawful attorney in fact and agent, for such Person and in such Person's name, place and stead for all purposes necessary or desirable in order for Parent to take all actions contemplated by this Agreement, with the ability to execute and deliver all instruments, certificates and other documents of every kind incident to the foregoing to all intents and purposes and with the same effect as such Seller could do personally, including to give and receive notices and communications; to object to such deliveries, to agree to, negotiate, enter into settlements and compromises of, and comply with orders of courts with respect to such claims; and to take all actions necessary or appropriate in the judgment of Parent for the accomplishment of the foregoing.  The dissolution, liquidation, insolvency or bankruptcy of any Seller shall not terminate the authority and agency of Parent as each Seller's representative pursuant to this Section 12.7.  The power of attorney granted in this Section 12.7 is coupled with an interest and is irrevocable.

(b)    Purchaser shall be entitled to rely exclusively upon any communication given or other action taken by Parent pursuant to this Agreement, and shall not be liable for any

action taken or not taken in good faith reliance on a communication or other instruction from Parent.

Section 12.8   Time of Essence.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Section 12.9   Entire Agreement; Amendments and Waivers.  This Agreement (including the Schedules and Exhibits hereto) and the other Transaction Documents represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the Parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 12.10  Governing Law.  THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, AND ANY CLAIM OR CONTROVERSY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN OR IN CONNECTION WITH THIS AGREEMENT OR AS AN INDUCEMENT TO ENTER INTO THIS AGREEMENT), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED, AND DETERMINED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISION THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION) AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

Section 12.11  Notices.  All notices and other communications under this Agreement shall be in writing and shall be deemed duly given (i) when delivered personally or by prepaid overnight courier, with a record of receipt, (ii) the fourth day after mailing if mailed by certified mail, return receipt requested, or (iii) the day of transmission, if sent by facsimile or telecopy during regular business hours or the Business Day after transmission, if sent after regular business hours (with a copy promptly sent by prepaid overnight courier with record of receipt or by certified mail, return receipt requested), to the Parties at the following addresses or facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Parties pursuant to this Section 12.11):

If to Sellers:

        Blockbuster Inc.
        1201 Elm Street
        Dallas, Texas 75270
        Phone:  (214) 854-4081
        Fax:  (214) 854-4321
        Attention:  General Counsel

With a copy to:

        Weil, Gotshal & Manges LLP
        200 Crescent Court, Suite 300
        Dallas, Texas 75201
        Phone:  214-746-8178
        Fax:  214-746-7777
        Attention:  D. Gilbert Friedlander
                 Martin A. Sosland

If to Purchaser:

        Cobalt Video Holdco LLC
        c/o Milbank, Tweed, Hadley & McCloy LLP
        One Chase Manhattan Plaza
        New York, New York 10005
        Facsimile: (212) 530-5219
        Attention:  Thomas C. Janson, Esq.
                 Mark Shinderman, Esq.

      Section 12.12  <u>Severability</u>.  If any term or provision of this Agreement is invalid, illegal or incapable of being enforced by Law or public policy, all other terms and provisions hereof shall nevertheless remain in full force and effect so long as the legal substance of the Transactions is not affected in any manner materially adverse to any Party.  Upon such determination that any term or provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

      Section 12.13  <u>No Right of Set-Off</u>.  Purchaser for itself and for its Affiliates, successors and assigns hereby unconditionally and irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Purchaser or any of its Affiliates, successors and assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.  Each of Sellers, for itself and for its Affiliates, successors and assigns hereby unconditionally and irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Sellers or any of their Affiliates, successors and assigns has or may have with respect to the payment of the Reimbursable Expenses or any other payments to be

made by Sellers pursuant to this Agreement or any other document or instrument delivered by Sellers in connection herewith.

Section 12.14  Expense Reimbursement. Subject to entry of the Bidding Procedures Order, Purchaser shall be entitled to receive the Reimbursable Expenses as follows:  (i) in the event that the Closing occurs, as a reduction in the amount of cash payable pursuant to the Closing Date Payment, in accordance with Section 3.3(b)(v) or (ii) in the event that this Agreement is properly terminated pursuant to Section 4.4 (other than Sections 4.4(e), 4.4(i), 4.4(l) or 4.4(m)), from Sellers, as an Administrative Priority Expense (as defined in the Bidding Procedures Order) and in accordance with Section 4.5(b).

Section 12.15  Binding Effect; Assignment.  This Agreement shall be binding solely upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person not a Party to this Agreement except to the extent provided in Section 12.4.  No assignment of this Agreement or of any rights or obligations hereunder may be made by any Party (by operation of law or otherwise) without the prior written consent of the other Party and any attempted assignment without the required consents shall be void; provided, however, that (i) prior to the Closing, Purchaser may assign this Agreement and any or all rights or obligations hereunder (including Purchaser's right to purchase the Purchased Assets and assume the Assumed Liabilities) to any Affiliate of Purchaser and (ii) after the Closing, Purchaser (or its permitted assignee) shall have the right to assign its rights and/or delegate its obligations hereunder (A) to any Affiliates, (B) to any financing sources for collateral purposes or (C) to any subsequent purchaser of all or any portion of the stock or assets of Purchaser or the Business. Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

Section 12.16  Counterparts.  This Agreement may be executed and delivered (including by electronic transmission) in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[The Remainder of This Page Is Intentionally Left Blank.]

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its respective officers thereunto duly authorized, as applicable, all as of the date first above written.

BLOCKBUSTER INC.

By: _____
    Name: Rod McDonald
    Title: SVP & General Counsel


BLOCKBUSTER PROCUREMENT LP,


By: Blockbuster Distribution, Inc.,
    its General Partner

    By: _____
        Name: Rod McDonald
        Title: SVP & General Counsel


BLOCKBUSTER CANADA INC.
BLOCKBUSTER DIGITAL TECHNOLOGIES INC.
BLOCKBUSTER DISTRIBUTION, INC.
BLOCKBUSTER GIFT CARD, INC.
BLOCKBUSTER GLOBAL SERVICES INC.
BLOCKBUSTER INTERNATIONAL SPAIN INC.
BLOCKBUSTER INVESTMENTS LLC
BLOCKBUSTER VIDEO ITALY INC.
MOVIELINK, LLC
TRADING ZONE, INC.
B2 LLC

By: _____
    Name: Rod McDonald
    Title: SVP & General Counsel


[ASSET PURCHASE AND SALE AGREEMENT SIGNATURE PAGE]

**COBALT VIDEO HOLDCO LLC**

By: _____
    Name:  Andrew Herenstein
    Title:  Authorized Signatory


By: _____
    Name:
    Title:  Authorized Signatory


By: _____
    Name:
    Title:  Authorized Signatory


By: _____
    Name:
    Title:  Authorized Signatory


[ASSET PURCHASE AND SALE AGREEMENT SIGNATURE PAGE]

**COBALT VIDEO HOLDCO LLC**

By: _____
    Name:
    Title: Authorized Signatory

By: _____
    Name: Jeffrey Altman
    Title: Authorized Signatory

By: _____
    Name:
    Title: Authorized Signatory

By: _____
    Name:
    Title: Authorized Signatory

[ASSET PURCHASE AND SALE AGREEMENT SIGNATURE PAGE]

**COBALT VIDEO HOLDCO LLC**

By: _____
     Name:
     Title:  Authorized Signatory


By: _____
     Name:
     Title:  Authorized Signatory

By: _____
     Name:  Brad P. Bauer
     Title:  Authorized Signatory


By: _____
     Name:
     Title:  Authorized Signatory

[ASSET PURCHASE AND SALE AGREEMENT SIGNATURE PAGE]

**COBALT VIDEO HOLDCO LLC**

By: _____
    Name:
    Title:  Authorized Signatory


By: _____
    Name:
    Title:  Authorized Signatory


By: _____
    Name:
    Title:  Authorized Signatory


By: _____
    Name:  Jonathan Sacks
    Title:  Authorized Signatory


[ASSET PURCHASE AND SALE AGREEMENT SIGNATURE PAGE]

EXHIBIT A

Form of Agency and License Agreement

## FORM OF AGENCY AND LICENSE AGREEMENT

This Agency and License Agreement (this "Agreement"), dated as of [_____], 2011, is made and entered into by and among Blockbuster Inc., a Delaware corporation ("Parent"), each of the Debtor Subsidiaries (together with Parent, the "Sellers", and individually a "Seller") and Cobalt Video Holdco LLC, a Delaware limited liability company, or its designee or assignee ("Purchaser"). All references herein to Purchaser shall be applicable to the Purchaser's designee or assignee.

## RECITALS:

WHEREAS, Sellers and Purchaser are parties to that certain Asset Purchase and Sale Agreement, dated as of February [__], 2011 (the "Purchase Agreement"), pursuant to which, among other things, Sellers shall sell to Purchaser, and Purchaser shall purchase from Sellers, all of Sellers' right, title and interest in and to the Purchased Assets and Purchaser shall assume from Sellers and thereafter pay, discharge and perform the Assumed Liabilities;

WHEREAS, on September 23, 2010, Sellers filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, as contemplated by Section 8.8(b) of the Purchase Agreement, Purchaser may elect, in lieu of purchasing and taking title to and possession of certain of the inventory, tangible personal property and other assets located at certain of Sellers' Stores and Distribution Centers, to act as exclusive agent of the Sellers for the purpose of liquidating such assets in such Stores and Distribution Centers, which Stores and Distribution Centers are set forth on Exhibit A (the "Designated Liquidation Stores") through the conduct of "store closing" or similar going out of business sales (the "Sale") during the Liquidation Period, and the Parties are entering into this Agreement to provide for the terms, conditions and procedures applicable to the conduct of such Store Closing Liquidations; and

WHEREAS, Sellers have agreed and the Bankruptcy Court has approved, to grant Purchaser a right and license to use the Designated Liquidation Stores for the purpose of conducting the Sale in each such Designated Liquidation Store, with each such Sale to be completed no later than the Sale Termination Date (the "Store Closing License").

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Sellers hereby agree as follows:

Section 1.

1.1    Defined Terms. The terms set forth below are defined in the Sections referenced of this Agreement. Capitalized terms used herein and not otherwise defined shall have the meanings given to such terms in the Purchase Agreement:

| Defined Term | Section Reference |
|---|---|
| Additional Goods | Section 8.7 |
| Administrative Services | Section 4.1(d) |
| Agency Accounts | Section 7.2(a) |
| Agreement | Preamble |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Designated Liquidation Store(s) | Recitals |
| Designated Seller Accounts | Section 7.2(b) |
| Events of Default | Section 12 |
| Excluded Benefits | Section 4.4 |
| Expenses | Section 4.1 |
| FF&E | Section 13 |
| Final Reconciliation | Section 8.6 |
| Liquidation FF&E | Section 7.1 |
| Liquidation Merchandise | Section 5.1 |
| Parent | Preamble |
| Proceeds | Section 7.1 |
| Purchase Agreement | Recitals |
| Purchaser | Preamble |
| Purchaser Claim | Section 11.5 |
| Real Estate Occupancy Expenses | Section 4.1(b) |
| Retained Employee | Section 9.1 |
| Sale | Recitals |
| Sale Commencement Date | Section 6.1 |
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Sales Tax Account | Section 8.3 |
| Sales Taxes | Section 8.3 |
| Seller Account Usage Period | Section 7.2(a) |
| Sellers | Preamble |
| Store Closing License | Recitals |
| Store License Period | Section 2.1(b) |
| Supplies | Section 8.4 |
| Vacate Date | Section 6.2 |

      1.2     Exhibits. The Exhibits annexed to this Agreement, as listed below, are an integral part of this Agreement:

| Exhibit | Section | Description |
|---|---|---|
| Exhibit A | Recitals | Designated Liquidation Stores |

1.3 <u>Currency</u>. Unless otherwise specified, all references to monetary amounts refer to United States dollars.

Section 2. <u>Appointment as Sellers' Agent</u>.

2.1 <u>Appointment of Agent and Grant of License</u>. (a) Sellers hereby irrevocably appoint Purchaser (or its designee or assignee) to act as Sellers' exclusive agent for the limited purpose of conducting the Sale in accordance with the terms and conditions of this Agreement, the Purchase Agreement and the Sale Order.

(b) <u>Authorization to Occupy and Manage the Designated Liquidation Stores and Corporate Office</u>. Sellers hereby grant to Purchaser, effective as of the date hereof and through and including the Sale Termination Date (as defined herein) (the "<u>Store License Period</u>"), the Store Closing License and the right to occupy and use the Designated Liquidation Stores and the furniture, fixtures, equipment and personal property located thereat and agree to use their commercially reasonable efforts to provide Purchaser, at all times during the Sale Term, full access to the books and records and Contracts used or useful in the operation of the Designated Liquidation Stores, for the purpose of conducting the Sale in accordance with the terms and conditions of this Agreement, the Purchase Agreement and the Sale Order. During the Store License Period, Purchaser shall be under no duty or obligation to take any directions from Sellers or their Subsidiaries in connection with the conduct of the Sale and the operation and management of the Designated Liquidation Stores, other than with respect to (i) any Employees of Sellers with respect to matters unrelated to the Sale, (ii) any terms of the Real Property Leases pursuant to which such Designated Liquidation Store is subject except as authorized herein and by the Sale Order and (iii) any applicable orders of the Bankruptcy Court; and no landlord-tenant relationship shall be created hereby.

(c) <u>Operations For the Account of Purchaser</u>. The conduct of the Sale and the disposition of the Liquidation Merchandise and the Liquidation FF&E shall be for the sole account of Purchaser, subject to the obligations of Purchaser with respect to Expenses, and all Proceeds shall be the property of Purchaser only.

Section 3. <u>Method of Payment</u>.

3.1 <u>Wire Transfers</u>. All amounts required to be paid by Purchaser to Sellers under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Purchaser to a Parent designated account identified and communicated in writing to Purchaser not later than two (2) Business Days prior to the Closing.

Section 4. <u>Expenses of the Sale</u>.

