UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11
                                          :
BLOCKBUSTER INC., *et al.*,[1]            :    Case No. 10-14997 (BRL)
                                          :
                                          :    (Jointly Administered)
              Debtors.                    :
------------------------------------------------------------ x

# ORDER, PURSUANT TO 11 U.S.C. §§ 105, 363, 364, 365 AND 503 AND FED. R. BANKR. P. 2002, 4001, 6004, 6006, 9008, 9014, AND 9019 APPROVING (A) BID PROCEDURES, (B) STALKING HORSE EXPENSE REIMBURSEMENT, (C) NOTICE OF SALE, AUCTION AND SALE HEARING, (D) ASSUMPTION PROCEDURES AND RELATED NOTICES, (E) INCURRENCE OF SALE-RELATED ADMINISTRATIVE PRIORITY CLAIMS, AND (F) IMPOSITION OF AN ADMINISTRATIVE STAY

Upon the Motion, dated February 21, 2011,[2] of Blockbuster Inc. and its debtor affiliates, as debtors and debtors in possessions (collectively, "***Blockbuster***", or the "***Debtors***"), pursuant to 11 U.S.C. §§ 105, 362, 363, 364, 365 and 503 and Fed. R. Bankr. P. 2002, 4001, 6004, 6006, 9008, 9014, and 9019 for entry of (I) an order authorizing and approving, among other things, (A) Bid Procedures in connection with the sale of substantially of all of the Debtors' assets (the "***Assets***"), (B) the Expense Reimbursement, (C) the notice of sale, auction, and sale hearing (the "***Sale Notice***'), (D) Assumption Procedures and Assumption, Assignment, and Cure Notices with respect to the assumption and assignment of executory contracts and

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Blockbuster Inc. (5102); Blockbuster Canada Inc. (1269); Blockbuster Digital Technologies Inc. (9222); Blockbuster Distribution, Inc. (0610); Blockbuster Gift Card, Inc. (1855); Blockbuster Global Services Inc. (3019); Blockbuster International Spain Inc. (7615); Blockbuster Investments LLC (6313); Blockbuster Procurement LP (2546); Blockbuster Video Italy, Inc (5068); Movielink, LLC (5575); Trading Zone Inc. (8588); and B$^2$ LLC (5219).

[2] Capitalized terms used herein but not defined herein shall have the meanings ascribed to such terms in the Motion.

unexpired leases in connection with the Sale Transaction (as hereinafter defined), (E) incurrence of sale-related Administrative Priority Expenses, and (F) imposition of an injunction enjoining any collection efforts (the "**Administrative Stay**") with respect to the payment of administrative expenses related to the period from the Commencement Date through February 24, 2011 (the "**Pre-Sale Period**"); and (II) an order (A) authorizing and approving the sale and related transactions (the "**Sale Transaction**") contemplated by the Stalking Horse Bid of the Debtors' Assets free and clear of all liens, claims, and encumbrances to the Successful Bidder, (B) authorizing and approving the assumption and assignment of certain Designated Contracts to the Stalking Horse Bidder (together with any of its designees, the "**Purchaser**") or the Successful Bidder(s), and (C) granting related relief; and upon the Court's consideration of the Motion, the record of the hearing held on March 10, 2011 with respect to the Motion (the "**Hearing**"), including any objections filed and raised at the Hearing; and upon all of the proceedings had before the Court; and after due deliberation, and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**:[3]

A. The Court has jurisdiction over this matter and over the property of the Debtors and their respective bankruptcy estates pursuant to 28 U.S.C. §§ 157(a) and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O). The statutory predicates for the relief sought herein are 11 U.S.C. §§ 105, 363, 364, 365 and 503 and Fed. R. Bankr. P. 2002, 6004, 6006, 9008, 9014 and 9019. Venue of these cases and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B. The relief granted herein is in the best interests of the Debtors, their estates, their stakeholders, and other parties in interest.

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law. *See* Fed. R. Bankr. P. 7052.

C. The notice of the Motion and the Hearing given by the Debtors constitutes due and sufficient notice thereof.

D. The Debtors have articulated good and sufficient reasons for the Court to (i) approve the Bid Procedures, including the authorization to incur and pay expenses necessary to reach the sale and the application of the proceeds of the sale, (ii) approve the Expense Reimbursement as provided in the Purchase Agreement, as amended in the form annexed hereto as ***Exhibit "A"*** (the "***Purchase Agreement***"), (iii) approve the form and manner of notice of the Motion, the Auction, the Sale Hearing, and the assumption and assignment of the Designated Contracts, and (iv) set the date of the Auction and the Sale Hearing.

