Stephen Karotkin
Martin A. Sosland (*admitted pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007


Attorneys for Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **In re** | : | **Chapter 11** |
|  | : |  |
| **Blockbuster Inc., *et al.*,**[1] | : | **Case No. 10-14997 (BRL)** |
|  | : |  |
|  | : | **(Jointly Administered)** |
| **Debtors.** | : |  |

---------------------------------------------------------------x

**DEBTORS' EMERGENCY MOTION, PURSUANT TO 11 U.S.C. §§ 105 AND 363 AND FED. R. BANKR. P. 2002, 4001, 6004, AND 9014, FOR ENTRY OF A SUPPLEMENTAL ORDER APPROVING AMENDED AND RESTATED ASSET PURCHASE AND SALE AGREEMENT BY AND AMONG BLOCKBUSTER, INC., THE DEBTOR SUBSIDIARIES PARTY THERETO, AND DISH NETWORK CORPORATION**

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

Blockbuster Inc. and its debtor affiliates, as debtors and debtors in possession

(collectively, "***Blockbuster***" or the "***Debtors***")[2] submit this motion (the "***Motion***") and

respectfully represent as follows:

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Blockbuster Inc. (5102); Blockbuster Canada Inc. (1269); Blockbuster Digital Technologies Inc. (9222); Blockbuster Distribution, Inc. (0610); Blockbuster Gift Card, Inc. (1855); Blockbuster Global Services Inc. (3019); Blockbuster International Spain Inc. (7615); Blockbuster Investments LLC (6313); Blockbuster Procurement LP (2546); Blockbuster Video Italy, Inc (5068); Movielink, LLC (5575); Trading Zone Inc. (8588); and B$^2$ LLC (5219).

# I.

## JURISDICTION

1.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

# II.

## RELIEF REQUESTED

2.      Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, the Debtors request entry of a supplemental order approving that certain Amended and Restated Asset Purchase and Sale Agreement, by and among Blockbuster Inc., its debtor subsidiaries parties thereto, and DISH Network Corporation ("***DISH***" or the "***Purchaser***"), dated as of April 20, 2011, (the "***Modified Purchase Agreement***") and related agreements (inclusive of the Store License Agreement, as defined and described below (collectively, the "***Amendments***")).

3.      A proposed form of order is annexed hereto as ***Exhibit "A"***. The Modified Purchase Agreement, with the Store License Agreement, is substantially in the form annexed hereto as ***Exhibit "B"***. A cumulative blackline reflecting the changes between the Asset Purchase and Sale Agreement, by and among Blockbuster Inc., its debtor affiliates parties

---

[2]      Information regarding Blockbuster's business, capital structure, and the circumstances leading to these chapter 11 cases is contained in the *Affidavit of Jeffery J. Stegenga Pursuant to Local Bankruptcy Rule 1007-2 in Support of First Day Motions* [Docket No. 3], filed on September 23, 2010 (the "***Commencement Date***"), the date on which each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"). The Debtors are authorized to continue to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"). Further, on October 1, 2010, the United States Trustee for Region 2 (the "***U.S. Trustee***") appointed a statutory committee of unsecured creditors (the "***Creditors' Committee***").

thereto, and the Purchaser, dated as of April 6, 2011 (the "***Original Purchase Agreement***", which was attached as Exhibit A to the Sale Order)[3] and the Modified Purchase Agreement is annexed hereto as ***Exhibit "C"***.

**III.**

**FACTUAL BACKGROUND**

A.     The 363 Sale Process

4.     On February 21, 2011, the Debtors filed that certain *Motion, Pursuant to 11 U.S.C. §§ 105, 363, 364 and Fed. R. Bankr. P. 2002, 4001, 6004, 6006, 9008, and 9014, For Entry of : (I) an Order Approving (a) Bid Procedures, (b) Stalking Horse Expense Reimbursement, (c) Notice of Sale, Auction, and Sale Hearing, (d) Assumption Procedures and Related Notices, (e) Incurrence of Sale-Related Administrative Priority Claims, and (f) Imposition of an Administrative Stay; and (II) an Order Approving the Sale of Substantially all of the Debtors' Assets* [Docket No.  947] (the "***Sale Motion***").  In the Sale Motion, the Debtors requested entry of an order approving, among other things, the sale of substantially all of their assets free and clear of all liens and other interests (the "***363 Sale***"), auction and bid procedures in connection with the 363 Sale, and procedures for the assumption and assignment of executory contracts and unexpired leases in connection with the 363 Sale.

5.     An initial hearing on the Sale Motion was held on March 10, 2011 (the "***Bid Procedures Hearing***").  At the Bid Procedures Hearing, the Court authorized the Debtors to proceed with the 363 Sale, and on March 17, 2011, the Court entered an order approving same [Docket No. 1223] (the "***Bid Procedures Order***").  In accordance with the Bid Procedures Order, from April 4, 2011 through April 6, 2011, the Debtors conducted an auction (the "***Auction***") for

---

[3]     Capitalized terms used but not defined herein shall have the meaning(s) ascribed to them in the Sale Order or Original Purchase Agreement, as applicable.

the sale of the Debtors' assets.  At the conclusion of the Auction, DISH was named as the successful bidder, offering the Debtors and their estates the highest or otherwise best bid at the Auction.

**B.      Court Approval of the Original Purchase Agreement**

6.      The Court held a hearing on April 7, 2011 to consider the Sale Motion and the outcome of the Auction (the "***Sale Hearing***").  At the Sale Hearing, the Debtors presented the Original Purchase Agreement, pursuant to which DISH agreed to purchase, subject to Court approval, substantially all of the Debtors' assets and assume certain liabilities, all as more further set forth in the Original Purchase Agreement.  In addition, and in light of the Debtors' limited runway as to the continued consensual use of cash collateral, DISH agreed to a closing target date of April 21, 2011, with an outside closing date of May 5, 2011.  DISH further agreed that it would pay a $500,000 penalty for every additional day that the closing is delayed between the target date and the outside date.  After testimony as to the conduct of the Auction and the Debtors' selection of the DISH bid as the highest and otherwise best bid, the Court approved the proposed transaction.

7.      Importantly, the Original Purchase Agreement also contemplated that certain executory contracts or unexpired nonresidential real property leases (together, the "***Contracts***") would be assumed and assigned to the Purchaser as of the Sale Hearing.  However, because of the expedited timeframe and the multitude of objections filed as to proposed cure amounts and adequate assurance of future performance, the Debtors did not seek the assumption and assignment of any Contracts to DISH at the Sale Hearing.  Consequently, the Debtors and DISH informed the Court and other parties in interest at the Sale Hearing that the parties would submit a form of sale order with revised terms as to procedures for assumption and assignment.

Immediately thereafter, the Debtors, in consultation with the Creditors' Committee and certain objecting counterparties' counsel, negotiated the terms of such revised sale order with DISH.

8.     The Court held a hearing on April 14, 2011 to consider the proposed form of sale order.  On April 14, 2011, the Court entered an order approving the Sale Motion [Docket No. 1602] (the "**Sale Order**").  The Sale Order, *inter alia*, approved the Original Purchase Agreement and authorized the parties to consummate the sale.  The Sale Order also provides, among other things, that the parties are authorized to make necessary non-material modifications to the Original Purchase Agreement without further Court approval.  Sale Order, ¶ 18.  The Sale Order also required that DISH provide, and the Debtors serve, the schedule of executory contracts and unexpired nonresidential real property leases to be assumed and assigned to the Purchaser or its designated assignee (the "**PAC Designation Schedule**") by no later than Monday, April 18, 2011, for purposes of facilitating the assumption and assignment of such contracts and leases (as defined below and in the Original Purchase Agreement, the "**Purchaser Assumed Contracts**" or "**PACs**") by the April 21st target closing date.

**C.     The Amendments**

9.     Shortly after entry of the Sale Order, DISH informed the Debtors that it believed it would have insufficient time to finalize its decision as to which Contracts it would immediately designate as PACs and also what it would want to do with those store locations whose leases were not designated as PACs (the "**Non-PAC Stores**").  Accordingly, DISH requested certain amendments to the Original Purchase Agreement so as to extend the time by which it could designate PACs through an additional post-closing period of 90 days with respect to executory contracts and until the Lease Extensions expire with respect to unexpired real property leases ("**Leased Properties**").  DISH also informed the Debtors that, in lieu of the

provisions set forth in Section 8.8(b) of the Original Purchase Agreement, it sought to elect, instead of assuming and taking possession of those Non-PAC Stores or conducting store liquidations pursuant to the Agency and License Agreement, an irrevocable license from the Debtors to occupy and use the Non-PAC Stores during the extended period it was seeking in which to make a determination to assume or reject the applicable Leased Properties (the "*License Period*").

10.     The Debtors and DISH engaged in extensive negotiations with respect to the requested amendments, which culminated in the Modified Purchase Agreement.

11.     The material modifications to the Original Purchase Agreement that have been incorporated into the Modified Purchase Agreement are summarized as follows:[4]

   a.   **<u>Assumed Liabilities</u>**:

        i.   <u>Real Estate Professional Fees</u>:  The Modified Purchase Agreement has clarified that the Purchaser has agreed to assume certain additional administrative expenses of the estates related to the assumption and assignment of certain Contracts.  Specifically, the Purchaser has agreed to assume for (i) Leased Properties that have documented Lease Extensions and/or other lease modifications and that are (A) Purchaser Assumed Contracts and (B) actually assumed and assigned to Purchaser, the real estate professional fees that are owed by Sellers for such Leased Properties, and (ii) Leased Properties pursuant to which legal fees were incurred by Sellers in an effort to reach Lease Extensions and/or other lease modifications, all such legal fees; provided, that the aggregate amount of such Liabilities shall not exceed $4,900,000.  Modified Purchase Agreement, § 2.3(g).

        ii.  <u>Accrued Vacation</u>:  The Modified Purchase Agreement also has clarified that the Purchaser has agreed to assume certain additional employee benefit liabilities of the estates with respect to

---

[4]   This summary is provided to assist the Court and other parties in interest in reviewing the material changes reflected in the Modified Purchase Agreement.  To the extent that there is any inconsistency or difference in terminology as between this summary and the provisions of the Amendments, the Amendments shall govern. Capitalized terms used in this summary and not otherwise defined have the meanings ascribed to such terms in the Modified Purchase Agreement.

"***Transferred Employees***".[5]  Specifically, the Purchaser has agreed to assume, subject to the limitation set forth in the proviso to Section 2.3(b) of the Modified Purchase Agreement, Liabilities with respect to Transferred Employees attributable to their accrued and unused vacation, sick days and personal days accrued from January 1, 2011 through the Closing Date, in an aggregate amount not to exceed $3,500,000.

b.  **Assumed Contracts**:  As stated, the provisions relating to executory contracts have been amended to reflect the extended time the Purchaser will have to make a decision on assumption and assignment or rejection, and to provide that the Purchaser shall bear the costs attendant to the Contracts during the extended period.  These provisions are summarized as follows:

i.  Purchaser Assumed Contracts and Designation Procedures: "***Purchaser Assumed Contracts***" means, to the extent assignable pursuant to section 365 of the Bankruptcy Code, all Contracts set forth on Schedule 1.1(e) of the Modified Purchase Agreement (as such schedule may be modified  pursuant to Section 2.5).[6]

ii.  Assumed Cure Costs:  At the Closing (or at such other time as any Purchaser Assumed Contracts are assumed and assigned to Purchaser) and pursuant to section 365 of the Bankruptcy Code and the Sale Order, the Debtors shall assume and assign to Purchaser, and Purchaser shall consent to such assignment from Sellers, the Purchaser Assumed Contracts; provided, that if this Agreement is terminated pursuant to Section 4.4(g), any Purchaser Assumed Contracts that were assigned to Purchaser prior to such termination shall be assigned back to, and assumed by, the applicable Debtor.  All Cure Costs with respect to the Purchaser Assumed Contracts shall be paid in full by Purchaser on or before

---

[5]  "At least five (5) days prior to the Closing, Purchaser shall deliver, in writing individually or generally, an offer of employment commencing on the Closing Date and contingent upon the Closing, on an at-will basis (except to the extent otherwise expressly agreed in a writing signed by Purchaser and such Employee) and on such other terms and conditions as Purchaser may determine, to substantially all of the Employees who remain employed by Sellers and are providing services with respect to the Purchased Assets immediately prior to the Closing.  Such individuals who accept such offer are hereinafter referred to as the "Transferred Employees." Modified Purchase Agreement, § 9.2(a).

[6]  Purchaser has the right to remove Contracts from Schedule 1.1(e) at any time and from time to time in accordance with Section 2.5(e) of the Modified Purchase Agreement.  As of the filing of this Motion, the PAC Designation Schedules [Doc. No. 1623, 1624] and Supplemental PAC Designation Schedule [Doc. No. 1626] presently constitute what the Debtors believe will be Schedule 1.1(e) as of the Closing.

the Closing Date (or at such other time as any Purchaser Assumed Contracts are assumed and assigned to Purchaser) (the "**Assumed Cure Costs**"), and the Debtors shall have no liability therefor. Modified Purchase Agreement, § 2.5(a).

It is the Purchaser's obligation to, on or prior to the Closing Date (or at such later time as any Purchaser Assumed Contracts are assumed and assigned to Purchaser), deliver to each of the counterparties to the Purchaser Assumed Contracts the full amount of the applicable Cure Costs for the assumption and assignment of such Contracts by the Debtors. Modified Purchase Agreement, § 3.3(e).

iii. <u>Rejected Contracts</u>. Prior to the "**Assumption Deadline**",[7] Purchaser shall provide the Debtors with one or more lists of Contracts that it will not designate as a Purchaser Assumed Contract and the Debtors will promptly reject any such Contracts. The Debtors further agree to use their reasonable best efforts to obtain an order of the Court approving the rejection of any such Contract (i) prior to the Closing, if Debtors are provided notice prior to the Closing that Purchaser will not designate such Contract as a Purchaser Assumed Contract; <u>provided</u>, that, if such Order is not obtained prior to Closing, Debtors shall use reasonable best efforts to obtain such Order of the Bankruptcy Court approving the rejection of such Contract as soon as practicable, or (ii) if Debtors are provided notice that Purchaser will not designate such Contract as a Purchaser Assumed Contract after the Closing, as soon as practicable after Debtors receive such notice. Modified Purchase Agreement, § 2.5(b).

iv. <u>Treatment of "Excluded" Executory Contracts</u> (e.g., executory contracts as to which Purchaser has yet to determine to either have assumed and assigned to it or rejected). Prior to the applicable Assumption Deadline (*i.e.*, 90 days from Closing), with respect to any executory Contract (other than Leased Properties, which are addressed in <u>Section 8.8</u> of the Modified Purchase Agreement and, as summarized below, in the Store License Agreement) that has not been designated as a Purchaser Assumed Contract or otherwise rejected (each, an "**Excluded Contract**"), Purchaser may, in its sole

---

[7] In the Modified Purchase Agreement, "**Assumption Deadline**" means (i) with respect to any Leased Property for which a Lease Extension has been received, the expiration of such Lease Extension, and (ii) with respect to any executory Contract that has not been designated as a Purchaser Assumed Contract, ninety (90) days following the Closing Date. Essentially, the time for the Purchaser to decide to assume or reject Contracts has been extended from the Closing Date to the dates set forth in clauses (i) and (ii) above.

discretion, include such Excluded Contract as a Purchaser Assumed Contract by providing Debtors with written notice of such election not less than five (5) Business Days prior to the Assumption Deadline, and such Contract shall thereafter be deemed to be a Purchaser Assumed Contract for purposes of the Modified Purchase Agreement and the Sale Order. The Debtors have agreed to use their reasonable best efforts to obtain an Order of the Court approving the assumption and assignment of any such executory Contract that is added to Schedule 1.1(e) (x) prior to the Closing, if such Contract is added to Schedule 1.1(e) prior to Closing; provided, that, if such Order is not obtained prior to Closing, Debtors shall use reasonable best efforts to assume and assign such Contracts to Purchaser as soon as practicable, or (y) if such Contract is added to Schedule 1.1(e) after the Closing, as soon as practicable after such Contract is added to Schedule 1.1(e).

Following the Closing, for any Excluded Contract that Purchaser has not requested in writing prior to Closing be rejected by Sellers or for any Contract that has been designated as a Purchaser Assumed Contract but has not been actually assumed and assigned to Purchaser, Purchaser shall pay directly on an ongoing basis as and when due any and all direct costs and expenses incurred or payable by Sellers, and perform any and all obligations of Sellers, in accordance with the express terms of such Excluded Contract (the "Contract Maintenance Costs"), during the period from the Closing Date to the earlier to occur of (i) the effective date of the assumption and assignment to Purchaser of any such Contract and (ii) the date that Purchaser notifies Sellers in writing of its election not to have Sellers assume and assign such Contract to Purchaser (the "Maintenance Period"); provided, that Purchaser shall not have any obligation with respect to Contract Maintenance Costs if the Modified Purchase Agreement is terminated pursuant to Section 4.4(g) thereof. Purchaser shall indemnify and hold Sellers harmless with respect to all Contract Maintenance Costs. For the avoidance of doubt, it is intended that Sellers shall have no costs or obligations with respect to any Excluded Contract (other than pursuant to Section 8.2(c) thereof) which are not paid or performed by Purchaser during the Maintenance Period. Modified Purchase Agreement, § 2.5(c).

v. Removed Contracts. Subject to the provisions of the Modified Purchase Agreement and the Store License Agreement, Purchaser may elect to remove any Contract(s) (inclusive of Leased Properties) (each, a "**Removed Contract**") from the list of Purchaser Assumed Contracts by giving written notice thereof to the Debtors no later than one (1) Business Day prior to the date of

a hearing to consider the assumption and assignment of such Contract to Purchaser or at anytime thereafter prior to assumption if the terms and conditions of the assumption and assignment of any Purchaser Assumed Contract are not acceptable to Purchaser. Upon designation in accordance with the foregoing, each such Removed Contract shall cease to be a Purchaser Assumed Contract for the purposes of the Modified Purchase Agreement and the Sale Order and may thereafter be rejected at the Debtors' discretion without any additional notice to or consent from Purchaser or any liability of Purchaser (other than with respect to any Contract Maintenance Costs or costs under the Store License Agreement, if applicable). Modified Purchase Agreement, § 2.5(e).

c. **Treatment of Leased Properties/ Store License Agreement**. Section 8.8(b) of the Modified Purchase Agreement deals with Leased Property as to which the Purchaser has yet to determine to either have assumed and assigned to it or rejected. Section 8.8(b) provides that with respect to any Leased Property for which Purchaser has not designated a Purchaser Assumed Contract at Closing or which has been designated as a Purchaser Assumed Contract but has not yet been assumed and assigned to Purchaser as of the Closing (the "***Closing Date Leased Properties***"), the Debtors shall retain the lease related to the Leased Properties and grant to the Purchaser an irrevocable license to occupy and use the premises until the Assumption Deadline pursuant to the Store License Agreement.

Under the Store License Agreement, Purchaser shall be entitled to receive all proceeds generated at the Closing Date Leased Properties which are subject to the Store License Alternative (whether from Store Closing Liquidations or otherwise) and shall be responsible for the payment of the Expenses (as defined and as provided in the Store License Agreement). Prior to the Assumption Deadline, Purchaser may, in its sole discretion, designate as a Purchaser Assumed Contract any unexpired real property lease applicable to any such Closing Date Leased Property and the Store License Agreement shall terminate with respect to any such unexpired real property lease upon the effective date of the assumption and assignment to Purchaser thereof. The Debtors agree to use their reasonable best efforts to obtain an Order of the Court approving the assumption and assignment of any Closing Date Leased Property that is designated as a Purchaser Assumed Contract and added to Schedule 1.1(e) (x) prior to the Closing, if such Contract is added to Schedule 1.1(e) prior to Closing; provided, that, if such Order is not obtained prior to Closing, Sellers shall use reasonable best efforts to assume and assign such Contract to Purchaser as soon as practicable, or (y) if such Contract is added to Schedule 1.1(e) after the Closing, as soon as practicable after such Contract is added to Schedule 1.1(e).

Annexed as Exhibit A to the Modified Purchase Agreement is the proposed Store License Agreement. Significantly, pursuant to the Store License Agreement, the Purchaser has agreed to pay any and all "***Expenses***"[8] on an ongoing basis with respect to the Closing Date Leased Properties, and all obligations of the Debtors required to be performed in connection with the Closing Date Leased Properties shall be performed by Purchaser. As stated above, the intent is that the Debtors shall have no costs or obligations with respect to the Closing Date Leased Properties which are not performed or paid by Purchaser during the period when the Purchaser has reserved the right to determine whether the applicable lease should be assumed or assigned to it or rejected.

    d.   **Delayed Closing Penalty**. In exchange for the additional consideration being provided to the estates as described above, the Debtors have agreed to waive the Delayed Closing Penalty of $500,000 until April 26, 2011. Modified Purchase Agreement, § 4.4(b).

12.     Lastly, the Modified Purchase Agreement reflects an agreement among the Debtors and the Purchaser to correct an inadvertent omission with respect to the Purchase Price. Modified Purchase Agreement, §3.3(b)(vii). The amendment provides for the Closing Date Payment to include a deduction for the payment of the Expense Reimbursement to the Stalking Horse Bidder, which reflects the Purchaser's bid as presented to the Court at the Sale Hearing and agreed upon by the parties at the Auction.

---

[8]   Pursuant to the Store License Agreement, "***Expenses***" are defined to mean "any direct expenses incurred or otherwise payable by Sellers that arise during the License Period with respect to the operation of any Designated Store, including, without limitation, any Real Estate Occupancy Expenses incurred with respect to any Designated Store. As used [in the Store License Agreement] 'Real Estate Occupancy Expenses' shall mean all applicable rent; common area maintenance; utilities; security; housekeeping; ordinary course maintenance and repairs; fixed general liability insurance, property taxes and all other amounts payable pursuant to any Real Property Lease in respect of a Designated Store to the extent such expenses arise or become payable during the License Period. If for any reason Sellers are required to pay any Expenses in connection with the Designated Stores themselves, Purchaser shall promptly reimburse or, if necessary, advance the necessary funds therefor, to Sellers. For the avoidance of doubt, the intent of [the Store License Agreement] is that Sellers shall have no costs or obligations with respect to any Designated Store (other than as provided in Section 8.2(c) of the Purchase Agreement) which are not paid or performed by Purchaser with respect to the License Period."

# IV.

## THE AMENDMENTS SHOULD BE APPROVED

13.     Given that the DISH offer is the highest and best offer received by the Debtors, which was approved by the Court after a competitive auction process, it is in the best interests of these estates and their creditors that the proposed Amendments be approved without delay.  The Amendments essentially seek to provide DISH with additional time to designate which executory contracts and unexpired leases it wishes to maintain as part of the go-forward Blockbuster business, as well as which contracts are essential to the assets and businesses which are being purchased.  In exchange for this option, DISH has agreed to essentially cover all expenses and other obligations related to the Contracts pending DISH's determination as to whether such Contracts should be assumed and assigned to the Purchaser or rejected.  Thus, neither the Debtors nor DISH anticipate that the Debtors' estates nor any counterparty to a Contract or Leased Property should be prejudiced as a result of the proposed Amendments.  Further, although the Debtors will be waiving the $500,000 penalty for a short period of time, they believe that the Purchaser's agreement to assume additional  liabilities as described above provide more than reasonable consideration therefor.  Further, the additional time afforded with respect to the Contract assumption and assignment process should help to assure a smooth transition of the business to the Purchaser.

14.     Ample authority exists for approval of the Amendments as they relate to the 363 Sale to DISH, which was previously approved by the Sale Order.  The Debtors hereby restate and reincorporate the legal rationale set forth in the Sale Motion and the factual testimony provided to the Court at the Sale Hearing as support for approval of the Amendments.  The Amendments are fair, reasonable and were negotiated at arm's length.  Moreover, as stated, the Amendments should impose no material additional obligations on the estates, and should assure

a more orderly Closing.  Thus, the Debtors submit that approval of the Amendments is warranted and in the best interests of the Debtors, their estates, and creditors.

**V.**

**<u>NOTICE</u>**

15.     No trustee or examiner has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion on:  (i) the Master Service List (as such term is defined in that certain Order of the Court, dated October 20, 2010) [Doc. No. 365]; (ii) all counterparties to Contracts; and (iii) all other parties that have requested service in these cases pursuant to Bankruptcy Rule 2002 (collectively, the "***Notice Parties***").  The Debtors submit that no other or further notice need be provided.

16.     No previous request for the relief sought herein has been made to this or

any other Court other than the Sale Motion.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just and necessary.

Dated: New York, New York
      April 21, 2011

/s/      Stephen Karotkin
Stephen Karotkin
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

                and

Martin A. Sosland (*admitted pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone:  (214) 746-7700
Facsimile:  (214) 746-7777

Attorneys for Debtors and Debtors in Possession

# EXHIBIT A

**Proposed Form of Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                 :

**In re**                            :                **Chapter 11**
                                 :

**BLOCKBUSTER INC.,** *et al.*,[1]       :                **Case No. 10-14997 (BRL)**
                                 :

                                 :                **(Jointly Administered)**
               **Debtors.**           :

------------------------------------------------------------x

**SUPPLEMENTAL ORDER, PURSUANT TO 11 U.S.C. §§ 105
AND 363 AND FED. R. BANKR. P. 2002, 4001, 6004, AND 9014,
APPROVING AMENDED AND RESTATED ASSET PURCHASE AND
SALE AGREEMENT BY AND AMONG BLOCKBUSTER, INC., THE DEBTOR
SUBSIDIARIES PARTY THERETO, AND DISH NETWORK CORPORATION**

Upon the Emergency Motion ("***Motion***"), dated April 21, 2011,[2] of Blockbuster Inc. and

its debtor affiliates, as debtors and debtors in possession (collectively, "***Blockbuster***", or the

"***Debtors***"), pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Fed. R. Bankr. P. 2002, 4001, 6004,

and 9014 for Entry of a Supplemental Order Approving Amended and Restated Asset Purchase

and Sale Agreement By and Among Blockbuster, Inc., the Debtor Subsidiaries Party thereto, and

DISH Network Corporation; and upon the Court's consideration of the Motion, the Modified

Purchase Agreement, substantially in the form attached hereto as ***Exhibit "A"***, and the

Amendments; and due and proper notice of the Motion having been given; and a hearing having

been held on April 26, 2011 with respect to the Motion, and upon the record of such hearing and

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Blockbuster Inc. (5102); Blockbuster Canada Inc. (1269); Blockbuster Digital Technologies Inc. (9222); Blockbuster Distribution, Inc. (0610); Blockbuster Gift Card, Inc. (1855); Blockbuster Global Services Inc. (3019); Blockbuster International Spain Inc. (7615); Blockbuster Investments LLC (6313); Blockbuster Procurement LP (2546); Blockbuster Video Italy, Inc (5068); Movielink, LLC (5575); Trading Zone Inc. (8588); and B[2] LLC (5219).

[2] Capitalized terms used herein but not defined herein shall have the meaning ascribed to such terms in the Motion.

the Sale Hearing; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and all other parties-in-interest; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Motion and at the hearings establish just cause for the relief granted herein; and after due deliberation thereon, **IT IS HEREBY FOUND, DETERMINED AND ORDERED THAT:**

1.      **Motion is Granted**.  The Motion and the relief requested therein is GRANTED and APPROVED, as set forth herein.  This Order supplements the Sale Order.

2.      **Objections Overruled**.  All objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits, with prejudice.

3.      **Approval**.  The Modified Purchase Agreement, the Store License Agreement, and the other Amendments, and all of the terms and provisions thereof, are hereby approved.  The Debtors are hereby authorized to (i) execute the Modified Purchase Agreement, the Store License Agreement and any other Amendments, along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Amendments, *provided* that such additional documents do not materially change their terms; (ii) consummate the Sale Transaction in accordance with the terms and provisions of the Amendments and the other agreements approved by the Sale Order and this Order; (iii) assume and assign to Purchaser the Purchaser Assumed Contracts, subject to further order of the Court; and (iv) take all other and further actions as may be reasonably necessary to implement the Sale Transaction, the Sale Order and this Order.

4.     **Binding Effect of Order**.  The terms and provisions of the Amendments and this Order shall be binding in all respects upon the Debtors, the Debtors' estates, all creditors (whether known or unknown) and holders of equity interests in either the Debtors, the Purchaser and their respective affiliates, successors and assigns, and any trustee that may be appointed in these cases or if any of these cases are converted to cases under chapter 7 of the Bankruptcy Code.

5.     **Post-Closing Assumption and Assignment Procedures**.  The post-Closing assumption procedures set forth in sections 2.5 and 8.8 of the Modified Purchase Agreement are hereby approved and modify the provisions of the procedures approved in paragraph 8 of the Sale Order to the extent that a Contract or Leased Property is designated to be a Purchaser Assumed Contract post-Closing but prior to the Assumption Deadline or conclusion of the License Period, as applicable.

6.     **No Stay of Order**.  Notwithstanding the provisions of Bankruptcy Rule 6004 and Bankruptcy Rule 6006 or any applicable provisions of the Local Rules, this Order shall not be stayed for fourteen (14) days after the entry hereof, but shall be effective and enforceable immediately upon entry.  Time is of the essence in approving the Amendments, and the Debtors and the Purchaser intend to close the Sale Transaction as soon as practicable.  Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

7.     **Retention of Jurisdiction**.  In addition to the provisions of Section 12.5 of the Modified Purchase Agreement and the provisions of the Sale Order, this Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order, the Sale Order, the

Modified Purchase Agreement, the Ancillary Agreements, and the Amendments and all amendments thereto and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (i) compel delivery of the Assets to Purchaser; (ii)  interpret, implement and enforce the provisions of this Order, the Sale Order, and any related order; (iii) determine any disputes or claims with respect to the Modified Purchase Agreement, the Store License Agreement, or any ancillary agreement; and (iv) enter any orders under section 363 and 365 of the Bankruptcy Code with respect to the Purchaser Assumed Contracts.

Dated:    New York, New York
           _____, 2011

_____
HONORABLE BURTON R. LIFLAND
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT B</u>**

**Modified Purchase Agreement**

**AMENDED AND RESTATED**

**ASSET PURCHASE AND SALE AGREEMENT**

**BY AND AMONG**

**BLOCKBUSTER INC.,**

**THE DEBTOR SUBSIDIARIES PARTY HERETO**,

**AND**

**DISH NETWORK CORPORATION**

**Dated as of April 20, 2011**

**TABLE OF CONTENTS**

Article I      DEFINITIONS ................................................................. 2

     Section 1.1      Definitions ................................................................. 2

     Section 1.2      Terms Defined Elsewhere in this Agreement .................................. 15

     Section 1.3      Other Definitional and Interpretative Provisions ............................ 17

Article II      PURCHASE AND SALE ................................................................. 18

     Section 2.1      Purchase and Sale of Assets .................................................. 18

     Section 2.2      Excluded Assets ................................................................. 20

     Section 2.3      Assumption of Liabilities .................................................. 21

     Section 2.4      Excluded Liabilities ................................................................. 22

     Section 2.5      Assumed Contracts .................................................. 24

     Section 2.6      Further Conveyances and Assumptions. .................................. 25

     Section 2.7      Bulk Sales Laws ................................................................. 26

     Section 2.8      Receivables ................................................................. 26

Article III      PURCHASE PRICE ................................................................. 26

     Section 3.1      Purchase Price ................................................................. 26

     Section 3.2      Deposit ................................................................. 26

     Section 3.3      Payment of Purchase Price. .................................................. 27

     Section 3.4      Purchase Price Adjustment. .................................................. 28

     Section 3.5      Allocation of Purchase Price .................................................. 30

Article IV      CLOSING AND TERMINATION ................................................................. 31

     Section 4.1      Closing Date ................................................................. 31

     Section 4.2      Deliveries by Sellers ................................................................. 31

     Section 4.3      Deliveries by Purchaser ................................................................. 32

     Section 4.4      Termination of Agreement ................................................................. 32

     Section 4.5      Effect of Termination. ................................................................. 34

Article V      REPRESENTATIONS AND WARRANTIES OF SELLERS ......................... 34

     Section 5.1      Organization and Good Standing ................................................................. 34

     Section 5.2      Ownership of Non-Debtor Subsidiaries. ......................................... 35

     Section 5.3      Authorization of Agreement ................................................................. 35

     Section 5.4      No Violation; Consents. .................................................. 36

     Section 5.5      Financial Information. .................................................. 36

     Section 5.6      No Undisclosed Liabilities ................................................................. 37

| | | | |
|---|---|---|---|
| Section 5.7 | Title to Purchased Assets | | 37 |
| Section 5.8 | Taxes | | 37 |
| Section 5.9 | Real Property. | | 38 |
| Section 5.10 | Tangible Personal Property; Capital Leases. | | 39 |
| Section 5.11 | Intellectual Property. | | 40 |
| Section 5.12 | Material Contracts. | | 41 |
| Section 5.13 | Employee Benefits. | | 43 |
| Section 5.14 | Labor. | | 44 |
| Section 5.15 | Litigation | | 44 |
| Section 5.16 | Compliance with Laws; Permits. | | 44 |
| Section 5.17 | Environmental Matters. | | 45 |
| Section 5.18 | Accounts and Notes Receivable and Payable | | 45 |
| Section 5.19 | Insurance. | | 46 |
| Section 5.20 | Financial Advisors | | 46 |
| Section 5.21 | No Other Representations or Warranties; Schedules | | 46 |
| Article VI | REPRESENTATIONS AND WARRANTIES OF PURCHASER | | 46 |
| Section 6.1 | Organization and Good Standing | | 46 |
| Section 6.2 | Authorization of Agreement | | 46 |
| Section 6.3 | No Violation; Consents | | 47 |
| Section 6.4 | Litigation | | 47 |
| Section 6.5 | Investment Intention. | | 47 |
| Section 6.6 | Financial Capability | | 48 |
| Section 6.7 | Bankruptcy | | 48 |
| Section 6.8 | Financial Advisors | | 48 |
| Section 6.9 | Condition of the Business | | 48 |
| Article VII | BANKRUPTCY COURT MATTERS | | 48 |
| Section 7.1 | Competing Transaction. | | 48 |
| Section 7.2 | Bankruptcy Court Filings | | 49 |
| Article VIII | COVENANTS | | 50 |
| Section 8.1 | Access to Information | | 50 |
| Section 8.2 | Conduct of the Business Pending the Closing. | | 50 |

Section 8.3          Consents ........................................................................ 54

Section 8.4          Appropriate Action; Filings............................................. 54

Section 8.5          Confidentiality ............................................................... 56

Section 8.6          Preservation of Records; Cooperation ............................ 56

Section 8.7          Publicity.......................................................................... 57

Section 8.8          Lease Extensions; Store Liquidations. ............................ 57

Section 8.9          Intentionally Omitted. ..................................................... 58

Section 8.10        Banks ............................................................................... 58

Section 8.11        Supplements to Schedules .............................................. 58

Section 8.12        Further Assurances .......................................................... 58

Section 8.13        Payment of Sales Tax Amounts....................................... 58

Section 8.14        Use of Name .................................................................... 58

Section 8.15        Notice of Breach of Studio Condition.............................. 59

Article IX          EMPLOYEE AND EMPLOYEE BENEFITS MATTERS; TAX
                    MATTERS ........................................................................ 59

Section 9.1          Employment..................................................................... 59

Section 9.2          Employee Benefits .......................................................... 60

Section 9.3          Tax Matters...................................................................... 60

Article X           CONDITIONS TO CLOSING.............................................. 62

Section 10.1        Conditions Precedent to Obligations of Purchaser .......... 62

Section 10.2        Conditions Precedent to Obligations of Sellers .............. 64

Section 10.3        Conditions Precedent to Obligations of Purchaser and Sellers ......... 64

Section 10.4        Frustration of Closing Conditions.................................... 65

Article XI          LIMITATIONS ................................................................. 65

Section 11.1        Purchaser's Review ......................................................... 65

Section 11.2        No Consequential or Punitive Damages............................ 65

Article XII          MISCELLANEOUS.......................................................... 66

Section 12.1        Survival of Representations, Warranties, Covenants and
                    Agreements...................................................................... 66

Section 12.2        Remedies. ........................................................................ 66

Section 12.3        Expenses .......................................................................... 67

# TABLE OF CONTENTS
## (continued)

Section 12.4        Non-Recourse ................................................................. 67

Section 12.5        Submission to Jurisdiction ............................................. 67

Section 12.6        Waiver of Jury Trial ...................................................... 67

Section 12.7        Authorization of Parent as Representative of Sellers ...................... 68

Section 12.8        Time of Essence .............................................................. 68

Section 12.9        Entire Agreement; Amendments and Waivers ................................ 68

Section 12.10       Governing Law ................................................................ 69

Section 12.11       Notices ........................................................................ 69

Section 12.12       Severability .................................................................. 70

Section 12.13       No Right of Set-Off .......................................................... 70

Section 12.14       Binding Effect; Assignment ................................................ 70

Section 12.15       Counterparts ................................................................. 71

<u>Exhibits</u>

Exhibit A – Form of Store License Agreement
Exhibit B – Bidding Procedures Order
Exhibit C – Cash Flow Budget
Exhibit D – Protected Stores
Exhibit E – Form of Bill of Sale
Exhibit F – Form of Assignment Agreement

<u>Schedules</u>

| | |
|---|---|
| Schedule 1.1(a) | Inventory Amount Methodology |
| Schedule 1.1(b) | Frozen Studio Balances |
| Schedule 1.1(c) | Initial Liquidating Stores |
| Schedule 1.1(d) | Non-Debtor Subsidiaries |
| Schedule 1.1(e) | Purchaser Assumed Contracts |
| Schedule 5.2(a) | Ownership of Non-Debtor Subsidiaries |
| Schedule 5.2(d) | Other Ownership Interests |
| Schedule 5.4(a) | No Violation |
| Schedule 5.4(b) | Consents |
| Schedule 5.7 | Title to Purchased Assets |
| Schedule 5.8 | Taxes |
| Schedule 5.9(a) | Owned Property |
| Schedule 5.9(b) | Real Property Leases |
| Schedule 5.9(d) | Rights to Occupancy |
| Schedule 5.10(a) | Personal Property Leases |
| Schedule 5.10(b) | Capital Leases |
| Schedule 5.11(a) | Intellectual Property Registrations |
| Schedule 5.11(b) | Intellectual Property Licenses |
| Schedule 5.11(c) | Intellectual Property |
| Schedule 5.12(a) | Material Contracts |
| Schedule 5.13(a) | Employee Benefit Plans |
| Schedule 5.13(c) | Qualified Plans |
| Schedule 5.13(d) | Non-Debtor Benefit Plan Compliance |
| Schedule 5.13(e) | Non-Debtor Benefit Plan Proceedings |
| Schedule 5.14(a) | Labor Agreements |
| Schedule 5.14(b) | Work Stoppages |
| Schedule 5.15 | Litigation |
| Schedule 5.16 | Compliance with Laws |
| Schedule 5.17(a) | Environmental Matters |
| Schedule 5.19 | Insurance |
| Schedule 5.20 | Sellers' Financial Advisors |
| Schedule 6.8 | Purchaser's Financial Advisors |
| Schedule 8.2(a) | Conduct of Business Pending Closing |
| Schedule 8.2(b) | Conduct of Business Pending Closing |
| Schedule 8.8(a) | Prior Store Liquidations |
| Schedule 10.1(d) | Store Liquidations |

# AMENDED AND RESTATED ASSET PURCHASE AND SALE AGREEMENT

THIS AMENDED AND RESTATED ASSET PURCHASE AND SALE AGREEMENT, dated as of April 20, 2011 (this "Agreement"), is made and entered into by and among Blockbuster Inc., a Delaware corporation ("Parent"), each of the Debtor Subsidiaries (as defined herein, and together with Parent, "Sellers", and individually a "Seller") and DISH Network Corporation, a Nevada corporation ("Purchaser"). Sellers and Purchaser are sometimes herein referred to collectively as the "Parties" and individually as a "Party."

W I T N E S S E T H:

WHEREAS, Sellers and their Subsidiaries are global providers of rental and retail media entertainment, including movie, game and other related entertainment products delivered through one or more distribution channels (such business and all other business conducted by any Seller or any of its Subsidiaries, the "Business");

WHEREAS, on September 23, 2010, Sellers filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, on February 21, 2011, Sellers entered into the Asset Purchase and Sale Agreement (as amended from time to time, the "Cobalt Agreement") with Cobalt Video Holdco LLC, a Delaware limited liability company ("Cobalt"), pursuant to which Sellers agreed to sell to Cobalt substantially all of Sellers' assets as more fully described in the Cobalt Agreement, subject to approval of the Bankruptcy Court and to higher or better offers;

WHEREAS, on March 17, 2011, the Bankruptcy Court issued the Bidding Procedures Order (as defined herein) setting forth bidding procedures in connection with the sale of Sellers' assets;

WHEREAS, on April 6, 2011, the Parties entered into that certain Asset Purchase and Sale Agreement (the "April 6th APA");

WHEREAS, the Bankruptcy Court approved the April 6th APA and the transactions contemplated thereunder on April 7, 2011 and entered the Sale Order on April 14, 2011;

WHEREAS, on the terms and subject to the conditions hereinafter set forth and pursuant to the Sale Order, the Parties desire to enter into this Agreement pursuant to which, among other things, (i) the Parties shall amend and restate the April 6th APA and (ii) Sellers shall sell to Purchaser, and Purchaser shall purchase from Sellers, all of Sellers' right, title and interest in and to the Purchased Assets (as defined herein) and Purchaser shall assume from Sellers and thereafter pay, discharge and perform the Assumed Liabilities (as defined herein); and

WHEREAS, Sellers believe, following consultation with their advisors and reasonable due diligence, that, in light of the current circumstances, a sale of the Purchased Assets as

described herein to Purchaser instead of Cobalt is necessary to maximize value and is in the best interest of Sellers, their creditors and other stakeholders.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, representations, warranties and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereby agree as follows:

# ARTICLE I

# DEFINITIONS

Section 1.1     Definitions.  For the purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"Action" means any action, suit, arbitration, claim, inquiry, proceeding or investigation by or before any Governmental Authority of any nature, civil, criminal, regulatory or otherwise, in law or in equity.

"Ad Hoc Studio Committee" shall have the meaning specified in the Bidding Procedures Order.

"Affiliate" (and, with a correlative meaning "affiliated") means, with respect to any Person, any direct or indirect subsidiary of such Person, and any other Person that directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such first Person.  As used in this definition, "control" (including with correlative meanings, "controlled by" and "under common control with") means possession, directly or indirectly, of power to direct or cause the direction of the management or policies (whether through ownership of securities or partnership or other ownership interests, by Contract or otherwise).

"Applicable Law" means, with respect to any Person, any Law applicable to such Person or its business, properties, assets or Liabilities.

"Approved Sale Expenses" means Sellers' reasonable good faith estimate of the costs and expenses of Sellers in connection with the sale and liquidation of any of the Purchased Assets, which shall be provided in writing by Sellers to Purchaser not later than the earlier to occur of (i) the Auction and (ii) five (5) Business Days prior to the Sale Hearing, and which estimate shall be reasonably acceptable to Purchaser.

"Assumption Deadline" means (i) with respect to any Leased Property for which a Lease Extension has been received, the expiration of such Lease Extension, and (ii) with respect to any executory Contract that has not been designated as a Purchaser Assumed Contract, ninety (90) days following the Closing Date.

"Auction" shall have the meaning specified in the Bidding Procedures Order.

"Bankruptcy Cases" means the chapter 11 cases commenced by Sellers on September 23, 2010, jointly administered under Case No. 10-14997 (BRL).

"Beginning Inventory Amount" means an amount equal to $635,848,496.66, the reference value of the December 31, 2010 inventory count provided by Sellers to Purchaser, based on the methodology, inventory type and gross value per unit prices set forth in Schedule 1.1(a).

"Bidding Procedures Order" means the Order of the Bankruptcy Court, attached hereto as Exhibit B.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Law to close. Any event the scheduled occurrence of which would fall on a day that is not a Business Day shall be deferred until the next succeeding Business Day.

"Business Intellectual Property" means all (i) Purchased Intellectual Property and (ii) other Intellectual Property used by any Seller or any of its Subsidiaries.

"Canadian Collateral Obligees" means Twentieth Century Fox Home Entertainment LLC, Sony Pictures Home Entertainment Inc. and Warner Home Video, a division of Warner Bros. Home Entertainment.

"Cash Flow Budget" means the Sale Budget (defined in the Bidding Procedures Order), current as of the date hereof and attached hereto as Exhibit C, and, to the extent approved by Purchaser, any other budget subsequently adopted by Sellers and the Requisite DIP Lenders (as defined in the DIP Credit Agreement) in connection with the DIP Credit Agreement, any refinancing thereof, or any other debtor-in-possession financing entered into by Sellers, in each case.

"Closing Cash Amount" means the amount of all cash, cash equivalents and freely marketable securities held by Sellers as of 11:59 p.m. (prevailing eastern time) on the day immediately preceding the Closing Date, less the amounts of any unpaid checks, drafts and wire transfers issued by Sellers on or prior the Closing Date, calculated in accordance with GAAP applied on a basis consistent with the preparation of the Balance Sheet, plus the Sales Tax Amount.

"Closing Inventory Amount" means the value of the inventory held by Sellers as of 11:59 p.m. (prevailing eastern time) on the day immediately preceding the Closing Date, calculated in accordance with the methodologies, inventory type and gross value per unit prices set forth on Schedule 1.1(a); provided, that inventory which has been paid for in full prior to such time but which is in transit from the supplier to the Stores or the Distribution Centers pursuant to customary shipping arrangements in the Ordinary Course of Business shall be included in such Closing Inventory Amount to the extent such inventory is actually received within twelve (12) Business Days of the Closing Date.

"COBRA" means the Consolidated Omnibus Reconciliation Act of 1985, as amended.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competition Laws" means the HSR Act and all other Laws that are designed or intended to prohibit, restrict or regulate (i) actions having the purpose or effect of monopolization or restraint of trade or lessening of competition or (ii) foreign investment.

"Contract" means any contract, indenture, note, bond, loan, instrument, lease, license, purchase order, commitment or other agreement, and any amendment or modification thereto, whether written or oral.

"Cure Costs" means amounts that must be paid and obligations that otherwise must be satisfied, including pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of any Purchaser Assumed Contract as determined pursuant to the Sale Order.

"Debtor" has the meaning given to such term in the Sale Motion.

"Debtor Benefit Plans" means the Employee Benefit Plans other than the Non-Debtor Benefit Plans.

"Debtor Subsidiaries" means Blockbuster Global Services Inc., Blockbuster Investments LLC, Blockbuster Video Italy, Inc., Blockbuster Distribution, Inc., Blockbuster Procurement LP, Blockbuster Canada Inc., Blockbuster International Spain Inc., Blockbuster Digital Technologies Inc., Movielink, LLC, Blockbuster Gift Card Inc., Trading Zone Inc., and B2 LLC.

"Designated FF&E" means all furniture, fixtures, furnishings, leasehold improvements, equipment and other tangible personal property located at the Closing Date Leased Properties.

"Designated Liquidation Merchandise" means all movie, television program, game and cell phone inventory, merchandise, memorabilia, supplies, food and beverage items and other finished goods inventory located at, or in transit to, the Closing Date Leased Properties.

"DIP Credit Agreement" means that certain Senior Secured, Super-Priority Debtor-In-Possession Revolving Credit Agreement, dated as of September 23, 2010, among Sellers, the lenders signatory thereto and Wilmington Trust FSB, as agent.

"Distribution Centers" means (i) all of Sellers' distribution centers located throughout the United States to support Sellers' by-mail subscription business and (ii) Sellers' 850,000 square foot distribution center located in McKinney, Texas.

"Documents" means all files, documents, instruments, papers, books, reports, manuals, records, tapes, microfilms, hard drives, databases, compilations of information, photographs, letters, budgets, accounts, forecasts, ledgers, journals, title policies, customer and supplier lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (including sales brochures, flyers, pamphlets, web pages,

4

etc.), and other similar materials related to the Business and the Purchased Assets in each case whether or not in electronic form.

"Employee" means any employee of any Seller who performs work primarily related to the operation of the Business.

"Employee Benefit Plans" means all employment or individual compensation agreements, and all other plans, programs, funds, policies, contracts, agreements, payroll practices, arrangements or understandings (whether written or unwritten) providing any bonus, incentive, retention, equity or equity-based compensation, deferred compensation, stock purchase, severance pay, sick leave, vacation pay, salary continuation, disability, welfare benefit, pension benefit, retirement, profit sharing, life insurance, medical insurance, hospitalization, dental, vision, insurance, fringe benefits, educational assistance, relocation, expatriate, tax gross up, change in control, retention or other employee benefit, in each case as to which Sellers or any of their Subsidiaries has or may have any Liability or obligation with respect to any current or former officers, employees or directors (or their respective dependents) of any Sellers or any of their Subsidiaries, including any "employee benefit plan" as defined in Section 3(3) of ERISA.

"Environmental Law" means all Applicable Laws in effect on the date hereof relating to the environment, natural resources, health and safety or the protection thereof, including but not limited to any applicable provisions of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq*., the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq*., the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq*., the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, the Clean Air Act, 42 U.S.C. § 7401 *et seq*., the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq*., the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 *et seq*., the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq*., and the Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq*., and the regulations promulgated pursuant thereto, and all analogous state or local statutes.

"Environmental Liabilities and Obligations" means all Liabilities arising from any impairment or damage to the environment or failure to comply with Environmental Laws in connection with the prior or ongoing ownership or operation of the Business, including Liabilities related to: (i) the transportation, storage, use, arrangement for disposal or disposal of Hazardous Materials or waste; (ii) the Release of Hazardous Materials or waste; (iii) any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments; (iv) any other obligations imposed under Environmental Laws with respect to the Business; and (v) all obligations with respect to personal injury, property damage, wrongful death and other damages and losses arising under Applicable Law as a result of any of the matters identified in clauses (i) – (iv) of this definition.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Estimated Cash Adjustment Amount" means (i) if the Target Cash Amount exceeds the Estimated Cash Amount, the amount of such excess, which shall reduce the Closing Date Payment by such amount, or (ii) if the Estimated Cash Amount exceeds the Target Cash Amount, the amount of such excess, which shall increase the Closing Date Payment by such amount.

"Estimated Inventory Adjustment Amount" means (i) if the Beginning Inventory Amount exceeds the sum of the Estimated Inventory Amount *plus* the Inventory Liquidation Expenses, the amount of such excess, which shall reduce the Closing Date Payment by such amount, or (ii) if the sum of the Estimated Inventory Amount *plus* the Inventory Liquidation Expenses exceeds the Beginning Inventory Amount, the amount of such excess, which shall increase the Closing Date Payment by such amount.

"Estimated Wind Down Expenses" means Sellers' reasonable good faith estimate of the out of pocket costs and expenses that Sellers expect to incur in connection with winding down their bankruptcy estates, which estimate shall include a reasonably detailed breakdown of such costs and expenses by category and shall be provided in writing by Sellers to Purchaser not later than the earlier to occur of (i) the Auction and (ii) five (5) Business Days prior to the Sale Hearing, and which estimate shall be reasonably acceptable to Purchaser.

"Frozen Studio Balance" means, with respect to any Specified Studio, an amount equal to the amount set forth opposite such Specified Studio's name in Schedule 1.1(b).

"GAAP" means United States generally accepted accounting principles as in effect and consistently applied during the time period of the relevant financial statement.

"Governmental Authority" means any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to United States or foreign federal, state, provincial or local government, any governmental authority, agency, department, board, commission or instrumentality or any political subdivision or regulatory authority thereof, and any US or foreign federal, state, provincial or local tribunal or court or arbitrator(s) of competent jurisdiction, and shall include the Bankruptcy Court.

"Hazardous Materials" means all substances, in any amount of concentration, listed, classified, regulated or defined as "hazardous substances," "hazardous wastes," "hazardous materials," "radioactive," "pollutants," "toxic wastes," "toxic substances" or "contaminants" or otherwise regulated under Environmental Laws or with respect to which liability or standards of conduct are imposed under Environmental Laws.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Indebtedness" of any Person means, without duplication, (i) the principal of and premium, interest, fees, penalties and other expenses (if any) in respect of (A) indebtedness of such Person for money borrowed whether secured or unsecured and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases which shall have been or are required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of

any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations, "keep well" agreements, agreements to maintain or contribute cash or capital to any Person or other similar agreements or arrangements; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"<u>Initial Liquidating Stores</u>" means those Stores identified by Sellers in <u>Schedule 1.1(c)</u> that commenced in-store liquidation or going out of business sales on or before the date hereof.

"<u>Intellectual Property</u>" means all worldwide intellectual property and rights, title and interest arising from or in respect of the following: all (i) inventions, discoveries, industrial designs, business methods, patents and patent applications (including provisional and Patent Cooperation Treaty applications), including continuations, divisionals, continuations-in-part, reexaminations and reissues, extensions, renewals and any patents that may be issued with respect to the foregoing; (ii) trademarks, service marks, certification marks, collective marks, trade names, business names, assumed names, d/b/a's, fictitious names, brand names, trade dress, logos, symbols, Internet domain names and corporate names, and general intangibles of a like nature and other indicia of origin or quality, whether registered, unregistered or arising by Law, and all applications, registrations, and renewals for any of the foregoing, together with the goodwill associated with and symbolized by each of the foregoing; (iii) published and unpublished works of authorship in any medium, whether copyrightable or not (including databases and other compilations of information, computer software, source code, object code, algorithms, and other similar materials and Internet website content), copyrights and moral rights therein and thereto, and registrations and applications therefor, and all issuances, renewals, extensions, restorations and reversions thereof; and (iv) confidential and proprietary information, trade secrets, and know-how, including methods, processes, business plans, strategy, marketing data, marketing studies, advertisements, schematics, concepts, software and databases (including source code, object code and algorithms), formulae, drawings, prototypes, models, designs, devices, technology, research and development and customer information and lists (collectively, "<u>Trade Secrets</u>").

"<u>Intellectual Property Licenses</u>" means (i) any Contract that contains any grant by any Seller or any of its Subsidiaries to any third Person of any right to use, publish, perform or exploit any of the Business Intellectual Property, and (ii) any Contract that contains any grant by any third Person to any Seller or any of its Subsidiaries of any right to use, publish, perform or exploit any Intellectual Property of such third Person concerning or relating to the Business Intellectual Property.

"<u>Inventory Liquidation Expenses</u>" means the sum of (a) an amount equal to $900,000 for lease return conditions actually paid by Sellers with respect to Stores for which liquidations commenced after January 1, 2011 and which expenses were incurred and paid during the period beginning January 1, 2011 through the date of the Cobalt Agreement, <u>*plus*</u> (b) the product of (i) the aggregate number of Stores that commence and substantially complete liquidation or going out of business sales during the period from January 1, 2011 until the Closing Date, <u>*multiplied by*</u> (ii) $36,500.

"IRS" means the United States Internal Revenue Service.

"Law" means any United States or foreign, federal, state, provincial or local law (including common law), statute, code, ordinance, rule, regulation or other requirement enacted, promulgated, issued or entered by a Governmental Authority.

"Lease Extension" means, with respect to any Leased Property, a writing pursuant to which Sellers' counterparty to the lease for such Leased Property has affirmatively agreed to an extension of not less than sixty (60) days of the April 21, 2011 deadline for Sellers' assumption or rejection of such unexpired real property leases under section 365 of the Bankruptcy Code.

"Leased Properties" means, collectively, each unexpired real property lease to which any Seller is a party (other than the Initial Liquidating Stores).

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Authority.

"Liabilities" means any and all debts, losses, liabilities, claims (including claims as defined in the Bankruptcy Code), damages, expenses, fines, costs, royalties, proceedings, deficiencies or obligations (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, disclosed or undisclosed, matured or unmatured, determined or undeterminable, on or off-balance sheet, fixed, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, or otherwise and whether due or to become due, and whether in contract, tort, strict liability or otherwise, and whether or not resulting from third party claims, and any reasonable out-of-pocket costs and expenses in connection therewith (including reasonable legal counsels', accountants', or other fees and expenses incurred in defending any action or in investigating any of the same or in asserting any rights thereunder or hereunder).

"Lien" means any lien (statutory or other), pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, right of first offer, easement, servitude, transfer restriction under any shareholder or similar agreement or encumbrance or any other restriction or limitation whatsoever.

"Non-Debtor Benefit Plans" means the Employee Benefit Plans (excluding any governmental plan or arrangement) as to which any Non-Debtor Subsidiary (or any of their Subsidiaries) has any Liability arising from or relating to any current or former employee or director of any Non-Debtor Subsidiary (or any of their Subsidiaries) and (i) has been established under the laws of a jurisdiction other than the United States or any state or other jurisdiction thereof, and (ii) exclusively covers current and former employees or directors of the Non-Debtor Subsidiaries (or any of their Subsidiaries).

"Non-Debtor Subsidiaries" means the foreign subsidiaries of Sellers that are listed on Schedule 1.1(d), provided that Purchaser, in its sole discretion, at any time and from time to time prior to the Closing, shall be entitled to modify such schedule to (i) remove any one or more of the subsidiaries of Sellers listed thereon and/or (ii) add any one or more of the Subsidiaries of Sellers that are not Debtors. For the avoidance of doubt, the representations and warranties set

forth in Article V with respect to the Non-Debtor Subsidiaries are being made by Sellers solely with respect to the Non-Debtor Subsidiaries that are listed on Schedule 1.1(e) as of the date hereof.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award, whether temporary, preliminary or permanent.

"Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business through the date hereof consistent with past practice during the one month period prior to the date of the Cobalt Agreement, and without regard to store closures and liquidations.

"Permits" means any approvals, authorizations, consents, notices, registrations, Orders, variances, licenses, franchises, permits or certificates.

"Permitted Liens" means:

(a)     with respect to any real property and to the extent that they do not materially interfere with the ownership, occupancy, use or operation of, or materially detract from the value of, the affected Owned Properties or Real Property Leases in the manner and for the purposes heretofore used by Sellers and their Subsidiaries in connection with the Business, easements, restrictive covenants, and rights-of-way on, over or in respect of any Owned Property or Real Property Lease, servitudes, permits, surface leases and other rights with respect to surface operations;

(b)     all rights reserved to or vested in any Governmental Authority to control or regulate the Purchased Assets and all obligations and duties under all Applicable Laws or under any permit issued by any Governmental Authority;

(c)     statutory Liens for Taxes not yet delinquent or the amount or validity of which is being contested in good faith through appropriate proceedings;

(d)     prior to the entry of the Sale Order, any Lien that pursuant to section 363(f) of the Bankruptcy Code will be released from the Purchased Assets upon entry of the Sale Order; and

(e)     prior to Closing, other Liens that will be released on or prior to Closing at no cost or expense to Purchaser.

"Person" means and includes natural persons, corporations, limited partnerships, limited liability companies, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and all Governmental Authorities.

"Post-Closing Studio Condition" means, with respect to any Specified Studio that is engaged in the distribution of packaged and digital audio-visual media, that at all times from the Closing Date until the date of determination, such Specified Studio shall (i) ship to Purchaser and Purchaser's domestic and international subsidiaries, as the case may be, in such quantities as requested in the ordinary course of business, on a "cash in advance" basis at such Specified

Studio's standard wholesale price (or better terms in such Specified Studio's sole and absolute discretion) and support Purchaser's digital business by continuing to offer video on demand and electronic sell through services on the same terms and conditions as is currently provided by such Specified Studio, or in accordance with the terms and conditions of current agreements, at the sole election of such Specified Studio, subject to overall market trends and/or window shifts during the ninety (90) day period following the Closing and (ii) meet with Purchaser during the ninety (90) day period following the Closing to discuss future content deals and consider any Purchaser proposals or other communications; provided that any credit decisions shall remain in the sole discretion of such Specified Studio.

"Pre-Closing Tax Period" means any Tax period (or the portion thereof) ending on or before the Closing Date.

"Protected Stores" means the retail store locations set forth on the list attached hereto as Exhibit D.

"Purchased Intellectual Property" means all Intellectual Property owned by any Seller or any Debtor Subsidiary.

"Purchaser Assumed Contracts" means, to the extent assignable pursuant to section 365 of the Bankruptcy Code, all Contracts set forth on Schedule 1.1(e) (as such schedule may be modified pursuant to Section 2.5). For the avoidance of doubt, Purchaser shall have the right to remove Contracts from Schedule 1.1(e) at any time and from time to time in accordance with Section 2.5(d).

"Purchaser Material Adverse Effect" means any change, circumstance, fact, condition or event that individually or in the aggregate with any other change, circumstance, fact, condition or event, would or would reasonably be expected to materially delay or impair the ability of Purchaser to perform its material obligations under this Agreement.

"Reimbursable Expenses" means the reasonable and documented out-of-pocket fees and expenses (including the fees and expenses of Milbank, Tweed, Hadley & McCloy LLP and Kramer Levin Naftalis & Frankel LLP as counsel, Houlihan Lokey Howard & Zukin Capital, Inc. as financial advisor and Zolfo Cooper, LLC) incurred by Cobalt and each of Monarch Alternative Capital LP, Owl Creek Asset Management LP, Stonehill Capital Management, LLC and Värde Partners, Inc. (or on its or their behalf) in connection with its bid, in an aggregate amount not to exceed $5,000,000.

"Release" means any actual or threatened release, spill, emission, discharge, migration, leaking, pumping, injection, deposit or disposal of Hazardous Materials into, onto or through the environment or within any building, structure, facility or fixture.

"Remedial Action" means any investigation, response, corrective action, monitoring, remedial or other action required under any Environmental Law or by a Governmental Authority to address a Release or threatened Release of Hazardous Materials.

"Representatives" of a Person means its officers, directors, managers, employees, attorneys, investment bankers, accountants and other agents and representatives.

"Revenue Share Adjustment Amount" means, in the event that any of the Purchased Assets that are acquired by Purchaser remain subject to any liabilities or obligations under the Revenue Sharing Agreements, an amount equal to the aggregate estimated amount of all liabilities and obligations under the Revenue Sharing Agreements to which the Purchased Assets will be subject and which Purchaser will be required to satisfy following the Closing, with such amount to be determined by the good faith estimate of Sellers which estimate shall include a reasonably detailed breakdown of such liabilities or obligations by category, and which shall be delivered in writing to Purchaser not less than two (2) Business Days prior to the Closing Date. In the event that Sellers' counterparties under the Revenue Sharing Agreements have asserted ownership rights to, or other restrictions on, sales of any portion of the inventory and merchandise located at the Stores and Distribution Centers subject to such Revenue Sharing Agreements at Closing (the "Rev Share Units"), Sellers shall give prompt written notice to Purchaser with respect to any such assertions of ownership or other restrictions with respect to any Rev Share Units. Not later than five (5) Business Days prior to the Closing, Sellers and Purchaser shall mutually agree as to whether, in the event that any Rev Share Units cannot be acquired by the Purchaser free and clear of the liabilities and obligations under the Revenue Sharing Agreements, all or any portion of such Rev Share Units shall be (i) retained by Sellers and treated as Excluded Assets or (ii) transferred to Purchaser as Purchased Assets with the corresponding adjustment to the Purchase Price for the Revenue Share Adjustment Amount; provided, however, in the event that Sellers and Purchaser cannot reach agreement on the treatment of the Rev Share Units, the Rev Share Units shall be retained by Sellers and treated as Excluded Assets. For the avoidance of doubt, if any Rev Share Units are retained by Sellers and treated as Excluded Assets, then, with respect to such Rev Share Units, (i) no adjustment to the Cash Purchase Price shall be made pursuant to Section 3.3(b)(vi), and (ii) in lieu of such adjustment to the Cash Purchase Price, such Rev Share Units shall be disregarded and shall not be taken into account in computing the Estimated Inventory Amount, the Closing Inventory Amount or the Final Inventory Amount for purposes of Sections 3.3 and 3.4. Notwithstanding the foregoing, Sellers shall not be required to give any notice with respect to, and Purchaser may not treat as Excluded Assets under this provision, any Rev Share Units of any Specified Studio that are being delivered free and clear of all liabilities and obligations under the Revenue Sharing Agreements pursuant to the Sale Order.

"Revenue Sharing Agreements" means, collectively, the "revenue sharing" agreements between Sellers and certain studios, including, but not limited to each of the Specified Studios and Lions Gate Films Inc., pursuant to which such studios supply Sellers with movie titles for a price that includes a certain percentage of the revenue Sellers generate from the rental and/or sale of such titles.

"Roll-Up Notes" has the meaning given to such term in the DIP Credit Agreement.

"Sale Hearing" shall have the meaning given to such term in the Bidding Procedures Order.

"Sale Motion" shall mean the motion filed by Sellers with the Bankruptcy Court on February 21, 2011, seeking entry of the Sale Order and the Bidding Procedures Order, which shall not be amended, supplemented or modified except with Purchaser's prior written consent to the extent such amendments, supplements or modifications are adverse to Purchaser.

"Sale Order" means (a) that certain Order Pursuant to 11 U.S.C. §§ 105(a), 363, and 365 and Fed. R. Bankr. P. 2002, 6004, 6006 and 9014 Authorizing and Approving (A) the Sale of Debtors' Assets Free and Clear of Interests and (B) Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Lease to the Purchaser entered by the Bankruptcy Court on April 14, 2011, and (b) any further order or orders of the Bankruptcy Court issued pursuant to sections 105, 363 and 365 of the Bankruptcy Code, in form and substance acceptable to Purchaser, approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Sellers to consummate the Transactions and enter into the Transaction Documents. Without limiting the generality of the foregoing, such order shall specifically include, among other things, provisions ordering that in the event that any of the Bankruptcy Cases are converted to cases under chapter 7 of the Bankruptcy Code, the Sale Order and the Transaction Documents shall be binding on the chapter 7 trustee in such chapter 7 cases.

"Sales Tax Amount" means the lesser of (x) the amount of the Closing Sales Tax Payment paid as of the close of business on the day immediately preceding the Closing Date pursuant to Section 8.13 and (y) $8,000,000.

"Seller Material Adverse Effect" means any change, circumstance, fact, condition or event that, individually or in the aggregate with any other change, circumstance, fact, condition or event, (a) is or would reasonably be expected to have a materially adverse effect on (i) the Business, financial condition, results of operations, properties, assets or Liabilities of Sellers and their Subsidiaries (taken as a whole) as the same shall have existed as of the date of the Cobalt Agreement, or (ii) the ability of Sellers to perform their respective obligations under this Agreement, or (b) prevents or materially delays the consummation of the Transactions, in each case other than an Excluded Matter which shall not be taken into account in determining whether there has been or would reasonably be expected to be a Seller Material Adverse Effect. "Excluded Matter" means any adverse change, circumstance, fact, condition or event resulting from one or more of the following: (i) the condition of the economy or the securities markets in general, or any outbreak of hostilities, terrorist activities or war; (ii) except for purposes of Section 5.4 and with respect to Section 10.1(a) to the extent related to the accuracy of Section 5.4, the announcements, pendency or consummation of the sale of the Purchased Assets or any other action by Purchaser or its Affiliates contemplated or required hereunder including the Store Closing Liquidations and the inability of Sellers to pay any administrative expense claims in the Bankruptcy Cases and any Action taken by any Person as a result thereof, if, in each case in this clause (ii), the result thereof would not reasonably be expected to prevent the Business from operating substantially in the Ordinary Course of Business; (iii) any changes in general economic, political or regulatory conditions; (iv) the impact on the Business or assets of any Seller or any of their Subsidiaries as a result of the termination of the DIP Credit Agreement and any ability of Sellers to use cash collateral; (v) any Action (including a bankruptcy filing or equivalent proceeding under Applicable Law) taken by any Person other than Sellers or their Affiliates or Representatives with respect to Blockbuster Canada Co.; (vi) any changes in Applicable Laws or accounting rules, in each case only to the extent occurring after the date of this Agreement; or (vii) any material breach by Purchaser of any covenant or agreement herein or any representation or warranty of Purchaser having been or having become untrue in any material respect; provided, however, that with respect to clauses (i), (iii) and (vi), such change, circumstance, fact, condition or event does not disproportionately adversely affects Sellers and

their Subsidiaries, taken as a whole, as compared to other companies operating in the industries in which Sellers and their Subsidiaries operate.

"Sellers' Knowledge" means the knowledge of Jim Keyes, Tom Kurrikoff, Bruce Lewis, Dennis McGill, Jeff Stegenga, Roger Dunlap and Kevin Lewis.

"Specified Studios" means, collectively, Twentieth Century Fox Home Entertainment LLC, Sony Pictures Home Entertainment Inc., Warner Home Video, a Division of Warner Bros. Home Entertainment Inc., Paramount Home Entertainment Inc., Universal Studios Home Entertainment LLC, The Walt Disney Company, and Summit Distribution, LLC, together with their respective Studio Affiliates. For purposes of this definition, (i) "Studio Affiliate" means, with respect to any Specified Studio, any direct or indirect subsidiary of such Specified Studio, and any other Person that, directly or through one or more intermediaries, is controlled by such Specified Studio; and (ii) "controlled" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies (whether through ownership of securities or partnership or other ownership interests, by Contract or representation on the board or similar governing body).

"Store License Agreement" means the Store License Agreement to be entered into between Purchaser and Sellers substantially in the form attached as Exhibit A hereto.

"Stores" means Sellers' domestic non-franchised retail store locations.

"Straddle Period" means any Tax period beginning before, and ending after, the Closing Date.

"Studio Condition" means, with respect to any Specified Studio, that at all times from the date of the Cobalt Agreement until the Closing, (A) in the event that such Specified Studio is engaged in the distribution of packaged and digital audio visual media, it shall have continued to (i) support Sellers' digital business on terms materially consistent with or better than those in effect on February 14, 2011 and (ii) provide Sellers' Stores and its international operations with physical copies of movies in amounts requested by Sellers, on a "cash in advance" or better payment basis and at prices materially consistent with or better than those in effect on February 14, 2011, (B) in the event that such Specified Studio is engaged in the distribution of packaged and digital audio visual media, it shall take no adverse action against any non-Debtor Subsidiaries of Sellers, provided that (i) any Specified Studio may exercise its rights and remedies as to any non-Debtor Subsidiary of Sellers to the extent that such non-Debtor Subsidiary breaches any agreement between such Specified Studio and such non-Debtor Subsidiary, provided that such breach does not arise as a result of a guaranty obligation or cross-default arising from the breach of another agreement, (ii) nothing herein shall limit or affect the rights of any of the Canadian Collateral Obligees as a holder of collateral pledged by non-Debtor Subsidiary Blockbuster Canada Co. (the "Canadian Collateral"), with respect to enforcing its rights against Blockbuster Canada Co. or with respect to the Canadian Collateral, and (iii) customary trade practices in the ordinary course of business consistent with past practice shall not constitute "adverse action" hereunder and (C) such Specified Studio shall have continued to affirmatively support the Bidding Procedures Order (including the payment of the Roll-Up Notes), the bidding and sale process contemplated thereby, and a sale of the Sellers' assets to

Purchaser (unless overbid) at the Sale Hearing. Compliance with clause (A) of the Studio Condition shall be satisfied, with respect to any Specified Studio if, until the Closing Date, such Specified Studio ships product to Sellers and their domestic and international subsidiaries, as the case may be, in such quantities as requested in the ordinary course of business on "cash in advance" terms at the applicable Studio's standard wholesale price (or better terms in each Studio's sole and absolute discretion) and supporting the Sellers' digital business by continuing to offer video on demand and electronic sell through services on the same terms and conditions as is currently provided by such Specified Studio, or in accordance with the terms and conditions of current agreements, at the sole election of such Specified Studio, subject to overall market trends and/or window shifts.

"Studio Condition Percentage" means the percentage equivalent of a fraction, the numerator of which is the sum of the Frozen Studio Balances of all Specified Studios that have fully satisfied the Studio Condition and the denominator of which is the aggregate Frozen Studio Balances of all Specified Studios.

"Studio Contracts" mean all contracts, agreements, arrangements or understandings between Sellers and any of the Specified Studios or any of Sellers' movie and/or video game suppliers.

"Studio Liability Amount" means an amount equal to the product of $11,500,000 multiplied by the Studio Condition Percentage.

"Subsidiary" or "subsidiary" means, with respect to any Person, any corporation, limited liability company, joint venture or partnership of which such Person (a) beneficially owns, either directly or indirectly, more than fifty percent (50%) of (i) the total combined voting power of all classes of voting securities of such entity entitled, under ordinary circumstances, to vote in the election of directors or other governing body of such Person, (ii) the total combined equity interests, or (iii) the capital or profit interests, in the case of a partnership; or (b) otherwise has the power to vote or to direct the voting of sufficient securities to elect a majority of the board of directors or similar governing body of such Person.

"Subsidiary Shares" means the outstanding ownership interests in each of the Non-Debtor Subsidiaries.

"Target Cash Amount" means an amount equal to $68,400,000, *less* any Contract Maintenance Costs described in Section 2.5(c) not previously reimbursed by Purchaser.

"Tax" means all federal, state, provincial, territorial, municipal, local or foreign income, profits, franchise, gross receipts, environmental (including taxes under Code Section 59A), customs, duties, net worth, sales, use, goods and services, withholding, value added, ad valorem, employment, social security, disability, occupation, pension, real property, personal property (tangible and intangible), stamp, transfer, conveyance, severance, production, excise and other taxes, withholdings, duties, levies, imposts and other similar charges and assessments (including any and all fines, penalties and additions attributable to or otherwise imposed on or with respect to any such taxes, charges, fees, levies or other assessments, and interest thereon) imposed by or on behalf of any Governmental Authority.

"Tax Returns" means any report, return, declaration, claim for refund, information report or return or statement required to be supplied to a Taxing Authority in connection with Taxes, including any schedule or attachment thereto or amendment thereof.

"Taxing Authority" means any Governmental Authority exercising any authority to impose, regulate, levy, assess or administer the imposition of any Tax.

"Transaction Documents" means this Agreement, the escrow agreement to be entered into with respect to the Purchase Price Adjustment Escrow, the Assignment Agreement, the Store License Agreement and all other Contracts and agreements necessary to effectuate the Transactions.

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents.

"Transition Services Agreement" means the agreement, if applicable, to be entered into by Parent and Purchaser pursuant to Section 8.9 hereof.

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq*. (1988) and any similar federal, state, local or foreign "mass layoff" or "plant closing" laws.

Section 1.2    Terms Defined Elsewhere in this Agreement.  For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
| --- | --- |
| Accounting Referee | Section 3.4(c) |
| Agreement | Preamble |
| Asset Acquisition Statement | Section 3.5 |
| Assignment Agreement | Section 4.2(d) |
| Assumed Cure Costs | Section 2.5(a) |
| Assumed Liabilities | Section 2.3 |
| Balance Sheet | Section 5.5(a) |
| Balance Sheet Date | Section 5.5(a) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Business | Recitals |
| Canadian Agreement | Section 4.2(d) |
| Capital Leases | Section 5.10(b) |
| Cash Purchase Price | Section 3.1 |
| Closing | Section 4.1 |
| Closing Accounts | Section 3.4(a) |
| Closing Date | Section 4.1 |
| Closing Date Leased Properties | Section 8.8(b) |
| Closing Date Payment | Section 3.3(b) |
| Closing Sales Tax Payment | Section 8.13 |
| Closing Statement | Section 3.4(a) |

| Term | Section |
|------|---------|
| Cobalt | Recitals |
| Cobalt Agreement | Recitals |
| Competing Bid | Section 7.1(a) |
| Confidentiality Agreement | Section 8.5 |
| Contract Maintenance Costs | Section 2.5(b) |
| Delayed Closing Penalty | Section 4.4(b) |
| Deposit | Section 3.2(a) |
| Escrow Agent | Section 3.3(h) |
| Estimated Cash Amount | Section 3.3(a) |
| Estimated Inventory Amount | Section 3.3(a) |
| Excluded Assets | Section 2.2 |
| Excluded Contract | Section 2.5(b) |
| Excluded Liabilities | Section 2.4 |
| Excluded Matter | Section 1.1 (in Seller Material Adverse Effect definition) |
| Final Cash Amount | Section 3.4(f) |
| Final Inventory Amount | Section 3.4(e) |
| Financial Statements | Section 5.5(a) |
| Italian Agreement | Section 4.2(e) |
| Liquidation Condition | Section 8.8(a) |
| Maintenance Period | Section 2.5(c) |
| Material Contracts | Section 5.12(a) |
| Nonassignable Assets | Section 2.6(d) |
| Outside Date | Section 4.4(b) |
| Owned Properties | Section 5.9(a) |
| Parent | Preamble |
| Parties | Preamble |
| Personal Property Leases | Section 5.10(a) |
| Post-Closing Studio Obligation | Section 3.3(g) |
| Proposed Allocation | Section 3.5 |
| Purchase Price | Section 3.1 |
| Purchase Price Adjustment Escrow | Section 3.3(h) |
| Purchased Assets | Section 2.1 |
| Purchased Business Name Trademarks | Section 8.14 |
| Purchaser | Preamble |
| Purchaser Documents | Section 6.2 |
| Real Property Lease | Section 5.9(b) |
| Removed Contract | Section 2.5(e) |
| Rev Share Units | Section 1.1 (in Revenue Share Adjustment Amount definition) |
| Revised Statements | Section 3.5 |
| Securities Act | Section 6.5 |
| Seller or Sellers | Preamble |
| Seller Documents | Section 5.3 |
| Store Closing Liquidations | Section 8.8(a) |

| Term | Section |
|------|---------|
| Store License Alternative | Section 8.8(b) |
| Studio Allocation Percentage | Section 3.3(f) |
| Tax Claim | Section 9.3(c) |
| Taxable Consideration | Section 3.5 |
| Trade Secrets | Section 1.1 (in Intellectual Property definition) |
| Transfer Taxes | Section 9.3(a) |
| Transferred Employees | Section 9.1(a) |
| Undisclosed Assumed Contract | Section 2.5(d) |

Section 1.3    Other Definitional and Interpretative Provisions.

(a)    The words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(b)    The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

(d)    Any reference in this Agreement to "$" shall mean United States dollars.

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(f)    Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.  References to a Person are also to its permitted successors and assigns.

(g)    All Article and Section references herein are to Articles and Sections of this Agreement, unless otherwise specified.

(h)    All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(i)    This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if all Parties had prepared it and, in the

event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

# ARTICLE II

## PURCHASE AND SALE

Section 2.1 <u>Purchase and Sale of Assets</u>. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Sellers shall sell, transfer, assign, convey and deliver to Purchaser (or its designee), and Purchaser (or its designee) shall purchase, acquire and accept from Sellers, free and clear of any and all Liens (other than Liens created by Purchaser and Permitted Liens), all of Sellers' right, title and interest in, to and under any and all of the assets, properties, rights and claims of any kind or nature, whether tangible or intangible, real, personal or mixed, wherever located and whether or not carried or reflected on the books and records of any Seller, which are used or useful in or held for use in connection with the operation of the Business, excluding only the Excluded Assets expressly identified in Section 2.2 (such assets, properties, rights and claims to be acquired hereunder, collectively, the "<u>Purchased Assets</u>"). Without limiting the foregoing, the Purchased Assets shall include the following:

(a) all of the outstanding ownership interests in each of the Non-Debtor Subsidiaries;

(b) all rights, title and interest of Sellers in the BB 2009 Trust;

(c) all cash, cash equivalents, bank deposits or similar cash items of Sellers (including all items taken into account in determining the $68,400,000 amount for purposes of the definition of Target Cash Amount);

(d) all accounts and notes receivable and other rights to payment (including credit card receivables), together with any unpaid late fees and financing charges accrued thereon, other than any accounts and notes receivable or other rights to payment arising out of or relating to any Excluded Asset and which receivable or right to payment is created or arises subsequent to the Closing, arising from the conduct of the Business;

(e) all deposits (including security deposits for rent, electricity, telephone or otherwise) and prepaid or deferred charges and expenses of Sellers, including all prepaid rentals and unbilled charges, fees or deposits, other than deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Asset which are made, created or arise subsequent to the Closing;

(f) all tangible personal property owned by Sellers related to, useful in or held for use in the conduct of the Business, including movie, television program, game, and cell phone inventory, merchandise, memorabilia, supplies, food and beverage items, samples, equipment, televisions, monitors, video players, computers, hardware, electronics, file servers, scanners, printers, networks, copiers, cash registers, furniture, furnishings, fixtures, improvements (whether leasehold or otherwise),  telephone lines, telecopy machines,

telecommunication equipment, storeroom contents, spare parts, shipping materials, packaging materials, raw materials and other consumables relating to or available for sale or use in connection with the Business;

(g)     all rights, title and interest of Sellers in each Owned Property and under each Real Property Lease which is a Purchaser Assumed Contract, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

(h)     all rights, title and interest of Sellers in and to any property subject to a personal property lease that is related to, useful in or held for use in the conduct of the Business, to the extent any such personal property lease is a Purchaser Assumed Contract;

(i)     the Purchased Intellectual Property;

(j)     after giving effect to the Sale Order, all of the rights and benefits accruing under any of the Purchaser Assumed Contracts, including each Studio Contract, Real Property Lease, personal property lease or Intellectual Property License that is a Purchaser Assumed Contract;

(k)     all Documents that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business, including Documents relating to marketing, advertising, promotional materials, Purchased Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (g) above, but excluding (i) personnel files for Employees who are not Transferred Employees, (ii) such files as may not be transferred under Applicable Law regarding privacy, (iii) Documents which any Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party and (iv) Documents relating to an Excluded Asset or Excluded Liability; provided, however, to the extent such Documents relate in any way to the conduct of the Business, Purchaser shall receive copies thereof;

(l)     all of the rights and benefits accruing under any Permits held, used or made by any Seller in the Business to the extent assignable, except any such Permit that is an Excluded Contract;

(m)     all warranties and guarantees related to the Purchased Assets, including warranties and guarantees made by suppliers, manufacturers and contractors under the Purchased Assets, and claims against suppliers and other third parties in connection with the Purchaser Assumed Contracts;

(n)     any rights, demands, claims, causes of action, rights of recovery, credits, allowances, rebates, or rights of setoff or subrogation arising out of or relating to any of the Purchased Assets;

(o)     all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(p)     all third party property and casualty insurance proceeds, and all rights to third party property and casualty insurance proceeds, in each case to the extent received or receivable in respect of the Business or the Purchased Assets (or to any portion thereof);

(q)     all rights of Sellers under or pursuant to any franchise agreements or other arrangements with franchisees, other than any such agreement or arrangement which the Purchaser has specifically designated as a Removed Contract pursuant to Section 2.5(d);

(r)     all goodwill and other intangible assets associated with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property;

(s)     all assets attributable to Non-Debtor Benefit Plans (including any trusts, insurance or other funding arrangements);

(t)     all of Sellers' assets related to, located at, or used or useful in connection with the operation of Sellers' Distribution Centers;

(u)     all rights, claims and causes of action of Sellers (except to the extent arising under the Transaction Documents), but not including any rights, claims and causes of action under the Bankruptcy Code (including chapter 5 thereof) or any similar claims and causes of action for avoidance, preference or fraudulent conveyance under Applicable Law;

(v)     sales and use Tax refunds to the extent provided in Section 2.3(d); and

(w)     all other assets, properties, rights and claims of Sellers of any kind or nature which relate to the Business, which are used or useful in or held for use in the Business, or which relate to the Purchased Assets (in each case, other than the Excluded Assets) not otherwise described in this Section 2.1, including, but not limited to, all of Sellers' assets related to, located at, or used or useful in connection with (i) the operation of all of Sellers' Stores, (ii) the operation of Sellers' digital, kiosk and by-mail businesses and (iii) Sellers' franchise businesses.

Section 2.2     Excluded Assets.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets.  "Excluded Assets" shall mean only the following assets:

(a)     the Excluded Contracts, including any accounts receivable arising out of or in connection with any Excluded Contract;

(b)     all equity interests of Parent and the Debtor Subsidiaries;

(c)     any (i) confidential personnel and medical records pertaining to any Employee of Sellers not permitted to be transferred to Purchaser under Applicable Law; (ii) books and records that Sellers are required by Law to retain, that relate exclusively to the Excluded Assets or the Excluded Liabilities, including Tax Returns, financial statements, and corporate or other entity filings; provided, however, that Purchaser shall receive copies of any portions of such retained books and records that relate to the Business or any of the Purchased

Assets or Assumed Liabilities; and (iii) corporate charters, qualifications to do business, taxpayer and other identification numbers, corporate seals, minute books, stock ledgers, stock certificates and any other documentation related to governance, organization, maintenance or existence of Sellers; provided, that Purchaser shall receive copies of any portions of such documents and records;

(d)     except as otherwise provided in Section 2.3(d), any claim, right or interest of any Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Taxes that are Excluded Liabilities or for which any Seller has liability pursuant to Section 9.3;

(e)     all rights and claims of Sellers under the Transaction Documents;

(f)     all Debtor Benefit Plans (and any trusts, 501(c)(9) organizations, insurance (including fiduciary insurance), administrative or other service contracts relating thereto);

(g)     all rights, claims and causes of action of Sellers under the Bankruptcy Code (including chapter 5 thereof) and any similar claims and causes of action for avoidance, preference or fraudulent conveyance under Applicable Law; and

(h)     all restricted cash of Sellers relating to cash collateralized letters of credit and/or Excluded Liabilities.

Section 2.3     Assumption of Liabilities.  Purchaser shall assume no Liability of Sellers except the Liabilities that are expressly set forth in this Section 2.3 (collectively, the "Assumed Liabilities").  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume the Assumed Liabilities and shall agree to pay, discharge, perform and otherwise satisfy such Assumed Liabilities in accordance with their respective terms, subject to any defenses or claimed offsets asserted in good faith against the obligee to whom such Liabilities of Sellers and their Subsidiaries are owed.  The Assumed Liabilities shall consist of only the following Liabilities:

(a)     all Liabilities of Sellers under the Purchaser Assumed Contracts solely to the extent of the Assumed Cure Costs and Liabilities arising from events arising and occurring following the Closing Date;

(b)     all Liabilities of Sellers with respect to accrued and unpaid wages, accrued and unused vacation (subject to the limitations in Section 9.2(a)), and the employer's share of any payroll Taxes, in each case with respect to Transferred Employees who accept Purchaser's offer of employment and commence employment with Purchaser; provided, that with respect to the pay period during which the Closing occurs, the maximum aggregate amount of such wages, vacation and payroll Taxes included in the Assumed Liabilities for each Transferred Employee shall not exceed an amount equal to one half of the aggregate amount of such wages, vacation and payroll Taxes accrued during such Transferred Employee's normal pay period cycle;

(c)     all Liabilities of Sellers to the extent specifically provided in Article IX;

(d)      all sales or use or other Taxes of any Seller (but not including any Taxes assumed by Purchaser pursuant to <u>Section 2.3(b)</u> or paid by Sellers pursuant to the Closing Sales Tax Payment), up to an aggregate amount not to exceed $1,600,000, that (i) result from sales and use Tax audits or examinations of Sellers for periods prior to the Closing Date or (ii) for which any director, officer or employee of a Seller may be personally liable under Applicable Law; <u>provided</u>, that Purchaser shall be entitled to all Tax refunds of Sellers for Tax periods prior to the Closing Date to the extent they relate to Taxes that would constitute Assumed Liabilities pursuant to this <u>Section 2.3(d)</u>; <u>provided</u>, <u>further</u>, <u>however</u>, that Purchaser shall not be entitled to any such refund to the extent that it would cause the aggregate amount of refunds received by Purchaser pursuant to this <u>Section 2.3(d)</u> to exceed the aggregate amount of Taxes that have become Assumed Liabilities pursuant to this <u>Section 2.3(d)</u>;

(e)      the Post-Closing Studio Obligation, with respect to each Specified Studio that fully satisfies the Studio Condition;

(f)      all Liabilities with respect to the Assumed Cure Costs; and

(g)      for (i) Leased Properties that have documented Lease Extensions and/or other lease modifications and that are (A) Purchaser Assumed Contracts and (B) actually assumed and assigned to Purchaser, the real estate professional fees that are owed by Sellers for such Leased Properties, and (ii) Leased Properties pursuant to which legal fees were incurred by Sellers in an effort to reach Lease Extensions and/or other lease modifications, all such legal fees; <u>provided</u>, that the aggregate amount of Liabilities assumed pursuant to this <u>Section 2.3(g)</u> shall not exceed $4,900,000.

For the avoidance of doubt, while Purchaser is not assuming the Liabilities of any of the Non-Debtor Subsidiaries, Purchaser acknowledges that the Liabilities of each Non-Debtor Subsidiary will remain intact as obligations of such Non-Debtor Subsidiary as such exists on the Closing Date.

Section 2.4      <u>Excluded Liabilities</u>.  Notwithstanding anything to the contrary in this Agreement, the Parties expressly acknowledge and agree that Purchaser shall not assume or in any manner whatsoever be liable or responsible for any Liabilities of any Seller or of any predecessor of any Seller, existing on the Closing Date or arising thereafter, other than the Assumed Liabilities.  All of the Liabilities of any Seller or of any predecessor of any Seller not specifically and expressly assumed by Purchaser pursuant to Section 2.3 shall be referred to herein collectively as the "<u>Excluded Liabilities</u>." Without limiting the foregoing, Purchaser shall not be obligated to assume, and does not assume, and hereby disclaims all of the Excluded Liabilities, including all of the following Liabilities, of each Seller or of any predecessor of any Seller:

(a)      all Liabilities for accrued expenses and accounts payable incurred prior to the Closing Date, except to the extent that the same constitute Assumed Liabilities pursuant to <u>Section 2.3</u>;

(b)      all Liabilities arising out of any of the Excluded Assets, including Excluded Contracts;

(c)     all Environmental Liabilities and Obligations, and all other Liabilities relating to any Laws in connection with any environmental, health or safety matters based on facts arising or existing during Sellers' operation of the Business prior to the Closing Date; provided, that nothing in this Agreement shall (i) release, nullify, or enjoin the enforcement of any liability to a Governmental Authority under Environmental Laws (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the Closing Date or (ii) in any way (x) diminish the obligation of any entity to comply with Environmental Laws, or (y) diminish the obligations of Sellers to comply with Environmental Laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code;

(d)     all Liabilities relating to any claims for infringement, dilution, misappropriation or any other violation of or by the Business Intellectual Property arising from Sellers' operation of the Business prior to the Closing Date;

(e)     all Liabilities for (i) any Taxes of any Seller (other than those assumed pursuant to Sections 2.3(b) and 2.3(d)) and (ii) Transfer Taxes;

(f)     all Liabilities arising out of, relating to or with respect to (i) the employment or performance of services by any Employee of Sellers or any of their Affiliates prior to the Closing, (ii) termination of employment or services of any Employee by any Seller or any of its Affiliates, including any severance payments, (iii) each of the Employee Benefit Plans subject to Title IV of ERISA (or similar rules or regulations under any federal, state, local or foreign law) and all Debtor Benefit Plans and (iv) the WARN Act;

(g)     all Liabilities arising as a result of any Action initiated at any time, to the extent related to the Business or the Purchased Assets on or prior to the Closing Date, including any shareholder Actions, Actions for breach of contract, or any tort Actions;

(h)     all Liabilities arising under any Indebtedness of Sellers, including any Liabilities with respect to the Senior Secured Notes (as defined in the Sale Motion), the DIP Credit Agreement, the Roll-Up Notes and any obligations or Liabilities to equity holders;

(i)     other than the Reimbursable Expenses, all Liabilities with respect to any costs and expenses (including all legal, accounting, financial advisory, valuation, investment banking and other third party advisory or consulting fees and expenses) incurred by or on behalf of any Seller, Cobalt or any of their respective Affiliates in connection with the Bankruptcy Cases or the Transactions;

(j)     all Liabilities (i) existing prior to the filing of the Bankruptcy Cases that are subject to compromise under the Bankruptcy Cases, other than the Assumed Cure Costs and (ii) to the extent not otherwise expressly assumed herein, incurred subsequent to the filing of the Bankruptcy Cases;

(k)     all Liabilities with respect to any customer programs or rights, including merchandise returns;

(l)     all Liabilities with respect to any gift cards outstanding on the Closing Date;

(m)     all Liabilities (other than the Post-Closing Studio Obligation to the extent set forth in Section 2.3(e)) with respect to any Studio Contracts, including the Revenue Sharing Agreements; and

(n)     all Liabilities relating to the failure to comply with any bulk sales Laws.

Section 2.5     Assumed Contracts.

(a)     Purchaser Assumed Contracts. At the Closing (or at such other time as any Purchaser Assumed Contracts are assumed and assigned to Purchaser) and pursuant to section 365 of the Bankruptcy Code and the Sale Order, Sellers shall assume and assign to Purchaser, and Purchaser shall consent to such assignment from Sellers, the Purchaser Assumed Contracts; provided, that if this Agreement is terminated pursuant to Section 4.4(g), any Purchaser Assumed Contracts that were assigned to Purchaser prior to such termination shall be assigned back to, and assumed by, the applicable Seller.  All Cure Costs with respect to the Purchaser Assumed Contracts shall be paid in full by Purchaser on or before the Closing Date (or at such other time as any Purchaser Assumed Contracts are assumed and assigned to Purchaser) (the "Assumed Cure Costs"), and Sellers shall have no Liability therefor.

(b)     Rejected Contracts.  Prior to the Assumption Deadline, Purchaser shall provide Sellers with one or more lists of Contracts that it will not designate as a Purchaser Assumed Contract and Sellers hereby agree to promptly reject any such Contracts.  Sellers hereby further agree to use their reasonable best efforts to obtain an Order of the Bankruptcy Court approving the rejection of any such Contract (i) prior to the Closing, if Sellers are provided notice prior to the Closing that Purchaser will not designate such Contract as a Purchaser Assumed Contract; provided, that, if such Order is not obtained prior to Closing, Sellers shall use reasonable best efforts to obtain such Order of the Bankruptcy Court approving the rejection of such Contract as soon as practicable, or (ii) if Sellers are provided notice that Purchaser will not designate such Contract as a Purchaser Assumed Contract after the Closing, as soon as practicable after Sellers receive such notice.

(c)     Excluded Contracts.  Prior to the applicable Assumption Deadline, with respect to any executory Contract (other than unexpired real property leases, which are addressed in Section 8.8) that has not been designated as a Purchaser Assumed Contract or designated to be rejected or rejected pursuant to Section 2.5(b) above (each, an "Excluded Contract"), Purchaser may, in its sole discretion, include such Excluded Contract as a Purchaser Assumed Contract by providing Sellers with written notice of such election not less than five (5) Business Days prior to the Assumption Deadline, and such Contract shall thereafter be deemed to be a Purchaser Assumed Contract for purposes of this Agreement and the Sale Order and shall be deemed to be automatically added to Schedule 1.1(e). Sellers hereby agree to use their reasonable best efforts to obtain an Order of the Bankruptcy Court approving the assumption and assignment of any such Contract that is added to Schedule 1.1(e) (x) prior to the Closing, if such Contract is added to Schedule 1.1(e) prior to Closing; provided, that, if such Order is not obtained prior to Closing, Sellers shall use reasonable best efforts to assume and assign such Contracts to Purchaser as soon

as practicable, or (y) if such Contract is added to Schedule 1.1(e) after the Closing, as soon as practicable after such Contract is added to Schedule 1.1(e).  Following the Closing, for any Excluded Contract that Purchaser has not requested in writing prior to Closing be rejected by Sellers or for any Contract that has been designated as a Purchaser Assumed Contract but has not been actually assumed and assigned to Purchaser, Purchaser shall pay directly on an ongoing basis as and when due any and all direct costs and expenses incurred or payable by Sellers, and perform any and all obligations of Sellers, in accordance with the express terms of such Excluded Contract (the "Contract Maintenance Costs") during the period from the Closing Date to the earlier to occur of (i) the effective date of the assumption and assignment to Purchaser of any such Contract and (ii) the date that Purchaser notifies Sellers in writing of its election not to have Sellers assume and assign such Contract to Purchaser (the "Maintenance Period"); provided, that Purchaser shall not have any obligation with respect to Contract Maintenance Costs if this Agreement is terminated pursuant to Section 4.4(g).  Purchaser shall indemnify and hold Sellers harmless with respect to all Contract Maintenance Costs.  For the avoidance of doubt, it is intended that Sellers shall have no costs or obligations with respect to any Excluded Contract (other than pursuant to Section 8.2(c)) which are not paid or performed by Purchaser during the Maintenance Period.

(d)     Undisclosed Assumed Contracts.  If prior to, at, or following the Closing (but prior to the conclusion of the Bankruptcy Cases), any Party becomes aware of any executory Contract or unexpired lease that has not been disclosed in writing or that was not made available, in each case, to Purchaser prior to the date hereof, the discovering party shall promptly (but in any event no later than two (2) Business Days) notify the other party in writing of such executory Contract or unexpired lease.  Purchaser may elect, no later than the later of (i) five (5) Business Days after such notice and (ii) the Closing Date, to receive an assignment of such Seller's rights in such executory Contract or unexpired lease (upon such election by Purchaser, an "Undisclosed Assumed Contract"); provided that the Bankruptcy Court enters an order (in a form and substance reasonably acceptable to Purchaser and Sellers) authorizing the assumption by Sellers (for Contracts entered prior to the commencement of the Bankruptcy Cases, whether or not amended after the commencement of the Bankruptcy Cases) and the assignment to Purchaser of such Undisclosed Assumed Contract(s). All Cure Costs under any and all Undisclosed Assumed Contracts shall be paid in full by Purchaser.

(e)     Removed Contracts.  Subject to the provisions of this Agreement and the Store License Agreement, Purchaser may elect to remove any Contract(s) and/or unexpired real property lease(s) (each, a "Removed Contract") from the list of Purchaser Assumed Contracts by giving written notice thereof to Sellers no later than one (1) Business Day prior to the date of a hearing to consider the assumption and assignment of such Contract to Purchaser or at anytime thereafter prior to assumption if the terms and conditions of the assumption and assignment of any Purchaser Assumed Contract are not acceptable to Purchaser.  Upon designation in accordance with the foregoing, each such Removed Contract shall cease to be a Purchaser Assumed Contract for the purposes of this Agreement and the Sale Order and may thereafter be rejected at Sellers' discretion without any additional notice to or consent from Purchaser or any liability of Purchaser (other than with respect to any Contract Maintenance Costs or costs under the Store License Agreement, if applicable).

Section 2.6     Further Conveyances and Assumptions.

(a)     From time to time following the Closing and except as prohibited by Law, Sellers shall, or shall cause their Affiliates to, make available to Purchaser such non-confidential data in personnel records of Transferred Employees as is reasonably necessary for Purchaser to transition such employees into Purchaser's records.

(b)     From time to time following the Closing, Sellers and Purchaser shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquittances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents and to assure fully to Sellers and their Affiliates and their successors and assigns, the assumption of the Assumed Liabilities assumed by Purchaser under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby; provided, that nothing in this Section 2.6 shall require the Purchaser or any of its Affiliates to assume any Liabilities other than the Assumed Liabilities.

(c)     To the extent not obtained at or prior to Closing, Sellers shall use reasonable best efforts to obtain termination statements, lien releases, discharges, financing change statements or other documents, notices or other instruments as Purchaser may reasonably deem necessary to release Liens (other than Permitted Liens) on the Purchased Assets, each in form and substance reasonably satisfactory to Purchaser.

(d)     Nothing in this Agreement nor the consummation of the Transactions shall be construed as an attempt or agreement to transfer or assign any Purchased Asset, including any Contract, Permit, certificate, approval, authorization or other right, which (i) is not capable of being assigned pursuant to section 365 of the Bankruptcy Code or transferred pursuant to section 363 of the Bankruptcy Code to Purchaser at the Closing, or (ii) the transfer or assignment of which would result in a violation of any Applicable Law, if the consent of a third party is not obtained prior to such transfer or assignment ("Nonassignable Assets") unless and until such consent shall have been obtained.  Sellers shall use their reasonable best efforts, and Purchaser shall use commercially reasonable efforts to cooperate with Sellers, in endeavoring to obtain such consents; provided that no Party shall be obligated to incur any costs or expenses or provide any financial accommodation or other consideration of any nature to any Person to facilitate obtaining such consent to transfer any Nonassignable Asset. To the extent permitted by Applicable Law, in the event consents to the assignment thereof cannot be obtained, such Nonassignable Assets shall be held, as of and from the Closing Date, by Sellers in trust for Purchaser and the covenants and obligations thereunder shall be performed by Purchaser in the applicable Seller's name to the extent it would have been responsible therefor if such consent or approval had been obtained, and all benefits and obligations existing thereunder shall be for Purchaser's account.  Sellers shall promptly pay over to Purchaser all money or other consideration received by it in respect of all Nonassignable Assets.

Section 2.7     Bulk Sales Laws.  Purchaser hereby waives compliance by Sellers with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise

be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

Section 2.8    Receivables.  If, following the Closing, any Seller shall receive payment in respect of accounts receivable that are included in the Purchased Assets, then such Seller shall hold such amounts in trust for Purchaser and shall promptly forward such payment to Purchaser.

## ARTICLE III

## PURCHASE PRICE

Section 3.1    Purchase Price.  The aggregate consideration for the Purchased Assets (the "Purchase Price") shall be (a) an amount in cash equal to the Closing Date Payment, subject to adjustment as provided in Section 3.4 (the "Cash Purchase Price"), *plus* (b) the assumption of Assumed Liabilities.

Section 3.2    Deposit.

(a)    Upon the execution of this Agreement, Purchaser shall have deposited with JPMorgan Chase Bank, N.A., an escrow agent (the "Escrow Agent") pursuant to that certain Escrow Agreement, dated as of March 25, 2011, between Parent and Escrow Agent (the "Escrow Agreement") by certified check or wire transfer of immediately available funds, an amount equal to $28,400,000 (the "Deposit").

(b)    The Parties agree that the Deposit shall (i) be applied as a deposit towards the Closing Date Payment and delivered to Parent at Closing as provided in Section 3.3(d), (ii) be returned to Purchaser in the event that this Agreement is terminated pursuant to any provision of Section 4.4 other than by Sellers pursuant to (A) Section 4.4(h) or (B) pursuant to Section 4.4(b) in the event that Closing does not occur on or before the Outside Date solely as a result of Purchaser's material breach of its obligations under this Agreement (including non-payment of the Closing Date Payment pursuant to Section 3.3), as promptly as practicable but no later than three (3) Business Days after the date of such termination, (iii) be paid to Sellers (with any accrued interest actually earned thereon) in the event that this Agreement is properly terminated by Sellers (A) pursuant to Section 4.4(h) or (B) pursuant to Section 4.4(b) in the event that Closing does not occur on or before the Outside Date solely as a result of Purchaser's material breach of its obligations under this Agreement (including payment of the Closing Date Payment pursuant to Section 3.3), or (iv) be treated as otherwise provided in the Bidding Procedures Order.

Section 3.3     <u>Payment of Purchase Price</u>.

(a)     Not later than three (3) Business Days prior to the Closing Date, Sellers shall prepare in good faith and provide to Purchaser a written statement of Parent, signed and certified by the Chief Financial Officer of Parent, setting forth in reasonable detail (and together with reasonable supporting documentation) (i) the Inventory Liquidation Expenses and (ii) Sellers' good faith reasonable estimate of (x) the projected Closing Inventory Amount (the "<u>Estimated Inventory Amount</u>") and (y) the projected Closing Cash Amount (the "<u>Estimated Cash Amount</u>").

(b)     At the Closing, Purchaser shall deliver, or cause to be delivered, the Closing Date Payment (as defined below) by wire transfer of immediately available funds, as set forth in clause (c) below. "<u>Closing Date Payment</u>" means an amount calculated as follows:

(i)     an amount equal to $320,600,000 <u>*minus*</u> the Studio Liability Amount;

(ii)     <u>*plus or minus*</u> (as applicable) an amount equal to the Estimated Cash Adjustment Amount;

(iii)     <u>*plus or minus*</u> (as applicable) an amount equal to the Estimated Inventory Adjustment Amount;

(iv)     <u>*minus*</u> the amount equal to the Reimbursable Expenses;

(v)     <u>*minus*</u> an amount equal to the Deposit;

(vi)     <u>*plus*</u>, if applicable, an amount equal to the Delayed Closing Penalty; and

(vii)     <u>*minus*</u>, if applicable, an amount equal to the Revenue Share Adjustment Amount.

(c)     At the Closing, Purchaser will pay to Parent the Closing Date Payment, $5,000,000 of which shall be paid by Parent to Cobalt in satisfaction of the Reimbursable Expenses, and the remainder of which shall be applied as set forth in Section 16 of the Bidding Procedures Order.

(d)     At the Closing, Parent shall instruct the Escrow Agent to transfer to Parent the Deposit.

(e)     On or prior to the Closing Date (or at such later time as any Purchaser Assumed Contracts are assumed and assigned to Purchaser), Purchaser shall deliver to each of the counterparties to the Purchaser Assumed Contracts the full amount of the applicable Cure Costs for the assumption and assignment of such Contracts by Sellers.

(f)     At the Closing Purchaser shall pay (or cause to be paid), by wire transfer of immediately available funds, to each Specified Studio that has fully satisfied the Studio

Condition, an amount equal to 25% of such Specified Studio's ratable share of the Studio Liability Amount, which ratable share shall be determined based on such Specified Studio's Frozen Studio Balance as a percentage of the aggregate Frozen Studio Balances of all Specified Studios that have fully satisfied the Studio Condition (with respect to each such Specified Studio, the "Studio Allocation Percentage").

(g)     Following the Closing, Purchaser shall pay (or cause to be paid), by wire transfer of immediately available funds, to each Specified Studio that has fully satisfied the Studio Condition, an amount equal to 75% of such Specified Studio's Studio Allocation Percentage of the Studio Liability Amount, to be paid ratably over three (3) payments on the first Business Days that are 30, 60 and  90 days following the Closing Date and which payments shall be secured by letters of credit, cash deposited with an independent escrow agent at Purchaser's option, or some other form of collateral reasonably acceptable to the Specified Studios, provided that each such payment shall be subject to the applicable Specified Studio's having fully satisfied (subject to the opportunity to cure within three (3) Business Days following notice to such Specified Studio and counsel for the Ad Hoc Studio Committee), to the date of such payment, the Post-Closing Studio Condition (the aggregate amounts payable pursuant to this sentence, the "Post-Closing Studio Obligation").

(h)     At the Closing, an amount equal to $20,000,000 of the Closing Date Payment shall be paid to Escrow Agent (or such other escrow agent as is mutually agreed upon by Parent and Purchaser) from the Closing Date Payment, pursuant to item "Fifth" of the payment waterfall set forth in Section 16 of the Bidding Procedures Order, to be held and disbursed in accordance with an escrow agreement to be agreed among Purchaser, Sellers and the Escrow Agent (or such other escrow agent as is agreed by Purchaser and Parent) for the purposes of satisfying any adjustments to the Purchase Price payable to Purchaser by Sellers pursuant to Section 3.4 (the "Purchase Price Adjustment Escrow").

(i)     At the Closing, in addition to the Closing Date Payment and notwithstanding the actual amount of wages, vacation and payroll Taxes, if any, for any Employees that have accrued as of the Closing Date, Purchaser shall pay to Parent in immediately available funds an amount equal to $4,600,000 in respect of any such accrued wages, vacation and payroll Taxes.  For the avoidance of doubt, such payment shall be included (i) in the Closing Cash Amount and (ii) as cash in accordance with Section 2.1(c) .

Section 3.4     Purchase Price Adjustment.

(a)     As promptly as practicable, but no later than forty-five (45) days after the Closing Date, Purchaser shall cause to be prepared and delivered to Parent a closing statement (the "Closing Statement") setting forth Purchaser's calculation of (i) the Closing Inventory Amount *plus* the Inventory Liquidation Expenses and (ii) the Closing Cash Amount (together, the "Closing Accounts").

(b)     If Parent disagrees with Purchaser's calculation of the Closing Accounts delivered pursuant to Section 3.4(a), Parent may, within fifteen (15) days after delivery of the Closing Statement, deliver a notice to Purchaser disagreeing with such calculation and setting forth Purchaser's calculation of such amount.  Any such notice of disagreement shall specify

those items or amounts as to which Parent disagrees, and Parent shall be deemed to have agreed with all other items and amounts contained in the Closing Statement and the calculation of the Closing Accounts delivered pursuant to Section 3.4(a).  In the event that Parent fails to timely deliver a notice of disagreement within such fifteen (15) day period, the Closing Statement and Purchaser's determination of the Closing Accounts shall be deemed final and binding on the Parties.

(c)  If a notice of disagreement shall be duly delivered pursuant to Section 3.4(b), Purchaser and Parent shall, during the fifteen (15) days following such delivery, use their commercially reasonable efforts to reach agreement on the disputed items or amounts in order to determine, as may be required, the amount of the Closing Accounts, which amount shall not be less than the amount thereof shown in Purchaser's calculation delivered pursuant to Section 3.4(a) nor more than the amount thereof shown in Parent's calculation delivered pursuant to Section 3.4(b).  If during such period, Purchaser and Parent are unable to reach such agreement, they shall promptly thereafter cause an independent accountant to be mutually agreed upon by Parent and Purchaser (the "Accounting Referee") to review this Agreement and the disputed items or amounts for the purpose of calculating the Closing Accounts (it being understood that in making such calculation, the Accounting Referee shall be functioning as an expert and not as an arbitrator).  In making such calculation, the Accounting Referee shall consider only those items or amounts in the Closing Statement and Purchaser's calculation of the Closing Accounts as to which Parent has disagreed.  The Accounting Referee shall deliver to Purchaser and Parent, as promptly as practicable (but in any case no later than thirty (30) days from the date of engagement of the Accounting Referee), a report setting forth such calculation.  Such report shall be final and binding upon Purchaser and Sellers.  Sellers shall pay a portion of the fees and expenses of the Accounting Referee equal to 100% multiplied by a fraction, the numerator of which is the absolute value of the difference between the Accounting Referee's calculation of the Closing Accounts and Parent's calculation of the Closing Accounts, and the denominator of which is the sum of (x) the absolute value of the difference between the Accounting Referee's calculation of the Closing Accounts and Parent's calculation of the Closing Accounts *plus* (y) the absolute value of the difference between the Accounting Referee's calculation of the Closing Accounts and Purchaser's calculation of the Closing Accounts, with each Seller jointly and severally liable for the entire portion allocable to Sellers.  Purchaser shall pay only such portion of the fees and expenses of the Accounting Referee that Sellers are not required to pay hereunder.

(d)  Purchaser and Parent shall, and shall cause their respective representatives to, cooperate and assist in the preparation of the Closing Statement and the calculation of the Closing Accounts and in the conduct of the review referred to in this Section 3.4, including, the making available to the extent necessary of books, records, work papers and personnel.

(e)  If the Final Inventory Amount exceeds the Estimated Inventory Amount plus the Inventory Liquidation Expenses, Purchaser shall pay to Sellers, in the manner provided in Section 3.4(g), the amount of such excess and, if the Estimated Inventory Amount plus the Inventory Liquidation Expenses exceeds the Final Inventory Amount, Sellers shall pay to Purchaser, as an adjustment to the Cash Purchase Price, in the manner provided in Section 3.4(g) the amount of such excess.  The "Final Inventory Amount" means the Closing Inventory Amount plus Inventory Liquidation Expenses (i) as shown in Purchaser's calculation delivered pursuant

to Section 3.4(a) if no notice of disagreement with respect thereto is duly delivered pursuant to Section 3.4(b) or (ii) if such a notice of disagreement is delivered, (A) as agreed by Purchaser and Parent pursuant to Section 3.4(c) or (B) in the absence of such agreement, as shown in the Accounting Referee's calculation delivered pursuant to Section 3.4(c); provided, however, that in no event shall the Final Inventory Amount be less than Purchaser's calculation of the Closing Inventory Amount plus Inventory Liquidation Expenses delivered pursuant to Section 3.4(a) or more than Parent's calculation of the Closing Inventory Amount plus Inventory Liquidation Expenses delivered pursuant to Section 3.4(b).

(f)     If the Final Cash Amount exceeds the Estimated Cash Amount, Purchaser shall pay to Sellers, in the manner provided in Section 3.4(g), the amount of such excess and, if the Estimated Cash Amount exceeds the Final Cash Amount, Sellers shall pay to Purchaser, as an adjustment to the Cash Purchase Price, in the manner provided in Section 3.4(g) the amount of such excess.  The "Final Cash Amount" means the Closing Cash Amount (i) as shown in Purchaser's calculation delivered pursuant to Section 3.4(a) if no notice of disagreement with respect thereto is duly delivered pursuant to Section 3.4(b) or (ii) if such a notice of disagreement is delivered, (A) as agreed by Purchaser and Parent pursuant to Section 3.4(c) or (B) in the absence of such agreement, as shown in the Accounting Referee's calculation delivered pursuant to Section 3.4(c); provided, however, that in no event shall the Final Cash Amount be less than Purchaser's calculation of the Closing Cash Amount as set forth in the Closing Statement delivered pursuant to Section 3.4(a) or more than Parent's calculation of the Closing Cash Amount as set forth in its calculations delivered pursuant to Section 3.4(b).

(g)     Any payments pursuant to Sections 3.4(e) or 3.4(f) shall be made within five (5) Business Days after the Final Inventory Amount or the Final Cash Amount, as applicable, has been determined pursuant to this Section 3.4, by wire transfer by Purchaser or Sellers, as the case may be, of immediately available funds to the account of such other Party as may be designated in writing by such other Party.  In the event that any payments are due to Purchaser pursuant to Section 3.4(e) or 3.4(f), such amounts shall be paid (i) to Purchaser by the Escrow Agent out of the Purchase Price Adjustment Escrow and (ii) if any amounts remain due to Purchaser after payment to Purchaser of the full amount of such Purchase Price Adjustment Escrow and any earnings thereon, by Sellers out of funds available to them.  The obligations of Sellers to pay any purchase price adjustments pursuant to Sections 3.4(e) and 3.4(f) and this Section 3.4(g) shall be joint and several obligations.

Section 3.5     Allocation of Purchase Price.  Within thirty (30) days after the Closing Date, Purchaser shall prepare and deliver to Sellers an allocation of the Cash Purchase Price, the Assumed Liabilities and any other items that are treated as additional purchase price for Tax purposes (the "Taxable Consideration") among the Purchased Assets in accordance with Section 1060 of the Code (the "Proposed Allocation").  Sellers shall have thirty (30) days after receipt of the Proposed Allocation to notify Purchaser in writing of any items of the Proposed Allocation that are not reasonable in Sellers' view.  If Sellers do not object in writing during such thirty (30) day period, then the Proposed Allocation shall be final and binding on all Parties.  If Sellers object in writing during such thirty (30) day period, then the Parties shall cooperate in good faith to reach a mutually agreeable allocation of the Taxable Consideration, which allocation shall be binding on all Parties.  If the Parties are unable to reach an agreement within sixty (60) days of Sellers' receipt of the Proposed Allocation, then any disputed items shall be

referred to the Accounting Referee for resolution, and the determination of the Accounting Referee shall be final and binding on the Parties. The fees and expenses of the Accounting Referee shall be paid fifty percent (50%) by Purchaser and fifty percent (50%) by Sellers, with each Seller severally liable for the entire portion allocable to Sellers. In accordance with such allocation, Purchaser shall prepare and deliver to Sellers copies of Form 8594 and any required exhibits thereto (the "Asset Acquisition Statement").  Purchaser shall prepare and deliver to Sellers (or their designated successors) from time to time revised copies of the Asset Acquisition Statement (the "Revised Statements") so as to report any matters on the Asset Acquisition Statement that need updating (including pursuant to purchase price adjustments, if any), consistent with the agreed upon allocation.  The Parties shall, and shall cause their respective Affiliates to, use the allocations set forth in the Asset Acquisition Statement or, if applicable, the last Revised Statement for all Tax purposes, file all Tax Returns in a manner consistent with such allocation statement and take no position contrary thereto, in each case, unless required to do so by a change in applicable Tax Laws or good faith resolution of a Tax contest.

## ARTICLE IV

## CLOSING AND TERMINATION

Section 4.1   Closing Date.  The purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York (or at such other place as the Parties may designate in writing) at 10:00 a.m. local time on the date that is three (3) Business Days following the satisfaction or waiver of the conditions set forth in Article X (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the Parties.  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."  Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title and interest of Sellers to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (prevailing eastern time) on the Closing Date.

Section 4.2   Deliveries by Sellers.  At the Closing, Sellers shall deliver to Purchaser:

(a)     for each Owned Property listed on Schedule 5.9(a), a warranty deed duly executed by the applicable Seller;

(b)     a duly executed copy of the Store License Agreement;

(c)     a duly executed bill of sale in the form attached as Exhibit E hereto;

(d)     a duly executed copy of a stock purchase agreement, which shall be in form and substance mutually acceptable to Parent and Purchaser, transferring to Purchaser the equity interest in Blockbuster Canada Co NSULC held by Parent (the "Canadian Agreement");

(e)     a duly executed copy of a stock purchase agreement, which shall be in form and substance mutually acceptable to Parent and Purchaser, transferring to Purchaser the equity interest in Blockbuster Italia, S.p.A. held by Parent (the "Italian Agreement");

(f)     a duly executed assignment and assumption agreement in the form attached as Exhibit F hereto (the "Assignment Agreement") and duly executed assignments transferring all of Sellers' and any Debtor Subsidiary's rights, titles and interests in and to the Intellectual Property included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. Patent and Trademark Office and U.S. Copyright Office;

(g)     copies of all consents, waivers and approvals referred to in Section 10.1(g);

(h)     stock certificates, if applicable, representing the Subsidiary Shares, duly endorsed in blank or accompanied by appropriate transfer documentation duly endorsed in blank and with all appropriate stock transfer tax stamps affixed;

(i)     for each Seller, a certificate of non-foreign status pursuant to Section 1445 of the Code and Treasury Regulation Section 1.1445-2(b);

(j)     a certified copy of the Sale Order;

(k)     unless otherwise specified by Purchaser prior to the Closing, the written resignations of each of the directors, managing members or equivalent authorized persons of each Non-Debtor Subsidiary effective as of the Closing; and

(l)     a certificate signed by an authorized officer of each Seller (in form and substance reasonably satisfactory to Purchaser) pursuant to Sections 10.1(a) and (b)).

Section 4.3     Deliveries by Purchaser.  At the Closing, Purchaser shall deliver to Sellers:

(a)     the Closing Date Payment;

(b)     a duly executed copy of the Assignment Agreement;

(c)     a duly executed copy of the Store License Agreement;

(d)     a duly executed copy of the Canadian Agreement;

(e)     a duly executed copy of the Italian Agreement;

(f)     a certificate signed by an authorized officer of Purchaser (in form and substance reasonably satisfactory to Sellers) pursuant to Sections 10.2(a) and (b); and

(g)     with respect to each Specified Studio that fully satisfies the Studio Condition and has a Post-Closing Studio Obligation that is an Assumed Liability pursuant to Section 2.3(e), an assumption agreement, in form and substance reasonably acceptable to Purchaser and such Specified Studio, regarding their respective obligations with respect to such Post-Closing Studio Obligation.

Section 4.4    <u>Termination of Agreement</u>.  This Agreement may be terminated prior to the Closing Date as follows:

(a)    At any time prior to the Closing Date by the joint written consent of Sellers and Purchaser;

(b)    By either Sellers or Purchaser if the Closing has not occurred on or before April 25, 2011 (as may be extended by written agreement of the Parties, the "<u>Outside Date</u>"); <u>provided</u>, <u>however</u>, that if on April 25, 2011 one or more of the conditions to closing set forth in <u>Sections 10.1</u> or <u>10.3</u> shall have not been satisfied but all other conditions to closing have been satisfied (or, in the case of conditions that by their terms are to be satisfied at the Closing, shall be capable of being satisfied on April 25, 2011), then such date shall, at the option of Purchaser, be extended to and including May 5, 2011, upon written notice from Purchaser to Parent on or prior to April 25, 2011 of its election to so extend such date; <u>provided</u>, <u>further</u>, that a Party may not terminate this Agreement pursuant to this <u>Section 4.4(b)</u> if such Party is in breach of its obligations hereunder in any material respect and such breach is the sole reason that the Closing has not occurred by such date; and <u>provided</u>, <u>further</u>, that if Closing has not occurred on or before April 26, 2011 for any reason other than a material breach by Sellers of their obligations hereunder, Purchaser shall pay to Sellers an amount equal to $500,000 for each day thereafter to and including the date on which the Closing occurs (the "<u>Delayed Closing Penalty</u>");

(c)    By the Purchaser or, prior to entry of the Sale Order, by Sellers, if (i) Sellers enter into a definitive agreement with respect to a Competing Bid or (ii) the Bankruptcy Court enters an Order approving a Competing Bid or (iii) the Bankruptcy Court enters an Order that otherwise precludes the consummation of the Transactions on the terms and conditions set forth in this Agreement;

(d)    By either Sellers or Purchaser, if an Order is entered by a Governmental Authority of competent jurisdiction having valid enforcement authority permanently restraining, prohibiting or enjoining either Party from consummating the Transactions and such Order shall have become final and non-appealable or shall not have been vacated prior to the Outside Date;

(e)    By Purchaser or Sellers, if the Sale Order has not been entered by the Bankruptcy Court on or before April 11, 2011;

(f)    By Purchaser, if any of the Bankruptcy Cases are dismissed or converted to a case under chapter 7 of the Bankruptcy Code for any reason;

(g)    By Purchaser, so long as Purchaser is not in breach of its obligations under this Agreement in any material respect, upon a breach of any covenant or agreement of Sellers set forth in this Agreement, or if any representation or warranty of Sellers shall have been or becomes untrue, in each case such that the conditions set forth in <u>Section 10.1(a)</u> or <u>Section 10.1(b)</u>, as the case may be, would not be satisfied and such breach or untruth cannot be cured by the Outside Date;

(h)    By Sellers, so long as Sellers are not in breach of their obligations under this Agreement in any material respect, upon a breach of any covenant or agreement of Purchaser set forth in this Agreement, or if any representation or warranty of Purchaser shall have been or

becomes untrue, in each case such that the conditions set forth in <u>Section 10.2(a)</u> or <u>Section 10.2(b)</u>, as the case may be, would not be satisfied and such breach or untruth cannot be cured by the Outside Date;

(i)     By Purchaser, (i) if the Bidding Procedures Order is modified in any respect, with respect to any of the provisions set forth in Sections 16, 17 or 18 or (ii) if the Bidding Procedures Order or the Sale Order is modified in any manner adverse to Purchaser, in the case of any of clauses (i) or (ii) without the prior written consent of Purchaser (which consent may be withheld in Purchaser's sole discretion);

(j)     By Purchaser, if any secured creditor of Sellers obtains relief from the stay to foreclose on any of the Purchased Assets, the effect of which would cause, or would reasonably be expected to cause, a Seller Material Adverse Effect; and

(k)     By Purchaser, if Sellers shall not have obtained written consent (which consent shall be in full force and effect) from the Requisite Lenders (as defined in the DIP Credit Agreement) of any Cash Flow Budget (that, among other things, will cover, in full, the Estimated Wind Down Expenses and the Sale Budget).

Section 4.5     <u>Effect of Termination</u>.

(a)     No termination of this Agreement pursuant to <u>Section 4.4</u> shall be effective until notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which such termination is made.  In the event that this Agreement is validly terminated as provided herein, this Agreement shall become wholly void and of no further force and effect without liability to Purchaser or Sellers, or any of their respective Representatives, and each shall be fully released and discharged from any Liability or obligation after the date of such termination and such termination shall be without liability to Purchaser or Sellers; <u>provided, however</u>, that the obligations of the Parties under <u>Sections 4.5</u>, <u>8.5</u>, and <u>8.7</u> and <u>Article XII</u> of this Agreement shall survive any such termination and shall be enforceable hereunder.

(b)     In the event this Agreement is properly terminated by Sellers pursuant to (i) <u>Section 4.4(b)</u> in the event that Closing does not occur on or before the Outside Date solely as a result of Purchaser's material breach of its obligations under this Agreement or (ii) <u>Section 4.4(h)</u> as a result of a material breach by Purchaser, the sole remedy of Sellers shall be retention of the Deposit as provided in <u>Section 12.2(a)(ii)</u>.  Under no circumstance shall Purchaser have any liability to Sellers for termination of this Agreement for any other reason.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby represent and warrant to Purchaser as follows:

Section 5.1     <u>Organization and Good Standing</u>.  Each Seller and each Non-Debtor Subsidiary is duly organized, validly existing, in good standing and duly qualified to transact business under the laws of the jurisdiction of its formation, and is duly qualified or licensed to do business in each jurisdiction in which the nature of its business or the ownership or leasing of its

properties makes such qualification or licensing necessary, except where the failure to be so qualified would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect, and, subject to the limitations imposed on Sellers as a result of having filed petitions for relief under the Bankruptcy Code, or pursuant to any Order entered by the Bankruptcy Court, each Seller and each Non-Debtor Subsidiary has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted. Other than with respect to Blockbuster NZ Ltd., each Seller and each Non-Debtor Subsidiary has delivered or made available to Purchaser true, complete and correct copies of its organizational documents as in effect on the date hereof.

Section 5.2    Ownership of Non-Debtor Subsidiaries.

(a)    Except as otherwise indicated on Schedule 5.2(a), all of the outstanding capital stock or other equity interests of each Non-Debtor Subsidiary are owned, directly or indirectly, by the owner reflected on Schedule 5.2(a), free and clear of any and all Liens, other than (i) restrictions on transfer that may be imposed by federal or state securities Laws, (ii) Liens that arise out of any actions taken by or on behalf of Purchaser or its Affiliates, or (iii) Permitted Liens. All equity interests of each Non-Debtor Subsidiary have been validly issued and are fully paid, nonassessable and were not issued in violation of any purchase or call option, right of first refusal, subscription right, preemptive right or any similar rights.

(b)    There are no outstanding or authorized options, convertible or exchangeable securities or instruments, warrants, rights, contracts, calls, puts, rights to subscribe, conversion rights or other agreements or commitments to which Sellers are a party or which are binding on any of them providing for the issuance, disposition or acquisition of any equity interest of any of the Non-Debtor Subsidiaries.

(c)    There are no voting trusts, proxies or other agreements or understandings with respect to the voting of any equity interest of the Non-Debtor Subsidiaries.

(d)    Except (i) for the equity interests in the Non-Debtor Subsidiaries and other Sellers and (ii) as set forth on Schedule 5.2(d), Sellers do not own or hold of record or beneficially any equity interests in any Person.

(e)    The Non-Debtor Subsidiaries do not own, directly or indirectly, any voting interest in any Person that would require an additional filing by Parent under the Competition Laws in connection with any of the transactions contemplated by this Agreement.

Section 5.3    Authorization of Agreement.  Subject to the entry of the Sale Order, Sellers have all requisite power, authority and legal capacity to execute and deliver this Agreement and each other Transaction Document, agreement, document, or instrument or certificate contemplated by this Agreement or to be executed by any such Seller in connection with the consummation of the transactions contemplated by this Agreement (the "Seller Documents"), to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Seller Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate or limited

liability company action, as applicable, on the part of each Seller. This Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by each Seller which is a party hereto and thereto and (assuming the due authorization, execution and delivery by the other parties hereto and thereto and the entry of the Sale Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of such Seller enforceable against such Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 5.4    No Violation; Consents.

(a)    Except as set forth on Schedule 5.4(a), none of the execution and delivery by Sellers of this Agreement or any of the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Sellers with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or give rise to any obligation of any Seller or their Subsidiaries to make any payment under or to the increased, additional, accelerated or guaranteed rights or entitlements of any Person under, or result in the creation of any Liens (other than Permitted Liens) upon any of the Purchased Assets or the assets of the Non-Debtor Subsidiaries or cancellation under any provision of (i) the certificate of incorporation and bylaws or comparable organizational documents of any Seller or any Non-Debtor Subsidiary; (ii) subject to entry of the Sale Order, any Contract or Permit to which any Seller or any Non-Debtor Subsidiary is a party or by which any of the properties or assets of any Seller or any Non-Debtor Subsidiary are bound; (iii) subject to entry of the Sale Order, any Order of any Governmental Authority applicable to any Seller or any Non-Debtor Subsidiary or any of the properties or assets of any Seller or any Non-Debtor Subsidiary as of the date hereof and as of the Closing Date; or (iv) subject to entry of the Sale Order, any Applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

(b)    Except as set forth on Schedule 5.4(b), no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of any Seller or any Non-Debtor Subsidiary in connection with the execution and delivery of this Agreement or the Seller Documents, the compliance by any Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the assignment and assumption of the Purchaser Assumed Contracts, or the taking by any Seller of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act or any other applicable Competition Laws, (ii) the entry of the Sale Order and (iii) other immaterial consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications.

Section 5.5    Financial Information.

(a)     Sellers have delivered to Purchaser copies of (i) the audited consolidated balance sheet of Sellers and their Subsidiaries as at January 3, 2010 and the related audited consolidated statement of income and of cash flows of Sellers and their Subsidiaries for the year then ended and (ii) the unaudited consolidated balance sheet of Sellers and their Subsidiaries as at January 2, 2011 and the related consolidated statement of income and cash flows of Sellers and their Subsidiaries for the twelve (12) month period then ended (such audited and unaudited statements, including the related notes and schedules thereto, are referred to herein as the "Financial Statements").  Each of the Financial Statements is complete and correct in all material respects, has been prepared in accordance with GAAP consistently applied throughout the periods indicated without modification of the accounting principles used in the preparation thereof throughout the periods presented and presents fairly in all material respects the consolidated financial position, results of operations and cash flows of Sellers and their Subsidiaries as at the dates and for the periods indicated therein, subject to normal year-end adjustments and the absence of complete notes in the case of the unaudited statements.  For the purposes hereof, the unaudited consolidated balance sheet of Sellers and their Subsidiaries as at January 2, 2011 is referred to as the "Balance Sheet" and January 2, 2011 is referred to as the "Balance Sheet Date."

(b)     Sellers make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of their respective assets.  Sellers maintain systems of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP and to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the actual levels at reasonable intervals and appropriate action is taken with respect to any differences.

Section 5.6     No Undisclosed Liabilities.  No Seller nor any of its Subsidiaries has any Liabilities that would have been required to be reflected in, reserved against or otherwise described in the Balance Sheet or the notes thereto in accordance with GAAP, other than Liabilities incurred in the Ordinary Course of Business since the Balance Sheet Date, Liabilities under this Agreement, Liabilities of Sellers that will not be Assumed Liabilities and Liabilities that would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

Section 5.7     Title to Purchased Assets.  Except as set forth in Schedule 5.7, and other than the real property subject to the Real Property Leases, Intellectual Property owned by third parties and licensed to Sellers subject to any Intellectual Property Licenses and personal property subject to personal property leases (including the Personal Property Leases), Sellers own each of the Purchased Assets, and at the Closing Purchaser will be vested with good and valid title to such Purchased Assets, free and clear of all Liens, other than Permitted Liens, to the fullest extent permissible under section 363(f) of the Bankruptcy Code.

Section 5.8     Taxes.  Except as set forth on Schedule 5.8 and except as precluded by the Bankruptcy Code:

(a)	(i) Sellers and each of their Subsidiaries have timely filed (or have caused to be timely filed) with the appropriate Taxing Authorities all material Tax Returns required to be filed with respect to the Purchased Assets (taking into account any extension of time to file granted or obtained with respect to such entity); (ii) all such Tax Returns are complete and accurate; and (iii) all income and other material Taxes due, regardless of whether shown on a filed Tax Return, have been timely paid.

(b)	No Tax audits, investigations or administrative or judicial proceedings are pending or in progress or, to Sellers' Knowledge, have been threatened in writing with respect to the Purchased Assets or the Non-Debtor Subsidiaries.

(c)	Each of Sellers and the Non-Debtor Subsidiaries has complied in all material respects with all Applicable Laws relating to the payment and withholding of Taxes and has duly and timely withheld and paid over to the appropriate Taxing Authorities all amounts required to be so withheld and paid over under all Applicable Laws.

(d)	No Seller or any Subsidiary of a Seller has been party to any "listed transaction" as defined in Treasury Regulation Section 1.6011-4 or subject to any similar provision of state, local or foreign Law.

(e)	Each Non-Debtor Subsidiary is treated as an association taxable as a corporation for U.S. federal income Tax purposes.

(f)	No Seller is a foreign person within the meaning of Section 1445 of the Code.

(g)	No agreement, waiver or other document or arrangement extending or having the effect of extending the period for assessment or collection of Taxes (including, but not limited to, any applicable statute of limitations) or the period for filing any Tax Return, has been executed or filed with any Taxing Authority by or on behalf of any of the Non-Debtor Subsidiaries.

(h)	No power of attorney with respect to any Tax matter is currently in force with respect to the Purchased Assets, the Business or any of the Non-Debtor Subsidiaries that would, in any manner, bind, obligate, or restrict Purchaser.

(i)	No Tax elections have been made with respect to the Purchased Assets or the Business or by any Non-Debtor Subsidiary that would, in any manner, bind, obligate or restrict Purchaser.

(j)	Other than with respect to customary provisions related to a Tax pass-through, employee gross-up or other similar arrangements entered into in the Ordinary Course of Business, no Tax allocation, Tax sharing or Tax indemnity or similar agreement or arrangement is currently in effect with respect to the Purchased Assets or the Business or by any Non-Debtor Subsidiary that would, in any manner, bind, obligate or restrict Purchaser.

(k)     Since the Balance Sheet Date, each Non-Debtor Subsidiary has made full provision for any and all Taxes resulting from or attributable to any transaction or matter occurring or deemed to occur on or prior to the Closing Date.

Section 5.9     <u>Real Property</u>.

(a)     <u>Schedule 5.9(a)</u> sets forth a complete list of all material real property and interests in real property owned by Sellers and the Non-Debtor Subsidiaries that is necessary for, used or held for use in connection with the operation and conduct of the Business (individually, an "<u>Owned Property</u>" and collectively, the "<u>Owned Properties</u>"). Each of Sellers and the Non-Debtor Subsidiaries has good and marketable (or, to the extent located in Texas, indefeasible) fee title to all Owned Properties, free and clear of all Liens of any nature whatsoever except (i) as set forth on <u>Schedule 5.9(a)</u>, (ii) matters that are disclosed in the relevant title policy and survey for such Owned Property, (iii) Permitted Liens, and (iv) zoning, planning and other limitations and restrictions of record, none of which would reasonably be expected to have, individually or in the aggregate, a material impact on the use or operation of any such Owned Property or prevent or materially limit the continued use and operation of the Owned Properties as currently owned and operated.  Except as set forth on <u>Schedule 5.9(a)</u>, the Owned Properties are not subject to any leases or tenancies or other rights of occupancy.  Neither Seller nor any Non-Debtor Subsidiary has received notice that any of the improvements comprising the Owned Properties or the business conducted by Sellers or any Non-Debtor Subsidiaries thereon is in violation of any building line, use or occupancy restriction, limitation, easement, condition or covenant of record.  To Sellers' Knowledge, there are no physical defects in the buildings or other facilities or machinery or equipment located at any of the Owned Properties which would interfere with the use and operation of the Owned Properties as currently used and operated, other than with respect to such defects as would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

(b)     <u>Schedule 5.9(b)</u> sets forth a complete list of all material real property and interests in real property leased by Sellers or any Non-Debtor Subsidiaries (individually, a "<u>Real Property Lease</u>" and collectively, the "<u>Real Property Leases</u>") as lessee or lessor. Sellers have provided Purchaser with, or access to, prior to the date of this Agreement, true, correct, accurate and complete copies of all leases and other instruments and agreements together with all amendments, modifications, supplements, and restatements thereto, if any, pertaining to the Real Property Leases.  To Sellers' Knowledge, there are no physical defects in the buildings or other facilities or machinery or equipment located at any of the properties subject to any of the Real Property Leases which would interfere with the continued use and operation of the properties subject to the Real Property Leases as currently used and operated, other than with respect to such defects as would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

(c)     Except as disclosed in <u>Schedule 5.9(d)</u>, neither Seller nor any Non-Debtor Subsidiary has granted to any other Person any rights, adverse or otherwise, under such Real Property Lease, or sublet, assigned or otherwise conveyed all or any portion of the premises demised under the Real Property Lease or Real Property Lease to any other Person.

Section 5.10     <u>Tangible Personal Property; Capital Leases</u>.

(a)    Schedule 5.10(a) sets forth all leases of personal property ("Personal Property Leases") involving annual payments in excess of $50,000 relating to personal property used by Sellers or any of the Non-Debtor Subsidiaries in connection with the Business or to which any Seller or any Non-Debtor Subsidiary is a party or by which the properties or assets of any Seller or any Non-Debtor Subsidiary are bound.

(b)    Schedule 5.10(b) sets forth all capital leases ("Capital Leases") involving annual payments in excess of $50,000 relating to property used by Sellers or any of the Non-Debtor Subsidiaries in connection with the Business or to which any Seller or any Non-Debtor Subsidiary is a party or by which the properties or assets of any Seller or any Non-Debtor Subsidiary are bound.

(c)    Sellers and the Non-Debtor Subsidiaries have a valid and enforceable leasehold interest under each of the Personal Property Leases and Capital Leases under which each is a lessee, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).  Each of the Personal Property Leases and Capital Leases is in full force and effect.

(d)    All personal property of Sellers and the Non-Debtor Subsidiaries (including personal property subject to Personal Property Leases) and all property of Sellers or any of the Non-Debtor Subsidiaries subject to Capital Leases, other than any Excluded Asset, is (i) in good operating condition and repair (ordinary and reasonable wear and tear excepted), and (ii) suitable for the purposes for which it is currently used.

(e)    None of Sellers nor any of the Non-Debtor Subsidiaries has leased or subleased to any other Person any property that is subject to a Personal Property Lease or a Capital Lease.  None of Sellers nor any of the Non-Debtor Subsidiaries has assigned to any other Person its interest under any lease or sublease with respect to any property subject to a Personal Property Lease or Capital Lease.  The rental set forth in each lease or sublease of any item or distinct group of personal property of each Seller or each Non-Debtor Subsidiary is and immediately after the Closing will be the actual rental being paid by such Seller or such Non-Debtor Subsidiary and there are and immediately after the Closing will be no separate agreements or understandings in respect thereof.

Section 5.11    Intellectual Property.

(a)    Schedule 5.11(a) sets forth a true and complete list of all material issuances and registrations and material applications for issuance or registration included in the Purchased Intellectual Property.

(b)    Schedule 5.11(b) sets forth a true and complete list of (i) all material written Intellectual Property Licenses that are Purchaser Assumed Contracts and (ii) to Sellers' Knowledge, all material oral Intellectual Property Licenses that are Purchaser Assumed Contracts, regardless of whether such Intellectual Property Licenses involve annual payments by or to a Seller or an Affiliate of any Seller.

(c)     Except as set forth on Schedule 5.11(c):

(i)     A Seller or one of its Subsidiaries owns all Intellectual Property listed on Schedule 5.11(a) and has valid rights in and to, including rights to use, publish, and perform, as applicable, all other Business Intellectual Property included in the Purchased Assets as such Business Intellectual Property is used in the Ordinary Course of Business, in each case, free and clear of all Liens other than Permitted Liens and Intellectual Property Licenses.

(ii)     The Purchased Intellectual Property is not the subject of any ownership, validity, use, or enforceability challenge or claim received by Sellers in writing or, to Sellers' Knowledge, any outstanding Order restricting the use by Sellers or any of their Subsidiaries thereof or adversely affecting any of the rights of Sellers or any of their Subsidiaries thereto, except as would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

(iii)     No Seller has received any written notice of any default or any event that with notice or lapse of time, or both, would constitute a default under any Intellectual Property License that is a Purchaser Assumed Contract and to which any Seller is a party or by which it is bound, except for defaults that would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect. To Sellers' Knowledge, no Person is violating any Purchased Intellectual Property or Business Intellectual Property exclusively licensed to any Seller or any of its Subsidiaries under an Intellectual Property License that is a Purchaser Assumed Contract, except for violations that would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

(iv)     To Sellers' Knowledge, (A) no Seller nor any of its Subsidiaries is violating, and since September 23, 2010, has violated, any Intellectual Property rights of any other Person and (B) there are no Actions or Legal Proceedings, pending or threatened, concerning any claim that Sellers or any of their Subsidiaries have infringed, diluted, misappropriated, or otherwise violated any Intellectual Property rights of any other Person, in each case, except as would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

(v)     Sellers and their Subsidiaries have used commercially reasonable efforts to protect the confidentiality of any material Trade Secrets and other material confidential and proprietary information included in the Purchased Assets.

Section 5.12     Material Contracts.

(a)     Schedule 5.12(a) sets forth all of the following Contracts to which any Seller or any Non-Debtor Subsidiary is a party or by which any Seller or any Non-Debtor Subsidiary is bound in connection with the Business or by which the Purchased Assets may be bound or affected and that are Purchaser Assumed Contracts (collectively, the "Material Contracts"):

(i)     Contracts with any Affiliate or current or former officer or director of any Seller or any of its Subsidiaries or any Non-Debtor Subsidiaries;

(ii) Contracts pursuant to which a Seller or any of its Subsidiaries or any Non-Debtor Subsidiary grants to any Person any franchise rights or rights to represent a Seller or any Non-Debtor Subsidiary with respect to any product, or act as agent for any Seller or any Non-Debtor Subsidiary in connection with the marketing, distribution or sale of any Business product;

(iii) Contracts with any labor union or association representing any employees of any Seller or any Non-Debtor Subsidiary;

(iv) Contracts for the sale of any of the assets of the Business, other than in the Ordinary Course of Business;

(v) Contracts relating to the acquisition by any Seller or any of its Subsidiaries, or any Non-Debtor Subsidiary of any operating business or the capital stock of any other Person;

(vi) Contracts containing a covenant that restricts a Seller or any Affiliate of a Seller or any Non-Debtor Subsidiary from engaging in any line of business, conducting the Business in any geographic area, competing with any Person or hiring any Person;

(vii) Contracts relating to incurrence of Indebtedness or the making of any loans, in each case involving amounts in excess of $100,000;

(viii) Contracts relating to a joint venture of the Business, any Seller or any of its Subsidiaries or any Non-Debtor Subsidiaries;

(ix) Contracts which involve the expenditure of more than $100,000 in the aggregate or require performance by any party more than one year from the date hereof that, in either case, are not terminable by a Seller or any Non-Debtor Subsidiary without penalty on less than one hundred eighty (180) days' notice;

(x) the Intellectual Property Licenses;

(xi) the Studio Contracts;

(xii) the Alliance Agreement, dated as of January 23, 2009, by and between NCR Corporation and Blockbuster Inc.;

(xiii) Contracts providing for severance, retention, change in control or similar payments;

(xiv) Contracts for the employment of any individual on a full-time, part-time or consulting or other basis providing annual compensation in excess of $100,000;

(xv) all Real Property Leases; and

(xvi)    any other Contracts that are not made in the Ordinary Course of Business or that are material to the Business or the Non-Debtor Subsidiaries.

(b)    Each of the Material Contracts is in full force and effect and is the legal, valid and binding obligation of Sellers or a Non-Debtor Subsidiary, enforceable against them in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).  Sellers have good and valid title to the Material Contracts, free and clear of all Liens (other than Permitted Liens).  Sellers have delivered or otherwise made available to Purchaser, prior to the date of this Agreement, true, correct and complete copies of all of the Material Contracts, together with all amendments, modifications or supplements thereto.

Section 5.13    Employee Benefits.

(a)    Schedule 5.13(a) separately lists: (i) all material Debtor Benefit Plans and (ii) all material Non-Debtor Benefit Plans.

(b)    True, correct and complete copies of each of the material Employee Benefit Plans and with respect to each Non-Debtor Benefit Plan the following documents (as applicable) have been made available to Purchaser (i) each material writing constituting a part of such Non-Debtor Benefit Plan, including all plan documents, benefit schedules, trust agreements, and insurance contracts and other funding vehicles and amendments thereto and written interpretations thereof, (ii) where a material plan document for a Non-Debtor Benefit Plan does not exist, a detailed description of such Non-Debtor Benefit Plan, (iii) the most recent annual report or similar document filed with any Governmental Authority, (iv) the most recent financial statement and actuarial valuation, (v) the most recent IRS determination letter or other governmental registration, and (vi) the most recent summary plan descriptions (including letters or other documents updating such descriptions).

(c)    Except as disclosed on Schedule 5.13(c), each of the Employee Benefit Plans (including the Non-Debtor Benefit Plans) intended to qualify for tax-advantaged status under Applicable Laws so qualifies and there are no existing circumstances nor any events that have occurred that could reasonably be expected to adversely affect the qualified status of any Non-Debtor Benefit Plan.

(d)    Except as disclosed on Schedule 5.13(d), each of the Non-Debtor Benefit Plans has been administered in all material respects in compliance with its terms and all Applicable Laws and, with respect to each such Non-Debtor Benefit Plan, (i) all employer and employee contributions required by Law or by the terms of the plan have been timely made, or, if applicable, accrued, in accordance with normal accounting practices; (ii) if they are intended to be funded and/or book-reserved, the fair market value of the assets of each funded plan, or the book reserve established for each plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations with respect to all current and former participants in such plan according to the actuarial assumptions and valuations most recently used to account for such obligations in accordance with applicable generally accepted accounting

principles; and (iii) it has been registered as required and has been maintained in good standing with applicable regulatory authorities.

(e)     Except as disclosed on <u>Schedule 5.13(e)</u>, there is no litigation and there are no judicial or governmental proceedings pending or, to Sellers' Knowledge, threatened with respect to any Non-Debtor Benefit Plan other than claims for benefits thereunder in the ordinary course.

(f)     None of the Sellers or their Subsidiaries are required to gross up or reimburse a payment to any Employee for Taxes incurred under sections 409A or 457A of the Code or any similar provision of state, local or non-US tax law.

(g)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in conjunction with another event) (i) result in any payment becoming due to any Employee of any Seller; (ii) increase any benefits otherwise payable under any Employee Benefit Plan; or (iii) result in the acceleration of the time of payment or vesting of any such benefits, in each case, that would be required to be satisfied by Purchaser following the Closing.

Section 5.14     <u>Labor</u>.

(a)     Except as set forth on <u>Schedule 5.14(a)</u>, none of Sellers, the Non-Debtor Subsidiaries or any of the Debtor Subsidiaries is a party to any labor or collective bargaining agreement and there are no labor unions or other similar organizations or groups representing or, to Sellers' Knowledge, purporting or attempting to represent any Employee of any Seller or any Subsidiary.

(b)     Except as set forth on <u>Schedule 5.14(b)</u>, there are no (i) strikes, work stoppages, work slowdowns or lockouts pending or, to Sellers' Knowledge, threatened against or involving Seller, any of the Non-Debtor Subsidiaries or any of the Debtor Subsidiaries, or (ii) unfair labor practice charges, grievances or complaints pending or, to Sellers' Knowledge, threatened by or on behalf of any employee or group of employees of Seller, any of the Non-Debtor Subsidiaries or any of the Debtor Subsidiaries, except in each case as would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

Section 5.15     <u>Litigation</u>.  Except (a) as set forth on <u>Schedule 5.15</u>, (b) for matters before the Bankruptcy Court involving Sellers or any of their Affiliates, and (c) any matters that will otherwise be resolved by the Sale Order without any Liability or restriction applicable to Purchaser or the Purchased Assets, there are no Legal Proceedings or Actions pending or, to Sellers' Knowledge, threatened against any Seller or any of its Subsidiaries, or relating to the Business or any of the Purchased Assets or Assumed Liabilities, before any Governmental Authority, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

Section 5.16    Compliance with Laws; Permits.

(a)    Except as set forth on Schedule 5.16, since September 23, 2010, Sellers and the Non-Debtor Subsidiaries have (i) conducted and continue to conduct the Business in accordance with all Applicable Laws and Orders applicable to their respective operations or assets or the Business, (ii) complied with and continue to comply with all Laws and Orders applicable to the Purchased Assets and the Assumed Liabilities, and (iii) are not in violation of any such Law or Order, except where the failure to be in compliance would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect and except with respect to Environmental Laws which are addressed in Section 5.17. Neither any Seller nor any of its Subsidiaries has received any written notice of or been charged with the violation of any Laws and, to Sellers' Knowledge, there are no facts or circumstances that would reasonably be expected to give rise to any such violation, except where such violation would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

(b)    Sellers and the Non-Debtor Subsidiaries currently have all Permits which are required for the operation of the Business as presently conducted, except where the absence of which would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect. Neither any Seller nor any of its Subsidiaries is in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which it is a party, and, to Sellers' Knowledge, there are no facts or circumstances that would reasonably be expected to give rise to any such violation, except where such default or violation would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

Section 5.17    Environmental Matters.

(a)    Except as set forth on Schedule 5.17(a), the operations of Sellers and their Subsidiaries are in material compliance with all applicable Environmental Laws and all Permits issued pursuant to Environmental Laws or otherwise and no Seller nor any of its Subsidiaries has any material Environmental Liabilities or Obligations and no facts exist or events have occurred that could reasonably be expected to give rise to any such material Environmental Liabilities or Obligations.

(b)    Sellers and their Subsidiaries have obtained all Permits required under all applicable Environmental Laws necessary to operate the Business.

(c)    None of Sellers or their Subsidiaries is the subject of any outstanding Order or Contract with any Governmental Authority respecting (i) Environmental Laws, (ii) Remedial Action or (iii) any Release or threatened Release of a Hazardous Material.

(d)    None of Sellers or their Subsidiaries has received any written communication alleging that any Seller or any of its Subsidiaries may be in violation of any Environmental Law or any Permit issued pursuant to Environmental Law, or may have any Environmental Liabilities or Obligations.

(e)　　　To Sellers' Knowledge, there are no investigations of the Business, or currently or previously owned, operated or leased property of any Seller or any of its Subsidiaries pending or, to Sellers' Knowledge, threatened which would reasonably be expected to result in the imposition of any material liability pursuant to any Environmental Law.

Section 5.18　　　Accounts and Notes Receivable and Payable.

(a)　　　All accounts and notes receivable of Sellers and the Non-Debtor Subsidiaries have arisen from bona fide transactions in the Ordinary Course of Business consistent with past practice and are payable on ordinary trade terms, are properly reflected on Sellers' and the Non-Debtor Subsidiaries' books and records and properly reserved for with respect to doubtful accounts, all in accordance with GAAP.

(b)　　　All accounts payable of Sellers and Non-Debtor Subsidiaries reflected in the Balance Sheet or arising after the date thereof are the result of bona fide transactions in the Ordinary Course of Business.

Section 5.19　　　Insurance.　Set forth on Schedule 5.19 is a list of all material policies of insurance by which the Purchased Assets and the Non-Debtor Subsidiaries are covered as of the date hereof.　Except as set forth on Schedule 5.19, all such policies are in full force and effect and there are no material claims pending as of the date hereof under any of such policies where underwriters have reserved their rights or disclaimed coverage under such policy with such exceptions that would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

Section 5.20　　　Financial Advisors.　Except as set forth on Schedule 5.20, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for any Seller or any of its Subsidiaries in connection with the transactions contemplated by this Agreement.　No Person is entitled to any fee or commission or like payment from Purchaser in respect thereof.

Section 5.21　　　No Other Representations or Warranties; Schedules.　Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), no Seller nor any other Person makes any express or implied representation or warranty with respect to Sellers, their Subsidiaries, the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and Sellers disclaim any other representations or warranties, whether made by Sellers, any Affiliate of Sellers or any of their respective officers, directors, employees, agents or representatives.　Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), Sellers expressly disclaim and negate any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or express warranty of merchantability or fitness for a particular purpose). Sellers make no representations or warranties to Purchaser regarding the probable success or profitability of the Business.

# ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers as follows:

Section 6.1 <u>Organization and Good Standing</u>. Purchaser is a corporation duly organized, validly existing, in good standing and duly qualified to transact business under the laws of the State of Nevada and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 6.2 <u>Authorization of Agreement</u>. Purchaser has all requisite power, authority and legal capacity to execute and deliver this Agreement, the other Transaction Documents and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "<u>Purchaser Documents</u>"), to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary limited liability company action on behalf of Purchaser. This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 6.3 <u>No Violation; Consents</u>.

(a) None of the execution and delivery by Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of formation and operating agreement or comparable organizational documents of Purchaser, (ii) any Contract or Permit to which Purchaser is a party or by which Purchaser or its properties or assets are bound, (iii) any Order of any Governmental Authority applicable to Purchaser or by which any of the properties or assets of Purchaser are bound or (iv) any Applicable Law, except in the case of clauses (ii), and (iii) and (iv) as would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

(b) No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of Purchaser in connection with the execution and delivery of this Agreement or the

Purchaser Documents, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for compliance with the applicable requirements of the HSR Act and other applicable Competition Laws, the entry of the Sale Order or that would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

Section 6.4    Litigation.  There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to have a Purchaser Material Adverse Effect.

Section 6.5    Investment Intention.  Purchaser is acquiring the Subsidiary Shares for its own account, for investment purposes only and not with a view to the distribution thereof in violation of the Securities Act of 1933, as amended (the "Securities Act").  Purchaser understands that the Subsidiary Shares have not been registered under the Securities Act and cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is available.

Section 6.6    Financial Capability.  Purchaser (a) will have at the Closing sufficient funds available to pay the Purchase Price and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement, and (b) will have at the Closing the resources and capabilities (financial or otherwise) to perform its obligations hereunder.

Section 6.7    Bankruptcy.  There are no bankruptcy, reorganization or arrangement proceedings pending against, being contemplated by, or to the knowledge of Purchaser, threatened against, Purchaser.

Section 6.8    Financial Advisors.  Except as set forth on Schedule 6.8, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated hereunder and no Person is entitled to any fee or commission or like payment in respect thereof which would be payable by Sellers.

Section 6.9    Condition of the Business.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that no Seller is making any representations or warranties whatsoever, express or implied, beyond those expressly given by Sellers in Article V hereof (as modified by the Schedules hereto as supplemented or amended in accordance with Section 8.11), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "where is" and, as to condition, "as is" basis.  Purchaser further represents that no Seller or any of its Affiliates or any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Sellers or any of their Subsidiaries, the Business or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and no Seller, any of their Affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives or Purchaser's use of, any such information, including any confidential memoranda distributed on behalf of Sellers relating to the Business or other

publications or data room information provided to Purchaser or its representatives, in connection with the sale of the Business and the Transactions. Purchaser acknowledges that it has conducted to its satisfaction its own independent investigation of the Business and, in making the determination to proceed with the Transactions, Purchaser has relied on the results of its own independent investigation.

# ARTICLE VII

# BANKRUPTCY COURT MATTERS

Section 7.1    Competing Transaction.

(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids, including, in consideration of any sale, transfer, liquidation or disposition of the Business or assets of Sellers or their Subsidiaries, or a plan of reorganization or liquidation with respect to the Business or assets of Sellers and their Subsidiaries (each a "Competing Bid"). From the date hereof (and any prior time) and until the earlier of: (i) the consummation of the Transactions and (ii) the conclusion of any bid process described in the Bidding Procedures Order, Sellers are permitted to cause their representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) in compliance with the Bidding Procedures Order in connection with any sale or other disposition of the Purchased Assets and the Business. In addition, solely during the period described in the immediately preceding sentence of this Section 7.1(a), Sellers shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets or the Business and perform any and all other acts related thereto which are required under the Bankruptcy Code or other Applicable Law, including supplying information relating to the Business and assets of Sellers and its Subsidiaries to prospective purchasers;

(b)    Sellers shall not and shall not permit any of their Subsidiaries to furnish information concerning Sellers, the Non-Debtor Subsidiaries, the Business, or the properties or assets of Sellers or their Subsidiaries to any third party, except (i) in the Ordinary Course of Business, (ii) to any Governmental Authority, or (iii) pursuant to a confidentiality agreement entered into between any Seller and such third party. Sellers shall use commercially reasonable efforts to promptly provide, or identify and make available to Purchaser any non-public information concerning Sellers, the Non-Debtor Subsidiaries, the Purchased Assets or the Business provided to any other Person after the date hereof which was not previously provided to Purchaser.

(c)    Following the date of the entry of the Sale Order approving this Agreement and until such time as this Agreement has been terminated in accordance with its express terms, Sellers shall not, nor shall any of their Subsidiaries authorize or permit any Representative of any Seller to, (i) directly or indirectly solicit, initiate or encourage the submission of any offer or proposal concerning any Competing Bid or (ii) directly or indirectly participate in any discussions or negotiations regarding, or furnish to any Person any information with respect to, or take any other action to facilitate the making of, any proposal or expression of interest that constitutes or is reasonably likely to lead to a Competing Bid.

Section 7.2    Bankruptcy Court Filings.  As promptly as practicable following the date of this Agreement, Sellers shall obtain entry of the Sale Order from the Bankruptcy Court. Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  In the event the entry of the Sale Order or the Bidding Procedures Order shall be appealed, Sellers and Purchaser shall use their respective commercially reasonable efforts to defend such appeal.  Sellers shall not amend, supplement, or modify, or cause to be amended, supplemented or modified, the Sale Order and/or the Bidding Procedures Order, in any manner adverse to Purchaser without Purchaser's prior written consent (which consent may be withheld in Purchaser's sole discretion).

## ARTICLE VIII

## COVENANTS

Section 8.1    Access to Information.  Sellers agree that, prior to the Closing Date, Purchaser shall be entitled, through its officers, employees and Representatives, to (a) make such investigation of the properties, businesses and operations of the Business and (b) make such examination of the books and records of the Business, the Non-Debtor Subsidiaries, the Purchased Assets and the Assumed Liabilities as Purchaser reasonably requests and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and Sellers and their Subsidiaries shall cooperate fully therein.  Purchaser and its Representatives shall cooperate with Sellers and their Representatives and shall use their commercially reasonable efforts to minimize any disruption to the Business in connection with such investigation and examination.  Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Sellers or any of their Subsidiaries to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which such Seller or any of its Subsidiaries is bound.  With respect to any material vendor or other strategic partner of Sellers and their Subsidiaries that Purchaser desires to contact prior to Closing, Purchaser shall consult with Sellers and, so long as in Sellers' reasonable judgment such contact would not be materially detrimental to the Business, Sellers and their Subsidiaries shall promptly seek and use commercially reasonable efforts to arrange appropriate meetings and telephone conferences with such parties.  No investigation by Purchaser prior to or after the date of this Agreement shall affect or be deemed to modify any of the representations, warranties, covenants or agreements of Sellers and the Non-Debtor Subsidiaries contained in this Agreement or the Seller Documents.  In order that Purchaser may have full opportunity to make such physical, business, accounting and legal review, examination or investigation as it may reasonably request of the affairs of Sellers and their Subsidiaries, Sellers shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of Sellers and their Subsidiaries to cooperate fully with such representatives in connection with such review and examination.  Sellers shall promptly deliver to Purchaser all

pleadings, motions, notices, statements, schedules, applications, reports and other papers filed in any other judicial or administrative proceeding as Purchaser may reasonably request.

Section 8.2    Conduct of the Business Pending the Closing.

(a)    Prior to the Closing, except (1) as set forth on Schedule 8.2(a), (2) as required by Applicable Law or by Order of the Bankruptcy Court, (3) as otherwise expressly contemplated by this Agreement, or (4) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), Sellers shall, and shall cause their Subsidiaries to:

(i)    conduct the Business only in the Ordinary Course of Business (other than Store Closing Liquidations in accordance with this Agreement) and comply with the Cash Flow Budget in all material respects;

(ii)    use their commercially reasonable efforts to (A) preserve the present business operations, organization and goodwill of the Business, and (B) preserve the present relationships with Persons having business dealings with Sellers and their Subsidiaries (including customers and suppliers of the Business);

(iii)    (A) maintain the books, accounts and records of Sellers and their Subsidiaries in the Ordinary Course of Business, (B) continue to operate billing procedures and collect accounts receivable utilizing normal procedures and without discounting or accelerating payment of such accounts, (C) subject to compliance with the Cash Flow Budget, pay accounts payable and comply with all contractual and other obligations applicable to the operation of the Business, and (D) not permit any material change in any pricing, investment, accounting, financial reporting, inventory, credit, allowance or Tax practice or policy of Sellers or the Non-Debtor Subsidiaries that would adversely affect any of the Non-Debtor Subsidiaries;

(iv)    Intentionally Omitted;

(v)    subject to any confidentiality restrictions which apply to Sellers or their Subsidiaries, use commercially reasonable efforts to consult in good faith from time to time with the Representatives of Purchaser to report cash flow results of the Business, material operational developments as they arise, the general status of ongoing operations of the Business and with respect to the Store Closing Liquidations;

(vi)    other than in the Ordinary Course of Business or in connection with any liquidations or going out of business sales, maintain the Purchased Assets and assets of the Non-Debtor Subsidiaries in their current condition, ordinary wear and tear excepted;

(vii)    defend and protect the properties and assets of Sellers and their Subsidiaries from infringement or usurpation;

(viii)    maintain in full force and effect until the Closing insurance upon all of the Purchased Assets and the assets of the Non-Debtor Subsidiaries in such amounts and of such kinds comparable to that in effect on the date of this Agreement; and

(ix)     comply with Applicable Laws, including Environmental Laws, other than with respect to the failure of such compliance as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

(b)     Prior to the Closing, except (1) as set forth on Schedule 8.2(b), (2) as required by Applicable Law or Order of the Bankruptcy Court, (3) as otherwise expressly contemplated by this Agreement, (4) as expressly permitted or expressly contemplated by the Cash Flow Budget, or (5) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Sellers shall not, and shall not permit their Subsidiaries to:

(i)     other than with respect to payments made in the Ordinary Course of Business on a "payment neutral" basis (i.e., payments to vendors with respect to newly accruing obligations on account of revenue sharing arrangements or otherwise) or as otherwise expressly permitted by the Cash Flow Budget or to the extent expressly permitted or required by this Agreement, make any payments to any studio vendors or with respect to any Studio Contract;

(ii)     (A) increase the compensation or any other benefits of any of their respective directors, officers, employees or individual consultants, (B) grant any bonus, benefit or other direct or indirect compensation to any director, officer, employee or individual consultant, (C) increase the coverage or benefits available under (or create any new or otherwise amend) any Employee Benefit Plan or (D) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which any Seller or any of its Subsidiaries is a party or involving a director or executive officer of any Seller or any of its Subsidiaries, except, in each case, as required by Applicable Law from time to time in effect;

(iii)     (A) make, change or rescind any material election relating to Taxes, (B) settle or compromise any material claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes, or (C) except as may be required by Applicable Law or GAAP, make any material change to any of its methods of accounting for Tax purposes from those employed in the preparation of its most recent Tax Returns;

(iv)     subject any of the Purchased Assets or the assets of a Non-Debtor Subsidiary to any Lien, except for Permitted Liens and except for non-exclusive licenses under any Purchased Intellectual Property or any Intellectual Property owned by any Non-Debtor Subsidiary granted in the Ordinary Course of Business;

(v)     acquire any material properties or assets that would be Purchased Assets or assets of a Non-Debtor Subsidiary or, except for the purpose of disposing of obsolete or worthless assets, sell, assign, license, transfer, convey, lease or otherwise dispose of any of the Purchased Assets or assets of a Non-Debtor Subsidiary;

(vi)     cancel, amend, modify, terminate or compromise any material debt or claim or waive or release any material right of Seller or any of its Subsidiaries that constitutes a Purchased Asset or an asset of a Non-Debtor Subsidiary;

(vii)    acquire any entity or all or substantially all of the assets of any entity or enter into any commitment for capital expenditures in excess of $25,000 for any individual commitment and $100,000 for all commitments in the aggregate;

(viii)    enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization;

(ix)    enter into any Contract for the sale of any Owned Property or the sublease with respect to any property subject to a Real Property Lease;

(x)    (A) enter into any transaction or enter into, modify or renew any Contract which by reason of its size or otherwise is not in the Ordinary Course of Business (including, for the avoidance of doubt, any Contract that contains exclusivity or most favored nation provisions) or (B) enter into any Contract that would have been a Material Contract had it been entered into prior to this Agreement;

(xi)    enter into any Contract, understanding or commitment that restrains, restricts, limits or impedes the ability of the Business, or the ability of Purchaser, to compete with or conduct any business or line of business in any geographic area;

(xii)    terminate, amend, restate, supplement or waive any rights under (A) prior to the expiration of Purchaser's right to designate Purchaser Assumed Contracts pursuant to Section 2.5 and subject to Sellers' rights under Section 2.5(c), any Real Property Leases or material contracts of Sellers, (B) following the expiration of Purchaser's right to designate Purchaser Assumed Contracts, any Purchaser Assumed Contract or Real Property Leases, (C) any material contract of any Non-Debtor Subsidiary or (D) any Permit;

(xiii)    amend its certificate or articles of incorporation, bylaws, or other organizational documents or take any other action if any such amendment or action would have an adverse effect on the ability of Seller to consummate the Transactions or otherwise adversely affect the Business or the value, utility or transferability of the Purchased Assets or Subsidiary Shares;

(xiv)    issue, and Sellers shall use their reasonable efforts to prohibit any of their franchisees and franchisees of Non-Debtor Subsidiaries from issuing, to any customers or Employees any gift cards, gift certificates, vouchers, discounts or any other offers that may be redeemable for cash or any inventory offered by the Business following the Closing Date;

(xv)    other than with respect to customary advances for expenses to Employees in the Ordinary Course of Business, make any loan or advance to any Person;

(xvi)    engage in any transaction with respect to the Business with any officer, director or Affiliate of Sellers or their Subsidiaries;

(xvii)    incur or assume any Indebtedness;

(xviii)   enter into or agree to enter into any merger or consolidation with any corporation or other entity, or engage in any new business or invest in, make a loan, advance or capital contribution to, or otherwise acquire the securities of, any other Person;

(xix)    declare, set aside, make or pay any dividend or other distribution, payable in cash, stock, property or otherwise, in respect of the capital stock of Sellers or their Subsidiaries or repurchase, redeem or otherwise acquire any outstanding shares of the capital stock or other securities of, or interests in, Sellers or their Subsidiaries;

(xx)    introduce any material change with respect to the operation of the Business, including any material change in the types, nature, composition or quality of products or services, or make any change in product specifications or prices or terms of distributions of such products;

(xxi)    honor or redeem (or in any way use assets of Sellers' bankruptcy estate in connection with the honoring or redemption of) any gift cards that are outstanding on, or issued subsequent to, the date hereof, except to the extent honored and/or redeemed pursuant to a program for which Purchaser provides, in its sole discretion, its prior written consent upon and following the date that is forty-five (45) days (or such longer period as required by applicable state or local regulations) after the date hereof; provided, that for the avoidance of doubt, this Section 8.2(b)(xxi) shall not restrict Sellers' right to honor or redeem gift cards prior to the expiration of such 45-day period (or, to the extent applicable, such longer period as required by applicable state or local regulations);

(xxii)    issue, sell or pledge any equity in any of the Non-Debtor Subsidiaries, or securities or rights that by their terms may be exercised or exchanged or converted into equity of any of the Non-Debtor Subsidiaries; or

(xxiii)   agree to do anything prohibited by this Section 8.2.

(c)    Subject to compliance by Purchaser with the terms of this Agreement and the Store License Agreement, except with the prior written consent of Purchaser or as required by Section 2.5(b), from and after the Closing until the Assumption Deadline, Sellers shall not terminate, reject, amend, restate, supplement or waive any rights under any Contract that can be designated a Purchaser Assumed Contract pursuant to this Agreement.

Section 8.3    Consents.  Sellers shall use (and shall cause each of their Subsidiaries to use) commercially reasonable efforts, and Purchaser shall cooperate with Sellers, to obtain at the earliest practicable date all consents and approvals required to consummate the Transactions, including the consents and approvals referred to in Section 5.4(b); provided, however, that neither Sellers nor Purchaser nor any of their respective Affiliates shall be obligated to (a) pay any consideration therefor to any third party from whom consent or approval is requested, or (b) agree to any restrictions on its ability to operate the Business or the Purchased Assets or Non-Debtor Subsidiaries or hold or exercise ownership over the Purchased Assets, or initiate any litigation or Legal Proceedings to obtain any such consent or approval.

Section 8.4    Appropriate Action; Filings.

(a)     Subject to the terms and conditions of this Agreement (including the last sentence of Section 8.4(b)), through the Closing Date, Sellers and Purchaser shall cooperate with each other and use (and shall cause their respective Affiliates to use) commercially reasonable efforts: (i) to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable on its part under this Agreement, Applicable Law or otherwise to consummate and make effective the Transactions, (ii) to obtain promptly from any Governmental Authority any Orders or Permits required to be obtained by Sellers or Purchaser or any of their respective Affiliates in connection with the authorization, execution, delivery and performance of this Agreement and the consummation of the Transactions, (iii) to promptly make all necessary filings and thereafter make any other required submissions with respect to this Agreement and prompt consummation of the Transactions required under (A) the HSR Act, (B) any notifications or filings required for the Transactions under other applicable Competition Laws, and (C) any Applicable Law, (iv) to defend any and all lawsuits and other proceedings by or before any Governmental Authority challenging this Agreement or the consummation of the Transactions, (v) to cause to be lifted or rescinded any injunction, decree, ruling, order or other action of any Governmental Authority adversely affecting the ability of any of the Parties to consummate the Transactions, and (vi) to provide prompt notification to the other Party of any actions pursuant to clauses (i) – (v) of this Section 8.4(a); provided, however, that nothing in this Section 8.4 shall be construed as altering the rights or obligations of Sellers under Section 7.1; provided further, that neither Purchaser nor any Seller nor any of their respective Affiliates shall be obligated to pay any consideration or incur any costs to obtain any approvals or consents from third parties, whether or not they may be necessary, proper or advisable to consummate the Transactions.

(b)     As promptly as practicable, but in no event later than two (2) Business Days following the Sale Hearing, the Parties shall (i) each file with the Federal Trade Commission and the Department of Justice any notifications and report forms, together with all required supplemental information, required to be filed under the HSR Act and the regulations promulgated thereunder with respect to the Transactions, and request early termination of the waiting period with respect to the Transactions and (ii) file any notifications or filings required under the Transactions under other applicable Competition Laws. Subject to the terms and conditions of this Agreement (including the last sentence of this Section 8.4(b)), Sellers and Purchaser shall consult with each other as to the appropriate time of filing such notifications and shall use their commercially reasonable efforts to make such filings at the agreed upon time, to respond promptly to any requests for additional information made by the Federal Trade Commission, the Department of Justice or any other Governmental Authority to cooperate with each other in connection with resolving any investigation or other inquiry concerning the Transactions commenced by the Federal Trade Commission, the Department of Justice or any other Governmental Authority and to cause the waiting periods under the HSR Act to terminate or expire at the earliest possible date after the date of filing. Subject to the terms and conditions of this Agreement (including the last sentence of this Section 8.4(b)), Sellers and Purchaser shall use their commercially reasonable efforts to (i) eliminate every impediment under any Competition Law, including taking all actions necessary to obtain any necessary approval under applicable Competition Laws and resisting in good faith any assertion that the Transactions contemplated hereby constitute a violation of the Competition Laws, and (ii) otherwise resolve all such objections, if any, as may be asserted by any Governmental Authority so as to enable the Closing to occur as soon as reasonably possible, all to the end of expediting the consummation of

the Transactions contemplated hereby.  Nothing contained in this Section 8.4(b) or in any other provision of this Agreement shall be construed as requiring Purchaser or Sellers or any of their respective Affiliates to, as a condition to, or in connection with, obtaining any of the necessary approvals or consents, and none of Sellers or their respective Affiliates may, without the prior written consent of Purchaser, become subject to, consent to, or offer or agree to, or otherwise take any action with respect to, any requirement, condition, limitation, understanding, agreement or order to (i) sell, license, assign, transfer, divest, hold separate or otherwise dispose of any assets, business or portion of business of Purchaser, Sellers, Non-Debtor Subsidiaries, or any of their respective Affiliates in any manner, (ii) conduct, restrict, operate, invest or otherwise change the assets, business or portion of business of Purchaser, Sellers, Non-Debtor Subsidiaries, or any of their respective Affiliates in any manner, or (iii) impose any restriction, requirement or limitation on the operation of the business or portion of the business of Purchaser, Sellers, Non-Debtor Subsidiaries or any of their respective Affiliates in any manner.

(c)     Through the Closing Date, Sellers shall use (and shall cause their Subsidiaries to use) commercially reasonable efforts (subject to receipt of the Sale Order) to promptly obtain all necessary consents and approvals for the assignment and assumption of all of the Purchaser Assumed Contracts.

Section 8.5     Confidentiality.  Purchaser acknowledges that Confidential Information (as defined in the Confidentiality Agreement) has been, and in the future will be, provided to it in connection with this Agreement, including under Section 8.1, and is subject to the terms of the confidentiality agreement between Parent and Purchaser, dated as of April 7, 2010 (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference.  Purchaser acknowledges and understands that this Agreement may be made available by Sellers to prospective bidders and that such disclosure shall not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.  Effective upon, and only upon, the Closing, the Confidentiality Agreement shall terminate.  Sellers acknowledge that from and after the Closing, all non-public information relating to the Business, including, but not limited to the Purchased Assets and the Assumed Liabilities, will be valuable and proprietary to Purchaser and its Affiliates.  Sellers agree that, from and after the Closing, no Seller will, and Sellers will cause their Subsidiaries not to, disclose to any Person any non-public information relating to Purchaser and its Affiliates, or the Business, including but not limited to the Purchased Assets, the Non-Debtor Subsidiaries and the Assumed Liabilities, except as required by Law or as otherwise becomes available in the public domain other than through any action by any Seller in violation of its obligations under this Section 8.5.  The provisions of this Section 8.5 shall survive the Closing.

Section 8.6     Preservation of Records; Cooperation.  Sellers and Purchaser shall (and shall cause their Affiliates to) preserve and keep in their possession all records held by them on and after the date hereof relating to the Purchased Assets for a period of three (3) years or such longer period as may be required by Applicable Law; (provided, however, that in no event shall Sellers be required to preserve such records after the Bankruptcy Cases are closed) and shall make such records and personnel available to the other Party as may reasonably be required by such Party, including in connection with any insurance claims or Legal Proceedings involving the Purchased Assets, or any governmental investigations of Sellers or Purchaser or any of their respective Affiliates related to the Purchased Assets or in order to enable Sellers or Purchaser or

any of their respective Affiliates to comply with their respective obligations hereunder and each other agreement, document or instrument contemplated hereby or thereby or otherwise; provided, however, that in no event shall either Party be obligated to provide any information the disclosure of which would jeopardize any privilege available to such Party or any of its Affiliates relating to such information or which would cause such Party or any of its Affiliates to breach a confidentiality obligation to which it is bound. Purchaser further acknowledges that Sellers shall be entitled to copy any such records, at Sellers' sole cost and expense, and to retain copies of such records. After the expiration of any applicable retention period, before Purchaser shall dispose of any of such records, at least ninety (90) days' prior written notice to such effect shall be given by Purchaser to Sellers or their successors (or a Person designated by Sellers) and Sellers or their successors (or a Person designated by Sellers) shall have the opportunity (but not the obligation), at their sole cost and expense, to remove and retain all or any part of such records as they may in their sole discretion select. In the event Sellers wish to destroy any records after the Bankruptcy Cases are closed, before Sellers shall dispose of any of such records, at least ninety (90) days' prior written notice to such effect shall be given by Sellers to Purchaser or its successors (or a Person designated by Purchaser) and Purchaser or its successors (or a Person designated by Purchaser) shall have the opportunity (but not the obligation), at its sole cost and expense, to remove and retain all or any part of such records as it may in its sole discretion select.

Section 8.7    Publicity. Prior to the Closing and without limiting or restricting any Party from making any filing with the Bankruptcy Court with respect to this Agreement or the Transactions, no Party shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld or delayed, unless, in the reasonable judgment of Purchaser or Sellers, disclosure is otherwise required by Applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of the Securities Exchange Commission or any stock exchange on which Purchaser or such Seller lists securities, provided that the Party intending to make such release shall use its commercially reasonable efforts consistent with such Applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof. After the Closing, the Parties may issue public announcements regarding the Transactions so long as such announcements, in the case of announcements made by Sellers, do not disclose the specific terms or conditions of this Agreement or any Transaction Document except where such terms and conditions have already been disclosed as required by Law, applicable stock exchange regulation or in filings that any Seller is required to make in the Bankruptcy Court or office of the United States Trustee; provided, however, that the issuing party shall use its best efforts to consult with the other party with respect to the text thereof.

Section 8.8    Lease Extensions; Store Liquidations.

(a)    Sellers shall have commenced, and shall diligently pursue, unless otherwise directed by Purchaser, liquidation of each Leased Property set forth on Schedule 8.8(a) for which the lease counterparty has not provided a Lease Extension by February 28, 2011 (the "Liquidation Condition"); provided, however, that the Protected Stores shall not be subject to the Liquidation Condition. In connection with the liquidation through the conduct of "store closing" or similar going out of business sales or liquidations of any Stores (the "Store Closing

Liquidations") occurring prior to the Closing Date, Sellers shall consult with Purchaser as to how such liquidations shall be conducted, including the selection and terms of engagement of the liquidators, if any, to be used and the aggregate estimated expenses to be incurred in connection with such liquidations. On or promptly following April 1, 2011 (and in no event more than one (1) Business Day thereafter), Sellers shall provide Purchaser with a list of each Protected Store for which a Lease Extension has not been received, and Purchaser shall be entitled, in its discretion at any time following the date of the Auction and on or before the fifth (5th) Business Day prior to the Closing Date, to provide written notice to Sellers of its election to require Sellers to transport all such Designated Liquidation Merchandise and Designated FF&E located in each such Protected Store to one or more other Closing Date Leased Properties designated by Purchaser, at Sellers' sole cost and expense, prior to the Closing and prior to the Sellers' rejection of the unexpired real property lease pursuant to which such Protected Store is leased; provided that Sellers shall not be required to transport any such Designated Liquidation Merchandise and Designated FF&E until after the closing of the Auction.

(b)     With respect to any Leased Property (including any Protected Store or Distribution Center) for which Purchaser has not designated as a Purchaser Assumed Contract at Closing or which has been designated as a Purchaser Assumed Contract but has not been assumed and assigned to Purchaser as of Closing (the "Closing Date Leased Properties"), Sellers shall retain any such unexpired real property lease and Purchaser shall be granted an irrevocable license to occupy and use such Closing Date Leased Property (the "Store License Alternative") until the applicable Assumption Deadline for such Closing Date Leased Property pursuant to the terms of the Store License Agreement.  Under the Store License Agreement, Purchaser shall be entitled to receive all proceeds generated at the Closing Date Leased Properties which are subject to the Store License Alternative (whether from Store Closing Liquidations or otherwise) and shall be responsible for the payment of the Expenses (as defined and as provided in the Store License Agreement).  Prior to the Assumption Deadline, Purchaser may, in its sole discretion, designate as a Purchaser Assumed Contract any unexpired real property lease applicable to any such Closing Date Leased Property and the Store License Agreement shall terminate with respect to any such unexpired real property lease upon the effective date of the assumption and assignment to Purchaser thereof.  Sellers hereby agree to use their reasonable best efforts to obtain an Order of the Bankruptcy Court approving the assumption and assignment of any Closing Date Leased Property that is designated as a Purchaser Assumed Contract and added to Schedule 1.1(e) (x) prior to the Closing, if such Contract is added to Schedule 1.1(e) prior to Closing; provided, that, if such Order is not obtained prior to Closing, Sellers shall use reasonable best efforts to assume and assign such Contract to Purchaser as soon as practicable, or (y) if such Contract is added to Schedule 1.1(e) after the Closing, as soon as practicable after such Contract is added to Schedule 1.1(e).

Section 8.9     Intentionally Omitted.

Section 8.10     Banks.  Not less than two (2) Business Days prior to the Closing, Sellers shall provide to Purchaser a complete and correct list of the names and locations of all banks in which any Non-Debtor Subsidiaries have accounts or safe deposit boxes and the names of all persons authorized to draw thereon or to have access thereto.

Section 8.11    Supplements to Schedules.  Sellers may in response to any changes or updates to Schedule 1.1(e) by Purchaser, supplement or amend the Schedules provided pursuant to Sections 5.4(b), 5.11(b) and 5.12(a). Such supplements or amendments shall be effective to cure and correct, for all purposes, any breach of any representation or warranty which would have existed if Sellers had not made such supplements or amendments. All references to Schedules that are supplemented or amended pursuant to this Section 8.11 shall be deemed to be a reference to such Schedule as supplemented or amended.

Section 8.12    Further Assurances.  Each Seller and Purchaser shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the Transactions and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Transactions.

Section 8.13    Payment of Sales Tax Amounts.  During the period between the date of this Agreement and the Closing Date, Sellers will continue to pay when due and in accordance with Applicable Law all sales and use taxes generated in the Ordinary Course of Business.  On the day immediately prior to the Closing Date, Sellers shall pay to the appropriate Taxing Authorities all accrued and unpaid sales and use taxes which were generated in the Ordinary Course of Business and remain unpaid at such date (the "Closing Sales Tax Payment").

Section 8.14    Use of Name.  Sellers hereby agree that upon and following the Closing, Sellers shall not, and shall cause their Affiliates (other than (i) the Non-Debtor Subsidiaries, (ii) until such time as the Italian Agreement is terminated pursuant to its terms, Blockbuster Italia, S.p.A. and, (iii) until such time as the Canadian Agreement is terminated pursuant to its terms, Blockbuster Canada Co. NSULC) not to, use the name "Blockbuster" or any of the items listed in the schedule of Trademarks and Trademark Applications set forth in Schedule 5.11(a) or similar names or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing or comprising the foregoing, including any name or mark confusingly similar thereto (collectively, the "Purchased Business Name Trademarks"), other than in the case of disclosures by Sellers of their former ownership of the Business.  In furtherance thereof, as promptly as practicable but in no event later than one hundred twenty (120) days following the Closing Date, each Seller shall remove any Purchased Business Name Trademarks from its legal name by appropriate legal proceedings in the jurisdiction of such Seller's organization.

Section 8.15    Notice of Breach of Studio Condition.  In the event that any Specified Studio breaches the Studio Condition, Sellers shall provide written notice thereof to such Specified Studio (with a copy to counsel to the Ad Hoc Studio Committee), by email and overnight delivery to the person designated in writing to Sellers by such Specified Studio and the Ad Hoc Studio Committee, and such Specified Studio shall have three (3) Business Days after the date of such notice to cure such breach, and if such breach is not fully cured within such period such Specified Studio shall have failed to satisfy the Studio Condition for all purposes under this Agreement.  For the avoidance of doubt, with respect to any Specified Studio's non-shipment of DVD's, having three (3) Business Days to cure shall mean that Sellers and such Specified Studio have reached agreement on a means to cure such breach and such Specified Studio shall have resumed shipments within such time frame, not that resumed shipments must be received by Sellers by such third Business Day.

# ARTICLE IX

# EMPLOYEE AND EMPLOYEE BENEFITS MATTERS; TAX MATTERS

Section 9.1    Employment.

(a)    Transferred Employees.  At least five (5) days prior to the Closing, Purchaser shall deliver, in writing individually or generally, an offer of employment commencing on the Closing Date and contingent upon the Closing, on an at-will basis (except to the extent otherwise expressly agreed in a writing signed by Purchaser and such Employee) and on such other terms and conditions as Purchaser may determine, to substantially all of the Employees who remain employed by Sellers and are providing services with respect to the Purchased Assets immediately prior to the Closing.  Such individuals who accept such offer are hereinafter referred to as the "Transferred Employees." For the avoidance of doubt, Purchaser shall not be required to offer employment to any employees providing services with respect to Closing Date Leased Properties as to which Purchaser elects the Store License Alternative and, until Purchaser elects to assume the unexpired real property lease for any Closing Date Leased Property, if ever, and such offers of employment are made, such employees shall not be deemed Transferred Employees.

(b)    Standard Procedure.  Pursuant to the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 20, (i) Purchaser and Seller shall report on a predecessor/successor basis as set forth therein, (ii) Seller will not be relieved from filing a Form W-2 with respect to any Transferred Employees, and (iii) Purchaser will undertake to file (or cause to be filed) a Form W-2 for each such Transferred Employee with respect to the portion of the year during which such Employees are employed by Purchaser that includes the Closing Date, excluding the portion of such year that such Employee was employed by Seller or its Subsidiaries.

Section 9.2    Employee Benefits.

(a)    Accrued Vacation.  Purchaser shall, subject to the limitation set forth in the proviso of Section 2.3(b), be responsible for Liabilities with respect to Transferred Employees attributable to their accrued and unused vacation, sick days and personal days accrued from January 1, 2011 through the Closing Date in an aggregate amount not to exceed $3,500,000.

(b)    Accrued Wages.  Purchaser shall, subject to the limitation set forth in the proviso of Section 2.3(b), assume and pay all accrued and unpaid wages of Transferred Employees through the Closing Date.

(c)    Severance.  Sellers shall be and remain solely responsible for all severance Liabilities and obligations arising under any plan, program, policy or agreement of or with Sellers or their Affiliates (other than any Non-Debtor Subsidiaries).

(d)    COBRA.  Purchaser shall provide continuation coverage under its group medical plan pursuant to ERISA or Section 4980B of the Code to all Employees as of the Closing Date and their respective qualified beneficiaries as of the Closing Date, all former

Employees and their qualified beneficiaries who are entitled to such coverage as of the Closing Date under the Employee Benefit Plans, and all other "affected employees" as defined for purposes of ERISA and Section 4980B of the Code and their qualified beneficiaries.

(e)     WARN Act.  Within five (5) Business Days after the date of the Cobalt Agreement, Sellers shall have provided notice to such Employees of Sellers that they determine, in their sole discretion, could be entitled to such notice in accordance with the WARN Act or similar state Laws.

(f)     Nothing contained in this Section 9.2 or elsewhere in this Agreement shall be construed to prevent the termination of employment of any Transferred Employee or any change in the employee benefits available to any Transferred Employee.

Section 9.3     Tax Matters.

(a)     All sales, transfer, filing, recordation, registration, documentary, stamp, value-added, goods and services and similar Taxes and fees arising from or associated with the Transactions (collectively, "Transfer Taxes"), whether levied on Purchaser or Sellers, shall be paid by Sellers. Sellers shall prepare at Sellers' expense, with Purchaser's cooperation, any necessary Tax Returns and other documentation with respect to any Transfer Taxes, and the party required by law to file such Tax Return shall timely do so.

(b)     From the date of this Agreement until the Closing, and taking into account Section 8.2(b), each Seller, on behalf of itself and its Subsidiaries, shall prepare and file (or cause to be prepared and filed) in accordance with past practice and in a timely manner all Tax Returns relating to such Seller, each of its Subsidiaries, and the Purchased Assets, that are required to be filed on or before the Closing Date (after giving effect to any applicable extensions), and shall pay all Taxes required to be paid by or on behalf of such Seller, its Subsidiaries, and the Purchased Assets on or before the Closing Date; provided, however, that Sellers shall deliver to Purchaser (i) a copy of any material Tax Return for a Straddle Period or a Pre-Closing Tax Period and shall consider in good faith any comments submitted by Purchaser at least ten (10) days prior to the due date for filing such Tax Return (after giving effect to any applicable extensions), and (ii) written notice of any material Tax payment obligation for which Sellers are liable hereunder at least ten (10) Business Days prior to the date on which such payment is required to be made.  After the Closing, Purchaser shall prepare and file (or cause to be prepared and filed) all Tax Returns required to be filed with respect to the Purchased Assets. In connection with the foregoing, Sellers shall pay Purchaser, prior to the payment due date, any amounts attributable to any Tax obligation which is Sellers' responsibility under Section 2.4(e); provided, however, that Purchaser shall deliver to Sellers (i) a copy of any material Tax Return and shall consider in good faith any comments submitted by Sellers at least ten (10) days prior to the due date for filing such Tax Return (after giving effect to any applicable extensions), and (ii) written notice of any material Tax payment obligation at least ten (10) Business Days prior to the date on which such payment is required to be made. Whenever it is necessary to determine liability for Taxes in respect of any Seller, any of its Subsidiaries or the Purchased Assets for a Straddle Period, the portion of such Tax which relates to the portion of the Straddle Period ending on the Closing Date shall (i) in the case of any Taxes, other than Taxes based upon or related to income or receipts, be deemed to be the amount of such Tax for the entire Straddle Period multiplied by

a fraction, the numerator of which is the number of days in the portion of the Straddle Period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period; and (ii) in the case of any Tax based upon or related to income or receipts, be deemed equal to the amount which would be payable on the basis of an interim closing of the books as of the end of the Closing Date.  The dispute resolution provisions of <u>Section 3.5</u> should apply in the case of any disagreement with respect to any Tax Returns governed under this <u>Section 9.3(b)</u>.

(c)      Sellers, at their expense, shall have the right, but not the obligation, to control the conduct of the defense of any audit, claim, proceeding, investigation, or other controversy relating solely to Taxes ("<u>Tax Claim</u>") for which Sellers are liable pursuant to <u>Section 2.4(e)</u>; <u>provided</u>, <u>however</u>, that Sellers will not have the right to settle any such Tax Claim if the resolution or determination of such Tax Claim is reasonably likely to adversely affect Purchaser without first obtaining Purchaser's written consent, such consent to not be unreasonably withheld, conditioned or delayed.  Purchaser shall control the conduct of all other Tax Claims; <u>provided</u>, <u>however</u>, that if such Tax Claim, if successful, could reasonably be expected to result in any Tax for which Sellers may be responsible for under this Agreement, Purchaser shall (i) promptly notify Sellers in writing of such claim, (ii) notify Sellers of any significant developments regarding such claim, (iii) consider in good faith recommendations of Sellers in connection with such claim, and (iv) not settle any such claim without first obtaining Sellers' written consent, such consent to not be unreasonably withheld, conditioned or delayed.

(d)      Sellers shall cause any Tax allocation, Tax sharing, or Tax indemnity agreement or arrangement (other than this Agreement) between any Non-Debtor Subsidiary and any Debtor Subsidiary, or between two Non-Debtor Subsidiaries, to be terminated as of the Closing Date (but only as between such subsidiaries, and not any third party), and, after the Closing Date, such Non-Debtor Subsidiary shall no longer be bound thereby or have rights or liabilities thereunder.

(e)      Sellers acknowledge and agree that no restructuring activities shall be undertaken by any Seller or any of its Affiliates in connection with the Bankruptcy Cases (or otherwise) that may produce any material adverse Tax consequences for Purchaser and its Affiliates. Upon Purchaser's request, the Parties shall use their commercially reasonable efforts to restructure the transactions contemplated by this Agreement in a Tax-efficient manner. Purchaser may, in its sole discretion and expense, make (or cause to be made) an election under Section 338(g) of the Code (and any corresponding or similar provision of state or local Law) with respect to the acquisition of any Non-Debtor Subsidiary that is treated as an association taxable as a corporation for U.S. federal income Tax purposes; <u>provided</u>, <u>however</u>, that such election shall not materially adversely effect any of Sellers.

(f)      Sellers, on the one hand, and Purchaser will provide each other with such cooperation and information as either of them reasonably may request of the other in filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes, or participating in or conducting any audit or other proceeding in respect of Taxes.  Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings and other determinations by Taxing Authorities. Any information obtained

under this <u>Section 9.3</u> shall be kept confidential except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting any audit or other proceeding.

(g)     Any reimbursement payment to be made pursuant to this Agreement shall be treated by the Parties as an adjustment to the Cash Purchase Price for all Tax purposes.

# ARTICLE X

## CONDITIONS TO CLOSING

Section 10.1     <u>Conditions Precedent to Obligations of Purchaser</u>.  The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser, in its sole discretion, in whole or in part to the extent permitted by Applicable Law):

(a)     the representations and warranties of Sellers set forth in this Agreement shall be true and correct as of the date of this Agreement and at and as of the Closing with the same force and effect as if made at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date); <u>provided</u>, <u>however</u>, that in the event of a breach of a representation or warranty other than a representation or warranty qualified by materiality or Seller Material Adverse Effect, the condition set forth in this <u>Section 10.1(a)</u> shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together results in a Seller Material Adverse Effect, and Purchaser shall have received a certificate signed by an authorized officer of each Seller (in form and substance reasonably satisfactory to Purchaser), dated the Closing Date, to such effect;

(b)     Sellers shall have performed and complied in all material respects with all obligations, covenants and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect;

(c)     Sellers shall have executed, delivered and/or filed or authorized Purchaser to file such termination statements, lien releases, discharges, financing change statements or other documents, notices or other instruments as Purchaser may reasonably deem necessary to release Liens (other than Permitted Liens) on the Purchased Assets, to the extent Sellers are authorized to do so absent the consent of the holder of the Lien;

(d)     Sellers shall have completed the Store liquidations and closures of the Initial Liquidating Stores and the Stores set forth in <u>Schedule 10.1(d)</u>, as such schedule shall be updated from time to time to reflect the Stores to be liquidated pursuant to <u>Section 8.8(a)</u>;

(e)     the Bidding Procedures Order provisions regarding the Specified Studios, as set forth in Section 17, 18 and 19 of the Bidding Procedures Order, shall be in full force and effect (which shall provide that, pursuant to such Bidding Procedures Order and subject to payment of the amounts to be paid to Specified Studios pursuant to clauses (g) and (h) of Section

16 thereof (the "Studio Payments"), Sellers or Purchaser (or, if applicable, Purchaser's assignee or designee under the Store License Agreement) shall be entitled to sell all inventory (including without limitation all "Certified Field Destroy" units ("CFDs") to which the Studio Payments relate, free and clear of any liabilities, liens, encumbrances or obligations owed to such Specified Studios or their affiliates on account of such inventory (including without limitation CFDs));

(f)     Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2;

(g)     all material consents (or in lieu thereof waivers) to the performance by Sellers of their obligations under this Agreement or to the consummation of the Transactions contemplated hereby as are required under any Contract to which any Seller or Non-Debtor Subsidiary is a party or by which any of their respective assets and properties are bound (i) shall have been obtained, (ii) shall be in form and substance reasonably satisfactory to Purchaser, (iii) shall not be subject to the satisfaction of any condition that has not been satisfied or waived and (iv) shall be in full force and effect, except where the failure to obtain any such consent (or in lieu thereof waiver) could not, individually or in the aggregate with other such failures, have or reasonably be expected to have a Seller Material Adverse Effect; and

(h)     Sellers shall have obtained authorization to use cash collateral to fund (i) all of the wind down costs of the estates in the Bankruptcy Cases in accordance with the Estimated Wind Down Expenses and (ii) the costs and sale expenses related to Store Closing Liquidations following the Closing in accordance with the Approved Sale Expenses.

Section 10.2     Conditions Precedent to Obligations of Sellers.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers, in their sole discretion, in whole or in part to the extent permitted by Applicable Law):

(a)     the representations and warranties of Purchaser set forth in this Agreement shall be true and correct at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date); provided, however, that in the event of a breach of a representation or warranty other than a representation or warranty qualified by materiality or Purchaser Material Adverse Effect, the condition set forth in this Section 10.2(a) shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together results in a Purchaser Material Adverse Effect, and Sellers shall have received a certificate signed by an authorized officer of Purchaser (in form and substance reasonably satisfactory to Sellers), dated the Closing Date, to such effect;

(b)     Purchaser shall have performed and complied in all material respects with all obligations, covenants and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(c)	Purchaser shall have paid in full or otherwise satisfied all Cure Costs with respect to the Purchaser Assumed Contracts set forth on Schedule 1.1(e) prior to or on the Closing Date; and

(d)	Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 4.3.

Section 10.3	Conditions Precedent to Obligations of Purchaser and Sellers.  The respective obligations of Purchaser and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Sellers in whole or in part to the extent permitted by Applicable Law):

(a)	there shall not be in effect any Law or Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(b)	the Bidding Procedures Order shall be in full force and effect and shall not have been reversed, modified, amended or stayed;

(c)	the Bankruptcy Court shall have entered the Sale Order and such Order shall be in full force and effect and shall not have been reversed, modified, amended or stayed; and

(d)	the waiting period applicable to the transactions contemplated by this Agreement under the HSR Act or any other Competition Law shall have expired or early termination shall have been granted and the Parties shall have obtained any other consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Authority required to be obtained or made in connection with the execution and delivery of this Agreement or the performance of the Transactions, and each such consent, approval, order or authorization shall be in full force and effect.

Section 10.4	Frustration of Closing Conditions.  Neither Sellers nor Purchaser may rely on the failure of any condition set forth in Section 10.1, Section 10.2 or Section 10.3, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

## ARTICLE XI

## LIMITATIONS

Section 11.1	Purchaser's Review.

(a)	No Reliance.  Purchaser has had the opportunity to ask questions in connection with its decision to enter into this Agreement, and to consummate the Transactions. In connection with the execution and delivery of this Agreement and the consummation of the Transactions, Purchaser has not relied upon, and Purchaser expressly waives and releases Sellers from any Liability for any claims relating to or arising from, any representation, warranty,

statement, advice, document, projection, or other information of any type provided by Sellers or their Affiliates or any of their respective Representatives, except for those representations and warranties expressly set forth in Article V.  In deciding to enter into this Agreement, and to consummate the Transactions, Purchaser has relied solely upon its own knowledge, investigation, judgment and analysis (and that of its Representatives) and not on any disclosure or representation made by, or any duty to disclose on the part of, Sellers or their Affiliates or any of their respective Representatives, other than the express representations and warranties of Seller set forth in Article V.

(b)     Limited Duties.  Any and all duties and obligations which any Party may have to any other Party with respect to or in connection with the Purchased Assets, this Agreement or the Transactions are limited to those specifically set forth in this Agreement. Neither the duties nor obligations of any Party, nor the rights of any Party, shall be expanded beyond the terms of this Agreement on the basis of any legal or equitable principle or on any other basis whatsoever.

Section 11.2   No Consequential or Punitive Damages.  NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

# ARTICLE XII

## MISCELLANEOUS

Section 12.1   Survival of Representations, Warranties, Covenants and Agreements. The representations and warranties of any Party made herein, in any Transaction Document or in any other instrument delivered pursuant to this Agreement shall terminate at the Closing, or upon termination of this Agreement pursuant to Section 4.4, and, following the Closing or the termination of this Agreement, as the case may be, there shall be no Liability in respect thereof on the part of any Party or any of its Representatives.  Except with respect to covenants or agreements which are to be performed on or prior to the Closing, all covenants and agreements contained in this Agreement shall survive the Closing in accordance with their respective terms; provided, that any covenant or agreement contained herein whose survival is not limited by its terms shall survive until fully performed in accordance with its terms.

Section 12.2   Remedies.

(a)     The Parties acknowledge and agree that the following remedies shall be available upon the following occurrences:

(i)     except as set forth in <u>Section 12.2(b)</u>, the sole remedy available to Purchaser in the event of Sellers' breach of this Agreement shall be to terminate this Agreement pursuant to and to the extent permitted by <u>Section 4.4</u> and, to the extent provided in <u>Section 3.2(b)</u>, the return of the Deposit; and

(ii)    except as set forth in <u>Section12.2(c)</u>, the sole remedy available to Sellers in the event of Purchaser's breach of this Agreement shall be to terminate this Agreement pursuant to and to the extent permitted by (A) <u>Section 4.4(b)</u> in the event that Closing does not occur on or before the Outside Date solely as a result of Purchaser's material breach of its obligations under this Agreement (including payment of the Closing Date Payment pursuant to <u>Section 3.3</u>) or (B) <u>Section 4.4(h)</u>, and in connection therewith to receive the Deposit, to the extent provided in <u>Section 3.2(b)</u>, as liquidated damages.

(b)     The Parties acknowledge that Purchaser shall be irreparably harmed and that there shall be no adequate remedy at law for a violation of any of the covenants or agreements of Sellers and their Subsidiaries set forth herein. Therefore, it is agreed that, in addition to the remedies set forth in <u>Section 12.2(a)(i)</u>, Purchaser shall have the right to enforce such covenants and agreements by specific performance, injunctive relief or by any other means available to Purchaser in law or in equity.

(c)     The Parties acknowledge that Parent shall be irreparably harmed and that there shall be no adequate remedy at law for a violation of any of the covenants or agreements of Purchaser set forth herein. Therefore, it is agreed that, in addition to the remedies set forth in <u>Section 12.2(a)(ii)</u>, Parent shall have the right to enforce such covenants and agreements by specific performance, injunctive relief or by any other means available to Parent in law or in equity.

Section 12.3    <u>Expenses</u>.  Except as otherwise set forth in this Agreement, each Party shall bear its own expenses (including attorneys' fees) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated hereby and the consummation of the Transactions contemplated hereby and thereby; <u>provided</u>, <u>however</u>, Purchaser shall bear sole responsibility for any governmental charges relating to HSR Act filing fees by Purchaser and its Affiliates and any UCC-3 filing fees, FAA, ICC, DOT, real estate, title recording or filing fees and other amounts payable in respect of transfer filings in connection with the transactions contemplated by this Agreement.

Section 12.4    <u>Non-Recourse</u>.  The Parties acknowledge and agree that no past, present or future director, officer, employee, incorporator, member, partner, stockholder, agent, attorney, Representative or Affiliate of the Parties to this Agreement, in such capacity, shall have any liability for any obligations or liabilities of Purchaser or Sellers, as applicable, under this Agreement or for any claim based on, in respect of, or by reason of, the Transactions.

Section 12.5    <u>Submission to Jurisdiction</u>.

(a)     Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes among the Parties which may arise or result

from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all Actions related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and shall receive notices at such locations as indicated in Section 12.11; provided, however, that if the Bankruptcy Cases have been fully and finally dismissed and the Bankruptcy Court declines jurisdiction, the Parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County.

(b)     The Parties hereby unconditionally and irrevocably waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any dispute arising out of or relating to this Agreement or any of the Transactions brought in any court specified in subsection (a) above, or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)     Each of the Parties hereby consents to process being served by any Party in any suit, Action or proceeding by the mailing of a copy thereof in accordance with the provisions of Section 12.11; provided, however, that such service shall not be effective until the actual receipt thereof by the Party being served.

Section 12.6    Waiver of Jury Trial.  THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.6.

Section 12.7    Authorization of Parent as Representative of Sellers.

(a)     By entering into and executing this Agreement, Sellers irrevocably make, constitute and appoint Parent as their agent, effective as of the date hereof, and authorize and empower Parent to fulfill the role of Sellers' representative hereunder, and each Seller appoints Parent as such Person's true and lawful attorney in fact and agent, for such Person and in such Person's name, place and stead for all purposes necessary or desirable in order for Parent to take all actions contemplated by this Agreement, with the ability to execute and deliver all instruments, certificates and other documents of every kind incident to the foregoing to all intents and purposes and with the same effect as such Seller could do personally, including to give and receive notices and communications; to object to such deliveries, to agree to, negotiate,

enter into settlements and compromises of, and comply with orders of courts with respect to such claims; and to take all actions necessary or appropriate in the judgment of Parent for the accomplishment of the foregoing.  The dissolution, liquidation, insolvency or bankruptcy of any Seller shall not terminate the authority and agency of Parent as each Seller's representative pursuant to this <u>Section 12.7</u>.  The power of attorney granted in this <u>Section 12.7</u> is coupled with an interest and is irrevocable.

(b)     Purchaser shall be entitled to rely exclusively upon any communication given or other action taken by Parent pursuant to this Agreement, and shall not be liable for any action taken or not taken in good faith reliance on a communication or other instruction from Parent.

Section 12.8     <u>Time of Essence</u>.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Section 12.9     <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement (including the Schedules and Exhibits hereto) and the other Transaction Documents represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the Parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 12.10     <u>Governing Law</u>.  THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, AND ANY CLAIM OR CONTROVERSY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN OR IN CONNECTION WITH THIS AGREEMENT OR AS AN INDUCEMENT TO ENTER INTO THIS AGREEMENT), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED, AND DETERMINED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISION THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION) AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

Section 12.11  Notices.  All notices and other communications under this Agreement shall be in writing and shall be deemed duly given (i) when delivered personally or by prepaid overnight courier, with a record of receipt, (ii) the fourth day after mailing if mailed by certified mail, return receipt requested, or (iii) the day of transmission, if sent by facsimile or telecopy during regular business hours or the Business Day after transmission, if sent after regular business hours (with a copy promptly sent by prepaid overnight courier with record of receipt or by certified mail, return receipt requested), to the Parties at the following addresses or facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Parties pursuant to this Section 12.11):

If to Sellers:

> Blockbuster Inc.
> 1201 Elm Street
> Dallas, Texas 75270
> Phone:  (214) 854-4081
> Fax:  (214) 854-4321
> Attention:  General Counsel

With a copy to:

> Weil, Gotshal & Manges LLP
> 200 Crescent Court, Suite 300
> Dallas, Texas 75201
> Phone:  214-746-8178
> Fax:  214-746-7777
> Attention: D. Gilbert Friedlander
>             Martin A. Sosland

If to Purchaser:

> DISH Network Corporation
> 9601 South Meridian Boulevard
> Englewood, CO 80112
> Phone: 888-825-2557
> Fax: 303-723-1699
> Attention: General Counsel

With a copy to:

> Linklaters LLP
> 1345 Avenue of the Americas
> New York, NY 10105
> Phone:  212-903-9000
> Fax:  212-903-9100
> Attention: Daniel G. Dufner, Jr.

Section 12.12  <u>Severability</u>.  If any term or provision of this Agreement is invalid, illegal or incapable of being enforced by Law or public policy, all other terms and provisions hereof shall nevertheless remain in full force and effect so long as the legal substance of the Transactions is not affected in any manner materially adverse to any Party.  Upon such determination that any term or provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

Section 12.13  <u>No Right of Set-Off</u>.  Purchaser for itself and for its Affiliates, successors and assigns hereby unconditionally and irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Purchaser or any of its Affiliates, successors and assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.  Each of Sellers, for itself and for its Affiliates, successors and assigns hereby unconditionally and irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Sellers or any of their Affiliates, successors and assigns has or may have with respect to any payments to be made by Sellers pursuant to this Agreement or any other document or instrument delivered by Sellers in connection herewith.

Section 12.14  <u>Binding Effect; Assignment</u>.  This Agreement shall be binding solely upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person not a Party to this Agreement except to the extent provided in <u>Section 12.4</u>.  No assignment of this Agreement or of any rights or obligations hereunder may be made by any Party (by operation of law or otherwise) without the prior written consent of the other Party and any attempted assignment without the required consents shall be void; <u>provided</u>, <u>however</u>, that (i) prior to the Closing, Purchaser may assign this Agreement and any or all rights or obligations hereunder (including Purchaser's right to purchase the Purchased Assets and assume the Assumed Liabilities) to any Affiliate of Purchaser and (ii) after the Closing, Purchaser (or its permitted assignee) shall have the right to assign its rights and/or delegate its obligations hereunder (A) to any Affiliates, (B) to any financing sources for collateral purposes or (C) to any subsequent purchaser of all or any portion of the stock or assets of Purchaser or the Business.  Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires; <u>provided</u>, Purchaser shall remain liable for the performance of the obligations of such assignee under <u>Section 2.5(c)</u> (including payment of all Contract Maintenance Costs) and under <u>Section 8.8(b)</u> (including the payment of all Expenses (as defined in the Store License Agreement)) notwithstanding any such assignment.

Section 12.15  <u>Counterparts</u>.  This Agreement may be executed and delivered (including by electronic transmission) in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[The Remainder of This Page Is Intentionally Left Blank]

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its respective officers thereunto duly authorized, as applicable, all as of the date first above written.

BLOCKBUSTER INC.

By: _____
    Name: Rod McDonald
    Title: Secretary

BLOCKBUSTER PROCUREMENT LP,

By: Blockbuster Distribution, Inc., its General Partner

By: _____
    Name: Rod McDonald
    Title: Secretary

BLOCKBUSTER DIGITAL TECHNOLOGIES INC.
BLOCKBUSTER DISTRIBUTION, INC.
BLOCKBUSTER GIFT CARD, INC.
BLOCKBUSTER GLOBAL SERVICES INC.
BLOCKBUSTER INTERNATIONAL SPAIN INC.
BLOCKBUSTER INVESTMENTS LLC
MOVIELINK, LLC
TRADING ZONE, INC.
B2 LLC

By: _____
    Name: Rod McDonald
    Title: Secretary

DISH NETWORK CORPORATION

By: _____

Name: Michael Kelly

Title: EVP

EXHIBIT A

Form of Store License Agreement

**Exhibit A**

## STORE LICENSE AGREEMENT

This Store License Agreement (this "Agreement"), dated as of April [_], 2011, is made and entered into by and among Blockbuster Inc., a Delaware corporation ("Parent"), each of the Debtor Subsidiaries (together with Parent, the "Sellers", and individually a "Seller") and DISH Network Corporation, a Nevada corporation, or its designee or assignee ("Purchaser"). All references herein to Purchaser shall be applicable to Purchaser's designee or assignee.

## RECITALS:

WHEREAS, on September 23, 2010, Sellers filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq*. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, Sellers and Purchaser are parties to that certain Amended and Restated Asset Purchase and Sale Agreement, dated as of April [__], 2011 (the "Purchase Agreement"), pursuant to which, among other things, Sellers shall sell to Purchaser, and Purchaser shall purchase from Sellers, all of Sellers' right, title and interest in and to the Purchased Assets and Purchaser shall assume from Sellers and thereafter pay, discharge and perform the Assumed Liabilities;

WHEREAS, as contemplated by Section 8.8(b) of the Purchase Agreement, Sellers agreed to grant to Purchaser an irrevocable license to occupy and use the Closing Date Leased Properties (the "Designated Stores") during the License Period (as hereinafter defined), and the Parties are entering into this Agreement to provide for the terms and conditions with respect thereto; and

WHEREAS, any capitalized terms used herein and not otherwise defined shall have the meanings given to such terms in the Purchase Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Sellers hereby agree as follows:

Section 1.    Grant of Irrevocable License. Sellers hereby grant to Purchaser an irrevocable license to occupy and use the Designated Stores during the License Period.

Section 2.    Operations For the Account of Purchaser.    All operations conducted at the Designated Stores shall be for the sole account of Purchaser, subject to the obligations of Purchaser with respect to Expenses, and all proceeds thereof shall be the property of Purchaser.

Section 3.    Payment and Performance.    Any and all Expenses (as defined herein) shall be paid by Purchaser directly on behalf of Sellers on an ongoing basis as and when

due and any and all obligations of Sellers required to be performed in connection with the Designated Stores shall performed by Purchaser on behalf of Sellers. Purchaser shall indemnify and hold Sellers harmless from and against all Expenses and such obligations.

Section 4. <u>Expenses</u>. Purchaser shall be responsible for and shall pay directly any and all Expenses incurred or otherwise payable by Sellers in connection with the Designated Stores during the License Period. As used herein, "<u>Expenses</u>" shall mean any direct expenses incurred or otherwise payable by Sellers that arise during the License Period with respect to the operation of any Designated Store, including, without limitation, any Real Estate Occupancy Expenses incurred with respect to any Designated Store. As used herein, "<u>Real Estate Occupancy Expenses</u>" shall mean all applicable rent; common area maintenance; utilities; security; housekeeping; ordinary course maintenance and repairs; fixed general liability insurance, property taxes and all other amounts payable pursuant to any Real Property Lease in respect of a Designated Store to the extent such expenses arise or become payable during the License Period. If for any reason Sellers are required to pay any Expenses in connection with the Designated Stores themselves, Purchaser shall promptly reimburse or, if necessary, advance the necessary funds therefor, to Sellers. For the avoidance of doubt, the intent of this Agreement is that Sellers shall have no costs or obligations with respect to any Designated Store (other than as provided in Section 8.2(c) of the Purchase Agreement) which are not paid or performed by Purchaser with respect to the License Period.

Section 5. <u>License Term</u>.

5.1 <u>Term</u>. Purchaser shall have the right to use and occupy the Designated Stores on the Closing Date (the "<u>Commencement Date</u>") and Purchaser shall vacate each Designated Store's premises in favor of Sellers or their representative or assignee on or before the expiration of the applicable Lease Extension for each Designated Store (the "<u>License Termination Date</u>"). The period from the Commencement Date to the License Termination Date shall be referred to herein as the "<u>License Period</u>"; <u>provided</u>, <u>however</u>, the License Period with respect to any Designated Store may be, on a location by location basis, terminated earlier by Purchaser, in its sole discretion, upon not less than ten (10) Business Days' advance written notice to Sellers of any such proposed accelerated termination date.

5.2 <u>Vacating the Designated Liquidation Stores</u>. Subject to the terms of <u>Section 5.1</u> hereof, Purchaser shall provide Sellers with not less than ten (10) Business Days' advance written notice of its intention to vacate any Designated Store (as to each Designated Store, the "<u>Vacate Date</u>"). On the Vacate Date, (i) Purchaser shall vacate such Designated Store in broom swept condition (which shall include historical store closing costs and signage removal) in favor of Sellers or their representatives or assignee, and (ii) Sellers shall reject the applicable Real Property Lease covering such Designated Store such that the effective date for such rejection is the Vacate Date and take all commercially reasonable actions to mitigate the occupancy Expenses in respect of such Real Property Lease.

Section 6.    Defaults.

(a)    Sellers' or Purchaser's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured ten (10) days after receipt of written notice thereof to the defaulting party shall constitute an "Event of Default" hereunder.

(b)    In the event of an Event of Default, the non-defaulting party may, in its discretion, elect to terminate this Agreement upon two (2) Business Days' written notice to the other party and pursue any and all rights and remedies and damages resulting from such default hereunder.

Section 7.    Miscellaneous.

7.1    Notices.    All notices and other communications under this Agreement shall be in writing and shall be deemed duly given (i) when delivered personally or by prepaid overnight courier, with a record of receipt, (ii) the fourth day after mailing if mailed by certified mail, return receipt requested, or (iii) the day of transmission, if sent by facsimile or telecopy during regular business hours or the Business Day after transmission, if sent after regular business hours (with a copy promptly sent by prepaid overnight courier with record of receipt or by certified mail, return receipt requested), to the parties at the following addresses or facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other parties pursuant to this Section 7.1):

If to Sellers:

Blockbuster Inc.
1201 Elm Street
Dallas, Texas 75270
Phone:  (214) 854-4081
Fax:  (214) 854-4321
Attention:  General Counsel

With a copy to:

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Phone:  214-746-8178
Fax:  214-746-7777
Attention:  D. Gilbert Friedlander
                    Martin A. Sosland

If to Purchaser:

    DISH Network Corporation
    9601 South Meridian Boulevard
    Englewood, CO 80112
    Phone: 888-825-2557
    Fax: 303-723-1699
    Attention: General Counsel

With a copy (which shall not constitute notice) to:

    Linklaters LLP
    1345 Avenue of the Americas
    New York, NY 10105
    Phone:  212-903-9000
    Fax:  212-903-9100
    Attention: Daniel G. Dufner, Jr.

    7.2   <u>Governing Law</u>.  THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, AND ANY CLAIM OR CONTROVERSY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN OR IN CONNECTION WITH THIS AGREEMENT OR AS AN INDUCEMENT TO ENTER INTO THIS AGREEMENT), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED, AND DETERMINED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISION THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION) AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

    7.3   <u>Submission to Jurisdiction</u>.

    (a)   Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes among the parties which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated by this Agreement, and (ii) any and all Actions related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and shall receive notices at such locations as indicated in <u>Section 7.1</u>; <u>provided</u>, <u>however</u>, that if the Bankruptcy Cases have been fully and finally dismissed and the Bankruptcy Court declines jurisdiction, the parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County.

(b)     The parties hereby unconditionally and irrevocably waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any dispute arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement brought in any court specified in subsection (a) above, or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)     Each of the parties hereby consents to process being served by any party in any Action by the mailing of a copy thereof in accordance with the provisions of Section 7.1; provided, however, that such service shall not be effective until the actual receipt thereof by the party being served.

7.4     Waiver of Jury Trial.  THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.4.

7.5     Entire Agreement; Amendments and Waivers.  This Agreement and the Purchase Agreement represent the entire understanding and agreement between the parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

7.6     Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon Purchaser and Sellers, including, but not limited to, any chapter 11 or chapter 7 trustee.  Sellers may not assign this Agreement or any of their obligations hereunder.  Purchaser

may assign its rights and obligations under this Agreement, in whole or in part, to one or more assignees upon written notice to Sellers.

7.7     Parent as Sellers' Agent.  By entering into and executing this Agreement, Sellers irrevocably make, constitute and appoint Parent as their agent, effective as of the date hereof, and authorize and empower Parent to fulfill the role of Sellers' representative hereunder, and each Seller appoints Parent as such Person's true and lawful attorney in fact and agent, for such Person and in such Person's name, place and stead for all purposes necessary or desirable in order for Parent to take all actions contemplated by this Agreement, with the ability to execute and deliver all instruments, certificates and other documents of every kind incident to the foregoing to all intents and purposes and with the same effect as such Seller could do personally, including to give and receive notices and communications; to object to such deliveries, to agree to, negotiate, enter into settlements and compromises of, and comply with orders of courts with respect to such claims; and to take all actions necessary or appropriate in the judgment of Parent for the accomplishment of the foregoing.  The dissolution, liquidation, insolvency or bankruptcy of any Seller shall not terminate the authority and agency of Parent as each Seller's representative pursuant to this Section 7.7.  The power of attorney granted in this Section 7.7 is coupled with an interest and is irrevocable. Purchaser shall be entitled to rely exclusively upon any communication given or other action taken by Parent pursuant to this Agreement, and shall not be liable for any action taken or not taken in good faith reliance on a communication or other instruction from Parent.

7.8     Execution in Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement.  This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

7.9     Section Headings.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

7.10    Termination.  This Agreement shall remain in full force and effect until the first to occur of:  (i) the expiration of the License Period with respect to all Designated Stores or (ii) termination in accordance with Section 6 hereof; provided, in each case, Sellers shall have received reimbursement of all Expenses incurred or payable by Sellers prior to such expiration or termination pursuant to this Agreement.  Notwithstanding the foregoing sentence, this Section 7 shall survive any termination of this Agreement

[The Remainder of this Page Is Intentionally Left Blank.]

IN WITNESS WHEREOF, Purchaser and Sellers hereby execute this Store License Agreement by their duly authorized representatives as of the day and year first written above.

BLOCKBUSTER INC.

By: _____
    Name:
    Title:

BLOCKBUSTER PROCUREMENT LP,

By:  Blockbuster Distribution, Inc.,
     its General Partner

    By: _____
        Name:
        Title:

BLOCKBUSTER DIGITAL TECHNOLOGIES INC.
BLOCKBUSTER DISTRIBUTION, INC.
BLOCKBUSTER GIFT CARD, INC.
BLOCKBUSTER GLOBAL SERVICES INC.
BLOCKBUSTER INTERNATIONAL SPAIN INC.
BLOCKBUSTER INVESTMENTS LLC
MOVIELINK, LLC
TRADING ZONE, INC.
B2 LLC

By: _____
    Name:
    Title:

DISH NETWORK CORPORATION

By: _____
     Name:
     Title:

Exhibit A

**<u>DESIGNATED STORES</u>**

[To Be Attached At Closing]

EXHIBIT B

Bidding Procedures Order

EXHIBIT C

Cash Flow Budget

EXHIBIT D

Protected Stores

EXHIBIT E

Form of Bill of Sale

EXHIBIT F

Form of Assignment Agreement

# **EXHIBIT C**

## **Cumulative Blackline**

**AMENDED AND RESTATED**

**ASSET PURCHASE AND SALE AGREEMENT**

**BY AND AMONG**

**BLOCKBUSTER INC.,**

**THE DEBTOR SUBSIDIARIES PARTY HERETO**,

**AND**

**DISH NETWORK CORPORATION**

**Dated as of April 6,20, 2011**

**TABLE OF CONTENTS**

**Page**

Article I        DEFINITIONS ................................................................ 2
    Section 1.1        Definitions ................................................. 2
    Section 1.2        Terms Defined Elsewhere in this Agreement .................. 15
    Section 1.3        Other Definitional and Interpretative Provisions ........... 17
Article II        PURCHASE AND SALE ......................................... 18
    Section 2.1        Purchase and Sale of Assets ............................... 18
    Section 2.2        Excluded Assets ....................................... 2120
    Section 2.3        Assumption of Liabilities ................................. 21
    Section 2.4        Excluded Liabilities ..................................... 22
    Section 2.5        Assumed Contracts ...................................... 24
    Section 2.6        Further Conveyances and Assumptions. ..................... 25
    Section 2.7        Bulk Sales Laws ......................................... 26
    Section 2.8        Receivables ........................................... 2726
Article III        PURCHASE PRICE ........................................... 2726
    Section 3.1        Purchase Price ......................................... 2726
    Section 3.2        Deposit ............................................. 2726
    Section 3.3        Payment of Purchase Price. ................................ 27
    Section 3.4        Purchase Price Adjustment. ............................... 2928
    Section 3.5        Allocation of Purchase Price ............................. 3130
Article IV        CLOSING AND TERMINATION ............................... 3231
    Section 4.1        Closing Date .......................................... 3231
    Section 4.2        Deliveries by Sellers .................................... 3231
    Section 4.3        Deliveries by Purchaser .................................. 3332
    Section 4.4        Termination of Agreement ................................. 3332
    Section 4.5        Effect of Termination. .................................... 3534
Article V        REPRESENTATIONS AND WARRANTIES OF SELLERS ....... 3534
    Section 5.1        Organization and Good Standing ........................... 3534
    Section 5.2        Ownership of Non-Debtor Subsidiaries. ..................... 35
    Section 5.3        Authorization of Agreement ............................... 3635
    Section 5.4        No Violation; Consents. .................................. 36
    Section 5.5        Financial Information. .................................... 3736
    Section 5.6        No Undisclosed Liabilities ................................ 3837

| | | |
|---|---|---|
| Section 5.7 | Title to Purchased Assets | ~~38~~37 |
| Section 5.8 | Taxes | ~~38~~37 |
| Section 5.9 | Real Property. | ~~39~~38 |
| Section 5.10 | Tangible Personal Property; Capital Leases. | ~~40~~39 |
| Section 5.11 | Intellectual Property. | ~~41~~40 |
| Section 5.12 | Material Contracts. | ~~42~~41 |
| Section 5.13 | Employee Benefits. | 43 |
| Section 5.14 | Labor. | ~~45~~44 |
| Section 5.15 | Litigation | ~~45~~44 |
| Section 5.16 | Compliance with Laws; Permits. | ~~45~~44 |
| Section 5.17 | Environmental Matters. | ~~46~~45 |
| Section 5.18 | Accounts and Notes Receivable and Payable | ~~46~~45 |
| Section 5.19 | Insurance. | ~~47~~46 |
| Section 5.20 | Financial Advisors | ~~47~~46 |
| Section 5.21 | No Other Representations or Warranties; Schedules | ~~47~~46 |
| Article VI | REPRESENTATIONS AND WARRANTIES OF PURCHASER | ~~47~~46 |
| Section 6.1 | Organization and Good Standing | ~~47~~46 |
| Section 6.2 | Authorization of Agreement | ~~47~~46 |
| Section 6.3 | No Violation; Consents | ~~48~~47 |
| Section 6.4 | Litigation | ~~48~~47 |
| Section 6.5 | Investment Intention. | ~~48~~47 |
| Section 6.6 | Financial Capability | ~~49~~48 |
| Section 6.7 | Bankruptcy. | ~~49~~48 |
| Section 6.8 | Financial Advisors | ~~49~~48 |
| Section 6.9 | Condition of the Business. | ~~49~~48 |
| Article VII | BANKRUPTCY COURT MATTERS | ~~49~~48 |
| Section 7.1 | Competing Transaction. | ~~49~~48 |
| Section 7.2 | Bankruptcy Court Filings | ~~50~~49 |
| Article VIII | COVENANTS | ~~51~~50 |
| Section 8.1 | Access to Information | ~~51~~50 |
| Section 8.2 | Conduct of the Business Pending the Closing. | ~~51~~50 |

Section 8.3    Consents ....................................................................................... ~~55~~54

Section 8.4    Appropriate Action; Filings........................................................... ~~55~~54

Section 8.5    Confidentiality .............................................................................. ~~57~~56

Section 8.6    Preservation of Records; Cooperation ......................................... ~~57~~56

Section 8.7    Publicity........................................................................................ ~~58~~57

Section 8.8    Lease Extensions; Store Liquidations. ......................................... ~~58~~57

Section 8.9    ~~Transition Services Agreement......................59~~Intentionally Omitted. 58

Section 8.10   Banks ............................................................................................ ~~59~~58

Section 8.11   Supplements to Schedules ............................................................ ~~59~~58

Section 8.12   Further Assurances........................................................................ ~~59~~58

Section 8.13   Payment of Sales Tax Amounts.................................................... ~~59~~58

Section 8.14   Use of Name ................................................................................. ~~60~~58

Section 8.15   Notice of Breach of Studio Condition .......................................... ~~60~~59

Article IX     EMPLOYEE AND EMPLOYEE BENEFITS MATTERS; TAX
               MATTERS .................................................................................... ~~60~~59

Section 9.1    Employment.................................................................................. ~~60~~59

Section 9.2    Employee Benefits ....................................................................... ~~61~~60

Section 9.3    Tax Matters................................................................................... ~~61~~60

Article X      CONDITIONS TO CLOSING........................................................ ~~63~~62

Section 10.1   Conditions Precedent to Obligations of Purchaser ...................... ~~63~~62

Section 10.2   Conditions Precedent to Obligations of Sellers........................... ~~65~~64

Section 10.3   Conditions Precedent to Obligations of Purchaser and Sellers ..... ~~65~~64

Section 10.4   Frustration of Closing Conditions................................................ ~~66~~65

Article XI     LIMITATIONS .............................................................................. ~~66~~65

Section 11.1   Purchaser's Review ...................................................................... ~~66~~65

Section 11.2   No Consequential or Punitive Damages....................................... ~~67~~65

Article XII    MISCELLANEOUS ...................................................................... ~~67~~66

Section 12.1   Survival of Representations, Warranties, Covenants and
               Agreements................................................................................... ~~67~~66

Section 12.2   Remedies. ..................................................................................... ~~67~~66

Section 12.3    Expenses ................................................................. ~~68~~67

Section 12.4    Non-Recourse ......................................................... ~~68~~67

Section 12.5    Submission to Jurisdiction ...................................... ~~68~~67

Section 12.6    Waiver of Jury Trial ............................................... ~~69~~67

Section 12.7    Authorization of Parent as Representative of Sellers .................... ~~69~~68

Section 12.8    Time of Essence ...................................................... ~~69~~68

Section 12.9    Entire Agreement; Amendments and Waivers ........................... ~~69~~68

Section 12.10    Governing Law ...................................................... ~~70~~69

Section 12.11    Notices ................................................................ ~~70~~69

Section 12.12    Severability .......................................................... ~~71~~70

Section 12.13    No Right of Set-Off ................................................ ~~71~~70

Section 12.14    Binding Effect; Assignment ...................................... ~~72~~70

Section 12.15    Counterparts ......................................................... ~~72~~71

Exhibits

Exhibit A – Form of ~~Agency and~~Store License Agreement
Exhibit B – Bidding Procedures Order
Exhibit C – Cash Flow Budget
Exhibit D – Protected Stores
Exhibit E – Form of Bill of Sale
Exhibit F – Form of Assignment Agreement

Schedules

Schedule 1.1(a)          Inventory Amount Methodology
Schedule 1.1(b)          Frozen Studio Balances
Schedule 1.1(c)          Initial Liquidating Stores
Schedule 1.1(d)          Non-Debtor Subsidiaries
Schedule 1.1(e)          Purchaser Assumed Contracts
Schedule 5.2(a)          Ownership of Non-Debtor Subsidiaries
Schedule 5.2(d)          Other Ownership Interests
Schedule 5.4(a)          No Violation
Schedule 5.4(b)          Consents
Schedule 5.7             Title to Purchased Assets
Schedule 5.8             Taxes
Schedule 5.9(a)          Owned Property
Schedule 5.9(b)          Real Property Leases
Schedule 5.9(d)          Rights to Occupancy
Schedule 5.10(a)         Personal Property Leases
Schedule 5.10(b)         Capital Leases
Schedule 5.11(a)         Intellectual Property Registrations
Schedule 5.11(b)         Intellectual Property Licenses
Schedule 5.11(c)         Intellectual Property
Schedule 5.12(a)         Material Contracts
Schedule 5.13(a)         Employee Benefit Plans
Schedule 5.13(c)         Qualified Plans
Schedule 5.13(d)         Non-Debtor Benefit Plan Compliance
Schedule 5.13(e)         Non-Debtor Benefit Plan Proceedings
Schedule 5.14(a)         Labor Agreements
Schedule 5.14(b)         Work Stoppages
Schedule 5.15            Litigation
Schedule 5.16            Compliance with Laws
Schedule 5.17(a)         Environmental Matters
Schedule 5.19            Insurance
Schedule 5.20            Sellers' Financial Advisors
Schedule 6.8             Purchaser's Financial Advisors
Schedule 8.2(a)          Conduct of Business Pending Closing
Schedule 8.2(b)          Conduct of Business Pending Closing
Schedule 8.8(a)          Prior Store Liquidations
Schedule 10.1(d)         Store Liquidations

**AMENDED AND RESTATED ASSET PURCHASE AND SALE AGREEMENT**

THIS AMENDED AND RESTATED ASSET PURCHASE AND SALE AGREEMENT, dated as of April 6,20, 2011 (this "Agreement"), is made and entered into by and among Blockbuster Inc., a Delaware corporation ("Parent"), each of the Debtor Subsidiaries (as defined herein, and together with Parent, "Sellers", and individually a "Seller") and DISH Network Corporation, a Nevada corporation ("Purchaser"). Sellers and Purchaser are sometimes herein referred to collectively as the "Parties" and individually as a "Party."

W I T N E S S E T H:

WHEREAS, Sellers and their Subsidiaries are global providers of rental and retail media entertainment, including movie, game and other related entertainment products delivered through one or more distribution channels (such business and all other business conducted by any Seller or any of its Subsidiaries, the "Business");

WHEREAS, on September 23, 2010, Sellers filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, on February 21, 2011, Sellers entered into the Asset Purchase and Sale Agreement (as amended from time to time, the "Cobalt Agreement") with Cobalt Video Holdco LLC, a Delaware limited liability company ("Cobalt"), pursuant to which Sellers agreed to sell to Cobalt substantially all of Sellers' assets as more fully described in the Cobalt Agreement, subject to approval of the Bankruptcy Court and to higher or better offers;

WHEREAS, on March 17, 2011, the Bankruptcy Court issued the Bidding Procedures Order (as defined herein) setting forth bidding procedures in connection with the sale of Sellers' assets;

WHEREAS, on April 6, 2011, the Parties entered into that certain Asset Purchase and Sale Agreement (the "April 6th APA");

WHEREAS, the Bankruptcy Court approved the April 6th APA and the transactions contemplated thereunder on April 7, 2011 and entered the Sale Order on April 14, 2011;

WHEREAS, on the terms and subject to the conditions hereinafter set forth and pursuant to the Sale Order (as defined herein), the Parties desire to enter into this Agreement pursuant to which, among other things, (i) the Parties shall amend and restate the April 6th APA and (ii) Sellers shall sell to Purchaser, and Purchaser shall purchase from Sellers, all of Sellers' right, title and interest in and to the Purchased Assets (as defined herein) and Purchaser shall assume from Sellers and thereafter pay, discharge and perform the Assumed Liabilities (as defined herein); and

WHEREAS, Sellers believe, following consultation with their advisors and reasonable due diligence, that, in light of the current circumstances, a sale of the Purchased Assets as described

herein to Purchaser instead of Cobalt is necessary to maximize value and is in the best interest of Sellers, their creditors and other stakeholders.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, representations, warranties and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.  For the purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"Action" means any action, suit, arbitration, claim, inquiry, proceeding or investigation by or before any Governmental Authority of any nature, civil, criminal, regulatory or otherwise, in law or in equity.

"Ad Hoc Studio Committee" shall have the meaning specified in the Bidding Procedures Order.

"Affiliate" (and, with a correlative meaning "affiliated") means, with respect to any Person, any direct or indirect subsidiary of such Person, and any other Person that directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such first Person.  As used in this definition, "control" (including with correlative meanings, "controlled by" and "under common control with") means possession, directly or indirectly, of power to direct or cause the direction of the management or policies (whether through ownership of securities or partnership or other ownership interests, by Contract or otherwise).

"Agency and License Agreement" means the Agency and License Agreement to be entered into between Purchaser and Sellers substantially in the form attached as Exhibit A hereto.

"Applicable Law" means, with respect to any Person, any Law applicable to such Person or its business, properties, assets or Liabilities.

"Approved Sale Expenses" means Sellers' reasonable good faith estimate of the costs and expenses of Sellers in connection with the sale and liquidation of any of the Purchased Assets, which shall be provided in writing by Sellers to Purchaser not later than the earlier to occur of (i) the Auction and (ii) five (5) Business Days prior to the Sale Hearing, and which estimate shall be reasonably acceptable to Purchaser.

"Assumption Deadline" means (i) with respect to any Leased Property for which a Lease Extension has been received, the expiration of such Lease Extension, and (ii) with respect to any executory Contract that has not been designated as a Purchaser Assumed Contract, ninety (90) days following the Closing Date.

"Auction" shall have the meaning specified in the Bidding Procedures Order.

"Bankruptcy Cases" means the chapter 11 cases commenced by Sellers on September 23, 2010, jointly administered under Case No. 10-14997 (BRL).

"Beginning Inventory Amount" means an amount equal to $635,848,496.66, the reference value of the December 31, 2010 inventory count provided by Sellers to Purchaser, based on the methodology, inventory type and gross value per unit prices set forth in Schedule 1.1(a).

"Bidding Procedures Order" means the Order of the Bankruptcy Court, attached hereto as Exhibit B.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Law to close.  Any event the scheduled occurrence of which would fall on a day that is not a Business Day shall be deferred until the next succeeding Business Day.

"Business Intellectual Property" means all (i) Purchased Intellectual Property and (ii) other Intellectual Property used by any Seller or any of its Subsidiaries.

"Canadian Collateral Obligees" means Twentieth Century Fox Home Entertainment LLC, Sony Pictures Home Entertainment Inc. and Warner Home Video, a division of Warner Bros. Home Entertainment.

"Cash Flow Budget" means the Sale Budget (defined in the Bidding Procedures Order), current as of the date hereof and attached hereto as Exhibit C, and, to the extent approved by Purchaser, any other budget subsequently adopted by Sellers and the Requisite DIP Lenders (as defined in the DIP Credit Agreement) in connection with the DIP Credit Agreement, any refinancing thereof, or any other debtor-in-possession financing entered into by Sellers, in each case.

"Closing Cash Amount" means the amount of all cash, cash equivalents and freely marketable securities held by Sellers as of 11:59 p.m. (prevailing eastern time) on the day immediately preceding the Closing Date, less the amounts of any unpaid checks, drafts and wire transfers issued by Sellers on or prior the Closing Date, calculated in accordance with GAAP applied on a basis consistent with the preparation of the Balance Sheet, plus the Sales Tax Amount.

"Closing Inventory Amount" means the value of the inventory held by Sellers as of 11:59 p.m. (prevailing eastern time) on the day immediately preceding the Closing Date, calculated in accordance with the methodologies, inventory type and gross value per unit prices set forth on Schedule 1.1(a); provided, that inventory which has been paid for in full prior to such time but which is in transit from the supplier to the Stores or the Distribution Centers pursuant to customary shipping arrangements in the Ordinary Course of Business shall be included in such Closing Inventory Amount to the extent such inventory is actually received within twelve (12) Business Days of the Closing Date.

"COBRA" means the Consolidated Omnibus Reconciliation Act of 1985, as amended.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competition Laws" means the HSR Act and all other Laws that are designed or intended to prohibit, restrict or regulate (i) actions having the purpose or effect of monopolization or restraint of trade or lessening of competition or (ii) foreign investment.

"Contract" means any contract, indenture, note, bond, loan, instrument, lease, license, purchase order, commitment or other agreement, and any amendment or modification thereto, whether written or oral.

"Cure Costs" means amounts that must be paid and obligations that otherwise must be satisfied, including pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of any Purchaser Assumed Contract as determined pursuant to the Sale Order.

"Debtor" has the meaning given to such term in the Sale Motion.

"Debtor Benefit Plans" means the Employee Benefit Plans other than the Non-Debtor Benefit Plans.

"Debtor Subsidiaries" means Blockbuster Global Services Inc., Blockbuster Investments LLC, Blockbuster Video Italy, Inc., Blockbuster Distribution, Inc., Blockbuster Procurement LP, Blockbuster Canada Inc., Blockbuster International Spain Inc., Blockbuster Digital Technologies Inc., Movielink, LLC, Blockbuster Gift Card Inc., Trading Zone Inc., and B2 LLC.

"Designated FF&E" means all furniture, fixtures, furnishings, leasehold improvements, equipment and other tangible personal property ~~owned by Sellers and~~ located at the Closing Date Leased Properties.

"Designated Liquidation Merchandise" means all movie, television program, game and cell phone inventory, merchandise, memorabilia, supplies, food and beverage items and other finished goods inventory ~~owned by Sellers on the Closing Date and~~ located at, or in transit to, the Closing Date Leased Properties ~~on the Closing Date~~.

"DIP Credit Agreement" means that certain Senior Secured, Super-Priority Debtor-In-Possession Revolving Credit Agreement, dated as of September 23, 2010, among Sellers, the lenders signatory thereto and Wilmington Trust FSB, as agent.

"Distribution Centers" means (i) all of Sellers' distribution centers located throughout the United States to support Sellers' by-mail subscription business and (ii) Sellers' 850,000 square foot distribution center located in McKinney, Texas.

"Documents" means all files, documents, instruments, papers, books, reports, manuals, records, tapes, microfilms, hard drives, databases, compilations of information, photographs, letters, budgets, accounts, forecasts, ledgers, journals, title policies, customer and supplier lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (including sales brochures, flyers, pamphlets, web pages,

etc.), and other similar materials related to the Business and the Purchased Assets in each case whether or not in electronic form.

"Employee" means any employee of any Seller who performs work primarily related to the operation of the Business.

"Employee Benefit Plans" means all employment or individual compensation agreements, and all other plans, programs, funds, policies, contracts, agreements, payroll practices, arrangements or understandings (whether written or unwritten) providing any bonus, incentive, retention, equity or equity-based compensation, deferred compensation, stock purchase, severance pay, sick leave, vacation pay, salary continuation, disability, welfare benefit, pension benefit, retirement, profit sharing, life insurance, medical insurance, hospitalization, dental, vision, insurance, fringe benefits, educational assistance, relocation, expatriate, tax gross up, change in control, retention or other employee benefit, in each case as to which Sellers or any of their Subsidiaries has or may have any Liability or obligation with respect to any current or former officers, employees or directors (or their respective dependents) of any Sellers or any of their Subsidiaries, including any "employee benefit plan" as defined in Section 3(3) of ERISA.

"Environmental Law" means all Applicable Laws in effect on the date hereof relating to the environment, natural resources, health and safety or the protection thereof, including but not limited to any applicable provisions of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq*., the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq*., the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq*., the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, the Clean Air Act, 42 U.S.C. § 7401 *et seq*., the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq*., the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 *et seq*., the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq*., and the Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq*., and the regulations promulgated pursuant thereto, and all analogous state or local statutes.

"Environmental Liabilities and Obligations" means all Liabilities arising from any impairment or damage to the environment or failure to comply with Environmental Laws in connection with the prior or ongoing ownership or operation of the Business, including Liabilities related to: (i) the transportation, storage, use, arrangement for disposal or disposal of Hazardous Materials or waste; (ii) the Release of Hazardous Materials or waste; (iii) any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments; (iv) any other obligations imposed under Environmental Laws with respect to the Business; and (v) all obligations with respect to personal injury, property damage, wrongful death and other damages and losses arising under Applicable Law as a result of any of the matters identified in clauses (i) – (iv) of this definition.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Estimated Cash Adjustment Amount" means (i) if the Target Cash Amount exceeds the Estimated Cash Amount, the amount of such excess, which shall reduce the Closing Date Payment by such amount, or (ii) if the Estimated Cash Amount exceeds the Target Cash Amount, the amount of such excess, which shall increase the Closing Date Payment by such amount.

"Estimated Inventory Adjustment Amount" means (i) if the Beginning Inventory Amount exceeds the sum of the Estimated Inventory Amount *plus* the Inventory Liquidation Expenses, the amount of such excess, which shall reduce the Closing Date Payment by such amount, or (ii) if the sum of the Estimated Inventory Amount *plus* the Inventory Liquidation Expenses exceeds the Beginning Inventory Amount, the amount of such excess, which shall increase the Closing Date Payment by such amount.

"Estimated Wind Down Expenses" means Sellers' reasonable good faith estimate of the out of pocket costs and expenses that Sellers expect to incur in connection with winding down their bankruptcy estates, which estimate shall include a reasonably detailed breakdown of such costs and expenses by category and shall be provided in writing by Sellers to Purchaser not later than the earlier to occur of (i) the Auction and (ii) five (5) Business Days prior to the Sale Hearing, and which estimate shall be reasonably acceptable to Purchaser.

"Frozen Studio Balance" means, with respect to any Specified Studio, an amount equal to the amount set forth opposite such Specified Studio's name in Schedule 1.1(b).

"GAAP" means United States generally accepted accounting principles as in effect and consistently applied during the time period of the relevant financial statement.

"Governmental Authority" means any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to United States or foreign federal, state, provincial or local government, any governmental authority, agency, department, board, commission or instrumentality or any political subdivision or regulatory authority thereof, and any US or foreign federal, state, provincial or local tribunal or court or arbitrator(s) of competent jurisdiction, and shall include the Bankruptcy Court.

"Hazardous Materials" means all substances, in any amount of concentration, listed, classified, regulated or defined as "hazardous substances," "hazardous wastes," "hazardous materials," "radioactive," "pollutants," "toxic wastes," "toxic substances" or "contaminants" or otherwise regulated under Environmental Laws or with respect to which liability or standards of conduct are imposed under Environmental Laws.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Indebtedness" of any Person means, without duplication, (i) the principal of and premium, interest, fees, penalties and other expenses (if any) in respect of (A) indebtedness of such Person for money borrowed whether secured or unsecured and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases which shall have been or are required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of

any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations, "keep well" agreements, agreements to maintain or contribute cash or capital to any Person or other similar agreements or arrangements; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Initial Liquidating Stores" means those Stores identified by Sellers in Schedule 1.1(c) that commenced in-store liquidation or going out of business sales on or before the date hereof.

"Intellectual Property" means all worldwide intellectual property and rights, title and interest arising from or in respect of the following: all (i) inventions, discoveries, industrial designs, business methods, patents and patent applications (including provisional and Patent Cooperation Treaty applications), including continuations, divisionals, continuations-in-part, reexaminations and reissues, extensions, renewals and any patents that may be issued with respect to the foregoing; (ii) trademarks, service marks, certification marks, collective marks, trade names, business names, assumed names, d/b/a's, fictitious names, brand names, trade dress, logos, symbols, Internet domain names and corporate names, and general intangibles of a like nature and other indicia of origin or quality, whether registered, unregistered or arising by Law, and all applications, registrations, and renewals for any of the foregoing, together with the goodwill associated with and symbolized by each of the foregoing; (iii) published and unpublished works of authorship in any medium, whether copyrightable or not (including databases and other compilations of information, computer software, source code, object code, algorithms, and other similar materials and Internet website content), copyrights and moral rights therein and thereto, and registrations and applications therefor, and all issuances, renewals, extensions, restorations and reversions thereof; and (iv) confidential and proprietary information, trade secrets, and know-how, including methods, processes, business plans, strategy, marketing data, marketing studies, advertisements, schematics, concepts, software and databases (including source code, object code and algorithms), formulae, drawings, prototypes, models, designs, devices, technology, research and development and customer information and lists (collectively, "Trade Secrets").

"Intellectual Property Licenses" means (i) any Contract that contains any grant by any Seller or any of its Subsidiaries to any third Person of any right to use, publish, perform or exploit any of the Business Intellectual Property, and (ii) any Contract that contains any grant by any third Person to any Seller or any of its Subsidiaries of any right to use, publish, perform or exploit any Intellectual Property of such third Person concerning or relating to the Business Intellectual Property.

"Inventory Liquidation Expenses" means the sum of (a) an amount equal to $900,000 for lease return conditions actually paid by Sellers with respect to Stores for which liquidations commenced after January 1, 2011 and which expenses were incurred and paid during the period beginning January 1, 2011 through the date of the Cobalt Agreement, *plus* (b) the product of (i) the aggregate number of Stores that commence and substantially complete liquidation or going out of business sales during the period from January 1, 2011 until the Closing Date, *multiplied by* (ii) $36,500.

"IRS" means the United States Internal Revenue Service.

"Law" means any United States or foreign, federal, state, provincial or local law (including common law), statute, code, ordinance, rule, regulation or other requirement enacted, promulgated, issued or entered by a Governmental Authority.

"Lease Extension" means, with respect to any Leased Property, a writing pursuant to which Sellers' counterparty to the lease for such Leased Property has affirmatively agreed to an extension of not less than sixty (60) days of the April 21, 2011 deadline for Sellers' assumption or rejection of such unexpired real property leases under section 365 of the Bankruptcy Code.

"Leased Properties" means, collectively, each unexpired real property lease to which any Seller is a party (other than the Initial Liquidating Stores).

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Authority.

"Liabilities" means any and all debts, losses, liabilities, claims (including claims as defined in the Bankruptcy Code), damages, expenses, fines, costs, royalties, proceedings, deficiencies or obligations (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, disclosed or undisclosed, matured or unmatured, determined or undeterminable, on or off-balance sheet, fixed, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, or otherwise and whether due or to become due, and whether in contract, tort, strict liability or otherwise, and whether or not resulting from third party claims, and any reasonable out-of-pocket costs and expenses in connection therewith (including reasonable legal counsels', accountants', or other fees and expenses incurred in defending any action or in investigating any of the same or in asserting any rights thereunder or hereunder).

"Lien" means any lien (statutory or other), pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, right of first offer, easement, servitude, transfer restriction under any shareholder or similar agreement or encumbrance or any other restriction or limitation whatsoever.

"Liquidation Period" means with respect to any Leased Property for which a Lease Extension has been received, the period from the Closing Date until the expiration of such Lease Extension (which period shall not be less than sixty (60) days).

"Non-Debtor Benefit Plans" means the Employee Benefit Plans (excluding any governmental plan or arrangement) as to which any Non-Debtor Subsidiary (or any of their Subsidiaries) has any Liability arising from or relating to any current or former employee or director of any Non-Debtor Subsidiary (or any of their Subsidiaries) and (i) has been established under the laws of a jurisdiction other than the United States or any state or other jurisdiction thereof, and (ii) exclusively covers current and former employees or directors of the Non-Debtor Subsidiaries (or any of their Subsidiaries).

"Non-Debtor Subsidiaries" means the foreign subsidiaries of Sellers that are listed on Schedule 1.1(d), provided that Purchaser, in its sole discretion, at any time and from time to time prior to

the Closing, shall be entitled to modify such schedule to (i) remove any one or more of the subsidiaries of Sellers listed thereon and/or (ii) add any one or more of the Subsidiaries of Sellers that are not Debtors. For the avoidance of doubt, the representations and warranties set forth in Article V with respect to the Non-Debtor Subsidiaries are being made by Sellers solely with respect to the Non-Debtor Subsidiaries that are listed on Schedule 1.1(e) as of the date hereof.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award, whether temporary, preliminary or permanent.

"Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business through the date hereof consistent with past practice during the one month period prior to the date of the Cobalt Agreement, and without regard to store closures and liquidations.

"Permits" means any approvals, authorizations, consents, notices, registrations, Orders, variances, licenses, franchises, permits or certificates.

"Permitted Liens" means:

(a)     with respect to any real property and to the extent that they do not materially interfere with the ownership, occupancy, use or operation of, or materially detract from the value of, the affected Owned Properties or Real Property Leases in the manner and for the purposes heretofore used by Sellers and their Subsidiaries in connection with the Business, easements, restrictive covenants, and rights-of-way on, over or in respect of any Owned Property or Real Property Lease, servitudes, permits, surface leases and other rights with respect to surface operations;

(b)     all rights reserved to or vested in any Governmental Authority to control or regulate the Purchased Assets and all obligations and duties under all Applicable Laws or under any permit issued by any Governmental Authority;

(c)     statutory Liens for Taxes not yet delinquent or the amount or validity of which is being contested in good faith through appropriate proceedings;

(d)     prior to the entry of the Sale Order, any Lien that pursuant to section 363(f) of the Bankruptcy Code will be released from the Purchased Assets upon entry of the Sale Order; and

(e)     prior to Closing, other Liens that will be released on or prior to Closing at no cost or expense to Purchaser.

"Person" means and includes natural persons, corporations, limited partnerships, limited liability companies, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and all Governmental Authorities.

"Post-Closing Studio Condition" means, with respect to any Specified Studio that is engaged in the distribution of packaged and digital audio-visual media, that at all times from the Closing Date until the date of determination, such Specified Studio shall (i) ship to Purchaser and Purchaser's domestic and international subsidiaries, as the case may be, in such quantities as

requested in the ordinary course of business, on a "cash in advance" basis at such Specified Studio's standard wholesale price (or better terms in such Specified Studio's sole and absolute discretion) and support Purchaser's digital business by continuing to offer video on demand and electronic sell through services on the same terms and conditions as is currently provided by such Specified Studio, or in accordance with the terms and conditions of current agreements, at the sole election of such Specified Studio, subject to overall market trends and/or window shifts during the ninety (90) day period following the Closing and (ii) meet with Purchaser during the ninety (90) day period following the Closing to discuss future content deals and consider any Purchaser proposals or other communications; <u>provided</u> that any credit decisions shall remain in the sole discretion of such Specified Studio.

"<u>Pre-Closing Tax Period</u>" means any Tax period (or the portion thereof) ending on or before the Closing Date.

"<u>Protected Stores</u>" means the retail store locations set forth on the list attached hereto as <u>Exhibit D</u>.

"<u>Purchased Intellectual Property</u>" means all Intellectual Property owned by any Seller or any Debtor Subsidiary.

"<u>Purchaser Assumed Contracts</u>" means, to the extent assignable pursuant to section 365 of the Bankruptcy Code, all Contracts set forth on <u>Schedule 1.1(e)</u> (as <u>such schedule</u> may be modified ~~prior to the Closing pursuant to <u>Section 2.5</u>), which Schedule Purchaser shall deliver in writing to Sellers not less than two (2) Business Days prior to Closing and which shall not be amended or supplemented thereafter (except as provided in~~ pursuant to <u>Section 2.5</u>). For the avoidance of doubt, Purchaser shall have the right to remove Contracts from <u>Schedule 1.1(e)</u> at any time and from time to time in accordance with <u>Section 2.5(d)</u>.

"<u>Purchaser Material Adverse Effect</u>" means any change, circumstance, fact, condition or event that individually or in the aggregate with any other change, circumstance, fact, condition or event, would or would reasonably be expected to materially delay or impair the ability of Purchaser to perform its material obligations under this Agreement.

"<u>Reimbursable Expenses</u>" means the reasonable and documented out-of-pocket fees and expenses (including the fees and expenses of Milbank, Tweed, Hadley & McCloy LLP and Kramer Levin Naftalis & Frankel LLP as counsel, Houlihan Lokey Howard & Zukin Capital, Inc. as financial advisor and Zolfo Cooper, LLC) incurred by Cobalt and each of Monarch Alternative Capital LP, Owl Creek Asset Management LP, Stonehill Capital Management, LLC and Värde Partners, Inc. (or on its or their behalf) in connection with its bid, in an aggregate amount not to exceed $5,000,000.

"<u>Release</u>" means any actual or threatened release, spill, emission, discharge, migration, leaking, pumping, injection, deposit or disposal of Hazardous Materials into, onto or through the environment or within any building, structure, facility or fixture.

"<u>Remedial Action</u>" means any investigation, response, corrective action, monitoring, remedial or other action required under any Environmental Law or by a Governmental Authority to address a Release or threatened Release of Hazardous Materials.

"Representatives" of a Person means its officers, directors, managers, employees, attorneys, investment bankers, accountants and other agents and representatives.

"Revenue Share Adjustment Amount" means, in the event that any of the Purchased Assets that are acquired by Purchaser remain subject to any liabilities or obligations under the Revenue Sharing Agreements, an amount equal to the aggregate estimated amount of all liabilities and obligations under the Revenue Sharing Agreements to which the Purchased Assets will be subject and which Purchaser will be required to satisfy following the Closing, with such amount to be determined by the good faith estimate of Sellers which estimate shall include a reasonably detailed breakdown of such liabilities or obligations by category, and which shall be delivered in writing to Purchaser not less than two (2) Business Days prior to the Closing Date.  In the event that Sellers' counterparties under the Revenue Sharing Agreements have asserted ownership rights to, or other restrictions on, sales of any portion of the inventory and merchandise located at the Stores and Distribution Centers subject to such Revenue Sharing Agreements at Closing (the "Rev Share Units"), Sellers shall give prompt written notice to Purchaser with respect to any such assertions of ownership or other restrictions with respect to any Rev Share Units.  Not later than five (5) Business Days prior to the Closing, Sellers and Purchaser shall mutually agree as to whether, in the event that any Rev Share Units cannot be acquired by the Purchaser free and clear of the liabilities and obligations under the Revenue Sharing Agreements, all or any portion of such Rev Share Units shall be (i) ~~liquidated in connection with Purchaser's Agency Alternative election, (ii)~~ retained by Sellers and treated as Excluded Assets or (~~iii~~ii) transferred to Purchaser as Purchased Assets with the corresponding adjustment to the Purchase Price for the Revenue Share Adjustment Amount; provided, however, in the event that Sellers and Purchaser cannot reach agreement on the treatment of the Rev Share Units, the Rev Share Units shall be retained by Sellers and treated as Excluded Assets.  For the avoidance of doubt, if any Rev Share Units are retained by Sellers and treated as Excluded Assets, then, with respect to such Rev Share Units, (i) no adjustment to the Cash Purchase Price shall be made pursuant to Section 3.3(b)(vi), and (ii) in lieu of such adjustment to the Cash Purchase Price, such Rev Share Units shall be disregarded and shall not be taken into account in computing the Estimated Inventory Amount, the Closing Inventory Amount or the Final Inventory Amount for purposes of Sections 3.3 and 3.4.  Notwithstanding the foregoing, Sellers shall not be required to give any notice with respect to, and Purchaser may not treat as Excluded Assets under this provision, any Rev Share Units of any Specified Studio that are being delivered free and clear of all liabilities and obligations under the Revenue Sharing Agreements pursuant to the Sale Order.

"Revenue Sharing Agreements" means, collectively, the "revenue sharing" agreements between Sellers and certain studios, including, but not limited to each of the Specified Studios and Lions Gate Films Inc., pursuant to which such studios supply Sellers with movie titles for a price that includes a certain percentage of the revenue Sellers generate from the rental and/or sale of such titles.

"Roll-Up Notes" has the meaning given to such term in the DIP Credit Agreement.

"Sale Hearing" shall have the meaning given to such term in the Bidding Procedures Order.

"Sale Motion" shall mean the motion filed by Sellers with the Bankruptcy Court on February 21, 2011, seeking entry of the Sale Order and the Bidding Procedures Order, which shall not be

amended, supplemented or modified except with Purchaser's prior written consent to the extent such amendments, supplements or modifications are adverse to Purchaser.

"Sale Order" means ~~an~~(a) that certain Order Pursuant to 11 U.S.C. §§ 105(a), 363, and 365 and Fed. R. Bankr. P. 2002, 6004, 6006 and 9014 Authorizing and Approving (A) the Sale of Debtors' Assets Free and Clear of Interests and (B) Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Lease to the Purchaser entered by the Bankruptcy Court on April 14, 2011, and (b) any further order or orders of the Bankruptcy Court issued pursuant to sections 105, 363 and 365 of the Bankruptcy Code, in form and substance acceptable to Purchaser, approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Sellers to consummate the Transactions and enter into the Transaction Documents. Without limiting the generality of the foregoing, such order shall specifically include, among other things, provisions ordering that in the event that any of the Bankruptcy Cases are converted to cases under chapter 7 of the Bankruptcy Code, the Sale Order and~~, if applicable, the Agency and License Agreement,~~ the Transaction Documents shall be binding on the chapter 7 trustee in such chapter 7 cases.

"Sales Tax Amount" means the lesser of (x) the amount of the Closing Sales Tax Payment paid as of the close of business on the day immediately preceding the Closing Date pursuant to Section 8.13 and (y) $8,000,000.

"Seller Material Adverse Effect" means any change, circumstance, fact, condition or event that, individually or in the aggregate with any other change, circumstance, fact, condition or event, (a) is or would reasonably be expected to have a materially adverse effect on (i) the Business, financial condition, results of operations, properties, assets or Liabilities of Sellers and their Subsidiaries (taken as a whole) as the same shall have existed as of the date of the Cobalt Agreement, or (ii) the ability of Sellers to perform their respective obligations under this Agreement, or (b) prevents or materially delays the consummation of the Transactions, in each case other than an Excluded Matter which shall not be taken into account in determining whether there has been or would reasonably be expected to be a Seller Material Adverse Effect. "Excluded Matter" means any adverse change, circumstance, fact, condition or event resulting from one or more of the following: (i) the condition of the economy or the securities markets in general, or any outbreak of hostilities, terrorist activities or war; (ii) except for purposes of Section 5.4 and with respect to Section 10.1(a) to the extent related to the accuracy of Section 5.4, the announcements, pendency or consummation of the sale of the Purchased Assets or any other action by Purchaser or its Affiliates contemplated or required hereunder including the Store Closing Liquidations and the inability of Sellers to pay any administrative expense claims in the Bankruptcy Cases and any Action taken by any Person as a result thereof, if, in each case in this clause (ii), the result thereof would not reasonably be expected to prevent the Business from operating substantially in the Ordinary Course of Business; (iii) any changes in general economic, political or regulatory conditions; (iv) the impact on the Business or assets of any Seller or any of their Subsidiaries as a result of the termination of the DIP Credit Agreement and any ability of Sellers to use cash collateral; (v) any Action (including a bankruptcy filing or equivalent proceeding under Applicable Law) taken by any Person other than Sellers or their Affiliates or Representatives with respect to Blockbuster Canada Co.; (vi) any changes in Applicable Laws or accounting rules, in each case only to the extent occurring after the date of this Agreement; or (vii) any material breach by Purchaser of any covenant or agreement herein

or any representation or warranty of Purchaser having been or having become untrue in any material respect; provided, however, that with respect to clauses (i), (iii) and (vi), such change, circumstance, fact, condition or event does not disproportionately adversely affects Sellers and their Subsidiaries, taken as a whole, as compared to other companies operating in the industries in which Sellers and their Subsidiaries operate.

"Sellers' Knowledge" means the knowledge of Jim Keyes, Tom Kurrikoff, Bruce Lewis, Dennis McGill, Jeff Stegenga, Roger Dunlap, and Kevin Lewis, Joyce Woodward, and Josh D. Owuso.

"Specified Studios" means, collectively, Twentieth Century Fox Home Entertainment LLC, Sony Pictures Home Entertainment Inc., Warner Home Video, a Division of Warner Bros. Home Entertainment Inc., Paramount Home Entertainment Inc., Universal Studios Home Entertainment LLC, The Walt Disney Company, and Summit Distribution, LLC, together with their respective Studio Affiliates. For purposes of this definition, (i) "Studio Affiliate" means, with respect to any Specified Studio, any direct or indirect subsidiary of such Specified Studio, and any other Person that, directly or through one or more intermediaries, is controlled by such Specified Studio; and (ii) "controlled" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies (whether through ownership of securities or partnership or other ownership interests, by Contract or representation on the board or similar governing body).

"Store License Agreement" means the Store License Agreement to be entered into between Purchaser and Sellers substantially in the form attached as Exhibit A hereto.

"Stores" means Sellers' domestic non-franchised retail store locations.

"Straddle Period" means any Tax period beginning before, and ending after, the Closing Date.

"Studio Condition" means, with respect to any Specified Studio, that at all times from the date of the Cobalt Agreement until the Closing, (A) in the event that such Specified Studio is engaged in the distribution of packaged and digital audio visual media, it shall have continued to (i) support Sellers' digital business on terms materially consistent with or better than those in effect on February 14, 2011 and (ii) provide Sellers' Stores and its international operations with physical copies of movies in amounts requested by Sellers, on a "cash in advance" or better payment basis and at prices materially consistent with or better than those in effect on February 14, 2011, (B) in the event that such Specified Studio is engaged in the distribution of packaged and digital audio visual media, it shall take no adverse action against any non-Debtor Subsidiaries of Sellers, provided that (i) any Specified Studio may exercise its rights and remedies as to any non-Debtor Subsidiary of Sellers to the extent that such non-Debtor Subsidiary breaches any agreement between such Specified Studio and such non-Debtor Subsidiary, provided that such breach does not arise as a result of a guaranty obligation or cross-default arising from the breach of another agreement, (ii) nothing herein shall limit or affect the rights of any of the Canadian Collateral Obligees as a holder of collateral pledged by non-Debtor Subsidiary Blockbuster Canada Co. (the "Canadian Collateral"), with respect to enforcing its rights against Blockbuster Canada Co. or with respect to the Canadian Collateral, and (iii) customary trade practices in the ordinary course of business consistent with past practice shall not constitute "adverse action" hereunder and (C) such Specified Studio shall have continued to affirmatively support the Bidding

Procedures Order (including the payment of the Roll-Up Notes), the bidding and sale process contemplated thereby, and a sale of the Sellers' assets to Purchaser (unless overbid) at the Sale Hearing. Compliance with clause (A) of the Studio Condition shall be satisfied, with respect to any Specified Studio if, until the Closing Date, such Specified Studio ships product to Sellers and their domestic and international subsidiaries, as the case may be, in such quantities as requested in the ordinary course of business on "cash in advance" terms at the applicable Studio's standard wholesale price (or better terms in each Studio's sole and absolute discretion) and supporting the Sellers' digital business by continuing to offer video on demand and electronic sell through services on the same terms and conditions as is currently provided by such Specified Studio, or in accordance with the terms and conditions of current agreements, at the sole election of such Specified Studio, subject to overall market trends and/or window shifts.

 "Studio Condition Percentage" means the percentage equivalent of a fraction, the numerator of which is the sum of the Frozen Studio Balances of all Specified Studios that have fully satisfied the Studio Condition and the denominator of which is the aggregate Frozen Studio Balances of all Specified Studios.

"Studio Contracts" mean all contracts, agreements, arrangements or understandings between Sellers and any of the Specified Studios or any of Sellers' movie and/or video game suppliers.

"Studio Liability Amount" means an amount equal to the product of $11,500,000 multiplied by the Studio Condition Percentage.

"Subsidiary" or "subsidiary" means, with respect to any Person, any corporation, limited liability company, joint venture or partnership of which such Person (a) beneficially owns, either directly or indirectly, more than fifty percent (50%) of (i) the total combined voting power of all classes of voting securities of such entity entitled, under ordinary circumstances, to vote in the election of directors or other governing body of such Person, (ii) the total combined equity interests, or (iii) the capital or profit interests, in the case of a partnership; or (b) otherwise has the power to vote or to direct the voting of sufficient securities to elect a majority of the board of directors or similar governing body of such Person.

"Subsidiary Shares" means the outstanding ownership interests in each of the Non-Debtor Subsidiaries.

"Target Cash Amount" means an amount equal to $68,400,000, *less* any Contract Maintenance Costs described in Section 2.5(bc) not previously reimbursed by Purchaser.

"Tax" means all federal, state, provincial, territorial, municipal, local or foreign income, profits, franchise, gross receipts, environmental (including taxes under Code Section 59A), customs, duties, net worth, sales, use, goods and services, withholding, value added, ad valorem, employment, social security, disability, occupation, pension, real property, personal property (tangible and intangible), stamp, transfer, conveyance, severance, production, excise and other taxes, withholdings, duties, levies, imposts and other similar charges and assessments (including any and all fines, penalties and additions attributable to or otherwise imposed on or with respect to any such taxes, charges, fees, levies or other assessments, and interest thereon) imposed by or on behalf of any Governmental Authority.

"Tax Returns" means any report, return, declaration, claim for refund, information report or return or statement required to be supplied to a Taxing Authority in connection with Taxes, including any schedule or attachment thereto or amendment thereof.

"Taxing Authority" means any Governmental Authority exercising any authority to impose, regulate, levy, assess or administer the imposition of any Tax.

"Transaction Documents" means this Agreement, the escrow agreement to be entered into with respect to the Purchase Price Adjustment Escrow, the Assignment Agreement, the ~~Agency and~~Store License Agreement and~~, if applicable, the Transition Services Agreement entered into pursuant to Section 8.9 hereof, and~~ all other Contracts and agreements necessary to effectuate the Transactions.

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents.

"Transition Services Agreement" means the agreement, if applicable, to be entered into by Parent and Purchaser pursuant to Section 8.9 hereof.

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq*. (1988) and any similar federal, state, local or foreign "mass layoff" or "plant closing" laws.

Section 1.2    Terms Defined Elsewhere in this Agreement.  For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
|---|---|
| Accounting Referee | Section 3.4(c) |
| ~~Agency Alternative~~ | ~~Section 8.8(b)~~ |
| ~~Agency Liquidations~~ | ~~Section 8.8(b)~~ |
| Agreement | Preamble |
| Asset Acquisition Statement | Section 3.5 |
| Assignment Agreement | Section 4.2(d) |
| Assumed Cure Costs | Section 2.5(a) |
| Assumed Liabilities | Section 2.3 |
| Balance Sheet | Section 5.5(a) |
| Balance Sheet Date | Section 5.5(a) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Business | Recitals |
| Canadian Agreement | Section 4.2(d) |
| Capital Leases | Section 5.10(b) |
| Cash Purchase Price | Section 3.1 |
| Closing | Section 4.1 |
| Closing Accounts | Section 3.4(a) |
| Closing Date | Section 4.1 |
| Closing Date Leased Properties | Section 8.8(b) |

| Term | Section |
|---|---|
| Closing Date Payment | Section 3.3(b) |
| Closing Sales Tax Payment | Section 8.13 |
| Closing Statement | Section 3.4(a) |
| Cobalt | Recitals |
| Cobalt Agreement | Recitals |
| Competing Bid | Section 7.1(a) |
| Confidentiality Agreement | Section 8.5 |
| Contract Maintenance Costs | Section 2.5(b) |
| Delayed Closing Penalty | Section 4.4(b) |
| Deposit | Section 3.2(a) |
| Escrow Agent | Section 3.3(h) |
| Estimated Cash Amount | Section 3.3(a) |
| Estimated Inventory Amount | Section 3.3(a) |
| Excluded Assets | Section 2.2 |
| Excluded Contract | Section 2.5(b) |
| Excluded Liabilities | Section 2.4 |
| Excluded Matter | Section 1.1 (in Seller Material Adverse Effect definition) |
| Final Cash Amount | Section 3.4(f) |
| Final Inventory Amount | Section 3.4(e) |
| Financial Statements | Section 5.5(a) |
| Italian Agreement | Section 4.2(e) |
| Liquidation Condition | Section 8.8(a) |
| Maintenance Period | Section 2.5(c) |
| Material Contracts | Section 5.12(a) |
| Nonassignable Assets | Section 2.6(d) |
| Notice Period | Section 2.5(b) |
| Outside Date | Section 4.4(b) |
| Owned Properties | Section 5.9(a) |
| Parent | Preamble |
| Parties | Preamble |
| Personal Property Leases | Section 5.10(a) |
| Post-Closing Studio Obligation | Section 3.3(g) |
| Proposed Allocation | Section 3.5 |
| Proposed Rejection Date | Section 2.5(b) |
| Purchase Price | Section 3.1 |
| Purchase Price Adjustment Escrow | Section 3.3(h) |
| Purchased Assets | Section 2.1 |
| Purchased Business Name Trademarks | Section 8.14 |
| Purchaser | Preamble |
| Purchaser Documents | Section 6.2 |
| Real Property Lease | Section 5.9(b) |
| Rejection Deferral Date | Section 2.5(b) |
| Rejection Deferral Notice | Section 2.5(b) |
| Removed Contract | Section 2.5(de) |

| Term | Section |
|---|---|
| Rev Share Units | Section 1.1 (in Revenue Share Adjustment Amount definition) |
| Revised Statements | Section 3.5 |
| Securities Act | Section 6.5 |
| Seller or Sellers | Preamble |
| Seller Documents | Section 5.3 |
| Store Closing Liquidations | Section 8.8(a) |
| Store License Alternative | Section 8.8(b) |
| Studio Allocation Percentage | Section 3.3(f) |
| Tax Claim | Section 9.3(c) |
| Taxable Consideration | Section 3.5 |
| Trade Secrets | Section 1.1 (in Intellectual Property definition) |
| Transfer Taxes | Section 9.3(a) |
| Transferred Employees | Section 9.1(a) |
| Undisclosed Assumed Contract | Section 2.5(ed) |

Section 1.3    Other Definitional and Interpretative Provisions.

(a)    The words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(b)    The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

(d)    Any reference in this Agreement to "$" shall mean United States dollars.

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(f)    Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.  References to a Person are also to its permitted successors and assigns.

(g)    All Article and Section references herein are to Articles and Sections of this Agreement, unless otherwise specified.

(h)     All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(i)     This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if all Parties had prepared it and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

# ARTICLE II

## PURCHASE AND SALE

Section 2.1     Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Sellers shall sell, transfer, assign, convey and deliver to Purchaser (or its designee), and Purchaser (or its designee) shall purchase, acquire and accept from Sellers, free and clear of any and all Liens (other than Liens created by Purchaser and Permitted Liens), all of Sellers' right, title and interest in, to and under any and all of the assets, properties, rights and claims of any kind or nature, whether tangible or intangible, real, personal or mixed, wherever located and whether or not carried or reflected on the books and records of any Seller, which are used or useful in or held for use in connection with the operation of the Business, excluding only the Excluded Assets expressly identified in Section 2.2 (such assets, properties, rights and claims to be acquired hereunder, collectively, the "Purchased Assets"). Without limiting the foregoing, the Purchased Assets shall include the following:

(a)     all of the outstanding ownership interests in each of the Non-Debtor Subsidiaries;

(b)     all rights, title and interest of Sellers in the BB 2009 Trust;

(c)     all cash, cash equivalents, bank deposits or similar cash items of Sellers (including all items taken into account in determining the $68,400,000 amount for purposes of the definition of Target Cash Amount);

(d)     all accounts and notes receivable and other rights to payment (including credit card receivables), together with any unpaid late fees and financing charges accrued thereon, other than any accounts and notes receivable or other rights to payment arising out of or relating to any Excluded Asset and which receivable or right to payment is created or arises subsequent to the Closing, arising from the conduct of the Business;

(e)     all deposits (including security deposits for rent, electricity, telephone or otherwise) and prepaid or deferred charges and expenses of Sellers, including all prepaid rentals and unbilled charges, fees or deposits, other than deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Asset which are made, created or arise subsequent to the Closing;

(f)     all tangible personal property owned by Sellers related to, useful in or held for use in the conduct of the Business, including movie, television program, game, and cell phone inventory, merchandise, memorabilia, supplies, food and beverage items, samples, equipment, televisions, monitors, video players, computers, hardware, electronics, file servers, scanners, printers, networks, copiers, cash registers, furniture, furnishings, fixtures, improvements (whether leasehold or otherwise),  telephone lines, telecopy machines, telecommunication equipment, storeroom contents, spare parts, shipping materials, packaging materials, raw materials and other consumables relating to or available for sale or use in connection with the Business; ~~provided, however, that, in the event that Purchaser elects the Agency Alternative, Purchased Assets shall not include any of the Designated Liquidation Merchandise or Designated FF&E at the Closing Date Leased Properties, and Purchaser shall have the exclusive right, as set forth in Section 8.8(b) and the Agency and License Agreement, (i) to direct the sale or other disposition by Sellers of all such Designated Liquidation Merchandise and Designated FF&E and (ii) the exclusive right to receive and retain, for its own account, the proceeds, as set forth herein and in the Agency and License Agreement, of all such sales and dispositions;~~

(g)     all rights, title and interest of Sellers in each Owned Property and under each Real Property Lease which is a Purchaser Assumed Contract, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

(h)     all rights, title and interest of Sellers in and to any property subject to a personal property lease that is related to, useful in or held for use in the conduct of the Business, to the extent any such personal property lease is a Purchaser Assumed Contract;

(i)     the Purchased Intellectual Property;

(j)     after giving effect to the Sale Order, all of the rights and benefits accruing under any of the Purchaser Assumed Contracts, including each Studio Contract, Real Property Lease, personal property lease or Intellectual Property License that is a Purchaser Assumed Contract;

(k)     all Documents that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business, including Documents relating to marketing, advertising, promotional materials, Purchased Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (g) above, but excluding (i) personnel files for Employees who are not Transferred Employees, (ii) such files as may not be transferred under Applicable Law regarding privacy, (iii) Documents which any Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party and (iv) Documents relating to an Excluded Asset or Excluded Liability; provided, however, to the extent such Documents relate in any way to the conduct of the Business, Purchaser shall receive copies thereof;

(l)     all of the rights and benefits accruing under any Permits held, used or made by any Seller in the Business to the extent assignable, except any such Permit that is an Excluded Contract;

(m)     all warranties and guarantees related to the Purchased Assets, including warranties and guarantees made by suppliers, manufacturers and contractors under the Purchased Assets, and claims against suppliers and other third parties in connection with the Purchaser Assumed Contracts;

(n)     any rights, demands, claims, causes of action, rights of recovery, credits, allowances, rebates, or rights of setoff or subrogation arising out of or relating to any of the Purchased Assets;

(o)     all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(p)     all third party property and casualty insurance proceeds, and all rights to third party property and casualty insurance proceeds, in each case to the extent received or receivable in respect of the Business or the Purchased Assets (or to any portion thereof);

(q)     all rights of Sellers under or pursuant to any franchise agreements or other arrangements with franchisees, other than any such agreement or arrangement which the Purchaser has specifically designated as a Removed Contract pursuant to Section 2.5(d);

(r)     all goodwill and other intangible assets associated with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property;

(s)     all assets attributable to Non-Debtor Benefit Plans (including any trusts, insurance or other funding arrangements);

(t)     all of Sellers' assets related to, located at, or used or useful in connection with the operation of Sellers' Distribution Centers; provided, however, that, in the event that Purchaser elects the Agency Alternative, Purchased Assets shall not include any of the Designated Liquidation Merchandise or Designated FF&E at the Distribution Centers that are Closing Date Leased Properties, and Purchaser shall have the exclusive right, as set forth in Section 8.8(b) and the Agency and License Agreement, (i) to direct the sale or other disposition by Sellers of all such Designated Liquidation Merchandise and Designated FF&E and (ii) the exclusive right to receive and retain, for its own account, the proceeds, as set forth herein and in the Agency and License Agreement, of all such sales and dispositions;

(u)     all rights, claims and causes of action of Sellers (except to the extent arising under the Transaction Documents), but not including any rights, claims and causes of action under the Bankruptcy Code (including chapter 5 thereof) or any similar claims and causes of action for avoidance, preference or fraudulent conveyance under Applicable Law;

(v)     sales and use Tax refunds to the extent provided in Section 2.3(d); and

(w)     all other assets, properties, rights and claims of Sellers of any kind or nature which relate to the Business, which are used or useful in or held for use in the Business, or which relate to the Purchased Assets (in each case, other than the Excluded Assets) not otherwise

described in this Section 2.1, including, but not limited to, all of Sellers' assets related to, located at, or used or useful in connection with (i) the operation of all of Sellers' Stores, (ii) the operation of Sellers' digital, kiosk and by-mail businesses and (iii) Sellers' franchise businesses.

Section 2.2    Excluded Assets.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets.  "Excluded Assets" shall mean only the following assets:

(a)    the Excluded Contracts, including any accounts receivable arising out of or in connection with any Excluded Contract;

(b)    all equity interests of Parent and the Debtor Subsidiaries;

(c)    any (i) confidential personnel and medical records pertaining to any Employee of Sellers not permitted to be transferred to Purchaser under Applicable Law; (ii) books and records that Sellers are required by Law to retain, that relate exclusively to the Excluded Assets or the Excluded Liabilities, including Tax Returns, financial statements, and corporate or other entity filings; provided, however, that Purchaser shall receive copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets or Assumed Liabilities; and (iii) corporate charters, qualifications to do business, taxpayer and other identification numbers, corporate seals, minute books, stock ledgers, stock certificates and any other documentation related to governance, organization, maintenance or existence of Sellers; provided, that Purchaser shall receive copies of any portions of such documents and records;

(d)    except as otherwise provided in Section 2.3(d), any claim, right or interest of any Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Taxes that are Excluded Liabilities or for which any Seller has liability pursuant to Section 9.3;

(e)    all rights and claims of Sellers under the Transaction Documents;

(f)    all Debtor Benefit Plans (and any trusts, 501(c)(9) organizations, insurance (including fiduciary insurance), administrative or other service contracts relating thereto);

(g)    all rights, claims and causes of action of Sellers under the Bankruptcy Code (including chapter 5 thereof) and any similar claims and causes of action for avoidance, preference or fraudulent conveyance under Applicable Law; and

(h)    all restricted cash of Sellers relating to cash collateralized letters of credit and/or Excluded Liabilities.

Section 2.3    Assumption of Liabilities.  Purchaser shall assume no Liability of Sellers except the Liabilities that are expressly set forth in this Section 2.3 (collectively, the "Assumed Liabilities").  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume the Assumed Liabilities and shall agree to pay, discharge,

perform and otherwise satisfy such Assumed Liabilities in accordance with their respective terms, subject to any defenses or claimed offsets asserted in good faith against the obligee to whom such Liabilities of Sellers and their Subsidiaries are owed.  The Assumed Liabilities shall consist of only the following Liabilities:

(a)     all Liabilities of Sellers under the Purchaser Assumed Contracts solely to the extent of the Assumed Cure Costs and Liabilities arising from events arising and occurring following the Closing Date;

(b)     all Liabilities of Sellers with respect to accrued and unpaid wages, accrued and unused vacation (subject to the limitations in Section 9.2(a)), and the employer's share of any payroll Taxes, in each case with respect to Transferred Employees who accept Purchaser's offer of employment and commence employment with Purchaser; provided, that with respect to each Transferred Employeethe pay period during which the Closing occurs, the maximum aggregate amount of such wages, vacation and payroll Taxes included in the Assumed Liabilities for each Transferred Employee shall not exceed an amount equal to one half of the aggregate amount of such wages, vacation and payroll Taxes accrued during such Transferred Employee's normal pay period cycle;

(c)     all Liabilities of Sellers to the extent specifically provided in Article IX;

(d)     all sales or use or other Taxes of any Seller (but not including any Taxes assumed by Purchaser pursuant to Section 2.3(b) or paid by Sellers pursuant to the Closing Sales Tax Payment), up to an aggregate amount not to exceed $1,600,000, that (i) result from sales and use Tax audits or examinations of Sellers for periods prior to the Closing Date or (ii) for which any director, officer or employee of a Seller may be personally liable under Applicable Law; provided, that Purchaser shall be entitled to all Tax refunds of Sellers for Tax periods prior to the Closing Date to the extent they relate to Taxes that would constitute Assumed Liabilities pursuant to this Section 2.3(d); provided, further, however, that Purchaser shall not be entitled to any such refund to the extent that it would cause the aggregate amount of refunds received by Purchaser pursuant to this Section 2.3(d) to exceed the aggregate amount of Taxes that have become Assumed Liabilities pursuant to this Section 2.3(d);

(e)     the Post-Closing Studio Obligation, with respect to each Specified Studio that fully satisfies the Studio Condition; and

(f)     all Liabilities with respect to the Assumed Cure Costs.; and

(g)     for (i) Leased Properties that have documented Lease Extensions and/or other lease modifications and that are (A) Purchaser Assumed Contracts and (B) actually assumed and assigned to Purchaser, the real estate professional fees that are owed by Sellers for such Leased Properties, and (ii) Leased Properties pursuant to which legal fees were incurred by Sellers in an effort to reach Lease Extensions and/or other lease modifications, all such legal fees; provided, that the aggregate amount of Liabilities assumed pursuant to this Section 2.3(g) shall not exceed $4,900,000.

For the avoidance of doubt, while Purchaser is not assuming the Liabilities of any of the Non-Debtor Subsidiaries, Purchaser acknowledges that the Liabilities of each Non-Debtor Subsidiary

will remain intact as obligations of such Non-Debtor Subsidiary as such exists on the Closing Date.

Section 2.4     Excluded Liabilities.  Notwithstanding anything to the contrary in this Agreement, the Parties expressly acknowledge and agree that Purchaser shall not assume or in any manner whatsoever be liable or responsible for any Liabilities of any Seller or of any predecessor of any Seller, existing on the Closing Date or arising thereafter, other than the Assumed Liabilities.  All of the Liabilities of any Seller or of any predecessor of any Seller not specifically and expressly assumed by Purchaser pursuant to Section 2.3 shall be referred to herein collectively as the "Excluded Liabilities." Without limiting the foregoing, Purchaser shall not be obligated to assume, and does not assume, and hereby disclaims all of the Excluded Liabilities, including all of the following Liabilities, of each Seller or of any predecessor of any Seller:

(a)     all Liabilities for accrued expenses and accounts payable incurred prior to the Closing Date, except to the extent that the same constitute Assumed Liabilities pursuant to Section 2.3;

(b)     all Liabilities arising out of any of the Excluded Assets, including Excluded Contracts;

(c)     all Environmental Liabilities and Obligations, and all other Liabilities relating to any Laws in connection with any environmental, health or safety matters based on facts arising or existing during Sellers' operation of the Business prior to the Closing Date; provided, that nothing in this Agreement shall (i) release, nullify, or enjoin the enforcement of any liability to a Governmental Authority under Environmental Laws (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the Closing Date or (ii) in any way (x) diminish the obligation of any entity to comply with Environmental Laws, or (y) diminish the obligations of Sellers to comply with Environmental Laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code;

(d)     all Liabilities relating to any claims for infringement, dilution, misappropriation or any other violation of or by the Business Intellectual Property arising from Sellers' operation of the Business prior to the Closing Date;

(e)     all Liabilities for (i) any Taxes of any Seller (other than those assumed pursuant to Sections 2.3(b) and 2.3(d)) and (ii) Transfer Taxes;

(f)     all Liabilities arising out of, relating to or with respect to (i) the employment or performance of services by any Employee of Sellers or any of their Affiliates prior to the Closing, (ii) termination of employment or services of any Employee by any Seller or any of its Affiliates, including any severance payments, (iii) each of the Employee Benefit Plans subject to Title IV of ERISA (or similar rules or regulations under any federal, state, local or foreign law) and all Debtor Benefit Plans and (iv) the WARN Act;

(g)     all Liabilities arising as a result of any Action initiated at any time, to the extent related to the Business or the Purchased Assets on or prior to the Closing Date, including any shareholder Actions, Actions for breach of contract, or any tort Actions;

(h)     all Liabilities arising under any Indebtedness of Sellers, including any Liabilities with respect to the Senior Secured Notes (as defined in the Sale Motion), the DIP Credit Agreement, the Roll-Up Notes and any obligations or Liabilities to equity holders;

(i)     other than the Reimbursable Expenses, all Liabilities with respect to any costs and expenses (including all legal, accounting, financial advisory, valuation, investment banking and other third party advisory or consulting fees and expenses) incurred by or on behalf of any Seller, Cobalt or any of their respective Affiliates in connection with the Bankruptcy Cases or the Transactions;

(j)     all Liabilities (i) existing prior to the filing of the Bankruptcy Cases that are subject to compromise under the Bankruptcy Cases, other than the Assumed Cure Costs and (ii) to the extent not otherwise expressly assumed herein, incurred subsequent to the filing of the Bankruptcy Cases;

(k)     all Liabilities with respect to any customer programs or rights, including merchandise returns;

(l)     all Liabilities with respect to any gift cards outstanding on the Closing Date;

(m)     all Liabilities (other than the Post-Closing Studio Obligation to the extent set forth in Section 2.3(e)) with respect to any Studio Contracts, including the Revenue Sharing Agreements; and

(n)     all Liabilities relating to the failure to comply with any bulk sales Laws.

Section 2.5     Assumed Contracts.

(a)     Purchaser Assumed Contracts. At the Closing (or at such other time as any Purchaser Assumed Contracts are assumed and assigned to Purchaser) and pursuant to section 365 of the Bankruptcy Code and the Sale Order, Sellers shall assume and assign to Purchaser, and Purchaser shall consent to such assignment from Sellers, the Purchaser Assumed Contracts; provided, that if this Agreement is terminated pursuant to Section 4.4(g), any Purchaser Assumed Contracts that were assigned to Purchaser prior to such termination shall be assigned back to, and assumed by, the applicable Seller.  All Cure Costs with respect to the Purchaser Assumed Contracts shall be paid in full by Purchaser on or before the Closing Date (or at such other time as any Purchaser Assumed Contracts are assumed and assigned to Purchaser) (the "Assumed Cure Costs"), and Sellers shall have no Liability therefor.

(b)     Rejected Contracts.  Prior to the Assumption Deadline, Purchaser shall provide Sellers with one or more lists of Contracts that it will not designate as a Purchaser Assumed Contract and Sellers hereby agree to promptly reject any such Contracts.  Sellers hereby further agree to use their reasonable best efforts to obtain an Order of the Bankruptcy

Court approving the rejection of any such Contract (i) prior to the Closing, if Sellers are provided notice prior to the Closing that Purchaser will not designate such Contract as a Purchaser Assumed Contract; provided, that, if such Order is not obtained prior to Closing, Sellers shall use reasonable best efforts to obtain such Order of the Bankruptcy Court approving the rejection of such Contract as soon as practicable, or (ii) if Sellers are provided notice that Purchaser will not designate such Contract as a Purchaser Assumed Contract after the Closing, as soon as practicable after Sellers receive such notice.

(c) (b) Excluded Contracts. Prior to the Closingapplicable Assumption Deadline, with respect to any executory Contract or(other than unexpired real property leaseleases, which are addressed in Section 8.8) that has not been designated as a Purchaser Assumed Contract or designated to be rejected or rejected pursuant to Section 2.5(b) above (each, an "Excluded Contract"), Sellers shall, prior to the rejection of anyPurchaser may, in its sole discretion, include such Excluded Contract, provide Purchaser with as a Purchaser Assumed Contract by providing Sellers with written notice of such election not less than five (5) Business Days notice, which shall include the proposed date of such rejection (the "Proposed Rejection Date"), of their intent to reject such Excluded Contract (the "Notice Period"). If Purchaser desires to include such Excluded Contract as a Purchaser Assumed Contract, it shall provide Sellers with written notice of such election prior to the expiration of the Notice Periodprior to the Assumption Deadline, and such Contract shall thereafter be deemed to be a Purchaser Assumed Contract for purposes of this Agreement and the Sale Order and shall be deemed to be automatically added to Schedule 1.1(f). If Purchaser elects not to include such Excluded Contracte). Sellers hereby agree to use their reasonable best efforts to obtain an Order of the Bankruptcy Court approving the assumption and assignment of any such Contract that is added to Schedule 1.1(e) (x) prior to the Closing, if such Contract is added to Schedule 1.1(e) prior to Closing; provided, that, if such Order is not obtained prior to Closing, Sellers shall use reasonable best efforts to assume and assign such Contracts to Purchaser as soon as practicable, or (y) if such Contract is added to Schedule 1.1(e) after the Closing, as soon as practicable after such Contract is added to Schedule 1.1(e). Following the Closing, for any Excluded Contract that Purchaser has not requested in writing prior to Closing be rejected by Sellers or for any Contract that has been designated as a Purchaser Assumed Contract, it shall have the option upon written notice to Sellers prior to the expiration of the Notice Period (a "Rejection Deferral Notice") to require Sellers, up until the date specified in the Rejection Deferral Notice (the "Rejection Deferral Date"), which date shall be on or before (and may be extended until, in Purchaser's sole discretion) the date of the applicable rejection deadline under the Bankruptcy Code, to defer the rejection of such Excluded Contract and Purchaser (whether or not the Closing occurs) shall thereafter pay, or promptly reimburse Sellers for, all out-of-pocket costs and expenses (including any rental amounts due during such period) but has not been actually assumed and assigned to Purchaser, Purchaser shall pay directly on an ongoing basis as and when due any and all direct costs and expenses incurred or payable by Sellers, and perform any and all obligations of Sellers, in accordance with respect to (and solely as a result of the deferral of)the express terms of such Excluded Contract (the "Contract Maintenance Costs") during the period from the Proposed Rejection Date to the earlier of the Closing Date and the Rejection Deferral Date (the "Contract Maintenance CostsClosing Date to the earlier to occur of (i) the effective date of the assumption and assignment to Purchaser of any such Contract and (ii) the date that Purchaser notifies Sellers in writing of its election not to have Sellers assume and assign such Contract to Purchaser (the "Maintenance Period"); provided, that Purchaser shall not have

any obligation with respect to Contract Maintenance Costs if this Agreement is terminated pursuant to Section 4.4(g); ~~provided,~~ ~~further,~~ ~~that to the extent any Excluded Contract to which~~ Purchaser shall indemnify and hold Sellers harmless with respect to all Contract Maintenance Costs ~~would be incurred is actually assumed and assigned to Purchaser, Purchaser shall not have~~ ~~any obligation to pay or reimburse Sellers for any Contract Maintenance Costs with respect to~~ ~~such Contract. Notwithstanding the foregoing, at any time and from time to time prior to~~ ~~Closing, Purchaser may elect, by written notice to Sellers, to cause any one or more of the~~ ~~Excluded Contracts (to the extent not previously rejected by Sellers after giving notice as~~ ~~required above) to be included as a Purchaser Assumed Contract, and such Contract shall be~~ ~~added to Schedule 1.1(f) and shall thereafter be deemed to be a Purchaser Assumed Contract for~~ ~~purposes of this Agreement and the Sale Order to the extent approved by an Order of the~~ ~~Bankruptcy Court prior to Closing, which Sellers hereby agree to use their reasonable best~~ ~~efforts to obtain; provided, that, if such Order is not obtained prior to Closing, Sellers shall use~~ ~~reasonable best efforts to assume and assign such contracts to Purchaser as soon as practicable.~~ ~~In the event that Purchaser does not desire that Sellers defer such rejection or fails to provide~~ ~~Sellers with notice of any election prior to the expiration of the Notice Period, Sellers shall~~ ~~thereafter be permitted to file such motions and other documentation with the Bankruptcy Court~~ ~~and take such other action as they deem necessary to reject any such Excluded Contract(s) and to~~ ~~liquidate any assets related thereto~~. For the avoidance of doubt, it is intended that Sellers shall have no costs or obligations with respect to any Excluded Contract (other than pursuant to Section 8.2(c)) which are not paid or performed by Purchaser during the Maintenance Period.

(d) ~~(c)~~ Undisclosed Assumed Contracts.  If prior to, at, or following the Closing (but prior to the conclusion of the Bankruptcy Cases), any Party becomes aware of any executory Contract or unexpired lease that has not been disclosed in writing or that was not made available, in each case, to Purchaser prior to the date hereof, the discovering party shall promptly (but in any event no later than two (2) Business Days) notify the other party in writing of such executory Contract or unexpired lease.  Purchaser may elect, no later than the later of (i) five (5) Business Days after such notice and (ii) the Closing Date, to receive an assignment of such Seller's rights in such executory Contract or unexpired lease (upon such election by Purchaser, an "Undisclosed Assumed Contract"); provided that the Bankruptcy Court enters an order (in a form and substance reasonably acceptable to Purchaser and Sellers) authorizing the assumption by Sellers (for Contracts entered prior to the commencement of the Bankruptcy Cases, whether or not amended after the commencement of the Bankruptcy Cases) and the assignment to Purchaser of such Undisclosed Assumed Contract(s). All Cure Costs under any and all Undisclosed Assumed Contracts shall be paid in full by Purchaser.

(e) ~~(d)~~ Removed Contracts.  Subject to the provisions of this Agreement and the Store License Agreement, Purchaser may elect to remove any Contract(s) and/or unexpired real property lease(s) (each, a "Removed Contract") from the list of Purchaser Assumed Contracts by giving written notice thereof to Sellers no later than one (1) Business Day prior to the ~~Closing Date~~date of a hearing to consider the assumption and assignment of such Contract to Purchaser or at anytime thereafter prior to assumption if the terms and conditions of the assumption and assignment of any Purchaser Assumed Contract are not acceptable to Purchaser. Upon designation in accordance with the foregoing, each such Removed Contract shall cease to be a Purchaser Assumed Contract for the purposes of this Agreement and the Sale Order and may thereafter be rejected at Sellers' discretion without any additional notice to or consent from

Purchaser or any liability of Purchaser (other than with respect to any Contract Maintenance Costs or costs under the Store License Agreement, if applicable).

Section 2.6    Further Conveyances and Assumptions.

(a)    From time to time following the Closing and except as prohibited by Law, Sellers shall, or shall cause their Affiliates to, make available to Purchaser such non-confidential data in personnel records of Transferred Employees as is reasonably necessary for Purchaser to transition such employees into Purchaser's records.

(b)    From time to time following the Closing, Sellers and Purchaser shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquittances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents and to assure fully to Sellers and their Affiliates and their successors and assigns, the assumption of the Assumed Liabilities assumed by Purchaser under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby; provided, that nothing in this Section 2.6 shall require the Purchaser or any of its Affiliates to assume any Liabilities other than the Assumed Liabilities.

(c)    To the extent not obtained at or prior to Closing, Sellers shall use reasonable best efforts to obtain termination statements, lien releases, discharges, financing change statements or other documents, notices or other instruments as Purchaser may reasonably deem necessary to release Liens (other than Permitted Liens) on the Purchased Assets, each in form and substance reasonably satisfactory to Purchaser.

(d)    Nothing in this Agreement nor the consummation of the Transactions shall be construed as an attempt or agreement to transfer or assign any Purchased Asset, including any Contract, Permit, certificate, approval, authorization or other right, which (i) is not capable of being assigned pursuant to section 365 of the Bankruptcy Code or transferred pursuant to section 363 of the Bankruptcy Code to Purchaser at the Closing, or (ii) the transfer or assignment of which would result in a violation of any Applicable Law, if the consent of a third party is not obtained prior to such transfer or assignment ("Nonassignable Assets") unless and until such consent shall have been obtained.  Sellers shall use their reasonable best efforts, and Purchaser shall use commercially reasonable efforts to cooperate with Sellers, in endeavoring to obtain such consents; provided that no Party shall be obligated to incur any costs or expenses or provide any financial accommodation or other consideration of any nature to any Person to facilitate obtaining such consent to transfer any Nonassignable Asset. To the extent permitted by Applicable Law, in the event consents to the assignment thereof cannot be obtained, such Nonassignable Assets shall be held, as of and from the Closing Date, by Sellers in trust for Purchaser and the covenants and obligations thereunder shall be performed by Purchaser in the applicable Seller's name to the extent it would have been responsible therefor if such consent or approval had been obtained, and all benefits and obligations existing thereunder shall be for Purchaser's account.  Sellers shall promptly pay over to Purchaser all money or other consideration received by it in respect of all Nonassignable Assets.

Section 2.7    Bulk Sales Laws.  Purchaser hereby waives compliance by Sellers with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

Section 2.8    Receivables.  If, following the Closing, any Seller shall receive payment in respect of accounts receivable that are included in the Purchased Assets, then such Seller shall hold such amounts in trust for Purchaser and shall promptly forward such payment to Purchaser.

# ARTICLE III

# PURCHASE PRICE

Section 3.1    Purchase Price.  The aggregate consideration for the Purchased Assets (the "Purchase Price") shall be (a) an amount in cash equal to the Closing Date Payment, subject to adjustment as provided in Section 3.4 (the "Cash Purchase Price"), *plus* (b) the assumption of Assumed Liabilities.

Section 3.2    Deposit.

(a)    Upon the execution of this Agreement, Purchaser shall have deposited with JPMorgan Chase Bank, N.A., an escrow agent (the "Escrow Agent") pursuant to that certain Escrow Agreement, dated as of March 25, 2011, between Parent and Escrow Agent (the "Escrow Agreement") by certified check or wire transfer of immediately available funds, an amount equal to $28,400,000 (the "Deposit").

(b)    The Parties agree that the Deposit shall (i) be applied as a deposit towards the Closing Date Payment and delivered to Parent at Closing as provided in Section 3.3(d), (ii) be returned to Purchaser in the event that this Agreement is terminated pursuant to any provision of Section 4.4 other than by Sellers pursuant to (A) Section 4.4(h) or (B) pursuant to Section 4.4(b) in the event that Closing does not occur on or before the Outside Date solely as a result of Purchaser's material breach of its obligations under this Agreement (including non-payment of the Closing Date Payment pursuant to Section 3.3), as promptly as practicable but no later than three (3) Business Days after the date of such termination, (iii) be paid to Sellers (with any accrued interest actually earned thereon) in the event that this Agreement is properly terminated by Sellers (A) pursuant to Section 4.4(h) or (B) pursuant to Section 4.4(b) in the event that Closing does not occur on or before the Outside Date solely as a result of Purchaser's material breach of its obligations under this Agreement (including payment of the Closing Date Payment pursuant to Section 3.3), or (iv) be treated as otherwise provided in the Bidding Procedures Order.

Section 3.3    Payment of Purchase Price.

(a)    Not later than three (3) Business Days prior to the Closing Date, Sellers shall prepare in good faith and provide to Purchaser a written statement of Parent, signed and certified by the Chief Financial Officer of Parent, setting forth in reasonable detail (and together with reasonable supporting documentation) (i) the Inventory Liquidation Expenses and (ii) Sellers' good faith reasonable estimate of (x) the projected Closing Inventory Amount (the "Estimated Inventory Amount") and (y) the projected Closing Cash Amount (the "Estimated Cash Amount").

(b)    At the Closing, Purchaser shall deliver, or cause to be delivered, the Closing Date Payment (as defined below) by wire transfer of immediately available funds, as set forth in clause (c) below.  "Closing Date Payment" means an amount calculated as follows:

(i)    an amount equal to $320,600,000 *minus* the Studio Liability Amount;

(ii)    *plus or minus* (as applicable) an amount equal to the Estimated Cash Adjustment Amount;

(iii)    *plus or minus* (as applicable) an amount equal to the Estimated Inventory Adjustment Amount;

(iv)    *minus* the amount equal to the Reimbursable Expenses;

(v)    (iv) *minus* an amount equal to the Deposit;

(vi)    (v) *plus*, if applicable, an amount equal to the Delayed Closing Penalty; and

(vii)    (vi) *minus*, if applicable, an amount equal to the Revenue Share Adjustment Amount.

(c)    At the Closing, Purchaser will pay to Parent the Closing Date Payment, $5,000,000 of which shall be paid by Parent to Cobalt in satisfaction of the Reimbursable Expenses, and the remainder of which shall be applied as set forth in Section 16 of the Bidding Procedures Order.

(d)    At the Closing, Parent shall instruct the Escrow Agent to transfer to Parent the Deposit.

(e)    On or prior to the Closing Date (or at such later time as any Purchaser Assumed Contracts are assumed and assigned to Purchaser), Purchaser shall deliver to each of the counterparties to the Purchaser Assumed Contracts the full amount of the applicable Cure Costs for the assumption and assignment of such Contracts by Sellers.

(f)    At the Closing Purchaser shall pay (or cause to be paid), by wire transfer of immediately available funds, to each Specified Studio that has fully satisfied the Studio

Condition, an amount equal to 25% of such Specified Studio's ratable share of the Studio Liability Amount, which ratable share shall be determined based on such Specified Studio's Frozen Studio Balance as a percentage of the aggregate Frozen Studio Balances of all Specified Studios that have fully satisfied the Studio Condition (with respect to each such Specified Studio, the "Studio Allocation Percentage").

(g)     Following the Closing, Purchaser shall pay (or cause to be paid), by wire transfer of immediately available funds, to each Specified Studio that has fully satisfied the Studio Condition, an amount equal to 75% of such Specified Studio's Studio Allocation Percentage of the Studio Liability Amount, to be paid ratably over three (3) payments on the first Business Days that are 30, 60 and 90 days following the Closing Date and which payments shall be secured by letters of credit, cash deposited with an independent escrow agent at Purchaser's option, or some other form of collateral reasonably acceptable to the Specified Studios, provided that each such payment shall be subject to the applicable Specified Studio's having fully satisfied (subject to the opportunity to cure within three (3) Business Days following notice to such Specified Studio and counsel for the Ad Hoc Studio Committee), to the date of such payment, the Post-Closing Studio Condition (the aggregate amounts payable pursuant to this sentence, the "Post-Closing Studio Obligation").

(h)     At the Closing, an amount equal to $20,000,000 of the Closing Date Payment shall be paid to Escrow Agent (or such other escrow agent as is mutually agreed upon by Parent and Purchaser) from the Closing Date Payment, pursuant to item "Fifth" of the payment waterfall set forth in Section 16 of the Bidding Procedures Order, to be held and disbursed in accordance with an escrow agreement to be agreed among Purchaser, Sellers and the Escrow Agent (or such other escrow agent as is agreed by Purchaser and Parent) for the purposes of satisfying any adjustments to the Purchase Price payable to Purchaser by Sellers pursuant to Section 3.4 (the "Purchase Price Adjustment Escrow").

(i)     At the Closing, in addition to the Closing Date Payment and notwithstanding the actual amount of wages, vacation and payroll Taxes, if any, for any Employees that have accrued as of the Closing Date, Purchaser shall pay to Parent in immediately available funds an amount equal to $4,600,000 in respect of any such accrued wages, vacation and payroll Taxes.  For the avoidance of doubt, such payment shall be included (i) in the Closing Cash Amount and (ii) as cash in accordance with Section 2.1(c) .

Section 3.4     Purchase Price Adjustment.

(a)     As promptly as practicable, but no later than forty-five (45) days after the Closing Date, Purchaser shall cause to be prepared and delivered to Parent a closing statement (the "Closing Statement") setting forth Purchaser's calculation of (i) the Closing Inventory Amount *plus* the Inventory Liquidation Expenses and (ii) the Closing Cash Amount (together, the "Closing Accounts").

(b)     If Parent disagrees with Purchaser's calculation of the Closing Accounts delivered pursuant to Section 3.4(a), Parent may, within fifteen (15) days after delivery of the Closing Statement, deliver a notice to Purchaser disagreeing with such calculation and setting forth Purchaser's calculation of such amount.  Any such notice of disagreement shall specify

those items or amounts as to which Parent disagrees, and Parent shall be deemed to have agreed with all other items and amounts contained in the Closing Statement and the calculation of the Closing Accounts delivered pursuant to Section 3.4(a).  In the event that Parent fails to timely deliver a notice of disagreement within such fifteen (15) day period, the Closing Statement and Purchaser's determination of the Closing Accounts shall be deemed final and binding on the Parties.

(c)	If a notice of disagreement shall be duly delivered pursuant to Section 3.4(b), Purchaser and Parent shall, during the fifteen (15) days following such delivery, use their commercially reasonable efforts to reach agreement on the disputed items or amounts in order to determine, as may be required, the amount of the Closing Accounts, which amount shall not be less than the amount thereof shown in Purchaser's calculation delivered pursuant to Section 3.4(a) nor more than the amount thereof shown in Parent's calculation delivered pursuant to Section 3.4(b).  If during such period, Purchaser and Parent are unable to reach such agreement, they shall promptly thereafter cause an independent accountant to be mutually agreed upon by Parent and Purchaser (the "Accounting Referee") to review this Agreement and the disputed items or amounts for the purpose of calculating the Closing Accounts (it being understood that in making such calculation, the Accounting Referee shall be functioning as an expert and not as an arbitrator).  In making such calculation, the Accounting Referee shall consider only those items or amounts in the Closing Statement and Purchaser's calculation of the Closing Accounts as to which Parent has disagreed.  The Accounting Referee shall deliver to Purchaser and Parent, as promptly as practicable (but in any case no later than thirty (30) days from the date of engagement of the Accounting Referee), a report setting forth such calculation.  Such report shall be final and binding upon Purchaser and Sellers.  Sellers shall pay a portion of the fees and expenses of the Accounting Referee equal to 100% multiplied by a fraction, the numerator of which is the absolute value of the difference between the Accounting Referee's calculation of the Closing Accounts and Parent's calculation of the Closing Accounts, and the denominator of which is the sum of (x) the absolute value of the difference between the Accounting Referee's calculation of the Closing Accounts and Parent's calculation of the Closing Accounts *plus* (y) the absolute value of the difference between the Accounting Referee's calculation of the Closing Accounts and Purchaser's calculation of the Closing Accounts, with each Seller jointly and severally liable for the entire portion allocable to Sellers.  Purchaser shall pay only such portion of the fees and expenses of the Accounting Referee that Sellers are not required to pay hereunder.

(d)	Purchaser and Parent shall, and shall cause their respective representatives to, cooperate and assist in the preparation of the Closing Statement and the calculation of the Closing Accounts and in the conduct of the review referred to in this Section 3.4, including, the making available to the extent necessary of books, records, work papers and personnel.

(e)	If the Final Inventory Amount exceeds the Estimated Inventory Amount plus the Inventory Liquidation Expenses, Purchaser shall pay to Sellers, in the manner provided in Section 3.4(g), the amount of such excess and, if the Estimated Inventory Amount plus the Inventory Liquidation Expenses exceeds the Final Inventory Amount, Sellers shall pay to Purchaser, as an adjustment to the Cash Purchase Price, in the manner provided in Section 3.4(g) the amount of such excess.  The "Final Inventory Amount" means the Closing Inventory Amount plus Inventory Liquidation Expenses (i) as shown in Purchaser's calculation delivered pursuant

to Section 3.4(a) if no notice of disagreement with respect thereto is duly delivered pursuant to Section 3.4(b) or (ii) if such a notice of disagreement is delivered, (A) as agreed by Purchaser and Parent pursuant to Section 3.4(c) or (B) in the absence of such agreement, as shown in the Accounting Referee's calculation delivered pursuant to Section 3.4(c); provided, however, that in no event shall the Final Inventory Amount be less than Purchaser's calculation of the Closing Inventory Amount plus Inventory Liquidation Expenses delivered pursuant to Section 3.4(a) or more than Parent's calculation of the Closing Inventory Amount plus Inventory Liquidation Expenses delivered pursuant to Section 3.4(b).

(f)     If the Final Cash Amount exceeds the Estimated Cash Amount, Purchaser shall pay to Sellers, in the manner provided in Section 3.4(g), the amount of such excess and, if the Estimated Cash Amount exceeds the Final Cash Amount, Sellers shall pay to Purchaser, as an adjustment to the Cash Purchase Price, in the manner provided in Section 3.4(g) the amount of such excess.  The "Final Cash Amount" means the Closing Cash Amount (i) as shown in Purchaser's calculation delivered pursuant to Section 3.4(a) if no notice of disagreement with respect thereto is duly delivered pursuant to Section 3.4(b) or (ii) if such a notice of disagreement is delivered, (A) as agreed by Purchaser and Parent pursuant to Section 3.4(c) or (B) in the absence of such agreement, as shown in the Accounting Referee's calculation delivered pursuant to Section 3.4(c); provided, however, that in no event shall the Final Cash Amount be less than Purchaser's calculation of the Closing Cash Amount as set forth in the Closing Statement delivered pursuant to Section 3.4(a) or more than Parent's calculation of the Closing Cash Amount as set forth in its calculations delivered pursuant to Section 3.4(b).

(g)     Any payments pursuant to Sections 3.4(e) or 3.4(f) shall be made within five (5) Business Days after the Final Inventory Amount or the Final Cash Amount, as applicable, has been determined pursuant to this Section 3.4, by wire transfer by Purchaser or Sellers, as the case may be, of immediately available funds to the account of such other Party as may be designated in writing by such other Party.  In the event that any payments are due to Purchaser pursuant to Section 3.4(e) or 3.4(f), such amounts shall be paid (i) to Purchaser by the Escrow Agent out of the Purchase Price Adjustment Escrow and (ii) if any amounts remain due to Purchaser after payment to Purchaser of the full amount of such Purchase Price Adjustment Escrow and any earnings thereon, by Sellers out of funds available to them.  The obligations of Sellers to pay any purchase price adjustments pursuant to Sections 3.4(e) and 3.4(f) and this Section 3.4(g) shall be joint and several obligations.

Section 3.5     Allocation of Purchase Price.  Within thirty (30) days after the Closing Date, Purchaser shall prepare and deliver to Sellers an allocation of the Cash Purchase Price, the Assumed Liabilities and any other items that are treated as additional purchase price for Tax purposes (the "Taxable Consideration") among the Purchased Assets in accordance with Section 1060 of the Code (the "Proposed Allocation").  Sellers shall have thirty (30) days after receipt of the Proposed Allocation to notify Purchaser in writing of any items of the Proposed Allocation that are not reasonable in Sellers' view.  If Sellers do not object in writing during such thirty (30) day period, then the Proposed Allocation shall be final and binding on all Parties.  If Sellers object in writing during such thirty (30) day period, then the Parties shall cooperate in good faith to reach a mutually agreeable allocation of the Taxable Consideration, which allocation shall be binding on all Parties.  If the Parties are unable to reach an agreement within sixty (60) days of Sellers' receipt of the Proposed Allocation, then any disputed items shall be referred to the

Accounting Referee for resolution, and the determination of the Accounting Referee shall be final and binding on the Parties. The fees and expenses of the Accounting Referee shall be paid fifty percent (50%) by Purchaser and fifty percent (50%) by Sellers, with each Seller severally liable for the entire portion allocable to Sellers. In accordance with such allocation, Purchaser shall prepare and deliver to Sellers copies of Form 8594 and any required exhibits thereto (the "Asset Acquisition Statement"). Purchaser shall prepare and deliver to Sellers (or their designated successors) from time to time revised copies of the Asset Acquisition Statement (the "Revised Statements") so as to report any matters on the Asset Acquisition Statement that need updating (including pursuant to purchase price adjustments, if any), consistent with the agreed upon allocation. The Parties shall, and shall cause their respective Affiliates to, use the allocations set forth in the Asset Acquisition Statement or, if applicable, the last Revised Statement for all Tax purposes, file all Tax Returns in a manner consistent with such allocation statement and take no position contrary thereto, in each case, unless required to do so by a change in applicable Tax Laws or good faith resolution of a Tax contest.

## ARTICLE IV

## CLOSING AND TERMINATION

Section 4.1 **Closing Date**. The purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York (or at such other place as the Parties may designate in writing) at 10:00 a.m. local time on the date that is three (3) Business Days following the satisfaction or waiver of the conditions set forth in Article X (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the Parties. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title and interest of Sellers to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (prevailing eastern time) on the Closing Date.

Section 4.2 **Deliveries by Sellers**. At the Closing, Sellers shall deliver to Purchaser:

(a) for each Owned Property listed on Schedule 5.9(a), a warranty deed duly executed by the applicable Seller;

(b) a duly executed copy of the ~~Agency and~~Store License Agreement;

(c) a duly executed bill of sale in the form attached as Exhibit E hereto;

(d) a duly executed copy of a stock purchase agreement, which shall be in form and substance mutually acceptable to Parent and Purchaser, transferring to Purchaser the equity interest in Blockbuster Canada Co NSULC held by Parent (the "Canadian Agreement");

(e) a duly executed copy of a stock purchase agreement, which shall be in form and substance mutually acceptable to Parent and Purchaser, transferring to Purchaser the equity interest in Blockbuster Italia, S.p.A. held by Parent (the "Italian Agreement");

(f) (e) a duly executed assignment and assumption agreement in the form attached as Exhibit F hereto (the "Assignment Agreement") and duly executed assignments transferring all of Sellers' and any Debtor Subsidiary's rights, titles and interests in and to the Intellectual Property included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. Patent and Trademark Office and U.S. Copyright Office;

(g) (f) copies of all consents, waivers and approvals referred to in Section 10.1(g);

(h) (g) stock certificates, if applicable, representing the Subsidiary Shares, duly endorsed in blank or accompanied by appropriate transfer documentation duly endorsed in blank and with all appropriate stock transfer tax stamps affixed;

(i) (h) for each Seller, a certificate of non-foreign status pursuant to Section 1445 of the Code and Treasury Regulation Section 1.1445-2(b);

(j) (i) a certified copy of the Sale Order;

(k) (j) unless otherwise specified by Purchaser prior to the Closing, the written resignations of each of the directors, managing members or equivalent authorized persons of each Non-Debtor Subsidiary effective as of the Closing; and

(l) (k) a certificate signed by an authorized officer of each Seller (in form and substance reasonably satisfactory to Purchaser) pursuant to Sections 10.1(a) and (b)).

Section 4.3    Deliveries by Purchaser.  At the Closing, Purchaser shall deliver to Sellers:

(a)    the Closing Date Payment;

(b)    a duly executed copy of the Assignment Agreement;

(c)    a duly executed copy of the Agency and Store License Agreement;

(d)    a duly executed copy of the Canadian Agreement;

(e)    a duly executed copy of the Italian Agreement;

(f) (e) a certificate signed by an authorized officer of Purchaser (in form and substance reasonably satisfactory to Sellers) pursuant to Sections 10.2(a) and (b); and

(g) (f) with respect to each Specified Studio that fully satisfies the Studio Condition and has a Post-Closing Studio Obligation that is an Assumed Liability pursuant to Section 2.3(e), an assumption agreement, in form and substance reasonably acceptable to Purchaser and such Specified Studio, regarding their respective obligations with respect to such Post-Closing Studio Obligation.

Section 4.4    Termination of Agreement.  This Agreement may be terminated prior to the Closing Date as follows:

(a)    At any time prior to the Closing Date by the joint written consent of Sellers and Purchaser;

(b)    By either Sellers or Purchaser if the Closing has not occurred on or before April 25, 2011 (as may be extended by written agreement of the Parties, the "Outside Date"); provided, however, that if on April 25, 2011 one or more of the conditions to closing set forth in Sections 10.1 or 10.3 shall have not been satisfied but all other conditions to closing have been satisfied (or, in the case of conditions that by their terms are to be satisfied at the Closing, shall be capable of being satisfied on April 25, 2011), then such date shall, at the option of Purchaser, be extended to and including May 5, 2011, upon written notice from Purchaser to Parent on or prior to April 25, 2011 of its election to so extend such date; provided, further, that a Party may not terminate this Agreement pursuant to this Section 4.4(b) if such Party is in breach of its obligations hereunder in any material respect and such breach is the sole reason that the Closing has not occurred by such date; and provided, further, that if Closing has not occurred on or before April ~~20,~~26, 2011 for any reason other than a material breach by Sellers of their obligations hereunder, Purchaser shall pay to Sellers an amount equal to $500,000 for each day ~~beginning on April 21, 2011 that~~thereafter to and including the date on which the Closing ~~does not occur~~occurs (the "Delayed Closing Penalty");

(c)    By the Purchaser or, prior to entry of the Sale Order, by Sellers, if (i) Sellers enter into a definitive agreement with respect to a Competing Bid or (ii) the Bankruptcy Court enters an Order approving a Competing Bid or (iii) the Bankruptcy Court enters an Order that otherwise precludes the consummation of the Transactions on the terms and conditions set forth in this Agreement;

(d)    By either Sellers or Purchaser, if an Order is entered by a Governmental Authority of competent jurisdiction having valid enforcement authority permanently restraining, prohibiting or enjoining either Party from consummating the Transactions and such Order shall have become final and non-appealable or shall not have been vacated prior to the Outside Date;

(e)    By Purchaser or Sellers, if the Sale Order has not been entered by the Bankruptcy Court on or before April 11, 2011;

(f)    By Purchaser, if any of the Bankruptcy Cases are dismissed or converted to a case under chapter 7 of the Bankruptcy Code for any reason;

(g)    By Purchaser, so long as Purchaser is not in breach of its obligations under this Agreement in any material respect, upon a breach of any covenant or agreement of Sellers set forth in this Agreement, or if any representation or warranty of Sellers shall have been or becomes untrue, in each case such that the conditions set forth in Section 10.1(a) or Section 10.1(b), as the case may be, would not be satisfied and such breach or untruth cannot be cured by the Outside Date;

(h)    By Sellers, so long as Sellers are not in breach of their obligations under this Agreement in any material respect, upon a breach of any covenant or agreement of Purchaser

set forth in this Agreement, or if any representation or warranty of Purchaser shall have been or becomes untrue, in each case such that the conditions set forth in Section 10.2(a) or Section 10.2(b), as the case may be, would not be satisfied and such breach or untruth cannot be cured by the Outside Date;

(i)     By Purchaser, (i) if the Bidding Procedures Order is modified in any respect, with respect to any of the provisions set forth in Sections 16, 17 or 18 or (ii) if the Bidding Procedures Order or the Sale Order is modified in any manner adverse to Purchaser, in the case of any of clauses (i) or (ii) without the prior written consent of Purchaser (which consent may be withheld in Purchaser's sole discretion);

(j)     By Purchaser, if any secured creditor of Sellers obtains relief from the stay to foreclose on any of the Purchased Assets, the effect of which would cause, or would reasonably be expected to cause, a Seller Material Adverse Effect; and

(k)     By Purchaser, if Sellers shall not have obtained written consent (which consent shall be in full force and effect) from the Requisite Lenders (as defined in the DIP Credit Agreement) of any Cash Flow Budget (that, among other things, will cover, in full, the Estimated Wind Down Expenses and the Sale Budget).

Section 4.5     Effect of Termination.

(a)     No termination of this Agreement pursuant to Section 4.4 shall be effective until notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which such termination is made.  In the event that this Agreement is validly terminated as provided herein, this Agreement shall become wholly void and of no further force and effect without liability to Purchaser or Sellers, or any of their respective Representatives, and each shall be fully released and discharged from any Liability or obligation after the date of such termination and such termination shall be without liability to Purchaser or Sellers; provided, however, that the obligations of the Parties under Sections 4.5, 8.5, and 8.7 and Article XII of this Agreement shall survive any such termination and shall be enforceable hereunder.

(b)     In the event this Agreement is properly terminated by Sellers pursuant to (i) Section 4.4(b) in the event that Closing does not occur on or before the Outside Date solely as a result of Purchaser's material breach of its obligations under this Agreement or (ii) Section 4.4(h) as a result of a material breach by Purchaser, the sole remedy of Sellers shall be retention of the Deposit as provided in Section 12.2(a)(ii).  Under no circumstance shall Purchaser have any liability to Sellers for termination of this Agreement for any other reason.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby represent and warrant to Purchaser as follows:

Section 5.1     Organization and Good Standing.  Each Seller and each Non-Debtor Subsidiary is duly organized, validly existing, in good standing and duly qualified to transact business under the laws of the jurisdiction of its formation, and is duly qualified or licensed to do

business in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, except where the failure to be so qualified would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect, and, subject to the limitations imposed on Sellers as a result of having filed petitions for relief under the Bankruptcy Code, or pursuant to any Order entered by the Bankruptcy Court, each Seller and each Non-Debtor Subsidiary has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted. Other than with respect to Blockbuster NZ Ltd., each Seller and each Non-Debtor Subsidiary has delivered or made available to Purchaser true, complete and correct copies of its organizational documents as in effect on the date hereof.

Section 5.2    Ownership of Non-Debtor Subsidiaries.

(a)    Except as otherwise indicated on Schedule 5.2(a), all of the outstanding capital stock or other equity interests of each Non-Debtor Subsidiary are owned, directly or indirectly, by the owner reflected on Schedule 5.2(a), free and clear of any and all Liens, other than (i) restrictions on transfer that may be imposed by federal or state securities Laws, (ii) Liens that arise out of any actions taken by or on behalf of Purchaser or its Affiliates, or (iii) Permitted Liens. All equity interests of each Non-Debtor Subsidiary have been validly issued and are fully paid, nonassessable and were not issued in violation of any purchase or call option, right of first refusal, subscription right, preemptive right or any similar rights.

(b)    There are no outstanding or authorized options, convertible or exchangeable securities or instruments, warrants, rights, contracts, calls, puts, rights to subscribe, conversion rights or other agreements or commitments to which Sellers are a party or which are binding on any of them providing for the issuance, disposition or acquisition of any equity interest of any of the Non-Debtor Subsidiaries.

(c)    There are no voting trusts, proxies or other agreements or understandings with respect to the voting of any equity interest of the Non-Debtor Subsidiaries.

(d)    Except (i) for the equity interests in the Non-Debtor Subsidiaries and other Sellers and (ii) as set forth on Schedule 5.2(d), Sellers do not own or hold of record or beneficially any equity interests in any Person.

(e)    The Non-Debtor Subsidiaries do not own, directly or indirectly, any voting interest in any Person that would require an additional filing by Parent under the Competition Laws in connection with any of the transactions contemplated by this Agreement.

Section 5.3    Authorization of Agreement.  Subject to the entry of the Sale Order, Sellers have all requisite power, authority and legal capacity to execute and deliver this Agreement and each other Transaction Document, agreement, document, or instrument or certificate contemplated by this Agreement or to be executed by any such Seller in connection with the consummation of the transactions contemplated by this Agreement (the "Seller Documents"), to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Seller Documents and the consummation of the transactions

contemplated hereby and thereby have been duly authorized by all requisite corporate or limited liability company action, as applicable, on the part of each Seller.  This Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by each Seller which is a party hereto and thereto and (assuming the due authorization, execution and delivery by the other parties hereto and thereto and the entry of the Sale Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of such Seller enforceable against such Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 5.4    No Violation; Consents.

(a)    Except as set forth on Schedule 5.4(a), none of the execution and delivery by Sellers of this Agreement or any of the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Sellers with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or give rise to any obligation of any Seller or their Subsidiaries to make any payment under or to the increased, additional, accelerated or guaranteed rights or entitlements of any Person under, or result in the creation of any Liens (other than Permitted Liens) upon any of the Purchased Assets or the assets of the Non-Debtor Subsidiaries or cancellation under any provision of (i) the certificate of incorporation and bylaws or comparable organizational documents of any Seller or any Non-Debtor Subsidiary; (ii) subject to entry of the Sale Order, any Contract or Permit to which any Seller or any Non-Debtor Subsidiary is a party or by which any of the properties or assets of any Seller or any Non-Debtor Subsidiary are bound; (iii) subject to entry of the Sale Order, any Order of any Governmental Authority applicable to any Seller or any Non-Debtor Subsidiary or any of the properties or assets of any Seller or any Non-Debtor Subsidiary as of the date hereof and as of the Closing Date; or (iv) subject to entry of the Sale Order, any Applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

(b)    Except as set forth on Schedule 5.4(b), no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of any Seller or any Non-Debtor Subsidiary in connection with the execution and delivery of this Agreement or the Seller Documents, the compliance by any Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the assignment and assumption of the Purchaser Assumed Contracts, or the taking by any Seller of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act or any other applicable Competition Laws, (ii) the entry of the Sale Order and (iii) other immaterial consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications.

Section 5.5     Financial Information.

(a)     Sellers have delivered to Purchaser copies of (i) the audited consolidated balance sheet of Sellers and their Subsidiaries as at January 3, 2010 and the related audited consolidated statement of income and of cash flows of Sellers and their Subsidiaries for the year then ended and (ii) the unaudited consolidated balance sheet of Sellers and their Subsidiaries as at January 2, 2011 and the related consolidated statement of income and cash flows of Sellers and their Subsidiaries for the twelve (12) month period then ended (such audited and unaudited statements, including the related notes and schedules thereto, are referred to herein as the "Financial Statements").  Each of the Financial Statements is complete and correct in all material respects, has been prepared in accordance with GAAP consistently applied throughout the periods indicated without modification of the accounting principles used in the preparation thereof throughout the periods presented and presents fairly in all material respects the consolidated financial position, results of operations and cash flows of Sellers and their Subsidiaries as at the dates and for the periods indicated therein, subject to normal year-end adjustments and the absence of complete notes in the case of the unaudited statements.  For the purposes hereof, the unaudited consolidated balance sheet of Sellers and their Subsidiaries as at January 2, 2011 is referred to as the "Balance Sheet" and January 2, 2011 is referred to as the "Balance Sheet Date."

(b)     Sellers make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of their respective assets. Sellers maintain systems of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP and to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the actual levels at reasonable intervals and appropriate action is taken with respect to any differences.

Section 5.6     No Undisclosed Liabilities.  No Seller nor any of its Subsidiaries has any Liabilities that would have been required to be reflected in, reserved against or otherwise described in the Balance Sheet or the notes thereto in accordance with GAAP, other than Liabilities incurred in the Ordinary Course of Business since the Balance Sheet Date, Liabilities under this Agreement, Liabilities of Sellers that will not be Assumed Liabilities and Liabilities that would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

Section 5.7     Title to Purchased Assets.  Except as set forth in Schedule 5.7, and other than the real property subject to the Real Property Leases, Intellectual Property owned by third parties and licensed to Sellers subject to any Intellectual Property Licenses and personal property subject to personal property leases (including the Personal Property Leases), Sellers own each of the Purchased Assets, and at the Closing Purchaser will be vested with good and valid title to such Purchased Assets, free and clear of all Liens, other than Permitted Liens, to the fullest extent permissible under section 363(f) of the Bankruptcy Code.

Section 5.8    Taxes.  Except as set forth on Schedule 5.8 and except as precluded by the Bankruptcy Code:

(a)    (i) Sellers and each of their Subsidiaries have timely filed (or have caused to be timely filed) with the appropriate Taxing Authorities all material Tax Returns required to be filed with respect to the Purchased Assets (taking into account any extension of time to file granted or obtained with respect to such entity); (ii) all such Tax Returns are complete and accurate; and (iii) all income and other material Taxes due, regardless of whether shown on a filed Tax Return, have been timely paid.

(b)    No Tax audits, investigations or administrative or judicial proceedings are pending or in progress or, to Sellers' Knowledge, have been threatened in writing with respect to the Purchased Assets or the Non-Debtor Subsidiaries.

(c)    Each of Sellers and the Non-Debtor Subsidiaries has complied in all material respects with all Applicable Laws relating to the payment and withholding of Taxes and has duly and timely withheld and paid over to the appropriate Taxing Authorities all amounts required to be so withheld and paid over under all Applicable Laws.

(d)    No Seller or any Subsidiary of a Seller has been party to any "listed transaction" as defined in Treasury Regulation Section 1.6011-4 or subject to any similar provision of state, local or foreign Law.

(e)    Each Non-Debtor Subsidiary is treated as an association taxable as a corporation for U.S. federal income Tax purposes.

(f)    No Seller is a foreign person within the meaning of Section 1445 of the Code.

(g)    No agreement, waiver or other document or arrangement extending or having the effect of extending the period for assessment or collection of Taxes (including, but not limited to, any applicable statute of limitations) or the period for filing any Tax Return, has been executed or filed with any Taxing Authority by or on behalf of any of the Non-Debtor Subsidiaries.

(h)    No power of attorney with respect to any Tax matter is currently in force with respect to the Purchased Assets, the Business or any of the Non-Debtor Subsidiaries that would, in any manner, bind, obligate, or restrict Purchaser.

(i)    No Tax elections have been made with respect to the Purchased Assets or the Business or by any Non-Debtor Subsidiary that would, in any manner, bind, obligate or restrict Purchaser.

(j)    Other than with respect to customary provisions related to a Tax pass-through, employee gross-up or other similar arrangements entered into in the Ordinary Course of Business, no Tax allocation, Tax sharing or Tax indemnity or similar agreement or arrangement is currently in effect with respect to the Purchased Assets or the Business or by any Non-Debtor Subsidiary that would, in any manner, bind, obligate or restrict Purchaser.

(k)     Since the Balance Sheet Date, each Non-Debtor Subsidiary has made full provision for any and all Taxes resulting from or attributable to any transaction or matter occurring or deemed to occur on or prior to the Closing Date.

Section 5.9     Real Property.

(a)     Schedule 5.9(a) sets forth a complete list of all material real property and interests in real property owned by Sellers and the Non-Debtor Subsidiaries that is necessary for, used or held for use in connection with the operation and conduct of the Business (individually, an "Owned Property" and collectively, the "Owned Properties"). Each of Sellers and the Non-Debtor Subsidiaries has good and marketable (or, to the extent located in Texas, indefeasible) fee title to all Owned Properties, free and clear of all Liens of any nature whatsoever except (i) as set forth on Schedule 5.9(a), (ii) matters that are disclosed in the relevant title policy and survey for such Owned Property, (iii) Permitted Liens, and (iv) zoning, planning and other limitations and restrictions of record, none of which would reasonably be expected to have, individually or in the aggregate, a material impact on the use or operation of any such Owned Property or prevent or materially limit the continued use and operation of the Owned Properties as currently owned and operated.  Except as set forth on Schedule 5.9(a), the Owned Properties are not subject to any leases or tenancies or other rights of occupancy.  Neither Seller nor any Non-Debtor Subsidiary has received notice that any of the improvements comprising the Owned Properties or the business conducted by Sellers or any Non-Debtor Subsidiaries thereon is in violation of any building line, use or occupancy restriction, limitation, easement, condition or covenant of record.  To Sellers' Knowledge, there are no physical defects in the buildings or other facilities or machinery or equipment located at any of the Owned Properties which would interfere with the use and operation of the Owned Properties as currently used and operated, other than with respect to such defects as would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

(b)     Schedule 5.9(b) sets forth a complete list of all material real property and interests in real property leased by Sellers or any Non-Debtor Subsidiaries (individually, a "Real Property Lease" and collectively, the "Real Property Leases") as lessee or lessor. Sellers have provided Purchaser with, or access to, prior to the date of this Agreement, true, correct, accurate and complete copies of all leases and other instruments and agreements together with all amendments, modifications, supplements, and restatements thereto, if any, pertaining to the Real Property Leases.  To Sellers' Knowledge, there are no physical defects in the buildings or other facilities or machinery or equipment located at any of the properties subject to any of the Real Property Leases which would interfere with the continued use and operation of the properties subject to the Real Property Leases as currently used and operated, other than with respect to such defects as would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

(c)     Except as disclosed in Schedule 5.9(d), neither Seller nor any Non-Debtor Subsidiary has granted to any other Person any rights, adverse or otherwise, under such Real Property Lease, or sublet, assigned or otherwise conveyed all or any portion of the premises demised under the Real Property Lease or Real Property Lease to any other Person.

Section 5.10     Tangible Personal Property; Capital Leases.

(a)    Schedule 5.10(a) sets forth all leases of personal property ("Personal Property Leases") involving annual payments in excess of $50,000 relating to personal property used by Sellers or any of the Non-Debtor Subsidiaries in connection with the Business or to which any Seller or any Non-Debtor Subsidiary is a party or by which the properties or assets of any Seller or any Non-Debtor Subsidiary are bound.

(b)    Schedule 5.10(b) sets forth all capital leases ("Capital Leases") involving annual payments in excess of $50,000 relating to property used by Sellers or any of the Non-Debtor Subsidiaries in connection with the Business or to which any Seller or any Non-Debtor Subsidiary is a party or by which the properties or assets of any Seller or any Non-Debtor Subsidiary are bound.

(c)    Sellers and the Non-Debtor Subsidiaries have a valid and enforceable leasehold interest under each of the Personal Property Leases and Capital Leases under which each is a lessee, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).  Each of the Personal Property Leases and Capital Leases is in full force and effect.

(d)    All personal property of Sellers and the Non-Debtor Subsidiaries (including personal property subject to Personal Property Leases) and all property of Sellers or any of the Non-Debtor Subsidiaries subject to Capital Leases, other than any Excluded Asset, is (i) in good operating condition and repair (ordinary and reasonable wear and tear excepted), and (ii) suitable for the purposes for which it is currently used.

(e)    None of Sellers nor any of the Non-Debtor Subsidiaries has leased or subleased to any other Person any property that is subject to a Personal Property Lease or a Capital Lease.  None of Sellers nor any of the Non-Debtor Subsidiaries has assigned to any other Person its interest under any lease or sublease with respect to any property subject to a Personal Property Lease or Capital Lease.  The rental set forth in each lease or sublease of any item or distinct group of personal property of each Seller or each Non-Debtor Subsidiary is and immediately after the Closing will be the actual rental being paid by such Seller or such Non-Debtor Subsidiary and there are and immediately after the Closing will be no separate agreements or understandings in respect thereof.

Section 5.11    Intellectual Property.

(a)    Schedule 5.11(a) sets forth a true and complete list of all material issuances and registrations and material applications for issuance or registration included in the Purchased Intellectual Property.

(b)    Schedule 5.11(b) sets forth a true and complete list of (i) all material written Intellectual Property Licenses that are Purchaser Assumed Contracts and (ii) to Sellers' Knowledge, all material oral Intellectual Property Licenses that are Purchaser Assumed Contracts, regardless of whether such Intellectual Property Licenses involve annual payments by or to a Seller or an Affiliate of any Seller.

(c)     Except as set forth on Schedule 5.11(c):

(i)     A Seller or one of its Subsidiaries owns all Intellectual Property listed on Schedule 5.11(a) and has valid rights in and to, including rights to use, publish, and perform, as applicable, all other Business Intellectual Property included in the Purchased Assets as such Business Intellectual Property is used in the Ordinary Course of Business, in each case, free and clear of all Liens other than Permitted Liens and Intellectual Property Licenses.

(ii)     The Purchased Intellectual Property is not the subject of any ownership, validity, use, or enforceability challenge or claim received by Sellers in writing or, to Sellers' Knowledge, any outstanding Order restricting the use by Sellers or any of their Subsidiaries thereof or adversely affecting any of the rights of Sellers or any of their Subsidiaries thereto, except as would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

(iii)     No Seller has received any written notice of any default or any event that with notice or lapse of time, or both, would constitute a default under any Intellectual Property License that is a Purchaser Assumed Contract and to which any Seller is a party or by which it is bound, except for defaults that would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect. To Sellers' Knowledge, no Person is violating any Purchased Intellectual Property or Business Intellectual Property exclusively licensed to any Seller or any of its Subsidiaries under an Intellectual Property License that is a Purchaser Assumed Contract, except for violations that would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

(iv)     To Sellers' Knowledge, (A) no Seller nor any of its Subsidiaries is violating, and since September 23, 2010, has violated, any Intellectual Property rights of any other Person and (B) there are no Actions or Legal Proceedings, pending or threatened, concerning any claim that Sellers or any of their Subsidiaries have infringed, diluted, misappropriated, or otherwise violated any Intellectual Property rights of any other Person, in each case, except as would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

(v)     Sellers and their Subsidiaries have used commercially reasonable efforts to protect the confidentiality of any material Trade Secrets and other material confidential and proprietary information included in the Purchased Assets.

Section 5.12     Material Contracts.

(a)     Schedule 5.12(a) sets forth all of the following Contracts to which any Seller or any Non-Debtor Subsidiary is a party or by which any Seller or any Non-Debtor Subsidiary is bound in connection with the Business or by which the Purchased Assets may be bound or affected and that are Purchaser Assumed Contracts (collectively, the "Material Contracts"):

(i)     Contracts with any Affiliate or current or former officer or director of any Seller or any of its Subsidiaries or any Non-Debtor Subsidiaries;

(ii) Contracts pursuant to which a Seller or any of its Subsidiaries or any Non-Debtor Subsidiary grants to any Person any franchise rights or rights to represent a Seller or any Non-Debtor Subsidiary with respect to any product, or act as agent for any Seller or any Non-Debtor Subsidiary in connection with the marketing, distribution or sale of any Business product;

(iii) Contracts with any labor union or association representing any employees of any Seller or any Non-Debtor Subsidiary;

(iv) Contracts for the sale of any of the assets of the Business, other than in the Ordinary Course of Business;

(v) Contracts relating to the acquisition by any Seller or any of its Subsidiaries, or any Non-Debtor Subsidiary of any operating business or the capital stock of any other Person;

(vi) Contracts containing a covenant that restricts a Seller or any Affiliate of a Seller or any Non-Debtor Subsidiary from engaging in any line of business, conducting the Business in any geographic area, competing with any Person or hiring any Person;

(vii) Contracts relating to incurrence of Indebtedness or the making of any loans, in each case involving amounts in excess of $100,000;

(viii) Contracts relating to a joint venture of the Business, any Seller or any of its Subsidiaries or any Non-Debtor Subsidiaries;

(ix) Contracts which involve the expenditure of more than $100,000 in the aggregate or require performance by any party more than one year from the date hereof that, in either case, are not terminable by a Seller or any Non-Debtor Subsidiary without penalty on less than one hundred eighty (180) days' notice;

(x) the Intellectual Property Licenses;

(xi) the Studio Contracts;

(xii) the Alliance Agreement, dated as of January 23, 2009, by and between NCR Corporation and Blockbuster Inc.;

(xiii) Contracts providing for severance, retention, change in control or similar payments;

(xiv) Contracts for the employment of any individual on a full-time, part-time or consulting or other basis providing annual compensation in excess of $100,000;

(xv) all Real Property Leases; and

(xvi)   any other Contracts that are not made in the Ordinary Course of Business or that are material to the Business or the Non-Debtor Subsidiaries.

(b)   Each of the Material Contracts is in full force and effect and is the legal, valid and binding obligation of Sellers or a Non-Debtor Subsidiary, enforceable against them in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).  Sellers have good and valid title to the Material Contracts, free and clear of all Liens (other than Permitted Liens).  Sellers have delivered or otherwise made available to Purchaser, prior to the date of this Agreement, true, correct and complete copies of all of the Material Contracts, together with all amendments, modifications or supplements thereto.

Section 5.13   Employee Benefits.

(a)   Schedule 5.13(a) separately lists: (i) all material Debtor Benefit Plans and (ii) all material Non-Debtor Benefit Plans.

(b)   True, correct and complete copies of each of the material Employee Benefit Plans and with respect to each Non-Debtor Benefit Plan the following documents (as applicable) have been made available to Purchaser (i) each material writing constituting a part of such Non-Debtor Benefit Plan, including all plan documents, benefit schedules, trust agreements, and insurance contracts and other funding vehicles and amendments thereto and written interpretations thereof, (ii) where a material plan document for a Non-Debtor Benefit Plan does not exist, a detailed description of such Non-Debtor Benefit Plan, (iii) the most recent annual report or similar document filed with any Governmental Authority, (iv) the most recent financial statement and actuarial valuation, (v) the most recent IRS determination letter or other governmental registration, and (vi) the most recent summary plan descriptions (including letters or other documents updating such descriptions).

(c)   Except as disclosed on Schedule 5.13(c), each of the Employee Benefit Plans (including the Non-Debtor Benefit Plans) intended to qualify for tax-advantaged status under Applicable Laws so qualifies and there are no existing circumstances nor any events that have occurred that could reasonably be expected to adversely affect the qualified status of any Non-Debtor Benefit Plan.

(d)   Except as disclosed on Schedule 5.13(d), each of the Non-Debtor Benefit Plans has been administered in all material respects in compliance with its terms and all Applicable Laws and, with respect to each such Non-Debtor Benefit Plan, (i) all employer and employee contributions required by Law or by the terms of the plan have been timely made, or, if applicable, accrued, in accordance with normal accounting practices; (ii) if they are intended to be funded and/or book-reserved, the fair market value of the assets of each funded plan, or the book reserve established for each plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations with respect to all current and former participants in such plan according to the actuarial assumptions and valuations most recently used to account for such obligations in accordance with applicable generally accepted accounting

principles; and (iii) it has been registered as required and has been maintained in good standing with applicable regulatory authorities.

(e)     Except as disclosed on <u>Schedule 5.13(e)</u>, there is no litigation and there are no judicial or governmental proceedings pending or, to Sellers' Knowledge, threatened with respect to any Non-Debtor Benefit Plan other than claims for benefits thereunder in the ordinary course.

(f)     None of the Sellers or their Subsidiaries are required to gross up or reimburse a payment to any Employee for Taxes incurred under sections 409A or 457A of the Code or any similar provision of state, local or non-US tax law.

(g)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in conjunction with another event) (i) result in any payment becoming due to any Employee of any Seller; (ii) increase any benefits otherwise payable under any Employee Benefit Plan; or (iii) result in the acceleration of the time of payment or vesting of any such benefits, in each case, that would be required to be satisfied by Purchaser following the Closing.

Section 5.14   <u>Labor</u>.

(a)     Except as set forth on <u>Schedule 5.14(a)</u>, none of Sellers, the Non-Debtor Subsidiaries or any of the Debtor Subsidiaries is a party to any labor or collective bargaining agreement and there are no labor unions or other similar organizations or groups representing or, to Sellers' Knowledge, purporting or attempting to represent any Employee of any Seller or any Subsidiary.

(b)     Except as set forth on <u>Schedule 5.14(b)</u>, there are no (i) strikes, work stoppages, work slowdowns or lockouts pending or, to Sellers' Knowledge, threatened against or involving Seller, any of the Non-Debtor Subsidiaries or any of the Debtor Subsidiaries, or (ii) unfair labor practice charges, grievances or complaints pending or, to Sellers' Knowledge, threatened by or on behalf of any employee or group of employees of Seller, any of the Non-Debtor Subsidiaries or any of the Debtor Subsidiaries, except in each case as would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

Section 5.15   <u>Litigation</u>.  Except (a) as set forth on <u>Schedule 5.15</u>, (b) for matters before the Bankruptcy Court involving Sellers or any of their Affiliates, and (c) any matters that will otherwise be resolved by the Sale Order without any Liability or restriction applicable to Purchaser or the Purchased Assets, there are no Legal Proceedings or Actions pending or, to Sellers' Knowledge, threatened against any Seller or any of its Subsidiaries, or relating to the Business or any of the Purchased Assets or Assumed Liabilities, before any Governmental Authority, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

Section 5.16    Compliance with Laws; Permits.

(a)    Except as set forth on Schedule 5.16, since September 23, 2010, Sellers and the Non-Debtor Subsidiaries have (i) conducted and continue to conduct the Business in accordance with all Applicable Laws and Orders applicable to their respective operations or assets or the Business, (ii) complied with and continue to comply with all Laws and Orders applicable to the Purchased Assets and the Assumed Liabilities, and (iii) are not in violation of any such Law or Order, except where the failure to be in compliance would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect and except with respect to Environmental Laws which are addressed in Section 5.17.  Neither any Seller nor any of its Subsidiaries has received any written notice of or been charged with the violation of any Laws and, to Sellers' Knowledge, there are no facts or circumstances that would reasonably be expected to give rise to any such violation, except where such violation would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

(b)    Sellers and the Non-Debtor Subsidiaries currently have all Permits which are required for the operation of the Business as presently conducted, except where the absence of which would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect. Neither any Seller nor any of its Subsidiaries is in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which it is a party, and, to Sellers' Knowledge, there are no facts or circumstances that would reasonably be expected to give rise to any such violation, except where such default or violation would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

Section 5.17    Environmental Matters.

(a)    Except as set forth on Schedule 5.17(a), the operations of Sellers and their Subsidiaries are in material compliance with all applicable Environmental Laws and all Permits issued pursuant to Environmental Laws or otherwise and no Seller nor any of its Subsidiaries has any material Environmental Liabilities or Obligations and no facts exist or events have occurred that could reasonably be expected to give rise to any such material Environmental Liabilities or Obligations.

(b)    Sellers and their Subsidiaries have obtained all Permits required under all applicable Environmental Laws necessary to operate the Business.

(c)    None of Sellers or their Subsidiaries is the subject of any outstanding Order or Contract with any Governmental Authority respecting (i) Environmental Laws, (ii) Remedial Action or (iii) any Release or threatened Release of a Hazardous Material.

(d)    None of Sellers or their Subsidiaries has received any written communication alleging that any Seller or any of its Subsidiaries may be in violation of any Environmental Law or any Permit issued pursuant to Environmental Law, or may have any Environmental Liabilities or Obligations.

(e)     To Sellers' Knowledge, there are no investigations of the Business, or currently or previously owned, operated or leased property of any Seller or any of its Subsidiaries pending or, to Sellers' Knowledge, threatened which would reasonably be expected to result in the imposition of any material liability pursuant to any Environmental Law.

Section 5.18     Accounts and Notes Receivable and Payable.

(a)     All accounts and notes receivable of Sellers and the Non-Debtor Subsidiaries have arisen from bona fide transactions in the Ordinary Course of Business consistent with past practice and are payable on ordinary trade terms, are properly reflected on Sellers' and the Non-Debtor Subsidiaries' books and records and properly reserved for with respect to doubtful accounts, all in accordance with GAAP.

(b)     All accounts payable of Sellers and Non-Debtor Subsidiaries reflected in the Balance Sheet or arising after the date thereof are the result of bona fide transactions in the Ordinary Course of Business.

Section 5.19     Insurance.  Set forth on Schedule 5.19 is a list of all material policies of insurance by which the Purchased Assets and the Non-Debtor Subsidiaries are covered as of the date hereof.  Except as set forth on Schedule 5.19, all such policies are in full force and effect and there are no material claims pending as of the date hereof under any of such policies where underwriters have reserved their rights or disclaimed coverage under such policy with such exceptions that would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

Section 5.20     Financial Advisors.  Except as set forth on Schedule 5.20, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for any Seller or any of its Subsidiaries in connection with the transactions contemplated by this Agreement.  No Person is entitled to any fee or commission or like payment from Purchaser in respect thereof.

Section 5.21     No Other Representations or Warranties; Schedules.  Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), no Seller nor any other Person makes any express or implied representation or warranty with respect to Sellers, their Subsidiaries, the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and Sellers disclaim any other representations or warranties, whether made by Sellers, any Affiliate of Sellers or any of their respective officers, directors, employees, agents or representatives.  Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), Sellers expressly disclaim and negate any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or express warranty of merchantability or fitness for a particular purpose). Sellers make no representations or warranties to Purchaser regarding the probable success or profitability of the Business.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers as follows:

Section 6.1 <u>Organization and Good Standing</u>. Purchaser is a corporation duly organized, validly existing, in good standing and duly qualified to transact business under the laws of the State of Nevada and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 6.2 <u>Authorization of Agreement</u>. Purchaser has all requisite power, authority and legal capacity to execute and deliver this Agreement, the other Transaction Documents and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "<u>Purchaser Documents</u>"), to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary limited liability company action on behalf of Purchaser. This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 6.3 <u>No Violation; Consents</u>.

(a) None of the execution and delivery by Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of formation and operating agreement or comparable organizational documents of Purchaser, (ii) any Contract or Permit to which Purchaser is a party or by which Purchaser or its properties or assets are bound, (iii) any Order of any Governmental Authority applicable to Purchaser or by which any of the properties or assets of Purchaser are bound or (iv) any Applicable Law, except in the case of clauses (ii), and (iii) and (iv) as would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

(b) No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of Purchaser in connection with the execution and delivery of this Agreement or the

Purchaser Documents, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for compliance with the applicable requirements of the HSR Act and other applicable Competition Laws, the entry of the Sale Order or that would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

Section 6.4    Litigation.  There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to have a Purchaser Material Adverse Effect.

Section 6.5    Investment Intention.  Purchaser is acquiring the Subsidiary Shares for its own account, for investment purposes only and not with a view to the distribution thereof in violation of the Securities Act of 1933, as amended (the "Securities Act").  Purchaser understands that the Subsidiary Shares have not been registered under the Securities Act and cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is available.

Section 6.6    Financial Capability.  Purchaser (a) will have at the Closing sufficient funds available to pay the Purchase Price and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement, and (b) will have at the Closing the resources and capabilities (financial or otherwise) to perform its obligations hereunder.

Section 6.7    Bankruptcy.  There are no bankruptcy, reorganization or arrangement proceedings pending against, being contemplated by, or to the knowledge of Purchaser, threatened against, Purchaser.

Section 6.8    Financial Advisors.  Except as set forth on Schedule 6.8, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated hereunder and no Person is entitled to any fee or commission or like payment in respect thereof which would be payable by Sellers.

Section 6.9    Condition of the Business.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that no Seller is making any representations or warranties whatsoever, express or implied, beyond those expressly given by Sellers in Article V hereof (as modified by the Schedules hereto as supplemented or amended in accordance with Section 8.11), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "where is" and, as to condition, "as is" basis.  Purchaser further represents that no Seller or any of its Affiliates or any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Sellers or any of their Subsidiaries, the Business or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and no Seller, any of their Affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives or Purchaser's use of, any such information, including any confidential memoranda distributed on behalf of Sellers relating to the Business or other

publications or data room information provided to Purchaser or its representatives, in connection with the sale of the Business and the Transactions. Purchaser acknowledges that it has conducted to its satisfaction its own independent investigation of the Business and, in making the determination to proceed with the Transactions, Purchaser has relied on the results of its own independent investigation.

# ARTICLE VII

# BANKRUPTCY COURT MATTERS

Section 7.1    Competing Transaction.

(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids, including, in consideration of any sale, transfer, liquidation or disposition of the Business or assets of Sellers or their Subsidiaries, or a plan of reorganization or liquidation with respect to the Business or assets of Sellers and their Subsidiaries (each a "Competing Bid"). From the date hereof (and any prior time) and until the earlier of: (i) the consummation of the Transactions and (ii) the conclusion of any bid process described in the Bidding Procedures Order, Sellers are permitted to cause their representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) in compliance with the Bidding Procedures Order in connection with any sale or other disposition of the Purchased Assets and the Business. In addition, solely during the period described in the immediately preceding sentence of this Section 7.1(a), Sellers shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets or the Business and perform any and all other acts related thereto which are required under the Bankruptcy Code or other Applicable Law, including supplying information relating to the Business and assets of Sellers and its Subsidiaries to prospective purchasers;

(b)    Sellers shall not and shall not permit any of their Subsidiaries to furnish information concerning Sellers, the Non-Debtor Subsidiaries, the Business, or the properties or assets of Sellers or their Subsidiaries to any third party, except (i) in the Ordinary Course of Business, (ii) to any Governmental Authority, or (iii) pursuant to a confidentiality agreement entered into between any Seller and such third party. Sellers shall use commercially reasonable efforts to promptly provide, or identify and make available to Purchaser any non-public information concerning Sellers, the Non-Debtor Subsidiaries, the Purchased Assets or the Business provided to any other Person after the date hereof which was not previously provided to Purchaser.

(c)    Following the date of the entry of the Sale Order approving this Agreement and until such time as this Agreement has been terminated in accordance with its express terms, Sellers shall not, nor shall any of their Subsidiaries authorize or permit any Representative of any Seller to, (i) directly or indirectly solicit, initiate or encourage the submission of any offer or proposal concerning any Competing Bid or (ii) directly or indirectly participate in any discussions or negotiations regarding, or furnish to any Person any information with respect to, or take any other action to facilitate the making of, any proposal or expression of interest that constitutes or is reasonably likely to lead to a Competing Bid.

Section 7.2    Bankruptcy Court Filings.  As promptly as practicable following the date of this Agreement, Sellers shall obtain entry of the Sale Order from the Bankruptcy Court.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  In the event the entry of the Sale Order or the Bidding Procedures Order shall be appealed, Sellers and Purchaser shall use their respective commercially reasonable efforts to defend such appeal.  Sellers shall not amend, supplement, or modify, or cause to be amended, supplemented or modified, the Sale Order and/or the Bidding Procedures Order, in any manner adverse to Purchaser without Purchaser's prior written consent (which consent may be withheld in Purchaser's sole discretion).

## ARTICLE VIII

## COVENANTS

Section 8.1    Access to Information.  Sellers agree that, prior to the Closing Date, Purchaser shall be entitled, through its officers, employees and Representatives, to (a) make such investigation of the properties, businesses and operations of the Business and (b) make such examination of the books and records of the Business, the Non-Debtor Subsidiaries, the Purchased Assets and the Assumed Liabilities as Purchaser reasonably requests and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and Sellers and their Subsidiaries shall cooperate fully therein.  Purchaser and its Representatives shall cooperate with Sellers and their Representatives and shall use their commercially reasonable efforts to minimize any disruption to the Business in connection with such investigation and examination.  Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Sellers or any of their Subsidiaries to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which such Seller or any of its Subsidiaries is bound.  With respect to any material vendor or other strategic partner of Sellers and their Subsidiaries that Purchaser desires to contact prior to Closing, Purchaser shall consult with Sellers and, so long as in Sellers' reasonable judgment such contact would not be materially detrimental to the Business, Sellers and their Subsidiaries shall promptly seek and use commercially reasonable efforts to arrange appropriate meetings and telephone conferences with such parties.  No investigation by Purchaser prior to or after the date of this Agreement shall affect or be deemed to modify any of the representations, warranties, covenants or agreements of Sellers and the Non-Debtor Subsidiaries contained in this Agreement or the Seller Documents.  In order that Purchaser may have full opportunity to make such physical, business, accounting and legal review, examination or investigation as it may reasonably request of the affairs of Sellers and their Subsidiaries, Sellers shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of Sellers and their Subsidiaries to cooperate fully with such representatives in connection with such review and examination.  Sellers shall promptly deliver to Purchaser all

pleadings, motions, notices, statements, schedules, applications, reports and other papers filed in any other judicial or administrative proceeding as Purchaser may reasonably request.

Section 8.2    Conduct of the Business Pending the Closing.

(a)    Prior to the Closing, except (1) as set forth on Schedule 8.2(a), (2) as required by Applicable Law or by Order of the Bankruptcy Court, (3) as otherwise expressly contemplated by this Agreement, or (4) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), Sellers shall, and shall cause their Subsidiaries to:

(i)    conduct the Business only in the Ordinary Course of Business (other than Store Closing Liquidations in accordance with this Agreement) and comply with the Cash Flow Budget in all material respects;

(ii)    use their commercially reasonable efforts to (A) preserve the present business operations, organization and goodwill of the Business, and (B) preserve the present relationships with Persons having business dealings with Sellers and their Subsidiaries (including customers and suppliers of the Business);

(iii)    (A) maintain the books, accounts and records of Sellers and their Subsidiaries in the Ordinary Course of Business, (B) continue to operate billing procedures and collect accounts receivable utilizing normal procedures and without discounting or accelerating payment of such accounts, (C) subject to compliance with the Cash Flow Budget, pay accounts payable and comply with all contractual and other obligations applicable to the operation of the Business, and (D) not permit any material change in any pricing, investment, accounting, financial reporting, inventory, credit, allowance or Tax practice or policy of Sellers or the Non-Debtor Subsidiaries that would adversely affect any of the Non-Debtor Subsidiaries;

(iv)    [Intentionally Omitted];

(v)    subject to any confidentiality restrictions which apply to Sellers or their Subsidiaries, use commercially reasonable efforts to consult in good faith from time to time with the Representatives of Purchaser to report cash flow results of the Business, material operational developments as they arise, the general status of ongoing operations of the Business and with respect to the Store Closing Liquidations;

(vi)    other than in the Ordinary Course of Business or in connection with any liquidations or going out of business sales, maintain the Purchased Assets and assets of the Non-Debtor Subsidiaries in their current condition, ordinary wear and tear excepted;

(vii)    defend and protect the properties and assets of Sellers and their Subsidiaries from infringement or usurpation;

(viii)    maintain in full force and effect until the Closing insurance upon all of the Purchased Assets and the assets of the Non-Debtor Subsidiaries in such amounts and of such kinds comparable to that in effect on the date of this Agreement; and

(ix)     comply with Applicable Laws, including Environmental Laws, other than with respect to the failure of such compliance as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

(b)     Prior to the Closing, except (1) as set forth on Schedule 8.2(b), (2) as required by Applicable Law or Order of the Bankruptcy Court, (3) as otherwise expressly contemplated by this Agreement, (4) as expressly permitted or expressly contemplated by the Cash Flow Budget, or (5) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Sellers shall not, and shall not permit their Subsidiaries to:

(i)     other than with respect to payments made in the Ordinary Course of Business on a "payment neutral" basis (i.e., payments to vendors with respect to newly accruing obligations on account of revenue sharing arrangements or otherwise) or as otherwise expressly permitted by the Cash Flow Budget or to the extent expressly permitted or required by this Agreement, make any payments to any studio vendors or with respect to any Studio Contract;

(ii)     (A) increase the compensation or any other benefits of any of their respective directors, officers, employees or individual consultants, (B) grant any bonus, benefit or other direct or indirect compensation to any director, officer, employee or individual consultant, (C) increase the coverage or benefits available under (or create any new or otherwise amend) any Employee Benefit Plan or (D) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which any Seller or any of its Subsidiaries is a party or involving a director or executive officer of any Seller or any of its Subsidiaries, except, in each case, as required by Applicable Law from time to time in effect;

(iii)     (A) make, change or rescind any material election relating to Taxes, (B) settle or compromise any material claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes, or (C) except as may be required by Applicable Law or GAAP, make any material change to any of its methods of accounting for Tax purposes from those employed in the preparation of its most recent Tax Returns;

(iv)     subject any of the Purchased Assets or the assets of a Non-Debtor Subsidiary to any Lien, except for Permitted Liens and except for non-exclusive licenses under any Purchased Intellectual Property or any Intellectual Property owned by any Non-Debtor Subsidiary granted in the Ordinary Course of Business;

(v)     acquire any material properties or assets that would be Purchased Assets or assets of a Non-Debtor Subsidiary or, except for the purpose of disposing of obsolete or worthless assets, sell, assign, license, transfer, convey, lease or otherwise dispose of any of the Purchased Assets or assets of a Non-Debtor Subsidiary;

(vi)     cancel, amend, modify, terminate or compromise any material debt or claim or waive or release any material right of Seller or any of its Subsidiaries that constitutes a Purchased Asset or an asset of a Non-Debtor Subsidiary;

(vii)     acquire any entity or all or substantially all of the assets of any entity or enter into any commitment for capital expenditures in excess of $25,000 for any individual commitment and $100,000 for all commitments in the aggregate;

(viii)    enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization;

(ix)     enter into any Contract for the sale of any Owned Property or the sublease with respect to any property subject to a Real Property Lease;

(x)      (A) enter into any transaction or enter into, modify or renew any Contract which by reason of its size or otherwise is not in the Ordinary Course of Business (including, for the avoidance of doubt, any Contract that contains exclusivity or most favored nation provisions) or (B) enter into any Contract that would have been a Material Contract had it been entered into prior to this Agreement;

(xi)     enter into any Contract, understanding or commitment that restrains, restricts, limits or impedes the ability of the Business, or the ability of Purchaser, to compete with or conduct any business or line of business in any geographic area;

(xii)    terminate, amend, restate, supplement or waive any rights under (A) prior to the expiration of Purchaser's right to designate Purchaser Assumed Contracts pursuant to Section 2.5 and subject to Sellers' rights under Section 2.5(~~b~~c), any Real Property Leases or material contracts of Sellers, (B) following the expiration of Purchaser's right to designate Purchaser Assumed Contracts, any Purchaser Assumed Contract or Real Property Leases, (C) any material contract of any Non-Debtor Subsidiary or (D) any Permit;

(xiii)   amend its certificate or articles of incorporation, bylaws, or other organizational documents or take any other action if any such amendment or action would have an adverse effect on the ability of Seller to consummate the Transactions or otherwise adversely affect the Business or the value, utility or transferability of the Purchased Assets or Subsidiary Shares;

(xiv)    issue, and Sellers shall use their reasonable efforts to prohibit any of their franchisees and franchisees of Non-Debtor Subsidiaries from issuing, to any customers or Employees any gift cards, gift certificates, vouchers, discounts or any other offers that may be redeemable for cash or any inventory offered by the Business following the Closing Date;

(xv)     other than with respect to customary advances for expenses to Employees in the Ordinary Course of Business, make any loan or advance to any Person;

(xvi)    engage in any transaction with respect to the Business with any officer, director or Affiliate of Sellers or their Subsidiaries;

(xvii)   incur or assume any Indebtedness;

(xviii)  enter into or agree to enter into any merger or consolidation with any corporation or other entity, or engage in any new business or invest in, make a loan, advance or capital contribution to, or otherwise acquire the securities of, any other Person;

(xix)    declare, set aside, make or pay any dividend or other distribution, payable in cash, stock, property or otherwise, in respect of the capital stock of Sellers or their Subsidiaries or repurchase, redeem or otherwise acquire any outstanding shares of the capital stock or other securities of, or interests in, Sellers or their Subsidiaries;

(xx)    introduce any material change with respect to the operation of the Business, including any material change in the types, nature, composition or quality of products or services, or make any change in product specifications or prices or terms of distributions of such products;

(xxi)    honor or redeem (or in any way use assets of Sellers' bankruptcy estate in connection with the honoring or redemption of) any gift cards that are outstanding on, or issued subsequent to, the date hereof, except to the extent honored and/or redeemed pursuant to a program for which Purchaser provides, in its sole discretion, its prior written consent upon and following the date that is forty-five (45) days (or such longer period as required by applicable state or local regulations) after the date hereof; provided, that for the avoidance of doubt, this Section 8.2(b)(xxi) shall not restrict Sellers' right to honor or redeem gift cards prior to the expiration of such 45-day period (or, to the extent applicable, such longer period as required by applicable state or local regulations);

(xxii)   issue, sell or pledge any equity in any of the Non-Debtor Subsidiaries, or securities or rights that by their terms may be exercised or exchanged or converted into equity of any of the Non-Debtor Subsidiaries; or

(xxiii)  agree to do anything prohibited by this Section 8.2.

(c)    Subject to compliance by Purchaser with the terms of this Agreement and the Store License Agreement, except with the prior written consent of Purchaser or as required by Section 2.5(b), from and after the Closing until the Assumption Deadline, Sellers shall not terminate, reject, amend, restate, supplement or waive any rights under any Contract that can be designated a Purchaser Assumed Contract pursuant to this Agreement.

Section 8.3    Consents.  Sellers shall use (and shall cause each of their Subsidiaries to use) commercially reasonable efforts, and Purchaser shall cooperate with Sellers, to obtain at the earliest practicable date all consents and approvals required to consummate the Transactions, including the consents and approvals referred to in Section 5.4(b); provided, however, that neither Sellers nor Purchaser nor any of their respective Affiliates shall be obligated to (a) pay any consideration therefor to any third party from whom consent or approval is requested, or (b) agree to any restrictions on its ability to operate the Business or the Purchased Assets or Non-Debtor Subsidiaries or hold or exercise ownership over the Purchased Assets, or initiate any litigation or Legal Proceedings to obtain any such consent or approval.

Section 8.4    Appropriate Action; Filings.

(a)     Subject to the terms and conditions of this Agreement (including the last sentence of Section 8.4(b)), through the Closing Date, Sellers and Purchaser shall cooperate with each other and use (and shall cause their respective Affiliates to use) commercially reasonable efforts: (i) to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable on its part under this Agreement, Applicable Law or otherwise to consummate and make effective the Transactions, (ii) to obtain promptly from any Governmental Authority any Orders or Permits required to be obtained by Sellers or Purchaser or any of their respective Affiliates in connection with the authorization, execution, delivery and performance of this Agreement and the consummation of the Transactions, (iii) to promptly make all necessary filings and thereafter make any other required submissions with respect to this Agreement and prompt consummation of the Transactions required under (A) the HSR Act, (B) any notifications or filings required for the Transactions under other applicable Competition Laws, and (C) any Applicable Law, (iv) to defend any and all lawsuits and other proceedings by or before any Governmental Authority challenging this Agreement or the consummation of the Transactions, (v) to cause to be lifted or rescinded any injunction, decree, ruling, order or other action of any Governmental Authority adversely affecting the ability of any of the Parties to consummate the Transactions, and (vi) to provide prompt notification to the other Party of any actions pursuant to clauses (i) – (v) of this Section 8.4(a); provided, however, that nothing in this Section 8.4 shall be construed as altering the rights or obligations of Sellers under Section 7.1; provided further, that neither Purchaser nor any Seller nor any of their respective Affiliates shall be obligated to pay any consideration or incur any costs to obtain any approvals or consents from third parties, whether or not they may be necessary, proper or advisable to consummate the Transactions.

(b)     As promptly as practicable, but in no event later than two (2) Business Days following the Sale Hearing, the Parties shall (i) each file with the Federal Trade Commission and the Department of Justice any notifications and report forms, together with all required supplemental information, required to be filed under the HSR Act and the regulations promulgated thereunder with respect to the Transactions, and request early termination of the waiting period with respect to the Transactions and (ii) file any notifications or filings required under the Transactions under other applicable Competition Laws. Subject to the terms and conditions of this Agreement (including the last sentence of this Section 8.4(b)), Sellers and Purchaser shall consult with each other as to the appropriate time of filing such notifications and shall use their commercially reasonable efforts to make such filings at the agreed upon time, to respond promptly to any requests for additional information made by the Federal Trade Commission, the Department of Justice or any other Governmental Authority to cooperate with each other in connection with resolving any investigation or other inquiry concerning the Transactions commenced by the Federal Trade Commission, the Department of Justice or any other Governmental Authority and to cause the waiting periods under the HSR Act to terminate or expire at the earliest possible date after the date of filing. Subject to the terms and conditions of this Agreement (including the last sentence of this Section 8.4(b)), Sellers and Purchaser shall use their commercially reasonable efforts to (i) eliminate every impediment under any Competition Law, including taking all actions necessary to obtain any necessary approval under applicable Competition Laws and resisting in good faith any assertion that the Transactions contemplated hereby constitute a violation of the Competition Laws, and (ii) otherwise resolve all such objections, if any, as may be asserted by any Governmental Authority so as to enable the Closing to occur as soon as reasonably possible, all to the end of expediting the consummation of

the Transactions contemplated hereby. Nothing contained in this <u>Section 8.4(b)</u> or in any other provision of this Agreement shall be construed as requiring Purchaser or Sellers or any of their respective Affiliates to, as a condition to, or in connection with, obtaining any of the necessary approvals or consents, and none of Sellers or their respective Affiliates may, without the prior written consent of Purchaser, become subject to, consent to, or offer or agree to, or otherwise take any action with respect to, any requirement, condition, limitation, understanding, agreement or order to (i) sell, license, assign, transfer, divest, hold separate or otherwise dispose of any assets, business or portion of business of Purchaser, Sellers, Non-Debtor Subsidiaries, or any of their respective Affiliates in any manner, (ii) conduct, restrict, operate, invest or otherwise change the assets, business or portion of business of Purchaser, Sellers, Non-Debtor Subsidiaries, or any of their respective Affiliates in any manner, or (iii) impose any restriction, requirement or limitation on the operation of the business or portion of the business of Purchaser, Sellers, Non-Debtor Subsidiaries or any of their respective Affiliates in any manner.

(c)     Through the Closing Date, Sellers shall use (and shall cause their Subsidiaries to use) commercially reasonable efforts (subject to receipt of the Sale Order) to promptly obtain all necessary consents and approvals for the assignment and assumption of all of the Purchaser Assumed Contracts.

Section 8.5     <u>Confidentiality</u>.  Purchaser acknowledges that Confidential Information (as defined in the Confidentiality Agreement) has been, and in the future will be, provided to it in connection with this Agreement, including under Section 8.1, and is subject to the terms of the confidentiality agreement between Parent and Purchaser, dated as of April 7, 2010 (the "<u>Confidentiality Agreement</u>"), the terms of which are incorporated herein by reference. Purchaser acknowledges and understands that this Agreement may be made available by Sellers to prospective bidders and that such disclosure shall not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.  Effective upon, and only upon, the Closing, the Confidentiality Agreement shall terminate.  Sellers acknowledge that from and after the Closing, all non-public information relating to the Business, including, but not limited to the Purchased Assets and the Assumed Liabilities, will be valuable and proprietary to Purchaser and its Affiliates. Sellers agree that, from and after the Closing, no Seller will, and Sellers will cause their Subsidiaries not to, disclose to any Person any non-public information relating to Purchaser and its Affiliates, or the Business, including but not limited to the Purchased Assets, the Non-Debtor Subsidiaries and the Assumed Liabilities, except as required by Law or as otherwise becomes available in the public domain other than through any action by any Seller in violation of its obligations under this <u>Section 8.5</u>.  The provisions of this <u>Section 8.5</u> shall survive the Closing.

Section 8.6     <u>Preservation of Records; Cooperation</u>.  Sellers and Purchaser shall (and shall cause their Affiliates to) preserve and keep in their possession all records held by them on and after the date hereof relating to the Purchased Assets for a period of three (3) years or such longer period as may be required by Applicable Law; (provided, however, that in no event shall Sellers be required to preserve such records after the Bankruptcy Cases are closed) and shall make such records and personnel available to the other Party as may reasonably be required by such Party, including in connection with any insurance claims or Legal Proceedings involving the Purchased Assets, or any governmental investigations of Sellers or Purchaser or any of their respective Affiliates related to the Purchased Assets or in order to enable Sellers or Purchaser or

any of their respective Affiliates to comply with their respective obligations hereunder and each other agreement, document or instrument contemplated hereby or thereby or otherwise; provided, however, that in no event shall either Party be obligated to provide any information the disclosure of which would jeopardize any privilege available to such Party or any of its Affiliates relating to such information or which would cause such Party or any of its Affiliates to breach a confidentiality obligation to which it is bound. Purchaser further acknowledges that Sellers shall be entitled to copy any such records, at Sellers' sole cost and expense, and to retain copies of such records. After the expiration of any applicable retention period, before Purchaser shall dispose of any of such records, at least ninety (90) days' prior written notice to such effect shall be given by Purchaser to Sellers or their successors (or a Person designated by Sellers) and Sellers or their successors (or a Person designated by Sellers) shall have the opportunity (but not the obligation), at their sole cost and expense, to remove and retain all or any part of such records as they may in their sole discretion select. In the event Sellers wish to destroy any records after the Bankruptcy Cases are closed, before Sellers shall dispose of any of such records, at least ninety (90) days' prior written notice to such effect shall be given by Sellers to Purchaser or its successors (or a Person designated by Purchaser) and Purchaser or its successors (or a Person designated by Purchaser) shall have the opportunity (but not the obligation), at its sole cost and expense, to remove and retain all or any part of such records as it may in its sole discretion select.

Section 8.7  Publicity.  Prior to the Closing and without limiting or restricting any Party from making any filing with the Bankruptcy Court with respect to this Agreement or the Transactions, no Party shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld or delayed, unless, in the reasonable judgment of Purchaser or Sellers, disclosure is otherwise required by Applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of the Securities Exchange Commission or any stock exchange on which Purchaser or such Seller lists securities, provided that the Party intending to make such release shall use its commercially reasonable efforts consistent with such Applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof. After the Closing, the Parties may issue public announcements regarding the Transactions so long as such announcements, in the case of announcements made by Sellers, do not disclose the specific terms or conditions of this Agreement or any Transaction Document except where such terms and conditions have already been disclosed as required by Law, applicable stock exchange regulation or in filings that any Seller is required to make in the Bankruptcy Court or office of the United States Trustee; provided, however, that the issuing party shall use its best efforts to consult with the other party with respect to the text thereof.

Section 8.8  Lease Extensions; Store Liquidations.

(a)  Sellers shall have commenced, and shall diligently pursue, unless otherwise directed by Purchaser, liquidation of each Leased Property set forth on Schedule 8.8(a) for which the lease counterparty has not provided a Lease Extension by February 28, 2011 (the "Liquidation Condition"); provided, however, that the Protected Stores shall not be subject to the Liquidation Condition.  In connection with the liquidation through the conduct of "store closing" or similar going out of business sales or liquidations of any Stores (the "Store Closing

Liquidations") occurring prior to the Closing Date, Sellers shall consult with Purchaser as to how such liquidations shall be conducted, including the selection and terms of engagement of the liquidators, if any, to be used and the aggregate estimated expenses to be incurred in connection with such liquidations. On or promptly following April 1, 2011 (and in no event more than one (1) Business Day thereafter), Sellers shall provide Purchaser with a list of each Protected Store for which a Lease Extension has not been received, and Purchaser shall be entitled, in its discretion at any time following the date of the Auction and on or before the fifth (5th) Business Day prior to the Closing Date, to provide written notice to Sellers of its election to require Sellers to transport all such Designated Liquidation Merchandise and Designated FF&E located in each such Protected Store to one or more other Closing Date Leased Properties designated by Purchaser, at Sellers' sole cost and expense, prior to the Closing and prior to the Sellers' rejection of the unexpired real property lease pursuant to which such Protected Store is leased; provided that Sellers shall not be required to transport any such Designated Liquidation Merchandise and Designated FF&E until after the closing of the Auction.

(b) With respect to any Leased Property (including any Protected Store or Distribution Center) for which Purchaser has not ~~previously~~ designated ~~the real property lease~~ as a Purchaser Assumed Contract at Closing or which has been designated as a Purchaser Assumed Contract but has not been assumed and assigned to Purchaser as of Closing (the "Closing Date Leased Properties"), ~~Purchaser shall, in its sole discretion, either (i) designate as a Purchaser Assumed Contract, on or before the conclusion of the Auction (subject to Section 2.5(b)), the unexpired real property lease pursuant to which such Closing Date Leased Property is leased (for the avoidance of doubt Purchaser may remove any such lease from the list of Purchaser Assumed Contracts in accordance with Section 2.5(d)), or (ii) in lieu of assuming the unexpired real property lease pursuant to which such Closing Date Leased Property is leased and purchasing the Designated Liquidation Merchandise and Designated FF&E at such Closing Date Leased Property, elect (as so elected, the "Agency Alternative") to have Seller retain, and Seller shall retain, as an Excluded Asset, such unexpired real property lease and such Designated Liquidation Merchandise and Designated FF&E and engage Purchaser as its exclusive agent for the purpose of conducting Store Closing Liquidations during the Liquidation Period of the Designated Liquidation Merchandise and Designated FF&E at such Closing Date Leased Property, together with any additional inventory in transit to such Closing Date Leased Property as of the Closing Date (the "Agency Liquidations"). If Purchaser elects the Agency Alternative with respect to any Closing Date Leased Property, then Sellers shall carry out the Agency Liquidations at the Closing Date Leased Properties, as debtors in possession under the Bankruptcy Cases, through the end of the Liquidation Period and pursuant to the terms of the Agency and License Agreement. The terms, conditions and procedures applicable to the conduct of the Store Closing Liquidations in such Closing Date Leased Properties as to which Purchaser elects the Agency Alternative are set forth in the Agency and~~ Sellers shall retain any such unexpired real property lease and Purchaser shall be granted an irrevocable license to occupy and use such Closing Date Leased Property (the "Store License Alternative") until the applicable Assumption Deadline for such Closing Date Leased Property pursuant to the terms of the Store License Agreement. Under the ~~Agency and~~Store License Agreement, Purchaser shall be entitled to receive ~~the Proceeds (as defined in the Agency and License Agreement) from the Agency~~all proceeds generated at the Closing Date Leased Properties which are subject to the Store License Alternative (whether from Store Closing Liquidations or otherwise) and shall be responsible for the payment of the Expenses (as defined and as provided in the ~~Agency and License Agreement).~~Store License

Agreement).  Prior to the Assumption Deadline, Purchaser may, in its sole discretion, designate as a Purchaser Assumed Contract any unexpired real property lease applicable to any such Closing Date Leased Property and the Store License Agreement shall terminate with respect to any such unexpired real property lease upon the effective date of the assumption and assignment to Purchaser thereof.  Sellers hereby agree to use their reasonable best efforts to obtain an Order of the Bankruptcy Court approving the assumption and assignment of any Closing Date Leased Property that is designated as a Purchaser Assumed Contract and added to Schedule 1.1(e) (x) prior to the Closing, if such Contract is added to Schedule 1.1(e) prior to Closing; provided, that, if such Order is not obtained prior to Closing, Sellers shall use reasonable best efforts to assume and assign such Contract to Purchaser as soon as practicable, or (y) if such Contract is added to Schedule 1.1(e) after the Closing, as soon as practicable after such Contract is added to Schedule 1.1(e).

Section 8.9    ~~Transition Services Agreement.  If requested by Purchaser, Sellers shall negotiate in good faith to execute an agreement at Closing pursuant to which Sellers will continue to provide to Purchaser, on terms to be mutually agreed upon, certain general and administrative services then being provided by Sellers with respect to the Business~~Intentionally Omitted.

Section 8.10    Banks.  Not less than two (2) Business Days prior to the Closing, Sellers shall provide to Purchaser a complete and correct list of the names and locations of all banks in which any Non-Debtor Subsidiaries have accounts or safe deposit boxes and the names of all persons authorized to draw thereon or to have access thereto.

Section 8.11    Supplements to Schedules.  Sellers may in response to any changes or updates to Schedule 1.1(e) by Purchaser, supplement or amend the Schedules provided pursuant to Sections 5.4(b), 5.11(b) and 5.12(a). Such supplements or amendments shall be effective to cure and correct, for all purposes, any breach of any representation or warranty which would have existed if Sellers had not made such supplements or amendments. All references to Schedules that are supplemented or amended pursuant to this Section 8.11 shall be deemed to be a reference to such Schedule as supplemented or amended.

Section 8.12    Further Assurances.  Each Seller and Purchaser shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the Transactions and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Transactions.

Section 8.13    Payment of Sales Tax Amounts.  During the period between the date of this Agreement and the Closing Date, Sellers will continue to pay when due and in accordance with Applicable Law all sales and use taxes generated in the Ordinary Course of Business.  On the day immediately prior to the Closing Date, Sellers shall pay to the appropriate Taxing Authorities all accrued and unpaid sales and use taxes which were generated in the Ordinary Course of Business and remain unpaid at such date (the "Closing Sales Tax Payment").

Section 8.14    Use of Name.  Sellers hereby agree that upon and following the Closing, Sellers shall not, and shall cause their Affiliates (other than (i) the Non-Debtor Subsidiaries ~~and~~ (ii) until such time as the Italian Agreement is terminated pursuant to its terms, Blockbuster

Italia, S.p.A. and, (iii) until such time as the Canadian Agreement is terminated pursuant to its terms, Blockbuster Canada Co. NSULC) not to, use the name "Blockbuster" or any of the items listed in the schedule of Trademarks and Trademark Applications set forth in Schedule 5.11(a) or similar names or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing or comprising the foregoing, including any name or mark confusingly similar thereto (collectively, the "Purchased Business Name Trademarks"), other than in the case of disclosures by Sellers of their former ownership of the Business.  In furtherance thereof, as promptly as practicable but in no event later than one hundred twenty (120) days following the Closing Date, each Seller shall remove any Purchased Business Name Trademarks from its legal name by appropriate legal proceedings in the jurisdiction of such Seller's organization.

Section 8.15    Notice of Breach of Studio Condition.  In the event that any Specified Studio breaches the Studio Condition, Sellers shall provide written notice thereof to such Specified Studio (with a copy to counsel to the Ad Hoc Studio Committee), by email and overnight delivery to the person designated in writing to Sellers by such Specified Studio and the Ad Hoc Studio Committee, and such Specified Studio shall have three (3) Business Days after the date of such notice to cure such breach, and if such breach is not fully cured within such period such Specified Studio shall have failed to satisfy the Studio Condition for all purposes under this Agreement.  For the avoidance of doubt, with respect to any Specified Studio's non-shipment of DVD's, having three (3) Business Days to cure shall mean that Sellers and such Specified Studio have reached agreement on a means to cure such breach and such Specified Studio shall have resumed shipments within such time frame, not that resumed shipments must be received by Sellers by such third Business Day.

## ARTICLE IX

## EMPLOYEE AND EMPLOYEE BENEFITS MATTERS; TAX MATTERS

Section 9.1    Employment.

(a)    Transferred Employees.  At least five (5) days prior to the Closing, Purchaser shall deliver, in writing individually or generally, an offer of employment commencing on the Closing Date and contingent upon the Closing, on an at-will basis (except to the extent otherwise expressly agreed in a writing signed by Purchaser and such Employee) and on such other terms and conditions as Purchaser may determine, to substantially all of the Employees who remain employed by Sellers and are providing services with respect to the Purchased Assets immediately prior to the Closing.  Such individuals who accept such offer are hereinafter referred to as the "Transferred Employees." For the avoidance of doubt, Purchaser shall not be required to offer employment to any employees providing services with respect to Closing Date Leased Properties as to which Purchaser elects the Agency Alternative andStore License Alternative and, until Purchaser elects to assume the unexpired real property lease for any Closing Date Leased Property, if ever, and such offers of employment are made, such employees shall not be deemed Transferred Employees.

(b)    Standard Procedure.  Pursuant to the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 20, (i) Purchaser and Seller shall report

on a predecessor/successor basis as set forth therein, (ii) Seller will not be relieved from filing a Form W-2 with respect to any Transferred Employees, and (iii) Purchaser will undertake to file (or cause to be filed) a Form W-2 for each such Transferred Employee with respect to the portion of the year during which such Employees are employed by Purchaser that includes the Closing Date, excluding the portion of such year that such Employee was employed by Seller or its Subsidiaries.

Section 9.2    Employee Benefits.

(a)    Accrued Vacation.  Purchaser shall, subject to the limitation set forth in the proviso of Section 2.3(b), be responsible for all Liabilities with respect to Transferred Employees attributable to their accrued and unused vacation, sick days and personal days accrued from January 1, 2011 through the Closing Date in an aggregate amount not to exceed $3,500,000.

(b)    Accrued Wages.  Purchaser shall, subject to the limitation set forth in the proviso of Section 2.3(b), assume and pay all accrued and unpaid wages of Transferred Employees through the Closing Date.

(c)    Severance.  Sellers shall be and remain solely responsible for all severance Liabilities and obligations arising under any plan, program, policy or agreement of or with Sellers or their Affiliates (other than any Non-Debtor Subsidiaries).

(d)    COBRA.  Purchaser shall provide continuation coverage under its group medical plan pursuant to ERISA or Section 4980B of the Code to all Employees as of the Closing Date and their respective qualified beneficiaries as of the Closing Date, all former Employees and their qualified beneficiaries who are entitled to such coverage as of the Closing Date under the Employee Benefit Plans, and all other "affected employees" as defined for purposes of ERISA and Section 4980B of the Code and their qualified beneficiaries.

(e)    WARN Act.  Within five (5) Business Days after the date of the Cobalt Agreement, Sellers shall have provided notice to such Employees of Sellers that they determine, in their sole discretion, could be entitled to such notice in accordance with the WARN Act or similar state Laws.

(f)    Nothing contained in this Section 9.2 or elsewhere in this Agreement shall be construed to prevent the termination of employment of any Transferred Employee or any change in the employee benefits available to any Transferred Employee.

Section 9.3    Tax Matters.

(a)    All sales, transfer, filing, recordation, registration, documentary, stamp, value-added, goods and services and similar Taxes and fees arising from or associated with the Transactions (collectively, "Transfer Taxes"), whether levied on Purchaser or Sellers, shall be paid by Sellers. Sellers shall prepare at Sellers' expense, with Purchaser's cooperation, any necessary Tax Returns and other documentation with respect to any Transfer Taxes, and the party required by law to file such Tax Return shall timely do so.

(b)        From the date of this Agreement until the Closing, and taking into account Section 8.2(b), each Seller, on behalf of itself and its Subsidiaries, shall prepare and file (or cause to be prepared and filed) in accordance with past practice and in a timely manner all Tax Returns relating to such Seller, each of its Subsidiaries, and the Purchased Assets, that are required to be filed on or before the Closing Date (after giving effect to any applicable extensions), and shall pay all Taxes required to be paid by or on behalf of such Seller, its Subsidiaries, and the Purchased Assets on or before the Closing Date; provided, however, that Sellers shall deliver to Purchaser (i) a copy of any material Tax Return for a Straddle Period or a Pre-Closing Tax Period and shall consider in good faith any comments submitted by Purchaser at least ten (10) days prior to the due date for filing such Tax Return (after giving effect to any applicable extensions), and (ii) written notice of any material Tax payment obligation for which Sellers are liable hereunder at least ten (10) Business Days prior to the date on which such payment is required to be made.  After the Closing, Purchaser shall prepare and file (or cause to be prepared and filed) all Tax Returns required to be filed with respect to the Purchased Assets. In connection with the foregoing, Sellers shall pay Purchaser, prior to the payment due date, any amounts attributable to any Tax obligation which is Sellers' responsibility under Section 2.4(e); provided, however, that Purchaser shall deliver to Sellers (i) a copy of any material Tax Return and shall consider in good faith any comments submitted by Sellers at least ten (10) days prior to the due date for filing such Tax Return (after giving effect to any applicable extensions), and (ii) written notice of any material Tax payment obligation at least ten (10) Business Days prior to the date on which such payment is required to be made. Whenever it is necessary to determine liability for Taxes in respect of any Seller, any of its Subsidiaries or the Purchased Assets for a Straddle Period, the portion of such Tax which relates to the portion of the Straddle Period ending on the Closing Date shall (i) in the case of any Taxes, other than Taxes based upon or related to income or receipts, be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days in the portion of the Straddle Period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period; and (ii) in the case of any Tax based upon or related to income or receipts, be deemed equal to the amount which would be payable on the basis of an interim closing of the books as of the end of the Closing Date.  The dispute resolution provisions of Section 3.5 should apply in the case of any disagreement with respect to any Tax Returns governed under this Section 9.3(b).

(c)        Sellers, at their expense, shall have the right, but not the obligation, to control the conduct of the defense of any audit, claim, proceeding, investigation, or other controversy relating solely to Taxes ("Tax Claim") for which Sellers are liable pursuant to Section 2.4(e); provided, however, that Sellers will not have the right to settle any such Tax Claim if the resolution or determination of such Tax Claim is reasonably likely to adversely affect Purchaser without first obtaining Purchaser's written consent, such consent to not be unreasonably withheld, conditioned or delayed.  Purchaser shall control the conduct of all other Tax Claims; provided, however, that if such Tax Claim, if successful, could reasonably be expected to result in any Tax for which Sellers may be responsible for under this Agreement, Purchaser shall (i) promptly notify Sellers in writing of such claim, (ii) notify Sellers of any significant developments regarding such claim, (iii) consider in good faith recommendations of Sellers in connection with such claim, and (iv) not settle any such claim without first obtaining Sellers' written consent, such consent to not be unreasonably withheld, conditioned or delayed.

(d)     Sellers shall cause any Tax allocation, Tax sharing, or Tax indemnity agreement or arrangement (other than this Agreement) between any Non-Debtor Subsidiary and any Debtor Subsidiary, or between two Non-Debtor Subsidiaries, to be terminated as of the Closing Date (but only as between such subsidiaries, and not any third party), and, after the Closing Date, such Non-Debtor Subsidiary shall no longer be bound thereby or have rights or liabilities thereunder.

(e)     Sellers acknowledge and agree that no restructuring activities shall be undertaken by any Seller or any of its Affiliates in connection with the Bankruptcy Cases (or otherwise) that may produce any material adverse Tax consequences for Purchaser and its Affiliates. Upon Purchaser's request, the Parties shall use their commercially reasonable efforts to restructure the transactions contemplated by this Agreement in a Tax-efficient manner. Purchaser may, in its sole discretion and expense, make (or cause to be made) an election under Section 338(g) of the Code (and any corresponding or similar provision of state or local Law) with respect to the acquisition of any Non-Debtor Subsidiary that is treated as an association taxable as a corporation for U.S. federal income Tax purposes; provided, however, that such election shall not materially adversely effect any of Sellers.

(f)     Sellers, on the one hand, and Purchaser will provide each other with such cooperation and information as either of them reasonably may request of the other in filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes, or participating in or conducting any audit or other proceeding in respect of Taxes.  Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings and other determinations by Taxing Authorities. Any information obtained under this Section 9.3 shall be kept confidential except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting any audit or other proceeding.

(g)     Any reimbursement payment to be made pursuant to this Agreement shall be treated by the Parties as an adjustment to the Cash Purchase Price for all Tax purposes.

## ARTICLE X

## CONDITIONS TO CLOSING

Section 10.1   Conditions Precedent to Obligations of Purchaser.  The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser, in its sole discretion, in whole or in part to the extent permitted by Applicable Law):

(a)     the representations and warranties of Sellers set forth in this Agreement shall be true and correct as of the date of this Agreement and at and as of the Closing with the same force and effect as if made at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date); provided,

<u>however</u>, that in the event of a breach of a representation or warranty other than a representation or warranty qualified by materiality or Seller Material Adverse Effect, the condition set forth in this <u>Section 10.1(a)</u> shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together results in a Seller Material Adverse Effect, and Purchaser shall have received a certificate signed by an authorized officer of each Seller (in form and substance reasonably satisfactory to Purchaser), dated the Closing Date, to such effect;

(b)    Sellers shall have performed and complied in all material respects with all obligations, covenants and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect;

(c)    Sellers shall have executed, delivered and/or filed or authorized Purchaser to file such termination statements, lien releases, discharges, financing change statements or other documents, notices or other instruments as Purchaser may reasonably deem necessary to release Liens (other than Permitted Liens) on the Purchased Assets, to the extent Sellers are authorized to do so absent the consent of the holder of the Lien;

(d)    Sellers shall have completed the Store liquidations and closures of the Initial Liquidating Stores and the Stores set forth in <u>Schedule 10.1(d)</u>, as such schedule shall be updated from time to time to reflect the Stores to be liquidated pursuant to <u>Section 8.8(a)</u>;

(e)    the Bidding Procedures Order provisions regarding the Specified Studios, as set forth in Section 17, 18 and 19 of the Bidding Procedures Order, shall be in full force and effect (which shall provide that, pursuant to such Bidding Procedures Order and subject to payment of the amounts to be paid to Specified Studios pursuant to clauses (g) and (h) of Section 16 thereof (the "<u>Studio Payments</u>"), Sellers or Purchaser (or, if applicable, Purchaser's assignee or designee under the ~~Agency and~~<u>Store</u> License Agreement) shall be entitled to sell all inventory (including without limitation all "Certified Field Destroy" units ("<u>CFDs</u>")) to which the Studio Payments relate, free and clear of any liabilities, liens, encumbrances or obligations owed to such Specified Studios or their affiliates on account of such inventory (including without limitation CFDs));

(f)    Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 4.2</u>;

(g)    all material consents (or in lieu thereof waivers) to the performance by Sellers of their obligations under this Agreement or to the consummation of the Transactions contemplated hereby as are required under any Contract to which any Seller or Non-Debtor Subsidiary is a party or by which any of their respective assets and properties are bound (i) shall have been obtained, (ii) shall be in form and substance reasonably satisfactory to Purchaser, (iii) shall not be subject to the satisfaction of any condition that has not been satisfied or waived and (iv) shall be in full force and effect, except where the failure to obtain any such consent (or in lieu thereof waiver) could not, individually or in the aggregate with other such failures, have or reasonably be expected to have a Seller Material Adverse Effect; and

(h)     Sellers shall have obtained authorization to use cash collateral to fund (i) all of the wind down costs of the estates in the Bankruptcy Cases in accordance with the Estimated Wind Down Expenses and (ii) the costs and sale expenses related to Store Closing Liquidations following the Closing in accordance with the Approved Sale Expenses.

Section 10.2   <u>Conditions Precedent to Obligations of Sellers</u>.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers, in their sole discretion, in whole or in part to the extent permitted by Applicable Law):

(a)     the representations and warranties of Purchaser set forth in this Agreement shall be true and correct at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date); <u>provided</u>, <u>however</u>, that in the event of a breach of a representation or warranty other than a representation or warranty qualified by materiality or Purchaser Material Adverse Effect, the condition set forth in this <u>Section 10.2(a)</u> shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together results in a Purchaser Material Adverse Effect, and Sellers shall have received a certificate signed by an authorized officer of Purchaser (in form and substance reasonably satisfactory to Sellers), dated the Closing Date, to such effect;

(b)     Purchaser shall have performed and complied in all material respects with all obligations, covenants and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(c)     Purchaser shall have paid in full or otherwise satisfied all Cure Costs with respect to the Purchaser Assumed Contracts set forth on <u>Schedule 1.1(e)</u> prior to or on the Closing Date; and

(d)     Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in <u>Section 4.3</u>.

Section 10.3   <u>Conditions Precedent to Obligations of Purchaser and Sellers</u>.  The respective obligations of Purchaser and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Sellers in whole or in part to the extent permitted by Applicable Law):

(a)     there shall not be in effect any Law or Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(b)     the Bidding Procedures Order shall be in full force and effect and shall not have been reversed, modified, amended or stayed;

(c)     the Bankruptcy Court shall have entered the Sale Order and such Order shall be in full force and effect and shall not have been reversed, modified, amended or stayed; and

(d)     the waiting period applicable to the transactions contemplated by this Agreement under the HSR Act or any other Competition Law shall have expired or early termination shall have been granted and the Parties shall have obtained any other consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Authority required to be obtained or made in connection with the execution and delivery of this Agreement or the performance of the Transactions, and each such consent, approval, order or authorization shall be in full force and effect.

Section 10.4    Frustration of Closing Conditions.  Neither Sellers nor Purchaser may rely on the failure of any condition set forth in Section 10.1, Section 10.2 or Section 10.3, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

## ARTICLE XI

## LIMITATIONS

Section 11.1    Purchaser's Review.

(a)     No Reliance.  Purchaser has had the opportunity to ask questions in connection with its decision to enter into this Agreement, and to consummate the Transactions. In connection with the execution and delivery of this Agreement and the consummation of the Transactions, Purchaser has not relied upon, and Purchaser expressly waives and releases Sellers from any Liability for any claims relating to or arising from, any representation, warranty, statement, advice, document, projection, or other information of any type provided by Sellers or their Affiliates or any of their respective Representatives, except for those representations and warranties expressly set forth in Article V.  In deciding to enter into this Agreement, and to consummate the Transactions, Purchaser has relied solely upon its own knowledge, investigation, judgment and analysis (and that of its Representatives) and not on any disclosure or representation made by, or any duty to disclose on the part of, Sellers or their Affiliates or any of their respective Representatives, other than the express representations and warranties of Seller set forth in Article V.

(b)     Limited Duties.  Any and all duties and obligations which any Party may have to any other Party with respect to or in connection with the Purchased Assets, this Agreement or the Transactions are limited to those specifically set forth in this Agreement. Neither the duties nor obligations of any Party, nor the rights of any Party, shall be expanded beyond the terms of this Agreement on the basis of any legal or equitable principle or on any other basis whatsoever.

Section 11.2    No Consequential or Punitive Damages.  NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR

ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

## ARTICLE XII

## MISCELLANEOUS

Section 12.1    Survival of Representations, Warranties, Covenants and Agreements. The representations and warranties of any Party made herein, in any Transaction Document or in any other instrument delivered pursuant to this Agreement shall terminate at the Closing, or upon termination of this Agreement pursuant to Section 4.4, and, following the Closing or the termination of this Agreement, as the case may be, there shall be no Liability in respect thereof on the part of any Party or any of its Representatives.  Except with respect to covenants or agreements which are to be performed on or prior to the Closing, all covenants and agreements contained in this Agreement shall survive the Closing in accordance with their respective terms; provided, that any covenant or agreement contained herein whose survival is not limited by its terms shall survive until fully performed in accordance with its terms.

Section 12.2    Remedies.

(a)    The Parties acknowledge and agree that the following remedies shall be available upon the following occurrences:

(i)    except as set forth in Section 12.2(b), the sole remedy available to Purchaser in the event of Sellers' breach of this Agreement shall be to terminate this Agreement pursuant to and to the extent permitted by Section 4.4 and, to the extent provided in Section 3.2(b), the return of the Deposit; and

(ii)    except as set forth in Section12.2(c), the sole remedy available to Sellers in the event of Purchaser's breach of this Agreement shall be to terminate this Agreement pursuant to and to the extent permitted by (A) Section 4.4(b) in the event that Closing does not occur on or before the Outside Date solely as a result of Purchaser's material breach of its obligations under this Agreement (including payment of the Closing Date Payment pursuant to Section 3.3) or (B) Section 4.4(h), and in connection therewith to receive the Deposit, to the extent provided in Section 3.2(b), as liquidated damages.

(b)    The Parties acknowledge that Purchaser shall be irreparably harmed and that there shall be no adequate remedy at law for a violation of any of the covenants or agreements of Sellers and their Subsidiaries set forth herein. Therefore, it is agreed that, in addition to the remedies set forth in Section 12.2(a)(i), Purchaser shall have the right to enforce such covenants and agreements by specific performance, injunctive relief or by any other means available to Purchaser in law or in equity.

(c)     The Parties acknowledge that Parent shall be irreparably harmed and that there shall be no adequate remedy at law for a violation of any of the covenants or agreements of Purchaser set forth herein. Therefore, it is agreed that, in addition to the remedies set forth in Section 12.2(a)(ii), Parent shall have the right to enforce such covenants and agreements by specific performance, injunctive relief or by any other means available to Parent in law or in equity.

Section 12.3     Expenses.  Except as otherwise set forth in this Agreement, each Party shall bear its own expenses (including attorneys' fees) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated hereby and the consummation of the Transactions contemplated hereby and thereby; provided, however, Purchaser shall bear sole responsibility for any governmental charges relating to HSR Act filing fees by Purchaser and its Affiliates and any UCC-3 filing fees, FAA, ICC, DOT, real estate, title recording or filing fees and other amounts payable in respect of transfer filings in connection with the transactions contemplated by this Agreement.

Section 12.4     Non-Recourse.  The Parties acknowledge and agree that no past, present or future director, officer, employee, incorporator, member, partner, stockholder, agent, attorney, Representative or Affiliate of the Parties to this Agreement, in such capacity, shall have any liability for any obligations or liabilities of Purchaser or Sellers, as applicable, under this Agreement or for any claim based on, in respect of, or by reason of, the Transactions.

Section 12.5     Submission to Jurisdiction.

(a)     Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes among the Parties which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all Actions related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and shall receive notices at such locations as indicated in Section 12.11; provided, however, that if the Bankruptcy Cases have been fully and finally dismissed and the Bankruptcy Court declines jurisdiction, the Parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County.

(b)     The Parties hereby unconditionally and irrevocably waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any dispute arising out of or relating to this Agreement or any of the Transactions brought in any court specified in subsection (a) above, or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)     Each of the Parties hereby consents to process being served by any Party in any suit, Action or proceeding by the mailing of a copy thereof in accordance with the

provisions of Section 12.11; provided, however, that such service shall not be effective until the actual receipt thereof by the Party being served.

Section 12.6    Waiver of Jury Trial.  THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.6.

Section 12.7    Authorization of Parent as Representative of Sellers.

(a)    By entering into and executing this Agreement, Sellers irrevocably make, constitute and appoint Parent as their agent, effective as of the date hereof, and authorize and empower Parent to fulfill the role of Sellers' representative hereunder, and each Seller appoints Parent as such Person's true and lawful attorney in fact and agent, for such Person and in such Person's name, place and stead for all purposes necessary or desirable in order for Parent to take all actions contemplated by this Agreement, with the ability to execute and deliver all instruments, certificates and other documents of every kind incident to the foregoing to all intents and purposes and with the same effect as such Seller could do personally, including to give and receive notices and communications; to object to such deliveries, to agree to, negotiate, enter into settlements and compromises of, and comply with orders of courts with respect to such claims; and to take all actions necessary or appropriate in the judgment of Parent for the accomplishment of the foregoing.  The dissolution, liquidation, insolvency or bankruptcy of any Seller shall not terminate the authority and agency of Parent as each Seller's representative pursuant to this Section 12.7.  The power of attorney granted in this Section 12.7 is coupled with an interest and is irrevocable.

(b)    Purchaser shall be entitled to rely exclusively upon any communication given or other action taken by Parent pursuant to this Agreement, and shall not be liable for any action taken or not taken in good faith reliance on a communication or other instruction from Parent.

Section 12.8    Time of Essence.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Section 12.9    Entire Agreement; Amendments and Waivers.  This Agreement (including the Schedules and Exhibits hereto) and the other Transaction Documents represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the Parties with respect to the subject

matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 12.10  Governing Law.  THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, AND ANY CLAIM OR CONTROVERSY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN OR IN CONNECTION WITH THIS AGREEMENT OR AS AN INDUCEMENT TO ENTER INTO THIS AGREEMENT), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED, AND DETERMINED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISION THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION) AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

Section 12.11  Notices.  All notices and other communications under this Agreement shall be in writing and shall be deemed duly given (i) when delivered personally or by prepaid overnight courier, with a record of receipt, (ii) the fourth day after mailing if mailed by certified mail, return receipt requested, or (iii) the day of transmission, if sent by facsimile or telecopy during regular business hours or the Business Day after transmission, if sent after regular business hours (with a copy promptly sent by prepaid overnight courier with record of receipt or by certified mail, return receipt requested), to the Parties at the following addresses or facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Parties pursuant to this Section 12.11):

If to Sellers:

Blockbuster Inc.
1201 Elm Street
Dallas, Texas 75270
Phone:  (214) 854-4081
Fax:  (214) 854-4321
Attention:  General Counsel

With a copy to:

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Phone:  214-746-8178
Fax:  214-746-7777
Attention: D. Gilbert Friedlander
          Martin A. Sosland

If to Purchaser:

DISH Network Corporation
9601 South Meridian Boulevard
Englewood, CO 80112
Phone: 888-825-2557
Fax: 303-723-1699
Attention: General Counsel

With a copy to:

Linklaters LLP
1345 Avenue of the Americas
New York, NY 10105
Phone:  212-903-9000
Fax:  212-903-9100
Attention: Daniel G. Dufner, Jr.

Section 12.12  Severability.  If any term or provision of this Agreement is invalid, illegal or incapable of being enforced by Law or public policy, all other terms and provisions hereof shall nevertheless remain in full force and effect so long as the legal substance of the Transactions is not affected in any manner materially adverse to any Party.  Upon such determination that any term or provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

Section 12.13  <u>No Right of Set-Off</u>.  Purchaser for itself and for its Affiliates, successors and assigns hereby unconditionally and irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Purchaser or any of its Affiliates, successors and assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.  Each of Sellers, for itself and for its Affiliates, successors and assigns hereby unconditionally and irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Sellers or any of their Affiliates, successors and assigns has or may have with respect to any payments to be made by Sellers pursuant to this Agreement or any other document or instrument delivered by Sellers in connection herewith.

Section 12.14  <u>Binding Effect; Assignment</u>.  This Agreement shall be binding solely upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person not a Party to this Agreement except to the extent provided in <u>Section 12.4</u>.  No assignment of this Agreement or of any rights or obligations hereunder may be made by any Party (by operation of law or otherwise) without the prior written consent of the other Party and any attempted assignment without the required consents shall be void; <u>provided</u>, <u>however</u>, that (i) prior to the Closing, Purchaser may assign this Agreement and any or all rights or obligations hereunder (including Purchaser's right to purchase the Purchased Assets and assume the Assumed Liabilities) to any Affiliate of Purchaser and (ii) after the Closing, Purchaser (or its permitted assignee) shall have the right to assign its rights and/or delegate its obligations hereunder (A) to any Affiliates, (B) to any financing sources for collateral purposes or (C) to any subsequent purchaser of all or any portion of the stock or assets of Purchaser or the Business.  Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires<u>; provided, Purchaser shall remain liable for the performance of the obligations of such assignee under Section 2.5(c) (including payment of all Contract Maintenance Costs) and under Section 8.8(b) (including the payment of all Expenses (as defined in the Store License Agreement)) notwithstanding any such assignment.</u>

Section 12.15  <u>Counterparts</u>.  This Agreement may be executed and delivered (including by electronic transmission) in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[The Remainder of This Page Is Intentionally Left Blank]

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its respective officers thereunto duly authorized, as applicable, all as of the date first above written.

BLOCKBUSTER INC.

By: _____
Name:
Title:

BLOCKBUSTER PROCUREMENT LP,

By: Blockbuster Distribution, Inc., its General Partner

By:

_____
Name:
Title:

~~BLOCKBUSTER CANADA INC.~~
BLOCKBUSTER DIGITAL TECHNOLOGIES INC. BLOCKBUSTER DISTRIBUTION, INC.
BLOCKBUSTER GIFT CARD, INC. BLOCKBUSTER GLOBAL SERVICES INC.
BLOCKBUSTER INTERNATIONAL SPAIN INC. BLOCKBUSTER INVESTMENTS LLC
~~BLOCKBUSTER VIDEO ITALY INC.~~
MOVIELINK, LLC
TRADING ZONE, INC.
B2 LLC

By: _____
Name:
Title:

DISH NETWORK CORPORATION


By: _____
Name:
Title:

EXHIBIT A

Form of ~~Agency and~~<ins>Store</ins> License Agreement

EXHIBIT B

Bidding Procedures Order

EXHIBIT C

Cash Flow Budget

EXHIBIT D

Protected Stores

EXHIBIT E

Form of Bill of Sale

EXHIBIT F

Form of Assignment Agreement

Document comparison by Workshare Professional on Thursday, April 21, 2011 10:37:52 AM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://USDMS/US_ACTIVE/43689496/1 |
| Description | #43689496v1<US_ACTIVE> - DO NOT USE.doc |
| Document 2 ID | interwovenSite://USDMS/US_ACTIVE/43685878/9 |
| Description | #43685878v9<US_ACTIVE> - BBI/DISH APA (A/R) |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 215 |
| Deletions | 195 |
| Moved from | 13 |
| Moved to | 13 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 436 |