**PRYOR CASHMAN LLP**
Richard Levy, Jr.
Robert M. Fleischer
7 Times Square
New York, New York 10036-6569
Tel:    (212) 421-4100
Fax:    (212) 326-0806
rlevy@pryorcashman.com
rfleischer@pryorcashman.com

*Attorneys for Lions Gate Films, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| **BLOCKBUSTER INC., et al.,** | : | Case No. 10-14997 (BRL) |
| | : | |
| Debtors. | : | (Jointly Administered) |

----------------------------------------------------x

### NOTICE OF MOTION OF LIONS GATE FILMS, INC. FOR RECONSIDERATION OF (1) ORDER APPROVING SALE OF DEBTORS' ASSETS TO DISH NETWORK CORPORATION, AND (2) SUPPLEMENTAL ORDER APPROVING AMENDED AND RESTATED ASSET PURCHASE AND SALE AGREEMENT

PLEASE TAKE NOTICE that Lions Gate Films, Inc., for itself and its affiliates, moves pursuant to Rule 9023 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and Local Bankruptcy Rule 9023-1 for reconsideration of the following two orders entered by the Court in connection with the sale of the Debtors' assets to DISH Network Corporation ("DISH"): (1) order entered April 14, 2011, approving the sale of the Debtors assets to DISH (Dkt. No. 1602), and (2) supplemental order entered April 26, 2011, approving an amended and restated asset purchase and sale agreement between the Debtors and DISH (Dkt. No. 1723).

Pursuant to Local Bankruptcy Rule 9023-1: (1) the motion is returnable on May 12, 2011, and (2) oral argument will not be heard unless the Court grants reconsideration and orders that the matter be re-argued orally.

Answering papers, if any, shall be served in accordance with Local Bankruptcy Rule 9006-1(b).

Dated: New York, New York
      April 28, 2011

                        PRYOR CASHMAN LLP

                        By:   */s/ Robert M. Fleischer*
                              Richard Levy, Jr.
                              Robert M. Fleischer
                        7 Times Square
                        New York, New York 10036-6569
                        (212) 421-4100

                        *Attorneys for Lions Gate Films, Inc.*

**PRYOR CASHMAN LLP**
Richard Levy, Jr.
Robert M. Fleischer
7 Times Square
New York, New York 10036-6569
Tel:    (212) 421-4100
Fax:    (212) 326-0806
rlevy@pryorcashman.com
rfleischer@pryorcashman.com

*Attorneys for Lions Gate Films, Inc.*

Return Date:     May 12, 2011
NO ORAL ARGUMENT EXCEPT PER L.B.R. 9023-1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------x

In re:                                                        :                    Chapter 11

                                                                  :

**BLOCKBUSTER INC., et al.,**               :                    Case No. 10-14997 (BRL)

                                                                  :

                                      Debtors.     :                    (Jointly Administered)

-----------------------------------------------------x

**MOTION OF LIONS GATE FILMS, INC. FOR
RECONSIDERATION OF (1) ORDER APPROVING
SALE OF DEBTORS' ASSETS TO DISH NETWORK
CORPORATION, AND (2) SUPPLEMENTAL ORDER APPROVING
AMENDED AND RESTATED ASSET PURCHASE AND SALE AGREEMENT**

TO:     THE HONORABLE BURTON R. LIFLAND,
          UNITED STATES BANKRUPTCY JUDGE

Lions Gate Films, Inc., for itself and its affiliates (collectively "LGF"), moves pursuant to

Rule 9023 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and Local

Bankruptcy Rule 9023-1 for reconsideration of the following two orders entered by the Court in

connection with the sale of the Debtors' assets to DISH Network Corporation ("DISH"): (1)

order entered April 14, 2011, approving the sale of the Debtors assets to DISH ("Sale Approval

Order") (Dkt. No. 1602) (Exh. 1), and (2) supplemental order entered April 26, 2011, approving

1094705

an amended and restated asset purchase and sale agreement between the Debtors and DISH (Dkt. No. 1723) ("Supplemental Order"; together with the Sale Approval Order, the "Sale Orders") (Exh. 2).[1]  The Court should confirm that, in any event, LGF's revenue sharing rights are covered by the express terms of the asset purchase agreement approved by the Sale Approval Order.  The agreement specifically contemplates and provides for treatment of revenue share obligations arising from LGF's ownership interests in certain Videograms (defined below) acquired by DISH.

**PRELIMINARY STATEMENT**

1.      LGF makes this motion because, as explained below, LGF objected to the proposed sale of the Debtors' assets on the basis of its ownership interests in certain Videograms (defined below) under revenue sharing agreements with the Debtors, and the lack of any ownership interest by the Debtors at that time.  However, its objection appears to have been overlooked by both the Debtors and this Court and, therefore, was never adjudicated.  For that reason, reconsideration is warranted.

2.      On the face of the revenue sharing agreements between LGF and the Debtors, as of the date of the hearings that resulted in the Orders and as of the closing of the sale of assets to DISH, at most, the Debtors held – and DISH could only have acquired – only a leasehold interest in certain physical and digital units of copyrighted motion pictures  ("LGF Films") in the form of DVDs or digital copies ("Videograms").  LGF leased such Videograms to the Debtors pursuant to those revenue sharing agreements for the period of 26 weeks following a film's "street date" (public release date), with title to the Videogram for each film passing to the lessee only at the

---

[1]       In accordance with Local Rule 9023-1, LGF makes the motion returnable on 14 days' notice, the same notice period for the Sale Hearing as set by the Bid Procedures Order (as those terms are defined below).

end of the respective revenue sharing lease period (subject to certain end-of-term obligations to destroy a portion of certain Videograms).