4.1 <u>Expenses</u>. Purchaser shall be responsible for the Expenses incurred in conducting the Sale during the Sale Term. As used herein, "<u>Expenses</u>" shall mean only those operating expenses of the Sale that arise during the Sale Term with respect to each Designated Liquidation Store (unless otherwise specified herein) and are set forth below:

(a)    Base payroll (inclusive of Sellers' share of payroll taxes) for all Retained Employees (as referred to in Section 9.1 hereof) used in conducting the Sale for the actual days worked (or in the case of hourly employees, the actual hours worked) in connection with the Sale;

(b)    actual Real Estate Occupancy Expenses incurred with respect to each Designated Liquidation Store; provided, that expenses paid by Sellers on a monthly or other periodic basis (if less frequently than daily) with respect to any Designated Liquidation Store shall be calculated on a per-diem basis that reflects the number of days during the Sale Term of such Designated Liquidation Store that are covered by such payment.  Notwithstanding such per-diem reimbursement of Expenses, in the event Purchaser vacates a Designated Liquidation Store prior to the end of the then current monthly lease period, to the extent that Sellers are compelled to pay the rent in respect of the remainder of such monthly lease period following Purchaser's vacating the premises, such rent amount shall be deemed an Expense for purposes of this Agreement.  As used herein, "Real Estate Occupancy Expenses" shall mean all applicable rent; common area maintenance; utilities; security; housekeeping; ordinary course maintenance and repairs; fixed general liability insurance and property taxes for each Real Property Lease in respect of a Designated Liquidation Store to the extent such expenses are incurred or become payable during the Sale Term at any such Designated Liquidation Store;

(c)    credit card and bank card fees, chargebacks, discounts, bad debt expense, check guarantee fees and any other bank charges relating to Store operations to the extent such fees and charges are incurred after the Sale Commencement Date in connection with Sales;

(d)    actual costs and expenses for administrative services necessary for the Sale consisting of sales audit, MIS services, POS systems, payroll processing, cash reconciliation, inventory processing and handling, data processing and reporting and any similar services which are, in each case, incurred at a Designated Liquidation Store (the "Administrative Services"); provided that in no event shall Purchaser be responsible for any costs or expenses arising out of or related to Sellers' corporate overhead functions;

(e)    postage, courier and overnight mail charges and other costs of transferring Liquidation Merchandise between and among the Designated Liquidation Stores as directed in writing by Purchaser;

(f)    actual costs and expenses incurred by Sellers in performing services requested by Purchaser pursuant to Section 5.2; and

(g)    any other documented costs incurred by Sellers at the written direction of Purchaser.

There will be no double payment of Expenses to the extent Expenses appear or are contained in more than one Expense category.

4.2    Payment of Expenses.  All Expenses incurred during each week of the Sale (i.e., Monday through Sunday) shall be paid by Purchaser to or on behalf of Sellers, or offset from Proceeds held by Sellers, immediately following the weekly Sale reconciliation by

Sellers and Purchaser pursuant to Section 8.6 below, based upon invoices and other documentation reasonably satisfactory to Purchaser.

       4.3    Excluded Expenses. "Expenses" shall not include any costs, expenses or liabilities of or relating to the Designated Liquidation Stores other than those specifically referenced in Section 4.1  For the avoidance of doubt, the following shall not be Expenses: (i) Excluded Benefits; (ii) any rent or other occupancy expenses other than the Real Estate Occupancy Expenses in accordance with Section 4.1(b) hereof; (iii) any other costs, expenses or liabilities arising during the Sale Term, other than the Expenses listed above, all of which shall be paid by Sellers promptly when due during  the Sale Term, (iv) any costs or expenses arising out of or related to Sellers' obligation to comply with any lease return conditions of any Real Property Lease and (v) any and all costs, expenses or claims arising from the sale of Designated Liquidation Merchandise, including without limitation costs such as "revenue sharing" claims, charges relating to the sale of previously rented product, costs and claims relating to the Sellers' sale of product to one buyer, and the like.

       4.4    Excluded Benefits.  As used herein, "Excluded Benefits" shall mean (a) all employee benefits, including without limitation, vacation days or vacation pay, sick days or sick leave, maternity leave or other leaves of absence, termination or severance pay, union dues or other amounts due under any union contract or collective bargaining agreement, pension benefits, ERISA coverage and similar contributions, payroll taxes, worker's compensation and health insurance benefits and (b) any obligations under the WARN Act.

       Section 5.    Liquidation Merchandise.

       5.1    Liquidation Merchandise Subject to this Agreement.  For purposes of this Agreement, "Liquidation Merchandise" shall mean all movie, television program, game and cell phone inventory, merchandise, memorabilia, supplies, food and beverage items and other finished goods inventory owned by Sellers on the date hereof and located at, or in transit to, the Designated Liquidation Stores on the date hereof, which shall include, without limitation, merchandise that Purchaser elects to include in the Sale and located at the Distribution Centers which are included in the Designated Liquidation Stores and any such items returned to a Store (regardless of whether such item was purchased prior to the Sale Commencement Date).

       5.2    Calculation of Value of the Liquidation Merchandise.  The Sellers agree that, upon the request of Purchaser, they will, and agree to cause their respective representatives to, cooperate and assist in the preparation and the calculation of the aggregate value of the Liquidation Merchandise included in the Sale, including, without limitation, making available to the extent necessary, books, records, work papers and personnel.  In order to test the validity of the aggregate value of the Liquidation Merchandise as reflected on the Sellers' current books and records, subject to the availability of an inventory taking service, on or within ten (10) days after the Sale Commencement Date, Purchaser may cause to be taken an SKU and retail price physical inventory of the Liquidation Merchandise located in the Designated Liquidation Stores.

Section 6.        <u>Sale Term</u>.

6.1        <u>Term</u>.  Purchaser shall have the right to commence the Sale on the date hereof (the "<u>Sale Commencement Date</u>") and the Purchaser shall complete the Sale at each Store, and shall vacate each Store's premises in favor of Sellers or their representative or assignee on or before the date that is sixty (60) days after the Sale Commencement Date (the "<u>Sale Termination Date</u>").   The period from the Sale Commencement Date to the Sale Termination Date shall be referred to herein as the "<u>Sale Term</u>".  The Sale Termination Date may be, on a location by location basis, extended by mutual written agreement of Purchaser and Sellers or accelerated by Purchaser, in which case Purchaser shall provide Sellers with not less than five (5) Business Days' advance written notice of any such planned accelerated Sale Termination Date.

6.2        <u>Vacating the Designated Liquidation Stores</u>. Subject to the terms of <u>Section 6.1</u> hereof, Purchaser shall provide Sellers with not less than five (5) Business Days' advance written notice of its intention to vacate any Designated Liquidation Store (as to each Designated Liquidation Store, the "<u>Vacate Date</u>").  On the Vacate Date, (i) Purchaser shall vacate in favor of Sellers or their representatives or assignee, such Designated Liquidation Store; and (ii) the Sellers shall reject the applicable Real Property Lease covering such Designated Liquidation Store such that the effective date for such rejection is the Vacate Date and take all commercially reasonable actions to mitigate the occupancy Expenses in respect of such Real Property Lease.  Purchaser's obligation to pay all Expenses for each Designated Liquidation Store shall continue until the applicable Vacate Date; <u>provided</u>, <u>however</u>, that in no event shall Purchaser be obligated to (x) remove any unsold Liquidation Merchandise from any Designated Liquidation Store or (y) comply with any lease return conditions of any Real Property Lease.

Section 7.        <u>Sale Proceeds</u>.

7.1        <u>Proceeds</u>.  For purposes of this Agreement, "<u>Proceeds</u>" shall mean the aggregate of (a) the total amount (in dollars) from all sales of Liquidation Merchandise (including, but not limited to, credit card proceeds) made under this Agreement, exclusive of Sales Taxes; (b) the total amount (in dollars) of all sales of any FF&E (the "<u>Liquidation FF&E</u>") (including, but not limited to, credit card proceeds) made under this Agreement, exclusive of Sales Taxes; and (c) all proceeds of Sellers' insurance for loss or damage to Liquidation Merchandise or Liquidation FF&E, or loss of cash arising from events occurring during the Sale Term (but not any deductible payable by Sellers in respect of such insurance).

7.2        <u>Deposit of Proceeds</u>.

(a)        Within 21 days after the Sale Commencement Date (as and where applicable, the "<u>Seller Account Usage Period</u>"), Purchaser shall establish its own accounts, dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Purchaser hereunder, which accounts may be the Designated Seller Accounts so long as Sellers and Purchaser agree (the "<u>Agency Accounts</u>") and Sellers shall promptly upon Purchaser's request execute and deliver all necessary documents to open and maintain the Agency Accounts; <u>provided</u>, <u>however</u>, in the event that Purchaser establishes a reasonable business justification therefor, Sellers shall consent to an appropriate extension of the applicable Seller Account Usage Period.  Purchaser shall

exercise sole signatory authority and control with respect to the Agency Accounts; provided, however, upon request, Purchaser shall deliver to Sellers copies of all bank statements and other information relating to such accounts.  Sellers shall not be responsible for and Purchaser shall pay as an Expense hereunder, all bank fee and charges, including wire transfer charges, related to the Agency Accounts, whether received during or after the Sale Term.  Upon Purchaser's designation of the Agency Accounts, all Proceeds of the Sale (including credit card proceeds) shall be deposited into the Agency Accounts.

(b)    During the period between the Sale Commencement Date and the date Purchaser establishes the Agency Accounts, all Proceeds of the Sale (including credit card proceeds), shall be collected by Purchaser and deposited on a daily basis into Sellers' existing accounts designated for the Designated Liquidation Stores, but also are designated solely for the deposit of Proceeds of the Sale (including credit card proceeds), and the disbursement of amounts payable by Purchaser hereunder (the "Designated Seller Accounts").

    7.3    Credit Card Proceeds.  Purchaser shall use its commercially reasonable efforts to establish its own Seller identification numbers under Purchaser's name to enable Purchaser to process all credit card sales for Purchaser's account prior to the expiration of the Seller Account Usage Period.  Until such time as Purchaser establishes its own identification numbers, Purchaser shall have the right (but not the obligation) to use Sellers' credit card facilities (including Sellers' credit card terminals and processor(s), credit card processor coding, Seller identification number(s) and existing bank accounts) for credit card Proceeds.  In the event that Purchaser so elects to use Sellers' credit card facilities, Sellers shall process credit card transactions on behalf of Purchaser and for Purchaser's account, applying customary practices and procedures.  Without limiting the foregoing, Sellers shall cooperate with Purchaser to down-load data from all credit card terminals each day during the Sale Term and to effect settlement with Sellers' credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Purchaser under Sellers' identification number(s).  All credit card Proceeds will constitute the property of the Purchaser and shall be deposited into the Designated Seller Accounts or Agency Accounts, as the case may be.  To the extent credit card proceeds are deposited into the Designated Seller Accounts, Sellers shall transfer such Proceeds to Purchaser by wire transfer of immediately available funds within one (1) Business Day of such deposit.  At Purchaser's request, Sellers shall cooperate with Purchaser to establish Seller identification numbers under Purchaser's name to enable Purchaser to process all credit card Proceeds for Purchaser's account.  Sellers shall not be responsible for and Purchaser shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term.

    Section 8.    Conduct of the Sale.

    8.1    Rights of Purchaser.  Purchaser shall be permitted to conduct the Sale as a "store closing" or similar theme sale in the Designated Liquidation Stores throughout the Sale Term.  Notwithstanding anything herein to the contrary, in addition to any other rights granted to Purchaser hereunder in conducting the Sale, Purchaser, in the exercise of its sole discretion, shall have the right:

(a)    to all Administrative Services during the Sale Term and to establish Sale prices and Designated Liquidation Stores' hours which are consistent with the terms of applicable leases, mortgages or other occupancy agreements, and local laws or regulations, including, without limitation, Sunday closing laws, except to the extent otherwise provided by the Sale Order;

(b)    to use without charge (other than Purchaser's obligation to pay bank fees pursuant to Section 4.1(c) hereof), during the Sale Term all FF&E, bank accounts, store-level customer lists and mailing lists, computer hardware and software, existing supplies located at the Designated Liquidation Stores, intangible assets (including Sellers' trade names, logos and tax identification numbers), store keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Designated Liquidation Stores, and any other assets of Sellers located at the Designated Liquidation Stores (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses;

(c)    to establish and implement advertising, signage (including interior and exterior banners), and promotion programs consistent with a  "store closing," or similar theme sale (including, without limitation, by means of media advertising, A-frame,  and similar signage and interior and exterior signs and banners); and

(d)    to transfer Liquidation Merchandise between and among the Designated Liquidation Stores;

(e)    to use the services of third party vendors or providers in connection with conducting the Sale at any or all Designated Liquidation Stores; provided, that the costs and expenses of any such third party vendors or providers are for the account of Purchaser; and

(f)    Purchaser shall have the right to supplement the Sale with Additional Goods, provided, however, that the cost of expenses incurred therewith shall be at Purchaser's sole expense.

8.2    Terms of Sales to Customers, Law Compliance. All sales of Liquidation Merchandise and Liquidation FF&E will be "final sales" and "as is" and all advertisements and sales receipts will reflect the same. Purchaser shall not warrant the Liquidation Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash, nationally recognized bank credit cards and, in Purchaser's discretion, personal checks, provided, however, if Purchaser determines to accept personal checks, Purchaser shall bear the risk of loss therefor.  For the avoidance of doubt, Purchaser shall not be required to accept any gift cards or coupons as payment for any of the Liquidation Merchandise.

8.3    Sales Taxes.  During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Liquidation Merchandise, Additional Goods and, to the extent required to be collected by Applicable Law, Liquidation FF&E, as indicated on Sellers' point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes"), shall be added to the sales price of Liquidation Merchandise, Additional Goods and Liquidation FF&E (as applicable) and collected by Purchaser, and

deposited into trust accounts or other accounts, as designated by Purchaser (the "Sales Tax Account"). Sellers shall cooperate and assist Purchaser in connection with promptly paying all Sales Taxes, which shall be paid from the proceeds in the Sales Tax Account, and Sellers shall assist Purchaser in filing all applicable reports and documents required by the applicable taxing authorities.