E. The Expense Reimbursement, to the extent payable under the Purchase Agreement, (i) shall be deemed an actual and necessary cost and expense of preserving the Debtors' estates, (ii) is of substantial benefit to the Debtors' estates, (iii) is reasonable and appropriate, including in light of the size and nature of the Sale Transaction, the necessity to announce a sale transaction for the Debtors, and the efforts that have been and will be expended by the Purchaser, (iii) has been negotiated by the parties and their respective advisors at arms' length and in good faith, and (v) is necessary to ensure that the Purchaser will continue to pursue the proposed Sale Transaction. The Expense Reimbursement is a material inducement for, and condition of, the Purchaser's entry into the Stalking Horse Bid. The Purchaser is unwilling to commit to purchase the Assets under the terms of the Stalking Horse Bid unless the Purchaser is assured the Expense Reimbursement.

F. The Bid Procedures are reasonable and appropriate and represent the best method for maximizing the realizable value of the Assets.

**THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT**:

1. The Motion is granted, as provided herein.

2. All objections filed in response to the relief granted herein, to the extent not resolved as set forth herein or at the Hearing, are hereby overruled.

### The Stalking Horse Bid

3. The Sale Transaction contemplated by the Purchase Agreement is designated as the "*Stalking Horse Bid*."

### Bid Procedures

4. The Bid Procedures, substantially in the form annexed hereto as ***Exhibit "B"*** and incorporated herein by reference, are hereby approved. The failure specifically to include or reference a particular provision of the Bid Procedures in this Order shall not diminish or impair the effectiveness of such provision.

5. To constitute a "*Qualified Bid*", a bid (other than the Stalking Horse Bid, which hereby constitutes a Qualified Bid) must be received by the Bid Deadline (as defined in the Bid Procedures) and otherwise comply with all of the applicable provisions of the Bid Procedures.

### Auction and Sale Hearing

6. The Auction shall be held on April 4, 2011 at 10:00 a.m. (New York time) at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, Courtroom 623 (the "*Bankruptcy Court*"). The Debtors shall file a notice announcing the results of the Auction and the identity of the Successful Bidder(s) on the Court's docket and the Website (as defined below) as soon as practicable after conclusion of the Auction. The Court shall hold a hearing on April 7, 2011 at 10:00 a.m. (New York time) (the "*Sale Hearing*"), at which time the Court shall

consider the approval of the Sale Transaction as set forth in the Motion, approve the Successful Bidder(s), and confirm the results of the Auction, if any.

7. Objections to the Sale Transaction, if any, shall be in writing and shall be filed and served so as to be actually received by the Bankruptcy Court and the following parties (the "*Objection Recipients*") on or before March 31, 2011 at 5:00 pm New York Time (the "*Objection Deadline*"):

    a.    the Debtors, c/o Blockbuster Inc., 1201 Elm Street, Dallas, Texas 75270 (Attn: Rod McDonald, Esq.);

    b.    the attorneys for the Debtors, Weil, Gotshal & Manges LLP, at (x) 767 Fifth Avenue, New York, New York 10153 (Attn: Stephen Karotkin, Esq.) and (y) 200 Crescent Court, Suite 300, Dallas, Texas 75201 (Attn: Martin A. Sosland, Esq.);

    c.    the attorneys for the Creditors' Committee, Cooley LLP, 1114 Avenue of the Americas, New York, New York 10036 (Attn: Jay R. Indyke, Esq., Richard S. Kanowitz, Esq., and Cathy Hershcopf, Esq.);

    d.    the Office of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Brian Masumoto, Esq. and Elisabetta Gasparini, Esq.);

    e.    the attorneys for the Steering Committee and the DIP Lenders, Sidley Austin LLP, 787 Seventh Avenue, New York, New York 10019 (Attn: James P. Seery, Esq., Paul S. Caruso, Esq., and Alex R. Rovira, Esq.);

    f.    the attorneys for U.S. Bank National Association, as trustee (the "*Senior Secured Indenture Trustee*") under that certain Indenture, dated October 1, 2009, with respect to the Senior Secured Notes, Sheppard, Mullin, Richter & Hampton LLP, 333 South Hope St., Floor 43, Los Angeles, California 90071 (Attn: Kyle J. Mathews, Esq.);

    g.    the attorneys for The Bank of New York Trust Company, N.A., as trustee (the "*Senior Subordinated Indenture Trustee*") under that certain Indenture, dated as of August 20, 2004, with respect to the 9% Senior Subordinated Notes due 2012 issued by Blockbuster Inc., Emmet, Marvin & Martin, LLP, 120 Broadway, 32nd Floor, New York, New York 10271 (Attn: Edward P. Zujkowski, Esq.);