3.    Based on a review of events and the court's record in this matter, it appears that both the Sale Approval Order and the Supplemental Order are predicated on the assumption that LGF did not object (and/or waived any objection) to the sale of the Debtors' interests in the Videograms to the extent that the Debtors did not have clear title thereto and, instead, held only leasehold interests where the revenue share period had not expired. Moreover, the APA itself contemplates the continued viability of revenue sharing rights and provides for certain adjustments to the purchase price in consideration of those rights. As will be explained below, the other alternative, that any objection filed by LGF was overruled, simply does not appear to be the case.

4.    As shown below, LGF did object to the proposed sale in a pleading filed prior to consideration and entry of the Bid Procedures Order (defined below), basing its objection on its ownership interest in the Videograms under the revenue share agreements for which the leasehold period had not expired. Where the leasehold period had not expired, such Videograms remained the property of LGF for the balance of their respective leasehold periods. Consequently, the Debtors could only convey to a purchaser their rights as lessee in the Videograms for the remainder of the leasehold period (subject to the expiration of the revenue sharing period at which time title would pass). LGF's objection was also sufficient to trigger provisions of the APA that provide for certain revenue-sharing adjustments. DISH has taken the position, however, that the sale transferred the Videograms free of any revenue sharing obligations to LGF.

5.      Despite the undisputed and documented fact that LGF filed an objection, the Court's records indicate that LGF's objection was never considered by the Court either on its merits or in light of the express APA provisions that address revenue sharing agreements.  The Court's records reflect no opposition to LGF's objection having been filed by the Debtors. Therefore, the objection neither was adjudicated nor could it have been waived.  Accordingly, LGF is entitled to reconsideration of the Orders and a determination of its rights in the Videograms and the obligations of DISH and the Debtors respecting the Videograms and the revenue sharing obligations.

## FACTS

### LGF's Title In the Videograms Under Its Revenue-Sharing Agreements

6.      Prior to and following the commencement of the Debtors' bankruptcy cases on September 10, 2010 ("Petition Date"), LGF and the Debtors were parties to agreements, pursuant to which, among other things, LGF leased and distributed Videograms to the Debtors on a non-exclusive basis for use by the Debtors in their rental and retail movie businesses.  In return, the Debtors were obligated to LGF for payments in the form of up-front fees and revenue sharing payments for rentals of the pictures.  LGF owned , or had the right to exploit, the copyrights for the LGF Films supplied to the Debtors in the form of the Videograms.

7.      LGF and the Debtors were parties to a revenue sharing agreement originally entered as of September 1, 2004, for a term of two years ("Prepetition RSA").  The term of the Prepetition RSA was extended (through various amendments) until December 31, 2010, at which time it expired according to its terms.

8.      On November 3, 2010, this Court entered the so-called "Studio Payment Order," which authorized the Debtors to enter into "Accommodation Agreements" (as that term is used

in the Studio Payment Order) with motion picture studios (including LGF) pursuant to which (i) the studios' prepetition claims against the Debtors would be paid as an incentive for their continued dealings with the Debtors, (ii) the studios' post-petition claims would be granted administrative expense priority and paid in full, and (iii) the studios and the Debtors would continue to do business pursuant to mutually agreeable pre- and post-petition agreements in accordance with the Studio Payment Order.

9. In connection with the Studio Payment Order, LGF and the Debtors entered into an Accommodation Agreement, dated November 2, 2010, along with a post-petition revenue sharing agreement dated November 18, 2010 but effective January 1, 2011 ("Postpetition RSA"). The term of the Post-Petition RSA was for the period of January 1, 2011 to May 1, 2011. LGF entered these agreements on the understanding that, by doing so, LGF would be paid in full for the obligations the Debtors would incur thereunder, as well as for outstanding amounts under the Prepetition RSA for which payment was authorized by the Studio Payment Order and the Accommodation Agreement, and that Debtors would fully honor and perform their promises thereunder. Pursuant to these agreements and in the expectation that they would be honored by the Debtors, LGF thereafter leased and shipped to the Debtors the Videograms of various LGF Films pursuant to the Accommodation Agreement and, after expiration of the Prepetition RSA, pursuant to the Postpetition RSA. [2]

10. Under both the Prepetition RSA and the Postpetition RSA, title and risk of loss to each LGF Videogram remained with LGF for the 26-week "revenue sharing period" that runs

---

[2]      The Accommodation Agreement specifically provided that postpetition delivery of materials, goods, or services, whether ordered prepetition or postpetition, would receive administrative expense priority status pursuant to section 503(b) of the Bankruptcy Code.

     LGF has not filed copies of the RSAs in connection with this motion, as the agreements contain confidential and sensitive commercial business information, including information regarding pricing and the consideration payable to LGF. Moreover, the RSAs contain express confidentiality provisions. If the Court requires the filing of the agreements, LGF will seek to do so under seal to protect the confidential contents.

from the film's date of first release, known as the "street date." By the terms of the documents, the Debtors held only a lease in the Videogram during that period. The Debtors were obligated to make payments to LGF based on rentals of the Videograms during that period (subject to certain rights of recoupment for up-front payments made by the Debtors to LGF). Upon expiration of the revenue share period, title and risk of loss for the Videograms (but not copyright ownership) shifted to the Debtors. If any LGF Film generated gross box office revenue of $15 million, the Debtors were required to destroy a portion of the Videograms of that film at the end of the lease term. Only at the end of the revenue share period (subject to any destruction obligation) would the Debtors receive title to the Videograms and the right to rent, sell or otherwise dispose of the units of the particular film.