8.4    Supplies.    Purchaser shall have the right to use, without charge, all existing supplies located at the Designated Liquidation Stores, including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "Supplies"). In the event that additional Supplies are required in any of the Designated Liquidation Stores during the Sale and requested by the Purchaser, the acquisition of such additional Supplies shall be the responsibility of Purchaser as an Expense; provided, however, that Sellers shall reasonably assist Purchaser in obtaining supplies from Sellers' vendors at Sellers' cost.

8.5    Gift Certificates/Gift Cards/Merchandise Credits/Returns.

(a)    At the Designated Liquidation Stores, Purchaser shall not be required to accept any gift certificates/gift cards, coupons or merchandise credits issued by Sellers prior to the date hereof.

(b)    To the extent required by Applicable Law, at the Designated Liquidation Stores, Purchaser shall accept returns of goods sold by Sellers prior to the Sale Commencement Date, and in such case, the Parties shall negotiate in good faith a deduction to the Expense amount to be reimbursed to Sellers by Purchaser based on the actual costs incurred by Purchaser in accepting such return.  If any goods sold by Sellers are so returned, such goods shall be deemed Liquidation Merchandise for sale thereafter by Purchaser.

8.6    Sale Reconciliation.

(a)    On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Purchaser and Sellers shall cooperate to reconcile Expenses and such other Sale-related items as any party shall reasonably request, in each case for the prior week or partial week (i.e., Sunday through Saturday), all pursuant to procedures agreed upon by Sellers and Purchaser.  Within thirty (30) days after the end of the Sale Term, Purchaser and Sellers shall complete a final reconciliation of the Sale and Expenses (the "Final Reconciliation"), the written results of which shall be certified by representations of each of the Sellers and Purchaser as a final settlement of accounts between Sellers and Purchaser. In the event that there is a dispute with respect to the Final Reconciliation between Sellers and Purchaser that cannot be resolved, then any disputed items shall be referred to the Accounting Referee for resolution, and the determination of the Accounting Referee shall be final and binding on the parties hereto.  The fees and expenses of the Accounting Referee shall be paid fifty percent (50%) by Purchaser and fifty percent (50%) by Sellers, with each Seller severally liable for the entire portion allocable to Sellers.

(b)    For purposes of this Section 8, by entering into and executing this Agreement, Sellers irrevocably make, constitute and appoint Parent as their agent, effective as of the date hereof, and authorize and empower Parent to fulfill the role of Sellers' representative

hereunder, and each Seller appoints Parent as such Person's true and lawful attorney in fact and agent, for such Person and in such Person's name, place and stead for all purposes necessary or desirable in order for Parent to take all actions contemplated by this Agreement, with the ability to execute and deliver all instruments, certificates and other documents of every kind incident to the foregoing to all intents and purposes and with the same effect as such Seller could do personally, including to give and receive notices and communications; to object to such deliveries, to agree to, negotiate, enter into settlements and compromises of, and comply with orders of courts with respect to such claims; and to take all actions necessary or appropriate in the judgment of Parent for the accomplishment of the foregoing.  The dissolution, liquidation, insolvency or bankruptcy of any Seller shall not terminate the authority and agency of Parent as each Seller's representative pursuant to this Section 8.6(b).  The power of attorney granted in this Section 8.6(b) is coupled with an interest and is irrevocable.

(c)    Purchaser shall be entitled to rely exclusively upon any communication given or other action taken by Parent pursuant to this Agreement, and shall not be liable for any action taken or not taken in good faith reliance on a communication or other instruction from Parent.

8.7    Additional Goods.  Subject to obtaining authorization in the Sale Order, Purchaser may, at Purchaser's expense, supplement the Liquidation Merchandise in the Designated Liquidation Stores with additional goods, of like kind, mix and quality as has historically been located in the Designated Liquidation Stores consisted with Sellers' past practices (the "Additional Goods").  Sales of Additional Goods shall be run through Sellers' cash register systems, provided however, Purchaser shall mark the Additional Goods using either a "dummy" SKU or department number, so as to distinguish the sale of Additional Goods from the sale of Liquidation Merchandise.  Sellers and Purchaser intend that the transactions relating to the Additional Goods are, and shall be construed as, a true consignment from Purchaser to the Sellers in all respects and not a consignment for security purposes.  At all times and for all purposes the Additional Goods and their proceeds shall be the exclusive property of Purchaser, and no other person or entity shall have any claim against any of the Additional Goods or their proceeds.  The Additional Goods shall at all times remain subject to the exclusive control of Purchaser.  Sellers shall, at Purchaser's expense (and not as an Expense of the Sale), insure the Additional Goods and, if required, promptly file any proofs of loss with regard to same with Sellers' insurers.

Section 9.    Employee Matters.

9.1    Sellers' Employees.  Purchaser may use Sellers' employees in the conduct of the Sale to the extent Purchaser, in consultation with Sellers, deems expedient.  Purchaser may select and schedule the number and type of Sellers' employees required for the Sale.  Purchaser shall identify any such employees to be used in connection with the Sale (each such employee, a "Retained Employee") prior to the Sale Commencement Date, which identification may be on an individual employee basis or individual Designated Liquidation Store basis (in which event all employees of Sellers providing services at such Designated Liquidation Store shall be deemed identified).  Retained Employees shall at all times remain employees of Sellers, and shall not be considered or deemed to be employees of Purchaser.  Nothing contained in this Agreement and none of Purchaser's actions taken in respect of the Sale shall be deemed to constitute an

assumption by Purchaser of any of Sellers' obligations relating to any of Sellers' employees including, without limitation, termination type claims and obligations, or any other amounts required to be paid by Applicable Law, other than Purchaser's obligation to reimburse Sellers for base payroll for all Retained Employees as set forth in <u>Section 4.1(a)</u>; nor shall Purchaser become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.  Sellers shall not, without Purchaser's prior written consent, raise the salary or wages or increase the benefits for, or pay any bonuses or grant any severance or termination rights or make any other extraordinary payments to, any of its employees in anticipation of the Sale or prior to the Sale Termination Date except as required by Applicable Law from time to time in effect.  Sellers have not terminated and shall not during the Sale Term terminate any employee benefits or benefit programs covering or in respect of Retained Employees, without prior written notice to Purchaser.  It is understood and agreed that Purchaser's on site supervisors shall not be employees of Sellers under any circumstances.

9.2    <u>Termination of Employees</u>.  Purchaser may in its sole discretion stop using any Retained Employee at any time during the Sale Term.   In the event of Purchaser's termination of the services of any Retained Employee, Purchaser will provide written notice to Sellers at least three (3) Business Days prior thereto, except for a termination of services "for cause" (such as dishonesty, fraud or breach of employee duties), in which event no prior notice to Sellers shall be required, provided Purchaser shall notify Sellers as soon as practicable after such termination.  Upon delivery to Sellers of a notice of termination of services of a Retained Employee, then Purchaser's obligations with respect to such Retained Employee terminate on the effective date of such termination, as provided for in the termination notice; <u>provided</u>, <u>however</u>, although such Retained Employee will no longer be used in connection with the Sale, Sellers shall have the responsibility for terminating the employment of such Retained Employee from and after the date of this Agreement and until the Sale Termination Date, other than with respect to a Retained Employee for which Purchaser has ceased using during the Sale and has so notified Sellers, Sellers shall not transfer or dismiss employees of the Designated Liquidation Stores without Purchaser's prior consent (which consent shall not be unreasonably withheld), except "for cause".

9.3    <u>Payroll Matters</u>.  During the Sale Term, Sellers shall process and pay the base payroll and all related payroll taxes, worker's compensation, employment and unemployment insurance, and benefits for all Retained Employees in accordance with its usual and customary procedures.  Any additional personnel hired by Purchaser for the Sale shall not be deemed to be employees of Sellers, nor shall Sellers be obligated to process the payroll for or offer benefits to said additional personnel.

Section 10.    <u>Representations and Warranties</u>.

10.1    <u>Sellers' Representations and Warranties</u>.   Sellers hereby jointly and severally represent and warrant in favor of Purchaser as follows:

(a)    Each Seller (i) is duly organized, validly existing under the laws of the jurisdiction of its formation; (ii) has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is and during the Sale Term will continue to be, duly authorized and qualified to do business and in

good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Designated Liquidation Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Sellers to execute and deliver this Agreement and perform fully their obligations hereunder.

(b)    Subject to entry and effectiveness of the Sale Order, Sellers have the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully their obligations thereunder.  No further consent or approval on the part of any Seller is required for Sellers to enter into and deliver this Agreement, to perform their obligations thereunder, and to consummate the Sale.  This Agreement has been duly executed and delivered by Sellers and constitutes the legal, valid and binding obligation of Sellers enforceable in accordance with its terms.  No court order or decree of any federal, state, local, or provincial governmental authority or regulatory body is in effect that would prevent or materially impair, or is required for the Sellers' consummation of, the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as shall be obtained prior to the Sale Commencement Date, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Sellers to execute and deliver this Agreement and perform fully their obligations hereunder. Other than for any consent as shall be obtained prior to the Sale Commencement Date, and those contracts or agreements identified by Sellers to Purchaser on or prior to the Sale Commencement Date, if any, no contract or other agreement to which a Seller is a party or by which such Seller is otherwise bound will prevent or materially impair the consummation of the Sale and the other transactions contemplated by this Agreement.

10.2    Purchaser's Representations and Warranties.  Purchaser hereby represents and warrants in favor of Sellers as follows:

(a)    Purchaser (i) is a limited liability company, duly and validly existing and in good standing under the laws of the State of Delaware; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)    Purchaser has the limited liability company power, and authority to execute and deliver this Agreement and to perform fully its obligations thereunder.  Purchaser has taken all necessary actions required to authorize the execution, delivery, and performance of this Agreement, and no further consent or approval is required on the part of Purchaser for Purchaser to enter into and deliver this Agreement, to perform its obligations thereunder, and to consummate the Sale. This Agreement has been duly executed and delivered by the Purchaser and, constitutes the legal, valid and binding obligation of Purchaser enforceable in accordance with its terms.  No court order or decree of any federal, provincial, state or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Purchaser's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor other than as provided herein.

No contract or other agreement to which Purchaser is a party or by which Purchaser is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

Section 11.    <u>Insurance</u>.

11.1    <u>Purchaser's Liability Insurance</u>.  Purchaser shall maintain at its cost and expense until the Sale Termination Date, appropriate liability insurance policies including comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with Purchaser's operation of the Designated Liquidation Stores, and shall cause Sellers to be named as additional named insureds with respect to all such policies.  Prior to the Sale Commencement Date, Purchaser shall deliver to Sellers certificates evidencing such insurance setting forth the duration thereof and naming Sellers as additional named insureds, in form reasonably satisfactory to Sellers.  Prior to the Sale Termination Date, all such policies shall require at least thirty (30) days prior notice to Sellers of cancellation, non-renewal or material change.  In the event of a claim under any such policies Purchaser shall be responsible for the payment of all deductibles, retentions or self insured amounts thereunder.

11.2    <u>Sellers' Liability Insurance</u>.    Sellers shall continue until the Sale Termination Date, in such amounts as they currently have in effect, all of their liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with Sellers' operation of the Designated Liquidation Stores, and shall cause Purchaser to be named an additional named insured with respect to all such policies.  Prior to the Sale Commencement Date, Sellers shall deliver to Purchaser certificates evidencing such insurance setting forth the duration thereof and naming Purchaser as an additional named insured, in form reasonably satisfactory to Purchaser.  All such policies shall require at least fifteen (15) days prior notice to Purchaser of cancellation, non-renewal, or material change.

11.3    <u>Sellers' Casualty Insurance</u>.    Sellers shall continue until the Sale Termination Date, in such amounts as they currently have in effect, fire, flood, theft and extended coverage casualty insurance covering the Liquidation Merchandise in a total amount equal to no less than the retail value thereof as of the Sale Commencement Date.  In the event of a loss to the Liquidation Merchandise on or after the date hereof, the proceeds of such insurance attributable to the Liquidation Merchandise (net of any deductible) shall constitute Proceeds.  Prior to the Sale Commencement Date, Sellers shall deliver to Purchaser certificates evidencing such insurance setting forth the duration thereof, in form and substance reasonably satisfactory to Purchaser.  All such policies shall require at least fifteen (15) days prior notice to Purchaser of cancellation, non-renewal, or material change.  Sellers shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Purchaser's prior written consent.

11.4    <u>Worker's Compensation Insurance</u>.  Sellers shall continue until the Sale Termination Date, in such amounts as they currently have in effect, worker's compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.  Prior to the Sale Commencement Date, Sellers shall

deliver to Purchaser a certificate of their insurance broker(s) or carrier(s) evidencing such insurance.

11.5    Risk of Loss. Without limiting any other provision of this Agreement, Sellers acknowledges that Purchaser is conducting the Sale on behalf of Sellers solely in the capacity of an agent, and that in such capacity (i) Purchaser shall not be deemed to be in possession or control of the Designated Liquidation Stores or the assets located therein or associated therewith, or of Sellers' employees located at the Designated Liquidation Stores, and (ii) except as expressly provided in this Agreement or in the Purchase Agreement, Purchaser does not assume any of Sellers' obligations or liabilities with respect to any of the foregoing. Purchaser shall not be deemed to be a successor employer. Sellers and Purchaser agree that, subject to the terms of this Agreement, Sellers shall bear all responsibility for liability claims of customers, employees and other persons arising from events occurring at the Designated Liquidation Stores during and after the Sale Term, except to the extent any such claim arises from the acts or omissions of Purchaser, or its supervisors, agents, independent contractors, or employees located at the Designated Liquidation Stores or as a result of Purchaser's instructions or actions hereunder (a "Purchaser Claim").  In the event of any liability claim other than a Purchaser Claim, Sellers shall administer such claim and shall present such claim to Sellers' liability insurance carrier(s) in accordance with Sellers' policies and procedures existing immediately prior to the Sale Commencement Date, and shall provide a copy of the initial documentation relating to such claim to Purchaser at the address listed in this Agreement.  To the extent that a claim constitutes a Purchaser Claim, Purchaser shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Sellers.  In the event that Sellers and Purchaser cannot agree whether a claim constitutes a Purchaser Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party to the foregoing address.