|      |      |                                                                                                                                                                                                                                                                                 |
|------|------|---|
|      | h.   | the attorneys for Wilmington Trust FSB as agent under the DIP Facility (the "***DIP Agent***"), Skadden, Arps, Slate, Meagher & Flom LLP, , 4 Times Square, New York, New York 10036 (Attn: Peter J. Neckles, Esq.);                                                             |
|      | i.   | the United States Attorney for the Southern District of New York, (x) One St. Andrew's Plaza, Claims Unit – Room 417, New York, New York 10007, and (y) 86 Chambers Street, 3d Floor, New York, New York 10007 (Attn: Pierre G. Armand, Esq.);                                  |
|      | j.   | the Securities & Exchange Commission, Northeast Region, The Woolworth Building, 233 Broadway, New York, New York 10279 (Attn: John Murray);                                                                                                                                      |
|      | k.   | the attorneys for the Purchaser, Milbank, Tweed, Hadley & McCloy LLP, at (x) 601 South Figueroa Street, 30th Floor, Los Angeles, CA 90017-5735 (Attn: Mark Shinderman, Esq.) and (y) One Chase Manhattan Plaza, New York, New York 10005 (Attn: Tom Janson, Esq.); and          |
|      | l.   | the attorneys for the Ad Hoc Studio Committee of Blockbuster Inc. et al. (the "***Ad Hoc Studio Committee***"), Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 36th Floor, New York, New York 10017 (Attn: Robert J. Feinstein, Esq.).                                    |

Objections to the assumption and assignment of Designated Contracts are addressed below.

8. The failure to file and serve an objection to the Sale Transaction by the Objection Deadline shall be a bar to the assertion thereof at the Sale Hearing or thereafter.

9. The Sale Hearing may be adjourned from time to time without further notice to the Sale Motion Notice Parties, creditors or other parties in interest other than by announcement of the adjournment in open Court or an entry of a notice of such adjournment on the Court's docket.

**The Expense Reimbursement**

10. The Debtors are authorized and directed to pay the Expense Reimbursement as provided in the Purchase Agreement without further order of the Court.

11. The Debtors' obligation to pay the Expense Reimbursement as provided herein shall survive termination of the Stalking Horse Bid, shall constitute a superpriority administrative claim against the Debtors' estates pursuant to sections 105(a), 503(b) and 364(c)(1) of the Bankruptcy Code and shall be senior to, and have priority over, all other claims against the Debtors, including all claims with respect to the DIP Financing, but excluding and subject and subordinate in all respects to the Carve-Out Expenses, the Critical Expenses, and the Administrative Priority Expenses. Subject to the foregoing, the Expense Reimbursement shall be paid in cash from the proceeds of any approved sale, or credited against the purchase price if the Stalking Horse Bid is the Successful Bid and the sale contemplated by the Purchase Agreement is consummated.

## Authorization

12. The Debtors are authorized to take any and all such actions as contemplated by the Stalking Horse Bid prior to the Auction and the Sale Hearing, including, without limitation, actions to notify creditors, customers, regulators or other interested parties regarding the Sale Transaction and to obtain any and all necessary consents or approvals regarding the Sale Transaction.

## Notice

13. Notwithstanding anything in the Purchase Agreement to the contrary, notice of (a) the Motion, (b) the Bid Procedures, (c) the Auction, (d) the Objection Deadline, (e) the Sale Hearing and (f) the proposed assumption and assignment of the Designated Contracts to the Purchaser pursuant to the Stalking Horse Bid or to the Successful Bidder shall be good and sufficient, and no other or further notice shall be required, if given as follows:

(a) <u>Notice of Sale, Auction, and Sale Hearing</u>: Within three (3) business days after entry of this Order, the Debtors (or their agents) shall:

1. provide notice, in substantially the form attached hereto as ***Exhibit "C"*** (the "***Sale Notice***"), of this Order, the Motion, the Stalking Horse Bid, the Auction, the Objection Deadline, and the Sale Hearing by email, mail, facsimile or overnight delivery service, upon: (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the attorneys for the Senior Secured Indenture Trustee; (iv) the attorneys for the Senior Subordinated Indenture Trustee; (v) the attorneys for the Steering Committee and the DIP Lenders; (vi) the attorneys for the DIP Agent; (vii) each counterparty to an executory contract or unexpired lease; (viii) in each State in which the Debtors' stores are located: (a) the Attorney General's Office, and (b) the applicable taxing authorities; (ix) the United States Attorney for the Southern District of New York; (x) the attorneys for the Purchaser; (xi) the attorneys for the Ad Hoc Studio Committee; (xii) those parties who have requested notice pursuant to Bankruptcy Rule 2002; (xiii) all known creditors of the Debtors and all entities known to have asserted any claims against the Assets or the Debtors' interest in the Assets and other entities known to have asserted a lien, interest or encumbrance in or upon any of the Assets; and (xiv) all known bona fide entities that have previously expressed an interest in purchasing the Assets in the twelve (12) months immediately preceding the date of the Motion; and

2. cause the Sale Notice to be published on www.kccllc.net/blockbuster (the "***Website***") as soon as practicable after entry of this Order.