11.     The Prepetition RSA expired by its terms on December 31, 2010, and was succeeded by the Postpetition RSA on January 1, 2011. On or about January 28, 2011, however, in breach of the Postpetition RSA, the Debtors notified LGF that they would not make payment to LGF for any sums that were due and owed to LGF for post-petition periods preceding January 17, 2011, though the Debtors affirmed that they would make payments for related activity between January 17, 2011 and March 10, 2011.

12.     In response to this default, acting in accordance with their rights, LGF notified the Debtors on February 2, 2011, that, because of the Debtors' material breach of the parties' postpetition agreements, LGF would not provide further product under those agreements. LGF further stated that it and would deal with the Debtors thereafter only on a cash-in-advance sale basis (which, in fact, is how the parties dealt with each other for product ordered by the Debtors and delivered by LGF after February 2, 2011).

13.     LGF last delivered revenue sharing titles to the Debtors in January 2011, prior to

the payment default.  The following list identifies all LGF Films covered by the LGF RSAs and the Accommodation Agreement, with their street dates.  Because each film bears a 26-week revenue sharing period, as of the closing date set for the DISH purchase (April 26, 2011) the revenue share period was still running for any film delivered by LGF having a street date **later** than October 26, 2010 – indicated by bold-faced entries in the chart.  As such, the Debtors held only a leasehold interest in each Videogram until the completion of the respective lease period.

| In-Store Revenue Share Titles | | | |
|---|---|---|---|
| **ORDER DATE** | **SHIP DATE** | **STREET DATE** | **TITLE** |
| 9/1/2010 | 9/13/2010 | 10/5/2010 | BRATZ-PAMPERED PETZ (SPND) |
| 9/1/2010 | 9/10/2010 | 10/5/2010 | FRED THE MOVIE (SPND) |
| 9/1/2010 | 9/13/2010 | 10/12/2010 | MANSON-MY NAME IS EVIL (SPND) |
| 9/1/2010 | 9/17/2010 | 10/12/2010 | THO-MERRY WINTER WISH (SPND) |
| 9/1/2010 | 9/17/2010 | 10/12/2010 | KUNG FU MASTER (SPND) |
| 9/1/2010 | 9/17/2010 | 10/19/2010 | HITMEN-CHARLIE VALENTINE SPND |
| 9/1/2010 | 9/28/2010 | 10/19/2010 | AGORA (SPND) |
| **9/1/2010** | **9/15/2010** | **10/26/2010** | **WAY HOME, THE (SPND)** |
| **9/7/2010** | **9/28/2010** | **10/26/2010** | **WINTERS BONE (SPND)** |
| **9/29/2010** | **10/15/2010** | **11/9/2010** | **LOCKED DOWN (SPND)** |
| **9/29/2010** | **10/15/2010** | **11/9/2010** | **LOCKED DOWN (SPND)-BD** |
| **10/22/2010** | **11/1/2010** | **11/23/2010** | **AMOR DOLOR Y VICEVERSA (SPND)** |
| **10/22/2010** | **11/1/2010** | **11/23/2010** | **EXPENDABLES, THE (SPND)** |
| **10/22/2010** | **11/1/2010** | **11/23/2010** | **EXPENDABLES, THE (SPND)-BD** |
| **10/22/2010** | **11/1/2010** | **11/23/2010** | **TP-MBHF (PLAY) SPND** |
| **10/22/2010** | **11/1/2010** | **11/23/2010** | **WINNING SEASON, THE (SPND)** |
| **11/11/2010** | **11/24/2010** | **12/14/2010** | **FRENEMY (SPND)** |
| **11/11/2010** | **11/24/2010** | **12/21/2010** | **HEAVY, THE (SPND)** |
| **11/11/2010** | **11/29/2010** | **12/28/2010** | **LEGENDARY ASSASSIN (SPND)** |
| **08/4/2010** | **8/11/2010** | **1/4/2011** | **LENA BAKER STORY (SPND)** |
| **11/29/2010** | **12/9/2010** | **1/4/2011** | **LAST EXORCISM, THE (SPND)** |
| **11/29/2010** | **12/9/2010** | **1/4/2011** | **LAST EXORCISM, THE (SPND)-BD** |
| **12/8/2010** | **12/19/2010** | **1/11/2011** | **ALPHA & OMEGA (SPND)** |
| **12/8/2010** | **12/19/2010** | **1/11/2011** | **ALPHA & OMEGA (SPND)-BD** |
| **12/8/2010** | **12/22/2010** | **1/18/2011** | **BURIED (SPND)** |
| **12/8/2010** | **12/22/2010** | **1/18/2011** | **BURIED (SPND)-BD** |
| **12/8/2010** | **12/22/2010** | **1/18/2011** | **TRIGGERMAN (SPND)** |
| **12/16/2010** | **1/3/2011** | **1/25/2011** | **SAW-FINAL CHAPTER (SPND)** |

| 12/16/2010 | 1/3/2011 | 1/25/2011 | SAW-FINAL CHAPTER R 2D SPND-BD |
|---|---|---|---|
| 12/28/2010 | 1/18/2011 | 2/1/2011 | H1N1-VIRUS X |
| 12/28/2010 | 1/18/2011 | 2/8/2011 | TP-FOR COLORED GIRLS |
| 12/28/2010 | 1/18/2011 | 2/8/2011 | TP-FOR COLORED GIRLS |