Section 12.    Defaults.    The following shall constitute "Events of Default" hereunder:

(a)    Sellers' or Purchaser's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party; or

(b)    Any representation or warranty made by Sellers or Purchaser proves untrue in any material respect as of the date made or at any time and throughout the Sale Term.

(c)    In the event of an Event of Default, the non-defaulting party may, in its discretion, elect to terminate this Agreement upon seven (7) Business Days' written notice to the other party and pursue any and all rights and remedies and damages resulting from such default hereunder.

Section 13.    Fixtures.  With respect to furniture, fixtures and equipment owned by Sellers and located at the Designated Liquidation Stores (collectively, the "FF&E"), such FF&E was retained by Sellers as Excluded Assets under the Purchase Agreement and Sellers hereby grant Purchaser (or its assignee or designee) the right to sell the FF&E in any of the

Designated Liquidation Stores as Sellers' exclusive agent for Purchasers own account pursuant to the terms of this Agreement, the Proceeds of which shall be the property of Purchaser.  As of the Sale Termination Date, Purchaser may abandon, to Sellers, in place any unsold FF&E at the Designated Liquidation Stores.  The proceeds of any subsequent sale by Sellers of such FF&E (or abandoned Liquidation Merchandise) shall inure to the benefit of Sellers.

Section 14.    <u>Miscellaneous</u>.

14.1    <u>Notices</u>.  All notices and other communications under this Agreement shall be in writing and shall be deemed duly given (i) when delivered personally or by prepaid overnight courier, with a record of receipt, (ii) the fourth day after mailing if mailed by certified mail, return receipt requested, or (iii) the day of transmission, if sent by facsimile or telecopy during regular business hours or the Business Day after transmission, if sent after regular business hours (with a copy promptly sent by prepaid overnight courier with record of receipt or by certified mail, return receipt requested), to the parties at the following addresses or facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other parties pursuant to this <u>Section 14.1</u>):

If to Sellers:

> Blockbuster Inc.
> 1201 Elm Street
> Dallas, Texas 75270
> Phone:  (214) 854-4081
> Fax:  (214) 854-4321
> Attention:  General Counsel

With a copy to:

> Weil, Gotshal & Manges LLP
> 200 Crescent Court, Suite 300
> Dallas, Texas 75201
> Phone:  214-746-8178
> Fax:  214-746-7777
> Attention:  D. Gilbert Friedlander
>                 Martin A. Sosland

If to Purchaser:

> Cobalt Video Holdco LLC
> [_____]
> [_____]
> Attention:  [_____]

With a copy (which shall not constitute notice) to:

Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, NY 10005
Phone:  212-530-5921
Fax:  212-822-5921
Attention:  Thomas C. Janson, Esq.
                     Mark Shinderman, Esq

14.2    Governing Law.    THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, AND ANY CLAIM OR CONTROVERSY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN OR IN CONNECTION WITH THIS AGREEMENT OR AS AN INDUCEMENT TO ENTER INTO THIS AGREEMENT), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED, AND DETERMINED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISION THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION) AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

14.3    Submission to Jurisdiction.

(a)    Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes among the parties which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated by this Agreement, and (ii) any and all Actions related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and shall receive notices at such locations as indicated in Section 14.1; provided, however, that if the Bankruptcy Cases have been fully and finally dismissed and the Bankruptcy Court declines jurisdiction, the parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County.

(b)    The parties hereby unconditionally and irrevocably waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any dispute arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement brought in any court specified in subsection (a) above, or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)    Each of the parties hereby consents to process being served by any party in any Action by the mailing of a copy thereof in accordance with the provisions of Section 14.1;

provided, however, that such service shall not be effective until the actual receipt thereof by the party being served.

14.4    Waiver of Jury Trial. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).    EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 14.4.

14.5    Entire Agreement; Amendments and Waivers.    This Agreement and the other Transaction Documents represent the entire understanding and agreement between the parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

14.6    Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon Purchaser and Sellers, including, but not limited to, any chapter 11 or chapter 7 trustee.  Sellers may not assign this Agreement or any of their obligations hereunder.  Purchaser may assign its rights and obligations under this Agreement, in whole or in part, to one or more assignees upon written notice to Sellers.

14.7    Execution in Counterparts.    This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement.  This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

14.8    <u>Section Headings</u>.    The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

14.9    <u>Termination</u>.    This Agreement shall remain in full force and effect until the first to occur of:    (i) the expiration of the Sale Term with respect to all Designated Liquidation Stores and completion and certification by Sellers and Purchaser, or determination by the Accounting Referee, as the case may be, of the Final Reconciliation pursuant to <u>Section 8.6</u> above; provided, that Purchaser shall have received in the aggregate 100% of the Proceeds (exclusive of any Sales Taxes) and Sellers shall have received reimbursement of all Expenses incurred prior to such expiration pursuant to this Agreement, or (iii) termination in accordance with <u>Section 12</u> hereof.    Notwithstanding the foregoing sentence, this <u>Section 14</u> shall survive any termination of this Agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, Purchaser and Sellers hereby execute this Agency and License Agreement by their duly authorized representatives as of the day and year first written above.

BLOCKBUSTER INC.

By: _____
    Name:
    Title:

BLOCKBUSTER PROCUREMENT LP,

By:  Blockbuster Distribution, Inc.,
     its General Partner

    By: _____
       Name:
       Title:

BLOCKBUSTER CANADA INC.
BLOCKBUSTER DIGITAL TECHNOLOGIES INC.
BLOCKBUSTER DISTRIBUTION, INC.
BLOCKBUSTER GIFT CARD, INC.
BLOCKBUSTER GLOBAL SERVICES INC.
BLOCKBUSTER INTERNATIONAL SPAIN INC.
BLOCKBUSTER INVESTMENTS LLC
BLOCKBUSTER VIDEO ITALY INC.
MOVIELINK, LLC
TRADING ZONE, INC.
B2 LLC

By: _____
    Name:
    Title:

COBALT VIDEO HOLDCO LLC

By: _____
Name:
Title:

Exhibit A

## **<u>DESIGNATED LIQUIDATION STORES</u>**

[To Be Attached At Closing]

EXHIBIT B

Form of Bidding Procedures Order

(PLEASE SEE EXHIBIT 2 OF THE SALE MOTION)

**Exhibit C**

**FORM OF BILL OF SALE**

This **BILL OF SALE** (this "**Bill of Sale**") is made and delivered this [__] day of [_____], 2011, by Blockbuster Inc., a Delaware corporation ("**Parent**"), and each of the Debtor Subsidiaries (as defined in the Purchase Agreement, and together with Parent, "**Sellers**") for the benefit of Cobalt Video Holdco LLC, a Delaware limited liability company ("**Purchaser**"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement (as hereinafter defined).

**WHEREAS**, Sellers have entered into that certain Asset Purchase and Sale Agreement, dated as of February [__], 2011 (the "**Purchase Agreement**"), by and among Sellers and Purchaser, the terms of which are incorporated herein by reference, which provides, among other things, for the sale and assignment by Sellers to Purchaser of the Purchased Assets.

**NOW, THEREFORE**, in consideration of the mutual promises contained in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions of the Purchase Agreement:

1.      Sellers hereby irrevocably sell, grant, assign, transfer, convey and deliver unto Purchaser, and its successors and assigns, forever, all of Sellers' right, title and interest in and to the Purchased Assets, free and clear of any and all Liens except for Liens created by Purchaser and Permitted Liens, **TO HAVE AND TO HOLD** such Purchased Assets with all rights and appurtenances thereto, unto Purchaser, and its successors and assigns, for their use forever. Purchaser hereby accepts the foregoing sale, grant, assignment, transfer, conveyance and delivery of the Purchased Assets.

2.      This Bill of Sale shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

3.      This Bill of Sale is executed and delivered pursuant to the Purchase Agreement. Nothing in this Bill of Sale, express or implied, is intended to or shall be construed to modify, expand or limit in any way the terms of the Purchase Agreement. To the extent that any provision of this Bill of Sale conflicts or is inconsistent with the terms of the Purchase Agreement, the Purchase Agreement shall govern.

4.      At any time or from time to time, at Purchaser's reasonable request and without further consideration, Sellers shall execute and deliver to Purchaser such other instruments of sale, transfer, conveyance, assignment and confirmation, provide such materials and information and take such other actions as Purchaser may reasonably deem necessary or desirable in order more effectively to transfer, convey and assign the Purchased Assets to Purchaser.

5.      This Bill of Sale, and all claims and causes of action (whether in contract or in tort) that may be based upon, arise out of or relate to this Bill of Sale, or the execution or performance of this Bill of Sale, shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State without giving effect to the choice of law principles of such State or any other jurisdiction that would require or permit the application of the substantive laws of any jurisdiction other than New York.

6.      (a) The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Bill of Sale and to decide any claims or disputes among the Parties which may arise or result from, or be connected with, this Bill of Sale, and any and all Actions related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and shall receive notices at such locations as indicated in <u>Section 12.11 of the Purchase Agreement</u>; <u>provided</u>, <u>however</u>, that if the Bankruptcy Cases have been fully and finally dismissed and the Bankruptcy Court declines jurisdiction, the Parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County; and (b) the Parties hereby unconditionally and irrevocably waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any dispute arising out of or relating to this Bill of Sale brought in any court specified in subsection (a) above, or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

7.      Nothing contained in this Bill of Sale, express or implied, shall confer unto any Person other than the parties hereto or their respective successors and assigns any right, obligation, remedy or benefit hereunder.

8.      This Bill of Sale may be executed in two or more counterparts (including via facsimile), each of which will be deemed to be an original copy of this Bill of Sale and all of which, when taken together, will be deemed to constitute one and the same instrument.


[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

IN WITNESS WHEREOF, and intending to be legally bound hereby, Sellers have caused this Bill of Sale to be executed and delivered as of the date first above written.

BLOCKBUSTER INC.


By: _____
    Name:
    Title:


BLOCKBUSTER PROCUREMENT LP,

By:  Blockbuster Distribution, Inc.,
     its General Partner


    By: _____
        Name:
        Title:


BLOCKBUSTER CANADA INC.
BLOCKBUSTER DIGITAL TECHNOLOGIES INC.
BLOCKBUSTER DISTRIBUTION, INC.
BLOCKBUSTER GIFT CARD, INC.
BLOCKBUSTER GLOBAL SERVICES INC.
BLOCKBUSTER INTERNATIONAL SPAIN INC.
BLOCKBUSTER INVESTMENTS LLC
BLOCKBUSTER VIDEO ITALY INC.
MOVIELINK, LLC
TRADING ZONE, INC.
$B^2$ LLC


By: _____
    Name:
    Title:

**Exhibit D**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

This ASSIGNMENT AND ASSUMPTION AGREEMENT, dated as of this [___] day of [_____], 2011 (this "**Agreement**"), by and among Blockbuster Inc., a Delaware corporation ("**Parent**"), each of the Debtor Subsidiaries (as defined in the Purchase Agreement, and together with Parent, "**Sellers**") and Cobalt Video Holdco LLC, a Delaware limited liability company ("**Purchaser**").  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement (as hereinafter defined).

W I T N E S S E T H:

WHEREAS, Sellers have entered into that certain Asset Purchase and Sale Agreement, dated as of February [__], 2011 (the "**Purchase Agreement**"), by and among Sellers and Purchaser, the terms of which are incorporated herein by reference, which provides, among other things, for the transfer by Sellers to Purchaser of the Purchased Assets and the assumption by Purchaser of the Assumed Liabilities; and

WHEREAS, in accordance with the terms of the Purchase Agreement, Sellers and Purchaser have agreed to enter into this Agreement, providing for (a) the assignment from Sellers to Purchaser of all of Sellers' right, title and interest in, under and to the Purchaser Assumed Contracts, on and subject to the terms of the Purchase Agreement, and (b) the acceptance by Purchaser of such assignment and the assumption by Purchaser of (i) all obligations of Sellers under the Purchaser Assumed Contracts and (ii) the other Assumed Liabilities.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and subject to the terms and conditions of the Purchase Agreement, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Assignment.  In accordance with and subject to the terms of the Purchase Agreement, Sellers hereby irrevocably sell, assign, transfer and convey to Purchaser, to the extent that such are assignable under Applicable Law and any necessary consents to assignment have been obtained, all of Sellers' right, title and interest in, under and to the Purchaser Assumed Contracts, free and clear of any and all Liens except for Liens created by Purchaser and Permitted Liens, to have and to hold, together with all the rights and appurtenances thereto unto Purchaser, and the successors and assigns of Purchaser forever (the "**Assignment**").

2.    Acceptance and Assumption.  In accordance with and subject to the terms of the Purchase Agreement, Purchaser hereby (a) purchases and irrevocably accepts the Assignment; (b) irrevocably assumes all Liabilities of Sellers under the Purchaser Assumed Contracts solely to the extent of the Assumed Cure Costs and Liabilities arising from events arising and occurring following the Closing Date and (c) irrevocably assumes, undertakes and agrees to pay, perform or discharge when due all of the Assumed Liabilities.  Notwithstanding the foregoing, Purchaser

does not take or assume any of the Excluded Liabilities, all of which are expressly retained by Sellers.

      3.     <u>Parties in Interest</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

      4.     <u>Purchase Agreement Controls</u>.  This Agreement is executed and delivered pursuant to the Purchase Agreement.  Nothing in this Agreement, express or implied, is intended to or shall be construed to modify, expand or limit in any way the terms of the Purchase Agreement.  To the extent that any provision of this Agreement conflicts or is inconsistent with the terms of the Purchase Agreement, the Purchase Agreement shall govern.