In addition, the Debtors (or their agents) shall publish the Sale Notice on one occasion each in *The Wall Street Journal* and *The New York Times*, national editions, on or before March 23, 2011.

(b) <u>Assumption, Assignment and Cure Notice</u>.

1. Within three (3) business days after receiving the schedule from the Purchaser of those executory contracts and unexpired leases it wishes to assume pursuant to the Purchase Agreement (the "***Designated Contracts***") but no later than fifteen (15) days prior to the Sale Hearing, the Debtors shall file with the Court and serve on each counterparty to a Designated Contract by email, mail, facsimile or overnight delivery service, a notice of assumption, assignment and cure substantially in the form attached hereto as ***Exhibit "D"*** (the "***Assumption, Assignment and Cure Notice***"). The Assumption, Assignment and Cure Notice shall include (x) the Debtors' calculation of the amount necessary to cure all monetary defaults (the "***Cure Amount***") for each such Designated Contract, and (y) evidence of the Purchaser's ability to provide adequate assurance of performance of such executory contracts or unexpired leases (an "***Adequate Assurance Package***"). A list of the Designated Contracts, including Cure Amounts with respect thereto, will be posted on the Website and updated as modified. The Debtors reserve the right to provide the Assumption, Assignment and Cure Notice to counterparties not yet so designated by Purchaser, and Purchaser reserves the right to supplement its

8

designation of contracts for assumption and assignment up to April 1, 2011, and to remove a contract from the list of Designated Contracts at any time prior to conclusion of the Auction.

     2. Any counterparty to a Designated Contract shall file and serve on the Objection Recipients any objections to (i) the proposed assumption and assignment to the Successful Bidder (and must state in its objection, with specificity, the legal and factual basis of its objection) and (ii) if applicable, the proposed Cure Amount (and must state in its objection, with specificity, what Cure Amount is required with appropriate documentation in support thereof), no later than 5:00 p.m. (New York time) on March 31, 2011; *provided*, *however,* that to the extent the Successful Bidder is an entity other than the Purchaser, any further objections to the Sale Order by a counterparty to a Designated Contract based solely on the ability of the Successful Bidder to perform under any such Designated Contract shall be filed by no later than 12:00 p.m. (New York time) on the business day prior to the Sale Hearing. If any executory contract or unexpired lease is added to the schedule of Designated Contracts, a copy of the applicable Assumption, Assignment, and Cure Notice and Adequate Assurance Package shall be served on the counterparty by overnight courier service within one (1) day of such addition and any such counterparty may file an objection as aforesaid at any time that is one (1) business day prior to the Sale Hearing. If no objection is timely received, (x) the counterparty to a Designated Contract shall be deemed to have consented to the assumption and assignment of the Designated Contract to the Successful Bidder and shall be forever barred from asserting any objection with regard to such assumption and assignment, and (y) the Cure Amount set forth in the Assumption, Assignment and Cure Notice shall be controlling, notwithstanding anything to the contrary in any Designated Contract, or any other document, and the counterparty to a Designated Contract shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the Successful Bidder, or the property of any of them.

     3. If the Purchaser is not the Successful Bidder at the Auction, then prior to the Sale Hearing the Debtors shall send a subsequent notice (with, as applicable, a new Adequate Assurance Package) to each affected non-Debtor party to a Designated Contract identifying the Successful Bidder and publish same on the Website so as to provide adequate notice to such affected non-Debtor party.

14. As reflected in the budget attached hereto as ***Exhibit "E"*** (the "***Sale Budget***"), the DIP Lenders consent to the payment of $3.5 million from Cash Collateral, which shall be made as soon as practicable after entry of this Order to an unencumbered, segregated account of the

Debtors (the "**Administrative Account**") for the benefit of Pre-Sale Period Administrative Claims (as defined below) that are not otherwise paid pursuant to the Sale Budget.

15. The Post Carve-Out Trigger Cap (as defined in the DIP Order) is modified and incorporated herein as follows:

> "**Post Carve-Out Trigger Cap**" means the amount equal to (x) the allowed, actual and accrued professional fees and expenses for the Debtors and the Creditors' Committee (the "**Estate Professional Fees**") not to exceed the amounts set forth in the Sale Budget[4] (without any amendment to such amount without the prior written consent of the Debtors, the Creditors' Committee, and the Requisite DIP Lenders), plus (y) Estate Professional Fees incurred and unpaid prior to the period covered by the Sale Budget, less (z) the amounts actually paid on account of unpaid Estate Professional Fees from and after March 16, 2011 through and including the closing of the Sale Transaction. The payment of such Estate Professional Fees is subject to the rights of any party, including any of the DIP Lenders, to object in the Bankruptcy Court to the allowance of such fees on any grounds.