| Online Revenue Share Titles | | | |
|---|---|---|---|
| Order Date | Ship Date | Street Date | Title |
| 08/30/10 | 09/15/10 | 10/05/10 | FRED THE MOVIE |
| 08/30/10 | 09/16/10 | 10/05/10 | FRED THE MOVIE |
| 09/01/10 | 09/22/10 | 10/12/10 | MANSON-MY NAME IS EVIL |
| 09/01/10 | 09/22/10 | 10/12/10 | KUNG FU MASTER |
| 09/01/10 | 09/22/10 | 10/12/10 | MANSON-MY NAME IS EVIL |
| 09/01/10 | 09/22/10 | 10/12/10 | KUNG FU MASTER |
| 09/08/10 | 10/01/10 | 10/19/10 | AGORA (SPND) |
| 09/08/10 | 10/01/10 | 10/19/10 | HITMEN-CHARLIE VALENTINE |
| 09/08/10 | 10/01/10 | 10/19/10 | HITMEN-CHARLIE VALENTINE |
| 08/30/10 | 10/04/10 | 10/26/10 | WAY HOME, THE |
| 08/30/10 | 10/04/10 | 10/26/10 | WAY HOME, THE |
| 09/08/10 | 10/04/10 | 10/26/10 | WINTERS BONE (SPND) |
| 10/1/2010 | 10/13/10 | 11/09/10 | LOCKED DOWN BD |
| 10/1/2010 | 10/13/10 | 11/09/10 | LOCKED DOWN BD |
| 09/30/2010 | 10/13/10 | 11/09/10 | LOCKED DOWN |
| 10/1/2010 | 10/13/10 | 11/09/10 | LOCKED DOWN |
| 10/07/10 | 10/13/10 | 11/16/10 | GUNSLINGERS, THE-2009 |
| 10/25/10 | 10/13/10 | 11/16/10 | GUNSLINGERS, THE |
| 10/25/10 | 10/29/10 | 11/23/10 | EXPENDABLES, THE (SPND)-BD |
| 10/25/10 | 10/29/10 | 11/23/10 | WINNING SEASON, THE (SPND) |
| 10/25/10 | 10/29/10 | 11/23/10 | AMOR DOLOR Y VICEVERSA |
| 10/25/10 | 10/29/10 | 11/23/10 | TP-MBHF (PLAY) |
| 10/25/10 | 10/29/10 | 11/23/10 | EXPENDABLES, THE (SPND) |
| 11/19/10 | 11/22/10 | 12/14/10 | FRENEMY |
| 11/19/10 | 12/01/10 | 12/21/10 | HEAVY, THE (SPND) |
| 11/19/10 | 12/01/10 | 12/28/10 | LEGENDARY ASSASSIN |
| 12/09/10 | 12/18/10 | 01/04/11 | LAST EXORCISM, THE (SPND) |
| 12/09/10 | 12/18/10 | 01/04/11 | LAST EXORCISM, THE (SPND)-BD |
| 12/09/10 | 12/18/10 | 01/11/11 | ALPHA & OMEGA (SPND) |
| 12/09/10 | 12/19/10 | 01/11/11 | ALPHA & OMEGA (SPND)-BD |
| 12/09/10 | 12/19/10 | 01/18/11 | BURIED (SPND) |
| 12/09/10 | 12/19/10 | 01/18/11 | BURIED (SPND)-BD |
| 12/09/10 | 12/19/10 | 01/18/11 | TRIGGERMAN |
| 01/05/11 | 01/10/11 | 01/25/11 | SAW-FINAL CHAPTER-2010 |
| 01/05/11 | 01/10/11 | 01/25/11 | SAW-FINAL CHAPTER-D1-2010 (BD) |
| 01/05/11 | 01/10/11 | 01/25/11 | CRIMENES DE LUJURIA-SUB-2010 |

| | | | |
|---|---|---|---|
| 01/05/11 | 01/10/11 | 01/25/11 | SHAUN THE SHEEP-SPRING SHENANIGANS-2010 |
| 01/20/11 | 01/24/11 | 02/08/11 | FOR COLORED GIRLS-2010 |
| 01/20/11 | 01/24/11 | 02/08/11 | FOR COLORED GIRLS-D1-2010 (BD) |
| 01/20/11 | 01/24/11 | 02/22/11 | WEEDS-S6-D1-2010 |
| 01/20/11 | 01/24/11 | 02/22/11 | WEEDS-S6-D2-2010 |
| 01/20/11 | 01/24/11 | 02/22/11 | WEEDS-S6-D3-2010 |
| 01/20/11 | 01/24/11 | 02/22/11 | PSYCH 9-2009 |
| 01/20/11 | 01/24/11 | 02/22/11 | SWORD OF WAR-2009 |
| 01/20/11 | 01/24/11 | 02/22/11 | PSYCH 9-2009 (BD) |
| 01/20/11 | 01/24/11 | 02/22/11 | WEEDS-S6-2010 (BD) |
| 01/20/11 | 01/24/11 | 02/22/11 | NURSE JACKIE-S2-2010 (BD) |
| 01/20/11 | 01/24/11 | 02/22/11 | NURSE JACKIE-S2-2010 |