      5.     <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts (including via facsimile), each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

      6.     <u>Governing Law</u>.  This Agreement, and all claims and causes of action (whether in contract or in tort) that may be based upon, arise out of or relate to this Agreement, or the execution or performance of this Agreement, shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State without giving effect to the choice of law principles of such State or any other jurisdiction that would require or permit the application of the substantive laws of any jurisdiction other than New York.

      7.     <u>Submission to Jurisdiction</u>.  (a) The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes among the Parties which may arise or result from, or be connected with, this Agreement, and any and all Actions related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and shall receive notices at such locations as indicated in <u>Section 12.11</u> of the Purchase Agreement; <u>provided</u>, <u>however</u>, that if the Bankruptcy Cases have been fully and finally dismissed and the Bankruptcy Court declines jurisdiction, the Parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County; and (b) the Parties hereby unconditionally and irrevocably waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any dispute arising out of or relating to this Agreement brought in any court specified in subsection (a) above, or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

      8.     <u>Third Party Beneficiaries</u>.  Nothing contained in this Agreement, express or implied, shall confer unto any Person other than the parties hereto or their respective successors and assigns any right, obligation, remedy or benefit hereunder.

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Assignment and Assumption Agreement as of the date first written above.

BLOCKBUSTER INC.

By: _____
    Name:
    Title:

BLOCKBUSTER PROCUREMENT LP,

By:  Blockbuster Distribution, Inc.,
     its General Partner

    By: _____
        Name:
        Title:

BLOCKBUSTER CANADA INC.
BLOCKBUSTER DIGITAL TECHNOLOGIES INC.
BLOCKBUSTER DISTRIBUTION, INC.
BLOCKBUSTER GIFT CARD, INC.
BLOCKBUSTER GLOBAL SERVICES INC.
BLOCKBUSTER INTERNATIONAL SPAIN INC.
BLOCKBUSTER INVESTMENTS LLC
BLOCKBUSTER VIDEO ITALY INC.
MOVIELINK, LLC
TRADING ZONE, INC.
$B^2$ LLC

By: _____
    Name:
    Title:

COBALT VIDEO HOLDCO LLC


By: _____
      Name:
      Title:

**<u>EXHIBIT 2</u>**

**Bid Procedures Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                             :

In re                          :     Chapter 11
                             :

BLOCKBUSTER INC., *et al.*,[1]    :     Case No. 10-14997 (BRL)
                             :

                             :     (Jointly Administered)
          Debtors.        :

------------------------------------------------------------x

## ORDER APPROVING, PURSUANT TO 11 U.S.C. §§ 105, 363, 364, AND FED. R. BANKR. P. 2002, 4001, 6004, 6006, 9008, AND 9014, (A) BID PROCEDURES, (B) STALKING HORSE EXPENSE REIMBURSEMENT, (C) NOTICE OF SALE, AUCTION AND SALE HEARING, (D) ASSUMPTION PROCEDURES AND RELATED NOTICES, (E) INCURRENCE OF SALE-RELATED ADMINISTRATIVE PRIORITY CLAIMS, AND (F) IMPOSITION OF AN ADMINISTRATIVE STAY

Upon the Motion, dated February 21, 2011,[2] of Blockbuster Inc. and its debtor

affiliates, as debtors and debtors in possessions (collectively, "***Blockbuster***", or the "***Debtors***"),

pursuant to 11 U.S.C. §§ 105, 362, 363, 364, 365 and 503 and Fed. R. Bankr. P. 2002, 4001,

6004, 6006, 9008, and 9014, for entry of (I) an order authorizing and approving, among other

things, (A) Bid Procedures in connection with the sale of substantially of all of the Debtors'

assets (the "***Assets***"), substantially in the form attached hereto as ***Exhibit "A"***, (B) the Expense

Reimbursement, (C) the notice of sale, auction, and sale hearing (the "***Sale Notice***'),

(D) Assumption Procedures and Assumption, Assignment, and Cure Notices with respect to the

assumption and assignment of executory contracts and unexpired leases in connection with the

---

[1]   The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Blockbuster Inc. (5102); Blockbuster Canada Inc. (1269); Blockbuster Digital Technologies Inc. (9222); Blockbuster Distribution, Inc. (0610); Blockbuster Gift Card, Inc. (1855); Blockbuster Global Services Inc. (3019); Blockbuster International Spain Inc. (7615); Blockbuster Investments LLC (6313); Blockbuster Procurement LP (2546); Blockbuster Video Italy, Inc (5068); Movielink, LLC (5575); Trading Zone Inc. (8588); and B$^2$ LLC (5219).

[2]   Capitalized terms used herein but not defined herein shall have the meanings ascribed to such terms in the Motion.

Sale Transaction (as hereinafter defined), (E) incurrence of sale-related Administrative Priority

Claims, and (F) imposition of an injunction enjoining any collection efforts (the "***Administrative***

***Stay***") with respect to the payment of administrative expenses related to the period from the

Commencement Date through February 24, 2011 (the "***Pre-Sale Period***"); and (II) an order

(A) authorizing and approving the sale and related transactions (the "***Sale Transaction***")

contemplated by the Stalking Horse Bid of the Debtors' Assets free and clear of all liens, claims,

and encumbrances to the Successful Bidder, (B) authorizing and approving the assumption and

assignment of certain Designated Contracts to the Stalking Horse Bidder (together with any of its

designees, the "***Purchaser***") or the Successful Bidder(s), and (C) granting related relief; and

upon the Court's consideration of the Motion, the record of the hearing held on March ___, 2011

with respect to the Motion (the "***Hearing***"), including any objections filed and raised at the

Hearing; and upon all of the proceedings had before the Court; and after due deliberation, and

sufficient cause appearing therefor,

> **IT IS HEREBY FOUND AND DETERMINED THAT:**[3]

> A.      The Court has jurisdiction over this matter and over the property of the Debtors

and their respective bankruptcy estates pursuant to 28 U.S.C. §§ 157(a) and 1334.  This matter is

a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).  The statutory predicates

for the relief sought herein are 11 U.S.C. §§ 105, 363, 364, 365 and 503 and Fed. R. Bankr. P.

2002, 6004, 6006, 9008, and 9014.  Venue of these cases and the Motion is proper pursuant to 28

U.S.C. §§ 1408 and 1409.

> B.      The relief granted herein is in the best interests of the Debtors, their estates, their

stakeholders, and other parties in interest.

---

[3]      Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as
findings of fact to the fullest extent of the law. *See* Fed. R. Bankr. P. 7052.

C.     The notice of the Motion and the Hearing given by the Debtors constitutes due and sufficient notice thereof.

D.     The Debtors have articulated good and sufficient reasons for the Court to (i) approve the Bid Procedures, (ii) approve the Expense Reimbursement as provided in the Purchase Agreement, (iii) approve the form and manner of notice of the Motion, the Auction, the Sale Hearing, and the assumption and assignment of the Designated Contracts, and (iv) set the date of the Auction and the Sale Hearing.

E.     The Expense Reimbursement, to the extent payable under the Purchase Agreement, (i) shall be deemed an actual and necessary cost and expense of preserving the Debtors' estates, (ii) is of substantial benefit to the Debtors' estates, (iii) is reasonable and appropriate, including in light of the size and nature of the Sale Transaction, the necessity to announce a sale transaction for the Debtors, and the efforts that have been and will be expended by the Purchaser, (iii) has been negotiated by the parties and their respective advisors at arms' length and in good faith, and (v) is necessary to ensure that the Purchaser will continue to pursue the proposed Sale Transaction.  The Expense Reimbursement is a material inducement for, and condition of, the Purchaser's entry into the Stalking Horse Bid.  The Purchaser is unwilling to commit to purchase the Assets under the terms of the Stalking Horse Bid unless the Purchaser is assured the Expense Reimbursement.

F.     The Bid Procedures are reasonable and appropriate and represent the best method for maximizing the realizable value of the Assets.

**THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT**:

1.     The Motion is granted, as provided herein.

2.      All objections filed in response to the relief granted herein, to the extent not resolved as set forth herein or at the Hearing, are hereby overruled.

### The Stalking Horse Bid

3.      The Sale Transaction contemplated by the Purchase Agreement (as it may be amended prior to the Auction) is designated as the "*Stalking Horse Bid*."

### Bid Procedures

4.      The Bid Procedures, substantially in the form annexed hereto as *Exhibit "A"* and incorporated herein by reference, are hereby approved.  The failure specifically to include or reference a particular provision of the Bid Procedures in this Order shall not diminish or impair the effectiveness of such provision.

5.      To constitute a "*Qualified Bid*", a bid (other than the Stalking Horse Bid) must be received by the Bid Deadline (as defined in the Bid Procedures) and otherwise comply with all of the applicable provisions of the Bid Procedures.

### Auction and Sale Hearing

6.      The Auction shall be held on _____, 2011 at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 at 10:00 a.m. (New York time). The Court shall hold a hearing on _____,, 2011 at 10:00 a.m. (New York time) (the "*Sale Hearing*") in the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, Courtroom 623, at which time the Court shall consider the approval of the Sale Transaction as set forth in the Motion, approve the Successful Bidder(s), and confirm the results of the Auction, if any.  Objections to the Sale Transaction shall be in writing, filed and served so as to be actually received by the Bankruptcy Court and the following parties (the "*Objection Recipients*") on or before _____, 2011 at 5:00 pm New York Time (the "*Objection Deadline*"):

a.    the Debtors, c/o Blockbuster Inc., 1201 Elm Street, Dallas, Texas 75270 (Attn: Rod McDonald, Esq.);

b.    the attorneys for the Debtors, Weil, Gotshal & Manges LLP, attorneys for the Debtors at (i) 767 Fifth Avenue, New York, New York 10153 (Attn: Stephen Karotkin, Esq.) and (ii) 200 Crescent Court, Suite 300, Dallas, Texas 75201 (Attn: Martin A. Sosland, Esq.);

c.    the attorneys for the Creditors' Committee, Cooley LLP, 1114 Avenue of the Americas, New York, New York 10036 (Attn: Jay R. Indyke, Esq., Richard Kanowitz, Esq., and Jeffrey L. Cohen, Esq.);

d.    the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Brian Masumoto, Esq. and Elisabetta Gasparini, Esq.);

e.    Sidley Austin LLP, attorneys for the Steering Committee and the DIP Lenders, 787 Seventh Avenue, New York, New York 10019 (Attn: James Seery, Esq.);

f.    Sheppard, Mullin, Richter & Hampton LLP, attorneys for U.S. Bank National Association, as trustee under that certain Indenture, dated October 1, 2009, with respect to the Senior Secured Notes, 333 South Hope St., Floor 43, Los Angeles, California 90071 (Attn: Kyle J. Mathews, Esq.);

g.    Emmet, Marvin & Martin, LLP, attorneys for The Bank of New York Trust Company, N.A., as trustee under that certain Indenture, dated as of August 20, 2004, with respect to the 9% Senior Subordinated Notes due 2012 issued by Blockbuster Inc., 120 Broadway, 32nd Floor, New York, New York 10271 (Attn: Edward P. Zujkowski, Esq.);

h.    the attorneys for Wilmington Trust FSB as agent under the DIP Facility, Skadden, Arps, Slate, Meagher & Flom LLP, , 4 Times Square, New York, New York 10036 (Attn: Peter J. Neckles, Esq.);

i.    the United States Attorney for the Southern District of New York, One St. Andrew's Plaza, Claims Unit – Room 417, New York, New York 10007;

j.    the Securities & Exchange Commission, Northeast Region, The Woolworth Building, 233 Broadway, New York, New York 10279 (Attn: John Murray); and

k.      the attorneys for the Purchaser, Milbank, Tweed, Hadley &
        McCloy LLP, 601 South Figueroa Street, 30th Floor, Los Angeles,
        CA 90017-5735 (Attn: Mark Shinderman, Esq. and Brian Kelly,
        Esq.).

Objections to the assumption and assignment of Designated Contracts are addressed below.

7.      The failure to file and serve an objection to the Sale Transaction by the Objection

Deadline shall be a bar to the assertion thereof at the Sale Hearing or thereafter.

8.      The Sale Hearing may be adjourned from time to time without further notice to

the Sale Motion Notice Parties, creditors or other parties in interest other than by announcement

of the adjournment in open court or an entry of a notice of such adjournment on the Court's

docket.

### The Expense Reimbursement

9.      The Debtors are authorized and directed to pay the Expense Reimbursement as

provided in the Purchase Agreement without further order of the Court.

10.     The Debtors' obligation to pay the Expense Reimbursement as provided herein

shall survive termination of the Stalking Horse Bid, shall constitute a superpriority

administrative claim against the Debtors' estates pursuant to sections 105(a), 503( b) and

364(c)(1) of the Bankruptcy Code and shall be senior to, and have priority over, all other claims

against the Debtors, including all claims with respect to the DIP Financing, but subject and

subordinate in all respects to the Carve-Out Expenses, the Critical Expenses, and the

Administrative Priority Expenses.  Subject to the foregoing, the Expense Reimbursement shall be

paid in cash from the proceeds of any approved sale.

### Authorization

11.     The Debtors are authorized to take such actions as contemplated by the Stalking

Horse Bid prior to the Auction and the Sale Hearing, including, without limitation, actions to

notify creditors, customers, regulators or other interested parties regarding the Sale Transaction

and to obtain any necessary consents or approvals regarding the Sale Transaction.