**Payment of Purchase Price; Allocation of Proceeds**

16. At the closing of the Sale Transaction, the Successful Bidder shall pay an amount equal to the applicable purchase price (which amount will take into account (if applicable) a credit of any deposit), in immediately available funds, and the purchase price (to which the liens of the Senior Secured Noteholders will immediately attach) will be paid at closing as follows:

    (a) *First*, cash in an amount necessary to pay and/or create a sufficient reserve to satisfy all Carve-Out Expenses (as defined in the DIP Order, including as provided for in the Post-Carve Out Trigger Cap, as modified above) shall be deposited into an account designated in writing by the Debtors, which amount will continue to be subject to the liens of the Senior Secured Noteholders and paid out in the priority set forth in this paragraph

---

[4] For purposes of this Order and the DIP Order, the term "Sale Budget" as used in the definition of "Post Carve-Out Trigger Cap" shall have the meaning set forth in paragraph 14 hereof.

16, to the extent that any portion of such amount is not awarded to the applicable professionals.

(b) *Second*, cash in an amount equal to the amounts due to the DIP Agent and/or Senior Indenture Trustee (as defined in the DIP Order), as applicable, to satisfy and/or create a sufficient reserve necessary for amounts due to them for fees and expenses authorized to be paid under the DIP Order, including, without limitation, under paragraphs 7(d)(iii), 17 and 22(c) thereof and under Section 10.4 of the DIP Credit Agreement.

(c) *Third*, cash in an amount equal to the amounts due under the DIP Credit Agreement (other than the Roll-Up Notes) which shall be paid to the DIP Agent for immediate distribution to the DIP Lenders in accordance with the DIP Credit Agreement.

(d) *Fourth*, cash in an amount equal to $12.5 million to pay the Estimated Wind Down Expenses pursuant to the express line items in the Wind-Down Budget (but only to the extent such Estimated Wind Down Expenses have not been previously paid pursuant to the Sale Budget), which amount will be held in a segregated account by the Debtors.

(e) *Fifth*, if applicable pursuant to the terms of the Successful Bid, any cash to be escrowed pursuant to the Sale Transaction for any purchase price adjustments, which amount will continue to be subject to the liens of the Senior Secured Noteholders and paid out in the priority set forth in this paragraph 16 to the extent that any portion of such escrow is paid to the Debtors.

(f) *Sixth*, cash in an amount up to $10 million to the Debtors for the payment of Critical Expenses to the extent not paid from Cash Collateral, which Critical Expenses the Debtors may pay in the ordinary course of business.

(g) *Seventh*, to each Specified Studio,[5] in full and complete satisfaction of all "revenue share", "previously rented product" and other end-of-term obligations of the Debtors that would otherwise be payable as a result of or at closing under any and all Revenue Sharing Agreements between the

---

[5] Notwithstanding anything contained in the Motion or the Purchase Agreement to the contrary, the term "*Specified Studios*" shall mean Twentieth Century Fox Home Entertainment LLC, Sony Pictures Home Entertainment Inc., Warner Home Video, a Division of Warner Bros. Home Entertainment Inc., Paramount Home Entertainment Inc., Universal Studios Home Entertainment LLC, The Walt Disney Company, and Summit Entertainment LLC together with their respective Studio Affiliates that are engaged in the distribution of packaged and digital audio-visual media. For purposes of this Order, (i) "*Studio Affiliate*" means, with respect to any Specified Studio, any direct or indirect subsidiary of such Specified Studio, and any other Person (as such term is defined in the Purchase Agreement) that, directly or through one or more intermediaries, is controlled by such Specified Studio; and (ii) "*controlled*" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies (whether through ownership of securities or partnership or other ownership interests, by Contract (as such term is defined in the Purchase Agreement) or representation on the board or similar governing body).

Debtors and any Specified Studio, cash in an amount equal to 50% of the aggregate amount of all such obligations to such Specified Studio as calculated using the actual decay curve methodology set forth on **Exhibit "F"** hereto, *provided*, that in no event shall the amount of such payment to any Specified Studio exceed the product of $4,400,000 multiplied by such Specified Studio's pro rata share of such distribution.

(h)  *Eighth*, cash in an amount equal to $3,000,000, in full and complete satisfaction of all liabilities and obligations of the Debtors to the Specified Studios with respect to all pre- and post-closing date "Certified Field Destroy" units ("***CFDs***"), such payment to be allocated ratably on a per-disk basis to the Specified Studios otherwise entitled to CFD with respect to such disks.