**The Sale Proceedings, and LGF's Objection to the Sale Transaction**

14.     LGF indicated its ownership interest in the Videograms and its objection to the sale in a pleading filed with the Court on March 7, 2011 (Dkt. No. 1089) ("LGF Joinder") (Exh. 3), entitled "Joinder of Lions Gate Films, Inc., In Objections Filed By Other Movie Studies In Opposition to Debtors' Motion For Approval of Bidding Procedures and for Related Relief," in which LGF joined with and thereby adopted certain other studios' objections to the then-proposed sale procedures and asset purchase documents.[3]  LGF's Joinder was specifically filed in response to the Debtors' motion for, among other things, "approval of a sale of substantially all of the Debtors' assets" (Dkt. No. 947) ("Sale Motion") (Exh. 4).  The movie studio objections adopted by LGF raised, among other things: the issue that the Debtors was attempting to sell, free and clear, DVDs and copies of leased film titles that the Debtors did not actually own and that were subject to continuing ownership interests of the studios.  See, e.g., Objection filed by Universal Studios Home Entertainment LLC ("Universal") (Dkt. No. 1024) (Exh. 5, at ¶ 4).  The LGF Joinder, moreover, specifically stated that:

---

[3]     LGF also filed a motion for adequate protection of its property interests on March 9, 2011 (Dkt. No. 1175). That motion, however, was stayed by the "administrative stay" imposed by the Bid Procedures Order.  Nevertheless, it is a further indication that LGF claimed ownership rights in the Videograms.

> LGF, as with the Other Studios, leased DVD motion picture titles (owned or licensed by LGF for distribution) to the Debtors pursuant to a court-sanctioned Accommodation Agreement between the Debtors and LGF and a related post-petition revenue sharing agreement. The Debtors, however, breached and failed to perform their obligations to LGF under the agreements. LGF terminated the agreements, but the Debtors still have not paid LGF all amounts due for the products delivered to the Debtors during the post-petition period pursuant to those agreements, and remain in custody or possession of the DVD products, *which remain the property of LGF under the terms of the agreements* [italics added].

Exh. 5, p.2.

15.    The Bankruptcy Court approved *procedures* and related relief, such as bidding procedures and stalking-horse bidder protections, in an order entered on March 17, 2011 ("Bid Procedures Order") (Dkt. No. 1223) (Exh. 6). That order expressly provides that "all objections filed *in response to the relief granted herein*, to the extent not resolved … are hereby overruled" (Exh. 6, ¶ 2 (italics added)). As is clear, however, the Bid Procedures Order did not approve or purport to approve, and could not have approved, the *sale* itself. Similarly, as noted above, the Bid Procedures Order specifically limited the resolution of any objections to those filed in response to the particular relief granted by the Bid Procedures Order. Thus, LGF's objection to the Sale Motion that sought, among other things, "approval of a sale of substantially all of the Debtors' assets," was not and could have been addressed or resolved.

16.    In connection with entry of the Bid Procedures Order, various studios that had filed objections to the sale (denominated in the then proposed asset purchase agreement ("APA") and Bid Procedures Order as the "Specified Studios")), *but not LGF,* entered into terms with the Debtors and the original proposed purchaser to resolve their objections to the sale process. Among other things, as reflected in the Bid Procedures Order, in return for economic concessions and treatment, the studios agreed to support the sale transaction, including transfer of videograms leased under their revenue sharing agreements, free and clear of interests.

17.     Despite having joined in and adopted other movie studios' objections, and having had its Joinder reflected on the agenda for the March 10 hearing (Dkt. No. 1159) (Exh. 7), LGF was not included in that arrangement or in any of the discussions that led to it.  Hence, although the Specified Studios resolved their issues, LGF's objection, in which it joined in and adopted the objections of the Specified Studios, was neither withdrawn nor resolved.  The Bid Procedures Order did not dispose of LGF's substantive objection to the sale, which remained pending and undetermined.

18.     On March 9, 2011, one day before the hearing to consider approval of the bid procedures, the Steering Group of Senior Subordinated Noteholders filed a brief in support of the Debtors' sale motion (Dkt. No. 1154).  The brief argued, among other things, that the Debtors' inventory of Universal's video products supplied under revenue sharing agreements should be unconditionally included in the sale, free and clear of interests, because the contracts embodied sales and not true leases.  But, as with the other Specified Studios, Universal agreed to support the sale, thereby obviating any need for the Court to consider the issue in the context of the sale proceedings or on Universal's own motion for adequate protection of its property interests.  The Steering Group's arguments, therefore, were never determined by the Court.  No pleading or paper filed by the Debtor, the Steering Group or any other party specifically addressed LGF or its Joinder.  There was no mention of LGF on the record of the bid procedures hearing held on March 10, 2011 (Dkt. No. 1203) (Exh. 8).

19.     The record of proceedings before the Bankruptcy Court concerning substantive approval of the sale transaction reflects no response by the Debtors to LGF's Joinder.  There was no mention of the LGF Joinder on the agenda filed with the Court for the sale approval hearing held on April 7, 2011 (Dkt. No. 1525) (Exh. 8), and there was no mention of the LGF on the

record of the hearing (Exh. 9). Nor was there any mention of the LGF Joinder in the agenda for the hearing held on April 14, 2011 (Dkt. No. 1584) (Exh. 10). The Sale Approval Order determined that any objections to entry of the order or the "relief granted therein and requested in the [Sale] Motion" that were not otherwise resolved or disposed of "hereby are denied and overruled on the merits, with prejudice" (Exh. 1, ¶ 2).

20. In retrospect, it appears possible that, in resolving matters with the Specified Studios, the Debtors overlooked the fact that LGF had joined in and adopted as their own the objections filed by the Specified Studios, and the Court and the Debtors may have thought that LGF's status was bound up with those studios. Therefore, Debtors never responded to LGF's joinder. Because LGF never received any response to its objection, there was no reason for it to anticipate an argument on an objection with no response.

21. Given the likelihood that LGF's objection was overlooked by the Debtors, it appears that the Court also overlooked this pending objection in its consideration and issuance of the Sale Approval Order.