## **Notice**

12.      Notwithstanding anything in the Purchase Agreement to the contrary, notice of

(a) the Motion, (b) the Bid Procedures, (c) the Auction, (d) the Sale Hearing and (e) the proposed

assumption and assignment of the Designated Contracts to the Purchaser pursuant to the Stalking

Horse Bid or to the Successful Bidder shall be good and sufficient, and no other or further notice

shall be required, if given as follows:

(a)      Notice of Sale, Auction, and Sale Hearing:  Within three (3) business days
after entry of this Order, the Debtors (or their agents) shall:

1.      provide notice, in substantially the form attached
hereto as ***Exhibit "B"*** (the "***Sale Notice***"), of this Order, the Sale Motion, the
Stalking Horse Bid, the Auction, the Sale Hearing, and the proposed Sale Order
by email, mail, facsimile or overnight delivery service, upon: (i) the U.S. Trustee;
(ii) the attorneys for the Creditors' Committee; (iii) the attorneys for U.S. Bank
National Association, as trustee under the Indenture, dated as of October 1, 2009,
with respect to the Senior Secured Notes; (iv) the attorneys for The Bank of New
York Trust Company, N.A., as trustee under the Indenture, dated as of August 20,
2004, with respect to the 9% Senior Subordinated Notes due 2012 issued by
Blockbuster Inc.; (v) the attorneys for the DIP Lenders; (vi) the attorneys for
Wilmington Trust FSB, as agent under the DIP Facility; (vii) each counterparty to
an executory contract or unexpired lease; (viii) for each State in which the
Debtors' stores are located, (x) the Attorney General's Office, and (y) the
applicable taxing authorities; (ix) the United States Attorney for the Southern
District of New York; (x) the attorneys for the Purchaser; (xi) those parties who
have requested notice pursuant to Bankruptcy Rule 2002; (xii) all known creditors
of the Debtors and all entities known to have asserted any claims against the
Assets or the Debtors' interest in the Assets and other entities known to have
asserted a lien, interest or encumbrance in or upon any of the Assets; and (xiii) all
known bona fide entities that have previously expressed an interest in purchasing
the Assets in the last twelve (12) months preceding the date of the Motion;

2.      publish the Sale Notice on one occasion each in *The
Wall Street Journal*, and *The New York Times*, national editions, on or before
March ___, 2011; and

3.      cause the Sale Notice to be published on
www.kccllc.net/blockbuster (the "***Website***") immediately upon entry of this

Order.

    (b)    <u>Assumption, Assignment and Cure Notice.</u>

    1.    Within three (3) business days after receiving the schedule from the Purchaser of those executory contracts and unexpired leases it wishes to assume pursuant to the Purchase Agreement (the "***Designated Contracts***") but no later than fifteen (15) days prior to the Sale Hearing, the Debtors shall file with the Court and serve on each counterpart to a Designated Contract by email, mail, facsimile or overnight delivery service, a notice of assumption, assignment and cure substantially in the form attached hereto as ***Exhibit "C"*** (the "***Assumption, Assignment and Cure Notice***"). The Assumption, Assignment and Cure Notice shall include the Debtors' calculation of the amount necessary to cure all monetary defaults (the "***Cure Amount***") for each such Designated Contract. A list of the Designated Contracts, including Cure Amounts with respect thereto, will be posted on the Website and updated as modified. The Debtors reserve the right to provide the Assumption, Assignment and Cure Notice to counterparties not yet so designated by Purchaser, and Purchaser reserves the right to supplement its designation of contracts for assumption and assignment up to April 1, 2011, and to remove a contract from the list of Designated Contracts at any time prior to conclusion of the Auction.

    2.    Any counterparty to a Designated Contract shall file and serve on the Objection Recipients any objections to (i) the proposed assumption and assignment to the Successful Bidder (and must state in its objection, with specificity, the legal and factual basis of its objection) and (ii) if applicable, the proposed Cure Amount (and must state in its objection, with specificity, what Cure Amount is required with appropriate documentation in support thereof), no later than 5:00 p.m. (New York time) five (5) business days before the Sale Hearing; *provided, however,* that to the extent the Successful Bidder is an entity other than the Purchaser, any further objections to the Sale Order by a counterparty to a Designated Contract based solely on the ability of the Successful Bidder to perform under any such Designated Contract shall be filed by no later than 5:00 p.m. (New York time) one (1) business day prior to the Sale Hearing. If any executory contract or unexpired lease is added to the schedule of Designated Contracts, a copy of the applicable Assumption, Assignment, and Cure Notice shall be served on the counterparty by overnight courier service within one (1) day of such addition and any counterparty may file an objection as aforesaid at any time that is one (1) business day prior to the Sale Hearing. If no objection is timely received, (x) the counterparty to a Designated Contract shall be deemed to have consented to the assumption and assignment of the Designated Contract to the Successful Bidder and shall be forever barred from asserting any objection with regard to such assumption and assignment, and (y) the Cure Amount set forth in the Assumption, Assignment and Cure Notice shall be controlling, notwithstanding anything to the contrary in any Designated Contract, or any other document, and the counterparty to a Designated Contract shall be

deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the Successful Bidder, or the property of any of them.

3.      If the Purchaser is not the Successful Bidder at the Auction, then prior to the Sale Hearing the Debtors shall send a subsequent notice to each non-Debtor party to a Designated Contract identifying the Successful Bidder and publish same on the Website so as to provide adequate notice to such non-Debtor party.

## Administrative Priority Claims; Administrative Stay

13.      Pursuant to sections 362, 364 and 105(a) of the Bankruptcy Code and 28 U.S.C.

§ 959, the following additional relief is granted:

a.      No payments shall be made by the Debtors with respect to any costs or expenses of administration in the Debtors' chapter 11 cases incurred during the period from the Commencement Date through February 24, 2011 (each, a "*Pre-Sale Period Claim*"); *provided, however* that, notwithstanding the foregoing, Critical Expenses, as determined by the Debtors, may be paid to the extent provided for in the Sale Budget;

b.      No holder of a Pre-Sale Period Claim shall take any action prior to June 21, 2011 to collect or otherwise realize on such claim, whether pursuant to judicial process, set off or otherwise;

c.      The Debtors are authorized to pay in full all costs and expenses of administration relating to the Sale Process Period as provided in and up to the amounts provided for in the Sale Budget (the "*Administrative Priority Expenses*"); *provided, however*, that in connection with any studio agreements between the Debtors and movie studios, only the following shall be included as Administrative Priority Expenses[4]: (x) revenue share fees from the rental of movie titles that accrue during the Sale Process Period ("*Rental Share Fees*") only up to the amounts provided in the Sale Budget, and (y) previously rented product fees that accrue during

---

[4]    For the avoidance of doubt, Administrative Priority Expenses shall not include (i) any amounts or claims under any studio agreements other than the subsequently defined Rental Share Fees, Operating Stores PRP Fees, and Closing Stores PRP Fees accrued during the Sale Process Period up to the Closing Stores PRP Fee Cap; (ii) any revenue share fees or previously rented product fees or any other fee or claim that may accrue after the Sale Process Period or as a result of the sale of the Assets; (iii) any amounts not detailed in the Sale Budget; and (iv) any Rental Share Fees, Operating Stores PRP Fees, and Closing Stores PRP Fees owed to a movie studio that stops shipping units or delivering digital content to the Debtors on cash in advance or other terms agreeable to the Debtors.

the Sale Process Period from the sale of movie titles (A) in stores that continue to operate in the ordinary course only up to the amounts provided in the Sale Budget (the "***Operating Stores PRP Fees***") and (B) in connection with any previously rented product fees that accrue during the Sale Process Period from the sale of movie titles in stores that are liquidating (the "***Closing Stores PRP Fees***"), *provided*, that such Closing Stores PRP Fees shall be limited to an amount no greater than $9 million (the "***Closing Stores PRP Fee Cap***") as provided for in the Sale Budget, and only Operating Stores PRP Fees and Closing Stores PRP Fees only up to the Closing Store PRP Fee Cap shall receive superpriority claim status[5]; and

d.    Notwithstanding anything contained in the DIP Order to the contrary, pursuant to section 364 of the Bankruptcy Code, all Administrative Priority Expenses shall have superpriority claim status[6] in these chapter 11 cases which shall be senior and prior in right of payment to all other costs and expenses of administration of these chapter 11 cases other than the Carve-Out Expenses and the DIP Obligations (exclusive of the Roll-Up Note Obligations).

For the avoidance of doubt, payment of the Administrative Priority Expenses shall be subject and subordinate in all respects to the payment and satisfaction of the Carve-Out Expenses.

---

[5]    Any amount of Closing Stores PRP Fees greater than the Closing Stores PRP Fee Cap shall not receive superpriority claim status notwithstanding such fees may have been incurred during the Sale Process Period.

[6]    For the avoidance of doubt, (i) any amounts or claims that may be claimed to arise under studio agreements whether they accrue during or after the Sale Process Period (other than the aforementioned Rental Share Fees, Operating Stores PRP Fees, and Closing Stores PRP Fees accrued during the Sale Process Period and, as to Closing Stores PRP Fees, up to the Closing Stores PRP Fee Cap); (ii) any revenue share fees or previously rented product fees or any other fee or claim that may accrue after the Sale Process Period or as a result of the sale of the Assets; (iii) any amounts not detailed in the Sale Budget; and (iv) any Rental Share Fees, Operating Stores PRP Fees, and Closing Stores PRP Fees owed to a movie studio that stops shipping units or delivering digital content to the Debtors on cash in advance or other terms agreeable to the Debtors shall not receive such superpriority claim status.

14.    This Court shall retain jurisdiction to hear and determine all matters arising from

the implementation of this Order.


Dated: New York, New York
         _____, 2011


                                        _____
                                        HONORABLE BURTON R. LIFLAND
                                        UNITED STATES BANKRUPTCY JUDGE

**Exhibit A**

**Bid Procedures**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                          :
In re                                     :        Chapter 11
                                          :
Blockbuster Inc., *et al.*,[1]            :        Case No. 10-14997 (BRL)
                                          :
                                          :        (Jointly Administered)
          Debtors.                        :
-------------------------------------------------------------x

## BID PROCEDURES FOR THE SALE
## OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

      Blockbuster Inc. and certain of its direct or indirect domestic subsidiaries, as debtors and debtors in possession (collectively, "***Blockbuster***" or the "***Debtors***"), set forth the following bid procedures (the "***Bid Procedures***") to be employed in connection with an auction (the "***Auction***") for the sale of substantially all of the Debtors' assets.  At a hearing following the Auction (the "***Sale Hearing***"), the Debtors will seek the entry of an order or orders (the "***Sale Order***") from the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") authorizing and approving the sale to the Qualified Bidder(s) (as defined below) that the Debtors, in consultation with the statutory committee of unsecured creditors (the "***Creditors' Committee***") and, subject to the conditions described below, the holders of approximately 80% in principal amount of the 11.75% Senior Secured Notes due 2014 issued by Blockbuster Inc. (the "***Steering Committee***"), determine to have made the highest or otherwise best bid(s) (each, a "***Successful Bidder***"), recognizing that, in determining the highest or otherwise best bid, a critical consideration shall be the bid that provides the greatest net proceeds available for distribution to creditors by the estates after the payment of the Carve-Out Expenses, Critical Expenses, Administrative Priority Expenses and the Expense Reimbursement (each as defined and more fully described in the motion seeking, among other things, entry of the Sale Order (the "***Sale Motion***")).[2]

### Approvals

      The proposed sale(s) shall in all respects be subject to approval by the Bankruptcy Court and in compliance with: (i) the applicable provisions of chapter 11 of title 11 of the U.S.

---

[1]    The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Blockbuster Inc. (5102); Blockbuster Canada Inc. (1269); Blockbuster Digital Technologies Inc. (9222); Blockbuster Distribution, Inc. (0610); Blockbuster Gift Card, Inc. (1855); Blockbuster Global Services Inc. (3019); Blockbuster International Spain Inc. (7615); Blockbuster Investments LLC (6313); Blockbuster Procurement LP (2546); Blockbuster Video Italy, Inc (5068); Movielink, LLC (5575); Trading Zone Inc. (8588); and B[2] LLC (5219).

[2]    Capitalized terms used but not defined in these Bid Procedures shall have the meanings ascribed to them in the Sale Motion.

Code (the "***Bankruptcy Code***"); (ii) the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"); and (iii) other applicable rules and law, including, without limitation, the Local Rules and Orders of the Bankruptcy Court.

## Assets to Be Sold

The Auction shall consist of all of the assets (the "***Assets***") used in Blockbuster's business operations, including but not limited to, its inventory, cash, intellectual property, digital rights, executory contracts, unexpired leases of nonresidential real property (including its distribution centers), owned real property, and the Debtors' equity interests in their non-Debtor foreign subsidiaries.

## Confidentiality Agreements

Upon execution of a valid confidentiality agreement, in form and substance satisfactory to the Debtors, any party that the Debtors deem in their discretion capable of submitting a Qualified Bid (as defined below) that wishes to conduct due diligence on any of the Assets may be granted access to all material information that has been or will be provided to the Stalking Horse Bidder (as defined below) and other such bidders.

## Bid Deadline

Any person or entity interested in participating in the Auction must submit a Qualified Bid (as defined below) on or before _____, 2011 at 5:00 p.m. (New York Time) (the "***Bid Deadline***") in writing, to: (i) the attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Stephen Karotkin, Esq. and Martin A. Sosland, Esq.); (ii) the attorneys for the Creditors' Committee, Cooley LLP, 1114 Avenue of the Americas, New York, New York 10036 (Attn: Jay R. Indyke, Esq., Richard Kanowitz, Esq., and Jeffrey L. Cohen, Esq.),; and (iii) the attorneys for the Steering Committee, Sidley Austin LLP, 787 Seventh Avenue, New York, New York 10019 (Attn: James Seery, Esq.).