(i)  *Ninth*, cash in an amount sufficient to pay the aggregate outstanding amount of any unpaid and accrued, valid Administrative Priority Expenses solely in an amount equal to the difference between (i) any amounts actually paid to any supplier or provider of goods and services during the Sale Process Period (as defined below) per the Sale Budget and (ii) the amount expressly budgeted for such supplier or provider pursuant to the Sale Budget, notwithstanding how the supplier or provider applies such payments received nor the manner in which the Debtors remit such payments to the supplier or provider (other than the new accruals of Revenue Share Fees and PRP Fees that accrue from March 7, 2011 through the Closing Date that are paid in accordance with paragraph 18(c) herein), which amount shall be paid to an account designated in writing by the Debtors at least two (2) business days prior to the closing of the Sale Transaction for payment thereof.

(j)  *Tenth*, cash in an amount equal to $125 million to satisfy in full the Roll-Up Notes, which amount shall be paid to the Senior Indenture Trustee (or pursuant to his instructions) for immediate distribution to the Roll-Up Noteholders.

(k)  *Eleventh*, cash in an amount equal to $4 million, which shall be deposited in the Administrative Account to be allocated as set forth herein.

(l)  *Twelfth*, the remaining balance of any sale proceeds shall be paid in the following order: (x) *first*, (1) 75% of any such amounts shall be paid to the Senior Indenture Trustee (or pursuant to its directions) for immediate distribution to the holders of Senior Secured Notes up to the outstanding amount owed to the Senior Secured Noteholders on account of their Senior Secured Notes Claims; and (2) 25% of any such sale proceeds shall be paid to the Administrative Account up to the amount of unpaid Pre-Sale Period Administrative Claims, which is to be allocated as set forth in paragraph 19 below; (y) *second*, the remaining balance of sale proceeds, if any, after satisfaction of (x) shall be paid to the Senior Indenture Trustee (or pursuant to its directions) for immediate distribution to the holders of Senior Secured Notes up to the outstanding amount owed to the Senior

12

Secured Noteholders on account of their Senior Secured Notes Claims; and (z) *third*, the remaining balance of sale proceeds, if any, after satisfaction of (x) and (y) shall be paid to the Debtors.

17. For the avoidance of doubt, the payments to the Specified Studios and their affiliates pursuant to paragraph 16 above shall entitle the Debtors, the Successful Bidder, and/or any other third party agent of the foregoing to sell all product or CFDs to which such payment relates free and clear of any liabilities, liens, encumbrances, or obligations owed to such Specified Studios or their affiliates on account of such product or CFDs.

**Administrative Priority Claims; Treatment of Specified Studios; Administrative Stay**

18. Pursuant to sections 362, 364 and 105(a) of the Bankruptcy Code and 28 U.S.C. § 959, the following additional relief is granted:

   a. Except as expressly provided herein, no payments shall be made by the Debtors with respect to any costs or expenses of administration in the Debtors' chapter 11 cases incurred during the period from the Commencement Date through February 24, 2011 (each, a "***Pre-Sale Period Administrative Claim***"); *provided*, *however* that, notwithstanding the foregoing, Critical Expenses, as determined by the Debtors, may be paid to the extent provided for in the Sale Budget, and *provided, further,* however, that nothing herein shall adversely affect the rights of any utilities under section 366 of the Bankruptcy Code.

   b. No holder of a Pre-Sale Period Administrative Claim shall take any action prior to June 21, 2011 to collect or otherwise realize on such claim, whether pursuant to judicial process, set off or otherwise; provided, however, that notwithstanding the foregoing, nothing in this Order shall (i) prevent any Specified Studio (as defined below) from exercising its rights as to any non-Debtor entity to the extent that such non-Debtor entity breaches any agreement between such Specified Studio and such non-Debtor entity, or (ii) prevent any Specified Studio holding collateral pledged by any non-Debtor entity from enforcing its rights in its collateral, provided that such breach does not arise as a result of a guaranty obligation or cross-default arising from the breach of another agreement, and provided further that nothing herein shall limit or affect the rights of any of Twentieth Century Fox Home Entertainment LLC, Sony Pictures Home Entertainment Inc., or Warner Home Video, a Division of Warner Bros. Home Entertainment Inc. (the "Secured Studios")

from enforcing their respective rights against non-Debtor Blockbuster Canada Co. ("Blockbuster Canada") or in the collateral pledged to them by Blockbuster Canada (the "Canadian Collateral"). All motions filed by any Specified Studio seeking adequate protection, reclamation or to compel payment of its administrative expenses shall be adjourned sine die subject to being restored to the Court's calendar in the event the Debtors' chapter 11 cases are converted to cases under Chapter 7 or a trustee is appointed.