22. In addition to the fact that LGF had no reason to anticipate any argument on its objection, neither the Bid Procedures Order nor the form of notice of the sale approved by the Court (Exh. 11) required an appearance by an objecting party at the sale hearing or provided that failure to appear would constitute waiver of an objection to the sale transaction.

23. Thus, it appears that the Sale Approval Order was entered by this Court without the pending objection of LGF having been addressed or resolved.

**The APA's Recognition of Revenue-Sharing Rights**

24. By its terms, the APA expressly contemplated that the purchaser would acquire only the right title or interest of the Debtors, as Sellers, in the assets to be conveyed. See APA,

included in Exh. 6, at p. 1, Fifth Recital ("Sellers shall sell to Purchaser ... all of Sellers' right, title and interest in and to the Purchased Assets"); APA, § 2.1 ("Sellers shall convey … all of Sellers' right, title and interest in, to and under any and all of the assets"). The Debtors could only sell, and the Purchasers could only purchase, the assets in which the Debtors held title or an interest, and then only to the extent of the Debtor's right and interest therein. Thus, in the case of Videograms furnished under the RSAs where the lease period had not expired, the Debtors' property interest as of the date of the purported transfer of their right, title and interest to a purchaser under Section 363 of the Bankruptcy Code could only be their interest as a lessee of the relevant Videograms, subject to the subsequent vesting of title upon expiration of the leasehold period.

25.     Moreover, the APA itself recognized the existence of outstanding revenue sharing agreements between the Debtors and certain film studios, including the Specified Studios *and LGF*, which gave rise to issues regarding ownership and other obligations relating to inventory held by the Debtors that was to be conveyed to the purchaser. See Definitions of "Revenue Sharing Agreements" and "Revenue Sharing Adjustment Amount" in the APA:

> "Revenue Sharing Agreements" means, collectively, the "revenue sharing" agreements between Sellers and certain studios, including, but not limited to each of the Specified Studios and Lions Gate Films Inc., pursuant to which such studios supply Sellers with movie titles for a price that includes a certain percentage of the revenue Sellers generate from the *rental* and/or sale of such titles. [APA, included in Exh. 6, at p. 11 (emphasis and italics added).]

> "Revenue Share Adjustment Amount" means, in the event that any of the Purchased Assets that are acquired by Purchaser remain subject to any liabilities or obligations under the Revenue Sharing Agreements, an amount equal to the aggregate estimated amount of all liabilities and obligations under the Revenue Sharing Agreements to which the Purchased Assets will be subject and which Purchaser will be required to satisfy following the Closing, with such amount to be determined by the good faith estimate of

Sellers which estimate shall include a reasonably detailed breakdown of such liabilities or obligations by category, and which shall be delivered in writing to Purchaser not less than two (2) Business Days prior to the Closing Date. <u>In the event that Sellers' counterparties under the Revenue Sharing Agreements have asserted ownership rights to, or other restrictions on, sales of any portion of the inventory and merchandise located at the Stores and Distribution Centers subject to such Revenue Sharing Agreements at Closing (the "Rev Share Units"), Sellers shall give prompt written notice to Purchaser with respect to any such assertions of ownership or other restrictions with respect to any Rev Share Units.</u> Not later than five (5) Business Days prior to the Closing, Sellers and Purchaser shall mutually agree as to whether, in the event that any Rev Share Units cannot be acquired by the Purchaser free and clear of the liabilities and obligations under the Revenue Sharing Agreements, all or any portion of such Rev Share Units shall be (i) retained by Sellers and treated as Excluded Assets or (ii) transferred to Purchaser as Purchased Assets with the corresponding adjustment to the Purchase Price for the Revenue Share Adjustment Amount; <u>provided</u>, <u>however</u>, in the event that Sellers and Purchaser cannot reach agreement on the treatment of the Rev Share Units, the Rev Share Units shall be retained by Sellers and treated as Excluded Assets. For the avoidance of doubt, if any Rev Share Units are retained by Sellers and treated as Excluded Assets, then, with respect to such Rev Share Units, (i) no adjustment to the Cash Purchase Price shall be made pursuant to <u>Section 3.3(b)(vi)</u>, and (ii) in lieu of such adjustment to the Cash Purchase Price, such Rev Share Units shall be disregarded and shall not be taken into account in computing the Estimated Inventory Amount, the Closing Inventory Amount or the Final Inventory Amount for purposes of <u>Sections 3.3</u> and <u>3.4</u>. Notwithstanding the foregoing, Sellers shall not be required to give any notice with respect to, and Purchaser may not treat as Excluded Assets under this provision, any Rev Share Units of any Specified Studio that are being delivered free and clear of all liabilities and obligations under the Revenue Sharing Agreements pursuant to the Sale Order. [APA, included in Exh. 6, at pp. 10-11 (emphasis added).][4]

26.     These provisions, on their face, are self-executing under the APA and do not involve the

Court or the sale approval process:  They identify the revenue sharing agreements, including those with

LGF.  They identify the counterparties to those agreements.  They recognize that the Debtors do not hold

absolute title in all instances to DVDs or digital media subject to those agreements.  They recognize that

---

[4]     The version of the purchase agreement filed with the Sale Motion contained similar provisions.  The language changed the original provisions to incorporate changes apparently negotiated by the Specified Studios connection with entry of the Bid Procedures Order.  The provision for the Revenue Share Adjustment Amount quoted above was further modified pursuant to the Supplemental Order to delete internal clause (i) and renumber the subsequent clauses.

if a counterparty asserts rights in any inventory or merchandise at the Debtors' stores or distribution centers, certain economic adjustments are required. Thus, although the Specified Studios agreed in their compromise with the Debtors and the original proposed purchaser to allow their videograms to be sold free and clear of their interests (an aspect of their economic deal with the sale parties), the APA clearly contemplated the treatment of LGF's Videograms.