## Qualified Bids

In order to participate in the bidding process and be deemed a "***Qualified Bidder***," each potential bidder (other than the Stalking Horse Bidder, as defined below) must submit a "***Qualified Bid***" by the Bid Deadline. To constitute a Qualified Bid, a bid must:

      (a)      be in writing;

      (b)      state that such bidder offers to purchase the Assets, or some substantial portion thereof;

      (c)      state that such bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of such Assets on terms and conditions no less favorable in the aggregate to the Debtors than the terms and conditions contained in that certain Asset Purchase and

Sale Agreement (the "**Stalking Horse APA**"),[3] dated as of _____, by and among Blockbuster Inc., the Debtor Subsidiaries Party thereto and Cobalt Video Holdco LLC (the "**Stalking Horse Bidder**"), including (i) taking into account payment of the Expense Reimbursement plus at least $1 million in additional value, and (ii) provision for a cash component sufficient to pay in full in cash all amounts set forth in Section 3.3(c) (__) – (__) of the Stalking Horse APA;

(d)    include a clean and duly executed Asset Purchase Agreement (the "**Modified APA**") and a marked Modified APA reflecting the variations from the Stalking Horse APA;

(e)    provide that such bidder's offer is terminable only in accordance with its terms as agreed to by the Debtors and otherwise irrevocable until (i) the closing of the purchase of the Assets if such bidder is the Successful Bidder (as defined below) and (ii) for two (2) business days after the earlier of the closing of the Sale Transaction with the Successful Bidder or the termination of the Successful Bid, if such bidder is designated the Back-Up Bidder (as defined below) at the conclusion of the Auction;

(f)    state that such bidder is financially capable of consummating the transactions contemplated by the Modified APA and detail the source(s) of funds that will be used to consummate the transaction;

(g)    include such financial and other information that will allow the Debtors to make a reasonable determination as to the bidder's financial and other capabilities to consummate the transaction contemplated by the Modified APA;

(h)    for any bid that requires the assumption and assignment of executory contracts or unexpired leases, the bidder must identify which executory contracts and/or unexpired leases are to be assumed and assigned and provide evidence establishing its ability to provide adequate assurance of performance of such executory contracts or unexpired leases;

(i)    not request or entitle the bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment;

(j)    fully disclose the identity of each entity that will be bidding for the applicable Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(k)    not contain any due diligence or financing contingencies of any kind;

---

[3]    A copy of the Stalking Horse APA is available on the Debtors' claims agent's website at www.kccllc.net/blockbuster.

(l)    include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified APA; and

(m)    include a cash deposit in an amount equal to ten (10%) percent of the value of the consideration offered to purchase the Assets (the "*Good Faith Deposit*").

The Debtors, in their discretion, may accept a single Qualified Bid or multiple bids for non-overlapping material portions of the Assets such that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid.

Notwithstanding the requirement set forth above that a Qualified Bid must include an offer to purchase all or a substantial portion of the Assets, the Debtors will consider bids for less than a substantial (but nevertheless a material) portion of the Assets. In this regard, with the goal and primary purpose of selling substantially all of the Assets, the Debtors, in their discretion, may accept as a single Qualified Bid, multiple bids for non-overlapping material portions of the Assets such that, when taken together in the aggregate, such bids would otherwise meet the standards for a single Qualified Bid. The Debtors may permit otherwise Qualified Bidders who submitted bids by the Bid Deadline for less than a substantial (but nevertheless a material) portion of the Assets but who were not identified as a component of a single Qualified Bid consisting of such multiple bids, to participate in the Auction and to submit higher or otherwise better bids that in subsequent rounds of bidding may be considered, together with other bids for non-overlapping material portions of the Assets, as part of such a single Qualifying Bid for overbid purposes.

In accordance with section 363(k) of the Bankruptcy Code, a credit bid may be submitted on behalf of all of the holders of the Senior Secured Notes to the extent any such credit bid is authorized by the terms of paragraph 29 of the DIP Order, the Indenture, and any other documents governing such notes; *provided, however,* in order to be considered, any such credit bid must include a cash component adequate to fund the payment in full, in cash of the Carve-Out Expenses, the Critical Expenses, the Administrative Priority Expenses, the Expense Reimbursement, the Estimated Wind Down Expenses, and the Approved Sale Expenses. A credit bid may also be submitted on behalf of all holders of the Roll-Up Notes or all of the DIP Lenders only to the extent any such credit bid is authorized by the terms of paragraph 29 of the DIP Order, and subject to the foregoing requirements as to the cash component. A credit bid consistent with this paragraph shall be deemed to be a Qualified Bid.

The Debtors, in consultation with the Creditors' Committee and, as applicable, the Steering Committee, shall make a determination regarding whether a bid is a Qualified Bid and shall notify bidders whether their bids have been determined to be Qualified Bids by no later than 5:00 p.m. (New York Time) on _____, 2011. The Stalking Horse Bidder is deemed a Qualified Bidder and the Stalking Horse APA constitutes a Qualified Bid for all purposes.

**Stalking Horse Bidder Expense Reimbursement**

Recognizing the Stalking Horse Bidder's expenditure of time, energy, and resources, the Debtors have agreed that if the Stalking Horse Bidder is not the Successful Bidder, the Debtors will, in certain circumstances, pay to the Stalking Horse Bidder an Expense Reimbursement not to exceed $5,000,000.

**No Qualified Bids**

If no timely, conforming Qualified Bids, other than the Stalking Horse APA, are submitted by the Bid Deadline with respect to any of the Assets, the Debtors shall not hold the Auction and, instead, shall request at the Sale Hearing that the Bankruptcy Court approve the Stalking Horse APA with the Stalking Horse Bidder.

**Auction**

In the event that the Debtors timely receive one or more Qualified Bids other than the Stalking Horse APA for any of the Assets, the Debtors shall conduct the Auction. The Auction will be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 on ____, 2011 at 10:00 a.m. (New York Time), or such other location as designated by the Debtors in a notice to all Qualified Bidders; *provided, however*, that the Debtors shall have the right to cancel the Auction at any time by delivering notice of such cancellation to all Qualified Bidders; *provided further*, that the Debtors shall have the right to conduct any number of Auctions on such date to accommodate Qualified Bids for certain, but less than all, of the Debtors' Assets if the Debtors determine, in their business judgment and in consultation with the Creditors' Committee and the Steering Committee (subject to the description of the consultation rights provided on page 7 of these Bid Procedures), that such process would be in the best interest of the Debtors' estates.

The Auction shall be governed by the following procedures, subject to modification by the Debtors at the Auction:

(a)     The Stalking Horse Bidder and the Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative.

(b)     Only representatives of the Debtors, the Stalking Horse Bidder, holders of Qualified Bids, the DIP Lenders, the Steering Committee, and the Creditors' Committee shall be entitled to be present at the Auction.

(c)     Only the Stalking Horse Bidder and Qualified Bidders shall be entitled to make any subsequent bids at the Auction.

(d)     Each Qualified Bidder (including the Stalking Horse Bidder) shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale.

(e)     Bidding shall commence at the amount of the highest Qualified Bid submitted by the Qualified Bidders prior to the Auction.

(f)     Qualified Bidders may then submit successive bids higher than the previous bid in increments of no less than $1 million. The Debtors reserve the right, in their reasonable discretion and subject to the exercise of their business judgment, to announce reductions or increases in minimum incremental bids at any time during the Auction.

(g)     All Qualified Bidders shall have the right to submit additional bids and make additional modifications to the Stalking Horse APA or their respective Modified APA, as applicable, at the Auction to improve such bids.

(h)     The Auction may include individual negotiations with the Qualified Bidders and/or open bidding in the presence of all other Qualified Bidders.

(i)     The Debtors reserve the right to (x) determine, in their reasonable discretion and in consultation with the Creditors' Committee and the Steering Committee (subject to the description of the consultation rights provided on page 7 of these Bid Procedures), which bid is the highest or otherwise best (recognizing that, in determining same, a critical consideration shall be which bid provides the greatest net proceeds available for distribution to creditors by the estates after payment of, *inter alia*, the Carve-Out Expenses, the Critical Expenses, the Administrative Priority Expenses, and the Expense Reimbursement, if any), and (y) reject at any time, without liability, any offer, other than the Stalking Horse Bid, that the Debtors, in their reasonable discretion and in consultation with the Creditors' Committee and, as applicable, the Steering Committee, deem to be (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or procedures set forth therein or in the Bid Procedures Order, or (2) contrary to the best interests of the Debtors and their estates.

(j)     The Auction shall continue until the Debtors determine, in consultation with the Creditors' Committee and, as applicable, the Steering Committee, and subject to Bankruptcy Court approval, that the Debtors have received the highest or otherwise best offer or offers for the Assets from among the Qualified Bidders (including the Stalking Horse Bidder) submitted at the Auction (the "***Successful Bid(s)***") (recognizing that, in determining same, a critical consideration shall be which bid provides the greatest net proceeds available for distribution to creditors by the estates after payment of, *inter alia*, the Carve-Out Expenses, Critical Expenses, Administrative Priority Expenses, and the Expense Reimbursement, if any). In making this decision, the Debtors may, in consultation with the Creditors' Committee and, as applicable, the Steering Committee, consider, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the Qualified Bidders' ability to close a given transaction, the proposed timing thereof, and rights of such Qualified Bidder and the Debtors with respect to the termination thereof,

the number, type and nature of any changes reflected in the Modified APA requested by each Qualified Bidder, and the net benefit to the Debtors' estates. The Qualified Bidder(s) submitting such Successful Bid(s) for the Assets shall become the "Successful Bidder(s)," and shall have such rights and responsibilities of a purchaser, as set forth in the Modified APA or Purchase Agreement, as applicable.

After adjournment of the Auction, but prior to the Sale Hearing, the Successful Bidder(s) shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid(s) were made and make and pay for all necessary filings with all applicable governmental or other authorities. Bids made after the close of the Auction shall not be considered by the Debtors.

## Reservation of Rights

The Debtors reserve the right, in their reasonable discretion and subject to the exercise of their business judgment, to make non-material alterations to these Bid Procedures and/or to terminate discussions with any and all prospective acquirers and investors (including the Stalking Horse Bidder) at any time and without specifying the reasons therefor, but only to the extent not materially inconsistent with the Bid Procedures set forth herein.

## Back-Up Bidder and Return of Good Faith Deposits

If an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Qualified Bid for the Assets at the Auction (the "***Back-Up Bid***") shall be required to serve as the back-up bidder (the "***Back-Up Bidder***") for such Assets and keep such Back-Up Bid open and irrevocable for either (i) two (2) business days after the closing of the Sale Transaction with the Successful Bidder, or (ii) five (5) business days after the termination of the Successful Bid, whichever applies. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved Sale Transaction because of a breach or failure to perform on the part of such Successful Bidder or otherwise, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Bankruptcy Court. For the avoidance of doubt, absent participation in the Auction and the making of an overbid, the Stalking Horse Bidder cannot be designated the Back-Up Bidder, unless it consents to such designation.

Except as otherwise provided herein, Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder by no later than the fifth (5th) business day following the conclusion of the Auction. The Good Faith Deposit of the Back-Up Bidder shall be held by the Debtors until one (1) business day after the closing of the sale transaction with the Successful Bidder.

## Steering Committee

In connection with any consultation rights provided to the Steering Committee herein, neither the Stalking Horse Bidder nor any other holder of the Senior Secured Notes who has submitted, or participated in the submission of, a bid may participate in the Steering Committee's consultation rights unless and until such time as the Stalking Horse Bidder or such

other bidder informs the Debtors and the Steering Committee that it has irrevocably withdrawn from participating in the Auction.

**Sale Hearing**

      The Successful Bid(s) (or the Stalking Horse APA, if no Qualified Bid other than that of the Stalking Horse Bidder is received or accepted) will be subject to approval by the Bankruptcy Court. The Sale Hearing will take place on _____, 2011 at 10:00 a.m. (New York Time) before the Honorable Burton R. Lifland, United States Bankruptcy Judge, United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004, Courtroom 623. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open Court on the date scheduled for the Sale Hearing or on the Court's docket.

## Exhibit B

### Sale Notice

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                      :

In re                    :      **Chapter 11**
                    :

**BLOCKBUSTER INC.,** *et al.,*[1]  :      **Case No. 10-14997 (BRL)**
                    :

                    :      **(Jointly Administered)**
       **Debtors.**     :
-------------------------------------------------------------- x

## NOTICE OF (I) PROPOSED SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, (II) BID PROCEDURES, (III) AUCTION, AND (IV) SALE HEARING

       **PLEASE TAKE NOTICE** that, on February __, 2011, Blockbuster Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, "***Blockbuster***" or the "***Debtors***"), filed a motion (the "***Sale Motion***") with the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") seeking entry of (i) an order, among other things, (a) approving certain procedures (the "***Bid Procedures***") for the solicitation of bids and the conduct of an auction (the "***Auction***") in connection with the sale (the "***Sale Transaction***") of all or substantially all of the Debtors' assets (the "***Assets***"), (b) approving the form and manner of notice with respect to the proposed sale of the Assets, the Auction, and the Sale Hearing (as defined below), (c) approving procedures for the assumption and assignment of contracts and leases (the "***Assumption Procedures***") to any purchaser of the Assets and/or to resolve any objections thereto and related notices, (d) scheduling a hearing to approve any such sale with respect to any bid accepted by the Debtors (the "***Sale Hearing***"); and (ii) an order (a) authorizing and approving the Sale Transaction contemplated in that certain Asset Purchase and Sale Agreement, the "***Purchase Agreement***") with Cobalt Video Holdco LLC (the "***Purchaser***") or such Successful Bidder(s) (as such term is defined in the Bid Procedures), and (b) authorizing and approving the assumption and assignment of certain executory contracts and unexpired leases (the "***Designated Contracts***") in connection with the Sale Transaction.

       **PLEASE TAKE FURTHER NOTICE that the Auction is currently scheduled to be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 on _____, 2011 at 10:00 a.m. (New York Time), at which time**

---

[1]    The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Blockbuster Inc. (5102); Blockbuster Canada Inc. (1269); Blockbuster Digital Technologies Inc. (9222); Blockbuster Distribution, Inc. (0610); Blockbuster Gift Card, Inc. (1855); Blockbuster Global Services Inc. (3019); Blockbuster International Spain Inc. (7615); Blockbuster Investments LLC (6313); Blockbuster Procurement LP (2546); Blockbuster Video Italy, Inc (5068); Movielink, LLC (5575); Trading Zone Inc. (8588); and B$^2$ LLC (5219).

all "**Qualified Bidders**" (as such term is defined in the Bid Procedures) may bid and participate pursuant to the terms of the Bid Procedures. As described in the Bid Procedures, the Debtors are soliciting bids for all of their Assets. The Auction will continue until such time as the highest or otherwise best offer is determined by the Debtors. The Debtors may adopt rules for the Auction that will promote the goals of the Auction process and that are not inconsistent with any of the provisions of the Bid Procedures. Only bidders who submit bids in accordance with the Bid Procedures will be allowed to attend the Auction.