c. The Debtors are authorized to pay in full all costs and expenses of administration relating to the period beginning on February 25, 2011 and extending through the closing date (the "Closing Date") of the Sale Transaction (the "Sale Process Period") as provided in and up to the amounts provided for in the Sale Budget (the "Administrative Priority Expenses"); provided, however, that in connection with any agreements between the Debtors and any Specified Studios, regardless of whether such sums are expressly provided for in the Sale Budget, in full and complete satisfaction of any and all Revenue Share Fees (as defined below) and PRP Fees (as defined below) accruing thereunder during the Sale Process Period, the following shall be included as Administrative Priority Expenses[6]: (x) new accruals of revenue share fees from the rental of movie titles that accrue during the period from March 7, 2011 through the Closing Date ("Revenue Share Fees") shall accrue and be paid at a rate of 50% of the rate that would otherwise be payable under the Debtors' existing agreements with the Specified Studios on a weekly basis, uncapped (along with a supporting statement), and (y) new accruals of fees from the sale of previously rented product ("PRP Fees") that accrue during the period from March 7, 2011 through the Closing Date from the sale of movie titles shall accrue and be paid at a rate equal to 50% of the rate that would otherwise be payable under the Debtors' existing agreements with the Specified Studios, on a weekly basis, uncapped (along with a supporting statement). For the avoidance of doubt, regardless of the Sale Budget, the Debtors shall continue to pay Revenue Share

---

[6] For the avoidance of doubt, Administrative Priority Expenses shall not include (i) any amounts or claims under any studio agreements other than the Revenue Shares Fees and PRP Fees (each as defined in this Order) in the amounts payable as provided herein; (ii) any revenue share fees or previously rented product fees or any other fee or claim that may accrue prior to the Sale Process Period or as a result of the Sale Transaction; and (iii) any Revenue Share Fees or PRP Fees owed to a Studio that fails or ceases to comply with the Studio Condition or the Support Condition (as those terms are defined in this Order), subject to the opportunity to cure such noncompliance within three (3) business days following notice to such Studio and counsel for the Ad Hoc Studio Committee.

14

     Fees and PRP Fees to the Specified Studios that actually accrued through March 7, 2011 so as to maintain "credit neutrality."

  d. Notwithstanding anything contained in the Motion or the Purchase Agreement to the contrary, the term "Studio Condition" shall mean that at all times from the date of this Order until the Closing Date, an individual Specified Studio (without regard to compliance with the Studio Condition by any other Specified Studio)6 shall (i) have continued to ship product to Debtors and non-Debtor Blockbuster domestic and international entities, as the case may be, in such quantities as requested in the ordinary course of business, on cash in advance ("CIA") terms at the applicable Specified Studio's standard wholesale price (or better terms in each Specified Studio's sole and absolute discretion); (ii) have supported the Debtors' digital business by continuing to offer video on demand and electronic sell through services on the same terms and conditions as are currently provided by the applicable individual Specified Studio, or in accordance with the terms and conditions of current agreements, at the sole election of the Specified Studio, subject to overall market trends and/or window shifts, and (iii) take no adverse action against any non-Debtor Blockbuster entity, except that nothing shall affect the rights of the Secured Studios under the standstill agreement currently in effect and/or any forbearance agreement that the parties thereto may enter into with respect to the Canadian Collateral, and any Specified Studio may exercise its rights and remedies as to any non-Debtor entity to the extent that such non-Debtor entity breaches any agreement between such Specified Studio and such non-Debtor entity. In the event that the existing standstill agreement expires or a forbearance agreement is not entered into, the Secured Studios' rights with respect to Blockbuster Canada and the Canadian Collateral shall remain in effect and exercise thereof shall not constitute an "adverse action" hereunder. For the avoidance of doubt, the requirement that a Specified Studio ship on CIA terms at standard wholesale prices and support the Debtors' digital business, whenever used in this Order, only applies to Specified Studio wholly-owned product and does not apply to product that a Specified Studio distributes on behalf of another entity and for which the Specified Studio does not unilaterally control pricing and credit terms. Notice of any alleged breach of the Specified

---

6 For the avoidance of doubt, notwithstanding anything to the contrary in the Motion or the version of the Purchase Agreement attached thereto relating to compliance with the Studio Condition by no less than five out of six Studios, compliance with the Studio Condition shall be considered only on an individual, Studio-by-Studio basis, and no complying Studio will receive any adverse treatment based on non-compliance by any other Studio.