27.     After entry of the Sale Approval Order and prior to the closing, LGF's business representatives communicated with DISH concerning terms for future business dealings between the parties. In the course of those discussions DISH indicated, for the first time, that it had no liability for post-closing revenue sharing obligations for Videograms still within unexpired leasehold periods, to which LGF responded that it still have an ownership interest in the inventory of Videograms subject to the revenue-sharing leases and was entitled to payment from DISH. Those discussions precipitated LGF's limited objection to the Debtor's emergency motion for entry of the Supplemental Order (Dkt. No. 1710) (Exh. 12).

28.     At a hearing on April 26, 2011, the Court denied LGF's objection to entry of the Supplemental Order to approve a restated APA. The Court commented on the record of the hearing that there was little time remaining on the revenue sharing periods for any of the affected LGF revenue sharing films, and adopted the Debtors argument that LGF had waived its objections to the APA and, therefore, lacked standing to object to approval of the restated APA.

## ARGUMENT

### The Court Should Reconsider the Orders

29.     The Court operated under a mistaken view of the facts and record that resulted in its having overlooked facts or law that might reasonably lead to a change in the Court's conclusion.  The existence of LGF's ownership interest in the Videograms, its objection and the associated lack of consent to the sale without protection of its interest, could lead to the conclusion that the Videograms were not freely transferable to a purchaser without respecting the revenue sharing obligations tied to those products.  LGF, therefore, is entitled to reconsideration of the Orders pursuant to Rule 9023 and a determination of its rights under the RSA with respect to the sale of assets to DISH.

### A.     The Standard for Reconsideration

30.     Bankruptcy Rule 9023 incorporates Rule 59(e) of the Federal Rules of Civil Procedure.  Under the rule, reconsideration may be based, among other things, on the need to correct clear error, prevent manifest injustice or review the court's decision in light of the availability of new evidence.  E.g., *In re Old Carco LLC,* 2010 Bankr. LEXIS 389, at *3-4 (Bankr. S.D.N.Y.  Jan. 11, 2010); *Martin v. Enron Corp. (In re Enron Creditors Recovery Corp.)*, 378 B.R. 54, 65-57 (Bankr. S.D.N.Y. 2007).  Reconsideration is properly granted where the court overlooked matters or controlling law which, if timely considered, might reasonably have impacted its decision, or where the record establishes that the judgment rests on a manifest error of law or fact.  E.g., *Anwar v. Fairfield Greenwich Ltd*, 2010 745 F. Supp. 2d 379, 382 (S.D.N.Y. 2010); *Bowers v. Andrew Weir Shipping, Ltd*., 817 F. Supp. 4, 5 (S.D.N.Y. 1993); *Mason v. Hann*, 2011 U.S. Dist. LEXIS 22051, at *3-4 (S.D.N.Y.  Feb. 28, 2011) (citing *Parrish*

*v. Sollecito*, 253 F. Supp. 2d 713, 715 (S.D.N.Y. 2003)).  As explained below, reconsideration should be granted here.

B.    **The Orders Should Be Reconsidered to Address Matters Overlooked
       By the Court, to Correct Clear Error and to Prevent Manifest Injustice**

31.    LGF is entitled to relief because the Orders presume to authorize a transfer of the Videograms free and clear of LGF's rights, where it had filed an objection to the sale transaction and thereby clearly indicated that it did not consent to the relief, but that objection was never considered by the Court or by the Debtors.  The record demonstrates that the Court and the Debtors overlooked the LGF Joinder in connection with approval of the Debtors' sale transaction at the sale hearing.  Thus, there is no basis to conclude either that LGF's objection based on ownership of Videograms was overruled or waived with respect to the Sale Approval Order, or that LF lacked standing to object to entry of the Supplemental Order.

32.    The Orders rest on a plain oversight by the Court and the Debtors resulting from the mistaken impression or conclusion that LGF did not object to the sale.  Unless the Orders are reconsidered to address LGF's continued revenue sharing rights in the Videograms as specifically contemplated by the APA, the Orders result in clear injustice to LGF if they are construed to permit the transfer of the Videograms to DISH on a wholly free and clear basis.

33.    The Court also overlooked the application and plain meaning of the previously-quoted APA's revenue-sharing provisions. LGF is specifically referenced by the APA as a party to a covered Revenue Sharing Agreement.  By its filed Joinder, LGF, in fact registered its position in a manner that, in the words of the APA, "asserted ownership rights to, or other restrictions on, sales of any portion of the inventory and merchandise located at the Stores and

17

Distribution Centers subject to such Revenue Sharing Agreements" (see Paragraph 25 above).[5] This triggered the Revenue Sharing Adjustment, and the associated requirement for adjustment of the purchase price between the APA parties, and the obligations for payment by DISH to LGF of post-closing revenue share liabilities for the Videograms it acquired.

34.     The overlooked matters could have impacted the Court's entry of the Orders, such that if LGF had an ownership interest that supported revenue sharing for Videograms still under lease, provision would have to be made to accommodate that interest consistent with the APA's express provisions for the treatment of Revenue Sharing Agreements.  The Orders, therefore, should be reconsidered in light of LGF's interests in the Videograms and the plain language of the final APA approved by the Court, and the parties' rights and entitlements should be determined accordingly.