A copy of the Sale Motion, the Purchase Agreement, the Bid Procedures, and the order approving the Bid Procedures (the "*Bid Procedures Order*") may be obtained by (i) contacting the attorneys for the Debtors, Weil, Gotshal & Manges LLP at (x) 767 Fifth Avenue, New York, New York 10153 (Attn: Stephen Karotkin, Esq.) and (y) 200 Crescent Court, Suite 300, Dallas, Texas 75201 (Attn: Martin A. Sosland, Esq.); (ii) accessing the Bankruptcy Court's website at http://www.nysb.uscourts.gov (please note that a PACER password is needed to access documents on the Court's website); (iii) viewing the docket of these cases at the Clerk of the Court, United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004; or (iv) accessing the public website maintained by the Debtors' court-appointed claims agent, Kurtzman Carson Consultants, at www.kccllc.net/blockbuster. Copies of such documents may also be obtained by contacting Kurtzman Carson Consultants at (877) 660-6684.

**PLEASE TAKE FURTHER NOTICE that the Sale Hearing is currently scheduled to be held on _____, 2011 at 10:00 am (New York Time) at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, Courtroom 623, before the Honorable Burton R. Lifland, United States Bankruptcy Judge**, to consider the Debtors' selection of the highest or otherwise best bid and approval of the Sale Transaction. The Sale Hearing may be adjourned, from time to time, without further notice to creditors or parties in interest other than by announcement of the adjournment in open Court or on the Court's docket.

**PLEASE TAKE FURTHER NOTICE THAT ANY OBJECTIONS TO ANY RELIEF REQUESTED IN THE SALE MOTION, INCLUDING THE DEBTORS' REQUEST TO APPROVE THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES, MUST BE IN WRITING, FILED, AND SERVED SO AS TO BE ACTUALLY RECEIVED BY _____, 2011 AT 5:00 P.M. (NEW YORK TIME)** by the Bankruptcy Court and: (a) the Debtors, c/o Blockbuster Inc., 1201 Elm Street, Dallas, Texas 75270 (Attn: Rod McDonald, Esq.); (b) Weil, Gotshal & Manges LLP, attorneys for the Debtors at (x) 767 Fifth Avenue, New York, New York 10153 (Attn: Stephen Karotkin, Esq.) and (y) 200 Crescent Court, Suite 300, Dallas, Texas 75201 (Attn: Martin A. Sosland, Esq.); (c) the Office of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Brian Masumoto, Esq. and Elisabetta Gasparini, Esq.); (d) the United States Attorney for the Southern District of New York, One St. Andrew's Plaza, Claims Unit – Room 417, New York, New York 10007; (e) the Securities & Exchange Commission, Northeast Region, The Woolworth Building, 233 Broadway, New York, New York 10279 (Attn: John Murray); (f) Cooley LLP, attorneys for the Creditors' Committee, 1114 Avenue of the Americas, New York, New York 10036 (Attn: Jay R. Indyke, Esq., Richard Kanowitz, Esq., and Jeffrey L. Cohen, Esq.); (g) Sidley Austin LLP, attorneys for the Steering Committee and the

DIP Lenders, 787 Seventh Avenue, New York, New York 10019 (Attn: James Seery, Esq.); (h) Sheppard, Mullin, Richter & Hampton LLP, attorneys for U.S. Bank National Association, as trustee under that certain Indenture, dated October 1, 2009, with respect to the Senior Secured Notes, 333 South Hope St., Floor 43, Los Angeles, California 90071 (Attn: Kyle J. Mathews, Esq.); (i) Emmet, Marvin & Martin, LLP, attorneys for The Bank of New York Trust Company, N.A., as trustee under that certain Indenture, dated as of August 20, 2004, with respect to the 9% Senior Subordinated Notes due 2012 issued by Blockbuster Inc., 120 Broadway, 32nd Floor, New York, New York 10271 (Attn: Edward P. Zujkowski, Esq.); (j) Skadden, Arps, Slate, Meagher & Flom LLP, attorneys for Wilmington Trust FSB as agent under the DIP Facility, 4 Times Square, New York, New York 10036 (Attn: Peter J. Neckles, Esq.); and (k) Milbank, Tweed, Hadley & McCloy LLP, 601 South Figueroa Street, 30th Floor, Los Angeles, CA 90017-5735, the attorneys for the Purchaser (Attn: Mark Shinderman, Esq. and Brian Kelly, Esq.).

This notice is qualified in its entirety by the Bid Procedures Order and the Sale Motion. All persons and entities are urged to read the Bid Procedures Order and the Sale Motion and the provisions thereof carefully. To the extent that this notice is inconsistent with the Bid Procedures Order, the terms of the Bid Procedures Order shall govern.

**PLEASE TAKE FURTHER NOTICE THAT THE FAILURE TO ABIDE BY THE PROCEDURES AND DEADLINES SET FORTH IN THE BID PROCEDURES ORDER AND THE BID PROCEDURES MAY RESULT IN THE FAILURE OF THE BANKRUPTCY COURT TO CONSIDER A COMPETING BID OR AN OBJECTION TO THE PROPOSED SALE TRANSACTION.**

Dated: _____, 2011

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Attorneys for Debtors and Debtors in Possession

**<u>Exhibit C</u>**

**Notice of Assumption and Assignment**

UNITED STATES BANKRUPTCY COURT-
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                :

In re                                :          **Chapter 11**
                                :

**Blockbuster Inc., et al.,**[1]     :          **Case No. 10-14997 (BRL)**
                                :

                                :          **(Jointly Administered)**
            **Debtors.**          :
----------------------------------------------------------------x

## NOTICE OF ASSUMPTION, ASSIGNMENT AND CURE AMOUNT WITH RESPECT TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED TO THE SALE OF THE ASSETS OF THE DEBTORS

**PLEASE TAKE NOTICE** that, on February \_\_\_, 2011, Blockbuster Inc. and its debtor-affiliates in the above-captioned chapter 11 cases (collectively, "***Blockbuster***" or the "***Debtors***") entered into a Purchase Agreement (the "***Purchase Agreement***") with Cobalt Video Holdco LLC (the "***Purchaser***"), under which the Debtors have agreed to sell to Purchaser certain assets (as defined in the Purchase Agreement, the "***Assets***"), and Purchaser has agreed to assume (or cause certain of its subsidiaries to assume) certain liabilities, related to the Debtors' business (the "***Sale Transaction***"). The Purchase Agreement is subject to higher or otherwise better offers and an auction process.

**PLEASE TAKE FURTHER NOTICE** that, on February \_\_, 2011, the Debtors filed a motion (the "***Sale Motion***") to among other things (a) establish sales and bidding procedures with respect to the Sale Transaction, (b) approve certain stalking horse bidder protections, (c) schedule an auction and sale hearing (the "***Sale Hearing***") with respect to the Sale Transaction, and (d) approve the sale of the Assets and the assumption and assignment of certain contracts and leases relating thereto free and clear of all liens, claims, encumbrances and other interests.

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing is currently scheduled to be held on \_\_\_\_\_, 2011 at 10:00 am (New York Time) at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, Courtroom 623, before the Honorable Burton R. Lifland, United States Bankruptcy Judge, to consider the Debtors' selection of the highest or otherwise best bid and the approval of Sale Transaction. The Sale Hearing may be adjourned,

---

[1]    The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Blockbuster Inc. (5102); Blockbuster Canada Inc. (1269); Blockbuster Digital Technologies Inc. (9222); Blockbuster Distribution, Inc. (0610); Blockbuster Gift Card, Inc. (1855); Blockbuster Global Services Inc. (3019); Blockbuster International Spain Inc. (7615); Blockbuster Investments LLC (6313); Blockbuster Procurement LP (2546); Blockbuster Video Italy, Inc (5068); Movielink, LLC (5575); Trading Zone Inc. (8588); and B$^2$ LLC (5219).

from time to time, without further notice to creditors or parties in interest other than by announcement of the adjournment in open Court or on the Court's docket.

                **PLEASE TAKE FURTHER NOTICE** that, pursuant to the Sale Transaction, the Debtors have sought authorization to assume and assign certain executory contacts and unexpired leases relating to the Assets upon consummation of the transactions contemplated by the Sale Transaction. A list of these executory contracts and unexpired leases (the "***Designated Contracts***") is attached hereto as ***Exhibit "A"*** and is also available on the internet at www.kccllc.net/blockbuster (the "***Website***"), or upon request to the Debtors' noticing agent at 1-877-660-6684. The Debtors and the Purchaser reserve the right to remove any Designated Contracts from such list prior to consummation of the transaction contemplated by the Sale Transaction.

**YOU ARE RECEIVING THIS NOTICE BECAUSE**
**YOU MAY BE A PARTY TO A DESIGNATED CONTRACT**
**(OR REPRESENT A PARTY TO A DESIGNATED CONTRACT).**

                The Debtors have determined what they believe is the appropriate amount to cure all unpaid amounts due (the "***Cure Amount***") for each Designated Contract and have listed such Cure Amounts on ***Exhibit "A"*** hereto and on the Website.

                To the extent that you object to (i) the assumption and assignment to the Purchaser of your respective Designated Contract in connection with the Sale Transaction or (ii) the Cure Amount, then **you must file with the Bankruptcy Court and serve an objection upon the following parties, so as to be actually received by no later than _____, 2011 at 5:00 p.m. (New York Time):** (a) the Office of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Brian Masumoto, Esq. and Elisabetta Gasparini, Esq.); (b) the Debtors, c/o Blockbuster Inc., 1201 Elm Street, Dallas, Texas 75270 (Attn: Rod McDonald, Esq.); (c) Weil, Gotshal & Manges LLP, attorneys for the Debtors at (x) 767 Fifth Avenue, New York, New York 10153 (Attn: Stephen Karotkin, Esq.) and (y) 200 Crescent Court, Suite 300, Dallas, Texas 75201 (Attn: Martin A. Sosland, Esq.); (d) the United States Attorney for the Southern District of New York, One St. Andrew's Plaza, Claims Unit – Room 417, New York, New York 10007; (e) the Securities & Exchange Commission, Northeast Region, The Woolworth Building, 233 Broadway, New York, New York 10279 (Attn: John Murray); (f) Cooley LLP, attorneys for the Creditors' Committee, 1114 Avenue of the Americas, New York, New York 10036 (Attn: Jay R. Indyke, Esq., Richard Kanowitz, Esq., and Jeffrey L. Cohen, Esq.); (g) Sidley Austin LLP, attorneys for the Steering Committee and the DIP Lenders, 787 Seventh Avenue, New York, New York 10019 (Attn: James Seery, Esq.); (h) Sheppard, Mullin, Richter & Hampton LLP, attorneys for U.S. Bank National Association, as trustee under that certain Indenture, dated October 1, 2009, with respect to the Senior Secured Notes, 333 South Hope St., Floor 43, Los Angeles, California 90071 (Attn: Kyle J. Mathews, Esq.); (i) Emmet, Marvin & Martin, LLP, attorneys for The Bank of New York Trust Company, N.A., as trustee under that certain Indenture, dated as of August 20, 2004, with respect to the 9% Senior Subordinated Notes due 2012 issued by Blockbuster Inc., 120 Broadway, 32nd Floor, New York, New York 10271 (Attn: Edward P. Zujkowski, Esq.); (j) Skadden, Arps, Slate, Meagher & Flom LLP, attorneys for Wilmington Trust FSB as agent under the DIP Facility, 4 Times Square, New York, New York 10036 (Attn: Peter J. Neckles, Esq.); and (k) Milbank,

Tweed, Hadley & McCloy LLP, 601 South Figueroa Street, 30th Floor, Los Angeles, CA 90017-5735, attorneys for the Purchaser (Attn: Mark Shinderman, Esq. and Brian Kelly, Esq.).  **Any objection to the proposed assumption and assignment must state with specificity the legal and factual basis on which the objection is premised.  Any objection to the Cure Amount must state with specificity what other Cure Amount is required and provide appropriate documentation in support thereof.**

> **PLEASE TAKE FURTHER NOTICE** that your objection, if any, will be heard and determined at the Sale Hearing.

> **PLEASE TAKE FURTHER NOTICE** that, if the Purchaser is not the successful bidder at the Auction, then no less than three (3) days prior to the Sale Hearing, the Debtors shall send a subsequent notice to you identifying the successful bidder and publish same on the Website.  In such an event, by no later than 5:00 p.m. (New York Time) on _____, 2011 or such other date that is one (1) business day prior to the Sale Hearing, you may file an additional objection based solely on the ability of the successful bidder to perform its obligations under such Designated Contract.

> **PLEASE TAKE FURTHER NOTICE** that, if an objection to a Cure Amount is filed, the Purchaser or other successful bidder reserves the right to delete the applicable contract or lease as a Designated Contract if the Cure Amount is ultimately determined by order of the Court to be higher than the Cure Amount set forth on *Exhibit "A"* hereto.

> **PLEASE TAKE FURTHER NOTICE** that, if no objection to the assumption an assignment of a Designated Contract or Cure Amount is timely filed and served, (a) the counterparty to such a Designated Contract shall be deemed to have consented to the assumption and assignment of the Designated Contract in connection with the Sale Transaction and shall be forever barred from asserting any objection with regard to such assumption or assignment, and (b) the Cure Amount set forth on *Exhibit "A"* or on the Website shall be controlling, notwithstanding anything to the contrary in any Designated Contract, or any other document, and the counterparty to a Designated Contract shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the successful bidder, or the property of any of them.

Dated: _____, 2011

> WEIL, GOTSHAL & MANGES LLP
> 767 Fifth Avenue
> New York, New York 10153
> Telephone:  (212) 310-8000
> Facsimile:  (212) 310-8007
> Attorneys for Debtors and Debtors in Possession