Studio Condition will be sent by the Debtors to any Specified Studio alleged to be in breach, with three (3) business days to cure, with a copy to counsel to the Ad Hoc Studio Committee. Such notice shall be given by email and overnight delivery to persons designated by each Specified Studio and the Ad Hoc Studio Committee. For the avoidance of doubt, three (3) business days to cure, in the case of non-shipment of DVDs, shall mean that the Debtors and the applicable Specified Studio have reached agreement on a means to cure such breach and the Specified Studio alleged to be in breach shall have resumed shipments within such time frame, not that resumed shipments must be received by the Debtors by such third (3rd) business day. In addition, the exercise by any Specified Studio of customary trade practices in the ordinary course of business as to any Non-Debtor subsidiary shall not constitute "adverse action" hereunder.

e. In consideration for the payments contemplated in subparagraph (c) hereof, subparagraphs 16(g) and (h) above, and clause (c)(iii) of the definition of "Qualified Bid" in the Bid Procedures, the Specified Studios shall, at the Sale Hearing, affirmatively support the Motion, the Bid Procedures, this Order and a sale to the Stalking Horse Bidder (unless it is overbid) or any other Successful Bid that is no less favorable to the Specified Studios than the Stalking Horse Bid or that is otherwise a Qualified Bid (the "Support Condition"); provided, that solely for purposes of the Support Condition, the definition of "Specified Studio" shall include all Studio Affiliates, and shall not be limited to Studio Affiliates engaged in the distribution of packaged and digital audio-visual media. For the avoidance of doubt, the Support Condition shall not be violated if any Specified Studio objects to a sale on terms that are less favorable than the Stalking Horse Bid.

f. Notwithstanding anything contained in the DIP Order to the contrary, pursuant to section 364 of the Bankruptcy Code, all accrued and unpaid Administrative Priority Expenses shall have superpriority claim status in these chapter 11 cases which shall be senior and prior in right of payment to all other costs and expenses of administration of these chapter 11 cases other than the Carve-Out Expenses and the DIP Obligations (exclusive of the Roll-Up Note Obligations) solely in an amount equal to the difference between (i) any amounts actually paid to any supplier or provider of goods and services during the Sale Process Period per the Sale Budget and (ii) the amount expressly budgeted for such supplier or provider pursuant to the Sale Budget, notwithstanding how the supplier or provider applies such payments received nor the manner in which the Debtors remit such payments to the supplier

or provider.[7]

For the avoidance of doubt, payment of the Administrative Priority Expenses shall be subject and subordinate in all respects to the payment and satisfaction of the Carve-Out Expenses.

19. All amounts deposited in the Administrative Account shall be applied as follows:

   a. *First*, to be applied ratably to valid, uncontested, and unpaid Pre-Sale Period Administrative Claims other than those held by any Specified Studio (the "***Non-Studio Claims***"), until such time as the Non-Studio Claims have received payments on account of such claims in a percentage amount equal to the percentage amount received by the Specified Studios in respect of their Frozen Balance (as such term is defined in the Bid Procedures and as such amounts are set forth on Schedule A attached thereto) under any consummated Sale Transaction; and

   b. *Second*, ratably to all holders of allowed and allowable Pre-Sale Period Administrative Claims.

20. Nothing in this Order shall constitute the assumption, rejection, extension, amendment, modification or termination of any executory contracts between the Debtors and any Specified Studio, and all such parties' rights with respect to such matters are expressly reserved, except to the extent that this Order provides that specified obligations under such executory contracts are satisfied by performance of the terms set forth herein

21. Any Sale Transaction shall provide that all avoidance actions under chapter 5 of the Bankruptcy Code either shall (i) be purchased by the Successful Bidder (including the Purchaser) and not prosecuted to any extent and otherwise waived, or (ii) if not purchased, shall

---

[7] For the avoidance of doubt, (i) any amounts or claims under any studio agreements other than the Revenue Shares Fees and PRP Fees (each as defined in this Order) in the amounts payable as provided herein; (ii) any revenue share fees or previously rented product fees or any other fee or claim that may accrue prior to the Sale Process Period or as a result of the Sale Transaction; and (iii) any Revenue Share Fees or PRP Fees owed to a Studio that fails or ceases to comply with the Studio Condition or the Support Condition (as those terms are defined in this Order), subject to the opportunity to cure such noncompliance within three (3) business days following notice to such Studio and counsel for the Ad Hoc Studio Committee, shall not receive superpriority claim status.

remain with the Debtors' estates and permanently, unconditionally, and irrevocably waived and released on the closing of such Sale Transaction.

22. This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated: New York, New York
      March 17, 2011

                                            /s/ Burton R. Lifland
                                            HONORABLE BURTON R. LIFLAND
                                            UNITED STATES BANKRUPTCY JUDGE