35.     Moreover, the Orders do not comport with the fact that the Debtors could not escape the rights and ownership interests created by the RSAs, which limited the Debtors to leasehold interests in Videograms pending expiration of the their revenue sharing periods.  The Prepetition RSA expired during the pendency of bankruptcy case, and therefore was not subject to assumption or rejection under Section 365 of the Bankruptcy Code at the time of the sale.  The Post-Petition RSA resulted from post-petition administrative acts of the Debtors and thus was similarly binding.

36.     Although Section 363(b) of the Bankruptcy Code allows a trustee to sell estate property out the ordinary course of business after notice and a hearing, 11 U.S.C. § 363(b)(1), it is implicit in the statute that the estate must actually have an interest in the property to be sold. *Gorka v. Joseph (In re Atlantic Gulf Communities Corp.)*, 326 B.R. 294, 298-99 (Bankr. D. Del.

---

[5]     As noted above, LGF also filed a motion for adequate protection and related relief respecting its Videograms.  That motion, too, evidenced LGF's assertion of ownership rights in the Videograms.

2005) (citing *Cinicola v. Scharffenberger*, 248 F.3d 110, 121 (3d Cir. 2001) (before a trustee could sell estate property under section 363(b)(1), the estate was required to have an interest in that property); *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002) (intellectual property license is not extinguished by sale of the underlying property); *Anderson v. Conine (In re Robertson)*, 203 F.3d 855, 863 (5th Cir. 2000) (trustee could not sell property owned by debtor's former spouse in which debtor had no interest). Cf. *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294 (11th Cir. 2007) (rejection of an executory recording contract by performer did not constitute termination of the agreement, and would not eliminate the recording company's ownership interest in the copyrighted works).

37.     At most, during the lease period for a Videogram, the Debtors held non-exclusive permission to rent Videograms of the copyrighted LGF Films during that time, in return for contractual payments to LGF until expiration of the lease period when other rights would arise. As such, for the Debtors to sell the Videograms free and clear to DISH, they were required to obtain LGF's consent as a matter of applicable non-bankruptcy law. See *In re Patient Educ. Media*, *Inc.,* 210 B.R. 237, 242-43 (Bankr. S.D.N.Y. 1997) (debtor's proposed assignment of non-exclusive copyright interest under Section 365(a) of the Bankruptcy Code could not be accomplished without consent of the copyright holder as a matter of copyright law); compare *Fain v. Irving Trust Co (In re Waterson, Berlin & Snyder Co.)*, 48 F.2d 704, 710 (2d Cir. 1931) (where copyrights had been absolutely assigned to debtor, the bankruptcy estate held the title and the composers of the copyrighted works could not prevent a sale of the copyrights). No such consent was ever given by LGF.

38.     Any notion that LGF implicitly waived its objection to the sale also overlooked clear law requiring *actual* consent to the sale of property. In *In re DeCelis*, 349 B.R. 465 (Bankr.

E.D. Va. 2006), the bankruptcy court reasoned that the failure of a party holding an interest in property to object to a sale did not constitute the party's "consent" to the transaction within the meaning of Section 363(f)(2):

> When a person consents to a particular action, that person has unequivocally manifested his or her affirmation of the proposed action through some discernable statement or act. In contrast, when a person fails to object to a proposed action, that person's affirmation can only be deduced from the lack of any statement or act which would suggest a contrary position. Obviously, such deductive reasoning always leaves open the possibility that the person's failure to object is attributable to some reason totally unrelated to that person's actual consent to the proposed act.
>
> *   *   *
>
> Had Congress substituted "does not object" for "consent" in Section 363(f)(2), there would be no question that the lienholder had the obligation to act if it did not want the property to be sold free and clear of its lien. However, the concept of consent (i.e., to give assent) imposes no such duty upon the lienholder and secure the lienholder's assent if the trustee wishes to sell the property free and clear of the lien.

Id. at 467-68. See also *In re W.R.M.J. Johnson Fruit Farm, Inc.*, 107 B.R. 18, 19 (Bankr. W.D.N.Y. 1980 (party's non-filing of objection to proposed sale of assets free and clear under chapter 11 plan did not constitute consent).

      39.    In this case, the only basis enunciated by the Court (and argued by the Debtor's counsel) for the ruling made at the April 26 hearing was that LGF waived any right to object to the sale because it neither filed an objection nor appeared at the sale hearing. No other ground was given by the Court or urged by Debtor's counsel. But there is no doubt that LGF did not give affirmative assent to the sale of the Videograms, and there is no doubt that the APA recognizes LGF's revenue-sharing rights. If anything, there was an objection of record – LGF's filed Joinder – which indicated its opposition to the sale of its property. See *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002) ("the Bankruptcy Code limits the conditions

under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent"); compare *Precision Indus., Inc. v. Circo Leasing Co. (In re Qualitech Steel Corp.)*, 327 F.3d 537 (7th Cir. 2003) (real property leased by debtor to lessee was sold to third party free and clear of lease where lessee never indicated any objection to the sale).

## **CONCLUSION**

40.     For the foregoing reasons, LGF respectfully requests that the Court grant reconsideration of the Orders and, upon reconsideration, determine LGF's rights with respect to the Videograms for which title had not passed to the Debtors as of the closing of the sale of assets to DISH.

Dated: New York, New York
      April 28, 2011

                       PRYOR CASHMAN LLP

                       By:    */s/ Richard Levy, Jr.*
                           Richard Levy, Jr.
                           Robert M. Fleischer
                       7 Times Square
                       New York, New York 10036-6569
                       (212) 421-4100

                       *Attorneys for Lions Gate Films, Inc.*